**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**
Timothy S. DeJong, OSB No. 940662
tdejong@stollberne.com
Keith A. Ketterling, OSB No. 913368
kketterling@stollberne.com
Cody Berne, OSB No. 142797
cberne@stollberne.com
209 Southwest Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

*Liaison Counsel for Lead Plaintiffs and the Proposed Class*

*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | |
|---|---|
| IN RE NIKE, INC. SECURITIES LITIGATION | Case No. 3:24-cv-00974-AN<br><br>Judge: Hon. Adrienne Nelson<br><br>DEMAND FOR JURY TRIAL |

**SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 2

A. Overview of NIKE's Business ..... 2

B. The CDA Strategy ..... 3

C. Defendants Misled Investors Regarding Key Failures of the CDA Strategy ..... 5

D. The Truth of the CDA's Failure Begins to Emerge ..... 14

II. JURISDICTION AND VENUE ..... 18

III. THE PARTIES AND WITNESSES ..... 19

A. Lead Plaintiffs ..... 19

B. Defendants ..... 20

C. Relevant Third Parties ..... 22

IV. SUBSTANTIVE ALLEGATIONS OF FRAUD ..... 30

A. Relevant Factual Background ..... 30

1. History of NIKE's Operations and Mix of Wholesale and DTC Channels ..... 30

2. NIKE Introduces the Consumer Direct Offense Strategy ..... 33

3. NIKE's CDA Strategy, Led by New CEO John Donahoe, Accelerates NIKE's DTC Pivot and Promised Long-Term Sustainable Growth ..... 34

4. Key Factors for the CDA Strategy's Success ..... 41

a. The CDA Strategy Depended on Developing an Effective DTC Supply Chain ..... 42

b. The CDA Strategy Depended on NIKE Building Out Its Technological Capabilities and Organization ..... 46

c. The CDA Strategy Depended on NIKE Establishing a Streamlined Organizational Structure ..... 50

d. The CDA Strategy Depended on NIKE Maintaining a Robust Innovative Product Pipeline ..... 53

e. The CDA Strategy Also Depended on NIKE Maintaining Its Brand Strength and Competitive Separation ............................57

f. The CDA Strategy Depended on NIKE Effectively Responding to Consumer Demand for Multi-Brand vs. Mono-Brand Shopping ............................60

B. Defendants Misled the Market Concerning the Continued Success of the CDA Strategy ............................65

1. The Undisclosed Truth About the CDA Strategy ............................65

a. NIKE Failed to Develop an Effective DTC Supply Chain ............................66

b. NIKE Did Not Successfully Build Out Its Technological Capabilities or Organization ............................74

c. NIKE's Corporate Restructuring Under CDA Was a Disaster ............................101

d. NIKE Cut Off Its Pipeline of Innovative Products and Instead Relied on Flooding the Market with Legacy Franchises to Temporarily Boost Sales ............................107

e. NIKE's Brand Equity and Competitive Standing Depleted During the Class Period as the CDA Strategy Floundered ............................118

f. Defendants Concealed NIKE's Reliance on Multi-Brand Partners and the Failure of NIKE's Mono-Brand Stores ............................123

g. Defendants Concealed That NIKE's Initial DTC Growth Was an Unsustainable Mirage ............................133

2. Defendants Repeatedly Claim to Investors That the CDA Strategy Is Succeeding and Achieving Key Objectives ............................144

3. The Truth About the Failure of the CDA Strategy Gradually Comes to Light, While Defendants Continue to Mislead Investors ............................148

4. Defendant Donahoe Suspiciously Departs, and His Replacement Elliot Hill Admits CDA Failures ............................157

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................158

A. March 18, 2021 — FY 2021 Q3 Earnings Announcement ............................165

B. April 26, 2021 — UC Berkeley Speech ............................167

C. June 24, 2021 — FY 2021 Q4 Earnings Announcement....168
D. July 20, 2021 — Form 10-K....169
E. September 23, 2021 — FY 2021 Q1 Earnings Announcement....171
F. October 5, 2021 — Form 10-Q....173
G. October 6, 2021 — Annual General Meeting....174
H. November 18, 2021 — Press Release....178
I. December 20, 2021 — FY 2022 Q2 Earnings Announcement....178
J. January 6, 2022 — Form 10-Q....180
K. March 21, 2022 — FY 2022 Q3 Earnings Announcement....181
L. March 30, 2022 — Adobe Facebook Video....182
M. April 5, 2022 — Form 10-Q....183
N. May 16, 2022 — *Women's Wear Daily* Articles....183
O. June 27, 2022 — FY 2022 Q4 Earnings Announcement....184
P. July 21, 2022 — Form 10-K....188
Q. September 9, 2022 — Annual General Meeting....190
R. September 29, 2022 — FY 2023 Q1 Earnings Announcement....192
S. October 6, 2022 Form 10-Q....195
T. December 20, 2022 — FY 2023 Q2 Earnings Announcement....196
U. January 5, 2023 Form 10-Q....197
V. March 21, 2023 — FY 2023 Q3 Earnings Announcement....198
W. May 24, 2023 Press Release....199
X. April 6, 2023 Form 10-Q....200
Y. June 29, 2023 — FY 2023 Q4 Earnings Announcement....201
Z. July 20, 2023 — Form 10-K....204
AA. September 12, 2023 — Annual General Meeting....205

BB. September 28, 2023 — FY 2024 Q1 Earnings Announcement ........ 207

CC. December 21, 2023 — FY 2024 Q2 Earnings Announcement and First Partial Disclosure of the Truth / Materialization of the Risk ........ 207

DD. March 21, 2024 — FY 2024 Q3 Earnings Announcement and Second Partial Disclosure of the Truth / Materialization of the Risk ........ 208

EE. July 25, 2024 — Form 10-K ........ 208

VI. LOSS CAUSATION ........ 210

A. December 21, 2023 — First Partial Disclosure of the Truth / Materialization of the Risk ........ 213

B. March 21, 2024 — Second Partial Disclosure of the Truth / Materialization of the Risk ........ 217

C. June 27, 2024 — Third Partial Disclosure of the Truth / Materialization of the Risk ........ 223

D. October 1, 2024 —Final Partial Disclosure of the Truth / Materialization of the Risk ........ 229

VII. ADDITIONAL SCIENTER ALLEGATIONS ........ 234

A. NIKE Executives, Including Individual Defendants, Attended Meetings and Received Critical Information Detailing the CDA Strategy's Deficiencies ........ 234

1. Meetings and Reports Regarding NIKE's Deficient DTC Supply Chain ........ 234

2. Meetings and Reports Regarding NIKE's Technology and Technology-Organizational Failures ........ 235

3. Additional Meetings and Reports/Data Regarding CDA Strategy Failures ........ 240

B. The CDA Strategy's Success Was Core to NIKE's Business ........ 247

C. Defendants Closely Monitored the CDA Strategy, Including the Key Metrics Critical to Its Success ........ 250

D. NIKE Engaged in Large Strategic Shifts That Necessitated Defendants' Knowledge of the CDA Strategy's Failure ........ 254

E. Knowledge of the CDA Strategy's Failures Was Widespread Within NIKE ....255

F. Defendants' Own Misstatements Support Scienter ....260

G. The Suspicious Departures of Defendants Donahoe and Campion and Global Chief Digital Information Officer Lavu Support Scienter ....263

H. End of Class Period/Post-Class Period Admissions Support Scienter....266

I. NIKE's Use of Its Stock Price as a Key Metric in Executive Compensation Supports Defendants' Motive and Thus Contributes to a Strong Inference of Scienter ....269

J. NIKE's Use of Adjusted Digital Revenue as an Executive Compensation Metric Supports Defendants' Motive and Thus Contributes to a Strong Inference of Scienter ....270

K. Defendants Donahoe, Friend, and Parker Enriched Themselves Through Suspicious Insider Sales During the Class Period ....272

L. NIKE Possessed Corporate Scienter ....275

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ....276

IX. NO SAFE HARBOR ....277

X. CLASS ACTION ALLEGATIONS ....278

COUNT I For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) Promulgated Thereunder Against All Defendants ....280

COUNT II For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants as Control Persons of NIKE ....282

PRAYER FOR RELIEF ....283

JURY DEMAND ....283

Court-appointed Lead Plaintiffs Caisse de dépôt et placement du Québec ("CDPQ") and Deka Investment GmbH ("DEKA," and collectively with CDPQ, "Lead Plaintiffs"), bring this federal securities class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 75a et seq., the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), on behalf of themselves and a class consisting of all persons and entities that purchased NIKE Class B Common Stock ("NIKE Stock") from March 19, 2021 through October 1, 2024, inclusive (the "Class Period"). *See* ¶¶797-98 (operative Class definition). This Action is brought against Defendants NIKE, Inc. ("NIKE" or the "Company"), John J. Donahoe II ("Defendant Donahoe"), Matthew Friend ("Defendant Friend"), Heidi L. O'Neill ("Defendant O'Neill"), Andrew Campion ("Defendant Campion"), and Mark G. Parker ("Defendant Parker") (Defendants Donahoe, Friend, O'Neill, Campion, and Parker are collectively the "Individual Defendants").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, upon information and belief as to all other matters, and based upon the investigation of counsel, which included review of: (i) NIKE's public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) public statements by the Individual Defendants and NIKE and its executives, including in press releases, earnings or other analyst conference call transcripts, and news and social media; (iii) interviews with former employees of NIKE; (iv) documents provided by a former NIKE employee; and (v) reports of securities analysts, news articles, and other publicly available sources. Lead Plaintiffs believe that additional evidentiary support will arise for the allegations set forth herein after an opportunity for discovery.

# I. INTRODUCTION

1. Throughout the Class Period, Defendants repeatedly touted to investors the purported continued success of NIKE's key corporate strategy called "Consumer Direct Acceleration" ("CDA"), which emphasized a digitally enabled direct-to-consumer ("DTC") business model. The CDA strategy, according to Defendants, had the purpose and effect of propelling long-term sustainable financial growth for the benefit of NIKE and its shareholders. During the Class Period, Defendants repeatedly, falsely assured investors that the CDA strategy was achieving its key objectives—including, for example, that NIKE had developed the technological capabilities and supply chain infrastructure necessary to effectively execute such DTC operations—and thus was succeeding in driving the promised sustainable growth. Unbeknownst to investors, however, the CDA strategy suffered from multiple, severe problems in key underlying areas—including NIKE's failure to build out the critical DTC technological and supply chain capabilities—and thus was a ticking timebomb. When Defendants' fraud was finally revealed over a series of partial disclosures of the truth, showing the extent of NIKE's CDA strategy failures and their disastrous impact on the Company's financial performance, investors lost billions.

## A. Overview of NIKE's Business

2. NIKE sells products through both wholesale and DTC channels. Most of NIKE's wholesale channel sales are to retailers that sell NIKE products along with products from other brands (*i.e.*, "multi-brand" retailers). For example, under this model, a multi-brand retailer like Foot Locker will purchase sneakers on a wholesale basis from NIKE, and Foot Locker will then sell those NIKE sneakers side-by-side with sneakers from other brands to customers. NIKE's DTC channels, on the other hand, allow NIKE to sell its products directly to consumers without such a

middleman. Instead, under the DTC model, a consumer can walk into a NIKE store or log onto NIKE's website or mobile applications ("apps") and buy NIKE's sneakers or other products without the need to go through a third-party retailer, like Foot Locker.

3. Sales made through NIKE's wholesale and DTC channels were NIKE's lifeblood, as revenues from those two channels constituted approximately 95% of NIKE's total revenue throughout the Class Period.

4. Historically, NIKE has sold a significant majority of its merchandise through its wholesale partners. However, over the past decade, NIKE made a concerted effort to increase the portion of its revenue derived from DTC channels as opposed to wholesale channels. As part of this effort, in 2017, NIKE announced its "Consumer Direct Offense" ("CDO") strategy, which sought to "drive growth" by increasing investments in the Company's DTC channels, while similarly increasing the pace of NIKE's innovative product pipeline. In 2020, NIKE's strategic pivot reached a key inflection point with the appointment of Defendant Donahoe as NIKE's Chief Executive Officer ("CEO") and the announcement of the "next phase" of NIKE's DTC-focused strategy—which NIKE called CDA.

### B. The CDA Strategy

5. NIKE announced its CDA strategy on June 25, 2020. CDA incorporated the tenets of CDO, including its commitment to increasing NIKE's innovative product pipeline while investing in and building out the Company's DTC channels. But the CDA strategy went further—by accelerating NIKE's investments in its DTC channels, with a particular focus on its digital operations (*i.e.*, Nike's website and mobile apps). Specifically, the CDA strategy envisioned "three areas of strategic acceleration," which included: (1) increasing NIKE's focus on digitally-led DTC operations; (2) increasing NIKE's technological capabilities to enable those DTC operations; and

(3) engaging in a massive corporate restructuring to streamline and reorganize the Company's business around what it called "consumer constructs," meaning demographic categories—specifically, "Men's," "Women's," and "Kids'." This represented a shift from NIKE's prior approach of orienting its business around sport-based categories (*e.g.*, running and basketball, among other sports).

6. According to Defendants, the purpose and effect of the CDA strategy was to propel long-term sustainable growth for NIKE. Notably, when announcing the CDA strategy in 2020, NIKE described it as the Company's "new digitally empowered phase of NIKE's strategy to unlock long-term growth and profitability." Defendants repeated this sentiment throughout the Class Period. For example, in a June 24, 2021 press release, Defendants touted that NIKE's "digital leadership," enabled by the CDA strategy, had "set the foundation for NIKE's long-term growth."

7. The ability of the CDA strategy to drive this vaunted long-term growth depended on NIKE building out or maintaining certain key aspects of its business. These key areas were: (i) developing an effective DTC supply chain; (ii) enhancing NIKE's DTC technological capabilities and establishing a technology organization to support those capabilities; (iii) engaging in a corporate reorganization, including the creation of new consumer constructs; (iv) maintaining a robust pipeline of innovative products while effectively managing the supply of NIKE's key products; (v) maintaining NIKE's brand strength and leading competitive position; and (vi) effectively adapting to consumer demand patterns regarding shopping at mono-brand and multi-brand retail stores. The success of the CDA strategy hinged on the successful execution of each of these components; thus, the failure of even a single component jeopardized the success of the CDA strategy as a whole.

### C. Defendants Misled Investors Regarding Key Failures of the CDA Strategy

8. Throughout the Class Period, Defendants repeatedly conveyed that NIKE had successfully built out or maintained each key component of the CDA strategy and, as a result, that the CDA strategy was succeeding at propelling long-term, sustainable growth. For example, during the Class Period, Defendants repeatedly assured investors that the CDA strategy "***is working***," including by specifically touting the purportedly successful execution of its underlying key components, like the DTC supply chain and technological capabilities buildout.[1]

9. Investors took Defendants at their word, as evidenced by Class Period reports from securities analysts who followed NIKE and served as a proxy for investors. For example, a June 25, 2021 report by analysts at UBS[2] assigned NIKE Stock a positive "Buy" rating and hailed NIKE's DTC focus under the CDA strategy as a key growth driver for the Company: "***[t]he financial benefits from Nike's transformation into a digitally-led, direct-to-consumer company are just starting to play out.*** We believe the reason to own Nike is for the ***exceptional growth it is likely to achieve over the coming years***."

10. Unbeknownst to investors, however, each key component of the CDA strategy was plagued by persistent, severe problems throughout the Class Period, thus imperiling the success of the CDA strategy. The existence of such problems is evidenced by, *inter alia*, the accounts of 19 former NIKE employees serving as confidential witnesses ("CWs"), Defendants' own public admissions at the end of the Class Period as the truth regarding the CDA strategy's failures gradually emerged, and numerous news reports (by reputable media outlets, like *The Wall Street Journal*, based on their independent investigations) published at the end of the Class Period.

[1] All emphasis is added unless otherwise noted.

[2] "UBS" refers herein to "UBS Global Research and Evidence Lab" and/or "UBS Research."

11. ***First***, the CDA strategy's success hinged on NIKE developing an effective DTC supply chain because, without one, NIKE could not successfully distribute its merchandise to meet consumer demand. During the Class Period, Defendants repeatedly told investors that they had accomplished this goal. For example, Defendants claimed that NIKE had been able to "fairly impressively ***pivot to a more direct-to-consumer supply chain***," and had been "creating ***a digital-first supply chain*** in the marketplace." But none of this was true.

12. Multiple CWs recount that, during the Class Period, NIKE failed to develop an effective DTC supply chain, which impeded the success of the CDA strategy. Most notably, CW-1 (a former Vice President ("VP"), Global Store Development from approximately August 2022 through May 2024) stated ***NIKE did not have sufficient capabilities to manage its supply chain as it pivoted more toward emphasizing DTC at the expense of wholesale***. CW-1 confirmed that the supply chain management issue was a problem for all of NIKE's DTC operations: NIKE's brick-and-mortar stores, website, and apps. Based on this and other CW accounts (as well as additional corroboratory sources, including Defendants' own later admissions), this remained the case throughout the Class Period, and multiple Individual Defendants and the Board of Directors were repeatedly notified of this problem.

13. ***Second***, the CDA strategy required that NIKE build out and unify its DTC technological infrastructure, capabilities, and organization. During the Class Period, Defendants repeatedly claimed to investors that they had done so. For instance, during NIKE's Annual General Meeting on October 6, 2021, Defendant Friend falsely assured investors that the "***investments we've made against our end-to-end digital transformation are making us more agile, and we're building the capabilities that are required for NIKE to operate a digitally led omni-channel, direct-to-consumer business at scale***." Similarly, in a March 30, 2022 video posted publicly on

Facebook by Adobe Experience Cloud, Defendant Donahoe falsely touted NIKE's DTC technological capabilities (consumer personalization on the Company's digital platforms) that Adobe, Inc. ("Adobe")—a provider of digital marketing software—purportedly helped build as part of its partnership with NIKE: "***The Adobe platform has played such an important role of delivering a more personalized experience for our consumers***."

14. Throughout the entire Class Period, however, NIKE failed to successfully build out the DTC technological capabilities and organization that the Company needed for the CDA strategy to succeed. Indeed, accounts from multiple CWs employed in NIKE's Digital Product, Technology, and other relevant groups during the Class Period—including a Digital Product VP who regularly interacted directly with Defendant Donahoe and other Individual Defendants regarding these technology issues—tell a damning story. In particular, NIKE's DTC technology was antiquated throughout the Class Period and could not reliably perform critical functions like effectively personalize marketing to consumers on the NIKE website and its various mobile apps. NIKE partnered with Adobe in 2021, in an expensive $400-plus million deal that Defendant Donahoe personally approved, to build out these technological capabilities, which were intended to generate $1.5 billion or more in revenue. But, internally, the Adobe partnership was widely recognized as a failure from the start, as Adobe failed to deliver these capabilities during the Class Period, making limited progress during the next three years and ultimately generating zero revenue for NIKE.

15. These problems were compounded by NIKE's former Chief Digital Information Officer, Ratnakar Lavu, who, according to multiple CWs, set up a "shadow organization" within NIKE that created, *inter alia*, duplication of efforts and dysfunction within NIKE's organization that also impeded the Company's ability to develop the crucial DTC technology and thus further

jeopardized the success of the CDA strategy. Per multiple CWs and publicly filed pleadings, Lavu purportedly engaged in corruption, including kickbacks to external vendors and other misconduct that prompted an SEC investigation, and, in February 2023, departed NIKE under suspicious circumstances. Indeed, CW-1 explained that the only reason Lavu wasn't walked out of the building in handcuffs – even though he should have been – was to avoid embarrassment for the Company, especially for Donahoe. Critically, CW allegations support that the ***Individual Defendants***, particularly Defendant Donahoe, were not only apprised of these problems beginning no later than ***early 2022***, but also instituted ***scores of multiple regular and ad-hoc meetings to discuss these technology issues***. Notwithstanding their direct knowledge of these problems, Defendants continued to mislead investors about NIKE's purportedly strong DTC technological capabilities throughout the Class Period.

16. ***Third***, the CDA strategy required NIKE to execute a substantial corporate reorganization, including by pivoting away from categorizing NIKE's product lines based on sports (*e.g.*, running, basketball, tennis, etc.) to consumer constructs based on gender and age (*e.g.*, "Men's," "Women's," and "Kids'"). During the Class Period, Defendants repeatedly told investors that NIKE successfully executed this corporate reorganization. For example, in October 2021, Defendants claimed that "***[w]ith the CDA, we successfully realigned our organization***." Despite these assurances, however, Defendants later admitted, at the end of the Class Period, the failure of this restructuring—entirely reversing course to recreate the prior sport-based categorization of products that existed before the CDA strategy launched. For example, in NIKE's March 21, 2024 earnings call, Defendants admitted that NIKE had reverted to using the sport-based categorization "***[s]tarting last June***" ***(i.e., June 2023***). Indeed, on this call, Defendant Donahoe acknowledged, while discussing the CDA strategy, that "***it's been clear that we need to make some important***

***adjustments***," including that "***we need to sharpen our focus on sport***." CW accounts further detail these failures of NIKE's CDA-related reorganization, including that NIKE had actually begun to strategically pivot back to a sport-based category approach an entire year earlier than it had disclosed—in the summer ***of 2022***.

17. ***Fourth***, maintaining an innovative product pipeline to meet consumer demand was a foundational requirement of the CDA strategy. Throughout the Class Period, Defendants claimed that NIKE had maintained a robust pipeline of innovative products while effectively managing the supply of its existing products. For instance, in October 2021, Defendant Parker asserted that NIKE's "***pace of innovation has not slowed down at all***," and, in September 2022, Defendant Donahoe claimed that NIKE's "***pipeline of innovative product . . . prove[s] that our strategy is working***."

18. In reality, however, CW allegations show that, during the Class Period, NIKE's innovation stagnated after it, *inter alia*, lost critical talent due to personnel cuts made pursuant to the CDA strategy. Thus, NIKE cut its innovation, reduced its product pipeline, and instead flooded the market with key classic products, like the Air Jordan sneakers, to temporarily boost sales. For example, CW-16 recalled that after the CDA was instituted, NIKE was no longer focused on innovating its products. CW-16, however, also noted that this impact would not necessarily be felt in the marketplace until 2022 because NIKE could lean on products that were already in the pipeline prior to NIKE's pivot to CDA. She added that ***by mid-2022, NIKE started to see the negative effects on new products in the pipeline.*** Similarly, CW-1 advised that the over-supply of key products was a "dirty secret" at NIKE. CW accounts and news articles at the end of the Class Period confirm that NIKE's innovation stagnation diminished NIKE's sales and competitive

standing, as new, innovative competitors like HOKA and On capitalized on NIKE's innovation problem to take market share by no later than 2021.

19. Defendants' own subsequent admissions support these CW accounts. For example, during NIKE's March 21, 2024 earnings call, Defendants admitted that through the CDA strategy, NIKE had failed to "***drive a continuous flow of new product innovation***" and that NIKE had "been missing some product newness at scale in our portfolio over the last several seasons." In an April 2024 *CNBC* interview, Defendant Donahoe acknowledged that "***over the last year***, we have been ruthlessly focused on ***rebuilding*** our disruptive innovation pipeline." This admission—*i.e.*, that ***NIKE had begun "rebuilding" its innovation pipeline since at least early 2023***—shows that Defendants knew of such failures at least by that time, given their institution of significant remedial measures. Indeed, in November 2023, about a month before the first partial disclosure, NIKE announced that it had appointed the Company's ***first ever Chief Innovation Officer.*** Moreover, on NIKE's December 2023, March 2024, June 2024, and October 2024 earnings calls (all alleged disclosures of the truth), Defendants highlighted NIKE's increasingly dire need to "manage" the supply of key "franchises"—*i.e.*, that NIKE needed to reduce the supply of its most popular products because NIKE had previously flooded the market with them, thus ultimately diluting their popularity and reducing consumer demand.

20. ***Fifth***, the CDA strategy required NIKE to maintain its brand distinction and competitive separation. During the Class Period, Defendants repeatedly conveyed that NIKE had done so. For example, in September 2022, Defendants touted NIKE's "***competitive separation in the market***," due to the CDA strategy, and asserted in May 2023, that NIKE's "***brand momentum is strong***," while touting the CDA strategy. Further, during the Class Period, NIKE and other brands used a key marketing metric to gauge how "cool" consumers considered various brands.

This allowed companies to measure the strength of brands relative to one another. During a September 2022 earnings call, Defendants insisted that "***NIKE continues to lead as the number one cool and number one favorite brand in North America.***"

21. Unbeknownst to investors, however, NIKE's brand strength and competitive position significantly declined during the Class Period. For example, CW-10 recounted how NIKE began losing accounts to competitors in ***Summer 2021***. CW-2 recalled that ***by May 2022***, NIKE's "cool" factor was declining, and that NIKE was no longer the number one "cool" brand in North America. CW-2 further recalled that by May 2022, "cool" metrics showed that NIKE was losing ground to its competitors, specifically Adidas and Lululemon, both of which were gaining points and catching up, in "cool" metrics, to NIKE. Thus, such CW accounts directly contradict Defendants' repeated claims about NIKE's brand strength and competitive standing, including the September 2022 statement touting that "***NIKE continues to lead as the number one cool and number one favorite brand in North America.***"

22. Defendants' later admissions further support that NIKE's brand equity and competitive standing collapsed during the Class Period. For example, Defendant Donahoe admitted on NIKE's March 21, 2024 earnings call that NIKE's "brand marketing must become bolder and more distinctive," and Defendant Friend admitted on NIKE's June 27, 2024 earnings call that NIKE needed to now get "***focused on taking back market share***," which NIKE had lost to competitors, including more innovative DTC competitors, like HOKA and On.

23. ***Sixth***, in order for the CDA to succeed, NIKE's channel mix between wholesale and DTC sales needed to match consumer preferences. In other words, even if NIKE were able to develop the capabilities to sell a far larger number of its products through DTC channels, those capabilities would be useless if consumers preferred to purchase NIKE products from non-DTC

channels (*i.e.*, multi-brand retailers). Throughout the Class Period, Defendants publicly claimed that their channel mix between DTC and wholesale was matching consumer demand and was thus fueling growth. For example, in September 2023, when asked by an investor whether NIKE had changed its marketplace approach by pivoting back to its former wholesale partners, Defendant Donahoe denied such a shift, claiming that "our marketplace strategy ***remains the same***."

24. Multiple CWs, however, recounted that NIKE concealed that its pivot away from its wholesale partners was failing, forcing it to reengage those partners starting early in the Class Period. Indeed, these CW accounts show that NIKE was aware no later than ***fall 2021*** that the DTC strategy was failing, given continuing consumer preferences for multi-brand retailers, and Defendants sought to revive some of the key wholesale partnerships that NIKE had abandoned after launching its CDA strategy. For example, CW allegations reveal that NIKE began conducting financial due diligence on Sam's Club and Costco in fall 2021 because the DTC strategy was "slowing down," and that NIKE began reengaging with Macy's in fall 2022. As NIKE's inventory continued to pile up, Defendants turned to Foot Locker in late 2022 to take NIKE's "dead" inventory off its hands. And, at the same time, NIKE's mono-brand stores kept performing so poorly, based on various internal metrics detailed by CW allegations, that NIKE kept cutting its internal target for how many stores the Company planned to open.

25. These allegations are supported by Defendants' own admissions. Indeed, at the end of the Class Period, Defendants admitted that they had failed to respond to customer demand for multi-brand shopping. In particular, on NIKE's March 21, 2024 earnings call, Defendant Friend admitted Defendants had knowingly disregarded consumer demand for multi-brand shopping so that Defendants could hit performance metrics: "***we've been more focused on trying to achieve mix of marketplace targets than we have serving consumer demand where the consumer is***

***shopping***." Similarly, Defendant Donahoe admitted, in April 2024, that "***[w]e recognize that in our movement toward digital, we had over-rotated away from wholesale*** . . . . We've corrected that. ***We're investing heavily with our retail partners***." Indeed, in the June 27, 2024 partial disclosure, Defendant Donahoe reiterated that for ***"the last couple of quarters***," the Company had "spent a lot of time leaning in with our wholesale partners," confirming the CWs' accounts that NIKE had recognized this problem and begun attempts to remedy it earlier in the Class Period.

26. ***Finally***, Defendants repeatedly touted to investors that the CDA strategy was succeeding at propelling the growth Defendants promised investors. For instance, in a September 23, 2021 press release, Defendant Friend stated that NIKE's "Q1 results illustrate how NIKE's ***Consumer Direct Acceleration strategy continues to fuel growth***." Similarly, on a June 29, 2023 earnings call, Defendant Donahoe still insisted that "***[i]n the end, our CDA strategy is working***." In reality, however, the CDA strategy was failing to drive sustainable growth for NIKE, as numerous internal red flags (including missed revenue targets discussed internally by Defendants) demonstrated since the start of the Class Period.

27. Indeed, additional CW allegations show that, beginning no later than February 2022, NIKE employees began voicing their dissent with the Company party-line that the CDA strategy was "working"—in the chat function, which was monitored by Human Resources ("HR"), of virtual quarterly all-hands meetings hosted by Defendant Donahoe. These employees purportedly "got in trouble" with the Company. Such CW accounts were corroborated by *The Wall Street Journal*'s investigative reporting, which similarly described one of these all-hands meetings as "***dozens of people writing comments like this in a very public chat that is monitored by human resources, so it was a very brave and risky thing to do***"—it was "***an online protest against the CEO of the company that you're employed by***."

28. The CDA strategy's failures were also explicitly recognized by NIKE senior executives, including at an internal NIKE summit in fall 2023, which was attended by Defendants Donahoe, Friend, and O'Neill. At this meeting, according to CW-1, NIKE's President of Geographies & Marketplace, Craig Williams, stood up and said "***CDA was a failure***. ***We have to acknowledge that***." CW-1 described the summit as "***dire***," and observed that the summit was focused on how much NIKE had to do to grow. CW-1 further noted that ***Donahoe "painted a pretty ugly picture" at the summit.*** CW-1 recalled Donahoe stating that NIKE was no longer a growth company.

**D. The Truth of the CDA's Failure Begins to Emerge**

29. The truth about Defendants' misrepresentations concerning the CDA strategy emerged gradually over the course of four disclosures of the truth and/or materializations of the risk spanning from December 2023 to October 2024.

30. ***First***, on December 21, 2023, NIKE announced disappointing financial results for the second quarter of FY 2024 and disclosed total quarterly revenue and Direct revenue that were below analysts' consensus estimates. NIKE also significantly lowered its financial guidance for FY 2024.[3] Defendants tied these disappointing results to failures in the CDA strategy. For example, during NIKE's related earnings call, Defendant Friend explained that NIKE had lowered its guidance because it was anticipating slower growth in its Digital channels due to low customer traffic and the increased necessity to discount and reduce the supply of key products to account for lagging demand. Defendant Friend also announced that NIKE was "identifying opportunities across the company to deliver up to $2 billion in cumulative cost-savings over the next three

[3] NIKE's Fiscal Year ("FY") runs from June 1–May 31. Thus, for example, FY 2024 began on June 1, 2023 and ended on May 31, 2024.

years," which was necessary because the CDA strategy had added "***complexity and inefficiency***" to NIKE's operations. On this news, the price of NIKE Stock declined nearly 12%.

31. Investors and analysts were surprised and disappointed by these revelations. For instance, in a December 22, 2023 analyst report, UBS wrote that "Nike announced an uncharacteristic plan to reduce costs by $2B over 3 years. . . . Nike will use some cost saves to ***accelerate innovation*** and improve speed. ***This is surprising since these have been objectives for the last 5+ years. We assumed Nike made more progress in these areas.***" Just over two weeks after this partial disclosure, NIKE abruptly announced that Defendant Campion—who had served as NIKE's Chief Operating Officer ("COO") and misrepresented the CDA strategy's success to investors during the Class Period—would exit NIKE effective April 5, 2024.

32. ***Second,*** the truth about CDA's failures was further partially revealed on March 21, 2024, when NIKE announced another quarter of disappointing financial results (for the third quarter of FY 2024). These poor results included that NIKE expected "revenue in the first half of the fiscal year to be down low single digits." NIKE also lowered guidance as to its gross margins, which had been widely viewed by analysts as a metric for which the CDA strategy was supposed to drive growth. On the related earnings call, Defendant Friend attributed NIKE's lowered guidance to several factors, including "***higher markdowns*** [and] reduced benefits from channel mix due to ***franchise life cycle management***." Thus, NIKE announced that it was anticipating slower growth and lower profit due to the increased necessity to discount and reduce the supply of key products to account for lagging demand. On this same call, Defendant Donahoe admitted that the CDA strategy was not working in key respects, stating that the ***CDA strategy required "important adjustments,"*** including that ***"[w]e need to sharpen our focus on sport***, ***we must drive a continuous flow of new product innovation***, our ***brand marketing*** must become bolder and

more distinctive [and] . . . ***we must lean in with our wholesale partners***.” Thus, these disclosures partially revealed the failures in several key pillars of the CDA strategy—the shift away from sports categorization, product innovation, brand strength, and need to pivot back to wholesale partners. On this news, the price of NIKE Stock declined nearly 7%.

33. Analysts were again surprised by the disclosed poor financial results and admissions of CDA strategy failures. For instance, in a March 21, 2024 report, Jefferies Equity Research lowered its price target for NIKE Stock, and noted that: ***“[f]or years [NIKE] pushed a narrative it would increase digital/direct and reduce wholesale to improve margins and maximize customer impact,” but “reducing wholesale dramatically seems like the wrong move.”***

*34.* ***Third,*** the truth behind the CDA’s failure was further partially revealed on June 27, 2024, when NIKE announced a third consecutive quarter of disappointing financial results (for the fourth quarter of FY 2024 and for full FY 2024). For example, NIKE disclosed its actual revenue for the fourth quarter of FY 2024 was $12.61 billion, which missed consensus estimates by $250 million. NIKE also reduced its revenue guidance for FY 2025, with Defendant Friend stating that “we now expect fiscal 2025 reported revenue to be down mid-single digits, with the first half down high single digits.” In discussing this lowered guidance on NIKE’s related earnings call, Defendant Friend revealed that NIKE had lowered its guidance due to factors such as “***timelines and pacing to manage marketplace supply of our classic footwear franchises***,” and “***lower NIKE Digital growth . . . as we scale product innovation and newness*** across the marketplace.” Thus, NIKE revealed that it was anticipating slower growth because of the increased necessity to reduce the supply of key products to account for lack of demand, slower growth in NIKE’s digital channels, and NIKE’s lagging innovation. Defendant Donahoe also admitted that NIKE had “spent a lot of time ***leaning in with our wholesale partners***”—meaning that consumer demand for multi-brand

shopping had required NIKE to pivot back from DTC to emphasizing selling products through its wholesale partners.

*35.* On this news, the price of NIKE Stock collapsed nearly ***20%—the largest stock price drop in NIKE's history.***

36. Analysts were shocked by these revelations. For instance, in a June 28, 2024 report, Bank of America wrote that NIKE's "guidance reset was larger than expected as it expedites the reduction in lifestyle franchises in its DTC channel."

37. On September 19, 2024, mere weeks before the end of the Class Period, NIKE's Board of Directors announced the abrupt departure of Defendant Donahoe—the key architect of the CDA strategy and a purveyor of myriad misstatements about its success. Defendant Donahoe's successor was long-time NIKE veteran Elliot Hill, who came out of retirement to take the helm of NIKE's sinking ship and reverse course on NIKE's failed CDA strategy. Market commentary directly linked Defendant Donahoe's suspicious "resignation" to the disastrous CDA strategy and its detrimental impact on NIKE's business, as revealed in the three prior disclosures of the truth.

38. ***Finally***, the full extent and financial impact of Defendants' fraud was revealed on October 1, 2024, when NIKE announced yet another quarter of poor financial results (for the first quarter of FY 2025), including total revenue that was below analyst consensus estimates. Importantly, on the related earnings call, Defendant Friend revealed that NIKE was "***withdrawing our full year guidance***." Defendant Friend also provided specific guidance for NIKE's second quarter, stating that NIKE expected "Q2 revenues to be down in the 8% to 10% range . . . [and] Q2 gross margins to be down approximately 150 basis points," and attributed this guidance to factors such as "***higher promotions [and] channel mix headwinds***." Thus, NIKE announced that it was anticipating slower growth because of the increased necessity to reduce the supply of key

products to account for lack of demand and slower growth in NIKE's digital channels. On this news, the price of NIKE Stock dropped approximately 6.8%.

39. Analysts were again surprised by this final revelation of the CDA's failure. For example, on October 2, 2024, Truist noted that "[w]ith another miss vs depressed expectations, Nike's visibility into its own business appears lower than we previously anticipated." On this same day, Jeffries wrote that "promos are rising, ***new product will take time to resonate, if it does at all, and in the meantime competition is proving to be more severe***."

40. As a result of Defendants' misconduct alleged herein, Lead Plaintiffs and the Class have suffered significant losses. Due to Defendants' fraud, NIKE Stock reached a Class Period high closing price of $177.51 on November 5, 2021 and fell to $83.10 on October 2, 2024 after the truth was fully revealed, wiping out billions of dollars in shareholder value.

## II. JURISDICTION AND VENUE

41. The claims alleged herein arise under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b), "§ 10(b)"); Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5, "Rule 10b-5"); and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a), "§ 20(a)").

42. This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In connection with Defendants' acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

43. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because NIKE is headquartered in this District, and many of

Defendants' acts and practices complained of herein occurred in substantial part in this District, including the dissemination of materially false or misleading information.

## III. THE PARTIES AND WITNESSES

### A. Lead Plaintiffs

44. Lead Plaintiff Caisse de dépôt et placement du Québec ("CDPQ") is a global investment group with 452.1 billion CAD in assets under management. As detailed in its certification (ECF No. 53-1), CDPQ purchased NIKE Stock at artificially inflated prices during the Class Period and was damaged as a result of the conduct alleged herein. On October 25, 2024, the Court appointed CDPQ to serve as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). ECF No. 42.

45. Lead Plaintiff Deka Investment GmbH ("DEKA") is an investment management company organized under the laws of Germany as a Kapitalverwaltungsgesellschaft ("KVG"). As a KVG, DEKA creates and manages investment funds, including the funds listed in DEKA's certification attached hereto (the "DEKA Funds"). As a KVG, DEKA makes investment decisions on behalf of the DEKA Funds. Under German law, the DEKA Funds are not themselves legal entities. DEKA has the exclusive authority and obligation to bring claims in this action on behalf of the DEKA Funds, which have no authority to bring such claims themselves. As detailed in DEKA's certification (ECF No. 53-2), the DEKA Funds each purchased NIKE Stock at artificially inflated prices during the Class Period and were damaged as a result of the conduct alleged herein. On October 25, 2024, the Court appointed DEKA to serve as Lead Plaintiff pursuant to the PSLRA. ECF No. 42.

**B. Defendants**

46. Defendant Nike, Inc. ("NIKE") is an Oregon corporation with principal executive offices located at One Bowerman Drive, Beaverton, OR 97005. NIKE Stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "NKE." NIKE's principal business activity is the design, development, and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories, and services. NIKE is the largest seller of athletic footwear and apparel in the world.

47. Defendant John J. Donahoe II ("Donahoe") served as President and CEO of NIKE from January 13, 2020 until October 13, 2024. Defendant Donahoe also served as a member of the NIKE Board of Directors from 2014 until October 13, 2024. Throughout the Class Period, Donahoe served on the Board of Director's Executive Committee. Defendant Donahoe's departure from NIKE was announced on September 19, 2024. In his role as CEO of NIKE during the Class Period, Donahoe signed SEC filings and participated in earnings calls, conferences with securities analysts, the Company's annual general meetings, appearances on behalf of the Company, and NIKE's letters to shareholders, during which he made false and misleading statements and omissions of material fact relating to the success of NIKE's CDA strategy. Prior to his tenure at NIKE, Defendant Donahoe had been President and CEO of Servicenow.com, a software company, and was President and CEO of eBay, Inc.

48. Defendant Matthew Friend ("Friend") joined NIKE in 2009. Friend has served as Executive Vice President and Chief Financial Officer ("CFO") of NIKE since April 2020. Defendant Friend previously served in various roles at NIKE, including as Vice President of Investor Relations and CFO of the NIKE Brand. Prior to joining NIKE, Defendant Friend worked in the financial industry, including as Vice President in the investment banking and mergers and

acquisitions groups at Goldman Sachs and Morgan Stanley. In his role as CFO of NIKE during the Class Period, Defendant Friend signed SEC filings and participated in earnings calls, conferences with securities analysts, the Company's annual general meetings, and appearances on behalf of the Company during which he made false and misleading statements and omissions of material fact relating to the success of NIKE's CDA strategy.

49. Defendant Mark G. Parker ("Parker") has served as Executive Chairman of the NIKE Board of Directors at all relevant times. Prior to the Class Period, Defendant Parker was NIKE's CEO from 2006 to January 13, 2020, and Chairman, President & CEO from 2016 to January 13, 2020. Defendant Parker has been employed by NIKE since 1979 with primary responsibilities in product research, design and development, marketing, and brand management. In his role as Executive Chairman of NIKE's Board of Directors during the Class Period, Defendant Parker participated in the Company's annual general meetings, in which he made false and misleading statements and omissions of material fact relating to the success of NIKE's CDA strategy.

50. Defendant Heidi L. O'Neill ("O'Neill") joined NIKE in 1998. O'Neill has served as President, Consumer, Product & Brand of NIKE since May 2023. In that role, she was responsible for the integration of the global Men's, Women's & Kids' consumer teams, the entire global product engine and global brand marketing and sports marketing. From April 2020 to May 2023, she served as President of NIKE Consumer and Marketplace, responsible for leading NIKE Brand's four geographic operating regions along with leading NIKE's Global Sales and NIKE Direct organizations. Prior to that position, O'Neill served as President, DTC from 2016 to 2020. In her roles as President, Consumer, Product & Brand and President of NIKE Consumer and Marketplace during the Class Period, Defendant O'Neill participated in NIKE's annual general

meetings and spoke on behalf of the Company in press appearances during which she made false and misleading statements and omissions of material fact relating to the success of NIKE's CDA strategy.

51. Defendant Andrew Campion ("Campion") joined NIKE in 2007. Campion served as Managing Director, Strategic Business Ventures at NIKE from June 2023 until his departure from the Company, which was announced on January 5, 2024 and took effect on April 5, 2024. Prior to that, Defendant Campion served as Chief Operating Officer ("COO") of NIKE from April 2020 until June 2023. Campion also served as Executive Vice President and CFO from August 2015 to April 2020. Prior to that, Campion served in a variety of roles, including Vice President of Global Planning and Development, CFO of the NIKE Brand, and Senior Vice President, Strategy, Finance and Investor Relations. In his roles as Managing Director, Strategic Business Ventures and COO of NIKE during the Class Period, Defendant Campion participated in press appearances on behalf of the Company, during which he made false and misleading statements and omissions of material fact relating to the success of NIKE's CDA strategy.

52. Defendants Donahoe, Friend, Parker, O'Neill, and Campion are collectively referred to herein as the "Individual Defendants." NIKE and the Individual Defendants are collectively referred to herein as the "Defendants."

### C. Relevant Third Parties

53. This amended complaint references numerous former employees of NIKE that support Lead Plaintiffs' allegations herein.[4]

[4] All Confidential Witnesses are referred to with feminine pronouns, regardless of gender, to protect their identities.

54. CW-1 was a VP, Global Store Development at NIKE from approximately August 2022 through May 2024. CW-1 explained that the role she was hired to perform was to develop and expand NIKE's fleet of DTC stores. CW-1 continued that she was tasked with doing anything needed to help stores prepare for any issues, going to various locations to help them set up, setting strategy, opening and closing locations, working to prepare stores for the 2024 Olympics, and any other tasks needed. CW-1 first reported to Sumi Ghosh, then Global VP of Stores. CW-1 added that Ghosh was fired in October 2023, at which point CW-1 reported directly to Mary Beth Laughton (who re-joined NIKE in August 2023)[5] in an interim role, until Andy Shih (VP, Global NIKE Stores) took over Ghosh's position for the last month or so of CW-1's employment. CW-1 noted that Laughton reported to Craig Williams (President, Geographies & Marketplace); prior to Laughton joining NIKE, Ghosh reported to Daniel Heaf, currently Chief Strategy and Transformation Officer. After Heaf was promoted, CW-1 continued, Ghosh reported to Laughton, as did Shih.

55. CW-2[6] was employed by NIKE from 2002 to Fall 2022 in a variety of roles. CW-2 noted that she worked on marketing NIKE's DTC retail stores from 2018 to her departure. Specifically, in her last role at NIKE, CW-2 was a director within North America Consumer Direct Marketing for NIKE Direct from fall 2020 to fall 2022. In that capacity, CW-2 reported to a senior marketing director.

---

[5] Based on Lead Plaintiffs' investigation, Laughton served as Head of Nike Global Direct to Consumer until she left NIKE in early 2025.

[6] At CW-2's request, Lead Plaintiffs have withheld additional details of CW-2's employment at NIKE. While Lead Plaintiffs believe that the details of CW-2's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can provide additional information to the Court for an *in camera* inspection at the Court's request.

56. CW-3 was employed by NIKE from February 2020 through July 2024 as Vice President, NIKE Digital Product. CW-3 explained her job duties as they related to NIKE's CDA and DTC strategies, indicating that she was brought in to help build NIKE's capabilities in those areas. CW-3 advised that NIKE followed a product development model where an employee "owned" a type of product, such as digital products or capabilities. CW-3 added that examples of digital products were Nike.com, the NIKE app, training club, and other consumer-facing digital experiences. CW-3 elaborated that her role was to work as an intermediary with respect to digital product development, between the engineering and technology teams—who focused on the technology side of things, like developing the relevant software and third-party experiences—and the marketing and strategy teams—who focused on the business/strategic side. CW-3's role was to translate the needs of strategy and marketing into design, acting as an advocate for the consumer, and asking how the design would look and feel for the consumer, what the consumers' needs were and how they shopped, and what was achievable given the constraints of the technology. CW-3 added that she would get feedback from the engineering teams regarding these issues. CW-3 confirmed that her role involved bridging the distance between the business and technology sides, with the business side setting strategy and the technology side attempting to implement that strategy from a technological perspective. CW-3 analogized her role to an architect managing a construction project, acting as an intermediary between a carpenter and owner on a construction project. CW-3 also worked with legal teams to help navigate compliance and regulatory issues for various countries.

57. CW-4 was employed by NIKE as a Senior Finance Manager, NIKE Direct Strategic Investments from March 2022 to April 2023. CW-4 advised that she oversaw finance for digital strategic investments. CW-4 added that she reported to current Senior Principal, Organizational

Performance Agnieszka Janiewicz. CW-4 noted that she supported teams that worked directly on the Company's DTC strategy.

58. CW-5[7] was employed by NIKE for over a decade until early 2021 in a variety of roles. CW-5 most recently served as Global Merchandising Director D2C Omni Channel until her departure from NIKE. CW-5 advised that in this final role, she was responsible for assorting DTC merchandise for specific geographies based on DTC consumer data she reviewed. CW-5 added that she lastly reported to former Vice President North America One NIKE Marketplace Merchandising Brad Andrews, who in turn reported to former Chief Merchant Anne Spangenberg.

59. CW-6 was employed by NIKE from 1998 to June 2024 in a variety of roles. CW-6 most recently served as Supply Chain Finance Director, North America NIKE Direct from February 2019 to June 2024. CW-6 advised that she was responsible for feeding supply chain costs to NIKE Direct directors in North America and that she managed "all lanes" of transportation finance, including delivery costs to consumers and retail stores.

60. CW-7[8] was employed by NIKE from before the Class Period through Summer 2024 in a variety of roles. CW-7 most recently served as a director for the last two years of her tenure at the Company. CW-7 advised that in this role, she oversaw NIKE's relationships with various retailers and supervised a team that worked directly with accounts on various facets of the business.

---

[7]At CW-5's request, Lead Plaintiffs have withheld additional details of CW-5's employment at NIKE. While Lead Plaintiffs believe that the details of CW-5's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can provide additional information to the Court for an *in camera* inspection at the Court's request.

[8]At CW-7's request, Lead Plaintiffs have withheld additional details of CW-7's employment at NIKE. While Lead Plaintiffs believe that the details of CW-7's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can provide additional information to the Court for an *in camera* inspection at the Court's request.

61. CW-8 was employed by NIKE from October 2020 to December 2021 as Vice President of Digital Design. CW-8 advised that she was responsible for helping execute the digital DTC strategy.

62. CW-9 was employed by NIKE as a Strategic Account Executive from June 2013 to November 2023. CW-9 advised that she managed key accounts for NIKE and was responsible for maintaining relationships with these accounts, strategic planning, forecasting, shipping and product launches. CW-9 noted that her largest account was DSW. CW-9 noted that she was moved to NIKE's Golf team after the Company pulled out of DSW. CW-9 detailed that she reported to former Strategic Account Director Paul Scioneaux while she managed the DSW account. CW-9 noted that after reporting to Paul Scioneaux, she reported to another manager during COVID (name not recalled) and most recently reported to current Sales Director Chris Heniff.

63. CW-10 was employed by NIKE as a Financial Analyst from 2021 to December 2021. CW-10 advised that she primarily served as a credit analyst and worked on NIKE's larger accounts in the tennis, running, and women's apparel categories.

64. CW-11 was employed by NIKE from September 2014 until April 2023. For the first six months of her employment, CW-11 was a contractor and became a full-time employee in April 2015. From December 2020 to February 2022, CW-11 held the position of Principal Product Director, and, from March 2022 to April 2023, she had the position of Director of Product. As Principal Product Director, CW-11 worked in the NIKE App and Nike.com space. When she became Director of Product, CW-11 moved to Nike.net, which she explained was the wholesale back end for small to medium sized businesses, which included mom-and-pop sized stores as well as more medium-sized NIKE customers like Nordstroms. As a result, CW-11 advised, she saw the implementation of the DTC strategy from both sides. CW-11 said she reported to something like

14 managers during her tenure at NIKE. CW-11 mostly reported to Matthew Strocchia until Strocchia left in 2020. CW-11 then reported to Indra Kumaran (currently VP, Product Management, NIKE Direct and Marketplace, at the Company), then after CDA was implemented, she reported to Brian Reed. CW-11 confirmed that the majority of her time as Director of Product at Nike.net, she reported to Chris Dolbec, who no longer works at NIKE. For the final two weeks of her employment, CW-11 indicated that she reported to Dan Hutchins. CW-11 explained that the Nike.net organization rolled up to Michael Mlakar, currently Vice President, Global, Go to Market and CX; and from there to the Wholesale General Manager. CW-11 confirmed that, previously, while working on the NIKE app, everything rolled up to CW-3.

65. CW-12[9] was employed by NIKE from 2018 to 2022 in various roles. In her last role, which began in Summer 2020, CW-12 served as a technology leader who worked on digital marketing projects.

66. CW-13[10] was employed by the NIKE global accounting group from fall of 2018 to spring of 2023, and in this role she reported to the global controller.

67. CW-14 worked as a contractor at NIKE starting before the Class Period to June 2022. From 2018 to late 2021, CW-14 was a Program Manager within the Global Technology group. From late 2021 to June 2022, CW-14 was a Program Manager in NIKE's Global Brand

[9] At CW-12's request, Lead Plaintiffs have withheld additional details of CW-12's employment at NIKE. While Lead Plaintiffs believe that the details of CW-12's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can provide additional information to the Court for an *in camera* inspection at the Court's request.

[10] At CW-13's request, Lead Plaintiffs have withheld additional details of CW-13's employment at NIKE. While Lead Plaintiffs believe that the details of CW-13's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can provide additional information to the Court for an *in camera* inspection at the Court's request.

Marketing group, where she helped roll out the Adobe Experience Platform[11] and reported to a Senior Director of Program Management.

68. CW-15[12] joined NIKE in May 2021 as a technology operations manager. CW-15 was later promoted to a technology operations director in January 2022 and was part of a companywide layoff at NIKE in May 2024. CW-15 advised that she reported to NIKE's Technology Operations structure and worked under the Company's Global Technology umbrella. CW-15 stated that she worked in internal and external technology and ensured that technology funding was approved, among other things

69. CW-16 was employed by NIKE and worked at the Company's global headquarters in Beaverton, Oregon from 1998 to April 2024. CW-16's most recent titles were Senior Product Manager, Virtual Material Ecosystem (2022 – April 2024) and Senior Product Management, Virtual Product Creation (2019 – 2022). CW-16 advised that in her final reporting structure as Senior Product Manager, Virtual Material Ecosystem, she reported to Digital Product Director Lori Thune, who in turn reported to Senior Director, Digital Product Creation Sara Sampson, who in turn reported to Vice President Consumer Product, Brand & Marketplace Operations, Robert Barnette, who in turn reported to Senior Director of Product Management, Product Creation and Innovation, Cedar Miller and Senior Director – Design Engineering, Laurie Koenig. CW-16 advised that in her final reporting structure as Senior Product Management, Virtual Product

---

[11] As explained *infra,* Adobe described its Experience platform as a platform that "enables organizations to centralize and standardize customer data and content" and then "appl[ies] data science and machine learning to dramatically improve the design and delivery of rich, personalized experiences."

[12]At CW-15's request, Lead Plaintiffs have withheld additional details of CW-15's employment at NIKE. While Lead Plaintiffs believe that the details of CW-15's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can provide additional information to the Court for an *in camera* inspection at the Court's request.

Creation, she reported to Senior Director Digital Product Creation, Kerryn Foster, who in turn reported to Vice President, Digital Product Creation Michael Newton. CW-16 described her responsibilities between 2019 to April 2024 as supporting the creative team by enhancing NIKE's "virtual creation space," including by introducing 3D-design and sketch capabilities into the workflow (to replace their 2D-designs), as one example. CW-16 added that this transition was never implemented properly during her tenure.

70. CW-17 was employed by NIKE from March 2010 to October 2021 in a variety of roles. CW-17 most recently served as a Global Director, Program Management from November 2016 to October 2021. CW-17 advised that as a Global Director, Program Management, she led program management teams that rolled up to NIKE Direct Digital, which was overseen by Defendant O'Neill.

71. CW-18[13] was employed by NIKE from before the Class Period to summer 2024 in a variety of roles. From the summer of 2022 through her departure in summer 2024, CW-18 was a General Manager for one of the newly recreated sports categories in the Men's division in North America. In that role, she reported to the General Manager of the Men's Business, North America, who in turn reported to the General Manager, North America.

72. CW-19 was employed by NIKE from January 2015 to June 2023 in the following roles: Director of A/B Testing from January 2015 to April 2018; Director of Global Experimentation Center of Excellence from May 2018 to April 2022; and Director of Digital

[13] At CW-18's request, Lead Plaintiffs have withheld additional details of CW-18's employment at NIKE. While Lead Plaintiffs believe that the details of CW-18's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiffs can provide additional information to the Court for an *in camera* inspection at the Court's request.

Experiments from May 2022 to June 2023. CW-19 noted that she reported to current Nike Global Vice President, Insights, Data Science, & Analytics Sean Bruich.

## IV. SUBSTANTIVE ALLEGATIONS OF FRAUD

### A. Relevant Factual Background

#### 1. History of NIKE's Operations and Mix of Wholesale and DTC Channels

73. NIKE is headquartered in Beaverton, Oregon and incorporated in Oregon.

74. NIKE originally launched its operations with a focus on athletic footwear. The Company has since evolved to focus on the design, development, and worldwide marketing and sales of athletic footwear, apparel, equipment, accessories, and services. NIKE is the largest seller of athletic footwear and apparel in the world.

75. NIKE sells its products both through DTC channels and to wholesale accounts.

76. NIKE's wholesale accounts include a mix of independent distributors, licensees, and sales representatives in nearly all countries around the world. Most of NIKE's wholesale sales are to multi-brand retailers that then sell products directly to consumers. Under this model, for example, Foot Locker will purchase shoes on a wholesale basis from NIKE, and Foot Locker will then sell those NIKE shoes side-by-side with shoes from other brands to customers. Thus, in this scenario, Foot Locker is a "wholesale partner" of NIKE, and it is also a "multi-brand retailer" from the perspective of the customer.

77. NIKE also sells its products directly to customers via its DTC channels, rather than through third parties. These include both physical and online stores. As to the former, NIKE runs a fleet of brick-and-mortar NIKE-branded stores (*e.g.*, "NIKE Live" stores) that sell only NIKE products to consumers. DTC stores like these that sell only one brand are commonly referred to as "mono-brand" (or "monobrand") stores. In addition to its physical mono-brand stores, NIKE also

operates a website (Nike.com) and apps such as the NIKE App and the SNKRS App, which allow customers to purchase NIKE products on the internet.

78. NIKE reports its revenue in three segments: NIKE Brand (which comprises the vast majority of NIKE's consumer products), Converse (a wholly-owned subsidiary brand), and Corporate (which primarily consists of foreign currency hedge gains and losses). The vast majority of NIKE's revenue is generated in and reported under the NIKE Brand segment. Specifically, NIKE Brand revenue constituted approximately 94% or more of NIKE's total revenue in each of FY 2017, FY 2018, FY 2019, FY 2020, FY 2021, FY 2022, FY 2023, and FY 2024.[14]

79. Within the NIKE Brand, NIKE has historically, and at all relevant times, reported its revenue through three segments: Sales through NIKE Direct ("NIKE Direct," which consists of Sales through NIKE's various DTC channels including NIKE's physical stores and NIKE Brand Digital), Sales to Wholesale Customers ("Wholesale," which consists of sales to NIKE's wholesale partners), and Global Brand Divisions ("Global Brand," which consists of NIKE Brand licensing and other miscellaneous revenues that are not part of a geographic operating segment). Nearly all of NIKE Brand revenue is generated in and reported under NIKE Direct and Wholesale. Specifically, NIKE Direct and Wholesale have accounted for approximately 99% of NIKE Brand revenue in each of FY 2017, FY 2018, FY 2019, FY 2020, FY 2021, FY 2022, FY 2023, and FY 2024.

80. Thus, the NIKE Direct and Wholesale segments account for nearly all of the revenue generated in and reported under the NIKE Brand segment, which itself accounts for nearly all of NIKE's total revenue. This had remained constant at all relevant times.

---

[14] NIKE Brand revenue constituted approximately 95% of NIKE's overall revenue for each fiscal year listed except for FY 2017, when it constituted approximately 94% of overall revenue.

81. However, as displayed in the following chart, the mix of revenue derived from NIKE Direct versus Wholesale has shifted over time, with NIKE Direct increasingly constituting a larger share of NIKE Brand revenue:

| Fiscal Year | NIKE Direct Revenue as a % of NIKE Brand Revenue |
|---|---|
| FY2017 | 28% |
| FY2018 | 30% |
| FY2019 | 32% |
| FY2020 | 35% |
| FY2021 | 39% |
| FY2022 | 42% |
| FY2023 | 44% |
| FY2024 | 44% |

82. This increase in revenue derived from NIKE Direct reflects the Company's recent emphasis, since at least FY2018, toward DTC sales as part of its CDO and CDA strategies, as described *infra*, Section IV.A.2-3.

83. A significant factor in the growth of NIKE Direct was the substantial growth of sales in NIKE's digital channels. NIKE describes sales through its digital platforms as "NIKE Brand Digital." Sales from NIKE Brand Digital, a subsegment within NIKE Direct, grew considerably after NIKE launched the CDA strategy in 2020, and during the Class Period, NIKE began to report specific revenue figures in NIKE Brand Digital. The following chart describes the change in NIKE Brand Digital revenue over time:

| Fiscal Year (ends May 31 of the relevant year) | NIKE Brand Digital Revenue | NIKE Brand Digital Revenue as a % of Overall NIKE Revenue | Change in Total NIKE Brand Digital Revenue From Prior Year (Decline) |
|---|---|---|---|
| FY 2021 | $9.1 billion | 20.4% | |
| FY 2022 | $10.7 billion | 22.9% | 18% |
| FY 2023 | $12.4 billion[15] | 24.2% | 16% |
| FY 2024 | $12.1 billion | 23.6% | (2.4%) |

### 2. NIKE Introduces the Consumer Direct Offense Strategy

84. In June 2017, NIKE announced its "Consumer Direct Offense" ("CDO") strategy, which represented a shift toward a greater emphasis on DTC operations. The June 15, 2017 NIKE press release announcing the CDO strategy (the "June 15, 2017 Press Release") touted that the goal of CDO strategy was to "drive growth—by accelerating innovation and product creation, moving even closer to the consumer through Key Cities,[16] and deepening one-to-one connections."

85. According to the June 15, 2017 Press Release, the CDO strategy would be "fueled by NIKE's Triple Double strategy," which sought to "double innovation," "double speed," and "double direct connections with consumers and shape the future of retail." To accomplish this objective, NIKE was "accelerat[ing]" innovation and "supercharg[ing]" its product pipeline. NIKE also announced it was "accelerat[ing] the impact and cadence of new innovation platforms," and "deliver[ing] innovation, at speed, through more direct connections." Critically, NIKE also announced that it was creating a new NIKE Direct organization, led by Defendant O'Neill and Adam Sussman (NIKE's Chief Digital Officer at the time), which NIKE claimed would "unite

[15] This number is taken from NIKE's Form 10-K filed on July 25, 2024. NIKE's Form 10-K filed on July 20, 2023 indicates this figure is $12.6 billion.

[16] NIKE's "Key Cities" initiative focused on expanding NIKE's presence in certain critical cities across the globe, including by building out NIKE's mono-brand and "digitally enabled" stores in those cities, as described by Defendant O'Neill in NIKE's September 17, 2020 Annual General Meeting.

Nike.com, Direct-to-Consumer retail, and Nike+ digital products."[17] Therefore, through the CDO strategy, NIKE sought to unite its physical stores and digital sales channels to better serve customers—all with the goal of increasing sales via DTC channels.

86. The CDO strategy had the effect of increasing the proportion of NIKE's revenue derived from DTC sales. As previously noted, in FY 2017—which ended a few weeks before the CDO strategy was announced—NIKE reported that approximately 28% of its revenue was generated by DTC sales. By the end of FY 2020, NIKE Direct was accounting for approximately 34.8% of NIKE Brand revenue. That represents an approximate 23.3% increase within about three years.[18]

### 3. NIKE's CDA Strategy, Led by New CEO John Donahoe, Accelerates NIKE's DTC Pivot and Promised Long-Term Sustainable Growth

87. NIKE's pivot toward focusing on its DTC channels took a critical turn in 2020, with the initiation of NIKE's CDA strategy led by Defendant Donahoe.

88. Defendant Donahoe had served on the NIKE Board of Directors since 2014, but in October 2019, NIKE announced that Defendant Donahoe would succeed Defendant Parker as NIKE's President and CEO, effective January 13, 2020.

89. Upon Defendant Donahoe's appointment as President and CEO, Defendant Parker transitioned to the role of Executive Chairman. As detailed in the October 22, 2019 press release announcing Donahoe's appointment (the "October 22, 2019 Press Release"), Parker would "continue to lead the Board of Directors and work closely with Donahoe and the senior management team." The October 22, 2019 Press Release quotes Parker as stating: "I look forward

[17] Nike+ is a mobile application that helps users track fitness performance.
[18] In FY 2017, NIKE reported approximately $9.1B in revenue generated by DTC sales, and in FY 2020, NIKE reported approximately $12.4B in DTC sales—representing an increase of approximately 36.3%.

to continuing to lead the Board as Executive Chairman, as well as partnering closely with John and the management team to help him transition to his new role."

90. In the October 22, 2019 Press Release, Defendant Parker touted Defendant Donahoe's "expertise in digital commerce, technology, global strategy and leadership" and made clear that the goal of NIKE under Donahoe would be to "accelerate our digital transformation and to build on the positive impact of our Consumer Direct Offense."

91. Defendant Donahoe's prior corporate roles evidenced his expertise in digital commerce and made him the perfect candidate to lead the "accelerat[ion]" of the Company's "digital transformation." Specifically, Donahoe had previously served as: a member of the NIKE Board of Directors; President and CEO of ServiceNow, Inc., a software company; and President and CEO of eBay, Inc., an e-commerce company that allows users to buy and sell items through online marketplaces.

92. A January 12, 2020 article in *Yahoo Finance*, titled "Nike's fourth-ever CEO is about to take over — and he's going to be a different kind of leader," explained that Defendant "***Donahoe's tech background is precisely the reason he was chosen to become CEO of the world's largest sportswear company***." This article emphasized that Donahoe "is someone who can take the retailer exactly where it needs to be in the digital space," and quoted a Cowen Equity Research analyst as stating that Donahoe "obviously has tremendous experience in e-commerce and software. . . . I think Donahoe will bring a lot of domain expertise in that area of the business."

93. The vaunted digital acceleration that Defendant Donahoe was hired to lead took the form of NIKE's new strategy, called CDA, which Defendants announced within a few months of Donahoe's appointment as President and CEO.

94. Specifically, on a June 25, 2020 earnings call, Defendants announced the CDA strategy. Defendant Donahoe described CDA as a "new digitally empowered phase of our Consumer Direct strategy." Defendant Friend further described the CDA strategy as "th[e] next phase of the Consumer Direct Offense." Thus, the CDA strategy incorporated the tenets of the CDO strategy, including its commitment to "accelerate" innovation, "supercharge" NIKE's product pipeline, and build out and emphasize NIKE's DTC channels. But the CDA strategy was not merely a rebranding of the CDO strategy. The CDA strategy went even further—by accelerating NIKE's investments in its DTC channels, with a particular focus on intensifying NIKE's investments in its digital operations. As Donahoe stated on the June 25, 2020 earnings call, NIKE's plan under the CDA strategy was to "accelerate our focus and investment on the key areas to put an even sharper point on our highest-growth opportunities"—*i.e.*, NIKE's DTC operations, particularly its ***digital*** DTC operations.

95. During this June 25, 2020 earnings call, Defendant Donahoe described "***three areas*** of strategic acceleration" under CDA—*i.e.*, the three main pillars of the CDA strategy.

96. ***Focus on Digital: First***, Defendant Donahoe described that NIKE was increasing its focus on digitally-led DTC operations. In doing so, Donahoe stated that NIKE "will create a marketplace of the future, one more closely aligned with what [the] consumer[] want[s] and need[s]." Donahoe continued that NIKE's "vision is to create a clear and connected digital marketplace." This marketplace includes: (i) NIKE's digital platforms (*i.e.*, NIKE's website and apps); (ii) NIKE's "digitally-enabled mono-brand stores" (*i.e.*, NIKE's brick-and-mortar DTC stores); and (iii) "a small number of strategic partners who share [NIKE's] vision" (*i.e.*, select multi-brand retail entities).

97. ***Shift from Sport-Based to Gender and Aged-Based Categories: Second***, as part of the CDA strategy, NIKE would engage in a massive restructuring of the Company. For example, on the June 25, 2020 earnings call, Defendant Donahoe announced that NIKE will "realign the company" to reflect a "simpler consumer construct." Previously, NIKE had organized its business based on sport-categorization, *i.e.*, running and basketball, among other sports. With the CDA strategy, however, NIKE announced that it was shifting away from this sport-based categorization and was instead organizing around gender- and age-based constructs. As such, the CDA strategy initiated a corporate restructuring, through which NIKE would align its business under Men's, Women's, and Kids' constructs.

98. ***DTC Technological Capabilities: Third***, under CDA, NIKE would increase its technological capabilities to enable NIKE's digitally-led DTC operations—*i.e.*, expand and enhance NIKE's digital platforms like its website and various mobile apps. As Defendant Donahoe stated on the June 25, 2020 earnings call: "[W]e will invest in digital capabilities in our end-to-end technology foundation to accelerate our transformation" and establish a "single integrated technology strategy across our business." Specifically, NIKE would "speed up and unify our investments across demand sensing, insight gathering, inventory management and more."

99. Upon announcing the CDA strategy, Defendants repeatedly conveyed to investors that its purpose and effect was to propel long-term sustainable growth, accretive to NIKE's value. For example:[19]

(a) On NIKE's June 25, 2020 earnings call, Defendant Friend touted that NIKE's ***"transformation to a more digital and direct business is financially accretive to NIKE."***

---

[19] Certain of these statements were materially misleading for the reasons stated in Section V. However, all of them conveyed that the purpose (and, in some instances, the effect) of the CDA strategy was to drive long-term sustainable growth to the benefit of NIKE shareholders.

(b) A July 22, 2020 press release stated that the ***CDA strategy was the Company's "new digitally empowered phase of NIKE's strategy to unlock long-term growth and profitability***," which represents "the next phase of [NIKE's] growth."

(c) In a September 23, 2021 press release, Defendant Friend touted that NIKE's "Q1 results illustrate how ***NIKE's Consumer Direct Acceleration strategy continues to fuel growth and transform our long-term financial model***."

(d) On June 27, 2022, Defendant Friend highlighted, during an earnings call, that the CDA strategy "is ***driving long-term growth in value***" and "***positioning us well for long-term growth***."

(e) In an October 12, 2022 press release, Defendant Friend claimed that "[t]wo years into executing our Consumer Direct Acceleration, we are better positioned than ever to drive ***long-term growth***."

100. Analysts took note of CDA's importance to NIKE's long-term growth and profitability, and repeatedly emphasized that the CDA strategy thus was critical to NIKE's valuation. For example:

(a) In a July 22, 2020 analyst report, Morgan Stanley assigned NIKE Stock an "Overweight" rating and noted that the CDA strategy "solidifie[d] our belief in NIKE's long-term margin expansion story."

(b) Similarly, on March 11, 2021—on the eve of the Class Period—Morgan Stanely assigned NIKE Stock an "Overweight" rating, writing that "N[I]KE's commitment to and initial execution of its Consumer Direct Acceleration strategy further solidify our belief in the business' long-term [] revenue, margin expansion, & EPS growth story."

(c) On June 16, 2021, Morgan Stanely maintained NIKE Stock's "Overweight" rating, reiterating the above sentiment, and specifically emphasized that NIKE's growth story had just begun, with significant long-term growth on the horizon due to the CDA strategy, which "further solidif[ied] our belief that the business' long-term [] revenue, margin expansion, & EPS growth story remains ***in early innings***."

(d) Likewise, a June 25, 2021 report by UBS assigning NIKE Stock a "Buy" rating hailed NIKE's CDA strategy as the key to a future of "exceptional growth": "The market's main question now is if this is 'the top' for Nike? We think the answer is no. ***The financial benefits from Nike's transformation into a digitally-led, direct-to-consumer company are just starting to play out.*** We believe the reason to own Nike is for the ***exceptional growth it is likely to achieve over the coming years***."

(e) A March 22, 2022 report by Seaport Research Partners, assigning NIKE Stock a "Buy" rating, quoted Defendant Friend's statement on an earnings call the day before that "'the foundation is set for another year of strong growth . . . ***because our Consumer Direct Acceleration Strategy is working'"—which the analyst report described as NIKE's "[q]uote of the quarter***."

101. Similarly, Defendants consistently emphasized, both before and throughout the Class Period, that Defendant Donahoe's expertise in digital and DTC commerce perfectly positioned him to lead NIKE's CDA strategy.

102. For example, in the October 22, 2019 Press Release, Defendant Parker stated that Defendant Donahoe's "expertise in digital commerce, technology, global strategy and leadership combined with his strong relationship with the brand, make him ideally suited to accelerate our digital transformation and to build on the positive impact of our Consumer Direct Offense."

Industry publications like *Retail Dive*—which wrote that "Donahoe's experience in digital retail is a good fit for a brand focused on growing into that space"—and others ran with the story.

103. Similarly, on a December 19, 2019 earnings call, Defendant Campion emphasized Defendant Donahoe's "deep expertise in strategy, consumer digital technology and enterprise technology," and stated: "As we're still in the early innings of our digital transformation, now . . . is the perfect time for John to be joining and leading our team."[20]

104. Analyst commentary also repeatedly highlighted Defendant Donahoe's expertise in digital commerce, technology, and innovation, making Donahoe well-positioned to lead NIKE through its digital DTC acceleration. For example:

(a) On October 23, 2019, Oppenheimer, assigning NIKE Stock an "Outperform" rating, wrote that Defendant Donahoe "brings to the CEO role at N[I]KE a very impressive backdrop in technology and innovation, including time spent leading eBay and ServiceNow and on the board of PayPal," and that "***as a board member of N[I]KE for the past five years, John Donahoe served as an architect and proponent of the company's Consumer Direct Offense operating plan***."

(b) Similarly, on October 23, 2019, Cowen reiterated their "Outperform" rating of NIKE Stock and praised "Donahoe's skill set and rich experience [that] will directly address

[20] In NIKE's December 30, 2020 Annual Report and Annual Reports thereafter (*e.g.*, 2021, 2022, and 2023), Defendant Donahoe's featured biography highlighted his past roles and Board experience at such places as cloud computing company ServiceNow, e-commerce platform eBay, computer manufacturer Intel, and fintech leader PayPal. Likewise, in NIKE's Annual Reports on Form 10-K—*e.g.*, as issued on July 20, 2021, July 21, 2022, and July 20, 2023—in the section entitled "Information About Our Executive Officers," Defendants consistently touted Defendant Donahoe's "expertise in digital commerce, technology and global strategy" and prior service "as President and Chief Executive Officer at ServiceNow, Inc." and "as President and Chief Executive Officer of eBay, Inc."

Nike's digital transformation and help the [C]ompany to become more responsive to digital trends."

(c) In a March 23, 2021 article, Retail Dive quoted Michael Binetti, managing director at CreditSuisse, who praised Donahoe's fitness to lead NIKE under its new CDA strategy as part of the DTC focus: "He's the right man for the job . . . And you see him doing it very, very quickly."

(d) Likewise, in a December 15, 2021 analyst report, Truist Securities assigned NIKE Stock a "Buy" rating and highlighted Donahoe's "expertise in digital commerce, technology and global strategy."

**4. Key Factors for the CDA Strategy's Success**

105. The CDA strategy depended on NIKE building out or maintaining certain key aspects of its business. These key areas were: (i) developing an effective DTC supply chain; (ii) enhancing NIKE's DTC technological capabilities and establishing a technology organization to support those capabilities; (iii) engaging in a corporate reorganization to focus on DTC initiatives, including the creation of new consumer constructs; (iv) maintaining a robust pipeline of innovative products while effectively managing the supply of NIKE's key products; (v) maintaining its competitive separation and brand strength; and (vi) effectively adapting to consumer demand patterns regarding shopping at mono-brand and multi-brand retail stores. Unless NIKE achieved each of these goals, the CDA strategy could not drive the long-term sustainable growth promised to investors.

**a. The CDA Strategy Depended on Developing an Effective DTC Supply Chain**

106. The CDA strategy's success hinged in critical part on NIKE developing an effective DTC supply chain because, without one, NIKE could not successfully distribute merchandise to meet consumer demand.

107. When a company is relying on selling through wholesale partners, its supply chain is typically oriented around sending products to those wholesale partners. This involves shipping merchandise in large quantities to retailers who have already determined what merchandise to order based on consumer demand. These retailers have their own distribution capabilities, such that they then distribute the products they ordered to their stores or ship them for home delivery. Once again, using NIKE and Foot Locker as an example, Foot Locker will notify NIKE of which products it would like to purchase on a wholesale basis, and when. Foot Locker will then strategically disperse the NIKE products it purchased throughout Foot Locker's network of stores or will deliver them to consumers' homes.

108. When a company does not sell through wholesale partners, but instead operates a DTC model, it needs a supply chain capable of distributing products directly to consumers—either by shipping those products to the company's own mono-brand stores or directly to consumers' homes. This requires a company to establish complex logistical capabilities allowing it to ship merchandise directly to homes, take returns, and properly stock its own stores to meet consumer demand. Therefore, to increase its DTC capabilities, NIKE needed to successfully distribute its products directly to customers and its own mono-brand stores—without any third-party intermediary acting as a point-of-sale. Shipping products to NIKE's own stores creates unique complications because NIKE must determine how much of each type of merchandise should be in each store at a given time without relying on the data and expertise of a wholesale partner. This

involves building out a distinct supply chain infrastructure as compared to a wholesale distribution model. Thus, a company (in this case, NIKE) must expend large investments in logistics and infrastructure to develop an effective DTC supply chain.

109. These key differences between DTC and wholesale supply chains are commonly understood, and it is widely accepted that executing a successful DTC strategy requires an effective DTC supply chain.

110. For example, an April 25, 2024 article in *The Wall Street Journal,* entitled "The Tricky Logistics Behind Direct-to-Consumer Sales Strategies," quotes Tom Enright, a consumer retail analyst with a specialization in supply chain strategies, articulating that in order to execute a successful DTC strategy, "[y]ou've got to have a supply chain that looks more like a retail supply chain than a distribution one." When pivoting from wholesale to DTC, according to Enright, there must be a "reinvention of the supply chain."

111. This *Wall Street Journal* article explained the typical wholesale distribution process as follows: "Companies making goods from T-shirts to appliances typically ship merchandise in large quantities to retailers, often on shrink-wrapped pallets hauled by tractor-trailers to merchants' distribution centers. Retailers then handle distributing and selling the products through stores and home delivery." In contrast, "[r]eaching customers directly [*i.e.*, via a DTC distribution process] means charting a different supply chain, including picking, packing and shipping individual items through warehouses, as well as developing shipping and returns policies that are crucial to consumer sales."

112. Similarly, in a March 13, 2023 *Forbes* article titled, "The Impact on Supply Chains By Direct-To-Consumer Brands," the author quotes Marne Martin, an executive with decades of technology business leadership in various roles in software companies, who explained that "[a]

direct-to-consumer (DTC) brand is one that has full control over the selling process and its channels, which typically include online, other digital channels or its own branded stores."

113. Indeed, after launching the CDA strategy, NIKE publicly acknowledged the importance of building out a DTC supply chain to meet consumers where they are. For instance:[21]

(a) On a December 18, 2020 earnings call, Defendant Friend promised that NIKE would "***create a digital-first supply chain***, ***built on a strong technology and analytics foundation*** in order to optimize service, cost, convenience and sustainability."

(b) On a March 18, 2021 earnings call, Defendant Donahoe misrepresented that ***NIKE had been able to "fairly impressively pivot to a more direct-to-consumer supply chain***."

(c) In an April 26, 2021 interview at the U.C. Berkeley Haas School of Business, Defendant Friend falsely touted NIKE's DTC supply chain, specifically assuring investors that NIKE was "***employing data and analytics capabilities in our supply chain***," which yielded "the net benefit of . . . higher margins because we have less waste, less mark-downs, less inefficiency."

(d) On a September 23, 2021 earnings call, Defendant Friend falsely claimed that NIKE was "***creating a digital-first supply chain in the marketplace***."

(e) During the October 6, 2021 Annual General Meeting, Defendant Friend falsely claimed that NIKE was "***building a digital-first supply chain to meet the strong and growing digital demand***."

(f) On May 16, 2022, Defendant Campion represented to publication *Women's Wear Daily* that "the [DTC] supply chain is more productive than ever," noting that NIKE had

[21] Certain of these statements were materially misleading for the reasons stated in Section V. However, all of them conveyed to investors the importance to the CDA strategy of building a DTC supply chain to NIKE.

"***three to four times greater digital commerce distribution capability than [they] had two years ago***."

114. Likewise, analysts repeatedly emphasized that developing a DTC supply chain was critical to the success of NIKE's CDA strategy. For example:

(a) On August 17, 2020, Goldman Sachs assigned NIKE Stock a "Buy" rating and wrote that NIKE deserved its high valuation given ***NIKE's "digital shift, and investments in supply chain***."

(b) Similarly, on March 19, 2021, UBS gave NIKE Stock a "Buy" rating, highlighting that "Nike's investments in product innovation, ***supply chain speed***, and digital are unlocking what is likely a multiyear period of above average growth." UBS reiterated this sentiment, verbatim or nearly verbatim, many more times in additional analyst reports during the Class Period.[22]

(c) Likewise, on September 24, 2021, October 6, 2021, and January 7, 2022, Deutsche Bank issued analyst reports assigning NIKE Stock a "Buy" rating and applauding NIKE's ***"enhanced digital/supply chain capabilities" as reasons why "we remain confident in the company's long-term earnings algorithm.***"

(d) And in a September 24, 2021 analyst report assigning NIKE Stock a "Buy" rating, Jefferies wrote that NIKE "Shares Should Rise Another 25% From Here," in significant part because "the company's distribution model is moving towards DTC." In reports by Jefferies

[22] These include reports issued on: June 25, 2021, September 8, 2021, December 9, 2021, March 13, 2022, April 14, 2022, June 15, 2022, June 28, 2022, September 19, 2022, December 12, 2022, December 21, 2022, March 12, 2023, March 22, 2023, June 19, 2023, June 30, 2023, September 29, 2023, and December 7, 2023.

issued on December 21, 2021 and March 22, 2022, Jefferies reiterated that NIKE "[s]hares [l]ook [a]ttractive" for these same reasons.

**b. The CDA Strategy Depended on NIKE Building Out Its Technological Capabilities and Organization**

115. One of the three central pillars of the CDA strategy was that NIKE build out and unify its DTC technological infrastructure to enhance its DTC technological capabilities. To do this, NIKE needed to expand its technology organization (*i.e.*, group) that would ensure these DTC technological capabilities were successfully developed and employed. Without accomplishing these goals, NIKE's CDA strategy could not succeed.

116. This necessity of establishing sufficient DTC technological capabilities supported by an effective technological organization is widely understood. For example, in a March 28, 2023 interview published by McKinsey & Co. under the title "Retail growth: The big sprint towards customer obsession," Christiana Shi—a consultant focused on digitally-transforming consumer and retail businesses (who was previously a senior partner at McKinsey & Company and a NIKE executive who led NIKE DTC from 2013 to 2016)—described the sustained investment in technology that NIKE's digital transformation required. Specifically, she stated that "[a]nyone who is going through a digitally led transformation must understand that the commitment needs to be sustained, because, ***if not, you will fall behind the adaption curve, consumers, and the most efficient and cost-effective technologies***."

117. Likewise, an April 8, 2021 *MarketingTech* article, titled "Why direct-to-consumer depends on digital transformation: Key brand examples," noted that "direct-to-consumer depends on digital transformation." The article's author, Dr Anjali Subburaj (then the digital commerce chief architect at food manufacturer Mars) explained that that "[f]or brands to continue to grow their revenue and sustain their consumers beyond the pandemic, they must deliver relevant,

impactful, and cohesive experiences across all digital touchpoints and not just their eCommerce websites."

118. NIKE fully understood the importance of having a strong technological team capable of fully utilizing the technology needed to support its DTC acceleration, even before the CDA strategy was announced. Indeed, in a June 6, 2019 press release ("June 6, 2019 Press Release"), NIKE announced that it had created the new position of Global Chief Digital Information Officer, who would "lead all of Nike's global technology functions across the enterprise ***with responsibility for accelerating new digital capabilities for Nike***." The addition of this new leadership role was necessary because NIKE needed to "sharpen[] our ability to sense and serve" consumers. Concurrently, NIKE also announced in the June 6, 2019 Press Release that Ratnakar Lavu would become the Company's first Global Chief Digital Information Officer. Previously, Lavu had been the Chief Technology and Information Officer at Kohl's, "where he led all of IT, digital and consumer technology," and was previously Chief Technology Officer at Redbox. The June 6, 2019 Press Release touted that Lavu's "20-year track record in building seamless consumer experiences and leading teams through dynamic, digital transformations will further accelerate our growth." Thus, Lavu, as NIKE's first Global Chief Digital Information Officer was to play a critical role in building out NIKE's DTC technological capabilities and thus ensuring the success of the CDA strategy.

119. After the CDA strategy was announced, NIKE repeatedly emphasized that developing sophisticated technologies to support its DTC operations and establishing a technology team capable of fully utilizing its technology, was critical to the CDA's success. For example:[23]

[23] Certain of these statements were materially misleading for the reasons stated in Section V. However, all of them conveyed the importance of building out NIKE's technology capabilities and organization to ensuring the success of the CDA strategy.

(a) During a June 25, 2020 earnings call, Defendant Donahoe claimed NIKE would establish a "single integrated technology strategy across our business."

(b) In a July 22, 2020 press release, NIKE stated that the CDA strategy required that NIKE "unify investments in an end-to-end technology foundation to accelerate our digital transformation."

(c) During NIKE's 2020 Annual Meeting of Shareholders on September 17, 2020, Defendant Donahoe assured investors that ***"as part of CDA, we will accelerate our investments in digitally enabled stores and in our technology platform to create one integrated technology strategy across the business."*** Defendant Donahoe claimed that these changes and investments would result in "greater speed and responsiveness for consumers, as well as generating more profitability and growth for our business."

(d) On February 9, 2021, NIKE announced in a press release that it had acquired Datalogue, "a leading data integration platform start-up . . . to enable its consumer-led digital transformation." Defendant Donahoe explained that the acquisition would support the CDA strategy by "build[ing] on our digital momentum by enhancing our ability to transform raw data into actionable insights in real time and across the enterprise."

(e) In NIKE's April 2, 2021 10-Q Quarterly Report, Defendants indicated that they planned to "create an end-to-end technology foundation, which will further accelerate our digital transformation."

(f) During an April 26, 2021 interview for the U.C. Berkeley Haas School of Business Dean's Speaker Series, Defendant Friend touted that "[w]e are clearly going to be a technology company. . . the big opportunity for Nike is how we responsibly leverage the data that consumers give to us so that we can . . . serve them in more personalized ways."

(g) In NIKE's October 5, 2021 10-Q Quarterly Report, Defendants misrepresented that as part of the CDA strategy, they would "***continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further accelerate our digital transformation***."

(h) At a February 24, 2022 all-hands employee meeting, as reported by *Business Insider*, then-NIKE Chief Digital Information Officer Lavu insisted that ***"[t]echnology is going to be at the center of all the transformation that is going to happen now and in the future of the company*** . . . [a]nd it's actually going to get more deep-rooted and embedded into everything that we do."

(i) In NIKE's July 20, 2023 10-K, Defendants again noted that "we have made significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations, and our digital offerings will require continued investment in the development and upgrading of our technology platforms. In order to deliver high-quality digital experiences, our digital platforms must be designed effectively and work well with a range of other technologies, systems, networks, and standards."

120. Likewise, securities analysts repeatedly stressed that developing enhanced DTC technological capabilities and a technology team to effectively use those capabilities was critical to the CDA strategy's success. For example:

(a) On November 13, 2020, assigning NIKE Stock an "Overweight" rating, Morgan Stanley wrote that NIKE had "created one integrated technology roadmap with the goal of leveraging data to make faster, more informed decisions across the organization."

(b) In a September 24, 2021 analyst report assigning NIKE Stock a "Buy" rating, Jefferies wrote that NIKE "Shares Should Rise Another 25% From Here," in significant

part because "***the company is using tech to deepen its connection with its customer***." In reports by Jefferies issued on December 21, 2021 and March 22, 2022, Jefferies reiterated that NIKE "[s]hares [l]ook [a]ttractive" for these same reasons.

(c) A January 26, 2023 analyst report by J.P.Morgan, assigning NIKE Stock an "Overweight" rating, highlighted "personalization technology" as a "key" aspect of the CDA strategy.

**c. The CDA Strategy Depended on NIKE Establishing a Streamlined Organizational Structure**

121. The CDA strategy also required NIKE to execute a substantial corporate reorganization. This reorganization included NIKE reorganizing its business to focus on gender and age based "consumer constructs" (specifically Men's, Women's, and Kids'), as opposed to its previous focus on sport-based categories. The reorganization also included significant employee layoffs. According to a July 22, 2020 press release, this reorganization would "streamline [NIKE's] organization."

122. Defendants first conveyed certain specifics of this reorganization to investors on NIKE's June 25, 2020 earnings call. During that call, Donahoe began to detail this reorganization, stating that NIKE would "realign the company to reflect . . . [a] simplified Men's, Women's and Kid's approach." Previously, NIKE had organized its business based on sport-categorization, *i.e.*, running and basketball, among other sports. With the CDA strategy, however, NIKE announced that it was shifting away from this sport-based categorization, and was instead organizing around gender-and age-based constructs. As such, the CDA strategy initiated a corporate restructuring, through which NIKE would align its business under Men's, Women's, and Kids' constructs. On the same earnings call, Defendant Donahoe claimed that "this consumer construct will allow us to significantly simplify our organization and focus more of our resources on the capabilities and

opportunities that will forge our future . . . These intentional organizational focuses will touch every area of our business, including innovation, product creation, marketing, merchandising and distribution."

123. The July 22, 2020 press release further elaborated on NIKE's corporate reorganization under CDA, and announced "a series of senior leadership changes [] supporting the company's Consumer Direct Acceleration." These changes included the appointment of: (i) senior leadership to NIKE's newly created Men's, Women's, and Kids' constructs; (ii) new leaders for NIKE Brand's geographic operating segments (under the leadership of Defendant O'Neill); and (iii) new members to NIKE's Executive Leadership Team reporting to Defendant Donahoe (including Craig A. Williams, President of Jordan Brand). The July 22, 2020 press release touted that these "leadership changes, combined with a strategic alignment of NIKE's operating model against the CDA, will create even greater focus and agility that will be enabled by a nimbler, flatter organization in service of consumers."

124. This CDA-focused reorganization also included substantial employee layoffs. In the July 22, 2020 press release, NIKE stated that "[o]perational model changes to fully align against the CDA are expected to lead to a net loss of jobs across the company, resulting in pre-tax one-time employee termination costs of approximately $200 million to $250 million." On November 2, 2020, *The Oregonian* reported that NIKE had announced that it "expects to eliminate 700 jobs at its headquarters near Beaverton by early January, part of a broader restructuring the company announced last summer."

125. Analysts also repeatedly noted that NIKE's corporate reorganization under the CDA strategy was critical to its success. For example:

(a) On June 25, 2020, Goldman Sachs Equity Research assigned NIKE Stock a "Buy" rating, writing that it was a "best-in-class growth asset," and that analysts were "encouraged by [NIKE's] plans to accelerate its digital transformation," "as well as ***reorganization plans to increase focus on women's and apparel product and better integration of technology***."

(b) Likewise, an August 17, 2020 report by Goldman Sachs Equity Research assigning NIKE Stock a "Buy" rating stated that NIKE's "***new consumer construct . . . will prove to accelerate [NIKE's] DTC strategy***."

(c) Similarly, on September 15, 2020, BTIG wrote: "[t]he company's change to gender-focused categories should make the organization flatter and afford managers the ability to more efficiently and effectively drive growth." They added: ***"[w]e believe that . . . [NIKE's] streamlined men's / women's / kid's classifications are important accelerators to the company's evolving digital strategy***."

(d) Likewise, on December 15, 2021, Wells Fargo published an analyst report maintaining NIKE Stock's "Equal Weight" rating (stating: "the [NIKE] story [i]s among the best of consumer brands today"), and highlighting NIKE's "slew of organizational changes, including a shift toward a Men's/Women's/Kids' construct" and noting that "***we see the simpler format as a positive development" and that this reorganization "looks to be a powerful shift***."

(e) And, on December 21, 2022, UBS published a report assigning NIKE Stock a "Buy" rating and describing a call between UBS and NIKE management, during which a focus of UBS's questions was whether NIKE's "simplified men's, women's and kids approach . . . is working out the way [NIKE] intended."

#### d. The CDA Strategy Depended on NIKE Maintaining a Robust Innovative Product Pipeline

126. Maintaining an innovative product pipeline to meet consumer demand was also a foundational requirement of the CDA strategy.

127. As described *supra,* Section IV.A.3., the CDA strategy represented the "next phase of the Consumer Direct Offense." Thus, the CDA strategy incorporated key tenets of the CDO initiative—specifically, CDO's commitments to "accelerat[e]" innovation and "supercharg[e]" NIKE's product pipeline, "accelerate the impact and cadence of new innovation platforms," and "deliver innovation, at speed, through more direct connections."

128. Defendants were explicit that a focus on NIKE's product innovation pipeline was foundational to the CDA strategy. For example, when announcing the CDA strategy on the June 25, 2020 earnings call, Donahoe specifically assured investors that ***NIKE's focus on "product innovation" was something that "is not going to change" under the CDA strategy***, as NIKE's peerless innovation "will continue to drive distinction for our brand." Donahoe also touted NIKE's "unmatched investment in product innovation" and conveyed that "***innovation continues to be NIKE's greatest competitive advantage***," as "[w]e continuously bring fresh, new product to market." Further, Donahoe stated that "[t]he strength of our brand, our deep connections to consumers and our unmatched product innovation give us an advantage to create and define our future." On the same call, Defendant Friend echoed this sentiment, stating that "[t]he financial and operating principles that will carry us through these unprecedented times are the same ones that have guided us over the decades, and our brand momentum and deep consumer connections, our differentiated product and ***continuous flow of innovation***, our digital advantage and our operational capabilities have never been stronger."

129. After the announcement of the CDA strategy, NIKE continued to emphasize that the Company's robust pipeline of innovation products was integral to its DTC pivot. For instance, in a letter to shareholders dated July 24, 2020, NIKE stated that it was "delivering on . . . our high-impact differentiators," including "innovation and direct connections with consumers." In a September 22, 2020 earnings call, Defendant Donahoe similarly claimed that NIKE's "innovation pipeline and cadence has not slowed."

130. Defendants continued touting the importance of NIKE's innovation and product pipeline throughout the Class Period. For example:[24]

(a) In a September 23, 2021 press release, Defendant Donahoe attributed "NIKE's strong results" that quarter to "deep consumer connections, [an] unrelenting innovation pipeline and a digital advantage that fuels our brand momentum."

(b) During NIKE's June 27, 2022 Q4 2022 earnings call, Defendant Donahoe falsely touted NIKE's "***relentless pipeline of innovative products***, which ***continues to drive separation between us and our competition***. No other brand has our ability to resource, solve and scale in response to a consumer opportunity."

(c) On that same earnings call on June 27, 2022, Defendant Donahoe added, in response to a Deutsche Bank analyst's direct question about the product pipeline, that: earlier that month, at a meeting of Vice Presidents, "everyone walked out excited by the breadth and depth of the innovation pipeline."

[24] Certain of these statements were materially misleading for the reasons stated in Section V. However, all of them conveyed the importance of maintaining NIKE's innovative product pipeline to the success of the CDA strategy.

(d) In a June 27, 2022 press release, Defendant Donahoe falsely touted that ***"[o]ur competitive advantages, including our pipeline of innovative product*** and expanding digital leadership, ***prove that our strategy is working***."

(e) On September 29, 2022, during the Q1 2023 earnings call, Defendant Donahoe highlighted NIKE's "culture of innovation that drives a continuous pipeline of new products," falsely insisting that "***NIKE's relentless pipeline of innovative product continues to create separation between us and our competition***."

(f) During the December 21, 2023 Q2 2024 earnings call, in response to a J.P. Morgan analyst's question regarding NIKE's product pipeline, Defendant Donahoe underscored that as part of the CDA strategy, NIKE had "realigned [the] entire organization under Heidi O'Neill and Craig Williams . . . And as you know, we're single-mindedly focused on aligning our entire team to drive what NIKE does best: innovative product."

131. Analyst and news publications demonstrate that the investing public understood that NIKE's pipeline of innovative products was critical to the success of the CDA strategy and the Company's long-term growth prospects. For example:

(a) In the wake of the CDA's announcement, on August 4, 2020, Bernstein Societe Generale Group issued a report assigning NIKE Stock a "Buy" rating and stating that it "***believe[s] strong product traction and innovation will continue to drive results,*** while the shift to DTC benefits margins."

(b) Similarly, on June 19, 2020, Telsey Advisory Group assigned NIKE Stock an "Outperform" rating stating that they "see further upside over the next 12 months driven by . . . Nike's brand momentum and ***product innovation pipeline***."

(c) Likewise, on March 19, 2021 UBS gave NIKE Stock a "Buy" rating, highlighting that "***Nike's investments in product innovation***, supply chain speed, and digital ***are unlocking what is likely a multiyear period of above average growth***." UBS reiterated this sentiment, verbatim or nearly verbatim, many more times in separate analyst reports issued during the Class Period, up through December 7, 2023.[25]

(d) A March 19, 2021 analyst report by Citi similarly "assign[ed] NIKE a Buy rating," in significant part because of NIKE's purportedly "***unrivaled innovation pipeline***" and NIKE's "accelerating shift toward DTC."

(e) On September 24, 2021, October 6, 2021, and January 7, 2022, Deutsche Bank assigned NIKE Stock "Buy" ratings and issued analyst reports touting that NIKE's "***innovative product pipeline" was a key reason why "we remain confident in the company's long-term earnings algorithm***."

(f) On December 20, 2021, Deutsche Bank released a report assigning NIKE Stock a "Buy" rating and articulating that "we believe demand for N[I]KE product will remain robust and anticipate the company to achieve EPS growth of 20%+ in the out-years ***given N[I]KE's product innovation pipeline***," among other reasons.

(g) And, on March 21, 2022, J.P. Morgan published a report assigning NIKE Stock an "Overweight" rating and highlighting that NIKE's "***forward product pipeline . . .*** provid[ed] the foundation to execute the model's financial algorithm."

---

[25] These include reports issued on: June 25, 2021, September 8, 2021, December 9, 2021, March 13, 2022, April 14, 2022, June 15, 2022, June 28, 2022, September 19, 2022, December 12, 2022, December 21, 2022, March 12, 2023, March 22, 2023, June 19, 2023, June 30, 2023, September 29, 2023, and December 7, 2023.

132. The flipside of NIKE's need to ensure it had a robust pipeline of innovative products, however, was the Company's need to ensure it carefully managed the supply of its already-popular products. NIKE frequently refers to its various products as "franchises." As part of NIKE's pivot, it was important that NIKE have the correct level of supply for popular franchises, such as the Air Jordan sneakers, so it could meet demand without flooding the market.

133. As set forth in a July 5, 2024 *Sports Illustrated* article, titled "Why Nike Plans To Make Less of Its 3 Most Popular Sneakers," NIKE must manage the supply of its key products so that supply of those products does not outpace demand. This helps to "maintain the long-term health of Nike's most popular sneakers." Flooding the market with key products such that supply outpaces demand, however, risks making these products "uncool," thus diluting their popularity with consumers and reducing demand further. Similarly, an October 1, 2024 article in *The Wall Street Journal*, titled "***Nike Shares Slide After It Withdraws Year Forecast***," explained that for years NIKE had "***oversold" key products "and diluted their cool in the process.***

#### e. The CDA Strategy Also Depended on NIKE Maintaining Its Brand Strength and Competitive Separation

134. The CDA strategy also required NIKE to maintain its competitive separation and brand distinction. Even if NIKE were able to develop the capability to sell a far larger number of its products through DTC channels, demand for those products would nonetheless decline if NIKE's brand strength suffered and/or NIKE's competitive standing diminished.

135. It was particularly important that NIKE maintain its competitive position and brand strength in its key categories, such as running. Defendants repeatedly emphasized the special importance of the running category to NIKE's long-term success and, therefore, the success of the CDA strategy. For instance, on NIKE's March 21, 2023 earnings call, Defendant Donahoe said that "running is the heart of NIKE." At the end of the Class Period, in the October 1, 2024 earnings

call, Defendant Friend further explained the importance to NIKE of the running category, stating that "***NIKE is a running company. NIKE is a running brand. And it's incredibly important for NIKE to win with runners***."

136. Indeed, Defendants repeatedly publicly acknowledged that competitive separation and brand distinction were critical aspects of the CDA strategy. For instance:[26]

(a) During NIKE's June 25, 2020 earnings call, Defendant Donahoe stated: "NIKE's competitive advantage is driven by our team and by our brand's ability to connect with consumers, and this is fueled by our strategy, the Consumer Direct Offense, and it's why I continue to believe no one is better positioned than NIKE to navigate the current environment." As discussed *supra*, the CDA strategy incorporated the tenets of the CDO strategy.

(b) When announcing the CDA strategy on the June 25, 2020 earnings call, Defendant Donahoe specifically highlighted "[t]he strength of our brand" as a critical "advantage to create and define our future."

(c) Similarly, on the June 25, 2020 earnings call, Defendant Friend pointed to NIKE's "brand momentum" as a key aspect of NIKE's success that "will carry us through these unprecedented times."

(d) In a March 18, 2021 Press Release, Defendant Donahoe touted that "NIKE continues to deeply connect with consumers all over the world driven by our strong competitive advantages."

---

[26] All of these statements conveyed the importance of maintaining NIKE's brand strength and competitive separation to the success of the CDA strategy and thus the Company's long-term financial growth.

(e) On a June 27, 2022 earnings call, Defendant Donahoe assured investors that NIKE "continue[d] to have a competitive advantage in digital as one of the few brands that can connect with and directly serve consumers at scale."

(f) On A September 29, 2022 earnings call, Defendant Friend claimed that "NIKE's competitive advantages are also growing as the Consumer Direct Acceleration transforms our operating model, driving deeper and more direct connections through digital."

(g) On a March 21, 2023 earnings call, Defendant Donahoe noted that "[i]n an environment of increasing macro volatility, the distinction of our brands and our Consumer Direct Acceleration strategy set NIKE apart."

137. Analysts likewise repeatedly pointed out that NIKE's competitive separation and brand strength were crucial for the CDA strategy to succeed. For example:

(a) In a September 24, 2021 analyst report assigning NIKE Stock an "Outperform" rating, Evercore ISI wrote that "we think, ***given its brand power***, engaged consumers, ***limited competition, and now scaled DTC business***, Nike could more aggressively use pricing as a lever – especially during this highly inflationary period."

(b) In a December 8, 2021 analyst report assigning NIKE Stock a "Buy" rating, Goldman Sachs noted that "***N[I]KE has a strong runway for longer term growth, driven by: . . . a superior branding vs competition through continued engagement with consumers by investing into the DTC channel***."

(c) In a March 22, 2022 analyst report assigning NIKE Stock an "Outperform" rating, Cowen stated that "***Nike's Consumer Direct Acceleration strategy drove further competitive separation and quality sales growth***."

(d) On June 15, 2022, 2021, UBS gave NIKE Stock a "Buy" rating, highlighting the Company's "***brand strength***" as a key reason that NIKE could "outperform peers through a potential recession." UBS reiterated this sentiment verbatim, or nearly verbatim, in several additional analyst reports published during the Class Period through March 22, 2024.[27]

(e) On June 29, 2023, a UBS analyst report assigned NIKE Stock a "Buy" rating and stated that "Nike made it clear it is not changing its Consumer Direct Acceleration strategy and this likely means Nike will continue to take market share from Foot Locker." The UBS report also stated that "***Nike is a long-term outperformer," among other reasons, because of its "investments in product innovation, supply chain speed, and digital . . . [p]lus, we believe Nike has the brand strength***."

**f. The CDA Strategy Depended on NIKE Effectively Responding to Consumer Demand for Multi-Brand vs. Mono-Brand Shopping**

138. Another critical component for the success of the CDA strategy was that NIKE's channel mix between wholesale and DTC sales needed to match consumer preferences. In other words, even if NIKE were able to develop the capabilities to sell a far larger number of its products through DTC channels, those capabilities would be useless if consumers preferred to purchase NIKE products from non-DTC channels (*i.e.*, multi-brand retailers).

139. As previously described, NIKE sells its products through both mono-brand platforms (such as its own stores, website, and apps) and multi-brand stores (through its wholesale partners), and NIKE has historically sold a significant majority of its merchandise through its wholesale partners. Prior to the CDA strategy launch, as part of the CDO strategy, NIKE began to

[27] These include reports issued by UBS on: June 15, 2022, September 19, 2022, December 12, 2022, December 21, 2022, March 12, 2023, March 22, 2023, June 19, 2023, June 30, 2023, September 29, 2023, December 7, 2023, and March 11, 2024.

limit its sales to wholesale partners with the goal of instead growing its sales through DTC channels and a select group of "strategic" wholesale partners. As part of the CDA strategy, NIKE accelerated its turn away from wholesale partners, selling even less merchandise through multi-brand channels. By December 2020, NIKE had dropped about 30% of its undifferentiated wholesale partners. By spring 2021, NIKE had cut ties with wholesale partners, including many well-known multi-brand retailers, such as Fred Meyer, Zappos, Dillard's, City Blue, VIM, EbLens, Belk, Bob's Stores Boscov's, DSW, Urban Outfitters, Shoe Show, Dunham's Sports, Olympia Sports, Big 5 Sporting Goods, and Macy's. Indeed, according to a March 28, 2022 article in *Retail Wire* titled "Nike heads to the wholesale exits," by spring 2022, NIKE had reduced its number of wholesale partners worldwide by ***more than 50 percent***.

140. Instead of selling products through wholesale partners, after the launch of the CDA strategy, NIKE emphasized selling products through its own mono-band channels. These mono-brand channels included NIKE's stores that operated under a variety of names, such as NIKE Rise, NIKE Live, and NIKE House of Innovation, among others. NIKE's mono-brand channels also included digital platforms, such as NIKE's website and mobile apps.

141. Indeed, Defendants publicly acknowledged that for the CDA strategy to succeed, NIKE's channel mix between wholesale and DTC sales needed to match consumer preferences. For example:[28]

(a) On the June 25, 2020 earnings call, Defendant Donahoe claimed that NIKE's customers wanted a "consistent, seamless physical and digital experience" ordering products directly from NIKE through multiple mono-brand channels.

---

[28] All of these statements conveyed the importance of meeting consumer demand for mono-brand and multi-brand shopping to the success of the CDA strategy and NIKE's long-term growth.

(b) During the September 17, 2020 Annual General Meeting, Defendant Donahoe similarly noted: "You'll see us continue to shift away from undifferentiated retail. That means we'll focus on small number of key strategic wholesale partners that share our commitments to building the same premium, consistent, and seamless experience for our consumers."

(c) Likewise, on a September 28, 2023 earnings call, Defendant Friend stated: "We have shifted our channel mix, and that's been a consumer-led and a consumer-driven shift based on the consumer's desire to want to connect with NIKE both through our digital apps and through our stores."

142. Similarly, analysts and industry experts repeatedly emphasized that for the CDA strategy to succeed, NIKE needed to respond to consumer demand for multi-brand vs. mono-brand shopping. For instance:

(a) A July 29, 2020 article in *Vogue Business* titled, "Inside Nike's latest bet to understand its customers," cited industry experts stating that "Nike's colossal investment [in mono-brand retail] could ultimately pay off. It feeds into the company's ongoing strategy to scale back dependency on wholesale partners and have stronger control over its own distribution."

(b) Likewise, on September 23, 2020, analysts at UBS reiterated their "Buy" rating of NIKE Stock and highlighted that "***Nike is proving it can capture demand via its own websites and stores as it strategically reduces inventory in 'undifferentiated' wholesale channels***."

(c) In a March 19, 2021 report by Telsey Advisory Group assigning NIKE Stock an "Outperform" rating, analysts stated that NIKE's outlook was positive, "driven by a favorable channel mix related to higher penetration of Nike Direct."

(d) In a May 11, 2021 report by Jefferies upgrading NIKE Stock to a "Buy" rating, analysts stated that "[m]argin trends continue to improve given favorable channel mix (DTC > Wholesale)."

(e) In an October 12, 2021 report by Goldman Sachs assigning NIKE a "Buy" rating, analysts wrote that they "see the impact of th[e] strategic shift in Nike's channel mix" and were encouraged by NIKE executives having "announced that they plan to increase DTC's penetration of total sales up to 60% by 2025," a strategy they called a "meaningful driver for gross margins."

(f) In a December 21, 2021 report by Goldman Sachs assigning NIKE Stock a "Buy" rating, analysts saw "continued DTC channel shift as a gross margin driver moving forward."

(g) In a January 26, 2022 report by Jefferies assigning NIKE Stock a "Buy" rating, analysts stated that "[m]argin trends continue to improve given favorable channel mix (DTC > Wholesale)" and NIKE's "DTC shift aids full-price selling, while margins expand from channel mix benefits."

(h) In a March 16, 2022 report by Jefferies assigning NIKE Stock a "Buy" rating, analysts stated that "[m]argin trends continue to improve given favorable channel mix (DTC > Wholesale)."

(i) In an April 14, 2022 report by J.P. Morgan assigning NIKE Stock an "Overweight" rating, analysts opined that one of NIKE's "multi-year" drivers of margin growth included the "Channel Mix: Shift toward DTC (60% by FY25 from 40% in FY21) coupled w/ elevated wholesale positioning in Phase 2 of the Marketplace model now underway (= focus on driving productivity w/ remaining wholesale accounts following Phase 1 distribution 'cuts')."

(j) In a June 23, 2022 report by J.P. Morgan assigning NIKE Stock an "Overweight" rating, analysts opined that one of NIKE's "key drivers in FY23" included the "Channel Mix: Shift toward DTC (60% by FY25 from 40% in FY21) coupled w/ elevated wholesale positioning in Phase 2 of the Marketplace model now underway (= focus on driving productivity w/ remaining wholesale accounts following Phase 1 distribution 'cuts')."

(k) In a July 11, 2022 report by Jeffries assigning NIKE Stock a "Buy" rating, analysts stated that "[m]argin trends continue to improve given favorable channel mix (DTC > Wholesale)."

(l) In a September 23, 2022 report by Jeffries assigning NIKE Stock a "Buy" rating, analysts stated that "[m]argin trends continue to improve given favorable channel mix (DTC > Wholesale)."

(m) In a June 16, 2023 CGS-CIMB Securities and Raymond James report maintaining NIKE Stock's "Outperform" rating, analysts stated that they "expect tailwinds from channel mix—DTC should outperform Wholesale due to NKE's increasing focus on DTC (strategy)."

(n) In a June 16, 2023 Raymond James report maintaining NIKE Stock's "Outperform" rating, analysts stated that they "expect tailwinds from channel mix—DTC should outperform Wholesale due to NKE's increasing focus on DTC (strategy)."

(o) In a June 30, 2023 Bernstein Research report maintaining NIKE Stock's "Outperform" rating, analysts stated: "[d]espite concerns that Nike's return to DSW and Macy's signaled a reversal of the DTC shift or underperformance of the channel, DTC grew +18% cc in Q4, outpacing Wholesale at +2% cc. Mgmt reiterated their DTC strategy, expecting Nike Direct to outperform the rest of the business."

(p) In a December 7, 2023 report assigning NIKE Stock a "Buy" rating, UBS stated that their "gross margin estimate also increase[d] slightly as NKE's consumer direct acceleration strategy leads to improved channel mix."

(q) In a December 18, 2023 report, Oppenheimer & Co. assigned NIKE Stock an "Outperform" rating, highlighting Defendant Donahoe's September 28, 2023 earnings call statement that "we're going to be a more direct and a more digital company and a more profitable company. And there's a channel mix and channel profitability opportunity that comes with that as well."

## B. Defendants Misled the Market Concerning the Continued Success of the CDA Strategy

### 1. The Undisclosed Truth About the CDA Strategy

143. As explained *supra*, the CDA strategy depended on NIKE building out or maintaining certain key aspects of its business. These key areas were: (i) developing an effective DTC supply chain; (ii) enhancing NIKE's technological capabilities and building out a unified technology organization to support those capabilities; (iii) engaging in a corporate reorganization, including the creation of new consumer constructs; (iv) maintaining a robust pipeline of innovative products while effectively managing the supply of NIKE's key products; (v) maintaining NIKE's brand strength and competitive separation ; and (vi) effectively adapting to consumer demand patterns regarding shopping at mono-brand and multi-brand retail stores.

144. Unbeknownst to investors, however, Defendants knew or recklessly disregarded that, throughout the Class Period, NIKE was plagued by severe problems in each of these critical areas, which foreseeably led to the CDA strategy's eventual demise at the end of the Class Period.

### a. NIKE Failed to Develop an Effective DTC Supply Chain

145. Multiple former NIKE employees recount that throughout the Class Period NIKE failed to develop an effective DTC supply chain, thereby impeding the CDA strategy from the start. Indeed, as detailed further below, NIKE later tacitly admitted this deficiency after the Class Period by announcing that the Company's Chief Supply Chain Officer would report directly to the new CEO, Elliot Hill.

146. **NIKE's Deficient DTC Supply Chain:** CW-1 (NIKE's VP, Global Store Development from approximately August 2022 through May 2024) explained that the role she was hired to perform was to develop and expand NIKE's fleet of DTC stores. CW-1 stated that supply chain management was integral to the CDA strategy, but NIKE did not have sufficient capabilities to manage its supply chain as it pivoted more toward emphasizing DTC at the expense of wholesale, and NIKE did not sufficiently invest in supply chain management. According to CW-1, as a result, NIKE had significant supply chain problems that inhibited the success of the CDA strategy. CW-1 confirmed that the supply chain management issue was a problem for all of NIKE's DTC operations: NIKE's brick-and-mortar stores, website, and apps. ***Critically, this was a problem throughout CW-1's entire tenure—i.e., August 2022 through May 2024, and pre-dated her employment by many years***.[29]

147. CW-1 explained that supply chain management for DTC operations is very different than supply chain management when selling products on a wholesale basis to retailers. She added that NIKE had historically been a wholesaler, which is logistically simpler from a supply-chain perspective than running a DTC operation: NIKE could just ship product to retailers,

---

[29] CW-1's basis of knowledge for the preceding information predating her employment at NIKE is explained further below, in this Section at ¶155.

per the retailers' orders. Running a DTC operation, CW-1 advised, is much more complicated, as NIKE needs to know how much product to ship to which location, and when to do it. CW-1 elaborated that a DTC operation requires a different distribution system and measurement of different metrics.

148. CW-1 stated that most DTC retailers therefore have a separate distribution system for DTC operations than for wholesale operations. ***In contrast, CW-1 indicated, NIKE never put that kind of plan into place***; the Company had no plan to invest in a distribution system for its own stores. Instead, CW-1 added, NIKE just took its existing system that was built to supply third-party retailers with product, and it shifted that system to supply NIKE's own stores with product. CW-1 elaborated that ***the Company never established planning and allocation teams for its DTC stores***. CW-1 commented that there was no way for that system to be successful, and that it was a failure from the start: if the Company can't get products into its own stores, it can't get sales. CW-1 added that the supply chain was a problem years before she joined NIKE, but no one did anything. CW-1 explained that the US had the biggest problem with supply chain issues, and the supply chain problems affected mostly North America, Europe, Middle East & Africa ("EMEA"), and Latin America.

149. CW-1 indicated that she observed supply-chain problems first-hand when she visited NIKE stores and saw their storerooms, which she described as "hazardous." CW-1 noted that store managers tried to control the inventory flow, but they could not, and some stores had to rent their own separate storage spaces for excess inventory. CW-1 further noted that the poor distribution system led to product frequently moving back and forth between warehouses, stores, and storage units, and because of the increased need to move product, there was a large amount of product lost due to theft and general loss during transit.

150. CW-1 recalled that for months, there was no product able to get pushed out from the distribution centers to North America not because of COVID (NIKE used that as an excuse) but because their systems were built as wholesale systems.

151. **<u>Supply Chain Problems Raised to Management</u>:** NIKE's DTC supply chain problems were widely discussed and reported to management throughout the Class Period. CW-1 noted that many people internally raised NIKE's DTC-related supply chain problems. For example, CW-1 specifically recalled Mary Beth Laughton, Head of NIKE Global DTC,[30] discussing the problem. According to CW-1, management's response was that it was too expensive to create a separate DTC distribution system, and therefore they did not want to do it. CW-1 said that NIKE refused to invest in addressing the root cause of this issue.

152. CW-1 elaborated that these supply chain problems frustrated Laughton. CW-1 added that Laughton had a mandate to fix these problems, but she was "stymied from the get-go," as she was never given the tools to actually fix the problem.

153. CW-1 recalled that CW-1 first learned of the supply chain problems in 2022 from her former supervisor Sumi Ghosh (Global VP of Stores). CW-1 explained that Ghosh had informed the entire leadership team about the problem.

154. CW-1 stated that NIKE held quarterly audit meetings attended by individuals such as Mary Beth Laughton and Sumi Ghosh. According to CW-1, Defendant O'Neill and Craig Williams (currently NIKE's President of Geographies and Marketplace) would occasionally attend as well, whereas Defendants Donahoe and Friend did not. However, per CW-1, ***reports came from these meetings that went to the Board of Directors*** saying that supply chain problems were a huge

[30] Based on Lead Plaintiffs' investigation, Mary Beth Laughton ("Laughton") left NIKE in early 2025.

issue that needs to be fixed. ***CW-1 stated that Donahoe, Friend, O'Neill, and Williams received the audit reports discussed at these meetings*** and were included on invites to these meetings.

155. CW-1 recalled that the first quarterly audit session she attended was in the fall of 2022, soon after she joined NIKE. CW-1 stated that there were two issues listed in these audit reports and discussed at the quarterly meetings that related to her team ***throughout her tenure***: NIKE's supply chain management problems and the lack of women employed at NIKE's DTC stores. CW-1 added that the person who ran supply chain prior to Laughton taking over advised that ***the supply chain issue had been on the list for approximately ten years***.

156. **Supply Chain Problems and NIKE's Mono-Brand Stores:** Multiple CWs described how NIKE's DTC supply chain problems negatively impacted NIKE's mono-brand stores.

157. CW-1 used NIKE's "Well Collective" stores—which were meant to market to women and compete against entities like Lululemon—as an example showing how supply chain problems negatively impacted NIKE. CW-1 explained that, due to poor supply chain management, NIKE could not figure out how to get the proper amount of product into these stores; either there was not enough product, or way too much. CW-1 clarified that these supply chain problems also existed at other NIKE stores, including NIKE Live stores (which were the predecessors to the Well Collective stores).

158. CW-1 added that the excess of inventory at NIKE's stores caused OSHA violations because the stores could not safely store it all. CW-1 added that sales plummeted as a result and that this was an ongoing problem, especially in North America. CW-1 cited as an example NIKE's New York City store, which performed so poorly that the store's landlord, which was paid a percentage of the store's sales as part of its lease, raised concerns with the Company. CW-1 added

that this was not just occurring at the New York City store. CW-1 recalled that there were multiple landlords across the whole fleet of NIKE stores towards the end of her tenure calling and asking ***why sales were down 20 to 30%.*** CW-1 noted that this happened toward the end of her time at the Company, and that it "got really bad."

159. CW-1 elaborated that a DTC operation also needs internal buyers and allocators, which she described as the left and right hand. CW-1 explained that the buyers and allocators work together: the buyer decides what to get for the stores and the allocators decide where to put the product in the store and how much. CW-1 added that NIKE did not have allocation teams, so every store got the same amount of product, and it did not matter if the product was selling or not. CW-1 advised that some of that problem was being fixed when she left NIKE (in May 2024), noting that the Company promoted Cesar Garcia, currently VP, Global Product Merchandising and Operations, to address the issue, create allocation teams, and guaranteed buys. CW-1 added that none of that was done when CDA was launched.

160. The account of CW-2—who worked on marketing NIKE's DTC retail stores from 2018 to her departure in fall 2022—supports these allegations. CW-2 recalled that, beginning in July 2022, NIKE began lowering its internal targets for the number of NIKE Live stores it planned to open in North America because the stores were not performing well and because the Company had trouble finding real estate for its stores, and that NIKE continued to reduce these internal targets throughout CW-2's tenure. CW-2 elaborated that in Fall 2020, NIKE's goal was to open 200 NIKE Live stores in North America in three-to-five-years. However, CW-2 recalled that beginning ***in July 2022, the Company changed its NIKE Live strategy because its DTC retail stores were not performing well***. Therefore, CW-2 noted that NIKE subsequently laid off a NIKE Live Director and changed its goal from opening ***200*** NIKE Live stores to opening ***100*** stores and

then to opening ***75*** stores in three-to-five-years. CW-2 added that NIKE had ***only opened 50*** NIKE Live stores at the time of her departure (fall 2022).

161. CW-2 explained that NIKE Live stores faced supply chain and product-pipeline problems, which were major contributors to NIKE lowering its target for the number of NIKE Live Stores the Company planned to open. CW-2 further explained that NIKE was unable to align receiving products with the timing of opening new NIKE Live stores.

162. Thus, NIKE's DTC supply chain infrastructure and its product pipeline were so deficient that NIKE could not properly allocate products to NIKE LIVE stores when they needed to open.

163. CW-2 explained that NIKE had to place product orders for its stores 18-months in advance, but that NIKE was unable to accurately anticipate or project how many and what products to order for its stores that far in advance. CW-2 further explained that product was lacking in the pipeline for new NIKE Live store openings, which led to stores not being sufficiently stocked with the proper products. For example, CW-2 recalled that a lot of NIKE Live stores did not have enough women's products. CW-2 explained that this was problematic because women's products were the largest revenue generator for NIKE Live stores. CW-2 stated that these supply chain and product pipeline problems resulted in the Company not being able to evenly distribute new product between its NIKE Live stores. According to CW-2, this then led to a lack of product in certain stores, which in turn, resulted in a lack of traffic in those stores.

164. CW-2 explained that NIKE was not a good retailer and was better at working with wholesale partners, including Dick's Sporting Goods, because its wholesale partners kept their own consumer data and knew what products to order.

165. Another CW further corroborated these problems with the CDA strategy. CW-5 described that NIKE did not know how much DTC merchandise would sell before placing orders, because it had not developed the capabilities needed to plan for DTC demand. Therefore, CW-5 explained, running a retail DTC business required strong forecasting skills sets, which NIKE did not possess. CW-5 noted that prior to NIKE's pivot to a DTC strategy, NIKE was used to selling confirmed orders from its wholesale partners, rather than having to forecast which products would sell in the future through NIKE's own channels. CW-5 explained that NIKE did not know how much DTC merchandise would sell before placing orders because it had not developed the capabilities needed to plan for DTC demand. CW-5 added that before pivoting to DTC, NIKE did not have to worry about wholesalers' excess inventory, whereas NIKE would have to worry about excess inventory in NIKE's DTC channels.

166. **Post-Class Period Admissions:** The Company's post-Class Period restructuring to improve the efficiency of its supply chain supports that NIKE failed to develop an effective DTC supply chain during the Class Period, as it was then taking measures to remediate these problems. Specifically, on October 30, 2024, NIKE announced that the Company's ***Chief Supply Chain Officer***, Venkatesh Alagirisamy, would now report directly to new CEO Hill (who had taken over as CEO two weeks before) and that Alagirisamy will become a member of NIKE's Senior Leadership Team.

167. On NIKE's December 19, 2024 earnings call, in response to an analyst's question about whether there were plans to make "***the organizational structure around supply chain and distribution . . . more efficient***," Hill discussed this shift in senior leadership. Specifically, Hill responded that NIKE's Chief Supply Chain Officer "looks [at] everything from factory, transportation, all the way through to logistics, to the consumer," and the decision to establish a

direct reporting line between himself and the Chief Supply Chain Officer was "one of the first leadership moves I made." Hill elaborated that this focus on improving NIKE's supply chain "will help set us up for long-term, sustainable and profitable growth" and that "it will certainly be a focus as we move forward as an opportunity for margin expansion." Thus, such subsequent remedial measures further support that NIKE lacked adequate DTC supply chain infrastructure during the Class Period, contrary to its many assurances to investors at the time.

168. Hill also admitted the failure of NIKE's pivot away from a consumer construct based on sports-categories, stating that NIKE was reversing course: "***We lost our obsession with sport. Moving forward, we will lead with sport.***" Hill also admitted that NIKE had cut off innovation and instead relied on flooding the market with key classic products, which Hill planned to reverse: "a reliance on a handful of sportswear silhouettes is not who we are. We will get back to leveraging deep athlete insights to ***accelerate innovation***, design, product creation and storytelling."

169. On this same call, Hill also acknowledged that "***[p]rioritizing NIKE Digital revenue has impacted the health of our marketplaces.*** We will build back an integrated marketplace." In other words, Hill admitted that the CDA strategy failed to respond to consumer demand for multi-brand shopping, and NIKE was reversing course. To do so, according to Hill, NIKE needed to "prioritize is building back and earning the trust of our key wholesale partners," as "[s]ome partners and channels feel we've turned our back on them and we stopped engaging consistently. I've connected with many of them directly."

#### b. NIKE Did Not Successfully Build Out Its Technological Capabilities or Organization

Numerous former NIKE employees describe widespread, persistent, and severe problems with NIKE's technology organization and NIKE's technological capabilities necessary to support the CDA strategy. Subsequent news reports and other developments confirm these CW allegations.

##### (1) CWs Detail Widespread Problems Within the Technology Organization and Related Failures in DTC Technological Capabilities

170. The accounts of multiple former NIKE employees confirm that, throughout the Class Period, NIKE failed to successfully build out the Company's DTC technological capabilities and organization, which were critical for the CDA strategy to succeed.

##### (a) CW-3

171. **<u>CW-3 and Her Critical Role</u>:** CW-3 was employed by NIKE from February 2020 through July 2024 as Vice President, NIKE Digital Product. CW-3 explained her job duties as they related to NIKE's CDA and DTC strategies, indicating that she was brought in to help build NIKE's capabilities in those areas. CW-3 advised that NIKE followed a product development model where an employee "owned" a type of product, such as digital products or capabilities. CW-3 added that examples of digital products were Nike.com, the Nike app, training club, and other consumer-facing digital experiences.

172. CW-3 elaborated that her role was to work as an intermediary with respect to digital product development, between the engineering and technology teams—who focused on the technology side of things, like developing the relevant software and third-party experiences—and the marketing and strategy teams—who focused on the business/strategic side. CW-3's role was to translate the needs of strategy and marketing into design, acting as an advocate for the consumer, and asking how the design would look and feel for the consumer, what the consumers' needs were

and how they shopped, and what was achievable given the constraints of the technology. CW-3 added that she would get feedback from the engineering teams regarding these issues. CW-3 confirmed that her role involved bridging the distance between the business and technology sides, with the business side setting strategy and the technology side attempting to implement that strategy from a technological perspective. CW-3 analogized her role to an architect managing a construction project, acting as an intermediary between a carpenter and owner on a construction project. CW-3 also worked with legal teams to help navigate compliance and regulatory issues for various countries.

173. CW-3 added that she started on Donahoe's first day as CEO, and they attended orientation together. CW-3 recounted that ***Donahoe requested to be CW-3's "life mentor," and the two of them had many informal one-on-one meetings during CW-3's tenure***.

174. CW-3 noted that when Donahoe first became CEO, Donahoe requested to have weekly meetings to discuss progress and technology for the DTC strategy.

175. CW-3 indicated that from approximately February through April 2020, ***she reported directly to Defendant O'Neill***, who was then Global Vice President, NIKE Direct. CW-3 noted that ***O'Neill recruited her to join NIKE***; at the time, O'Neill reported to former President Elliot Hill. After Hill left NIKE in April 2020,[31] O'Neill was promoted, and CW-3 started reporting to Daniel Heaf, who assumed the role of Global VP of NIKE Direct, until June 2023. During this time, Heaf reported to O'Neill. From June 2023 until her departure, CW-3 reported, sequentially, to Craig Williams, then Mary Beth Laughton, Muge Dogan, and lastly Deepak Arora.[32] CW-3 explained that Williams reported at the time to Donahoe; Laughton reported to

[31] As described *infra,* Elliot Hill returned to NIKE as President and CEO of NIKE, replacing Defendant Donahoe, in October 2024.

[32] Based on Plaintiffs' investigation, Craig Williams is currently NIKE's President of Geographies

Williams; Dogan reported to Donahoe; and Arora reported to Dogan, who continued to report to Donahoe.

176. CW-3 explained that Heaf had both direct and indirect lines of people reporting to him. She elaborated that the NIKE Direct leadership team included both Heaf's direct and dotted line reports and global teams, including CW-3. CW-3 added that Heaf had dotted line reports who were Geo GMs, meaning General Managers responsible for particular geographic ("Geo") areas. Those Geo GMs, she continued, had Vice President responsibility for the NIKE Direct business in their geographic territories, including NIKE's stores and digital DTC business.

177. The account that follows reveals that throughout the Class Period, NIKE failed to successfully build out the Company's technological capabilities and organization, which were critical for the CDA strategy to succeed.

178. **NIKE's Deficient Technology, Including Consumer Personalization:** CW-3 indicated that, when she joined NIKE, CW-3 had visibility into the Company's technology, and she observed how it was heavily "antiquated." CW-3 commented that the Company made a significant investment in DTC technology, approximately $2 billion (separate from investment made in NIKE's supply chain, which had a separate budget or fund). Despite that significant investment, CW-3 advised that there was ***little to no progress made on building out this technology***.

179. CW-3 gave an example of a specific problem regarding NIKE's technological capabilities that hindered NIKE's ability to execute its DTC strategy successfully: there was an expectation that Marketing would send personalized email blasts to consumers based on those

---

and Marketplace; Mary Beth Laughton is currently Head of NIKE Global DTC; Muge Dohan is currently NIKE's Chief Technology Officer; Deepak Arora is the former co-leader of NIKE's technology group.

consumers' personalized data, but the technology underpinning this aim was not there. CW-3 pointed out that NIKE had not built the capabilities to develop greater personalization. CW-3 added that they did not have the resources to do so. CW-3 further explained that they had so much else to do that remedying this lack of personalization was not a priority. CW-3 added that one concern involving collection and use of personalized data was legal compliance.

180. CW-3 noted that, as time went on, more pointed conversations about technological capability problems became more common. According to CW-3, Heaf was responsible for setting priorities with respect to the DTC strategy, but based on the priorities that Heaf had set, the team's ability to execute the strategy was very limited. According to CW-3, the Geo GMs would inform Heaf that they could not hit their business targets with the resources they had, unless NIKE offered certain discounts, but Heaf advised that they could not discount NIKE's products in such a way. CW-3 added that there was a limited supply of "hot product" and discounts that could be allocated. According to CW-3, the Geo GMs, who were responsible for the P & L for their businesses, advised Heaf that "there was only so much magic" they could create given the global landscape and limited resources; they complained that they needed more resources, or their numbers would not hit their targets.

181. Thus, NIKE not only suffered from deficient technological capabilities, which were critical to the success of CDA, but little to no progress was made on building them out during the Class Period.

182. **April 2022 Paris Meeting**: CW-3 recalled that ***problems with NIKE's DTC strategy were discussed at a meeting in Paris on April 27, 2022.*** CW-3 explained that NIKE held an offsite meeting in Paris, and the purpose was to team build across the global NIKE Direct

leadership teams. CW-3 explained that this meeting was attended by Heaf. (As discussed above, Heaf reported to Defendant O'Neill during this time.)

183. At the Paris meeting, CW-3 continued, CW-3 presented a detailed "roadmap" which outlined the decline in dollars they had, their technology problems, how they were losing money on their technology problems, how their costs were higher than anticipated, and how poorly the money was being spent. CW-3 advised that ***she presented how dire the situation was, communicating to Heaf that if changes were not made, they would "run out of runway" within a few quarters*** to leverage the technological capabilities that they could employ. CW-3 recalled that there was frustration at the meeting that they were running out of money to complete the technology projects that were needed to underpin NIKE's DTC strategy. CW-3 recounted that they felt NIKE had good product selection and depth, and that they could still manage and sell inventory well and play on margin dollars at that time. However, CW-3 added, given the outlook presented at this meeting, the attendees knew that things would get worse in all of those dimensions, which they did. CW-3 confirmed that off-site meetings such as this Paris meeting occurred every six months.

184. **Quarterly DTC Meetings:** CW-3 advised that the DTC team met quarterly with Heaf to discuss the DTC strategy and ***to prepare Heaf to present to Donahoe*** regarding the strategy. CW-3 elaborated that at these quarterly meetings with Heaf, they discussed all aspects of the division's performance, including the digital business, geography, how the technology was progressing, and other matters. CW-3 added that Heaf then met directly with Williams, ***O'Neill, Donahoe, and Friend***, and other senior leaders for approximately a day and a half to discuss NIKE's DTC business strategy. CW-3 was not present for those meetings, but CW-3 noted that she received many text messages from Heaf asking questions during the meetings, and that after

Heaf met with Donahoe and the C-suite, Heaf would debrief her and the rest of Heaf's team about the meeting.

185. Accordingly, by no later than April 2022, Heaf—who reported to Defendant O'Neill—was apprised in significant detail of the severe technology problems plaguing NIKE's DTC strategy, and, during the Class Period, Heaf was meeting on a quarterly basis with Defendants Donahoe and O'Neill to discuss NIKE's DTC business strategy. Thus, Heaf likely updated Defendants Donahoe and O'Neill regarding the significant technology problems undermining the success of the CDA strategy.

186. **Ratnakar Lavu's Shadow Organization:** A significant source of the problems plaguing NIKE's technological capabilities and organization was the Company's Chief Digital Information Officer, Ratnakar Lavu, and his technology team.

187. According to CW-3, the Technology leadership was concealing problems and spending levels. CW-3 confirmed that the head of Technology to whom she was referring was Ratnakar Lavu, former Global Chief Digital Information Officer at NIKE. CW-3 noted that ***Lavu reported to Defendant Campion, who reported to Defendant Donahoe***. CW-3 recounted how Lavu would claim that his department had completed a certain project, for example, "we just launched this thing in China," and share that claim with Donahoe, who in turn would make public statements to investors based on what Lavu had told him. CW-3 added that these statements were not true; Lavu had lied. CW-3 indicated that the state of the relationship with the Technology team highlighted the need to resolve and escalate technology issues. CW-3 detailed how ***Technology had created a "shadow organization"*** within its department to replicate the duties and titles of Senior Directors in CW-3's team, so that Technology employees would not have to work or interact with those DTC employees.

188. **<u>Mid-2022 Meetings with O'Neill Regarding Technological and Technology-Organizational Problems</u>**: CW-3 indicated that she met with ***O'Neill***, a Human Resources employee, and others to discuss the problems with Technology and its shadow organization. CW-3 added that the meeting in Paris highlighted the incompetence, deceit, and related issues, and made them realize they needed to act. CW-3 described an additional meeting with O'Neill, Heaf, and a representative from Treasury, sometime between May and July 2022, to further discuss problems with the Technology team. CW-3 recounted two facets to these problems: first, these problems were driving poor engagement with the non-Technology DTC team, who could not meet their requirements, and wound up leaving NIKE, costing the Company talent; second, the technology projects were costing much more than NIKE's management were told. CW-3 recounted, as an example, that Technology would state that a project would cost X, when in reality it would cost six times that. CW-3 recalled O'Neill stating that changes would be made, but she did not see any immediate changes.

189. Thus, by no later than July 2022, the problems with the Lavu's shadow organization had been directly raised to Defendant O'Neill via CW-3, and O'Neill acknowledged such problems but failed to act.

190. **<u>Monthly Technology Meetings with Donahoe, Friend, O'Neill, Campion, and Lavu</u>:** CW-3 described meeting with four Vice Presidents and Heaf to inform them that she had no faith in Technology's ability to execute what they needed to do to support NIKE's DTC strategy, and to discuss Technology's lack of transparency. CW-3 advised that that discussion led to the establishment of monthly meetings, beginning sometime between May and July 2022**,** that CW-3 attended with Donahoe, O'Neill, Friend, Campion, and Lavu. The purpose of these monthly meetings was to force Lavu to be more transparent and cooperative, and to discuss progress

regarding technology investments underpinning NIKE's DTC strategy. CW-3 elaborated that, by holding these meetings, Lavu was forced to be more transparent. In CW-3's view, these meetings did improve transparency and collaboration. CW-3 noted further that Lavu's direct reports also wanted the greater transparency, as they did not like the secrecy and deceit, and their working relationships improved after these meetings were instituted. CW-3 recalled that at these meetings, they discussed what the largest programs were in which they were investing, from a tech perspective. CW-3 gave as an example a compliance maintenance program in China which caused a major problem; the Company had to turn off its app in China in order to meet Chinese compliance requirements. CW-3 noted that doing so cost the Company millions of dollars. CW-3 advised that they also met directly with Donahoe about the compliance problems, and Donahoe was able to start asking questions about it, including questions about costs and timelines. CW-3 observed that it was clear that the Technology team could do very little but was spending a lot of money and not making sufficient progress toward executing NIKE's DTC strategy. Thus, ***CW-3 confirmed that by the summer of 2022, CW-3 was having monthly meetings with Donahoe and other executives, and that, Donahoe was informed about the problems within the Technology group led by Lavu***.

191. **CW-3's One-on-One *Ad Hoc* Meetings with Donahoe:** In addition to the monthly meetings that began in the summer of 2022, CW-3 advised that she had many ***one-on-one ad hoc meetings with Donahoe*** throughout her time at NIKE and that ***CW-3 spoke to Donahoe about these technological problems underpinning the DTC strategy*** at these meetings. CW-3 explained that she and Donahoe held their one-on-one meetings in different ways; sometimes Donahoe would call or FaceTime with her. CW-3 elaborated that even ***in January or February 2022***, she was clear with Donahoe about her concerns during their one-on-one meetings. CW-3 recalled that Donahoe pushed to have more meetings so that he could have more visibility. CW-3 clarified that she had

been meeting informally with Donahoe since the start of her employment, but ***in February 2022 she began telling Donahoe about the technological problems underpinning NIKE's DTC strategy and her concerns about Lavu; and between May and July 2022, she began participating in the more formal monthly meetings with Donahoe, Friend, and other senior executives to discuss the problems***.

192. **<u>Retention of Accenture</u>:** CW-3 explained that her concerns about Lavu's shadow organization were discussed during her meetings with Donahoe, and that these discussions led to the hiring of consulting firm Accenture to audit their product teams. According to CW-3, ***the audit results confirmed that Lavu had created a shadow organization***, that they had "100%" more product people than they needed, and that led to laying off about 200 of those employees. CW-3 expressed her frustration that these issues took a lot of her attention away from running the business and focused instead on managing operating levels and org charts.

193. **<u>DTC Marketing Technology Problems Discussed with Defendant Donahoe, Including Consumer Personalization</u>:** CW-3 detailed some of the problems that were raised in the meetings with Donahoe starting in the spring of 2022. CW-3 explained that some of the problems related to things that "you just have to do," meaning multi-year, hundred-million-dollar investments that take years to develop, such as their compliance problem in China. Another example CW-3 gave was building out the Company's marketing capabilities from a tech standpoint. CW-3 noted that, prior to 2020, NIKE had third-party wholesalers providing marketing. After the implementation of the CDA strategy in 2020, CW-3 continued, NIKE needed to develop personalization in its marketing as it reorganized to target specific markets, such as women, and competition grew fiercer. CW-3 explained that NIKE needed to focus on personalization, such as the ability to send push notifications and SMS messages. CW-3 gave the

example of a consumer getting an email that says, "we have women's tights now," and the link takes you to a web page for running shoes. CW-3 indicated that the Company needed to make sure its app, website, and the push notifications all lined up, but there were significant gaps in those capabilities. CW-3 noted that those gaps caused a ***significant decline in consumer email responses, which dropped 38% year-over-year***. CW-3 also noted that ***all direct engagement marketing was declining***.

194. CW-3 explained that, to resolve those problems, NIKE needed to collect and put to use personalized consumer data, which required NIKE to capture, store, and use customer data on a personalized basis to deliver meaningful marketing. CW-3 added that the Company also had to ensure its data privacy practices were legally compliant within each market. CW-3 commented that doing so is highly complex and requires a big investment. CW-3 added that her ability to develop meaningful marketing based on personalized consumer data was a major reason she was recruited to NIKE, and that it was clear what was required.

195. **Adobe Partnership:** CW-3 advised that, rather than build up its capabilities internally, NIKE chose to partner with Adobe to do so. According to CW-3, ***Lavu and Donahoe led the deal with Adobe***, which was a ***$400-plus million contract*** which was ***intended to generate $1.5 billion or more in revenue***. CW-3 explained that the Adobe deal required incremental payments to Adobe on an ongoing basis, and that it would free up investment after three years; from a business model perspective, the deal looked good, and ***Donahoe signed it.***

196. CW-3 confirmed that the ***Adobe contract was signed in 2021, but it became apparent almost immediately that there was a gap between what was promised and Adobe's ability to deliver***. CW-3 noted that there were expectations that were not met: Adobe promised that EMEA would have personalized messaging by Black Friday, but that did not happen, and Adobe

kept shifting the timeline and focus, such as shifting its focus to North America, because that was an easier geography to address, but that shift still did not yield results. CW-3 added that the Geo GMs lost faith in the project right away.

197. CW-3 confirmed that ***Donahoe had full visibility into the issues with Adobe as Donahoe had a direct hand in signing the agreement.*** CW-3 characterized the Adobe deal as NIKE's biggest financial miss from the cost perspective and its inability to deliver resources. CW-3 observed that the business case for the deal kept getting smaller, costs kept going up, and resources declined. CW-3 added that ***in 2024, Muge Dogan[33] came in, told Donahoe that the Adobe contract was "a dog" which was costing way too much, and she renegotiated it***.

198. CW-3 added that she inherited the deal to implement. CW-3 indicated, however, that Adobe was not capable of handling the project, which was too large for that company. CW-3 explained that there were too many gaps, which was quickly apparent, between what Adobe said it would offer and what was actually being delivered. ***For three years, CW-3 continued, the project stagnated, but NIKE kept spending money on Adobe.*** By the third year of the contract, CW-3 continued, NIKE was paying more to Adobe than the previous years, under the terms of the deal – approximately $65 million – ***but the technology still wasn't working***. CW-3 added that the internal costs and tech resources were not accounted for; ***the project brought in zero dollars*** and the Geo GMs were not getting the resources they needed.

199. CW-3 reiterated that Donahoe was kept apprised of the problems with Adobe, as Adobe's implementation and its progress were always featured in her monthly meetings with Donahoe. CW-3 stated that ***Donahoe was getting answers about the problems with the Adobe***

[33] Based on Plaintiffs' investigation, Dogan was appointed to lead NIKE's technology group in November 2023, after Lavu's departure in February 2023.

***deal, but did not act on it until Dogan came in***. CW-3 noted that Lavu also never acted on the problems with the Adobe deal.

200. **Additional Meetings with Heaf:** In addition to her monthly meetings with Donahoe, CW-3 stated that she and her team had monthly meetings with Heaf, and Heaf had a monthly meeting with Donahoe. CW-3 added that her monthly meetings were called Portfolio Reviews, in which they reviewed programs such as the Adobe contract and the China compliance issue. At these meetings, they would discuss, for example, having a budget of $2 billion to spend on technology, the team's progress, what the results are, the spending trend, and related issues.

201. Thus, Defendants, including specifically Defendant Donahoe, were aware that the Adobe partnership to build NIKE's DTC technological capabilities as part of the CDA strategy was a colossal failure, costing NIKE over $400 million—an investment intended to generate over $1.5 billion in revenue, but in reality generated $0. Accordingly, Defendants' repeated public statements during the Class Period touting NIKE's DTC technological capabilities, including the Adobe partnership specifically, were knowingly or recklessly false when made.

(b) **CW-12**

202. Additional CW allegations corroborate the account above regarding the severe problems in NIKE's technology organization and capabilities, which substantially undermined the Company's ability to successfully execute the CDA strategy and drive the vaunted long-term financial growth.

203. CW-12 was employed by NIKE from 2018 to 2022 in various roles. In her last role, which began in summer 2020, CW-12 served as a technology leader who worked on digital marketing projects.

204. **<u>Technology Group Merger and Employee Exodus</u>:** CW-12 recalled that two separate technology organizations existed at NIKE when she joined the Company in 2018. CW-12 explained that one of the technology organizations was a digital technology group within NIKE, which built software. CW-12 stated that the second technology organization at NIKE was larger and was more of a traditional IT organization. CW-12 noted that this organization primarily purchased software through vendors.

205. According to CW-12, the two technology organizations merged shortly before former Chief Digital Information Officer Ratnakar Lavu joined NIKE in June 2019, which CW-12 noted were related occurrences, as Lavu's new role and the merger were part of the same re-alignment of the tech organization within NIKE.

206. CW-12 noted that NIKE had less talent and clarity to execute its CDA strategy after the merger due to an exodus of talented technology employees. CW-12 detailed that the exodus of technology talent happened at NIKE approximately within a couple of years, beginning with the merger of the two technology organizations.

207. **<u>Lavu's Shadow Organization</u>:** CW-12 stated that Lavu's team impeded the work of CW-12's team at NIKE, partially because Lavu hired consultants from other countries to fill roles that CW-12 already filled with high paid employees. CW-12 recalled that Lavu also brought in his former Kohl's colleagues to NIKE. CW-12 noted that Lavu was a big part of why NIKE's CDA strategy achieved less than it could have. CW-12 clarified that this was her perception based on feedback she received from members of her team that were frustrated with Lavu.

208. CW-12 stated that complaints about Lavu were coming from all sides. CW-12 added that Lavu signed contracts to bring in contractors to do the same work that CW-12's team

was already doing. CW-12 noted that Lavu provided "no visibility" into these contracts. CW-12 stated that Lavu created duplication of efforts without conversation.

209. CW-12 recalled that NIKE brought in consultants to solve problems between Lavu and former Vice President, Digital Product CW-3. CW-12 detailed that CW-3 was hired in February 2020 to lead NIKE's Digital Product Management team. CW-12 explained that after NIKE's two technology organizations merged in 2019, NIKE pulled out the Digital Product Management team from the merger and left it as a standalone group within the Company. According to CW-12, CW-3 faced difficulties with Lavu mainly because Lavu built a technical product management organization underneath himself that mirrored CW-3's group.

210. **CW-3's Regular Meetings with Donahoe and Lavu**: CW-12 advised that ***Donahoe, Lavu, and CW-3 regularly met during her tenure to discuss NIKE's technology,*** and CW-12 appreciated hearing about this collaboration. CW-12 stated that she did not attend these meetings, but she learned from CW-3 that these meetings occurred. CW-12 stated that she became aware of these meetings prior to CW-12's departure. CW-12 clarified that Donahoe, Lavu, and CW-3 met to surf Nike.com and the NIKE app and discuss these platforms.

211. **Adobe Partnership:** CW-12 explained that NIKE employees were frustrated when NIKE partnered with Adobe because there were already internal efforts to accomplish the work that Adobe was then hired to do. CW-12 detailed that Adobe was brought on, among other reasons, to provide a new CMS system (which stands for "content management system"), but that NIKE already had as many as 200 employees working on a new CMS system. CW-12 clarified that providing a new CMS system included building out NIKE's digital marketing capabilities, including analyzing data to determine which NIKE customers to send marketing emails. However, CW-12 recalled that NIKE had 20 to 30 NIKE data scientists that were working on this project

already. CW-12 recalled that this partnership with Adobe began in 2021. CW-12 noted that by the time she departed the new Adobe CMS system had only launched pilots and had not been fully rolled out.

212. According to CW-12, NIKE never provided clarity to the NIKE employees whose work was duplicated by Adobe personnel about their responsibilities after NIKE partnered with Adobe. Therefore, CW-12 detailed that internal NIKE teams continued to build CMS and digital marketing capabilities even though the Company hired Adobe to work on those same capabilities.

(c) **CW-11**

213. Another CW focused on NIKE's technology echoed these concerns with NIKE's dysfunctional Technology organization and capabilities. CW-11 was employed by NIKE from September 2014 until April 2023 during which she worked on roles with the NIKE App, Nike.com, and Nike.net, which was the wholesale back end for small to medium sized business.

214. CW-11 confirmed that NIKE's CDA strategy depended on NIKE's technology team making changes to the Company's stores, websites, and apps.

215. **Lavu's Shadow Organization:** CW-11 indicated that NIKE's attempt to modernize its technological approach coincided with NIKE's decision to bring in Ratnakar Lavu to lead the Company's technology team. CW-11 advised that Lavu "brought in his crew" from Kohl's when he was hired, and they used an "old school, project management approach," instead of a modern product management approach, such as at Amazon.

216. CW-11 further advised that Lavu and his team were "bad actors." CW-11 elaborated that Lavu outsourced and off-shored many resources, including sending contracts to consultants in India, and spending significant amounts of money, but nothing got done.

217. CW-11 stated that when Lavu started using his contractors in India, the Company was no longer getting work done or getting quality work. CW-11 explained that technical people frequently had to join calls with these remote technology teams to explain basic issues. CW-11 noted that the front-end team, which CW-11 was on, still existed at NIKE. CW-11 added that this front-end team was still developing necessary capabilities to update NIKE's technology. However, according to CW-11, in order for the front-end capabilities to work, the back-end team needed to fulfill its function.

218. Per CW-11, the back-end teams did not deliver anything to make the front-end functions work. CW-11 described how relationships became "combative pretty quickly" between the new technology product managers and the people who had been with NIKE for a while.

219. CW-11 stated that another problem in the technology organization was that Lavu had hired many people for the tech organization in duplicate/redundant roles for positions which already existed in the product organization. CW-11 stated that the product organization reported to CW-3, former Vice President, NIKE Digital Product. CW-11 explained that this duplication of roles made it hard to get work done due to communication issues between the product organization teams trying to work with people with the same function in the technology organization teams. CW-11 reiterated that this was primarily an organizational issue more than a technology problem. CW-11 confirmed that her team reported to CW-3, and that these issues were "absolutely" raised to CW-3. CW-11 added that she did not know what the senior executive level were told about these problems, but people at CW-3's level – that is, vice president – "definitely" knew.

220. The reorganization of NIKE's technology team was impeded by problems with the staff hired by Lavu. CW-11 noted that Lavu came from Kohl's, which CW-11 described as a "cut-rate brand" based only in the United States. CW-11 added that Lavu brought in a bunch of his

people from Kohl's to NIKE. CW-11 stated that this in itself was not unusual. The problem, CW-11 advised, was that the people Lavu brought in had a different way of working than the existing NIKE employees. CW-11 explained that in a healthy organization, there is a back and forth between the new team and the existing teams to understand how things operate, how to adjust to the culture, and figure out how to get things done. According to CW-11, however, Lavu's team demanded things be done their way. CW-11 stated that their attitude was "our way is how we do things," and that attitude was a challenge.

221. In CW-11's experience, there was tension between her team and Lavu's team, in part because CW-11 could not get help when her team needed it from these hires. CW-11 recounted hearing that Lavu and other leaders in the tech organization engaged in "retribution" against engineers who spoke up that certain ideas were not feasible or good. According to CW-11, those engineers were ordered to implement those ideas anyway. Then, CW-11 explained, the ideas could not be implemented, as the engineers had warned, and those engineers were punished.

222. According to CW-11, however, ***by the end of 2021***, it was clear to everyone at the leadership level that Lavu's team was not working well or effectively with the other business units, including the Geos (Geography Managers), product management teams, or others. CW-11 explained that the Geos "owned" the P & L for their areas; they were responsible for taking the tech that CW-11's team gave them to sell as many products as they could. CW-11 elaborated that whenever her team could not deliver on the tech changes, it impacted the Geos marketing or business practices, creating more labor for them, and/or impacting their business flow. CW-11 added that the technology issues had an indirect impact on the Geos' numbers, even though the Geos did not have the interpersonal problems with the tech team like the product management teams did.

223. Thus, this CW account also confirms that it was well known within NIKE that Lavu's shadow organization, and its dysfunctional impact on NIKE's DTC technology development efforts, prevented NIKE from achieving an effective reorganization of its technology group and DTC technological capabilities, thus further undermining the success of the CDA strategy.

224. **Adobe Partnership:** CW-11 explained that Lavu also launched initiatives that did not make sense, like bringing in Adobe for a program called Adobe Target,[34] which is used for A/B testing[35] and other features, including marketing technology. CW-11 noted that NIKE had been using a different system for A/B testing. CW-11 also stated that NIKE had been using a different Adobe product for analytics. CW-11 stated that each of those systems worked. CW-11 elaborated that, when the technology organization announced that they would switch to Adobe Target, CW-11 and her peers objected, stating that that this technology was not as good as what NIKE was currently using and would take a year or more to implement.

225. CW-11 said she and her peers asked why NIKE would switch the technology. According to CW-11, switching the technology was an executive directive and she and her team had no choice. CW-11 noted that she got into a long argument with a senior director about the technology change, which occurred during the pandemic. CW-11 recalled that the senior director actually agreed with her but made it clear that they had no choice but to implement it.

226. CW-11 then explained that Adobe Target was the new product used for dynamic A/B testing and targeted marketing, including serving the right content to the right people,

[34] Adobe Target is further described in paragraphs 226-27 below.

[35] Based on Lead Plaintiffs' investigation, A/B testing is a method of comparing two versions of a webpage or mobile app against each other to determine which one performs better.

determining details such as what colors to make the buttons on the site, how many results should be returned per search, and how consumers responded, to figure out which features work better.

227. CW-11 indicated that NIKE already had tools to perform all these functions, some of which were other Adobe products. CW-11 stated that Adobe Target was intended to be a replacement for those tools. CW-11 added that the tech team that looked at Adobe Target for these marketing and testing tools communicated that Target was not optimal to replace their existing tools, but NIKE went with the contract for Adobe Target regardless. CW-11 explained that the problem with Adobe Target was that the technology did not do what NIKE needed it to do, and it never could. CW-11 described it as "doomed from the start." CW-11 added that it was understood by everyone on the technology team from the beginning that it would not be effective. CW-11 indicated that CW-3 and others at CW-3's level would have been apprised of the problems.

228. CW-11 noted that CW-3 was "deeply enmeshed" in Adobe Target and its problems. CW-11 recalled that Indra Kumaran was also involved with Adobe Target. Kumaran is currently VP, Product Management, NIKE Direct and Marketplace, at the Company.

229. CW-11 indicated that Kumaran was well aware of the Adobe Target issues and would have reported them up. CW-11 added that James Lane, former Sr. Director, Product Management - Experimentation & Personalization at NIKE, was also involved with Adobe Target. CW-11 advised that this situation was bad for employee morale and caused people to stop working as hard as they used to work. CW-11 noted that, previously, employees liked working at NIKE and had pride in the company, but when Lavu came in, progress ground to a halt.

230. CW-11 explained that the technology changes at NIKE included progress in terms of replacing APIs (Application Programming Interfaces) and making updates for the website. In CW-11's view, CDA would have failed regardless, but it was made much worse due to the failures

of the technology organization to operate effectively and in good faith. CW-11 explained that APIs are programs that enable technology systems to talk to each other; the API is the interface that the back-end uses to communicate with other programs to retrieve data.

231. CW-11 recalled that the big reorganization of the technology organization occurred in November 2020. CW-11 stated that she first started seeing the negative impact of Lavu's people by 2021, if not earlier.

232. CW-11 added that she shifted her role at NIKE ***in early 2022, and by that time the problems had been clear for a year.*** CW-11 noted that she experienced these problems working at the front-end consumer-facing side of the business, but when she shifted to working on NIKE.net – that is, wholesale operations – the problems were clear on that side also.

(d) **Additional CW Accounts**

233. Other CWs' accounts further corroborate and provide more details about the issues with NIKE's failing Adobe partnership, Lavu's shadow organization, and other organizational and technological problems inhibiting the success of the CDA strategy.

234. **Adobe Partnership**: CW-14 worked as a contractor at NIKE starting before the Class Period to June 2022. From 2018 to late 2021, CW-14 was a Program Manager within the Global Technology group. From late 2021 to June 2022, she was a Program Manager in NIKE's Global Brand Marketing group, where ***she helped roll out the Adobe Experience Platform*** and reported to a Senior Director of Program Management.[36]

[36] As described on Adobe's website, Adobe Experience is a platform that "enables organizations to centralize and standardize customer data and content from any system and apply data science and machine learning to dramatically improve the design and delivery of rich, personalized experiences."

235. According to CW-14, NIKE hired Adobe to help scale the Company's digital marketing capabilities. CW-14 detailed that from October 2021 to June 2022, she helped roll out a segment of the Adobe Experience Platform. CW-14 described that ***this project was a "mess" when she joined in October 2021 and that it "stayed a mess" until her departure in June 2022***. CW-14 explained that this project was a mess because there were too many people and vendors doing duplicative work and because there was a lack of guidance and leadership.

236. CW-14 detailed that the Adobe Experience Platform was broken down into four segments, although she did not recall the name of each specific segment. CW-14 did recall that she worked on a segment called Target. CW-14 explained that the purpose of the Target segment was to target customers with campaigns and offer customers specific products based on their likes and dislikes in an effort to engage them. ***CW-14 advised that her segment was "still a work in progress" by the time of her departure in June 2022***.

237. CW-14 stated that another aspect of the Adobe Experience Platform was meant to allow for email blasts to consumers. CW-14 explained that while she was not directly involved in implementing this aspect of the Adobe Experience Platform, she understood that NIKE was in the early stages of implementing it when she departed. CW-14 explained that NIKE was still building the email blast segment when she departed NIKE and that there were issues with capabilities such as tracking email blast numbers. ***CW-14 added that the email blast portion of Adobe Experience Platform was an "ongoing work in progress" and that "nothing was fully implemented" when she left NIKE.***

238. **<u>DTC Technological (Dis)organization</u>**: CW-14 explained that NIKE's digital reorganization did not account for groups that were a critical part of its business. For example, CW-14 recalled that NIKE wiped out an internal group that supported retail stores, which the

Company later brought back. CW-14 stated that her group was broken apart as part of NIKE's digital reorganization and that is the reason why she switched to work for Global Brand Marketing. According to CW-14, Lavu was supposed to take care of the digital reorganization when she joined NIKE. However, CW-14 noted that NIKE did not complete its digital reorganization by the time she switched groups in October 2021.

239. **Lavu's Shadow Organization:** Other CWs recounted similar problems with the dysfunction in the Technology group resulting from Lavu's shadow organization and its negative effects on DTC technology performance.

240. CW-8 was employed by NIKE from October 2020 to December 2021 as Vice President of Digital Design. CW-8 advised that she was responsible for helping execute the digital DTC strategy. CW-8 noted that there were concerns that Ratnakar Lavu was not the right person to execute the strategy. According to CW-8, Lavu was "subpar" and was not qualified to create a modern technology platform. CW-8 stated that Lavu was building his own shadow organization within NIKE. CW-8 explained that Lavu led technical engineering at NIKE but also hired his own design team, which she noted was "not effective" and was "duplicating" NIKE's own efforts. CW-8 noted that Lavu wanted the "whole pie" at NIKE and that he was not collaborative. CW-8 learned after her departure that Lavu was under SEC investigation from her former colleagues when Lavu resigned from NIKE in February 2023.

241. CW-8 recalled that she raised concerns about Lavu's ability to execute the DTC strategy throughout her tenure to NIKE leadership. CW-8 noted that she did not voice these concerns during leadership meetings because NIKE is "very political" and "you don't bring up" these concerns in "large forums." However, CW-8 detailed that upon resigning from NIKE, ***she sent an email in December 2021 to Defendant Donahoe***, Defendant O'Neill and another

executive named David (surname not recalled) expressing her concern that Lavu was the wrong person to execute the DTC strategy. CW-8 noted that she resigned from NIKE because she felt that NIKE was unable to execute NIKE's DTC strategy.

242. CW-14 stated that she heard from NIKE colleagues during her tenure that former Chief Digital Information Officer Ratnakar Lavu was involved in corruption. CW-14 detailed that she specifically heard that Lavu worked with fake charities and that he received kickbacks from vendor placements.

243. CW-1 described how Lavu personally was stealing money, creating a shadow organization within the Company, not putting money where it needed to go, and "robbing the Company blind." CW-1 explained that the only reason Lavu wasn't walked out of the building in handcuffs – even though he should have been – was to avoid embarrassment for the Company, especially for Donahoe. CW-1 described it as "absolute craziness" that NIKE allowed Lavu to continue stealing for as long as they did.

244. **Additional DTC Technology Problems:** Others CWs in the Technology organization described similar and various other problems with NIKE's DTC technological capabilities and technology organization.

245. CW-15 worked for NIKE from May 2021 to May 2024 as a technology operations manager and then technology operations director. She recalled that NIKE's DTC strategy was not successful and referred to it as a "colossal failure." CW-15 recalled hearing from colleagues that NIKE's DTC strategy was failing immediately upon joining NIKE in May 2021. CW-15 clarified that her perspective on the DTC strategy related to how the DTC strategy impacted NIKE's technology capabilities.

246. CW-15 stated that when NIKE pivoted to DTC, it did not take into consideration the impact it would have on its technological infrastructure. CW-15 explained that after NIKE changed categories as part of its DTC strategy, NIKE had to change and replace coding, which was time consuming and required funding. CW-15 added that the work to update NIKE's technological infrastructure to support DTC technology was not completed by the time she left NIKE. CW-15 also confirmed that NIKE did not finish replacing the necessary coding by the time of her departure.

247. CW-15 added that NIKE was left vulnerable to cyber-attacks because it had to change its technological infrastructure. CW-15 detailed that NIKE's technological systems were not able to effectively communicate with each other after NIKE was forced to change its technological infrastructure because of its DTC strategy. CW-15 stated that this led to cost risks.

248. According to CW-15, NIKE also did not have the proper mapping and resources available to make changes effectively. CW-15 explained that after NIKE removed certain suppliers and categories following the pivot to DTC, the Company was "playing catchup" because it had to remove and replace supplier codes, among other things. CW-15 stated that NIKE's backend databases, such as inventory databases, are connected to its website. Therefore, CW-15 explained that when NIKE made a change to Nike.com, such as changing the categories they were using, the Company also had to make corresponding updates to its own backend databases, and the databases of its external partners, like its suppliers, in coordination with them. However, CW-15 detailed that "nobody bothered to change code to reflect category changes" or to make the terminology they used uniform across all databases, even within NIKE's systems. CW-15 stated that NIKE "did not see the whole picture" and there was no one making sure NIKE understood how changes would affect the broader business. According to CW-15, NIKE did not have the right leadership

in place to execute its DTC strategy. CW-15 added that when NIKE leadership knew the DTC strategy was not working, they "pushed it further." CW-15 stated that this led to employees throughout the organization being behind on important projects.

249. CW-15 recalled that NIKE did not have the cultural or technological backbone, nor did NIKE have the right people or leadership in place, to successfully implement its DTC strategy.

250. CW-15 detailed that Nike.com experienced a few outages during her tenure (May 2021 to May 2024), which negatively impacted digital sales. Specifically, CW-15 recalled that NIKE experienced at least two outages during her tenure. CW-15 detailed that one of the outages was caused a cyber-attack and the other outage was caused by the Company switching to a different cloud provider.

251. CW-15 recalled that she and her team met regularly with technology leadership during her tenure. CW-15 stated that during these meetings with technology leadership, she and her team raised concerns about unplanned DTC work impeding the technology organization from completing other critical tasks. CW-15 detailed that she and her team specifically explained to technology leadership that NIKE did not take into consideration the technological impacts that the DTC strategy would have on the Company.

252. According to CW-19—who worked as Director of A/B Testing from January 2015 to April 2018; Director of Global Experimentation Center of Excellence from May 2018 to April 2022; and Director of Digital Experiments from May 2022 to June 2023—NIKE was hesitant about optimizing its website and conducting digital tests to observe the patterns of its consumers, which it should have done. For example, CW-19 stated that NIKE should have conducted tests and research to determine when customers were dropping off its website, when consumers were adding items to their cart and what consumers were clicking on. CW-19 added that she wanted NIKE to

analyze its problems and strengths through testing and analysis to help make informed decisions but was largely ignored. CW-19 recalled that she advocated for NIKE's Digital Product leaders to conduct more A/B testing. However, CW-19 recalled that they did not want to conduct more A/B testing and instead relied on what had worked historically for the Company. CW-19 further recalled that NIKE utilized an outdated Waterfall methodology instead of using agile experiments. According to CW-19, NIKE's planning process was 12 to 24 months in advance, which was antiquated.

253. CW-10 stated that one reason why NIKE's DTC strategy failed was because there were "always issues" with the NIKE app, which frustrated consumers. CW-10 recalled that NIKE's executives frequently met to discuss how to fix these problems and improve the app.

**(2) Subsequent News Reports and Other Developments Confirm the CWs' Allegations**

254. Publicly available information near the end or after the Class Period corroborates these CW allegations of persistent and severe problems in NIKE's technological organization and capabilities, which impeded the success of the CDA strategy.

255. In late February 2023, as reported in numerous outlets and in the context of the ongoing failures of NIKE's technology organization, Lavu was forced to resign from his role at NIKE under suspicious circumstances. For example, on March 19, 2023, *Business Insider* reported on Lavu's abrupt departure from NIKE: "In an ***internal email announcing his departure and a subsequent meeting with technology employees, the company didn't give a reason for his exit. . . . But his tenure also coincided with blistering criticisms from technology employees***, including widespread job dissatisfaction, according to a leaked employee survey." At the same time, the article reported that several existing NIKE employees were promoted to begin restoration of the technology team: among them Deepak Arora, "a nearly five-year company veteran, [was appointed

to] serve as one of two co-heads of global technology. His appointment was announced roughly two weeks after ***the sudden resignation of Ratnakar Lavu.*** . . . [Ryan] Fusselman, a 10-year NIKE veteran, join[ed] Arora as an interim co-head for global technology."

256. On February 23, 2024, former NIKE employee Bahram Ghiasinejad brought a lawsuit against NIKE alleging, among other things, that Lavu had been investigated for SEC violations, and that "Lavu was terminated along with one of his VPs Jacobson due to their involvement in potential SEC violations."

257. On September 13, 2024, *Bloomberg Businessweek* published "The Man Who Made Nike Uncool," a scathing exposé on Defendant Donahoe's tenure at NIKE. In this article, the writers noted that NIKE's February 2023 layoffs, coinciding with Lavu's departure, saw the exodus of "more than 30 software engineering directors and managers from the global tech division." These layoffs came after the ***technology organization "under Donahoe [] had devolved into a mess:*** a steady stream of engineers quitting, outsourcing some work to third parties, ***all under a chief digital information officer"—Lavu—"allegedly accepting bribes and doing 'backdoor dealings' with vendors.***"

258. In a September 22, 2024 article entitled "Did a Digital Obsession 'Just Do It' in for Nike's John Donahoe?" The Stack reported that "***[b]ehind the scenes, the technology estate that powers NIKE's digital efforts arguably does not get enough attention from investors***," pointing out that the last engineering blog from NIKE's team was published as far back as June 6, 2019 and "has not been updated since." The article further reported that "Nike admitted in one of the few mentions of technology on its fiscal Q4 earnings call to be 'optimizing technology spend; and restructuring our organization to streamline layers and support functions.'" The same article also

highlighted that "[i]n May 2024 meanwhile Nike appointed its first Chief Data and AI Officer (CDAO), Alan John" to help revamp its operations and repair its technological capabilities.

#### c. NIKE's Corporate Restructuring Under CDA Was a Disaster

259. Multiple former NIKE employees describe NIKE's corporate restructuring pursuant to the CDA strategy, which included refocusing NIKE's business along gender-and age-based consumer constructs instead of sport-based categories, as a disaster that inhibited the success of the CDA strategy. These accounts have been corroborated by Defendants' subsequent admissions and other conduct.

260. **NIKE's Restructuring Failed from the Start**: Multiple former NIKE employees described how NIKE's reorganization pursuant to the CDA strategy was riddled with problems from the start of the Class Period.

261. Based on public information, Massimo Giunco worked at NIKE in a variety of roles from 1997 to June 2022, and in his final position was Senior Brand Director from September 2017 to June 2022. In July of 2024, Guinco published a widely read piece on LinkedIn, titled "Nike: An Epic Saga of Value Destruction." According to Giunco, after NIKE's reorganization—with its pivot away from sport categorization and toward gender and age constructs—was implemented (in June 2020), and "***[i]n 6 months***, hundreds of colleagues were fired and together with them ***Nike lost a solid process and thousands of years of experience and expertise*** in running, football, basketball, fitness, training, sportwear, etc., built in decades of footwear leadership (and apparel too). Product engine became gender led: women, men, and kids (like Zara, GAP, H&M or any other generic fashion brand)." According to Giunco, ***NIKE's "lack of innovation" "originated" with this reorganization***. (NIKE's innovation woes are discussed in full in Section IV.B.1.d.)

262. Multiple CWs' accounts corroborate and expand on the failures of NIKE's restructuring under the CDA strategy. For example, CW-17—who served as a Global Director, Program Management from November 2016 to October 2021—stated that NIKE's DTC strategy was "the worst thing they ever did" and referred to it as a "disaster." CW-17 noted that it was "well known" within NIKE that the DTC strategy was not going well. CW-17 detailed that as part of NIKE's CDO and CDA, the Company laid off a lot of longtime employees and replaced them with unqualified employees. CW-17 added that NIKE conducted reorganizations in 2017 and 2020 and got rid of certain categories in 2020. CW-17 explained that NIKE used to have teams dedicated to specific categories, including running, training and soccer. However, CW-17 noted that NIKE got rid of these specialized teams and categories and only maintained general categories, including Men's and Women's products.

263. Thus, this strategy was a failure. Indeed, later in the Class Period, ***by no later than summer 2022***, NIKE quietly backtracked on this restructuring and began to internally pivot back to the pre-CDA strategy of organizing groups around sport-based categories.

264. **NIKE's Covert Pivot Back to Sport Categorization in Summer 2022:** CW-18 was employed at NIKE from before the Class Period to summer 2024 in a variety of roles. From the summer of 2022 through her departure in summer 2024, CW-18 was a General Manager for one of the newly recreated sports categories in the Men's division in North America. CW-18 described that NIKE underwent an organizational shift ***in approximately mid-2022 to address concerns about the Company's performance***. CW-18 explained that this reorganization created General Managers for the sports categories within the gender constructs. This reorganization, she added, ***was an attempt to recreate the sports categories used by NIKE prior to its CDA strategy***, but within the still-existing gender and age structure. This shift, CW-18 added, was an attempt to

address the loss of connection to sports among the company's segments. CW-18 advised that the General Manager role, which she accepted in the ***summer of 2022***, was created at that time as part of this shift.

265. **<u>NIKE's "Fields of Play" Rebrand by Fall 2023</u>:** By fall 2023, NIKE began internally branding the Company's sport-based categories within the age and gender constructs as "fields of play." CW-1 explained that the first time she heard the term "field of play" was at a ***VP summit in September/October 2023***. CW-1 stated that Donahoe, Friend, O'Neill, and Williams orchestrated the summit, and that ***Donahoe, Friend, and O'Neill spoke at the summit***.

266. CW-1 advised that "all 300 VPs" were at this VP summit, including VPs from China (most of whom attended remotely). She further added that the summit occurred in the Coach K Gymnasium at NIKE's headquarters, where they took over the entire basketball court, with tables packed in.

267. CW-1 further noted that ***Donahoe "painted a pretty ugly picture" at the summit.*** CW-1 recalled Donahoe stating that NIKE was no longer a growth company, and that there are things NIKE must do to be a growth company again. CW-1 further described Donahoe referencing what Apple does to be a growth company, adding that Apple CEO Tim Cook was a guest speaker who appeared via Zoom. CW-1 described the summit as "***dire***," and observed that the summit was focused on how much NIKE had to do to grow.

268. CW-1 confirmed that NIKE's management acknowledged the Company's problems related to CDA at this summit. She explained that they did so because they "ran out of straws to grasp at." She added that management acknowledged that ***business was softening and that the lack of sufficient investment in DTC capabilities was causing problems for NIKE.***

269. CW-1 noted that this summit consisted of two days of talks and breakout sessions. CW-1 clarified that the breakout sessions consisted of 50 to 75 people per breakout group, who were then divided further into tables of seven or eight people. CW-1 explained that in one breakout session she and Williams were in the same group, sitting at the same table. In this breakout session, according to CW-1, Williams said that the Company had known for a while that the CDA strategy was not working and that they needed to switch their strategy.

270. CW-1 recounted that Craig Williams, President, Geographies & Marketplace, stood up during this VP Summit in around September/October 2023 and said, "***CDA was a failure. We have to acknowledge that.***" CW-1 also said that Williams told her personally during a breakout session during the summit, "let me be crystal clear. ***CDA was a disaster and is not working and we know we have to fix it. It's our problem to fix it***." According to CW-1, ***during this same breakout session, Williams also stated that NIKE needed to return to sport-based categorization of its product lines***. CW-1 added that Williams' comments were "refreshing," because everyone at NIKE knew that CDA (Consumer Direct Acceleration) was "an absolute disaster."

271. CW-1 advised that, at the VP Summit, ***O'Neill*** presented a plan called "5 for 15" to fix these problems. CW-1 noted that the plan flopped. CW-1 explained that "5 for 15" was a new term for things NIKE was already doing. CW-1 elaborated that 5 referred to the 5 components to gain market share and ***lean into fields of play***.

272. **<u>Defendants' Later Admissions</u>:** Numerous later admissions by the Defendants near the end of the Class Period corroborate that NIKE's corporate reorganization pursuant to the CDA strategy was a disaster.

273. On the first alleged partial disclosure of the truth, during NIKE's December 21, 2023 earnings call, Defendant Friend told investors that NIKE was "identifying opportunities

across the [C]ompany to deliver up to $2 billion in cumulative cost-savings over the next three years," because ***the CDA strategy had "added complexity and inefficiency."*** This admission revealed that NIKE's corporate reorganization had failed to effectively streamline the organization, and had in fact led to inefficiencies forcing NIKE to engage in billions of dollars of cost-saving measures. Indeed, on the same earnings call, Defendant Donahoe disclosed that "***six months ago***" NIKE had "realigned our entire organization . . . and it is making a huge difference in our focus and ability to execute." This admission indicated that NIKE's prior reorganization as part of the CDA strategy had been a failure, and that NIKE had already began taking purportedly remedial actions to address this failure ***no later than June 2023***—though Defendants still continued to conceal that NIKE's pivot had actually begun a full year earlier, in 2022, as discussed *supra*.

274. Further, on February 19, 2024, NIKE announced that it was laying off 2% of its corporate workforce, ***cutting more than 1,500 jobs***, as part of a broad corporate restructuring. In discussing the layoffs, Defendant Donahoe claimed "[t]his is how we will re-ignite our growth." This layoff announcement thus further showed that NIKE's prior reorganization effort had failed, forcing NIKE to attempt yet another restructuring.

275. On the second alleged partial disclosure of the truth, during NIKE's March 21, 2024 earnings call, Defendant Donahoe admitted, while discussing the CDA strategy, that "***it's been clear that we need to make some important adjustments***," including that "***[w]e need to sharpen our focus on sport***." This acknowledgement further revealed that NIKE's CDA-based reorganization towards the Men's, Women's, and Kids' consumer construct had failed, and that NIKE needed to revert to its pre-CDA sport-based consumer construct. On the same call, Defendant Donahoe stated that NIKE was "making, and ***started nine months ago, important***

***adjustments*** in our offense. And that started with ***putting the consumer and sport squarely back into our offense***. And so that allows a sharpness across Men's-Women's-Kids and Jordan around sport." This admission once again emphasized that NIKE had begun attempting to remedy the failure of its CDA-based categories reorganization at least by ***the summer of 2023***.

276. On April 19, 2024, NIKE announced another round of major layoffs—about 740 more employees at its world headquarters in Oregon—as part of its previously announced corporate restructuring. This announcement showed that NIKE's prior CDA-based reorganization was such a failure that additional layoffs were required to remediate.

277. On the third partial disclosure of the truth, during NIKE's June 27, 2024 earnings call, Defendant Donahoe admitted that they had finally completed this corporate restructuring back to sport-based categorization, explaining: "we are now completely aligned across the organization around sport field of play . . . ***over the last 90 days, we completed completely aligning our organization along the lines of sport***." This admission further revealed the extent of the Company's CDA strategy's failure, including the prior corporate restructuring efforts, as NIKE now had been forced to completely backtrack and once again organize its business around sport-based categories.

278. Finally, on NIKE's December 19, 2024 earnings call, NIKE's new CEO Elliot Hill who replaced Donahoe in October 2024, emphasized that "[m]oving forward, ***we will lead with sport*** and put the athlete at the center of every decision." This admission confirmed that NIKE's realignment around the Men's Women's and Kids' consumer construct as part of the CDA strategy was a failure, as the Company had been forced to revert to a consumer construct centered on sports.

### d. NIKE Cut Off Its Pipeline of Innovative Products and Instead Relied on Flooding the Market with Legacy Franchises to Temporarily Boost Sales

279. Numerous former NIKE employees describe that NIKE did not maintain its innovative product pipeline during the Class Period. Instead, NIKE relied on unsustainably flooding the market with classic franchises, flooding the market with these key products to temporarily boost sales. Defendants' own subsequent admissions and media coverage confirm these allegations.

#### (1) Per Many CWs, NIKE Cut Off Its Pipeline of Innovative Products, Damaging Its Competitive Position, and Unsustainably Flooded the Market with Classic Products

280. **<u>NIKE's Deficient Pipeline of Innovative Products</u>:** The accounts of multiple former NIKE employees detail the severely deficient innovation and pipeline problems plaguing NIKE from the outset of the CDA strategy. CW-16 (who worked at NIKE's global headquarters from 1998 to April 2024, most recently as a Senior Product Manager, Virtual Material Ecosystem) recalled that early in Donahoe's tenure[37] many of NIKE's more senior and longest tenured management personnel were terminated. She explained that as a result of these cuts, the Company lost cumulatively "thousands of years of NIKE experience" from employees who understood NIKE's customer preferences, marketing, workflow from design to production, and work culture. CW-16 recalled that these cuts were announced by Donahoe as part of the CDA strategy.

281. According to CW-16, products going from design to development from 2020 through when she left the Company in April 2024 were not developed as quickly because of the layoffs directed by Donahoe in 2020, changes in how categories were set up, and constant

[37] As a reminder, Donahoe's tenure at NIKE began in January 2020.

reorganizations, among other reasons. She described categories as revolving around basketball, football, baseball, running, as some examples. She also described the changing NIKE culture as a change in focus from creating and producing products for these categories to "Donahoe trying to change NIKE into a technology company," as she recalled Donahoe stating at some point. She described the impact of NIKE's restructuring on product development and pipeline as: "It wasn't set up in a way that it would be successful," adding that NIKE "didn't have the right knowledge and leadership in place to drive it."

282. According to CW-16, CDA and the loss of institutional NIKE knowledge and culture negatively affected NIKE's product pipeline in a number of ways, including a lack of leadership "to drive things correctly," as an example. She recalled that in 2020, it was clear that personnel cuts driven by the CDA would negatively impact NIKE's product pipeline. CW-16 recalled that ***after the CDA was instituted, NIKE was no longer focused on innovating its products.*** CW-16, however, also noted that this impact would not necessarily be felt in the marketplace until 2022 because NIKE could lean on products that were already in the pipeline prior to NIKE's pivot to CDA. She added that ***by mid-2022, NIKE started to see the negative effects on new products in the pipeline***. CW-16 stated that "there was no way" senior leadership would not have known by mid-2022 that innovation and pipeline were being negatively affected. She recalled her managers seemingly "blew off" the concerns she raised because they became focused on positioning themselves for promotions rather than preserving the NIKE team culture after many of the longtime senior leaders had been terminated.

283. Other former NIKE employees corroborate that severe innovation and product pipeline problems plagued NIKE from the start of the CDA strategy.

284. For example, Massimo Giunco's post, titled "Nike: An Epic Saga of Value Destruction," similarly pinpointed NIKE's "lack of innovation" "originated" with this CDA-based reorganization in 2020.

285. And CW-1 explained that the CDA strategy had not been thought through, that there was a lack of innovation to support it, and that the Company did not fund innovation to the level the strategy needed.

286. Additional CWs' accounts corroborate the stagnation of NIKE's product innovation after the launch of the CDA strategy. CW-2 worked at NIKE from 2002 to Fall 2022, most recently as a director within North America Consumer Direct Marketing for NIKE Direct from Fall 2020 to Fall 2022. According to CW-2, NIKE did not bring new and innovative products to the market and instead relied on the same products that previously generated revenue, such as Air Force 1s, Air Jordans, and NIKE Dunks. CW-2 stated that this was clear during her tenure and that she also experienced this as a consumer because there were no new shoes to buy as a NIKE employee.

287. CW-1 corroborates this account. CW-1 stated that NIKE started flooding the market with Jordans, Air Force 1s, Pandas (a type of NIKE Dunk shoe), and other "hot" products by the end of 2022.

288. CW-2 further recalled that, beginning in July 2022, NIKE began lowering its internal targets for the number of NIKE Live stores it planned to open in North America. CW-2 further explained that NIKE Live stores faced supply chain and ***product-pipeline problems, which were major contributors to NIKE lowering its target for the number of NIKE Live Stores*** the Company planned to open. CW-2 further explained that product was lacking in the pipeline for new NIKE Live store openings which led to stores not being sufficiently stocked with the proper

products. For example, CW-2 recalled that a lot of NIKE Live stores did not have enough women's products. CW-2 explained that this was problematic because women's products were the largest revenue generator for NIKE Live stores. CW-2 stated that these supply chain and product pipeline problems resulted in the Company not being able to evenly distribute new product between its NIKE Live stores. According to CW-2, this then led to a lack of product in certain stores, which in turn, resulted in a lack of traffic in those stores.

289. **Competition Capitalized on NIKE's Innovation Problems:** Further, other CWs' allegations show that NIKE's lack of innovation also diminished the Company's competitive standing. For example, CW-15 worked at NIKE from May 2021 to May 2024 as a technology operations manager and then technology operations director. She explained that ***NIKE was losing customers to HOKA and On because they were more creative and innovative than NIKE***, which alternatively focused on rereleasing retro shoes and not new product development. Although the mantra at NIKE was to be innovative and creative, according to CW-15, NIKE did not allow for any innovation, and rather relied on the same products that previously generated revenue, such as Air Force 1s, Air Jordans, and NIKE Dunks. CW-15 stated that it was internally discussed that NIKE was getting its "ass handed to them" by competitors because the Company was "not moving fast enough" in terms of creating new and innovative products. CW-15 confirmed that this was the case throughout her tenure (*i.e.*, May 2021 to May 2024). CW-15 explained that she understood this information based on her own perspective on NIKE's technology and based on conversations with NIKE colleagues who did not work in technology, including designers.

290. **NIKE's Unsustainable Flood of Classic Products:** To conceal NIKE's pivot away from maintaining an innovative product pipeline, NIKE began inundating the market with

its key classic products. CW accounts support the fact that NIKE flooded the market with these products during the Class Period.

291. As CW-1 recalled, NIKE started flooding the market with Jordans, Air Force 1s, Pandas (a type of NIKE Dunk), and other "hot" products toward by the end of 2022.

292. CW-1 indicated that NIKE lacked innovation. CW-1 added that Donahoe relied on flooding the market to cover his other sins, and that practice eventually caught up with him. CW-1 advised that the over-supply of key products was a "dirty secret" at NIKE. CW-1 explained that everyone saw it, but no one discussed it.

293. CW-1 articulated that Donahoe wanted to boost his personal bonuses by cutting costs for innovation and relying on NIKE's classic products only. CW-1 indicated that this was a problem because the classics were "done," meaning no longer as popular, and NIKE had nothing to replace them, ***while competitors, like Lululemon and Hoka, took market share because NIKE had no new attractive products***.

294. CW-1 explained that starting at the end of 2022 and continuing all through 2023, NIKE's market share was eroding more and more, and the Company was relying more and more on its classic products. CW-1 advised that NIKE needed to have something in the pipeline to improve, but NIKE just kept selling the same products.

295. According to CW-2, NIKE did not bring new and innovative products to the market and instead relied on the same products that previously generated revenue, such as Air Force 1s, Air Jordans, and NIKE Dunks. CW-2 stated that this was clear during her tenure and that she also experienced this as a consumer because there were no new shoes to buy as a NIKE employee. And CW-16 recalled that another issue with the advent of Donahoe's tenure was the switch in focus from innovative performance- or sport-related footwear and apparel to a focus on selling their pre-

existing signature footwear, but in more colors and on selling leisure/lifestyle-oriented fashion apparel rather than apparel designed for athletic performance. According to CW-16, on the "footwear side" they relied on the staple and signature products but just made them in new colors.

**(2) Defendants' Later Admissions and Media Coverage Confirm These Innovation Problems**

296. **Defendants' Admissions About Innovation:** On November 14, 2023, about a month before the first partial disclosure of the truth, NIKE announced that it had appointed John Hoke as the Company's ***first Chief Innovation Officer***. In the press release announcing this appointment, NIKE stated that Hoke's appointment would "***amplify and accelerate Nike's innovation strategy*** and distinction." This appointment evidenced NIKE's knowledge that the Company had been failing to invest in innovation and needed to refocus on building its innovative product pipeline.

297. Defendants also made a series of admissions in late 2023 and throughout 2024 gradually revealing the depth of NIKE's innovation problems. For example, on NIKE's December 21, 2023 earnings call, Defendant Donahoe acknowledged that NIKE's pace of innovation had slowed, admitting that "we know we must be faster, increasing the pace of innovation." On NIKE's March 21, 2024 earnings call, Defendant Donahoe emphasized, while referencing the CDA strategy, that "***it's been clear that we need to make some important adjustments," including that "we must drive a continuous flow of new product innovation***." Defendant Friend also admitted that NIKE had to "shift our product portfolio toward newness and innovation," and that NIKE had "***been missing some product newness at scale in our portfolio over the last several seasons***." Defendant Friend further stated that NIKE was "scaling newness and innovation from this point forward." Thus, Defendants acknowledged on NIKE's March 21, 2024 earnings call that NIKE had been aware internally of failure to maintain its pipeline of innovative product for at least "the

last several seasons," and that only now was NIKE pivoting back to investing in its innovative pipeline of products "from this point forward."

298. Approximately three weeks later, on April 12, 2024, in an interview with CNBC, Defendant Donahoe admitted that "***over the last year***, we have been ruthlessly focused on ***rebuilding*** our disruptive innovation pipeline." This admission—*i.e.*, that ***NIKE had begun "rebuilding" its innovation pipeline since at least early 2023***—shows that Defendants knew of such failures at least by that time, given their institution of significant remedial measures.

299. Similarly, in an April 17, 2024 article in *COMPLEX*, titled "What's the Future of Nike? John Hoke Has Ideas," NIKE's new Chief Innovation Officer Hoke stated that NIKE needed to "***get back on the front foot" on innovation***, thus acknowledging Defendants' failure to maintain innovation previously. Hoke also admitted that "through the pandemic . . . we were serving consumers things that they know and love, which is fine, but part of our job is to take them someplace ***new***, to show them things they don't know are possible."

300. Likewise, an April 21, 2024 article in *The Wall Street Journal*, titled "***Nike Reverses Course as Innovation Stalls and Rivals Gain Ground***," quoted NIKE's Chief Design Officer Martin Lotti as admitting that NIKE had not been forward-looking in its innovation. Specifically, he stated that "[i]f you drive a car just by looking in the rear view mirror, that's not a good thing . . . . The bigger opportunity is the windshield." The same article stated that NIKE had "neglect[ed]" innovating in key categories, such as running.

301. Then, on NIKE's June 27, 2024 earnings call, Defendants further acknowledged NIKE's failure to innovate during the Class Period. Defendant Donahoe also admitted that NIKE was "***making a series of adjustments to position us to compete and win***," including "***accelerating our pace and scaling of newness and innovation," and "moving aggressively to reestablish our***

***innovation edge***." Further, Defendant Donahoe emphasized that NIKE was "now 100% focused on driving the growth and innovation," thus implicitly confirming that NIKE had ***not*** been focused on innovation previously. On the same call, Defendant Friend similarly admitted that NIKE needed to "accelerate our pace of innovation and scale newness across our product line." Even with NIKE's purportedly revitalized emphasis on innovation, Defendant Friend acknowledged that "newness [was] not yet at scale"—*i.e.*, that NIKE had not developed enough innovative new products that were ready to sell to NIKE customers. On the same call, Defendant Friend also stated that NIKE had "started managing these franchises ***a couple years ago***, and what we were most focused on was the fact that we needed to restrict supply of these franchises into the marketplace, ***because we had a gap in innovation in our pipeline***." Thus, Defendant Friend directly admitted that Defendants ***knew NIKE "had a gap in innovation in our pipeline" at least*** "***a couple of years ago"—i.e., no later than summer 2022,*** as the CWs recounted—directly contrary to Defendants' statements touting NIKE's product innovation pipeline at the time and afterwards during the Class Period.

302. In a July 25, 2024 letter to shareholders, Defendant Donahoe confirmed NIKE's innovation failures during the CDA strategy and the Company's belated efforts to right the ship on that key front. Specifically, Defendant Donahoe articulated that, ***"[o]ver this past year,"*** NIKE had been "***kick-starting a multi-year innovation cycle*** . . . . We're accelerating our pace and scaling of newness and innovation."

303. Finally, on NIKE's October 1, 2024 earnings call, Defendant Friend admitted that NIKE planned "to introduce and scale newness and innovation across the marketplace." Defendant Friend also stated that NIKE was "focused on trying to accelerate newness and innovation in order to create more momentum with consumers and more energy with consumers." This

acknowledgement revealed that NIKE still was struggling to produce innovative new products at the end of the Class Period.

304. **Defendants' Admissions About Flooding the Market with Classic Products:** Defendants admitted that instead of producing new, innovative products, NIKE had relied on flooding the market with key classic products. Specifically, during NIKE's December 21, 2023 earnings call, the first partial disclosure of the truth, Defendant Friend admitted that NIKE had to engage in "lifecycle management of key product franchises"—meaning that NIKE needed to intentionally lower the supply of its most critical products because it had previously flooded the market with those products. This tactic had led to a situation where supply of these products had outstripped demand. According to a December 22, 2023 report by Telsey Advisory Group, this lifecycle management meant that NIKE needed to "limit[] volumes of in demand franchises to preserve full price selling." Defendant Friend also made a similar admission during the March 21, 2024 earnings call, *e.g.*, recognizing the continued need to engage in "lifecycle management of our key product franchises" even though such franchise management "create[d] some near term headwinds, particularly on Digital."

305. Further, the above-referenced *Wall Street Journal* article, titled "Nike Reverses Course as Innovation Stalls and Rivals Gain Ground," recounts how NIKE "executives turned to the brand's lucrative franchises, including Air Jordan and Dunk, and ramped up the releases" in a "race to hit revenue targets." The article describes an interview with Donahoe where he admitted that this strategy was intentional, claiming that "NIKE ramped up production" of these franchises "to meet demand on its SNKRS app." Donahoe specifically cited NIKE's demand metrics from "early 2021" as a reason for this shift. Thus, ***Donahoe's interview serves as an admission that***

***NIKE had intentionally increased the supply of classic franchises, instead of new innovative products, beginning as soon as "early 2021"—i.e., the start of the Class Period.***

306. Then, on NIKE's June 27, 2024 earnings call, Defendant Friend revealed that the oversaturation of the market of these key products was so dire that NIKE needed to take even "more aggressive actions in managing our classic footwear franchises." This revealed that NIKE's strategy of increasing the supply of classic franchises over new products had resulted in a serious oversupply of those classic franchises. Then, on NIKE's October 1, 2024 earnings call, Defendant Friend revealed that the Company's "[f]ranchise management actions will continue throughout the year."

307. Finally, on NIKE's October 1, 2024 earnings call (the final disclosure of the truth), Defendant Friend disclosed that the Company's "franchise management" plan was even more destructive to NIKE's revenues than previously revealed, as NIKE's actions limiting supply of key products caused NIKE to plan for "double digit" declines in NIKE's Men's and Women's Lifestyle business and Jordan brand.

308. Thus, Defendants revealed during these disclosures that NIKE had not only failed to maintain its pipeline of innovative products and had instead flooded the market with key, classic products, which now needed to then be pulled from the shelves because of decreasing demand.

309. **Corroborative Media and Analyst Commentary:** Media and analyst commentary corroborates that NIKE cut off innovation during the Class Period, forcing NIKE to flood the market with key products and allowing competition to take market share.

310. For example, the above-referenced April 21, 2024 *Wall Street Journal* article, titled "Nike Reverses Course as Innovation Stalls and Rivals Gain Ground," cited former employees of NIKE, who stated that "[t]he pursuit of sales growth from limited-edition sneaker releases led Nike

to neglect its running category, long considered the core product of the company." The article also cited current and former NIKE employees who recounted that "Nike veered from its roots as a maker of cutting-edge footwear for serious athletes," which "has opened itself to competition from newcomers such as On and Hoka." The article also stated that NIKE "***has lost ground in its critical running category while it focused on pumping out old hits***," confirming that NIKE's reliance on its classic franchises caused it to lose market share to more innovative competitors.

311. In a September 13, 2024 article titled, "The Man Who Made Nike Uncool," *Bloomberg* reported that Defendant Donahoe had claimed NIKE's lack of innovation during the Class Period was due to "remote work, explaining that the office was critical to fostering innovation." Thus, the article confirmed Donahoe's later acknowledgement that NIKE had fallen behind on innovation. The article also detailed how, under Donahoe's leadership, "***the pace of product development slowed as Donahoe took few risks on performance-oriented shoe lines***."

312. Additionally, a September 19, 2024 analyst report by Bernstein Societe Generale Group described how NIKE's lack of innovation was a major cause of the Company's ***"[market] share losses to newer competitors including On and Hoka***." According to this analyst report, NIKE's production process was complicated by the 2020 shift to a gender-based structure. Similarly, a September 24, 2024 article in *Wired* titled, "Nike's New CEO Has One Hell of a Challenge Ahead," explained how a lack of innovation led to a loss in NIKE's competitive edge, stating that "[w]hile smaller, niche players like Hoka and On Running doubled down on product innovation and grassroots marketing, Nike seemed stuck in a loop of digital experimentation that failed to excite the core sportswear consumer."

### e. NIKE's Brand Equity and Competitive Standing Depleted During the Class Period as the CDA Strategy Floundered

313. Multiple former employees related that NIKE's brand equity and competitive standing decreased during the Class Period. Subsequent developments at the end of the Class Period, including Defendants' own admissions, corroborate these allegations.

#### (1) Former NIKE Employees Detail NIKE's Market Share Loss and Decline in Competitive Standing

314. **NIKE's Market Share Losses and Diminished Competitive Standing:** Multiple former NIKE employees recounted how NIKE was losing market share to competitors throughout the Class Period.

315. CW-5 (who was responsible for assorting DTC merchandise for specific geographies based on DTC consumer data until early 2021) recalled that Company metrics reflected that DTC running shoe sales began declining even before the CDA strategy was announced and ***continued to decline through her departure in early 2021***. CW-5 explained that this decline occurred because NIKE withdrew from running specialty stores as part of its DTC strategy. CW-5 noted that by ditching retailers as part of its DTC strategy, ***NIKE lost market share to competitors*** because other brands took shelf space that previously belonged to NIKE, and as a result, running customers began to buy product from other brands. According to CW-5, NIKE utilized third-party The NPD Group (now Circana) to track certain Company metrics. CW-5 recalled that certain metrics tracked by NPD showed that NIKE was losing market share to competitors.

316. According to CW-10 (a Financial Analyst at NIKE from 2021 to December 2021), ***NIKE began losing accounts to competitors in Summer 2021***. CW-10 detailed that NIKE began losing market share in the running shoe category to On and Hoka in summer 2021. CW-10

explained that this embarrassed NIKE because the Company was previously known primarily for its running shoes. Therefore, CW-10 was asked by NIKE Director of Credit and Risk Noel Runge to expand credit lines for customers in an effort to build back the Company's running shoe business.

317. Similarly, CW-7—a NIKE director from before the Class Period through summer 2024 who oversaw NIKE's relationships with various retailers and supervised a team that worked directly with accounts on various facets of the business—recounted that ***NIKE lost a "shit-ton" of market share to competitors as a direct result of its DTC strategy.*** CW-7 noted that NIKE did not completely exit lower-priced retailers, such as Famous Footwear, but did pull some inventory from these wholesalers because the Company thought those consumers would purchase products from Nike.com instead. However, CW-7 explained that NIKE lost consumers who purchased items for $110 or less to low-tier competitors, including Skechers, Adidas, and New Balance. CW-7 added that NIKE lost some Foot Locker consumers to Hoka as well.

318. CW-2—who worked at NIKE from 2002 to fall 2022 (including most recently as a director in NIKE's North America Consumer Direct Marketing for NIKE Direct from fall 2020 to fall 2022)—recounted that a major aim of NIKE was that its NIKE Live stores would compete with Lululemon Athletica retail stores. But, according to CW-2, ***NIKE was losing women sportswear customers to Lululemon Athletica during*** CW-2***'s tenure in her final role (fall 2020 to fall 2022)***. CW-2 detailed that she regularly attended meetings with NIKE's Women's Brand team and that this team focused on the fact that NIKE was losing customers to Lululemon Athletica. CW-2 recalled that NIKE tracked sales metrics that reflected that ***the Company was losing market share to Lululemon Athletica.*** CW-2 also stated that it was "widely known" within NIKE that the Company was losing market share to Lululemon Athletica.

319. Finally, as noted above, ***at the VP Summit in September/October 2023 attended by Defendants Donahoe, Friend, and O'Neill, NIKE management strategized how to regain market share***. CW-1 advised that, at the VP Summit, O'Neill presented a plan called "5 for 15" to fix these problems. She noted that the plan flopped. CW-1 explained that "5 for 15" was a new term for things NIKE was already doing. CW-1 elaborated that 5 referred to the 5 components to gain market share and lean into fields of play. CW-1 recalled that, at the VP summit in September/October 2023 attended by Donahoe, Friend, O'Neill, and others, ***it was discussed that NIKE was no longer number 1, number 2, or number 3 in running products; it was also an acknowledgement of how much the Company had slipped***. CW-1 noted that running was the "DNA of Nike," and that NIKE was always the premiere lead in running products. For the first time, CW-1 continued, NIKE dropped down from number one in running products due to CDA. One purpose of NIKE's pivot back to using sports categories, according to CW-1, was to try to fix that problem.

320. Similarly, CW-19—who was Director of A/B Testing from January 2015 to April 2018; Director of Global Experimentation Center of Excellence from May 2018 to April 2022; and Director of Digital Experiments from May 2022 to June 2023—described that NIKE lost women's apparel customers to Lululemon and other customers to Adidas and Under Armour.

321. **NIKE's "Cool" Metric Decline:** Critically, NIKE experienced significant decline in one of the Company's s key brand strength metrics, which competitors exploited to their advantage. CW-2 detailed that she attended quarterly Brand meetings during her tenure at NIKE, which were co-led by former Chief Marketing Officer DJ van Hameren and current Vice President, Marketing for North America Adam Roth. CW-2 recalled that a "cool" metric was analyzed during these quarterly meetings. In regard to the "cool" metric, CW-2 explained this is a common metric

used by brands to gauge how "cool" the public views the brand. CW-2 noted that NIKE purchased data from a third-party that, for example, conducted surveys to measure how "cool" the public viewed NIKE. CW-2 clarified that NIKE measured its cool factor against brands such as YouTube, TikTok, and Snapchat, and not just against other footwear and apparel brands. CW-2 recalled that, ***by May 2022, NIKE's "cool" factor was declining, and that NIKE was no longer the number one "cool" brand***. CW-2 further recalled that, ***by May 2022, "cool" metrics showed that NIKE was losing ground to its competitors, specifically Adidas and Lululemon***, both who were gaining points and catching up in "cool" metrics to NIKE. CW-2 clarified that these "cool" metrics reflected the views of North America-based consumers. CW-2 also clarified that NIKE measured NIKE's "cool" factor with 18-to-24-year-olds because 18-to-24-year-olds are the critical demographic. CW-2 stated that these "cool" metrics were included in quarterly business unit review reports.

#### (2) Defendants' Subsequent Admissions and Analyst and Media Coverage Confirm NIKE's Competitive Decline

322. **NIKE's Admissions:** Subsequent developments at the end of the Class Period, including Defendants' later admissions, further support that NIKE's brand equity and competitive position collapsed during the Class Period.

323. For example, on NIKE's March 21, 2024 earnings call (the second partial disclosure of the truth), Defendant Donahoe acknowledged that, "[w]hile our Consumer Direct Acceleration strategy has driven growth and direct connections with consumers, it's been clear that ***we need to make some important adjustments***," including that "***our brand marketing must become bolder and more distinctive***." Less than a week later, on March 25, 2024, NIKE announced it had hired Tim Hamilton as vice president of men's apparel design. Industry publication *Retail Dive*, in a March 25, 2024 article titled, "Nike hires Tim Hamilton as vice

president of men's apparel design," noted that "[t]he hire comes ***as Nike rethinks its overall brand strategy following flat Q3 earnings***."

324. On NIKE's June 27, 2024 earnings call (the third disclosure of the truth), Defendant Donahoe acknowledged that "we're making a ***series of adjustments to position us to compete and win***," including "driving bigger, bolder storytelling, and elevating the entire marketplace to fuel brand distinction and be in the path of the consumer." One the same call, Defendant Friend also stressed that NIKE was "***repositioning . . . to be more competitive***." Friend similarly reassured investors that NIKE was "***focused on taking back market share***," thus admitting that NIKE had lost market share to competitors.

325. These March and June 2024 disclosures, therefore, partially revealed that NIKE had failed to maintain its competitive edge and market share, requiring NIKE to attempt to remediate its competitive decline.

326. Finally, on NIKE's October 1, 2024 earnings call (the final disclosure), Defendant Friend further admitted that NIKE was suffering from the fact that "***the multi-brand environment is very competitive today, and it will take time to expand market share***." Likewise, according to Defendant Friend, NIKE "***acknowledged that we've lost market share in the running specialty channel. More than four years ago, we pulled back on our engagement with that channel. And as a result of that, we saw market share losses***." These disclosures revealed that Defendants had lost market share in its running shoe segment, which had been the lifeblood of NIKE's brand equity and financial success, after it pivoted away from that channel starting in 2020 as part of its CDA strategy, and the detrimental impact that such decisions had on NIKE's financial performance at the end of the Class Period.

327. **<u>Media and Analyst Commentary</u>:** Media and analyst commentary corroborate that NIKE's competitive edge and brand equity declined during the Class Period as a result of the CDA strategy failures. For instance, a September 24, 2024 article in *Wired* titled, "Nike's New CEO Has One Hell of a Challenge Ahead," cited Fiona Harkin, director of foresight at The Future Laboratory, a market research firm, explaining that NIKE's "***aggressive shift away from wholesale partners ultimately meant that they 'lost out on a lot of shelf space that went to their competitors,'*** . . . Once retail stores reopened and shopping habits normalized [as the COVID-19 pandemic receded], a flurry of challenger running shoe brands such [as] On Running, Hoka and Brooks swiftly capitalized on the available real estate."

328. Likewise, the April 21, 2024 *Wall Street Journal* article titled, "Nike Reverses Course as Innovation Stalls and Rivals Gain Ground" that was discussed above, explained that "[c]ompetitors have been using the sneaker giant's playbook at its expense. ***Smaller brands like On, Hoka and New Balance have captured significant pieces of the market*** for both hard-core and everyday runners—and their popularity is spreading to the mainstream." Similarly, a September 22, 2024 article in *The Wall Street Journal* titled, "Elliott Hill Loved Nike and Left It. Now He's Back as CEO," reported that "[r]ivals like Hoka and On are taking market share from Nike's core running category and its lifestyle offerings."

#### f. Defendants Concealed NIKE's Reliance on Multi-Brand Partners and the Failure of NIKE's Mono-Brand Stores

329. Multiple former NIKE employees stated that, while NIKE focused on driving business to its mono-brand channels as part of its CDA strategy, the Company failed to effectively respond to consumer demand for multi-brand shopping during the Class Period. This failure is further corroborated by Defendants' own admissions at the end of the Class Period.

### (1) Former NIKE Employees Detail That NIKE Concealed Its Dependence on Multi-Brand Partners and the Failure of NIKE's Mono-Brand Stores

330. **Pre-Class Period Warning Signs:** One of the key hallmarks of NIKE's CDA strategy was an aggressive pivot away from selling products through multi-brand retailers (*i.e.*, NIKE's wholesale partners). However, multiple CWs' accounts reveal that warning signs about the long-term unsustainability of this strategy existed by the start of the Class Period. CW-5 (who was responsible for assorting DTC merchandise for specific geographies based on DTC consumer data until early 2021) stated that a former NIKE Vice President of Global Marketplace Integration for NIKE Running voiced concern about the DTC strategy during her tenure. CW-5 detailed that this individual suggested that removing wholesale and running specialty stores would not be sustainable for NIKE because ***wholesale was an "anchor" for NIKE*** and its business would not work without it. CW-5 recalled that a Key Performance Indicator that NIKE utilized during her tenure was sell-through rate on new products, which helped determine if the market was able to assimilate new NIKE products. CW-5 detailed that sell-through rates for new DTC products reflected that the DTC strategy was not sufficiently working because this data showed that NIKE's consumers were not buying new DTC products to the level of NIKE's expectation. Therefore, CW-5 recounted, the feedback NIKE received from sales merchants was that this was a red flag.

331. **NIKE's Covert Dependence on Multi-Brand Retailers**. Multiple CWs recounted that by fall 2021, NIKE was already relying on multi-brand retailers to rescue the Company from its faltering CDA strategy.

332. CW-10 (a Financial Analyst at NIKE from 2021 to December 2021) recalled that current NIKE Director of Credit and Risk Noel Runge asked her and another financial analyst in ***fall 2021*** to conduct financial due diligence on Sam's Club and Costco because NIKE was looking

into establishing business relationships with them. CW-10 explained that NIKE wanted to "push products" that were not selling well, through Sam's Club and Costco. CW-10 stated that Runge indicated to her that the main reason why ***NIKE was interested in partnering with Sam's Club and Costco was because its DTC strategy was "slowing down" and "not working."*** CW-10 stated that NIKE was looking at these "big box names" because its DTC strategy "backfired." CW-10 suggested that NIKE's pivot to Sam's Club and Costco indicated that there were "underlying issues" with its DTC strategy.

333. CW-7 (who oversaw NIKE's relationships with various retailers and left NIKE in summer 2024) recalled that ***in late 2021 or early 2022*** inventory was piling up at NIKE. CW-7 stated that as a result, NIKE began offering discounts on its products and asked its wholesalers to take more products. CW-7 detailed that NIKE subsequently sold in bulk to City Specialty, Foot Locker and Finish Line to lessen its inventory.

334. CW-7 recalled that a team was engaged to renew the Company's relationship with Macy's in early 2023. CW-7 suggested that ***internal conversations at NIKE about reengaging with Macy's first occurred in approximately fall 2022***. According to CW-7, NIKE apparel returned to Macy's stores in fall 2023.

335. CW-7 recalled that the internal reason given as to why NIKE returned to Macy's was because it wanted to get back in path with Macy's consumers. However, CW-7 suggested that NIKE returned to Macy's, DSW and Foot Locker ***in 2023*** because the Company's DTC strategy was not performing as well as projected. CW-7 stated that wholesale was like a pipe for NIKE while DTC was like a straw for the Company's business.

336. CW-1 described that NIKE's stores—including the Well Collective and, before that, NIKE Live – were not hitting the strides the Company wanted them to hit. She noted that

NIKE's stores were propped up by ***Donahoe's "scheme" to flood the market with Jordans, Air Force 1s, and other popular brands, but behind the scenes, there was a massive backlog of shoes and apparel which were not selling.*** CW-1 described it as like a Ponzi scheme: certain products were selling very well, but a lot of merchandise was not, and NIKE was still making those products, which were dead inventory. CW-1 indicated that ***in 2022, the Ponzi scheme collapsed,*** and NIKE "strong-armed" Foot Locker to take a lot of inventory to make NIKE's financials look better. She added that doing so made Foot Locker's numbers awful, but it helped prop up NIKE. She explained that this occurred at the end of 2022; the Company knew how much inventory it had "sitting there," which it was trying to sell at Costco and other places, but it was not moving. As a result, CW-1 continued, NIKE "strong-armed" Foot Locker to take the "dead" inventory. CW-1 explained that NIKE used Foot Locker almost like an outlet to take all that excess inventory. CW-1 added that Foot Locker agreed to take the one-time hit to Foot Locker to maintain a strong relationship with NIKE. CW-1 stated that this was ***coordinated by Donahoe and Friend so NIKE wouldn't take a hit to its stock.***

337. **<u>NIKE's Faltering Mono-Brand Stores</u>.** NIKE's mono-brand stores, a key component of the CDA strategy, could only succeed if there was strong consumer demand for mono-brand shopping (as opposed to multi-brand shopping). Multiple CWs' accounts show that, as soon as early 2022, NIKE's mono-brand stores were faltering, thus further imperiling the success of the CDA strategy. This issue was true for NIKE's stores in North America and across the globe.

338. CW-2—who worked at NIKE from 2002 to fall 2022 (including most recently as a director in NIKE's ***North America*** Consumer Direct Marketing for Nike Direct from fall 2020 to fall 2022)—detailed that NIKE initially launched DTC retail stores prior to CDA. CW-2 described

two types of retail DTC stores that NIKE opened: NIKE Rise stores, which are 20,000 to 30,000 square feet and located in big metro areas; and NIKE Live stores, which are small format stores of 5,000 square feet or less. CW-2 stated that NIKE Live stores were more important to NIKE's DTC strategy than NIKE Rise stores.

339. CW-2 stated that DTC retail stores were a key component of NIKE's DTC strategy throughout her tenure, and that NIKE Live stores were a particularly important component. CW-2 stated that ***Defendant O'Neill led the NIKE Live team and referred to NIKE Live as O'Neill's "project" and "baby."***

340. CW-2 recalled that ***by early 2022***, ***it was apparent that NIKE Live stores on average were underperforming and not meeting their projected sales goals***. CW-2 detailed that during her tenure, she reviewed daily sales metrics reports, which included total NIKE Live sales and sales per NIKE Live store. CW-2 stated that daily sales metrics reports reflected that some NIKE Live stores were underperforming.

341. CW-2 recalled other metrics that NIKE tracked relating to its NIKE Live stores included average order value, in-store foot traffic, units purchased, and sales to members versus sales to non-members. CW-2 further explained that NIKE valued members more than non-members because they drove more revenue for NIKE compared to non-members. CW-2 stated that, in addition to sales, NIKE Live tracked KPIs such as in-store foot traffic and conversion rates. CW-2 explained that conversion rates are the percentage of people who visit NIKE Live stores and make a purchase while there. CW-2 recalled that ***by early 2022***, ***it was apparent that NIKE Live stores on average were not hitting their traffic or conversion KPI goals***. CW-2 added that sales, traffic, and conversion metrics were updated in NIKE's system daily.

342. CW-2 noted that many customers were using NIKE's DTC retail stores to return items that they purchased online and were not buying new product at the stores. CW-2 recalled that although NIKE expected customers to return items purchased online at NIKE Live stores, the ratio of sales-to-returns was greater than projected for some NIKE Live stores, and on some days, the returns outweighed the sales resulting in negative sales. CW-2 detailed by ***early 2022, it was known internally that the sales-to-returns ratio for some NIKE Live stores were not being met, and that this was acknowledged by NIKE management***.

343. As described *supra*, CW-2 recalled that beginning ***in July 2022 NIKE began lowering its internal targets for the number of NIKE Live stores it planned to open in North America.***

344. Thus, as soon as early 2022, NIKE's mono-brand "Live" stores, which were key to NIKE's CDA strategy, were underperforming—and by July 2022, NIKE began taking internal measures to cut back on Company goals to open these stores in North America.

345. Additionally, NIKE Live stores were struggling so much that NIKE needed to rebrand them in an effort to make them a more attractive destination for consumers. On NIKE's June 29, 2023 earnings all, Defendants announced that NIKE was rebranding its NIKE Live stores to be known as "NIKE Well Collective" stores. According to CW-2 , NIKE rebranded NIKE Live stores to NIKE Well Collective stores because the name NIKE Live did not resonate with consumers. According to CW-2, NIKE began debating rebranding NIKE Live stores to NIKE Well Collective stores ***in March 2022***. Accordingly, such allegations show that Defendants were aware of the poor performance of its NIKE Live stores and the need to rebrand by no later than March 2022, even if this decision was not implemented and publicly announced until June 2023.

346. Additional CW accounts support that NIKE's mono-brand stores were performing so poorly by 2022 that NIKE needed to persistently decrease its store opening targets, and even consulted with Dicks Sporting Goods to see how to make NIKE's stores more profitable.

347. CW-1—who was VP, Global Store Development at NIKE from approximately August 2022 through May 2024—stated that in her interviews for her position in summer 2022, she was told by Ghosh[38] that NIKE's goal was to open 500 DTC stores. CW-1 elaborated that Ghosh advised him that NIKE touted a goal that was higher than 500 stores but that the true internal target was 500 stores. CW-1 described that this target of opening 500 stores kept being reduced by NIKE.[39]

348. CW-1 indicated that when she joined NIKE, the Geos were instructed that they had to open a certain number of stores, "no question." CW-1 added that, when the stores did not perform after a few years, the Geos were then given latitude to reallocate those resources to other areas.

349. CW-1 confirmed that Defendant Friend "for sure" knew about the lowered store forecasts. ***CW-1 recalled Friend instructing the Geos that they were not generating enough revenue with the funds he was allocating to them, so they could not open more stores***. CW-1 analogized the Geos to children and Corporate to the parent providing an allowance in the form of funding for operations: Corporate provided the funds to the Geos and instructed them how to spend it, with some leeway. CW-1 added that, when Corporate saw that the Geos were not hitting their

[38] Then Global VP of Stores.

[39] While CW-1 referenced an initial target of 500 stores, and CW-2 cited as initial target of 200 stores (*see supra* ¶ 160), these numbers are not inconsistent, as CW-1 had a "Global" role at NIKE (*see* ¶ 54), while CW-2 had a "North America" role (*see* ¶ 55) and was specifically referring to NIKE Live stores (*see* ¶ 160).

targets, Corporate had to rein in the funding. CW-1 declared that ***Friend was "100%" involved in the decisions to cut the store opening goals***.

350. Thus, during the Class Period, NIKE's DTC stores were consistently failing, and NIKE reached out to third parties to remedy the situation. CW-1 elaborated that NIKE started talking with Dick's shortly after she joined the Company (in August 2022) in an effort to make NIKE's DTC store fleet more profitable. She explained that most NIKE stores lose money, because those stores put a lot of money into marketing. She added that all marketing expenses are charged back to the stores, and since they don't do "huge business," the stores are a financial drain. CW-1 advised that, at the time she was leaving the Company, there were internal discussions at NIKE about handing off its entire fleet of DTC stores in the U.S. to third-parties to run them. CW-1 recalled that these discussions were occurring in spring of 2024.

**(2) Defendants' Subsequent Admissions, as Well as Media Coverage, Confirm That NIKE's Channel Mix Strategy Was Failing During the Class Period**

351. **Defendants' Admissions:** Defendants made a series of admissions in 2024 acknowledging that NIKE had failed to effectively respond to consumer demand for multi-brand retail shopping throughout the Class Period.

352. Specifically, on the March 21, 2024 earnings call, Defendant Donahoe acknowledged that "it's been clear that we need to make some important adjustments," including that "***we must lean in with our wholesale partners to elevate our brand and grow the total marketplace***." Defendant Donahoe further admitted that NIKE was "***increasing our investment in wholesale*** to help us elevate and grow the entire marketplace. We recognize that our wholesale partners help us scale our innovation and newness in physical stores and connect our brands in the path of the consumer." Defendant Donahoe also revealed that NIKE was engaging in a

"***reinvestment with our wholesale partners,*** so we bring a more holistic offense that grows the market and gets in the path of our consumer."

353. Likewise, on this March 21, 2024 earnings call, Defendant Friend admitted Defendants had knowingly disregarded consumer demand for multi-brand shopping so that Defendants could hit performance metrics: "***we've been more focused on trying to achieve mix of marketplace targets than we have serving consumer demand where the consumer is shopping***." Defendant Friend went on, admitting that "***[t]he consumer is still clearly shopping in multi-brand retail,*** and we need to elevate our brand and our positioning to be able to serve the consumer." These admissions were discussed in a March 22, 2024 article in *Retail Dive* titled "***Nike Admits it Has a Problem***, and Its Solution is… Air?" When discussing the March 21, 2024 earnings call, this article noted that "[t]he big moment for the marketplace may have come when ***the CEO said that Nike is increasing its investment in wholesale*** to elevate and grow the market." This admission, the article explained, showed that "***Nike should not have turned its back on its retail partners*** and upset the delicate balance of the marketplace ecosystem. ***Instead, they opened the door for other brands like Hoka, On and New Balance to move into leadership positions in the innovation pipeline***. Nike missed big on the partnership approach with larger retailers that let other fashion-forward innovators take the shelf space Nike walked away from over the last few years."

354. Three weeks later, on April 12, 2024, Defendant Donahoe similarly admitted in a CNBC interview: "***We recognize that in our movement toward digital, we had over-rotated away from wholesale a little more than we intended*** . . . . We've corrected that. ***We're investing heavily with our retail partners***. They were all here over the last couple of days; they're very excited about the innovation pipeline."

355. On NIKE's June 27, 2024 earnings call, Defendant Donahoe reiterated that for ***"the last couple of quarters***," the Company had "spent a lot of time leaning in with our wholesale partners," and that NIKE was "embracing a more balanced approach to growing the whole marketplace." On this same call, CFO Defendant Friend similarly discussed that NIKE was "building momentum with our wholesale partners."

356. Finally, on NIKE's October 1, 2024 earnings call (the final disclosure of the truth), Defendant Friend admitted that sales trends for legacy franchises "in the wholesale channel were substantially better" than they were in NIKE's digital channel. Defendant Friend also admitted that NIKE's "***teams [had] been closely engaging with our partners since we acknowledged some of the missteps related to over-centering on Direct***."

357. These disclosures revealed that, during the Class Period, NIKE had failed to effectively respond to consumer demand for multi-brand shopping (rather than mono-brand shopping), and that NIKE had to completely backpedal on its strategy of emphasizing DTC channels over wholesale channels—a core tenet of the CDA strategy.

358. **NIKE's Rehiring of Tom Peddie:** On July 10, 2024, NIKE announced it had appointed Tom Peddie, a former NIKE executive who had retired in 2020 when the CDA strategy launched, as Vice President of Marketplace Partners. In a September 13, 2024 article titled "The Man Who Made Nike Uncool," *Bloomberg* wrote that "Donahoe brought back a retired Nike veteran of 30 years, Tom Peddie, ***to help rebuild relationships with retailers***" as it backtracked on such CDA strategy failures.

359. On October 10, 2024, NIKE announced that Tom Peddie would become Vice President, General Manager of the North America Geography. In the press release making this announcement, Craig Williams, President, Geographies and Marketplace, stated "[i]mportantly,

***Tom's outstanding relationships with our retailers*** and deep experience developing an integrated marketplace ***will be critical to accelerating our future success***." This admission showed that due to consumer demand for multi-brand shopping, NIKE still needed to further increase its reliance on its wholesale partners. *Fashion Dive* covered this Peddie-led restructuring in an October 14, 2024 article titled "Dive Brief: ***Nike shakeup continues*** with appointment of new North America chief," and commented that Peddie's "experience appears to be instrumental to the task of ***rebalancing wholesale and DTC***."

360. **Additional Media Coverage:** Additional media coverage confirms that throughout the Class Period NIKE had failed to effectively respond to consumer demand for multi-brand shopping. For example, *Bloomberg's* "The Man Who Made Nike Uncool" article (referenced above) described how consumers' desire to shop at multi-brand stores had forced Defendant Donahoe to "slowly try[] to repair those retail relationships to get Nikes back in stores." Likewise, former NIKE employee's Massimo Giunco's LinkedIn post, entitled "Nike: An Epic Saga of Value Destruction," described the "simple" story of NIKE's failed pivot away from multi-brand: "So, what happened? Simple. Many consumers - mainly occasional buyers - did not follow Nike (surprise, surprise) but continued shopping where they were shopping before the decision of the CEO and the President of the Brand. ***So, once they could not find Nike sneakers in their stores – because Nike wasn't serving those stores any longer -, they simply opted for other brands***."

#### g. Defendants Concealed That NIKE's Initial DTC Growth Was an Unsustainable Mirage

361. Defendants attributed the initial growth of NIKE's DTC channels during the Class Period to the success of the CDA strategy. However, in reality, this growth was not driven by the CDA strategy, but by other unrelated, temporary factors, including: (i) the COVID-19 pandemic; (ii) NIKE's reliance on products that were in its production pipeline prior to the CDA strategy;

and (iii) NIKE's oversaturation of the market with key classic products, particularly via NIKE's DTC channels. Meanwhile, as Defendants told investors that NIKE's DTC growth was a result of the CDA strategy, they were aware of or recklessly disregarded, numerous undisclosed warning signs within NIKE that the CDA strategy was failing. Thus, NIKE's initial DTC growth at the beginning of the Class Period was unsustainable, contrary to the goal of the CDA strategy to drive sustainable long-term growth.

**(1) The Purported Initial Success of the CDA Strategy Was Due to Covid-19, NIKE's Pre-CDA Pipeline, and Unsustainable Flood of Classic Products**

362. **Covid-19 Pandemic:** NIKE's initial success in growing its DTC channels is partially attributable to a temporary boost in sales in digital channels caused by the COVID-19 pandemic. The World Health Organization declared COVID-19 a "public health emergency of international concern" in January 2020—six months before the CDA strategy was announced. This designation remained until May 2023, the same month the Biden administration ended its public health emergency declarations in the United States. During this period, the COVID-19 pandemic caused in-store retail shopping to be restricted in key NIKE markets, which naturally led to a temporary boost in NIKE's digital sales—*i.e.*, via consumer's increased online shopping on NIKE's website or mobile apps during the initial COVID-19 lockdowns in 2021 and as the pandemic persisted in 2021 and 2022, with multiple variants of the virus keeping many consumers from returning to in-store shopping.

363. CW allegations support that NIKE's temporary boost from DTC sales was partially attributable to the COVID pandemic, rather than the CDA strategy. For example, CW-13 recounted that when COVID happened and people were stuck at home, sales on Nike.com initially

"took off." According to CW-13, after COVID waned and people started going back to retail stores, NIKE was hoping that the "sugar rush" of online sales would continue.

364. Similarly, according to CW-17, DTC digital sales "went through the roof" at the beginning of COVID while stores were closed, and people were stuck at home.

365. Publicly available information corroborates that the COVID-19 pandemic temporarily helped boost NIKE's DTC sales. For example, a September 19, 2024 article in *The Wall Street Journal*, titled "Nike CEO John Donahoe Stepping Down After Rocky Tenure," explains this phenomenon. The article reported that "in early 2020 . . . as Covid shifted shopping habits [Defendant Donahoe] set out to change the way the company sold shoes," as "Nike cut ties with longtime retail partners . . . and tried selling more merchandise directly to consumers." The article went on to explain that as the COVID pandemic abated, "[t]he strategy backfired as the e-commerce boom faded and many shoppers returned to physical stores." Similarly, a September 22, 2024 article in *The Wall Street Journal*, titled "Elliott Hill Loved Nike and Left It. Now He's Back as CEO," explained that "[w]hen the pandemic hit in 2020, Donahoe accelerated the digital sales push to reach shoppers stuck at home on Covid-19 lockdowns. He soon ordered an aggressive exit from longstanding bricks-and-mortar retail partnerships that Hill had helped build. Donahoe's push for digital sales and overreliance on Nike's cash-cow franchises such as Air Jordan and Dunk ***worked initially***. ***But ultimately the strategy backfired, and the company's sales growth hit a wall***."

366. **<u>NIKE's Pre-2020 Pipeline</u>:** As described in full *supra*, Section IV.B.1.d., NIKE failed to maintain its innovative product pipeline after the introduction of the CDA strategy. However, NIKE was able to temporarily rely on selling products that were in its production pipeline prior to the CDA strategy. This is because, once NIKE begins to develop a product, it

takes time for that product to make its way through NIKE's production pipeline and enter the market. According to a September 19, 2024 analyst report by Bernstein Societe Generale Group, at NIKE, "[t]he process to create and launch new products takes ***2.5-2 years***, managed on a rolling forward basis for 2-3 seasons at a time," which includes "12-18 months for research and innovation, 12+ months for product creation, and 6 months for production and shipping." Thus, in the early part of the Class Period—specifically 2021 through approximately mid-2022—NIKE could rely on selling products that were in the production pipeline prior to the launch of the CDA strategy.

367. According to CW-16, in 2020, it was clear that personnel cuts driven by the CDA would negatively impact NIKE's product pipeline. CW-16, however, also noted that this impact would not necessarily be felt in the marketplace ***until 2022 because NIKE could lean on products that were already in the pipeline prior to NIKE's pivot to CDA***. CW-16 added that by mid-2022, NIKE started to see the negative effects on new products in the pipeline. CW-16 stated that "there was no way" senior leadership would not have known by mid-2022 that innovation and pipeline were being negatively affected.

368. **<u>NIKE's Unsustainable Flood of Key Products:</u>** As described in full in Section IV.B.1.d., NIKE inundated the market with its key classic products like Air Force 1s, Air Jordans, and NIKE Dunks. This strategy temporarily concealed the flaws of the CDA strategy during the Class Period. Defendant Donahoe admitted that this was an intentional strategy beginning in early 2021, and multiple CWs witnessed the strategy on the inside (*see* Section IV.B.1.d.(1) for CW-1 and CW-2's allegations on this point). Faced with an oversaturated market, however, NIKE was forced to intentionally limit the supply of these key products more and more aggressively, beginning in December 2023. As Defendants confirmed in NIKE's March 21, 2024 earnings call,

for example, this oversupply was "particularly" acute in NIKE's digital DTC channels. Therefore, the initial boost driven by the oversupply also led to outsized growth in these same digital channels.

#### (2) Internal Warning Signs of the CDA Strategy's Failure Were Flashing Throughout the Class Period

369. While NIKE's DTC growth was being artificially boosted during the Class Period by these other factors, there were a legion of significant internal warning signs within NIKE that the CDA strategy was failing and that this initial financial growth was unsustainable long-term. *See* Sections IV.B.1.a-f *supra*. By way of example: (i) before and throughout the Class Period, severe and pervasive deficiencies with NIKE's supply chain vis-à-vis NIKE's DTC strategy were discussed in audit sessions and included on audit reports that were sent to Defendants Donahoe, Friend, and O'Neill (CW-1); (ii) by fall 2021, NIKE was looking into establishing relationships with new wholesale partners to push products that were not selling well (CW-10); (ii) by early 2022, it was apparent internally that NIKE Live stores on average were underperforming and not meeting projected sales goals (CW-2); (iv) in January or February 2022, the CDA's ongoing technological problems were discussed in one-on-one meetings with Defendant Donahoe, similar technological and other problems with NIKE's DTC strategy were discussed at a meeting in Paris on April 27, 2022, and beginning in the summer of 2022, Defendants Donahoe and other executives were having monthly and other regular meetings to discuss these failures with the CDA's technological infrastructure (CW-3); (v) NIKE's deteriorating brand strength was known internally at NIKE by May 2022, by which point NIKE's critical "cool" metric showed that it had lost ground to key competitors (CW-2); (vi) by fall 2022, NIKE was discussing reengaging Macy's internally (CW-7); and (vii) by September/October 2023 the failure of the CDA strategy was openly discussed at a "dire" VP summit orchestrated by Defendants Donahoe, Friend, and O'Neill (CW-1).

370. Additional CWs' accounts support that, throughout the Class Period, Defendants were aware of various internal red flags that the CDA strategy was not working and thus was not propelling the sustainable growth NIKE had promised investors.

371. **All-Employee Engagement Surveys Beginning After 2020:** CW-16—who worked at NIKE from 1998 to April 2024, and most recently was Senior Product Manager, Virtual Material Ecosystem (2022 – April 2024) and Senior Product Management, Virtual Product Creation (2019 – 2022)—said that every year NIKE creates and disseminates an All-Employee Engagement Survey (referred internally as an AES). According to CW-16, once responses are in, they are sent to an independent outside reviewer, who returns comprehensive findings. Then, there's an employee review period of the findings. Before she left, CW-16 recalled seeing a great deal of employee feedback. CW-16 recalled that in these surveys, employees spoke up about the problems with the CDA strategy. According to CW-16, the survey consisted of multiple-choice questions and a free text field where responders could provide more specific feedback.

372. CW-16 advised that ***Defendant Donahoe, Defendant Friend, Defendant O'Neill, and Executive Vice President, Chief Human Resources Officer, Monique Matheson, were amongst the senior leadership who reviewed the surveys***, which then went to the Vice President level for review, then her Senior Director, and then her managers who then reviewed the surveys with the respondents, including CW-16. CW-16 stated there was no way NIKE's senior leadership "did not know how everyone felt" regarding the CDA strategy because of the responses in the AES.

373. According to CW-16, each spring the surveys were distributed, and were reviewed with the responders in the summer. CW-16 recalled that ***she began seeing negative feedback in***

***the surveys on the CDA in the first survey following the first round of mass terminations which took place in early/mid-2020***.

374. **Other Internal Evidence of CDA Failures by May 2021:** For example, CW-15 (who was a technology operations manager and then technology operations director from May 2021 to May 2024) stated that when she joined the Company in May 2021, it was widely known within NIKE that the DTC strategy was failing. CW-15 explained that in her role within NIKE's Technology umbrella, she had regular contact with employees in other groups at NIKE, including colleagues who focused on NIKE's DTC operations. Many of these colleagues focusing on DTC operations were in direct contact with NIKE's customers and suppliers. According to CW-15, NIKE's customers and suppliers told her colleagues that they hate NIKE's DTC strategy and that it was failing.

375. According to CW-15, concerns about the DTC strategy were repeatedly raised to management. CW-15 elaborated that these concerns about the DTC strategy were repeatedly raised to management throughout her tenure, and that these concerns already existed when she joined NIKE in May 2021, and the negative consequences of the DTC strategy were already apparent at that time.

376. CW-15 detailed that during her tenure, her colleagues frequently told each other that NIKE "had f***ed up the DTC strategy." According to CW-15, this caused her colleagues to scramble. CW-15 stated that she learned this information from colleagues who communicated directly with customers and suppliers. CW-15 explained that the terms "customers" and "suppliers" referred to third-parties working with NIKE, including wholesalers like Foot Locker or Kohl's, as well as manufacturers and material suppliers. According to CW-15, all of these customers or suppliers voiced their concerns about DTC to CW-15's colleagues at NIKE. CW-15

noted that the colleagues who were directly exposed to DTC customers worked in different divisions within NIKE.

377. **Missed Revenue Targets and Inventory Liquidation Beginning in 2021:** CW-6 (who worked as a Supply Chain Finance Director, North America NIKE Direct from February 2019 to June 2024) stated that NIKE's DTC strategy was initially successful. However, CW-6 noted that the DTC strategy ultimately ***"did not work" beginning in 2021.*** CW-6 explained that NIKE's goal was to triple its digital business as part of its DTC strategy. However, CW-6 noted that NIKE was ***"not even close" to hitting digital revenue targets from 2021 through June 2024***. CW-6 noted that NIKE "walked away" from certain capital investments between 2021 and June 2024. CW-6 added that NIKE was also liquidating inventory during this time.

378. **All-Hands Video Calls Beginning in February 2022:** According to CW-16, Donahoe hosted and led quarterly all-hands video calls that any employee could attend, and CW-16 attended these live video calls. CW-16 recalled that ***in February 2022 she first noticed pushback in the chat function of these video calls***. CW-16 recalled that this led the ***chat function being disabled***, but when it was reactivated, the pushback from NIKE employees increased a lot. She recalled employees, in the chats while Donahoe was speaking, disagreeing with his narrative that in order for DTC sales to pick up that employees needed to be back working at the office instead of remotely, with employees stating that the problem with sales was not working remotely but rather with the transition to fashion and fashion footwear, NIKE not relating to their market any longer, the pivot away from brick-and-mortar sales, and the change in workflow and culture under Donahoe. CW-16 further recalled that the pushback from employees was even stronger on the final all-hands call she attended in 2024, including ***responses that "CDA was ineffective."***

379. This CW account reveals that Defendants retaliated against employees who voiced their dissent during these all-hands video calls through the chats. CW-16 noted that ***NIKE employees who spoke up on the February 2022 call got in trouble with HR.*** CW-16 explained that, after that first meeting when grievances were aired, at the next all-hands video call, ***the chat feature was disabled.*** Per CW-16, at the next meeting after that, the chat feature was back, but the chat was ***monitored by HR***. She recalled this ***pushback grew stronger throughout her tenure*** and lasted through the last all-hands quarterly meeting that she attended in early 2024.

380. CW-16 recalled that regular attendees at these all-hands meetings included Defendant Donahoe; President NIKE Global Geographies and Marketplace, Craig Williams; Defendant O'Neill; and Executive Vice President, Chief Human Resources Officer, Monique Matheson. She also recalled that Defendants Friend and Campion sometimes, although infrequently, attended.

381. Such CW accounts are corroborated by the news media's investigative reporting. For example, an October 3, 2024 episode of *The Journal*—a podcast by *The Wall Street Journal*—titled "The Missteps That Led Nike Off Course," also described one of these all-hands meetings. Specifically, *The Journal* described a February 2024 all-hands call where "20,000 employees logged onto the Zoom call as Donahoe spoke." According to *The Journal*, "When Donahoe started talking about accountability, saying that he and his team held themselves accountable for all the mistakes that had happened at the company," numerous employees began lodging complaints in the chat function. These employees criticized Donahoe's leadership and decisions as CEO. One employee wrote, "Accountability: I do not think that word means what you think it means." Another employee wrote "I hope Phil Knight [*i.e.*, NIKE's founder] is watching this right now." As detailed by *The Journal*, it was "***dozens of people writing comments like this in a very public***

***chat that is monitored by human resources, so it was a very brave and risky thing to do***"—it was "***an online protest against the CEO of the company that you're employed by***." Confronted by the details of the incident, Donahoe acknowledged its occurrence, telling *The Journal*'s interviewer that Donahoe and "our leadership team understand[]" the concerns raised by employees, and that such sentiments were unsurprising because NIKE was "going through a period of adjustment."

382. **Summer 2022 Missed Revenue Goals:** CW-9 stated that she attended NIKE's annual sales meeting at its Oregon headquarters ***in July or August 2022***. CW-9 detailed that NIKE's entire North America sales team attended this sales meeting, as well as Defendant Donahoe and Defendant Friend. CW-9 recalled that ***Donahoe and Friend*** gave a presentation to the sales team at this meeting where they delivered the message that ***NIKE was not hitting its total revenue goals***.

383. **October 2022 "Budget Scrub":** CW-16 provided a screenshot of an October 4, 2022 email she received stating: "We are doing a massive budget scrub in order to address some ***headwinds facing the company***." According to CW-16, a Senior Director had sent this email to CW-16's manager and her team although she could not recall to whom else it was sent, CW-16 knew that it was sent to many if not all departments besides hers. She further explained that the directive in the email would have "come from above," to a Vice President, then to her Senior Director who in turn emailed CW-16's manager and team. CW-16 explained that the reference to a "budget scrub" meant that NIKE was analyzing its budget with the aim of cutting back. ***She added the headwinds necessitating the budget scrub were related to CDA.***

384. **Summer 2023 Plans for Restructuring**: In addition, CW-16 provided a screenshot of a January 24, 2024 post on *thelayoff.com*, which stated: "they started planning this late last summer when Bain [NIKE's outside consultant] arrived. Initially target was to execute layoffs in

Nov[ember] but they weren't ready so pushed to Feb[ruary]. I'm close enough to be 99% certain first big wave will happen between now and mid/late Feb[ruary]." According to CW-16, the job cuts this post references were the cuts related to the $2 billion in cost cutting that CEO John Donahoe announced in December 2023. She recalled that ***in summer 2023***, NIKE started planning a round of cuts for that fall, but those cuts were pushed back to early 2024.

385. **March 2022-April 2023 Internal Struggles and Missed Revenue Targets:** CW-4 (who was a Senior Finance Manager, NIKE Direct Strategic Investments from March 2022 to April 2023) recalled that throughout her tenure, she attended in-person monthly finance meetings with leadership as part of the financial closure process. CW-4 explained that during these meetings, the finance team went over financial results and forecasts and received permission from leadership to place investments. CW-4 explained that she and her finance team discussed where the Company was overspending and underspending during these meetings. CW-4 added that current Vice President/CFO, NIKE Greater China Amanda Norwood attended these meetings and that information from these meetings rolled up to the Vice President overseeing NIKE's CDA strategy. CW-4 recalled that ***throughout her tenure (i.e., March 2022-April 2023), conversations from these meetings reflected that NIKE was struggling with executing its DTC strategy and that the DTC strategy was not yielding projected results***. She detailed that during these meetings throughout her tenure, it was discussed that ***NIKE was not hitting its topline revenue projections***.

386. According to CW-4, NIKE invested more money on operating expenses than projected and anticipated during her tenure. CW-4 stated that NIKE still made investments during her tenure as if it was hitting its topline revenue projections, which it was not. CW-4 explained that NIKE's year-to-date spending was off by "several million dollars" throughout her tenure.

Therefore, CW-4 and her team were tasked with determining where to make cuts and what investments the Company needed to make to yield different DTC results.

387. CW-4 recalled that during her tenure, digital sales did not grow as much as NIKE had projected or enough to offset the decline in wholesale and brick and mortar sales.

388. CW-4 stated that she prepared financial reports, which were consolidated with other reports, that were escalated to Digital Direct and NIKE Direct Vice Presidents. According to CW-4, ***information from these reports was escalated to Defendant Donahoe.*** CW-4 stated that Donahoe was part of strategic level conversations and that Donahoe was briefed on the Company's overall financial results prior to hosting quarterly investor relation calls.

**2. Defendants Repeatedly Claim to Investors That the CDA Strategy Is Succeeding and Achieving Key Objectives**

389. Throughout the Class Period, Defendants repeatedly touted the success of the CDA strategy to investors. Specifically, in addition to repeatedly claiming that the CDA strategy itself was succeeding, they told investors that NIKE was achieving each of the key pillars needed for the success of CDA strategy—when, as discussed above, based on numerous CW accounts and other corroborating sources, the internal reality was vastly different.

390. **<u>CDA's Success</u>:** Throughout the Class Period, Defendants repeatedly falsely touted the success of the CDA strategy. For instance, in a September 23, 2021 press release, Defendant Friend stated that NIKE's "Q1 results illustrate how NIKE's ***Consumer Direct Acceleration strategy continues to fuel growth***." During an October 6, 2021 Annual General Meeting, Defendant Donahoe similarly claimed, when referencing CDA, that "***Nike's strategy is working***." On a June 29, 2023 earnings call, Defendant Donahoe still insisted that "***[i]n the end, our CDA strategy is working***." In reality, however, as discussed above, the CDA strategy was failing to

drive sustainable growth for NIKE, as numerous internal red flags demonstrated since the start of the Class Period.

391. **DTC Supply Chain:** Throughout the Class Period, Defendants repeatedly falsely claimed that NIKE had successfully developed an effective DTC supply chain, which would help drive the promised sustainable growth. For instance, on a March 18, 2021 earnings call, Defendant Donahoe assured that NIKE had been able to "***fairly impressively pivot to a more direct-to-consumer supply chain***." Likewise, in a speech streamed live on YouTube on April 26, 2021, Defendant Friend, when discussing NIKE's "Consumer Direct strategy," falsely touted that NIKE was "***leveraging data analytics [and] machine learning so that we can read patterns and consumer behavior, we're employing data analytics capabilities in our supply chain***." In a September 23, 2021 earnings call, when discussing NIKE's technological investments, Defendant Friend misrepresented that NIKE had been "***creating a digital-first supply chain in the marketplace***." And in a May 16, 2022 article in *Women's Wear Daily*, Defendant Campion claimed that "***we've got three to four times greater digital commerce distribution capability than we had two years ago***." However, as described above by multiple former NIKE employees and other sources, NIKE failed to develop an effective DTC supply chain, thereby impeding the CDA strategy from the start—a problem that was repeatedly raised to NIKE management throughout the Class Period.

392. **Technological Capabilities and Organization:** Throughout the Class Period, Defendants also repeatedly and falsely touted NIKE's technological capabilities necessary to support NIKE's CDA strategy and technology organization that would ensure these technological capabilities were successfully developed and utilized. For instance, during NIKE's Annual General Meeting on October 6, 2021, Defendant Friend falsely assured investors that the "***investments***

***we've made against our end-to-end digital transformation are making us more agile, and we're building the capabilities that are required for NIKE to operate a digitally led omni-channel, direct-to-consumer business at scale***." Similarly, on a June 29, 2023 earnings call, Defendant Friend misleadingly highlighted that, as part of "accelerating direct consumer relationships across our digital platforms," NIKE had "***partnered with Adobe to enable one-to-one member personalization, driving gains in member retention, click-through rates and conversion resulting in higher demand per member and returns on digital ad spend***." In a March 30, 2022 video posted on Facebook by Adobe Experience Cloud, Defendant Donahoe falsely touted NIKE's DTC technological capabilities that Adobe purportedly helped build as part of their partnership: "***The Adobe platform has played such an important role of delivering a more personalized experience for our consumers***." In reality, as explained above by multiple CWs, Defendants knew from regular meetings with CW-3 and other internal reporting that NIKE had built out neither the technological capabilities nor organization needed for the CDA to succeed, including that NIKE's partnership with Adobe was failing to deliver promised technological capabilities.

393. **Streamlined Corporate Reorganization:** Throughout the Class Period, Defendants also repeatedly and falsely claimed that NIKE had engaged in a successful corporate reorganization to support the CDA strategy, including establishing new consumer constructs (from sports to gender and age-based categorization) that would fuel further sustainable growth. For instance, during NIKE's October 6, 2021 Annual General Meeting, Defendant O'Neill insisted that "***[w]ith the CDA, we successfully realigned our organization*** to further invest against our highest growth areas," and Defendant Donahoe falsely assured investors that "***[a]s part of CDA, we successfully realigned our organization*** and began investing in our highest-growth areas." In Defendants' October 6, 2022, Form 10-Q, Defendants falsely claimed NIKE had "***aligned our***

***product creation and category organizations around a new consumer construct focused on Men's, Women's and Kids'***." As described above, however, CWs detailed that NIKE's corporate reorganization was a disaster from the start, and that NIKE reversed course as early as summer 2022. Indeed, Defendants ultimately admitted at the end of the Class Period that NIKE's failed reorganization had forced it to return to its prior sports-focused categories once again, entirely backtracking on this key CDA initiative.

394. **Innovative Product Pipeline:** Throughout the Class Period, Defendants repeatedly and falsely represented that, after the launch of the CDA strategy, NIKE had maintained a robust pipeline of innovative products while effectively managing the supply of its existing product franchises. For instance, at an Annual General Meeting on October 6, 2021, Defendant Parker claimed that after the launch of the CDA strategy, NIKE's "***pace of innovation has not slowed down at all***." In a June 27, 2022 press release, Defendant Donahoe touted that NIKE's "***pipeline of innovative product . . . prove[s] that our strategy is working***." And in a May 24, 2023 press release, Defendant Donahoe still insisted to investors that NIKE's "***innovation pipeline is unmatched, and our strategy is working***." As described above, however, the internal reality directly contradicted Defendants' claims. Indeed, Defendants later admitted and multiple CWs recounted that NIKE had failed to maintain an innovative product pipeline beginning with the CDA's launch, and instead relied on flooding the market with classic franchises—providing NIKE with a temporary boost that eventually ended in catastrophe.

395. **Competitive Standing and Brand Distinction:** Throughout the Class Period, Defendants repeatedly falsely assured that NIKE had maintained its competitive separation and brand distinction. For instance, on a June 24, 2021 earnings call, Defendant Donahoe falsely claimed that NIKE's "***relentless pipeline of innovative product continues to create separation***

***between us and our competition***." On a September 29, 2022 earnings call, Defendant Friend insisted that "***NIKE continues to lead as the number one cool and number one favorite brand in North America***." In a May 24, 2023 press release, Defendant Donahoe represented that NIKE's "***brand momentum is strong***," while touting the CDA strategy. As described above by multiple CWs, however, NIKE's brand equity and competitive standing declined during the Class Period as NIKE began losing market share to more innovative competitors in 2021 and was no longer the number one "cool" brand by May 2022.

396. **Successful Channel Mix Between Wholesale and DTC:** Throughout the Class Period, Defendants falsely claimed that NIKE had effectively shifted a significant amount of its business away from its wholesale partners to its mono-brand channels while successfully meeting consumer demand. For instance, during a September 12, 2023 Annual General Meeting, in response to a question regarding whether NIKE was reengaging with wholesale partners, Defendant Donahoe reassured that "***our marketplace strategy remains the same.***" However, multiple CWs recount that as early as fall 2021, NIKE had become dependent on selling through its muti-brand partners to rescue the Company from its faltering CDA strategy, and that NIKE's mono-brand stores were similarly failing by early 2022. Indeed, NIKE later confirmed that it had failed to effectively respond to consumer demand for multi-brand shopping and that the Company needed to once again rely on wholesale partners to drive NIKE's growth.

### 3. The Truth About the Failure of the CDA Strategy Gradually Comes to Light, While Defendants Continue to Mislead Investors

397. Investors gradually learned the truth about the failures of the CDA strategy in a series of disclosures from December 21, 2023 through October 1, 2024. At the same time, Defendants continued to mislead investors and downplay these failures.

398. **<u>December 21, 2023—First Partial Disclosure of the Truth / Materialization of the Risk</u>:** Investors began to learn the truth about the CDA's failures on December 21, 2023, when NIKE announced disappointing financial results for the second quarter of FY 2024. NIKE disclosed quarterly revenue of $13.39 billion, which was $40 million below the consensus estimate of $13.43 billion. NIKE also disclosed that its Direct revenue was $5.7 billion, below the consensus estimate of $5.88 billion. These disappointing financial results began to show investors that the CDA strategy was failing to deliver the sustainable growth Defendants had claimed.

399. Importantly, NIKE lowered its financial guidance for FY 2024, further revealing to investors that the CDA strategy's failures would have ongoing consequences for NIKE. Specifically, on NIKE's December 21, 2023 earnings call, Defendant Friend stated that NIKE "expect[ed] Q3 reported revenue to be slightly negative as we again compare to double-digit growth in the prior year, and Q4 reported revenue to be up low-single digits, with full-year reported revenue now growing approximately 1%." This contrasted with NIKE's prior financial guidance announced on the Company's September 28, 2023 earnings call, where Defendant Friend stated that the Company expected "reported revenue to grow mid-single digits." During the earnings call, Defendant Friend cited several factors to explain the lowered guidance, including "***adjusted digital growth plans based on recent digital traffic softness*** . . . higher marketplace promotions [and] lifecycle management of key product franchises." Thus, NIKE revealed that it was anticipating slower growth in its digital channels because of low customer traffic on those platforms (NIKE's website, mobile apps, and the like) and the increased necessity to discount and reduce the supply of key products to account for lagging demand.

400. During this earnings call, Defendant Friend also disclosed that NIKE was "identifying opportunities across the company to deliver up to $2 billion in cumulative cost savings

over the next three years, both up and down our P&L and across our value chain." Defendant Friend explained that this reorganization was necessary because ***the CDA strategy had added "complexity and inefficiency" to NIKE***. In the same call, Defendant Donahoe also disclosed that Defendants knew NIKE "***must be faster, increasing the pace of innovation, increasing the pace of market-to-consumer and increasing our agility and responsiveness***." These disclosures partially demonstrated to investors not only that the CDA's reorganization was failing, but that NIKE had been failing to invest in innovation.

401. On this news, the price of NIKE Stock declined $14.49 per share, or nearly 12%, from a close of $122.53 per share on December 21, 2023, to close at $108.04 per share on December 22, 2023.

402. Investors and analysts were surprised and disappointed by these revelations, which for the first time partially revealed that the CDA strategy was failing in key respects, including innovation, and thus was not driving the promised financial growth. For instance, in a December 22, 2023 report, Raymond James wrote that NIKE's "weaker outlook is disappointing." In a December 22, 2023 report, Morgan Stanley noted that "the magnitude of [NIKE's] cut surprised to the downside." And in a December 22, 2023 report, UBS highlighted that "Nike announced an uncharacteristic plan to reduce costs by $2B over 3 years. . . . ***Nike will use some cost saves to accelerate innovation*** and improve speed. ***This is surprising since these have been objectives for the last 5+ years. We assumed Nike made more progress in these areas***."

403. Defendants, however, simultaneously downplayed the problems plaguing the CDA strategy to reassure investors. For instance, on this same earnings call, Defendant Donahoe falsely conveyed that NIKE's latest reorganization efforts had been effective:

> [S]ix months ago, ***we realigned our entire organization under Heidi O'Neill and Craig Williams as our Co-Presidents, and it is making a huge difference in our***

> ***focus and ability to execute.*** And as you know, we're single-mindedly focused on aligning our entire team to drive what NIKE does best: innovative product, combined with distinctive storytelling, combined with unique marketplace experiences. And as Matt just said, we have a real focus, Heidi, Craig and teams, a real focus on newness and driving our next product innovation cycle, which will elevate our entire portfolio, right.

404. **March 21, 2024—Second Partial Disclosure of the Truth / Materialization of the Risk:** The truth about CDA's failures were further partially revealed on March 21, 2024, when NIKE announced a second consecutive quarter of disappointing financial results (this time, for Q3 2024) and lowered its gross margin guidance (for FY 2024). On NIKE's March 21, 2024 earnings call discussing these results, Defendant Friend attributed NIKE's lowered guidance to several factors, including "higher markdowns [and] reduced benefits from channel mix due to franchise lifecycle management." This disclosure showed that, instead of maintaining an innovative product pipeline, NIKE had flooded the market with its classic "franchises" (*i.e.*, products), forcing NIKE to "manage" (*i.e.*, reduce) the supply of these franchises in the market because supply of these products had far outpaced demand. On the same earnings call, NIKE also announced that it expected "revenue in the first half of the fiscal year [FY 2025] to be down low single digits." Defendant Donahoe attributed also this lowered guidance to "near-term headwinds from lifecycle management of our key product franchises." Thus, Defendants revealed on this call that NIKE had misaligned the supply of these franchises so poorly during the Class Period that NIKE's remedial measures to limit the supply of these products would now cause NIKE's margins and revenues to suffer.

405. On the same call, Defendant Donahoe admitted the CDA strategy was failing in four crucial areas—*i.e.*, i) the shift from sports to other consumer categorization, ii) innovation, iii) brand equity, and iv) the pivot away from wholesale partners. Specifically, he stated:

> While our Consumer Direct Acceleration Strategy has driven growth and direct

> connections with consumers, ***it's been clear that we need to make some important adjustments***. Simply put, we need to make adjustments in ***four areas. We need to sharpen our focus on sport***, ***we must drive a continuous flow of new product innovation***, ***our brand marketing must become bolder and more distinctive***. And while NIKE Direct will continue to play a critical role, ***we must lean in with our wholesale partners*** to elevate our brand and grow the total marketplace.

406. Defendant Donahoe further disclosed that NIKE had "***started nine months ago, important adjustments in our offense***," including "putting the consumer ***and sport*** squarely back into our offense." In other words, Donahoe partially revealed that NIKE's CDA reorganization, in particular around the consumer constructs of Men's Women's and Kids', had failed, forcing the company to revert to organizing around sport-based categories as it did before the CDA strategy. Defendant Donahoe also admitted that NIKE had been "missing some product newness at scale in our portfolio over the last several seasons," which partially revealed to investors that NIKE had failed to maintain an innovative product pipeline for some time.

407. On this news, the price of NIKE Stock declined $6.96 per share, or nearly 7%, from a close of $100.82 per share on March 21, 2024, to close at $93.86 per share on March 22, 2024.

408. Analysts were also similarly surprised by NIKE's additional revelations about the CDA strategy's failures. For example, on March 22, 2024, Telsey Advisory Group wrote that "***Nike admitted it had been too focused on hitting its DTC and digital sales targets vs. serving consumer demand***." And in a March 21, 2024 report, Piper Sandler noted that NIKE's "Product lifestyle management will pressure near-term sales as [NIKE] refocuses on product innovation and reinvesting in wholesale." In a March 21, 2024 report, Wells Fargo Equity Research stated that NIKE's "franchise management will clearly be more of a headwind to the DTC/digital channel," because there was more excess of legacy franchise in NIKE's digital channels.

409. However, despite these partial revelations, Defendants continued to minimize these issues with the CDA strategy and continued to reassure investors that the CDA strategy was still

performing well in several key areas. For example, while acknowledging that NIKE needed to make certain "adjustments" to the CDA strategy, Defendant Donahoe continued to tout its success, falsely claiming that ***"[o]ur Consumer Direct Acceleration strategy has driven growth and direct connections with consumers***." Defendant Donahoe also claimed that, with respect to innovation, NIKE was "making significant progress . . . building a multiyear cycle of innovation that's bringing freshness and newness to consumers." On the same earnings call, Defendant Donahoe claimed that the Company was "back on our front foot with growing confidence in our innovation pipeline," and "our innovation engine is moving with speed."

410. **June 27, 2024—Third Partial Disclosure of the Truth / Materialization of the Risk:** The truth behind the CDA strategy's failure was further partially revealed on June 27, 2024, when NIKE announced a third consecutive quarter of disappointing financial results, along with poor results for FY 2024. For example, NIKE announced revenue for the fourth quarter of $12.61 billion, which missed consensus estimates by $250 million. NIKE also significantly reduced its guidance for FY 2025, with Defendant Friend stating that "we now expect fiscal 2025 reported revenue to be down mid-single digits, with the first half down high single digits."

411. In discussing this lowered guidance on NIKE's June 27, 2024 earnings call, Defendant Friend explained that NIKE had lowered its guidance due to factors such as "timelines and pacing to manage marketplace supply of our classic footwear franchises," and "***lower NIKE Digital growth . . . as we scale product innovation*** and newness across the marketplace." Thus, NIKE revealed that its "franchise management" plan—*i.e.*, its plan to intentionally pull its classic products off the market—was inflicting even greater pain on NIKE's revenue outlook than was previously disclosed, particularly when combined with the fact that NIKE lacked "newness" (*i.e.*, innovative products) to fill the gap.

412. Defendant Donahoe also disclosed that NIKE was "completely aligned across the organization around sport [categories]," which NIKE called "field[s] to play." This was the first time that Defendants acknowledged that the failure of NIKE's reorganization pursuant to the CDA strategy had forced NIKE to once again formally institute sport-based categories like NIKE had used prior to the CDA launch.

413. On the same earnings call, Defendant Donahoe also told investors that NIKE had "spent a lot of time ***leaning in with our wholesale partners***." This disclosure indicated that consumer demand for multi-brand shopping made NIKE dependent on its wholesale partners, thus acknowledging that a central component of the CDA strategy (the shift away from wholesale partners) had failed. Further, Defendant Friend admitted that such issues had begun to adversely affect NIKE's competitive position due to the misguided CDA initiatives. Specifically, Defendant Friend stated: "Although the next few quarters will be challenging, we are confident that we are ***repositioning NIKE to be more competitive***, with a more balanced portfolio to drive sustainable, profitable, long-term growth."

414. On this news, the price of NIKE Stock plunged $18.82 per share, or nearly ***20%***, from a close of $94.19 per share June 27, 2024, to close at $75.37 per share on June 28, 2024. This was ***the largest stock price drop in NIKE's history***,

415. Likewise, analysts were shocked by these revelations. For instance, in a June 28, 2024 report, Bernstein Societe Generale Group wrote that a "guidance cut was expected***, but the magnitude of it . . . was startling***." Similarly, in a June 28, 2024 report, Bank of America highlighted that NIKE's "***guidance reset was larger than expected as it expedites the reduction in lifestyle franchises in its DTC channel***."

416. However, despite these revelations, Defendants continued to downplay these CDA strategy problems and their impact on NIKE's growth prospects. For example, Defendant Donahoe assured investors he was "confident that our teams are lining up our competitive advantages to create greater impact for our business." Defendant Friend claimed that NIKE's "scaling of newness is on track" and that, "as we accelerate our pace of newness and innovation, the early response from consumers and partners are reinforcing our optimism in NIKE's path forward."

417. **October 1, 2024—Final Disclosure of the Truth / Materialization of the Risk:** The full extent and financial impact of Defendants' fraud was finally revealed on October 1, 2024, when NIKE announced its financial results for the first quarter of FY 2025, which again disappointed the market. For example, NIKE announced that its first quarter revenue was $11.6 billion, below consensus estimates of $11.64 billion. Notably, on the October 1, 2024 earnings call discussing these results, Defendant Friend disclosed that NIKE was "***withdrawing our full year guidance***." This disclosure indicated that the CDA strategy had failed to the point where NIKE could no longer reliably project its financial outlook.

418. The guidance that Defendants could provide conveyed the stark state of NIKE due to the CDA strategy's failures. Defendant Friend, for example, told investors that "Q2 revenues [were expected] to be down in the 8% to 10% range" and "Q2 gross margins [were expected] to be down approximately 150 basis points" because of "higher promotions [and] channel mix headwinds." Defendant Friend also disclosed that the Company's "franchise management" plan—which was required because of NIKE's previous oversaturation of the market with key classic products—was even more destructive to NIKE's revenues than previously disclosed. For example, Friend highlighted that NIKE's actions limiting supply of these products caused NIKE to plan for "double digit" declines in NIKE's Men's and Women's Lifestyle business and Jordan brand.

419. On the October 1, 2024 earnings call, Defendant Friend also admitted that NIKE had seen "***particular softness in traffic on NIKE Digital***" and that the Company had "***been closely engaging with our partners since we acknowledged some of the missteps related to over-centering on Direct***." This disclosure further revealed that NIKE's CDA strategy had failed to account for consumer demand for multi-brand shopping.

420. Finally, Defendant Friend also acknowledged that NIKE had lost brand strength and its competitive edge. Specifically, he stated that "***the multi-brand environment is very competitive today, and it will take time to expand market share***," and that NIKE had "***acknowledged that we've lost market share in the running specialty channel. More than four years ago***, we pulled back on our engagement with that channel. ***And as a result of that, we saw market share losses***."

421. On this news, the price of NIKE Stock declined $6.03 per share, or nearly 6.8%, from a close of $89.13 per share on October 1, 2024, to close at $83.10 per share on October 2, 2024.

422. Analysts were also shocked by these disclosures, which revealed the full extent of the CDA strategy's failures and its dire impact on NIKE's business, including NIKE's loss of market share to rising competitors. For example, on October 2, 2024, Jeffries wrote that "promos are rising, new product will take time to resonate, if it does at all, and ***in the meantime competition is proving to be more severe***." On October 2, 2024, analysts at Truist similarly concluded that "***[w]ith another miss vs depressed expectations***, Nike's visibility into its own business appears lower than we previously anticipated."

### 4. Defendant Donahoe Suspiciously Departs, and His Replacement Elliot Hill Admits CDA Failures

423. On September 19, 2024—between the third and fourth disclosures of the truth and a mere two weeks before the end of the Class Period, NIKE's Board of Directors announced that Defendant Donahoe would depart as NIKE's CEO. At the same time, NIKE's Board announced that long-time NIKE veteran Elliott Hill would return and replace Defendant Donahoe and become President and CEO of NIKE effective October 13, 2024. Hill had previously worked at NIKE for over three decades, and had retired in 2020 from the position of President - Consumer and Marketplace, wherein he led all commercial and marketing operations for NIKE and Jordan Brand.

424. Donahoe's departure and Hill's appointment was a tacit admission that the CDA strategy had failed, as Hill planned to reverse course on key initiatives of the CDA strategy. For example, in NIKE's September 19, 2024 press release announcing Donahoe's departure, NIKE highlighted that Hill's goals included "delivering bold, ***innovative products***" and "***reconnect[ing]" with "trusted partners***"—*i.e.*, the wholesale partners that NIKE had abandoned as part of its DTC shift under the CDA strategy. Similarly, a September 20, 2024 article on *Inc.com* quoted Thomas Hayes, equity manager at Great Hill Capital that: "Hill is going to work on repairing some of Nike's relationships with wholesale customers since Nike has dropped some customers over the years and pulled back some product that has created some ill will (among retailers)."

425. On NIKE's December 19, 2024 earnings call—the first since Hill took over as CEO—Hill discussed NIKE's CDA failures. As described *supra*, Hill stated that "one of the first leadership moves I made" was to realign reporting lines so that ***NIKE's Chief Supply Chain officer was "reporting directly to me"***—thus, tacitly acknowledging the prior DTC supply chain problems. Hill elaborated further that a new focus on improving NIKE's supply chain "will help

set us up for long-term sustainable and profitable growth" and that "it will certainly be a focus as we move forward as an opportunity for margin expansion." Hill also admitted the failure of NIKE's pivot away from a consumer construct based on sports-categories, stating that NIKE was reversing course: "***We lost our obsession with sport. Moving forward, we will lead with sport.***" Hill also admitted that NIKE had cut off innovation and instead relied on flooding the market with key classic products, which Hill planned to reverse: "a reliance on a handful of sportswear silhouettes is not who we are. We will get back to leveraging deep athlete insights to ***accelerate innovation***, design, product creation and storytelling."

426. On this same call, Hill also acknowledged that "***[p]rioritizing NIKE Digital revenue has impacted the health of our marketplaces.*** We will build back an integrated marketplace." In other words, Hill admitted that the CDA strategy failed to respond to consumer demand for multi-brand shopping, and NIKE thus was reversing course. To do so, according to Hill, NIKE needed to "prioritize is building back and earning the trust of our key wholesale partners," as "[s]ome partners and channels feel we've turned our back on them and we stopped engaging consistently. I've connected with many of them directly."

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

427. The allegations in this Section should be read in conjunction with Section IV, which provides additional context and explanations relevant to these allegations.

428. Lead Plaintiffs allege that the statements highlighted in ***bold and italics*** within this Section were materially false, materially misleading, and/or omitted to disclose material information.[40] The terms "misleading" and "misrepresentation" refer to statements that are false

[40] In other Sections of this pleading, language is also bolded and italicized for emphasis, not merely to identify specific statements that are materially false or misleading.

or misleading, including due to omission of information necessary to render the statements not misleading.

429. Each statement and all conduct in this Section by, or attributed to, Defendants Donahoe, Friend, Parker, O'Neill, or Campion are attributable to NIKE as well, because each such statement or conduct was made or performed by the relevant Individual Defendant in their capacity as a representative of NIKE and because each such statement or conduct can be properly deemed a statement by NIKE or conduct by NIKE.

430. During the Class Period, Defendants repeatedly, falsely touted to investors the purported success of NIKE's CDA strategy, including the success of its various key components (such as the Company's DTC supply chain, technological capabilities, and innovative product pipeline) that were essential for the CDA strategy to achieve the promised long-term financial growth, as detailed below. In reality, however, Defendants concealed from investors the following, severe problems in each of these key components of the CDA strategy that existed at the time of the misstatements and thus undermined the Company's ability to successfully execute that strategy and achieve that financial growth, as was revealed to investors at the end of the Class Period on the four alleged disclosures of the truth.

431. **DTC Supply Chain:** Several of the misstatements discussed below touted NIKE's success in developing an effective DTC supply chain. These representations were material to investors' assessment of the CDA strategy because, as described in Section IV.A.4.a., the CDA strategy's success hinged on NIKE developing an effective DTC supply chain as, without one, NIKE could not successfully distribute merchandise to meet consumer demand. As discussed in Section IV.B.1.a., however, during the Class Period, NIKE failed to develop an effective DTC supply chain, thereby impeding the CDA strategy from the start. NIKE did not have sufficient

capabilities to manage its supply chain as it emphasized pivoting towards DTC operations, and did not sufficiently invest in supply chain management. For example, multiple, well-placed CWs and other allegations, including Defendants' own later admissions, set forth that these severe supply chain problems: (i) predated the Class Period; (ii) persisted throughout the Class Period; (iii) were repeatedly raised to NIKE's senior management, including the Individual Defendants, throughout the Class Period; and (iv) contributed to NIKE reducing its targeted openings of NIKE Live Stores by no later than July 2022.

432. **Technological Capabilities and Organization:** Several of the misstatements discussed below claimed that NIKE had developed the technological capabilities necessary to support NIKE's CDA strategy and/or had a technology organization that would ensure these technological capabilities were successfully developed and deployed. These representations were material to investors' assessment of the CDA strategy because, as described in Section IV.A.4.b., the CDA strategy depended on NIKE building out and unifying its DTC technological capabilities and organization. As discussion in Section IV.B.1.b., however, during the Class Period, NIKE had failed to successfully build out these technological capabilities and organization, which were critical for the CDA strategy to succeed. For example, based on the accounts of numerous corroboratory CWs and other sources, including Defendants' own later admissions: (i) by the start of the Class Period, NIKE had experienced an exodus of technology talent, hindering its ability to support the CDA strategy; (ii) at the start of the Class Period, the Company's technology necessary to support the CDA strategy, including marketing personalization technology, was antiquated, and this remained the case throughout the Class Period; (iii) NIKE's corporate reorganization, pursuant to the CDA strategy, forced the Company to engage in complex and time-consuming projects, leading to delays of other technology projects critical to the CDA strategy's success; (iv) NIKE's

expensive partnership with Adobe to build critical DTC marketing and other technology was known to be a failure as soon as it began in 2021, as Adobe merely duplicated certain technological capabilities (*e.g.*, A/B testing) and failed to build out others (*e.g.*, marketing personalization); (v) by January or February 2022 at the latest, Defendant Donahoe and other Individual Defendants had begun holding regular meetings with key technology personnel to discuss the severe and persistent problems with the DTC technological capabilities and organization necessary for the CDA strategy to succeed; and (vi) former Chief Digital Information Officer Ratnakar Lavu engaged in corruption and created a "shadow" technology group that duplicated and refused to work with preexisting NIKE teams, which substantially undermined the technology organization's efforts to develop the essential DTC technological capabilities, and by the end of 2021, Defendants knew that these problems were inhibiting the success of the CDA strategy, eventually leading to Lavu's suspicious departure in February 2023.

433. **Streamlined Corporate Reorganization:** Several of the misstatements described below touted the success of NIKE's corporate reorganization, pursuant to the CDA strategy, which included refocusing NIKE's business along gender- and age-based consumer constructs instead of sport-based categories. These representations were material to investors' assessment of the CDA strategy because, as described in Section IV.A.4.c., the CDA strategy depended on NIKE successfully establishing a streamlined organizational structure, including by successfully reorganizing its business around gender-and-age consumer constructs. As discussed in Section IV.B.1.c., however, this reorganization also was a disaster, thus further undermining the success of the CDA strategy. For example, based on the accounts of numerous CWs and other sources, including Defendants' own subsequent admissions: (i) within six months of NIKE launching its reorganization in summer 2020, the Company lost substantial expertise and experience in sports

categories due to layoffs, which further jeopardized the success of the CDA strategy; (ii) by no later than summer 2022, NIKE began implementing a reversion to its pre-CDA sport-based categorization model to address concerns with the Company's lagging performance under the gender and age-based model; (iii) and Defendants admitted that, by June 2023, the failure of NIKE's initial reorganization, pursuant to the CDA strategy, had forced the Company to formally backtrack to the sport-based categories once again.

434. **Innovative Product Pipeline:** Several of the misstatements discussed below touted NIKE's innovative product pipeline. These representations were material to investors' assessment of the CDA strategy because, as described in Section IV.A.4.d., maintaining an innovative product pipeline to meet consumer demand was a foundational requirement of the CDA strategy. As discussed in Section IV.B.1.d., however, during the Class Period, NIKE failed to maintain its innovative product pipeline and instead relied on unsustainably flooding with the market with its classic franchises. For example, according to the allegations of former NIKE employees and the Company's own admissions: (i) NIKE's "lack of innovation" "originated" with the CDA strategy's reorganization in 2020; (ii) by early 2021, NIKE began unsustainably flooding the market with its key classic products (which became a "dirty secret" internally at NIKE); (iii) by 2022, it was apparent internally that NIKE's reorganization had impeded its ability to produce innovative products; (iv) by July 2022, product pipeline problems contributed to NIKE reducing its targeted openings of NIKE Live Stores; (v) by early 2023, NIKE had begun "rebuilding" its innovation pipeline, as rising new competitors with more innovative products eroded NIKE's market share.

435. **Competitive Standing and Brand Distinction:** Several of the misstatements described below claimed that NIKE had maintained or enhanced its brand equity and/or competitive standing. These representations were material to investors' assessment of the CDA

strategy because, as described in Section IV.A.4.e., the CDA strategy required NIKE to maintain its competitive separation and brand distinction. As discussed in Section IV.B.1.e., however, during the Class Period, NIKE's brand equity and competitive standing declined, thereby inhibiting the success of the CDA strategy. For example, based on the accounts of numerous CWs and other sources, including Defendants' own later admissions: (i) by no later than summer 2021, NIKE had begun losing customer accounts and market share to growing new competitors such as On and Hoka, at which point NIKE began exploring expanding credit lines for customers in an effort to build back the Company's running shoe business; and (ii) by May 2022, NIKE's critical "cool" marketing metric showed that NIKE was no longer the number one cool brand in North America and that NIKE was losing ground to its competitors, such as Adidas and Lululemon, according to this metric.

436. **Successful Channel Mix Between Wholesale and DTC:** Several of the misstatements described below claimed that NIKE had effectively shifted a significant amount of its business away from its wholesale partners to its mono-brand channels, while successfully meeting consumer demand. These representations were material to investors' assessment of the CDA strategy because, as described in Section IV.A.4.f., the CDA strategy depended on NIKE effectively responding to consumer demand for multi-brand vs. mono-brand shopping. As discussed in Section IV.B.1.f., however, during the Class Period, NIKE failed to effectively respond to consumer demand for multi-brand shopping, thereby further undermining the success of the CDA strategy. For example, according to multiple CWs and other sources, including Defendants' own admissions: (i) by early 2021, the sell-through rates for new DTC products reflected that the DTC strategy was faltering, and a former NIKE Vice President for Global Marketplace Integration voiced concerns regarding the sustainability of NIKE's marketplace

strategy because wholesale partners were an "anchor" of NIKE's business; (ii) by the fall of 2021, NIKE was dependent on multi-brand retailers to rescue it from its failing CDA strategy; and (iii) NIKE's mono-brand stores were performing poorly by no later than early 2022, thus also imperiling the success of the CDA strategy.

437. **CDA's Overall Success:** Several of the misstatements below claimed that NIKE's CDA strategy was succeeding. These statements conveyed to investors that NIKE was successfully building out or maintaining certain key aspects of its business that were critical components of the CDA strategy, including: (i) developing an effective DTC supply chain; (ii) enhancing NIKE's DTC technological capabilities and establishing an effective technology organization to support those capabilities; (iii) engaging in a corporate reorganization to focus on DTC initiatives, including the creation of new consumer constructs; (iv) maintaining a robust pipeline of innovative products while effectively managing supply of NIKE's key products; (v) maintaining its competitive separation and brand strength; and (vi) effectively adapting to consumer demand patterns regarding shopping at mono-brand and multi-brand retail stores. As described immediately above, however, per numerous corroboratory sources, including ***19 CWs***, NIKE was failing to achieve each of these critical components of the CDA strategy, thus ensuring the demise of the CDA strategy.

438. In addition, these statements conveyed that NIKE's CDA strategy was succeeding overall, which, as described in Section IV.A.3., investors understood to mean that the CDA strategy was propelling long-term sustainable growth for NIKE. As discussed in Section IV.B.1.g., however, NIKE's initial DTC growth during the Class Period was not driven by any purported success of the CDA strategy, but instead by temporary, unrelated factors, and the CDA strategy was doomed to fail given the numerous severe problems in its critical components, like the DTC

supply chain and technology. For example, (i) the initial growth of NIKE's DTC channels during the Class Period was driven by the COVID-19 pandemic, which began just before the launch of the CDA strategy and drove consumers to online shopping temporarily, NIKE's pre-CDA pipeline of products, and NIKE's oversaturation of the market with key classic products; and (ii) a legion of internal warning signs showed Defendants throughout the Class Period that the CDA strategy was failing and that NIKE's initial financial growth was unsustainable long-term.

**A. March 18, 2021 — FY 2021 Q3 Earnings Announcement**

439. On March 18, 2021, NIKE issued a Press Release titled "NIKE, Inc. Reports Fiscal 2021 Third Quarter Results," in which Defendant Donahoe stated, in reference to NIKE's CDA strategy:

> NIKE continues to deeply connect with consumers all over the world driven by our strong competitive advantages . . . . ***Our strategy is working, as we accelerate innovation*** and create the seamless, premium marketplace of the future. I've never been more confident in our leadership and teams to operate with agility in a dynamic environment.

440. Defendants' statement that the CDA strategy was "working" conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38. Further, Defendants' representation that NIKE was presently "accelerat[ing] innovation," conveyed that NIKE was not just maintaining, but was actually accelerating its innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434.

441. On March 18, 2021, during NIKE's FY 2021 Q3 earnings call ("March 18, 2021 Earnings Call"), Defendant Donahoe falsely claimed, in response to an Evercore ISI Analyst's question about NIKE's CDA strategy, that:

> The second area that plays an important role is – one part of the consumer experience was getting the right product in the right place at the right time, and so this is where our Celect acquisition has allowed us to ***fairly impressively pivot to a more direct-to-consumer supply chain.*** And I again give our supply chain team enormous credit for what they've done over the last year as we've pivoted toward digital. But what that's all about is knowing what inventory do have resident in local, regional warehouses so that you can get it delivered more rapidly and often through ground transportation.

442. This statement conveyed that NIKE had already developed the "direct-to-consumer supply chain" capabilities it needed for the CDA to succeed, which was materially misleading for the reasons stated in paragraphs 431.

443. During NIKE's March 18, 2021 Earnings Call Defendant Donahoe stated:

> As always, our brand is propelled by our ***unmatched innovation investment and pipeline.*** Innovation is at our core, reflecting not just our foundational values, but the values we share with consumers. We don't just innovate for the elite athlete, we use innovation and design to solve problems for all consumers, no matter their sport or style of play, and we consistently bring fresh, new product to market supported by compelling storytelling that helps drive consumer demand.

444. This statement conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated paragraph 434.

445. Analysts were reassured by Defendants' misstatements concerning NIKE's innovative product pipeline. For example, on March 18, 2021, Guggenheim issued an analyst report assigning NIKE Stock a "Buy" rating and highlighting that NIKE's "***new product innovation remains robust***." On March 19, 2021, UBS published an analyst report assigning NIKE Stock a "Buy" rating and stating that "Nike's ***investments in product innovation***, supply chain speed and digital are unlocking what is likely a multi-year period of above average growth." Other analysts were also encouraged by Defendants' misstatements regarding NIKE's innovative product pipeline. For instance, in a March 19, 2021 report, Evercore ISI stated that NIKE's ***"[s]trong product pipeline," was a key factor in its "investment thesis"*** underpinning its

"Outperform," rating of NIKE. Analysts' positive reactions also confirm that the market was materially misled by Defendants' misstatement concerning NIKE's DTC supply chain. For example, on March 19, 2021, UBS published an analyst report assigning NIKE Stock a "Buy" rating and stating that "Nike's investments in product innovation, ***supply chain speed*** and digital ***are unlocking what is likely a multi-year period of above average growth***."

**B. April 26, 2021 — UC Berkeley Speech**

446. On April 26, 2021, The University of California, Berkeley's Hass School of Business posted a video on YouTube in which Defendant Friend is depicted making the following statements as part of the Haas "Dean's Speaker Series," where he falsely touted NIKE's strong innovation pipeline, technological capabilities, and DTC supply chain:

> [P]roduct innovation and product and storytelling is what makes NIKE special. We could have the best mobile app. We could have the best digital commerce relationship. But if we didn't have great products that consumers wanted, it wouldn't matter, right? And so, because we're not just building a platform to sell multiple products, we're building a tighter and more intentional relationship with consumers. And so, what we've done through the pandemic and even beyond—what I've been focused on in my role—is ensuring that ***we're investing maniacally behind product innovation***, sustainability, and then ultimately creating these digital, a digital, platform that enables us to have those one-to-one connections with consumers at scale. ***Personalization, leveraging data analytics, um, machine learning so that we can read patterns and consumer behavior, we're employing data and analytics capabilities in our supply chain, so we know how to more smartly flow our product, where to put our product, um, the net benefit of that is higher margins because we have less waste, less mark-downs, less inefficiency, and where product sits around the world***.

447. Defendants' statement that NIKE was presently "investing maniacally behind product innovation" conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434. Defendants' statement that NIKE was effectively using DTC technology such as consumer "[p]ersonalization" conveyed that NIKE had successfully built out the technological capabilities and organization needed for the

CDA strategy to succeed because personalized marketing technology was a key DTC technological capability necessary to the success of the CDA strategy, which was materially misleading for the reasons stated in paragraph 432. Defendants' statement touting NIKE's "data and analytics capabilities in our supply chain" conveyed that NIKE had successfully developed an effective DTC supply chain permitting NIKE to "know how to more smartly flow our product, where to put our product . . . and where the product sits around the world," which was materially misleading for the reasons stated in paragraph 431.

### C. June 24, 2021 — FY 2021 Q4 Earnings Announcement

448. On June 24, 2021, NIKE issued a press release entitled: "Q4 NIKE, Reports Fiscal 2021 Fourth Quarter Results," in which Defendant Donahoe falsely claimed that NIKE was investing in innovation:

> NIKE's strong results this quarter and full fiscal year demonstrate NIKE's unique competitive advantage and deep connection with consumers all over the world . . . . FY21 was a pivotal year for NIKE as we brought our Consumer Direct Acceleration strategy to life across the marketplace. Fueled by our momentum, ***we continue to invest in innovation*** and our digital leadership to set the foundation for NIKE's long-term growth.

449. This statement conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434.

450. On June 24, 2021, during NIKE's FY 2021 Q4 earnings call (the "June 24, 2021 Earnings Call"), Defendant Donahoe falsely touted NIKE's strong product innovation pipeline and competitive position:

> ***[O]ur relentless pipeline of innovative product continues to create separation between us and our competition***. Our product is fueled by sharp consumer insight, supported by marketing data and analytics as we continue to invest in our digital transformation. And through our new operating model, we are bringing more precision to the art of product creation as we blend the art and science of innovation.

451. Defendants' statement touting NIKE's "relentless pipeline of innovative product" conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434. Defendants' statement that this innovative pipeline "create[d] separation" between NIKE and competitors conveyed that NIKE had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435.

452. Analysts were encouraged by Defendants' misstatements abouts NIKE's innovative product pipeline. For example, on June 25, 2021, Evercore ISI published an analyst report assigning NIKE Stock an "Outperform" rating, and stating that they "believe a premium multiple is warranted given the secular growth of the active / athletic sector, ***the company's long-tailed distribution shift towards digital and DTC, and the strong product pipeline***." Similarly, in a June 25, 2021 analyst report assigning NIKE Stock a "Buy" rating, UBS wrote that "[w]e see relatively limited stock price downside," and explained that, "with . . . ***Nike's innovation pipeline full*** . . . ***we see more that can go right, from a sales and margin perspective***, than wrong."

**D. July 20, 2021 — Form 10-K**

453. On July 20, 2021, Defendants filed their Annual Report on Form 10-K for the fiscal year ended May 31, 2021 ("July 2021 10-K"), which was signed by Defendants Donahoe and Friend. In it, Defendants stated that NIKE's potential inability to "adjust[] the mix of existing product offerings" and "develop[] new products, styles and categories" to meet consumer demand were hypothetical risks that "***could have a material adverse effect on our sales and profitability***."

454. This statement was materially misleading for the reasons stated in paragraph 434. In particular, Defendants' hypothetical warnings about NIKE's product offerings—*e.g.*, that potential failure to adjust the mix of NIKE products and develop new products to meet customer

demand—that "***could***" negatively impact NIKE's business were materially misleading because Defendants knew, or were reckless in not knowing, that NIKE had already failed to maintain its innovative product pipeline, and instead relied on unsustainably flooding the market with its classic franchises.

455. The July 2021 10-K also included a materially misleading risk disclosure regarding NIKE's competitive standing, in which Defendants stated:

> ***If we do not adequately and timely anticipate and respond to our competitors, our costs may increase, demand for our products may decline, possibly significantly, or we may need to reduce wholesale or suggested retail prices for our products.***

456. This statement was materially misleading for the reasons stated in paragraph 435. In particular, Defendants' hypothetical warnings that NIKE's potential failure to "respond to our competitors" "***may***" negatively impact NIKE's business was materially misleading because Defendants knew, or were reckless in not knowing, that NIKE's brand equity and competitive standing had already significantly declined as it, *inter alia*, lost market share to growing competition, thereby inhibiting the success of the CDA strategy.

457. The July 2021 10-K included an additional materially misleading risk disclosure, in which Defendants stated that a potential "***[f]ailure to maintain our reputation, brand image, and culture could negatively impact our business***."

458. This statement was materially misleading for the reasons stated in paragraph 435. In particular, Defendants' hypothetical warnings that NIKE's potential "***[f]ailure to maintain our reputation [and] brand image could negatively impact our business***" was materially misleading because Defendants knew, or were reckless in not knowing, that NIKE's brand equity and competitive standing had already significantly declined, thereby inhibiting the success of the CDA strategy.

459. Further, the July 2021 10-K included a materially misleading risk disclosure regarding NIKE's DTC technology, in which Defendants stated:

> In addition, we have made significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations, and our digital offerings will require continued investment in the development and upgrading of our technology platforms. In order to deliver high-quality digital experiences, our digital platforms must be designed effectively and work well with a range of other technologies, systems, networks, and standards that we do not control. ***We may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards.***

460. This statement was materially misleading for the reasons stated in paragraph 432. In particular, Defendants' hypothetical warnings that NIKE "***may not be successful***" in developing technology critical to NIKE's direct-to-consumer operations was materially misleading because Defendants knew, or were reckless in not knowing, that NIKE already was experiencing severe problems in its efforts to build out and unify its DTC technological capabilities and organization, which were critical for the CDA strategy to succeed.

**E. September 23, 2021 — FY 2021 Q1 Earnings Announcement**

461. On September 23, 2021, during NIKE's FY 2022 Q1 earnings call (the "September 23, 2021 Earnings Call"), Defendant Donahoe falsely affirmed the strength of NIKE's competitive position:

> Today, ***we're in a stronger position relative to our competition than we were prior to the pandemic***. Why? Because the changes happening in the market worked in our favor. Consumers' shift to digital that might have taken five years will now only take two years. That plays to NIKE's advantage. And our Consumer Direct Acceleration strategy is capitalizing on this marketplace transformation.

462. This statement conveyed that NIKE had not only successfully maintained its brand strength and competitive standing but that it had actually increased its brand strength and competitive standing because it represented that NIKE was "in a stronger position relative to our

competition than we were" prior to the CDA strategy, which was materially misleading for the reasons stated in paragraph 435.

463. During the September 23, 2021 Earnings Call, Defendant Friend stated, in response to a Guggenheim analyst's question regarding NIKE's supply chain capabilities:

> [A] couple of quarters ago I talked about, as we were starting to see the strength in consumer connections and the acceleration of our business, that we were going to begin accelerating investment to drive our digital transformation. ***And in particular, where we were investing was against technology, creating a digital-first supply chain in the marketplace.*** And we created a multiyear investment plan against our outlook to drive that growth.

464. This statement conveyed that NIKE had successfully developed an effective DTC supply chain because it stated that NIKE had previously invested in "creating a digital-first supply chain," enabling NIKE to serve consumer demand in the DTC marketplace, which was materially misleading for the reasons stated in paragraph 431.

465. On September 23, 2021, Defendants filed a Form 8-K, which was signed by Defendant Friend. In discussing the CDA strategy in a press release attached to this Form 8-K, Defendant Friend falsely claimed the CDA strategy was fueling NIKE's growth:

> NIKE is a growth company with a market opportunity as large as it's ever been . . . ***Our Q1 results illustrate how NIKE's Consumer Direct Acceleration strategy continues to fuel growth and transform our long-term financial model.***

466. This statement conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth—and that NIKE's FY 2022 Q1 financial results were caused by the purported success of the CDA strategy—all of which were materially misleading for the reasons stated in paragraphs 437-38.

467. Analysts were encouraged by Defendants' misstatements concerning the CDA strategy's positive impact on NIKE's growth. For instance, in a September 23, 2021 analyst report, J.P. Morgan issued NIKE Stock an "Overweight" rating, saying that Defendant Donahoe sees

NIKE "in a stronger position 18 months from now . . . accelerated by [] the CDA strategic focus of leveraging data/digital insights to drive inventory placement and reduce markdowns." In a September 24, 2021 analyst report, Barclays Equity Research indicated that NIKE's Stock price was "Overweight" in part due to "the acceleration of [NIKE's] direct-to-consumer strategy."

468. Analysts also reacted positively to Defendants' misstatements concerning NIKE's digital-first supply chain. For example, on September 24, 2021, UBS published an analyst report assigning NIKE Stock a "Buy" rating and stating that "***Nike's investments in . . . supply chain speed and digital are unlocking what is likely a multi-year period of above average growth***." On the same date, Morgan Stanley assigned NIKE Stock an "Overweight"[41] rating, adding: NIKE's "***supply chain innovation also create[s] LT [long-term] competitive advantages***." On September 24, 2021, Deutsche Bank assigned NIKE Stock a "Buy" rating and said: "we remain confident in the company's long-term earnings algorithm given the brand's . . . ***enhanced digital/supply chain capabilities***."

**F. October 5, 2021 — Form 10-Q**

469. On October 5, 2021, Defendants filed their Quarterly Report on Form 10-Q for the quarterly period ended August 31, 2021, which was signed by Defendants Donahoe and Friend. In it, Defendants falsely touted NIKE's technological capabilities needed for a DTC supply chain:

> Through the Consumer Direct Acceleration we are focusing on creating the marketplace of the future through more premium, consistent and seamless consumer experiences, leading with NIKE Digital and our owned stores, as well as select strategic partners who share our marketplace vision. We have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's, Kids' and the Jordan Brand and ***continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further***

[41] As described by the Corporate Finance Institute, an "Overweight" stock is a stock that financial analysts believe will outperform a benchmark stock, security, or index. The "Overweight" recommendation signals to investors to devote a larger percentage of their portfolio to the stock.

***accelerate our digital transformation.***

470. Defendants' statement that NIKE "continue[s] to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further accelerate our digital transformation" conveyed that NIKE had successfully developed an effective DTC supply chain because it clamed to have invested heavily in the these capabilities needed to establish such as supply chain, which was materially misleading for the reasons stated in paragraph 431.

**G. October 6, 2021 — Annual General Meeting**

471. On October 6, 2021, at NIKE's Annual General Meeting ("October 6, 2021 Annual General Meeting"), Defendant Donahoe falsely touted the continued success of the CDA strategy:

> Our belief in innovation also extends to our digital advantage. We continue to elevate our membership proposition, which comes to life across our One NIKE Marketplace. This year, NIKE hosted our first-ever globally coordinated Member Days, which reached over 60 million members across 25 countries, offering them first access to product, rewards for activity, and exclusives across stores and digital. And this year we've also added live streaming to the SNKRS app and kept on innovating, launching SNKRS LIVE, our first product drop via live streaming.
>
> So today, we're the clear leaders in digital in our industry. Our owned Digital revenue is now over 20% of our business, a mark we've hit three years ahead of plan. And looking ahead, we see even greater competitive acceleration. In fact, by fiscal 2025, we expect our business to be 40% owned Digital. This shift is having a profound transformation on our operating model; and thanks to our playbook, we are creating greater value for both consumers and shareholders. And so, in our fourth quarter earnings call in June, we outlined new fiscal 2025 financial goals. This new financial model is clear proof of the confidence we have in NIKE's future.
>
> And as I look ahead to fiscal 2022, I'm excited. ***We are clearly seeing our strategy work.*** The team at NIKE is energized by our incredible potential and I hope you're energized as well. Fueled by our competitive advantages, we will continue to drive our vision to create the future of sport. Thank you.

472. Defendants' statement that they were "clearly seeing [NIKE's] strategy work" conveyed that NIKE was presently succeeding in each of the key aspects of the CDA strategy and

that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

473. At the October 6, 2021 Annual General Meeting, in response to a shareholder question relayed by Defendant Parker about the CDA strategy ("[Y]ou're about a year into your new Consumer Direct Acceleration strategy, how is that going?"), Defendant Donahoe assured the strategy's continued success:

> As I said in my remarks, ***NIKE's strategy is working****,* and we're very encouraged and excited by the progress we've seen thus far. The Consumer Direct Acceleration is transforming NIKE with direct impacts that we can already see on our ability to serve consumers end-to-end with a premium and seamless experience, and on our business.

474. This statement conveyed that NIKE was presently succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

475. At the October 6, 2021 Annual General Meeting, Defendants touted NIKE's purportedly successful corporate reorganization of its consumer constructs. Specifically, in response to the same shareholder question relayed by Defendant Parker referenced above, Defendant O'Neill stated that "***[w]ith the CDA, we successfully realigned our organization to further invest against our highest growth areas.***" This statement conveyed that NIKE's reorganization had successfully organized around the new consumer constructs, which was materially misleading for the reasons stated in paragraph 433.

476. At the October 6, 2021 Annual General Meeting, in response to the shareholder question relayed by Defendant Parker referenced above, regarding the CDA strategy, Defendant Friend falsely assured investors that NIKE was successfully building out its DTC technological capabilities:

> I'd just add that the Consumer Direct Acceleration is having a profound effect also on our operating model. Our relentless focus on serving consumers is resulting in healthy profitable growth. And the shift to a more direct model has resulted in Nike's highest EBIT margin in recent history. ***The investments we've made against our end-to-end digital transformation are making us more agile, and we're building the capabilities that are required for NIKE to operate a digitally led omni-channel, direct-to-consumer business at scale.***

477. This statement conveyed that NIKE had successfully built out the technological capabilities and organization needed for the CDA strategy to succeed, which was materially misleading for the reasons stated in paragraph 432.

478. At the October 6, 2021 Annual General Meeting, in response to a shareholder question about the innovation pipeline, Defendant Parker falsely affirmed: "***The pace of innovation has not slowed down at all.***"

479. This statement conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434.

480. At the October 6, 2021 Annual General Meeting, in response to a shareholder question as relayed by Defendant Parker about the status of NIKE's "digital ecosystem" and the role of brick-and-mortar stores, Defendant O'Neill again falsely assured that its CDA strategy was succeeding:

> I'll start by reiterating what we've mentioned before, ***our strategy is definitely working***. We're being very intentional in our plans to shape the marketplace of the future and how we intend to lead it.

481. This statement conveyed that NIKE was "definitely" succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

482. At the October 6, 2021 Annual General Meeting, in response to a shareholder question relayed by Defendant Parker about NIKE's supply chain capabilities, Defendant Friend falsely stated:

> We've also been investing to build capabilities that are transforming our operating model; and Heidi mentioned a number of them in the marketplace question earlier, like online to offline services for consumers, we're leveraging the Express Lane, and ***we're building a digital-first supply chain to meet the strong and growing digital demand that we see.***
>
> And all of these things are helping us to operate with more agility than we've ever operated before. So we're optimistic that inventory supply availability will improve as we approach fiscal year 2023, and our vision for Nike's long-term future remains unchanged.

483. This statement conveyed that NIKE had been successfully developing an effective DTC supply chain, which was materially misleading for the reasons stated in paragraph 431.

484. At the October 6, 2021 Annual General Meeting, Defendant Donahoe falsely maintained that NIKE's corporate reorganization had succeeded:

> And this was also a year where we brought to life our new Consumer Direct Acceleration strategy. ***As part of CDA, we successfully realigned our organization*** and began investing in our highest-growth areas. Part of that investment is our consumer construct of men's, women's, and kids, and Jordan, which aligns us against the biggest opportunities we see ahead of us. We're putting resources behind our end-to-end digital transformation across the value chain, as we unlock more growth and efficiency for the business

485. This statement conveyed that NIKE's reorganization had successfully established a streamlined organizational structure, including by successfully reorganizing its business along gender-and-age consumer constructs, which was materially misleading for the reasons stated in paragraph 433.

486. Analysts were convinced by Defendants' misstatements concerning their digital ecosystem and success of their CDA strategy. For example, on October 12, 2021, Goldman Sachs published an analyst report assigning NIKE Stock a "Buy" rating and stating that NIKE's "DTC

initiative [] should drive higher gross margins over time" and that "***Nike has built an impressive digital ecosystem***." Goldman also stated that NIKE's "Powerful Brand Legacy Continues, ***Bolstered by Continued DTC Expansion***." Analysts also reacted positively to Defendants' misstatements concerning the strength and efficacy of NIKE's DTC supply chain. For example, on October 6, 2021, Deutsche Bank published an analyst report assigning NIKE Stock a "Buy" rating and stating that Deutsche Banks "remain[s] confident in the company's long-term earnings algorithm given the brand's . . . ***enhanced digital/supply chain capabilities***," among other things.

**H. November 18, 2021 — Press Release**

487. On November 18, 2021, NIKE issued a press release, entitled "NIKE, Inc. Announces 11 Percent Increase in Quarterly Dividend," in which Defendant Donahoe falsely assured investors the CDA strategy was continuing to fuel growth for NIKE:

> ***NIKE continues to fuel growth through our Consumer Direct Acceleration strategy***, while generating strong cash flow and increasing returns to shareholders . . . This is now our 20th consecutive year of increasing dividend payouts, and reflects our strong track record and confidence in our ability to deliver sustainable, profitable, capital-efficient growth over the long-term.

488. This statement conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

**I. December 20, 2021 — FY 2022 Q2 Earnings Announcement**

489. On December 20, 2021, NIKE issued a press release entitled "NIKE, Inc. Reports Fiscal 2022 Second Quarter Results" in which Defendant Donahoe falsely claimed the CDA strategy was working and that NIKE's competitive position was strengthening:

> ***NIKE's strong results this quarter provide further proof that our strategy is working***, as we execute through a dynamic environment . . . ***We are now in a much stronger competitive position today than we were 18 months ago***. And I want to thank our roughly 75,000 global teammates for all their work to provide consumers

> with the compelling new product, innovation and experiences that only NIKE can deliver.

490. Defendants' statement that NIKE's "strong results this quarter provide proof that our strategy is working" conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38. Defendants' statement that NIKE's "competitive position" had improved over the past 18 months (since approximately the launch of the CDA strategy in summer 2020) conveyed that NIKE had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435.

491. On December 20, 2021, during NIKE's FY 2022 Q2 earnings call (the "December 20, 2021 Earnings Call"), Defendant Donahoe falsely touted the continued success of the CDA strategy:

> As we look at Q2, the creativity and resilience of our entire NIKE, Inc. team helped deliver another strong quarter. ***The results we delivered offer continued proof that our strategy is working***, even as we execute through global macroeconomic constraints.

492. Later during this call, Defendant Donahoe reiterated this sentiment, falsely stating: "[T]oday, we're stronger than we were before the pandemic, and I couldn't be more excited by the opportunity ahead of us. ***Our results this quarter are evidence that our strategy is working***."

493. These statements that "our strategy is working" conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth—and that NIKE's financial results for FY 2022 Q2 were caused by the purported success of the CDA strategy—which was materially misleading for the reasons stated in paragraphs 437-38.

494. On the December 20, 2021 Earnings Call, Defendant Friend also falsely touted the success of the CDA strategy:

> ***Consumer Direct Acceleration is driving our business forward***, and it is transforming our financial model. We continue to prove that we can manage through the uncertainty and volatility in the current operating environment, but we are doing more than just managing through. We are building NIKE for the future with deeper consumer connections, a pipeline of product innovation to serve the needs of the modern athlete, and new operational capabilities required to serve consumers directly and digitally at scale.

495. This statement that the CDA strategy was "driving [NIKE's] business forward" conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

496. Analysts were encouraged by Defendants' claims about the continued success of the CDA strategy. For instance, in a December 21, 2021 report, Goldman Sachs Equity Research wrote that, after NIKE's earnings report, it maintained a positive "Buy" rating for NIKE, noting that while NIKE "is still in the early stages of its DTC strategy . . . [w]e see continued DTC channel shift as a gross margin driver moving forward."

### J. January 6, 2022 — Form 10-Q

497. On January 6, 2022, Defendants filed their Quarterly Report on Form 10-Q for the quarterly period ended November 30, 2021, which was signed by Defendants Donahoe and Friend. In it, Defendants falsely touted NIKE's technological capabilities needed for a DTC supply chain:

> Through the Consumer Direct Acceleration we are focusing on creating the marketplace of the future through more premium, consistent and seamless consumer experiences, leading with NIKE Digital and our owned stores, as well as select strategic partners who share our marketplace vision. We have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's, Kids' and the Jordan Brand and ***continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further***

***accelerate our digital transformation.***

498. Defendants' statement that NIKE "continue[s] to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further accelerate our digital transformation" conveyed that NIKE had developed capabilities for an effective DTC supply chain because the listed capabilities were essential to an effective DTC supply chain, which was materially misleading for the reasons stated in paragraph 431.

### K. March 21, 2022 — FY 2022 Q3 Earnings Announcement

499. On March 21, 2022, during NIKE's FY 2022 Q3 earnings call ("March 21, 2022 Earnings Call"), in response to a UBS analyst's question concerning the "contours" of Fiscal Year 2023, Defendant Friend falsely reassured investors that the CDA strategy was working:

> We're looking at fiscal '23 and believe the foundation is set for another year of strong growth. And that's because ***our Consumer Direct Acceleration strategy is working***.

500. This statement conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

501. On March 21, 2022, NIKE filed a Form 8-K, which was signed by Defendant Friend. In a press release attached to this Form 8-K, Defendant Donahoe falsely touted the success of the CDA strategy:

> NIKE's strong results this quarter show that our ***Consumer Direct Acceleration strategy is working***, as we invest to achieve our growth opportunities . . . Fueled by deep consumer connections, compelling product innovation and an expanding digital advantage, we have the right playbook to navigate volatility and create value through our relentless drive to serve the future of sport.

502. This statement conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

503. Analysts were encouraged by Defendants' claims about the purported success of the CDA strategy. For instance, on March 22, 2022, Barclays Equity Research indicated that the price of NIKE Stock was "Overweight" (meaning it would likely increase in the future) in part due to "***the acceleration of [NIKE's] direct-to-consumer strategy***." That same report stated that NIKE "is a DTC acceleration . . . story."

**L. March 30, 2022 — Adobe Facebook Video**

504. In a March 30, 2022 Facebook post by Adobe Experience Cloud, Defendant Donahoe is featured in a video where he touted NIKE's DTC technological capabilities that Adobe purportedly helped build as part of their partnership: "***The Adobe platform has played such an important role of delivering a more personalized experience for our consumers***."

505. Defendants' claim that NIKE's Adobe partnership had "deliver[ed] a more personalized experience" for consumers conveyed that NIKE had successfully built out the DTC technological capabilities and organization needed for the CDA strategy to succeed, including specifically the consumer marketing personalization capabilities, which was materially misleading for the reasons stated in paragraph 432. Specifically, as described in paragraph 432, NIKE's DTC technology, including personalization technology, remained deficient throughout the Class Period, and NIKE's partnership with Adobe was a failure from its start in 2021, including because it failed to build such consumer personalization technological capabilities, as detailed by multiple CWs, and as Defendant Donahoe was directly informed in regular meetings with CW-3, which had begun by this time.

**M. April 5, 2022 — Form 10-Q**

506. On April 5, 2022, Defendants filed their Quarterly Report on Form 10-Q for the quarterly period ended February 28, 2022, which was signed by Defendants Donahoe and Friend. In it, Defendants falsely touted NIKE's technological capabilities needed for a DTC supply chain:

> Through the Consumer Direct Acceleration we are focusing on creating the marketplace of the future through more premium, consistent and seamless consumer experiences, leading with digital and our owned stores, as well as select wholesale partners that share our marketplace vision. Over the last several years, as we have executed against the Consumer Direct Acceleration we have grown our NIKE Direct business to be approximately 43% of total NIKE Brand revenues for the first nine months of fiscal 2022, and we have reduced the number of wholesale accounts globally. Additionally, we have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's, Kids' and the Jordan Brand and ***continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which we expect will further accelerate our digital transformation.***

507. Defendants' statement that NIKE "continue[s] to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further accelerate our digital transformation" conveyed that NIKE had developed capabilities for an effective DTC supply chain because the listed capabilities were essential to an effective DTC supply chain, which was materially misleading for the reasons stated in paragraph 431.

**N. May 16, 2022 — *Women's Wear Daily* Articles**

508. On May 16, 2022, *Women's Wear Daily* published a series of articles about NIKE ("May 16, 2022 WWD Articles"). In one of those articles, titled "Heidi O'Neill on Creating a Seamless Digital/Retail Experience," Defendant O'Neill falsely insisted that the CDA strategy was succeeding:

> We've been driving this Consumer Direct offense for over five years now. And you know, ***we can look at our results and know it's working***.

509. This statement conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy, and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

510. In one of the May 16, 2022 WWD Articles, titled "***Supply Chain*** Guru Andy Campion Offers a Peek Behind the Curtain," Defendant Campion falsely touted NIKE's purportedly effective DTC supply chain:

> On the one hand, the supply chain is more productive than ever in the amount of goods being produced — I think it was up 8 percent last year and that's not in price, that's in units. Demand is incredibly strong and ***we've got three to four times greater digital commerce distribution capability than we had two years ago***.

511. Defendants Campion's claim that NIKE had greatly enhanced its "digital commerce distribution capability" in the prior two years conveyed that NIKE had successfully developed an effective DTC supply chain (because enabling "distribution" of "digital commerce" is a key component of a DTC supply chain), which was materially misleading for the reasons stated in paragraph 431.

**O. June 27, 2022 — FY 2022 Q4 Earnings Announcement**

512. On June 27, 2022, NIKE issued a press release, entitled "Q4 NIKE, Reports Fiscal 2022 Fourth Quarter Results," in which Defendant Donahoe falsely touted NIKE's purported competitive advantages, including its innovation, and the CDA strategy's success:

> NIKE's results this fiscal year are a testament to the unmatched strength of our brands and our deep connection with consumers . . . . ***Our competitive advantages, including our pipeline of innovative product and expanding digital leadership, prove that our strategy is working*** as we create value through our relentless drive to serve the future of sport.

513. Defendants' statement that NIKE's strategy was "working"—as "prove[n]" by the Company's "competitive advantages," including its pipeline of innovative product—conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy

was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38. Defendants' statement that NIKE presently had a "pipeline of innovative product" conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434. Defendants' claim that NIKE was presently experiencing "competitive advantages," including NIKE's innovative product pipeline and "expanding digital leadership," conveyed that the Company had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435.

514. On June 27, 2022, during NIKE's FY 2022 Q4 earnings call ("June 27, 2022 Earnings Call"), Defendant Donahoe falsely touted the Company's purportedly strong innovation product pipeline and competitive position:

> My second point today is our ***relentless pipeline of innovative products, which continues to drive separation between us and our competition***. No other brand has our ability to resource, solve and scale in response to a consumer opportunity. In Q4, we again introduced new performance innovations to the market, including new footwear technology from both NIKE Women's and the Jordan brand.

515. Defendants' statement touting NIKE's "relentless pipeline of innovative products" conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434. Defendants' statement that NIKE's innovative product pipeline "continues to drive separation between us and our competition" conveyed that NIKE had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435.

516. During the June 27, 2022 Earnings Call, Defendant Friend falsely claimed that the CDA strategy was working:

> As we set the foundation for another year of strong growth, I'd like to provide some broader context around our strategic transformation. Two years ago, we introduced

> a bold new phase of our strategy, our Consumer Direct Acceleration. In the early months of the pandemic, we set our sights beyond simply navigating through short-term volatility. Instead, we outlined a clear vision to pursue even further competitive separation by expanding our digital advantage, reshaping the marketplace of the future, and creating deeper, more direct consumer relationships. ***Today, NIKE's continued momentum shows that our strategy is working.*** As we look forward let me briefly highlight three of NIKE's foundational elements for long-term value creation: our global portfolio; our consumer-led digital transformation; and our expanding direct-to-consumer operational capabilities.

517. This statement conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth—and that NIKE's "momentum" was caused by the purported success of the CDA strategy—which was materially misleading for the reasons stated in paragraphs 437-38.

518. During the same earnings call, Defendant Friend falsely claimed that NIKE had developed needed DTC technological capabilities through its partnership with Adobe:

> We will also see a new consumer marketing offense in action in fiscal 2023. ***Through new capabilities activated in partnership with Adobe, we will unlock additional productivity and demand creation and member retention across our NIKE ecosystem.*** We have started testing audience segmentation in North America, with real-time data and personalized journeys on the Nike App, with plans for further expansion in the coming months. In Greater China, we're also accelerating our digital capabilities, building on our 40-year history.

519. Defendants' statement touting NIKE's "new capabilities" developed through the Adobe partnership conveyed that NIKE had successfully built out the DTC technological capabilities and organization needed for the CDA strategy to succeed, which was materially misleading for the reasons stated in paragraph 432.

520. During the June 27, 2022 Earnings Call, Defendant Friend also falsely insisted that the CDA strategy was working:

> As we move forward, we will stay focused on what we can control and continue managing the business for the long-term. This includes leveraging our scale and financial strength, optimizing supply and demand, and most importantly, creating value for our consumer from the products we design, to the stories we tell, to the

experiences that we deliver. ***Our Consumer Direct Acceleration is working.***

521. This statement conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

522. During June 27, 2022 Earnings Call, Defendant Friend falsely touted the CDA strategy's success:

> Two years ago, we introduced a bold new phase of our strategy, our Consumer Direct Acceleration. In the early months of the pandemic, we set our sights beyond simply navigating through short-term volatility. Instead, we outlined a clear vision to pursue even further competitive separation by expanding our digital advantage, reshaping the marketplace of the future, and creating deeper, more direct consumer relationships.
>
> Today, ***NIKE's continued momentum shows that our strategy is working***.

523. Defendants' statement that "our strategy is working" conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

524. Analysts were encouraged by Defendants' claims. For instance, in a June 28, 2022 report, Telsey Advisory Group assigned NIKE Stock an "Outperform" rating and wrote that it "***remain[ed] encouraged by the pipeline of product innovation, healthy demand, customer connectivity through digital, and underlying gross margin improvement driven by the shift to DTC***." Similarly, in a June 28, 2022 report, Evercore ISI Research assigned NIKE Stock an "Outperform" rating and highlighted that it was "excited about ***[NIKE's] innovation pipeline in FY23, which seems to be an acceleration from the past few years***." Likewise, in a June 28, 2022 report, Barclays Equity Research rated the price of NIKE stock as "Overweight" in part due to "***the acceleration of [NIKE's] direct-to-consumer strategy.***"

**P. July 21, 2022 — Form 10-K**

525. On July 21, 2022, Defendants filed their Annual Report on Form 10-K for the fiscal year ended May 31, 2022 (July 2022 10-K), which was signed by Defendants Donahoe and Friend. In it, Defendants stated that NIKE's potential inability to "adjust[] the mix of existing product offerings" and "develop[] new products, styles and categories" to meet consumer demand were hypothetical risks that "***could* have a material adverse effect on our sales and profitability.**"

526. This statement was materially misleading for the reasons stated in paragraph 434. In particular, Defendants' hypothetical warnings about NIKE's product offerings—*e.g.*, that a potential failure to adjust the mix of NIKE products and develop new products to meet customer demand "***could***" negatively impact NIKE's business—were materially misleading because Defendants knew, or were reckless in not knowing, that NIKE had already failed to maintain its innovative product pipeline, and instead relied on unsustainably flooding with the market with its classic franchises.

527. The July 2022 10-K also included a materially misleading risk disclosure regarding NIKE's competitive standing, in which Defendants stated:

> ***If we do not adequately and timely anticipate and respond to our competitors, our costs may increase, demand for our products may decline, possibly significantly, or we may need to reduce wholesale or suggested retail prices for our products.***

528. This statement was materially misleading for the reasons stated in paragraph 435. In particular, Defendants' hypothetical warnings that NIKE's potential failure to "respond to our competitors" "***may***" negatively impact NIKE's business was materially misleading because Defendants knew, or were reckless in not knowing, that NIKE's brand equity and competitive standing had already significantly declined, thereby inhibiting the success of the CDA strategy.

529. The July 2022 10-K included an additional materially misleading risk disclosure, in which Defendants stated that a potential "***[f]ailure to maintain our reputation, brand image, and culture could negatively impact our business***."

530. This statement was materially misleading for the reasons stated in paragraph 435. In particular, Defendants' hypothetical warnings that NIKE's potential "***[f]ailure to maintain our reputation [and] brand image could negatively impact our business***" was materially misleading because Defendants knew, or were reckless in not knowing, that NIKE's brand equity and competitive standing had already significantly declined, thereby inhibiting the success of the CDA strategy

531. Further, the July 2022 10-K included a materially misleading risk disclosure regarding NIKE's DTC technology, in which Defendants stated:

> In addition, we have made significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations, and our digital offerings will require continued investment in the development and upgrading of our technology platforms. In order to deliver high-quality digital experiences, our digital platforms must be designed effectively and work well with a range of other technologies, systems, networks, and standards that we do not control. ***We may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards.***

532. This statement was materially misleading for the reasons stated in paragraph 432. In particular, Defendants' hypothetical warnings that NIKE "***may not be successful***" in developing technology critical to NIKE's DTC operations was materially misleading because Defendants knew, or we reckless in not knowing, that NIKE already was struggling to build out and unify its DTC technological capabilities and organization, which were critical for the CDA strategy to succeed.

**Q. September 9, 2022 — Annual General Meeting**

533. On September 9, 2022, at NIKE's Annual General Meeting ("September 9, 2022 Annual General Meeting"), Defendant Donahoe responded to a shareholder question relayed by Defendant Parker, concerning the CDA strategy: "What's working, and how has it evolved since the beginning?" In response, Defendant Donahoe falsely claimed the CDA was succeeding and that NIKE was maintaining its competitive separation:

> I just kick off by reiterating that ***the progress you're seeing on CDA tells us that NIKE's strategy is working. We continue to see structural tailwinds***, as I mentioned in my remarks, ***around . . . a consumer-led shift toward digital*** that drives competence in our direction, in our strategy. And our operational transformation is giving us the agility we need to serve consumers more directly as we create a digital-led marketplace for the future.
>
> And over the past couple of years, as we've said repeatedly in our quarterly calls and other settings, we've accelerated our digital transformation in order to capture higher engagement with consumers and market share. And we've seen this in our fiscal 2022 results. So, ***our capabilities and efficiencies are allowing us to move at the speed of the consumer and to drive continued competitive separation in the market***.

534. Defendants' claims that NIKE's strategy was "working," as evidenced by the purported "progress you're seeing on CDA," and that NIKE was seeing "structural tailwinds" based on a "consumer-led shift toward digital," conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38. Defendants' statement that NIKE's "capabilities and efficiencies are allowing" NIKE "to drive continued competitive separation in the market" conveyed that NIKE had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435.

535. At the September 9, 2022 Annual General Meeting, in response to a shareholder question relayed by Defendant Parker concerning innovation, Defendant Donahoe stated:

> Well, Mark, as you know, innovation is deeply, deeply woven into every dimension of NIKE's culture. And ***innovation continues to be our greatest competitive advantage***.

536. Defendants' claim that innovation "continue[d]" to be NIKE's "greatest competitive advantage" conveyed that NIKE had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435.

537. At the September 9, 2022 Annual General Meeting, in response to a shareholder question relayed by Defendant Parker concerning the evolution of the CDA strategy, Defendant Friend falsely touted the CDA strategy's success:

> ***Fundamentally, the Consumer Direct Acceleration strategy is changing our financial and operating model, resulting in healthy, profitable growth for NIKE***.

538. This statement touting the success of the CDA strategy as "resulting in healthy, profitable growth for NIKE," conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth (*i.e.*, "healthy, profitable growth"), which was materially misleading for the reasons stated in paragraphs 437-38.

539. Analysts believed Defendants' claims that the CDA strategy was succeeding. For instance, in a September 11, 2022 report, UBS stated that "Nike held its annual shareholder meeting on 9/9 where it addressed multiple topics relevant to the current investor debates on the stock, such as its [CDA] strategy . . . ***Our main takeaway from the event was Nike's strong conviction around its CDA strategy. We think this is a positive for the stock***." The report explained that UBS continued to rate NIKE Stock as a "Buy."

**R. September 29, 2022 — FY 2023 Q1 Earnings Announcement**

540. On September 29, 2022, NIKE issued a press release, entitled "NIKE, Inc. Reports Fiscal 2023 First Quarter Results," in which Defendant Donahoe falsely touted NIKE's continued competitive advantages, including its strong brand and innovation pipeline, as proof that the CDA strategy was "working:"

> Our strong start to FY23 highlights the depth and breadth of NIKE's global portfolio, as we continue to manage through volatility . . . . ***Our competitive advantages, including the strength of our brand, deep consumer connections and pipeline of innovative product, continue to prove that our strategy is working.*** We expect our unrelenting focus on better serving the consumer to continue to fuel growth and create value like only NIKE can.

541. Defendants' touting of NIKE's "competitive advantages," including its brand strength, conveyed that NIKE had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435. Defendants' claim that NIKE presently had a "pipeline of innovative product" as a key "competitive advantage" conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434. Defendants' claim that NIKE's "strategy is working" conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

542. On September 29, 2022, during NIKE's FY 2023 Q1 earnings call ("September 29, 2022 Earnings Call"), Defendant Donahoe falsely claimed that NIKE had measured as the "number one" brand under the "cool" brand metric it employed:

> Now, if you look at this quarter's strong results, we can see our brand momentum and global portfolio come to life. This is true across the three areas I'd like to walk through today: a brand that deeply connects with consumers fueled by authenticity in sport; a culture of innovation that drives a continuous pipeline of new products; and our competitive advantage across the marketplace as one of the few brands that

> can connect with and serve consumers at scale.
>
> So, let's start with NIKE's strong brand and our connection to sport which differentiates us all over the globe. ***Consumers continue to rate us their number one cool and number one favorite brand as we connect directly and deeply with consumers worldwide.***

543. Defendants' claim that consumers were presently rating NIKE "their number one cool and number one favorite brand" conveyed that NIKE had successfully maintained its brand strength and competitive standing because "cool" was a critical metric by which NIKE measured its brand strength relative to competitors and other brands, which was materially misleading for the reasons stated in paragraph 435, including that by this time NIKE, in fact, was no longer the number one cool brand in North America and NIKE was losing ground to its competitors such as Adidas and Lululemon based on this metric.

544. During the September 29, 2022 Earnings Call, Defendant Donahoe also assured investors that NIKE had maintained its innovative product pipeline, which continued to separate it from its competitors:

> As we said before, ***NIKE's relentless pipeline of innovative product continues to create separation between us and our competition.*** Today, we have incredible momentum in key products and franchises across the spectrum of lifestyle and performance. And what excites us even more is the energy and anticipation we're feeling for the innovative product that's next in the pipeline. We're now starting to see the product that reflects our shift two years ago to our new consumer construct of men's, women's and kids. And the impact it's had is remarkable.

545. Defendants' statement that NIKE presently had a "relentless pipeline of innovative product" conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434. Defendants' statement that NIKE's product pipeline continued to drive competitive "separation" for the Company conveyed that NIKE had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435.

546. During the September 29, 2022 Earnings Call, Defendant Friend again assured investors that "***NIKE continues to lead as the number one cool and number one favorite brand in North America***."

547. Defendants' claim that NIKE was presently leading as "the number one cool and number one favorite brand in North America" conveyed that NIKE had successfully maintained its brand strength and competitive standing because "cool" was a critical metric by which NIKE measured its brand strength relative to competitors and other brands, which was materially misleading for the reasons stated in paragraph 435. Specifically, as described in paragraph 435, by this time NIKE was no longer the number one brand in North America as measured by its critical "cool" brand strength metric.

548. On the September 29, 2022 Earnings Call, in response to a J.P.Morgan analyst's question regarding demand for NIKE products in North America, Defendant Donahoe assured investors of continued "strong consumer demand," specifically denying seeing any "softness":

> ***[W]e see strong consumer demand in North America currently. Right? There's no signs of any softness*****,** that was relatively promotional in August, but strong into the first couple of weeks of this quarter. And so, we again talk in terms of transitional and structural. On a transitional basis, as Matt said, we're going to work through the excess inventory.

549. Defendants' claim that NIKE was presently experiencing "strong consumer demand in North America" with "no signs of any softness," conveyed that NIKE had effectively driven business to its DTC channels while meeting consumer demand, which was materially misleading for the reasons stated in paragraph 436. This statement also conveyed that NIKE had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435. This statement is also misleading for the reasons stated in paragraphs 437-38, including that a legion of internal warning signs showed that

by this time the CDA strategy was failing and that NIKE's initial financial growth was unsustainable long-term.

550. On the September 29, 2022 Earnings Call, in response to a Guggenheim analyst's question regarding inventory and the "supply-demand for NIKE," Defendant Donahoe assured investors that NIKE had maintained an innovative product pipeline:

> [W]e will be aggressive as Matt said on liquidating excess inventory, but also coming hard with our key popular franchises to bring heat and energy to them just like we did in Q1 like the Travis Scott AJ1 and that had a very strong full price realization and ***we got a very strong innovation pipeline*** that will still be coming hard and hot in Q2, Q3 and Q4. You saw in Q1, we had the Air Zoom Mercurial, we had the Air Max Scorpion, the NIKE Forward. ***We've got a really strong innovation pipeline.***

551. Defendants' statements touting the Company's "strong innovation pipeline" conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434.

552. Analysts were reassured by Defendants' claims. For instance, in a September 30, 2022 report, Telsey Advisory Group assigned NIKE Stock an "Outperform" rating and wrote that it "***remain[ed] encouraged by healthy demand, the pipeline of product innovation, customer connectivity through digital, and the potential for gross margin improvement driven by the shift to DTC***."

**S. October 6, 2022 Form 10-Q**

553. On October 6, 2022, Defendants filed their Quarterly Report on Form 10-Q for the quarterly period ended August 31, 2022, which was signed by Defendants Donahoe and Friend. In it, Defendants falsely claimed NIKE had successfully reorganized its business around gender-and-age-based consumer constructs, and also touted the Company's DTC supply chain capabilities:

> Additionally***, we have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's and Kids'*** and

> ***continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation, which we expect will further accelerate our digital transformation***.

554. Defendants' statement regarding NIKE's category alignment conveyed that NIKE's reorganization had successfully established a streamlined organizational structure around gender-and-age-based consumer constructs, which was materially misleading for the reasons stated in paragraph 433, including that by no later than summer 2022, NIKE had begun implementing a reversion of to its pre-CDA sport-based categorization model to address concerns with the Company's performance. Defendants' statement that NIKE "continue[s] to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation, which we expect will further accelerate our digital transformation" conveyed that NIKE had successfully developed an effective DTC supply chain because the capabilities listed above, which NIKE claimed to have invested in, were essential to an effective DTC supply chain, which was materially misleading for the reasons stated in paragraph 431.

**T. December 20, 2022 — FY 2023 Q2 Earnings Announcement**

555. On December 20, 2022, during NIKE's FY 2023 Q2 Earnings Call ("December 20, 2022 Earnings Call"), Defendant Donahoe falsely touted "the continued success" of the CDA strategy:

> As I mentioned earlier, ***our Q2 results speak to the continued success of our strategy.*** Consumer Direct Acceleration is fueling our marketplace approach in which we directly connect with the consumer no matter where they shopped. Today our marketplace strategy is driving distinction in this current promotional environment. Our work to directly connect with consumers is founded on a simple consumer insight.

556. This statement conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

557. During the December 20, 2022 Earnings Call, Defendant Donahoe also touted NIKE's CDA-related "competitive advantages:"

> ***[O]ur results speak to how we've leveraged our competitive advantages, which include a relentless innovation pipeline, unmatched brands, and deep consumer connections to build relative strength and stay ahead of competition.***

558. This statement falsely conveyed that, through increased consumer connections and a "relentless innovation pipeline" (*i.e.* through the CDA), NIKE had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435.

559. Analysts believed Defendants' claims that the CDA strategy was working. For instance, in a December 20, 2022 report, Guggenheim Securities assigned NIKE Stock a "Buy" rating and wrote that "[t]he brand commands dominant market share, which we expect will grow materially as digital scales up further [and] new product innovation remains robust." In a December 21, 2022 report rating NIKE Stock as "Overweight," Morgan Stanley Research noted "***DTC Skeptics Beware***," and stated that NIKE's financial performance "gives us incremental confidence that [NIKE] may deliver the long-awaited, DTC-driven margin gains as soon as next year."

**U. January 5, 2023 Form 10-Q**

560. On January 5, 2023, Defendants filed their Quarterly Report on Form 10-Q for the quarterly period ended November 30, 2022, which was signed by Defendants Donahoe and Friend.

In it, Defendants falsely claimed NIKE had successfully reorganized its business around gender-and-age-based consumer constructs and touted its DTC supply chain capabilities:

> Additionally*, **we have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's and Kids'*** and ***continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation, which we expect will further accelerate our digital transformation***.

561. Defendants' statement regarding NIKE's category alignment conveyed that NIKE's reorganization had successfully established a streamlined organizational structure around these gender-and-age-based consumer constructs, which was materially misleading for the reasons stated in paragraph 433, including that by no later than summer 2022, NIKE had begun implementing a reversion of to its pre-CDA sport-based categorization model to address concerns with the Company's performance. Defendants' statement that NIKE "continue[s] to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which we expect will further accelerate our digital transformation" conveyed that NIKE had successfully developed an effective DTC supply chain because the capabilities listed above, which NIKE claimed to have invested in, which was materially misleading for the reasons stated in paragraph 431.

**V. March 21, 2023 — FY 2023 Q3 Earnings Announcement**

562. On March 21, 2023, NIKE issued a press release entitled "NIKE, Inc. Reports Fiscal 2023 Third Quarter Results," wherein Defendant Donahoe again claimed that the CDA strategy was working: "***NIKE's strong results in the third quarter offer continued proof of the success of our Consumer Direct Acceleration strategy.***"

563. Defendants' statement conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

564. During the March 21, 2023 Earnings Call, in response to a J.P. Morgan analyst's question regarding "market share acceleration opportunities" and "the forward-looking product pipeline," Defendant Donahoe falsely touted NIKE's innovative product pipeline:

> ***[T]he breadth and depth of the innovation pipeline is really strong*** and what's clear is as we've returned to the office, as our teams are now back together in-person that NIKE magic of consumer insight driving product innovation combined with storytelling, combined with marketplace, is really picking up steam.

565. This statement conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434.

**W. May 24, 2023 Press Release**

566. On May 24, 2023, NIKE issued a press release, entitled "NIKE Announces Senior Leadership Changes to Deepen Consumer-Led Growth and Marketplace Advantage," in which Defendant Donahoe stated: "***Our brand momentum is strong, our innovation pipeline is unmatched, and our strategy is working.***"

567. Defendants' claim that NIKE's brand momentum was presently "strong," conveyed that NIKE had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435. Defendants' statement touting NIKE's present innovation pipeline conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434. Defendants' claim that NIKE's strategy was "working" conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

568. Analysts were encouraged by Defendants' claims about the continued success of the CDA strategy and its product innovation pipeline. For instance, in a March 22, 2023 report, UBS wrote: "We continue to view Nike as a long-term outperformer . . . . ***Nike's investments in product innovation, supply chain speed, and digital are unlocking what is likely a multiyear period of above average growth***."

**X. April 6, 2023 Form 10-Q**

569. On April 6, 2023, Defendants filed their Quarterly Report on Form 10-Q for the quarterly period ended February 28, 2023, which was signed by Defendants Donahoe and Friend. In it, Defendants falsely claimed NIKE had successfully reorganized its business around gender-and-age-based consumer constructs and touted its DTC supply chain:

> Additionally***, we have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's and Kids'*** and ***continue to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation, which we expect will further accelerate our digital transformation.***

570. Defendants' statement regarding NIKE's category alignment conveyed that NIKE's reorganization had successfully established a streamlined organizational structure around gender-and-age-based consumer constructs, which was materially misleading for the reasons stated in paragraph 433, including that by no later than summer 2022, NIKE had begun implementing a reversion of to its pre-CDA sport-based categorization model to address concerns with the Company's performance. Defendants' statement that NIKE "continue[s] to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further accelerate our digital transformation" conveyed that NIKE had successfully developed an effective DTC supply chain because the

capabilities listed above, which NIKE claimed to have invested in, were essential to an effective DTC supply chain, which was materially misleading for the reasons stated in paragraph 431.

**Y. June 29, 2023 — FY 2023 Q4 Earnings Announcement**

571. On June 29, 2023, NIKE issued a press release, entitled "NIKE, Inc. Reports Fiscal 2023 Fourth Quarter and Full Year Results," in which Defendant Donahoe falsely assured investors that the CDA strategy was working, including because of NIKE's continued competitive separation and product innovation:

> ***NIKE's strong results make clear that our strategy is working . . .*** FY23 was a milestone year for NIKE ***as our unique advantages continue to drive competitive separation. Our investment in innovation and our digital leadership are fueling broad-based growth*** across our portfolio of brands, as we create value by serving the future of sport.

572. Defendants' statement that "NIKE's strong results make clear that our strategy is working" conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38. Defendants' claim that NIKE's "unique advantages" were presently driving "competitive separation," conveyed that NIKE had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435. Defendants' statement that NIKE was presently investing in "innovation" that was contributing to "broad based growth" conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434.

573. On June 29, 2023, during NIKE's FY 2023 Q4 Earnings Call ("June 29, 2023 Earnings Call"), Defendant Donahoe falsely touted the success of the CDA strategy and NIKE's competitive standing:

> Fiscal '23 was a milestone year for NIKE, as we set new records while delivering on our operational and financial goals. ***It's clear that our strategy is working, and that NIKE's unique advantages continue to drive competitive separation.***

574. Defendants' claim that NIKE's "strategy is working" conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38. Defendants' claim that NIKE's "unique advantages" were presently driving "competitive separation," conveyed that NIKE had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435.

575. During the June 29, 2023 Earnings Call, Defendant Donahoe also falsely assured investors of the CDA strategy's continued success:

> ***In the end, our CDA strategy is working***. Our brands have strong energy. Our innovation pipeline is as relentless as ever and we're executing against what matters most to consumers. And as we look to fiscal '24, NIKE will occupy the same leadership position that we earn year after year as we usher our industry into the future.

576. This statement conveyed that NIKE was succeeding in each of the key aspects of the CDA strategy and that the CDA strategy was propelling long-term sustainable growth, which was materially misleading for the reasons stated in paragraphs 437-38.

577. During the June 29, 2023 Earnings Call, Defendant Friend falsely maintained that NIKE had increased its competitive separation:

> ***Throughout the year, we drove competitive separation*** by doing what NIKE does best, serve athletes with product innovation and rich storytelling, amplify our brand voice through key sport and consumer moments, deepen consumer connections across our portfolio and actively manage the marketplace to drive sustainable profitable growth.

578. This statement conveyed that NIKE had successfully maintained its brand strength and competitive standing, which was materially misleading for the reasons stated in paragraph 435.

579. During the June 29, 2023 Earnings Call, Defendant Friend falsely touted NIKE's partnership with Adobe in claiming that NIKE had developed key DTC technological capabilities, including consumer personalization:

> By better knowing and serving the consumers who love our brands, we are also unlocking strategic and financial benefits for NIKE. ***For example, we have partnered with Adobe to enable one-to-one member personalization, driving gains in member retention, click-through rates and conversion, resulting in higher demand per member and returns on digital ad spend.*** We are only beginning to operationalize these new capabilities and consumer experiences on our digital platforms, and we see even greater opportunity to come.

580. Defendants' claim that NIKE's Adobe partnership had "enable[d] one-to-one member personalization" for consumers conveyed that NIKE had successfully built out the technological capabilities and organization needed for the CDA strategy to succeed, which was materially misleading for the reasons stated in paragraph 432. Specifically, as described in paragraph 432, NIKE's DTC technology, including personalization technology, remained deficient throughout the Class Period, and NIKE's partnership with Adobe was a failure from its start in 2021, including because it did not successfully build out such consumer personalization technology during the Class Period.

581. Analyst coverage shows that investors were misled by the above misstatements. For example, J.P. Morgan published an analyst report on June 30, 2023, giving NIKE an "Overweight" stock rating and specifically quoted Defendant Donahoe's misrepresentation that "***[i]n the end our CDA strategy is working" as an example of a key "takeaway" from NIKE's earnings call the day before***.

**Z. July 20, 2023 — Form 10-K**

582. On July 20, 2023, Defendants filed their Annual Report on Form 10-K for the fiscal year ended May 31, 2023 ("July 2023 10-K"), which was signed by Defendants Donahoe and Friend. In it, Defendants stated that NIKE's potential inability to "adjust[] the mix of existing product offerings" and "develop[] new products, styles and categories" to meet consumer demand were hypothetical risks that "***could*** ***have a material adverse effect on our sales and profitability*****.**"

583. This statement was materially misleading for the reasons stated in paragraph 434. In particular, Defendants' hypothetical warnings about NIKE's product offerings—*e.g.*, that a potential failure to adjust the mix of NIKE products and develop new products to meet customer demand "***could***" negatively impact NIKE's business—were materially misleading because Defendants knew, or were reckless in not knowing, that NIKE had already failed to maintain its innovative product pipeline and instead relied on unsustainably flooding with the market with its classic franchises.

584. The July 2023 10-K also included a materially misleading risk disclosure regarding NIKE's competitive standing, in which Defendants stated:

> ***If we do not adequately and timely anticipate and respond to our competitors, our costs may increase, demand for our products may decline, possibly significantly, or we may need to reduce wholesale or suggested retail prices for our products.***

585. This statement was materially misleading for the reasons stated in paragraph 435. In particular, Defendants' hypothetical warnings that NIKE's potential failure to "respond to our competitors" "***may***" negatively impact NIKE's business was materially misleading because Defendants knew, or were reckless in not knowing, that NIKE's brand equity and competitive standing had already declined, thereby inhibiting the success of the CDA strategy.

586. The July 2023 10-K included an additional materially misleading risk disclosure regarding NIKE's brand strength, in which Defendants stated that a potential "***[f]ailure to maintain our reputation, brand image and culture could negatively impact our business***."

587. This statement was materially misleading for the reasons stated in paragraph 435. In particular, Defendants' hypothetical warnings that NIKE's potential "***[f]ailure to maintain our reputation [and] brand image . . . could negatively impact our business***" was materially misleading because Defendants knew, or were reckless in not knowing, that NIKE's brand equity and competitive standing had already declined, thereby inhibiting the success of the CDA strategy.

588. Further, the July 2023 10-K included a materially misleading risk disclosure regarding NIKE's DTC technology, in which Defendants stated:

> In addition, we have made significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations, and our digital offerings will require continued investment in the development and upgrading of our technology platforms. In order to deliver high-quality digital experiences, our digital platforms must be designed effectively and work well with a range of other technologies, systems, networks, and standards that we do not control. ***We may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards.***

589. This statement was materially misleading for the reasons stated in paragraph 432. In particular, Defendants' hypothetical warnings that NIKE "***may not be successful***" in developing technology critical to NIKE's DTC operations was materially misleading because Defendants knew, or we reckless in not knowing, that NIKE already was struggling to build out and unify its DTC technological capabilities and organization, which were critical for the CDA strategy to succeed.

**AA. September 12, 2023 — Annual General Meeting**

590. At NIKE's September 12, 2023 Annual General Meeting, in response to a shareholder question read by Defendant Parker regarding whether NIKE had "changed" its

strategy considering recent "headlines about re-entering various wholesalers," Defendant Donahoe misleadingly claimed that NIKE had not altered its wholesale and DTC strategies:

> ***Our marketplace strategy remains the same.*** Simply put, our focus is to serve consumers with what they want, when they want it and how they want it. And NIKE creates distinction across the marketplace by segmenting our consumer experiences to drive deep and direct connections with consumers across all channels.

591. NIKE's claim that its marketplace strategy had not changed conveyed that NIKE had effectively driven business to its DTC channels while meeting consumer demand without depending on its wholesale partners, which was materially misleading for the reasons stated in paragraph 436.

592. At NIKE's September 12, 2023 Annual General Meeting, in response to a shareholder question read by Defendant Parker about NIKE's innovation pipeline, Defendant O'Neill falsely claimed that NIKE's innovation pipeline enabled it to maintain its leading competitive position:

> Our Consumer Direct Acceleration strategy continues to unlock our future growth potential by powering up our holistic offense across product, innovation, storytelling and marketplace, all fueled by consumer insights and the voice of the athletes. Everything we do starts with listening to the voice of the athletes. And our pipeline is built to serve consumers across all sports, all geographies and all levels of play from elite to everyday athletes. And more and more, we're evolving from sponsorship to partnership [], meeting athletes where they are and doing what we do best, turning insights into actions. Some examples include Nike's Athlete Think Tank; Serena Williams Design Crew; and Megan Rapinoe's Victory Redefined Collection.
>
> Our consumer insights, research and development, and ***innovation pipeline continue to keep us in the lead.***

593. This statement conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434.

**BB. September 28, 2023 — FY 2024 Q1 Earnings Announcement**

594. On September 28, 2023, during NIKE's FY 2024 Q1 earnings call, Defendant Donahoe falsely touted NIKE's purportedly "strong" innovative product pipeline:

> Now, our teams have been back together in-person over the past 15 months and ***our innovation pipeline is strong*** and it was on full display. The excitement and alignment of our leadership team was clear as we continued to obsess the product and storytelling we'll be bringing to life for consumers at the Paris Olympics and into the fall. Simply put, our teams are on the offense as we compete to win in all segments.

595. This statement conveyed that NIKE had maintained an innovative product pipeline, which was materially misleading for the reasons stated in paragraph 434.

**CC. December 21, 2023 — FY 2024 Q2 Earnings Announcement and First Partial Disclosure of the Truth / Materialization of the Risk**

596. On December 21, 2023, for the first time, the failure of the CDA strategy was partially revealed, as discussed in full *infra,* Section VI.A.

597. However, even after these disclosures, the price of NIKE Stock remained artificially inflated, as Defendants continued to mislead investors about the CDA strategy.

598. Specifically, on December 21, 2023 during NIKE's FY 2024 Q2 earnings call ("December 21, 2023 Earnings Call"), in response to a J.P. Morgan analyst's question asking Defendants to "elaborate on the structural changes that [they] cited," Defendant Donahoe touted the purported success of NIKE's reorganization:

> ***[S]ix months ago, we realigned our entire organization under Heidi O'Neill and Craig Williams as our Co-Presidents, and it is making a huge difference in our focus and ability to execute***.

599. Defendants' claim that NIKE had "realigned" its organization, and that this reorganization was benefitting NIKE's "ability to execute," conveyed that NIKE's reorganization had successfully established a streamlined organizational structure, including by successfully

reorganizing its business around gender and age-based consumer constructs, which was materially misleading for the reasons stated in paragraph 433.

**DD. March 21, 2024 — FY 2024 Q3 Earnings Announcement and Second Partial Disclosure of the Truth / Materialization of the Risk**

600. On March 21, 2024, the failure of the CDA strategy was further partially revealed, as discussed in full *infra,* Section VI.B.

601. However, even after these disclosures, the price of NIKE Stock remained artificially inflated, as Defendants continued to mislead investors about the CDA strategy.

602. For example, while acknowledging that NIKE needed to make certain "adjustments" to the CDA strategy, Defendant Donahoe minimized those issues and continued to tout the strategy's purported success, falsely claiming that *"**our Consumer Direct Acceleration strategy has driven growth and direct connections with consumers**.*" This statement conveyed that the CDA strategy had in fact propelled long-term sustainable growth for NIKE, and that only minor "adjustments" were needed to continue that growth, which was materially misleading for the reasons stated in paragraphs 437-38, including that (i) the initial growth of NIKE's DTC channels during the Class Period was driven by unrelated, temporary factors (*i.e.*, the COVID-19 pandemic, NIKE's pre-CDA pipeline of products, and NIKE's oversaturation of the market with key classic products); and (ii) a legion of internal warning signs showed Defendants throughout the Class Period that the CDA strategy was failing and that NIKE's initial financial growth was unsustainable long-term.

**EE. July 25, 2024 — Form 10-K**

603. On July 25, 2024, Defendants filed their Annual Report on Form 10-K for the fiscal year ended May 31, 2024 (the "July 2024 10-K"), which was signed by Defendants Donahoe and Friend. In it, Defendants stated that NIKE's potential inability to "adjust[] the mix of existing

product offerings" and "develop[] new products, styles and categories" to meet consumer demand were hypothetical risks that "***could*** ***have a material adverse effect on our sales and profitability***."

604. This statement was materially misleading for the reasons stated in paragraph 434. In particular, Defendants' hypothetical warnings about NIKE's product offerings—*e.g.*, that a potential failure to adjust the mix of NIKE products and develop new products to meet customer demand "***could***" negatively impact NIKE's business—were materially misleading because Defendants knew, or were reckless in not knowing, that NIKE had already failed to maintain its innovative product pipeline, and instead relied on unsustainably flooding with the market with its classic franchises.

605. The July 2024 10-K also included a materially misleading risk disclosure regarding NIKE's competitive standing, in which Defendants also stated:

> ***If we do not adequately and timely anticipate and respond to our competitors, our costs may increase, demand for our products may decline, possibly significantly, or we may need to reduce wholesale or suggested retail prices for our products.***

606. This statement was materially misleading for the reasons stated in paragraph 435. In particular, Defendants' hypothetical warnings that NIKE's potential failure to "respond to our competitors" "***may***" negatively impact NIKE's business was materially misleading because Defendants knew, or were reckless in not knowing, that NIKE's brand equity and competitive standing had already declined, thereby inhibiting the success of the CDA strategy.

607. The July 2024 10-K included an additional materially misleading risk disclosure regarding NIKE's brand strength, in which Defendants stated that a potential "***[f]ailure to maintain our reputation, brand image and culture could negatively impact our business***."

608. This statement was materially misleading for the reasons stated in paragraph 435. In particular, Defendants' hypothetical warnings that NIKE's potential "***[f]ailure to maintain our***

***reputation [and] brand image could negatively impact our business***" was materially misleading because Defendants knew, or were reckless in not knowing, that NIKE's brand equity and competitive standing had already declined, thereby inhibiting the success of the CDA strategy.

609. Further, the July 2024 10-K included a materially misleading risk disclosure regarding NIKE's DTC technology, in which Defendants stated:

> In addition, we have made significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations, and our digital offerings will require continued investment in the development and upgrading of our technology platforms. In order to deliver high-quality digital experiences, our digital platforms must be designed effectively and work well with a range of other technologies, systems, networks, and standards that we do not control. ***We may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards.***

610. This statement was materially misleading for the reasons stated in paragraph 432. In particular, Defendants' hypothetical warnings that NIKE "***may not be successful***" in developing technology critical to NIKE's DTC operations was materially misleading because Defendants knew, or we reckless in not knowing, that NIKE already had struggled and failed to build out and unify its DTC technological capabilities and organization, which were critical for the CDA strategy to succeed.

## VI. LOSS CAUSATION

611. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of NIKE Stock at inflated levels and operated as a fraud or deceit on Class Period purchasers of NIKE Stock by failing to disclose and misrepresenting the adverse facts detailed herein.

612. Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased NIKE Stock at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiffs and other

Class members would not have purchased NIKE Stock at the artificially inflated prices at which it traded during the Class Period.

613. The truth regarding Defendants' fraud was revealed in a series of partial disclosures of the truth and/or materializations of concealed risk that occurred between December 21, 2023 and October 1, 2024. During this period, the price of NIKE Stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited the price of NIKE Stock. It was not until the final disclosure of the truth and/or materialization of concealed risk on October 1, 2024, that the full truth was known to the market, such that there was no longer any artificial inflation in the price of NIKE Stock attributable to the fraud.

614. The declines in the price of NIKE Stock during this period, including the declines summarized below, are directly attributable to the market absorbing information that revealed the truth and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

615. As a result of their purchases of NIKE Stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused NIKE Stock to trade at artificially inflated levels throughout the Class Period.

616. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of NIKE's business. As the truth about the Company and the extent of Defendants' fraud was revealed to the market, the price of NIKE Stock fell significantly. These declines removed the artificial inflation from the price of NIKE Stock, causing real economic loss to investors who had purchased NIKE Stock during the Class Period.

617. Each decline in the price of NIKE Stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

618. The economic loss (*i.e.*, damages) suffered by Lead Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and/or maintain the price of NIKE Stock at inflated levels and the subsequent significant decline in the value of NIKE Stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

619. The market for NIKE Stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 8.27 million shares during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein, NIKE Stock traded at artificially inflated prices throughout the Class Period. Lead Plaintiffs and other Class members purchased NIKE Stock relying upon the integrity of the market relating to NIKE Stock and suffered economic losses as a result thereof.

620. The declines in the price of NIKE Stock on December 22, 2023, March 22, 2024, June 28, 2024, and October 2, 2024, were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed after the market closed on December 21, 2023, March 21, 2024, June 27, 2024, and October 1, 2024. Each of these stock price declines is statistically significant at a 100% confidence level. The timing and magnitude of NIKE Stock's price declines evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

### A. December 21, 2023 — First Partial Disclosure of the Truth / Materialization of the Risk

621. Investors began to learn the truth about the CDA strategy's failure on December 21, 2023.

622. On December 21, 2023, NIKE announced disappointing financial results for the second quarter of FY 2024. NIKE disclosed quarterly revenue of $13.39 billion, which was approximately $40 million below analysts' consensus estimate of $13.43 billion. NIKE also disclosed that its Direct revenue was $5.7 billion, below the consensus estimate of $5.88 billion. These disappointing financial results, which revealed particular softness in NIKE Direct revenue—the DTC segment at the core of the CDA strategy—began to show investors that the CDA strategy was failing to deliver the sustainable growth that Defendants had touted.

623. NIKE concurrently lowered its financial guidance for FY 2024, revealing to investors that the CDA strategy's failures would have ongoing negative consequences for the Company's business. In particular, on NIKE's December 21, 2023 Earnings Call, Defendant Friend stated that NIKE "expect[ed] Q3 reported revenue to be slightly negative as we again compare to double-digit growth in the prior year and Q4 reported revenue to be up ***low***-single digits with full-year reported revenue now growing approximately 1%." This contrasted with NIKE's prior financial guidance announced on the Company's September 28, 2023 Earnings Call, where Defendant Friend stated that the Company expected "reported revenue to grow ***mid***-single digits." During the December 21, 2023 Earnings Call, Defendant Friend cited several factors to explain the lowered guidance, including "***adjusted digital growth plans based on recent digital traffic softness*** . . . higher marketplace promotions [and] ***lifecycle management of key product franchises***." Thus, NIKE revealed that it was anticipating slower growth in its Digital channels—*i.e.*, a key part of DTC segment that was expected to fuel NIKE's growth as part of the CDA

strategy—because of low customer traffic on those platforms (*i.e.*, website, mobile apps, and the like) and the necessity to discount and reduce the supply of (*i.e.*, "manage[]") key product franchises to account for lagging demand. Defendant Friend provided additional color on NIKE's oversupply of its key product franchises, stating that NIKE was "stepping up our plans to reduce marketplace supply of our key franchises," and that the Company was facing "increased macro headwinds, especially on Digital."

624. During the December 21, 2023 Earnings Call, Defendants also announced that NIKE was forced to initiate massive cost-cutting measures due to the CDA strategy's failure. Specifically, Defendant Friend disclosed that NIKE was "identifying opportunities across the [C]ompany to deliver up to $2 billion in cumulative cost savings over the next three years, both up and down our P&L and across our value chain." Defendant Friend explained that this reorganization was necessary because ***the CDA strategy had added "complexity and inefficiency" to NIKE's operations***. In the same call, Defendant Donahoe also disclosed that Defendants knew NIKE "***must be faster, increasing the pace of innovation,*** increasing the pace of market to consumer and increasing our agility and responsiveness," and that during "[t]he second half of fiscal 2024 represents the ***start of a multiyear product innovation cycle*** that will introduce new franchises, concepts, and platforms, elevating our full portfolio. And while there'll be some key moments in the second half, ***this new innovation cycle will take some time to fully ramp up, given our size and scale***." These disclosures partially revealed to investors not only that the CDA strategy was failing, but that under this CDA strategy, NIKE had been failing to adequately invest in product innovation, resulting in innovation stagnation, which endangered NIKE's brand strength and competitive position and now needed to be reversed using this new initiative of "a multiyear product innovation cycle."

625. On this news, the price of NIKE Stock declined $14.49 per share, or nearly 12%, from a close of $122.53 per share on December 21, 2023, to close at $108.04 per share on December 22, 2023.

626. Investors and analysts were surprised and disappointed by these revelations. For example, in a December 22, 2023 report, Morgan Stanley wrote that "***the magnitude of [NIKE's] cut surprised to the downside***," and explained that this revenue guidance cut was due to factors such as "***digital channel softness [and] intentional supply reduction of key product franchises***." This report further stated that these factors "sent NKE stock -12%." Similarly, in a December 22, 2023 report, UBS noted that "Nike announced an uncharacteristic plan to reduce costs by $2B over 3 years. . . . Nike will use some cost saves ***to accelerate innovation*** and improve speed. ***This is surprising since these have been objectives for the last 5+ years.*** We assumed Nike made more progress in these areas."

627. On December 22, 2023, analysts at Cowen Research decreased their NIKE Stock target price from $129.00 to $104.00, Evercore ISI downgraded their target price from $137.00 to $122.00, and Raymond James downgraded their target price from $130.00 to $124.00, to name a few examples. HSBC Research, assigning a "Hold" rating, wrote on December 21, 2023 that if "***you want to buy sales growth, look somewhere else***" besides NIKE Stock—as "***the Nike brand [h]as not [been] where it should be on running***, and we have made the case that ***it has been bleeding market share to more nimble players in both footwear and apparel***." On the same date, Seaport Research Partners issued a report assigning NIKE Stock a "Neutral" rating and noting that "***2Q24 looked pretty bad for Nike, Jordan, and Converse***." They added: ***"[c]ompared to N[I]KE, we continue to see momentum across certain athletic brands, namely HOKA and New Balance, which we believe are eating into N[I]KE's market share for running shoes***. Also, we believe that

adidas is eating into N[I]KE's market share for court shoes. We believe that footwear demand, especially athletic footwear, is driven by key franchises. As such, we suspect that N[I]KE is being negatively impacted by weakness across certain key footwear franchises, and that is partly due to the strength of certain competitor franchises."

628. Coverage by media outlets also demonstrates that investors were surprised and disappointed by NIKE's disclosures, including the Company's loss of competitive advantages and lack of innovation. For instance, according to a December 22, 2023 *Reuters* article titled "Nike's powerhouse labels lose footing against upstart brands, analysts say," analysts covering NIKE believed that ***NIKE "is starting to lose share to upstart sneaker brands . . . and will need to invest in fresher styles***." The article highlighted that "[a]t least six brokerage[s] cut their price target on Nike and two downgraded the stock."

629. Still, the Company's stock remained artificially inflated, even after this news, as Defendants continued to reassure the market that the CDA strategy was working. For instance, on the December 21, 2023 Earnings Call, Defendant Donahoe misleadingly reassured investors that NIKE's latest reorganization efforts around the gender and age-based consumer constructs had been effective: "***six months ago, we realigned our entire organization under Heidi O'Neill and Craig Williams as our Co-Presidents, and it is making a huge difference in our focus and ability to execute.***" Defendant Donahoe continued: "[W]e're single-mindedly focused on aligning our entire team to drive what NIKE does best: innovative product, combined with distinctive storytelling, combined with unique marketplace experiences. And as Matt just said, we have a real focus, Heidi, Craig and teams, a real focus on newness and driving our next product innovation cycle, which will elevate our entire portfolio."

630. On the December 21, 2023 Earnings Call, Defendant Friend further reassured investors that NIKE was managing the supply of its key products, stating "our top franchises continue to drive strong full-price sales, but we intentionally manage the lifecycle of these models across the marketplace for long-term value." Defendant Friend also claimed NIKE was seeing strong consumer demand due to its innovative products, stating "we saw strong consumer response to newness and premium innovation." Defendant Friend further reassured investors that NIKE's strategies would allow to drive growth: "Taken altogether, strong gross margin execution and disciplined cost controls are enabling us to offset softer second half revenue and drive earnings growth. Excluding restructuring charges, we expect to deliver on our prior full-year earnings outlook. While we expect the operating environment to remain dynamic, we have been here before and we know that moments like this are when NIKE operates and executes at its best."

631. Analysts were reassured by Defendants' positive statements. For instance, on December 22, 2023, Deutsche Bank Research assigned NIKE Stock a "Buy" rating and wrote that it viewed NIKE's cost cutting efforts "positively as they are geared toward streamlining the organization, accelerating innovation, and increasing speed to market, all aiming to drive greater profitability."

### B. March 21, 2024 — Second Partial Disclosure of the Truth / Materialization of the Risk

632. The truth behind the CDA strategy's failure was further partially revealed on March 21, 2024, when NIKE announced its financial results for Q3 2024 and lowered its gross margin guidance for FY 2024. Defendants advised investors they expected NIKE's full year gross margins to expand only 120 basis points, in contrast to the expected full year gross margin expansion of 140 to 160 basis points announced in the December 21, 2023 Earnings Call. As described earlier, *supra,* analysts believed the CDA strategy was critical to expanding NIKE's margins and,

therefore, this lowered margins guidance partially revealed the CDA strategy's failure. Defendants also attributed NIKE's disappointing guidance to the CDA strategy's failure, thus further partially revealing that the CDA strategy was failing to propel long-term, sustainable growth. In particular, on NIKE's March 21, 2024 earnings call discussing these results, Defendant Friend attributed NIKE's lowered margins guidance to several factors, including "higher markdowns [and] reduced benefits from channel mix due to franchise lifecycle management." On the same call, Defendant Friend similarly disclosed that NIKE expected "revenue in the first half of the fiscal year [FY 2025] to be down low single digits," which he attributed "near-term headwinds from lifecycle management of our key product franchises." Thus, Defendants revealed on this call that NIKE had misaligned the supply of these "franchises" (*i.e.*, classic products) so poorly during the Class Period that NIKE's remedial measures to limit the supply of these products had forced NIKE to cut its margin guidance and revenue guidance. Defendant Friend further explained that "[l]ooking ahead, we expect lifecycle management of key product franchises to create some near term headwinds, particularly on Digital."

633. NIKE needed to engage in this drastic reduction of supply because the Company had flooded the market with its classic franchises during the Class Period. This was necessary because NIKE had failed to produce new innovative products as part of the CDA strategy. Indeed, during this call Defendant Donahoe partially revealed that NIKE had failed to effectively innovate as part of the CDA strategy, stating that "we must drive a continuous flow of ***new product innovation***." Defendant Friend elaborated, stating that NIKE had to "shift our product portfolio toward newness and innovation." Defendant Donahoe also admitted that NIKE had been "missing some product newness at scale in our portfolio over the last several seasons," which partially

revealed to investors that NIKE had failed to maintain an innovative product pipeline for at least several months preceding this announcement.

634. Defendants also elaborated on additional aspects of the CDA strategy's failures. Specifically, Defendant Donahoe admitted that the CDA strategy's failures required that NIKE make substantial adjustments in four key areas, including that NIKE would (i) refocus back to sport categories, (ii) increase innovation, (iii) strengthen its brand marketing, and (iv) shift back to its wholesale partners to reach its sales goals (and thus effectively pulling back from its DTC channels). Specifically, he stated: "While our Consumer Direct Acceleration Strategy has driven growth and direct connections with consumers, ***it's been clear that we need to make some important adjustments***. Simply put, we need to make adjustments in ***four areas. We need to sharpen our focus on sport***, ***we must drive a continuous flow of new product innovation***, ***our brand marketing must become bolder and more distinctive***. And while NIKE Direct will continue to play a critical role, ***we must lean in with our wholesale partners*** to elevate our brand and grow the total marketplace." Defendant Donahoe further explained that NIKE had started making such major adjustments in June 2023, stating "***[s]tarting last June, we aligned our organization to put the consumer and a sharp focus on sport back at the center of everything we do.*** We integrated our leadership structure, appointing Heidi O'Neill and Craig Williams as Co-Presidents." These statements partially revealed that the CDA strategy had failed to effectively align NIKE's business, maintain NIKE's innovative product pipeline, preserve NIKE's brand strength and competitive position, and successfully pivot to DTC channel sales and away from its wholesale partners.

635. Defendants also elaborated on the CDA strategy's failure to pivot away from sport-based categories. Specifically. Defendant Donahoe explained that NIKE had "***started nine months ago [i.e., in June 2023] important adjustments in our offense,***" including "putting the consumer

***and sport*** squarely back into our offense." In other words, Donahoe partially revealed that NIKE's CDA reorganization—in particular, around the consumer constructs of Men's Women's and Kids'—had failed, forcing the Company to revert to organizing around sport-based categories, as it did before the CDA strategy. Thus, Defendants confirmed they had been aware of the CDA's failure since at least summer 2023.

636. Defendants Donahoe and Friend also partially revealed that NIKE failed to effectively respond to consumer demand for multi-brand shopping by pivoting towards DTC and away from its wholesale retail partners during the Class Period. Specifically, Defendant Donahoe stated that NIKE: (i) was "***increasing our investment in wholesale*** to help us elevate and grow the entire marketplace"; (ii) "***recognize[d] that our wholesale partners help us*** scale our innovation and newness in physical stores and connect our brands in the path of the consumer"; (iii) "***must lean in with our wholesale partners*** to elevate our brand and grow the total marketplace"; and (iv) had engaged in a "***reinvestment with our wholesale partners*** so we bring a more holistic offense that grows the market and gets in the path of our consumer," and that this combination was "driving [NIKE's] growth." Defendant Friend admitted Defendants had knowingly disregarded consumer demand for multi-brand shopping so that Defendants could hit performance metrics: "***we've been more focused on trying to achieve [a] mix of marketplace targets than we have serving consumer demand where the consumer is shopping***." Defendant Friend then went on, admitting further that "***[t]he consumer is still clearly shopping in multi-brand retail,*** and we need to elevate our brand and our positioning to be able to serve the consumer."

637. On this earnings call, Defendant Donahoe also partially revealed that NIKE had failed to drive competitive separation, stating that the company's "brand marketing must become

bolder and more distinctive," thus partially revealing that NIKE's brand equity and competitive standing had diminished during the Class Period.

638. On this news, the price of NIKE Stock declined $6.96 per share, or nearly 7%, from a close of $100.82 per share on March 21, 2024, to close at $93.86 per share on March 22, 2024.

639. Analysts were again surprised at NIKE's poor financial results and extent of the CDA strategy's failure revealed in these disclosures. For instance, in a March 21, 2024 report, Jeffries Equity Research assigned NIKE Stock a "Hold" rating, lowered their price target from $110.00 to $100.00, and pointed out the "slowing trend ahead for revenue growth as old style inventory is reduced and markdowns increase." In the same report, Jeffries Equity Research also noted that ***"[f]or years [NIKE] pushed a narrative it would increase digital/direct and reduce wholesale to improve margins and maximize customer impact. Problem is customers want to buy NIKE everywhere so reducing wholesale dramatically seems like the wrong move in hindsight.*** Now the company is left trying to figure out what the optimal mix between direct and wholesale should be, and we won't find that answer until an analyst day later this year." Similarly, in a March 21, 2024 report, Piper Sandler assigned NIKE Stock a "Neutral" rating, lowered their price target from $107.00 to $98.00, and wrote that NIKE's "[p]roduct lifestyle management will pressure near-term sales ***as [NIKE] refocuses on product innovation and reinvesting in wholesale***." Likewise, in a March 21, 2024 report maintaining NIKE Stock's "Overweight" rating but reducing the target price from $125.00 to $120.00, Wells Fargo Equity Research warned that NIKE's "franchise management will clearly be more of a headwind to the DTC/digital channel," because there was a greater excess of key product franchises in NIKE's digital channels. And, in a March 22, 2024 report, Telsey Advisory Group maintained its "Outperform" rating but lowered its price target from $120.00 to $115.00, stating that "***NIKE has realized consumers like shopping***

***at multi-brand retailers and wants [to] gain share and improve its presence at retail. In addition, NIKE admitted it had been too focused on hitting its DTC and digital sales targets vs. serving consumer demand***."

640. Various media outlets also reported on NIKE's disclosures of the CDA strategy's failure. For example, Defendants' March 21, 2024 admissions regarding NIKE's failure to meet consumer demand for multi-brand retail shopping were discussed in a March 22, 2024 article in *SGB Media*, titled "***NIKE Admits it Has a Problem***, and Its Solution is… Air?" When discussing the March 21, 2024 earnings call, this article noted that ***"[t]he big moment for the marketplace may have come when the CEO said that NIKE is increasing its investment in wholesale to elevate and grow the market***." This, the article explained, showed that "***NIKE should not have turned its back on its retail partners and upset the delicate balance of the marketplace ecosystem. Instead, they opened the door for other brands like Hoka, On and New Balance to move into leadership positions in the innovation pipeline.*** NIKE missed big on the partnership approach with larger retailers that let other fashion-forward innovators take the shelf space NIKE walked away from over the last few years." The article quoted a note to investors by Amalthea Funds stating that "NIKE used to have 30,000 wholesale arrangements (retailers who sold their product). They cut this number sharply, down to 3,000 and told people they were going to 1,800."

641. Still, the Company's stock remained artificially inflated, even after this news, as Defendants continued to reassure the market that the CDA strategy was working. For example, while acknowledging that NIKE needed to make certain "adjustments" to the CDA strategy, Defendant Donahoe continued to tout its success, falsely claiming that ***"[o]ur Consumer Direct Acceleration strategy has driven growth and direct connections with consumers***." Defendant Donahoe also continued to minimize the plight of the CDA strategy, claiming that NIKE was

"making significant progress . . . building a multiyear cycle of innovation that's bringing freshness and newness to consumers." On the same earnings call, Defendant Donahoe similarly downplayed NIKE's dire situation, claiming that Company was "back on our front foot with growing confidence in our innovation pipeline," and "our innovation engine is moving with speed."

642. Analysts were comforted by Defendants' reassurances and minimizations of NIKE's CDA problems. For instance, in a March 21, 2024 report, Cowen Research wrote that "[w]e believe ***direct to consumer expansion and [NIKE's] Consumer Direct Acceleration strategy could create a multi-year inflection in gross margin*** past prior peaks." Likewise, in a March 21, 2024 report assigning NIKE Stock a "Buy" rating, Guggenheim Securities opined that "***we continue to look favorably upon Nike's innovation pipeline*** and the ability to scale newness across the marketplace, including its wholesale partners." Similarly, in a March 22, 2024 report, Bernstein Research assigned NIKE Stock an "Outperform" rating and noted that NIKE management had told investors that "***[i]nnovation is finally coming***."

### C. June 27, 2024 — Third Partial Disclosure of the Truth / Materialization of the Risk

643. The truth behind the CDA strategy's failure was further partially revealed on June 27, 2024, when NIKE announced a third consecutive quarter of disappointing financial results, along with poor results for FY 2024. NIKE's poor financial results included revenue for the fourth quarter of $12.61 billion, which missed consensus estimates by $250 million. On NIKE's June 27, 2024 earnings call, Defendant Friend explained that the disappointing results stemmed, in part, from a decline in NIKE Digital sales of 10% and "lower sales of certain classic footwear franchises." Thus, NIKE's poor results were caused by the CDA strategy's failure to drive sales toward NIKE's DTC channels and the fact that NIKE had flooded the market with an over-supply of its classic franchises, leading to lower sales.

644. NIKE also announced that it was lowering its revenue guidance for FY 2025 and expected revenue growth in the first half and first quarter of FY 2025 to be materially constrained due to the CDA strategy's failure. Specifically, NIKE significantly reduced its guidance for FY 2025, with Defendant Friend stating that "we now expect fiscal 2025 reported revenue to be down mid-single digits, with the first half down high single-digits." As described below, in a related earnings call Defendants attributed NIKE's disappointing guidance to the CDA strategy's failure, thus further partially revealing that the CDA strategy was failing to propel long term, sustainable growth.

645. In particular, on NIKE's June 27, 2024 Earnings Call, Defendant Friend explained that NIKE had lowered its guidance due to factors such as "timelines and pacing to manage marketplace supply of our classic footwear franchises," and "***lower NIKE Digital growth . . . as we scale product innovation*** and newness across the marketplace." Defendant Friend then elaborated further, explaining that NIKE was "advancing our timelines to tighten total supply of certain classic footwear franchises," causing NIKE to "aggressively adjust[] our forward-looking plans for these franchises on NIKE Digital, where they have their highest share of business." These actions, according to Defendant Friend, "create several points of ***short-term headwinds on revenue in fiscal 2025***." Later in the earnings call, Defendant Friend added that NIKE had "started managing these franchises ***a couple years ago***, and what we were most focused on was the fact that we needed to restrict supply of these franchises into the marketplace, ***because we had a gap in innovation in our pipeline***." Thus, Defendant Friend directly admitted that Defendants ***knew NIKE "had a gap in our pipeline" at least "a couple of years ago"—i.e., no later than summer 2022,*** as the CWs recounted—directly contrary to Defendants' statements touting NIKE's product innovation pipeline at the time and afterwards during the Class Period.

646. Similarly, during this earnings call, Defendant Friend stated that NIKE expected for FY 2025 that "first quarter revenue to be ***down approximately 10%***," which he attributed to several factors, including "***more aggressive actions in managing our classic footwear franchises, continuing challenges on NIKE Digital, muted wholesale order books with newness not yet at scale***." This admission further revealed the damage caused by NIKE's CDA-era oversupply of classic product franchises. Thus, Defendants attributed NIKE's disappointing financial forecasts to a lack of innovation and the fact that, due to this lack of innovation, NIKE had flooded the market with an over-supply of its classic franchises. Now, NIKE had been forced to accelerate its reduction of the supply of those franchises. In other words, NIKE revealed that its franchise management plan—*i.e.*, its plan to intentionally pull its classic products off the market—was inflicting even greater pain on NIKE's revenue outlook than was previously disclosed, particularly when combined with the fact that NIKE's lacked "newness" (*i.e.,* innovative products) to fill the gap.

647. During the earnings call, Defendants further elaborated on the various key problems underlying CDA strategy's failures. For example, Defendants specifically noted NIKE's lagging innovation multiple additional times during this call. Specifically, Defendant Donahoe stated that NIKE was "moving aggressively to ***reestablish our innovation edge***" and noted that "[f]or NIKE, fiscal 2024 was a pivotal year to get back on the offense in sport with consumers, ***led by an urgency to accelerate our pace of innovation and scale newness across our product line***." Similarly, Defendant Friend reiterated that NIKE needed to "scale product innovation and newness across the marketplace."

648. Defendant Donahoe also provided additional color on how the failure of the CDA strategy had forced NIKE to depend on its wholesale partners to sell key products. For instance,

Donahoe admitted that NIKE had "***spent a lot of time leaning in with our wholesale partners***." This disclosure indicated that consumer demand for multi-brand shopping made NIKE dependent on its wholesale partners, thus acknowledging that a central component of the CDA strategy (the shift away from wholesale partners) had failed. Defendant Donahoe also stated that NIKE wanted "to be where the consumer is, whether that's digital, our own door, or wholesale, and so we're embracing a more balanced approach to growing the whole marketplace." Defendant Friend then confirmed that NIKE was "building momentum with our wholesale partners" and that the volatility in NIKE's financial results had been driven by "the dynamic of increasing supply . . . in the wholesale marketplace relative to having the supply of them on Digital." This acknowledgment indicated that consumer demand for multi-brand shopping had required NIKE to pivot back to emphasizing selling products through its wholesale partners.

649. Defendant Donahoe also further partially revealed that the CDA strategy failed to establish the streamlined organizational structure regarding consumer constructs previously promised to investors. Specifically, Defendant Donahoe stated that NIKE was "***now completely aligned across the organization around sport field of play***," and that "over the last 90 days, we've completed completely aligning our organization along the lines of sport." He also acknowledged that NIKE was "sharpening our focus on sport." This was the first time that Defendants acknowledged that the failure of NIKE's reorganization pursuant to the CDA had forced NIKE to once again formally institute sport-based categories like NIKE had done prior to CDA.

650. Defendants also partially revealed that NIKE's brand equity and competitive standing had continued to decline throughout the Class Period. In particular, Defendant Friend admitted that "[a]lthough the next few quarters will be challenging, we are confident that ***we are repositioning NIKE to be more competitive, with a more balanced portfolio to drive sustainable,***

***profitable, long-term growth***." This statement serves as an admission that NIKE had not previously been well-positioned to compete effectively under the CDA strategy, which thus had failed to drive sustainable, profitable growth.

651. Finally, Defendant Donahoe admitted that NIKE had known the CDA strategy was a failure and thus had initiated a remediation plan since at least summer 2023, stating that NIKE "set out our – what ***we're calling our comeback plan a year ago***." Thus, Defendants internally had already initiated a "***comeback plan***" no later than summer 2023—at the same time that they were publicly still professing the continued success of the CDA strategy, including its various key components.

652. On this news, the price of NIKE Stock collapsed $18.82 per share, or nearly ***20%***, ***the largest stock price drop in NIKE's history***, from a close of $94.19 per share June 27, 2024, to close at $75.37 per share on June 28, 2024.

653. Analysts and investors were shocked by these revelations. For example, in a June 28, 2024 report, analysts at Bernstein Societe Generale Group, despite maintaining NIKE Stock's "Outperform" rating, reduced the target price from $120.00 to $112.00 and wrote that a "guidance cut was expected, but ***the magnitude of it was startling***." The report went on to explain that NIKE's "Lifecycle Management process involves cutting distribution on older product to make room for new innovation. The effect is most prominent on their own digital channel, where the majority of the long tail of older product resides." Likewise, in a June 27, 2024 report, maintaining their "BUY" rating but "reducing our PO to $104 (from $113)," Bank of America highlighted that NIKE's "***guidance reset was larger than expected*** as it expedites the reduction in lifestyle franchises in its DTC channel." Similarly, in a June 28, 2024 report, analysts at Raymond James downgraded NIKE Stock's rating from "Outperform" to "Market Perform" and noted that "[w]hile

Nike's renewed focus on the Wholesale channel drove growth, it also distorts what Nike is aiming for in terms of its [long term] channel mix."

654. News media commentary further illustrates the market's shocked reaction to Defendants' disclosures about the CDA strategy's failures. For example, these revelations were discussed in a July 9, 2024 *Financial Times* article, titled "Nike's new chief runs into trouble as turnaround efforts falter." Notably, this article stated that NIKE's June 28, 2024 stock price decline was "***the single-worst day for the swoosh since its 1980 initial public offering***." The article also discussed quality issues with certain NIKE products and quoted a longtime NIKE employee who stated that such quality lapses "'***would never have happened" when Nike's internal structure had focused teams for each sport***.'" The article further explained that "***by eschewing longtime wholesale partners, competing brands such as Hoka, On and New Balance took up Nike's market share at chains including Foot Locker***."

655. Still, the Company's stock remained artificially inflated, even after this news, as Defendants continued to downplay the disclosed problems. For instance, Defendant Donahoe claimed that NIKE's previously announced adjustments were working and that the Company was "seeing momentum build in all four areas, particularly on the Performance side of our product portfolio. We have work to do, but we're on it. Our teams are moving with energy and urgency against the opportunity we see in front of us." Defendant Donahoe further reassured investors that NIKE was "accelerating our innovation pipeline, including pulling forward several innovations, some more than a year. We're moving aggressively to reestablish our innovation edge."

656. Defendant Donahoe also insisted that "our execution continues to stay on pace." Further, Defendant Friend reassured that "our past experience gives us confidence that proactively rebalancing our portfolio will strengthen our competitive position and fuel brand momentum as

we take the consumer somewhere new." Defendant Friend also stressed that "as we accelerate our pace of newness and innovation, the early response from consumers and partners are reinforcing our optimism in NIKE's path forward." Friend also claimed that "if I exclude the impact of the biggest franchises on our Digital business, the rest of our Digital business was healthy and we were pleased with the growth that it delivered. And so from that end, we feel comfortable in the way that we're looking at this."

657. Analysts were comforted by Defendants' reassurances. For instance, on June 28, 2024, reiterating a "Buy" rating, Bank of America wrote: "we are encouraged by early signs that innovation is resonating."

### D. October 1, 2024 —Final Partial Disclosure of the Truth / Materialization of the Risk

658. The full extent and financial impact of Defendants' fraud was finally revealed on October 1, 2024, when NIKE announced its financial results for the first quarter of 2025, which again disappointed the market. In particular, NIKE announced that its first quarter revenue was $11.59 billion, below consensus estimates of $11.64 billion. On the October 1, 2024 earnings call discussing these results, Defendant Friend informed investors that NIKE's poor sales for the quarter were driven by ***"[t]raffic declines across NIKE Direct***," including "***particular softness in traffic on NIKE Digital***." Thus, Defendants directly acknowledged that NIKE's continued poor financial results were caused by the CDA strategy's failure to drive sales toward NIKE's DTC channels, and thus achieve the promised sustainable, long-term growth.

659. During the same earnings call, Defendant Friend also disclosed that NIKE was "***withdrawing our full year guidance***." This announcement indicated that the CDA strategy had failed to the point where NIKE could no longer reliably project its financial outlook. Defendant Friend went on to explain that, looking forward, NIKE's "revenue expectations have moderated

since the start of the year, given traffic trends on NIKE Digital, retail sales trends across the marketplace and final order books for spring." Further, the guidance that Defendants could provide conveyed the dire state of NIKE's business due to the CDA strategy's failures. Specifically, Defendant Friend told investors that NIKE expected "Q2 revenues to be down in the 8% to 10% range. . . . Q2 gross margins to be down approximately 150 basis points," because of "higher promotions [and] channel mix headwinds."

660. Defendants also elaborated on additional aspects of the CDA strategy's failures, thus further revealing the extent of NIKE's DTC problems to the market. For instance, Defendant Friend disclosed that the Company's "[f]ranchise management" plan—which was required because of NIKE's previous oversaturation of the market with classic product franchises—was even more destructive to NIKE's revenues than previously disclosed. Specifically, Defendant Friend stated that NIKE was "intentionally reducing the proportion of our business driven by our classic footwear franchises: Air Force 1, Air Jordan 1 and Dunk," and that "***we have taken the most aggressive actions in NIKE Direct, and especially, Digital***." He then explained that NIKE was "actively rebalancing product allocations to our highest traffic channel in order to maximize franchise health and full price realization." Defendant Friend further disclosed that poor results from these classic franchises drove particular sales weakness in NIKE's Digital segment, stating: "On Digital, we did see – ***we were down 20% in the quarter in Digital***, and that was largely driven by the three classic franchises being down nearly 50% versus the prior year." Thus, Defendants revealed that the financial impact of NIKE's CDA-era practice of oversaturating the market with its classic products was worse than previously disclosed, and was causing the Company ongoing financial harm.

661. As discussed above, NIKE had originally oversaturated the market with its classic franchises because it lacked an innovative product pipeline, and Defendants went on to reveal that NIKE's lack of innovation had persisted, compounding NIKE's CDA strategy failures. During the same call, Defendant Friend confirmed that NIKE had been failing to effectively innovate as part of the CDA strategy, saying that that the Company "plan[s] to introduce and scale newness and innovation across the marketplace," and was "focused on trying to accelerate newness and innovation in order to create more momentum with consumers and more energy with consumers."

662. Defendant Friend went on to detail several related unfavorable business trends NIKE had seen in the first quarter of FY 2025—and which NIKE expected to continue into the future—as a result of the CDA strategy's failure, thus further revealing its continuing, severe financial impact on NIKE's business: "Our men's and women's lifestyle business was planned down double digits in Q1, and we expect these declines to continue through the year. The Jordan brand was planned down double digits this quarter. And we expect Jordan to be down at the same rate for fiscal 2025. ***And we expect NIKE Digital to decline double digits in fiscal 2025 versus the prior year. All taken together, these trends drove a mid-single digit headwind on Q1 revenue***." Defendant Friend further informed investors that "[f]ranchise management actions will continue throughout the year."

663. Defendant Friend also admitted that the CDA strategy had shifted too much towards NIKE's DTC business and thus needed to shift back to its wholesale partners, who had been critical to the Company's prior success. Specifically, he stated that NIKE had "been closely engaging with our partners ***since we acknowledged some of the missteps related to over-centering on Direct***." Indeed, Friend noted that "sales trends . . . in the wholesale channel were substantially better" than

the Digital sales trends of key product franchises. This further revealed that NIKE's CDA strategy had failed to account for consumer demand for multi-brand shopping.

664. Finally, Defendant Friend also acknowledged that NIKE had lost brand strength and its competitive edge, stating that "***the multi-brand environment is very competitive today, and it will take time to expand market share***." Indeed, he added that NIKE had "***acknowledged that we've lost market share in the running specialty channel. More than four years ago***, ***we pulled back on our engagement with that channel. And as a result of that, we saw market share losses***." Thus, NIKE admitted that its market share loss to competitors in its key running channel began as a result of its pullback from that channel four years earlier, *i.e.*, in 2020—when the Company launched its disastrous CDA strategy. Thus, Defendants directly connected NIKE's diminished competitive standing to its failed CDA strategy.

665. On this news, the price of NIKE Stock declined $6.03 per share, or approximately 6.8%, from a close of $89.13 per share on October 1, 2024, to close at $83.10 per share on October 2, 2024.

666. Investors and analysts were shocked by this final revelation of the CDA strategy's failure. For example, on October 2, 2024, Jefferies assigned NIKE Stock a "Hold" rating and emphasized that "***Digital is A Big Problem***" for NIKE, and noted that "promos are rising, ***new product will take time to resonate***, ***if it does at all,*** and in the meantime ***competition is proving to be more severe***." Similarly, on October 2, 2024, Truist reduced NIKE Stock's price target to $83.00 from $85.00, assigned a "Hold" rating, and noted that "***[w]ith another miss vs depressed expectations***, Nike's visibility into its own business appears lower than we previously anticipated." Likewise, in an October 2, 2024 report maintaining its "Market Perform" rating, Raymond James

wrote that "***[t]raffic decline at Nike Direct was more severe than expected, particularly in Digital***."

667. Moreover, various media outlets directly connected the Company's stock price decline to NIKE's disappointing disclosures about the severity of the CDA strategy's failures and its dire financial impact on NIKE. For instance, an October 1, 2024 article in *The Wall Street Journal*, titled "***Nike Shares Slide After It Withdraws Year Forecast***," tied NIKE's disclosures to the decline in its stock price and explained that NIKE had "***oversold" key products "and diluted their cool in the process.*** The company is now aggressively reducing supply of those franchises to save its most iconic sneakers. ***It is still making more of them than it can sell***." Similarly, an October 2, 2024 article in *The Wall Street Journal* titled, "Nike Needs Time to Get Off the Sidelines," described how the price of NIKE shares declined "***as the company made it clear that its turnaround might be more painful than investors thought***." In particular, the article described that "[Defendant] Friend made it clear that Nike's deliberate pullback from key franchises—Air Force 1, Air Jordan 1 and Dunk—will continue to weigh on its top line for the rest of its fiscal year." The article also stated that the pivot back to its wholesale partners would not be the quick fix for its CDA-caused problems that NIKE had hoped for, and that NIKE's damaged competitive position may be hard to repair: "***The brand's efforts to cozy up to its once-neglected retail partners are having mixed effects***. Order books for the coming spring season were roughly flat compared with the prior year, lighter than Nike had hoped. ***Upstart brands such as Hoka and On have made concerted efforts to fill the shelves that Nike left bare over the past few years; it is clear that re-establishing dominant status with those retail partners won't be easy***."

## VII. ADDITIONAL SCIENTER ALLEGATIONS

668. Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over NIKE's and their materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V, *supra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A. NIKE Executives, Including Individual Defendants, Attended Meetings and Received Critical Information Detailing the CDA Strategy's Deficiencies

669. Throughout the Class Period, the Individual Defendants (alongside other NIKE executives) attended critical meetings where the deficiencies of the CDA strategy were openly discussed and acknowledged. These executives also received negative information regularly, including in internal reports, showing that the CDA strategy was failing.

#### 1. Meetings and Reports Regarding NIKE's Deficient DTC Supply Chain

670. Key executives, including Individual Defendants, attended meetings and received reports where NIKE's deficient DTC supply chain was openly discussed.

671. CW-1 detailed that NIKE held quarterly audit meetings attended by individuals such as Mary Beth Laughton (Head of Global NIKE Direct to Consumer) and Sumi Ghosh (Global VP of Stores). According to CW-1, Heidi O'Neill and Craig Williams would occasionally attend as well, whereas Donahoe and Friend did not. However, per CW-1, ***reports came from these meetings that went to the Board of Directors*** saying that supply chain problems were a huge issue

that needs to be fixed. CW-1 stated that ***Donahoe, Friend, O'Neill, and Williams received the audit reports discussed at these meetings*** and were included on invites to these meetings. CW-1 recalled that the first quarterly audit session she attended was in the fall of 2022, soon after she joined NIKE. CW-1 stated that there were two issues listed in these audit reports and discussed at the quarterly meetings that related to her team throughout her tenure: NIKE's supply chain management problems and the lack of women employed at NIKE's DTC stores. CW-1 added that the person who ran supply chain prior to Laughton taking over advised that ***the supply chain issue had been on the list for approximately ten years***.

### 2. Meetings and Reports Regarding NIKE's Technology and Technology-Organizational Failures

672. Allegations from multiple CWs show that the Individual Defendants and other key members of management (including those who reported to the Individual Defendants) were fully aware of the problems with NIKE's DTC technology and technology organization that were impeding the success of the CDA strategy.

673. **Mid-2022 Meetings with O'Neill Regarding Technological and Technology-Organizational Problems**: As discussed *supra*, Section IV.B.1.b., the CDA strategy was not only plagued by technological deficiencies, but NIKE's internal technology group caused severe problems internally due to a corrupt "shadow organization" set up by Chief Digital Information Officer Ratnakar Lavu—all of which hindered the success of the CDA strategy. CW-3 indicated that she met with ***O'Neill***, a Human Resources employee, and others to discuss the problems with Technology and its shadow organization. CW-3 added that the meeting in Paris highlighted the incompetence, deceit, and related issues, and made them realize they needed to act. CW-3 described an additional meeting with O'Neill, Heaf, and a representative from Treasury, sometime between May and July 2022, to further discuss problems with the Technology team. CW-3

recounted two facets to these problems: first, these problems were driving poor engagement with the non-Technology DTC team, who could not meet their requirements, and wound up leaving NIKE, costing the Company talent; second, the technology projects were costing much more than NIKE's management were told. CW-3 recounted, as an example, that Technology would state that a project would cost X, when in reality it would cost six times that. CW-3 recalled O'Neill stating that changes would be made, but she did not see any immediate changes.

674. Thus, by no later than July 2022, the problems with the Lavu's shadow organization had been directly raised to Defendant O'Neill via CW-3, and Defendant O'Neill acknowledged such problems but failed to act.

675. **Monthly Technology Meetings with Donahoe, Friend, O'Neill, Campion, and Lavu:** CW-3 described meeting with four Vice Presidents and Heaf to inform them that she had no faith in Technology's ability to execute what they needed to do to support NIKE's DTC strategy, and to discuss Technology's lack of transparency. CW-3 advised that that discussion led to the establishment of monthly meetings, beginning sometime between May and July 2022, that CW-3 attended with Donahoe, O'Neill, Friend, Campion, and Lavu. The purpose of these monthly meetings was to force Lavu to be more transparent and cooperative, and to discuss progress regarding technology investments underpinning NIKE's DTC strategy. CW-3 elaborated that, by holding these meetings, Lavu was forced to be more transparent. CW-3 recalled that at these meetings, they discussed what the largest programs were in which they were investing, from a tech perspective. CW-3 gave as an example a compliance maintenance program in China which caused a major problem; the Company had to turn off its app in China in order to meet Chinese compliance requirements. CW-3 advised that they also met directly with Donahoe about the compliance problems, and Donahoe was able to start asking questions about it, including questions about costs

and timelines. CW-3 observed that it was clear that the Technology team could do very little but was spending a lot of money and not making sufficient progress toward executing NIKE's DTC strategy.

676. Additionally, as described *supra,* Section IV.B.1.b., NIKE partnered with Adobe beginning in 2021 to build out NIKE's DTC marketing and other technology, but the partnership failed to deliver. ***CW-3 reiterated that Donahoe was kept apprised of the problems with Adobe, as Adobe's implementation and its progress were always featured in her monthly meetings with Donahoe***.

677. Thus, ***CW-3 confirmed that by the summer of 2022, CW-3 was having monthly meetings with Donahoe and other executives, and that Donahoe was informed about the problems within the Technology group led by Lavu***.

678. Another CW corroborated CW-3's account of her regular meetings with Donahoe and Lavu regarding these technology problems. CW-12 advised that Donahoe, Lavu, and CW-3 regularly met during her tenure to discuss NIKE's technology, and CW-12 appreciated hearing about this collaboration. CW-12 stated that she did not attend these meetings, but she learned from CW-3 that these meetings occurred. CW-12 stated that she became aware of these meetings prior to CW-12's departure in 2022. CW-12 clarified that Donahoe, Lavu, and CW-3 met to surf NIKE.com and the NIKE app and discuss these platforms. CW-12 explained that NIKE employees were frustrated when NIKE partnered with Adobe because there were already internal efforts to accomplish the work that Adobe was then hired to do.

679. **<u>CW-3's One-on-One *Ad Hoc* Meetings with Donahoe</u>:** In addition to the monthly meetings that began in the summer of 2022, CW-3 advised that she had many ***one-on-one ad hoc meetings with Donahoe*** throughout her time at NIKE and that ***CW-3 spoke to Donahoe about***

***these technological problems underpinning the DTC strategy*** at these meetings. CW-3 explained that she and Donahoe held their one-on-one meetings in different ways; sometimes Donahoe would call or FaceTime with her. CW-3 elaborated that even ***in January or February 2022***, she was clear with Donahoe about her concerns during their one-on-one meetings. CW-3 recalled that Donahoe pushed to have more meetings so that he could have more visibility. CW-3 clarified that she had been meeting informally with Donahoe since the start of her employment, but ***in February 2022 she began telling Donahoe about the technological problems underpinning NIKE's DTC strategy and her concerns about Lavu; and between May and July 2022, CW-3 began participating in the more formal monthly meetings with Donahoe, Friend, and other senior executives to discuss the problems***. As explained *supra,* Section IV.B.1.b., these meetings included discussions of NIKE's technology investments, personalization capabilities, and compliance.

680. **December 2021 Email to Donahoe Regarding Lavu:** CW-8 detailed that upon resigning from NIKE, she sent an email in December 2021 to Defendant John Donahoe, Defendant Heidi O'Neill and David (surname not recalled) expressing her concern that Ratnakar Lavu was the wrong person to execute the DTC strategy. CW-8 noted that she resigned from NIKE because she felt that NIKE was unable to execute NIKE's DTC strategy.

681. **April 2022 Paris Meeting with Heaf**: CW-3 recalled that ***problems with NIKE's DTC strategy were discussed at a meeting in Paris on April 27, 2022.*** CW-3 explained that this meeting was attended by Heaf. (As discussed above, Heaf reported to Defendant O'Neill during this time.) At the Paris meeting, CW-3 continued, CW-3 presented a detailed "roadmap" which outlined the decline in dollars they had, their technology problems, how they were losing money on their technology problems, how their costs were higher than anticipated, and how poorly the

money was being spent. CW-3 advised that ***she presented how dire the situation was, communicating to Heaf that if changes were not made, they would "run out of runway" within a few quarters*** to leverage the technological capabilities that they could employ. CW-3 recalled that there was frustration at the meeting that they were running out of money to complete the technology projects that were needed to underpin NIKE's DTC strategy. CW-3 recounted that they felt NIKE had good product selection and depth, and that they could still manage and sell inventory well and play on margin dollars at that time. However, CW-3 added, given the outlook presented at this meeting, the attendees knew that things would get worse in all of those dimensions, which they did. CW-3 confirmed that off-site meetings such as this Paris meeting occurred every six months.

682. **Quarterly DTC Meetings:** CW-3 advised that the DTC team met quarterly with Heaf to discuss the DTC strategy and ***to prepare Heaf to present to Donahoe*** regarding the strategy. CW-3 elaborated that at these quarterly meetings with Heaf, they discussed all aspects of the division's performance, including the digital business, geography, how the technology was progressing, and other matters. CW-3 added that Heaf then met directly with Williams, ***O'Neill, Donahoe, and Friend***, and other senior leaders for approximately a day and a half to discuss NIKE's DTC business strategy. CW-3 was not present for those meetings, but CW-3 noted that she received many text messages from Heaf asking questions during the meetings, and that after Heaf met with Donahoe and the C-suite, Heaf would debrief her and the rest of Heaf's team about the meeting.

683. Accordingly, by no later than April 2022, Heaf—who reported to Defendant O'Neill—was apprised in significant detail of the severe technology problems plaguing NIKE's DTC strategy, and, during the Class Period, Heaf was meeting on a quarterly basis with Defendants

Donahoe and O'Neill to discuss NIKE's DTC business strategy. Thus, Heaf likely updated Defendants Donahoe and O'Neill regarding the significant technology problems undermining the success of the CDA strategy.

684. **Additional Meetings with Heaf:** In addition to her monthly meetings with Donahoe, CW-3 stated that she and her team had monthly meetings with Heaf, and Heaf had a monthly meeting with Donahoe. CW-3 added that her monthly meetings were called Portfolio Reviews, in which they reviewed programs such as the Adobe contract and the China compliance issue. At these meetings, they would discuss, for example, having a budget of $2 billion to spend on technology, the team's progress, what the results are, the spending trend, and related issues.

### 3. Additional Meetings and Reports/Data Regarding CDA Strategy Failures

685. **All-Employee Engagement Survey Data:** Defendants Donahoe, Friend, and O'Neill received employee survey data showing widespread dissatisfaction with NIKE's CDA strategy. CW-16 said that every year NIKE creates and disseminates an All-Employee Engagement Survey (referred internally as an AES). According to CW-16, once responses are in, they are sent to an independent outside reviewer, who returns comprehensive findings. Then, per CW-16, there's an employee review period of the findings. Before she left, CW-16 recalled seeing a great deal of employee feedback. CW-16 recalled that in these surveys, employees spoke up about the problems with the CDA strategy. According to CW-16, the survey consisted of multiple-choice questions and a free text field where responders could provide more specific feedback.

686. CW-16 advised that Defendant Donahoe, Defendant Friend, Defendant O'Neill, and Executive Vice President, Chief Human Resources Officer, Monique Matheson, were amongst the senior leadership who reviewed the surveys, which then went to the Vice President level for review, then her Senior Director, and then her managers who then reviewed the surveys with the

respondents, including CW-16. CW-16 stated there was no way NIKE's senior leadership "did not know how everyone felt" regarding the CDA strategy because of the responses in the AES.

687. According to CW-16, each spring the surveys were distributed, and were reviewed with the responders in the summer. CW-16 recalled that ***she began seeing negative feedback in the surveys on the CDA in the first survey following the first round of mass terminations which took place in early/mid-2020***.

688. **All-Hands Video Calls Beginning in February 2022:** CW accounts and news articles at the end of the Class Period (based on those journalists' independent investigation) also reveal that Defendants knew about or recklessly disregarded the CDA strategy problems by no later than early 2022, based on employee feedback in HR-monitored internal chat forums at regular all-hands video calls that Defendant Donahoe led.

689. According to CW-16, Donahoe hosted and led quarterly all-hands video calls that any employee could attend, and CW-16 attended these live video calls. CW-16 recalled that ***in February 2022 she first noticed pushback in the chat function of these video calls***. CW-16 recalled that this led to the ***chat function being disabled***, but when it was reactivated, the pushback from NIKE employees increased a lot. CW-16 recalled employees, in the chats while Donahoe was speaking, disagreeing with his narrative that in order for DTC sales to pick up that employees needed to be back working at the office instead of remotely, with employees stating that the problem with sales was not working remotely but rather with the transition to fashion and fashion footwear, NIKE not relating to their market any longer, the pivot away from brick-and-mortar sales, and the change in workflow and culture under Donahoe. CW-16 further recalled that the pushback from employees was even stronger on the final all-hands call she attended in 2024, including ***responses that "CDA was ineffective."***

690. This CW account further reveals that Defendants retaliated against employees who voiced their dissent during these all-hands video calls through the chats. CW-16 noted that ***NIKE employees who spoke up on the February 2022 call got in trouble with HR.*** CW-16 explained that, after that first meeting when grievances were aired, at the next all-hands video call, ***the chat feature was disabled.*** Per CW-16, at the next meeting after that, the chat feature was back, but the chat was ***monitored by HR***. CW-16 recalled this ***pushback grew stronger throughout her tenure*** and lasted through the last all-hands quarterly meeting that she attended in early 2024.

691. CW-16 recalled that regular attendees at these all-hands meetings included Defendant Donahoe; President NIKE Global Geographies and Marketplace, Craig Williams; Defendant O'Neill; and Executive Vice President, Chief Human Resources Officer, Monique Matheson. She also recalled that Defendants Friend and Campion sometimes, although infrequently, attended.

692. As detailed above, these CW allegations are corroborated by the news media's investigative reporting. Specifically, an October 3, 2024 episode of *The Journal*—a podcast by *The Wall Street Journal*—titled "The Missteps That Led Nike Off Course," described one of these all-hands meetings attended by "20,000 employees [who] logged onto the Zoom call as Donahoe spoke." According to *The Journal*, "Donahoe started talking about accountability, saying he and his team held themselves accountable for all the mistakes that had happened at the Company"—at which point numerous employees began lodging complaints in the chat function. These employees criticized Donahoe's leadership and decisions as CEO. One employee wrote: "Accountability: I do not think that word means what you think it means." Another employee wrote: "I hope Phil Knight [*i.e.*, NIKE's founder] is watching this right now." As detailed by *The Journal*, it was "***dozens of people writing comments like this in a very public chat that is monitored by human***

***resources, so it was a very brave and risky thing to do***"—it was "***an online protest against the CEO of the company that you're employed by***." Confronted by the details of the incident, Donahoe acknowledged its occurrence, telling *The Journal*'s interviewer that Donahoe and "the leadership team understand[]" the concerns raised by employees, and that such sentiments were unsurprising because NIKE was "going through a period of adjustment."

693. **Summer 2022 Sales Meeting:** CW-9 stated that she attended NIKE's annual sales meeting at its Oregon headquarters in July or August 2022. CW-9 detailed that NIKE's entire North America sales team attended this sales meeting, as well as Defendant Donahoe and Defendant Friend. CW-9 recalled that Donahoe and Friend gave a presentation to the sales team at this meeting where they delivered the message that NIKE was not hitting its total revenue goals.

694. **September/October 2023 VP Summit Attended by Defendants Donahoe, Friend, and O'Neill:** CW-1 recounted that Craig Williams, President, Geographies & Marketplace, stood up during a VP Summit in around September/October 2023 and said, "***CDA was a failure. We have to acknowledge that.***"

695. CW-1 stated that Donahoe, Friend, O'Neill, and Williams orchestrated the summit. CW-1 added that Donahoe, Friend, and O'Neill spoke at the summit.

696. CW-1 advised that "all 300 VPs" were at this VP summit, including VPs from China (most of whom attended remotely). CW-1 further added that the summit occurred in the Coach K Gymnasium at NIKE's headquarters, where they took over the entire basketball court, with tables packed in.

697. CW-1 further noted that ***Donahoe "painted a pretty ugly picture" at the summit.*** CW-1 recalled Donahoe stating that NIKE was no longer a growth company, and that there are things NIKE must do to be a growth company again. CW-1 further described Donahoe referencing

what Apple does to be a growth company, adding that Apple CEO Tim Cook was a guest speaker who appeared via Zoom. CW-1 described the summit as "***dire***," and observed that the summit was focused on how much NIKE had to do to grow.

698. CW-1 confirmed that NIKE's management acknowledged the Company's problems related to CDA at this summit. CW-1 explained that they did so because they "ran out of straws to grasp at." CW-1 added that management acknowledged that ***business was softening and that the lack of sufficient investment in DTC capabilities was causing problems for NIKE.***

699. CW-1 noted that this summit consisted of two days of talks and breakout sessions. CW-1 clarified that the breakout sessions consisted of 50 to 75 people per breakout group, who were then divided further into tables of seven or eight people. CW-1 explained that in one breakout session she and Williams were in the same group, sitting at the same table. In this breakout session, according to CW-1, Williams said that the Company had known for a while that the CDA strategy was not working and that they needed to switch their strategy.

700. CW-1 also said that Williams told her personally during a breakout session during the summit, "let me be crystal clear. ***CDA was a disaster and is not working and we know we have to fix it. It's our problem to fix it***." According to CW-1, ***during this same breakout session, Williams also stated that NIKE needed to return to sport-based categorization of its product lines***. CW-1 advised that, at the VP Summit, ***O'Neill*** presented a plan called "5 for 15" to fix these problems. CW-1 noted that the plan flopped. CW-1 explained that "5 for 15" was a new term for things NIKE was already doing. CW-1 elaborated that 5 referred to the 5 components to gain market share and ***lean into fields of play***.

701. **Quarterly Brand Meetings:** Defendants were also apprised of NIKE's declining brand strength and competitive standing during the Class Period based on quarterly Brand

meetings involving marketing personnel that were also attended by senior management, including Chief Marketing Officer DJ van Hameren.

702. CW-2 detailed that she attended quarterly Brand meetings during her tenure at NIKE, which were co-led by former Chief Marketing Officer DJ van Hameren and current Vice President, Marketing for North America Adam Roth. CW-2 recalled that a "cool" metric was analyzed during these quarterly meetings. In regard to the "cool" metric, CW-2 explained this is a common metric used by brands to gauge how "cool" the public views the brand. CW-2 noted that NIKE purchased data from a third-party that, for example, conducted surveys to measure how "cool" the public viewed NIKE. CW-2 clarified that NIKE measured its cool factor against brands such as YouTube, TikTok, and Snapchat, and not just against other footwear and apparel brands. CW-2 recalled that by May 2022, NIKE's "cool" factor was declining, and that NIKE was no longer the number one "cool" brand. CW-2 further recalled that ***by May 2022, "cool" metrics showed that NIKE was losing ground to its competitors, specifically Adidas and Lululemon, both were gaining points and catching up in "cool" metrics to NIKE***. CW-2 clarified that "cool" metrics reflected the views of North America-based consumers. CW-2 also clarified that NIKE measured NIKE's "cool" factor with 18-to-24-year-olds because 18-to-24-year-olds are the critical demographic. CW-2 stated that these "cool" metrics were included in quarterly business unit review reports.

703. **Quarterly Business Unit Reports Sent to Defendant O'Neill:** CW accounts confirm that Defendant O'Neill was also informed of NIKE's declining cool metric and competitive position through certain regular reports that O'Neill received during the Class Period.

704. CW-2 stated that ***Defendant O'Neill led the NIKE Live team and referred to NIKE Live as O'Neill's "project" and "baby***.*"* CW-2 detailed that O'Neill oversaw NIKE Live's

marketplace. CW-2 noted that O'Neill reported to Defendant Donahoe. CW-2 recalled that she drafted quarterly business unit review reports. CW-2 explained that the quarterly business unit reports detailed how each business unit was performing and provided updates on operations. CW-2 explained that the quarterly business unit review reports she drafted were submitted to senior directors and vice presidents to analyze and edit before they were ***ultimately sent to O'Neill*** to review, though CW-2 stated that she could not guarantee the information she drafted was seen by O'Neill because there were "a lot of layers" between her and O'Neill. As described *supra*, Section IV.B.1.e., and in the preceding paragraphs, NIKE tracked a critical metric gauging how "cool" their products were viewed by the public, and this metric showed NIKE's brand health declining by no later than May 2022. ***CW-2 stated that these "cool" metrics were included in quarterly business unit review reports***.

705. **Financial Reports and Meetings:** NIKE executives received information from the Finance team showing the CDA strategy's failure to drive NIKE's sustainable financial growth.

706. CW-4 recalled that throughout her tenure, she attended in-person monthly finance meetings with leadership as part of the financial closure process. CW-4 explained that during these meetings, the finance team went over financial results and forecasts and received permission from leadership to place investments. CW-4 explained that she and her finance team discussed where the Company was overspending and underspending during these meetings. CW-4 added that current Vice President/CFO, NIKE Greater China Amanda Norwood attended these meetings and that information from these meetings rolled up to the Vice President overseeing NIKE's CDA strategy. CW-4 recalled that throughout her tenure, conversations from these meetings reflected that NIKE was struggling with executing its DTC strategy and that the DTC strategy was not

yielding projected results. CW-4 detailed that during these meetings throughout her tenure, it was discussed that NIKE was not hitting its topline revenue projections.

707. CW-4 stated that she prepared financial reports, which were consolidated with other reports, that were escalated to Digital Direct and NIKE Direct Vice Presidents. According to CW-4, information from these reports was escalated to Defendant Donahoe. CW-4 stated that Donahoe was part of strategic level conversations and that Donahoe was briefed on the Company's overall financial results prior to hosting quarterly investor relation calls.

**B. The CDA Strategy's Success Was Core to NIKE's Business**

708. The Individual Defendants' knowledge of the CDA strategy's failure and the cause of that failure can be inferred because these facts were critical to NIKE's core operations.

709. The importance of the CDA strategy to NIKE's financial success is made clear by the growing importance of DTC sales to NIKE's overall business. Sales made through NIKE's wholesale and DTC channels are NIKE's lifeblood, as revenues from those two channels constituted approximately 95% of NIKE's total revenue throughout the Class Period.

710. Before and during the Class Period, the mix of NIKE's revenue derived from NIKE's DTC channels grew sharply, demonstrating the importance of the CDA strategy. In FY 2017, DTC sales accounted for approximately 28% of NIKE Brand revenue (which was approximately 99% of NIKE's overall revenue). In FY 2020, NIKE Direct accounted for approximately 35% of NIKE Brand revenue. In FY 2024, NIKE Direct accounted for approximately 44% of NIKE Brand revenue. This increase shows that the CDA strategy, the point of which was to increase NIKE Direct as a percentage of NIKE's revenue while driving sustainable growth, was critical to NIKE.

711. NIKE also repeatedly, publicly pointed to the CDA strategy, and its key components, as critical to NIKE's ongoing success.

712. As Defendant Friend articulated at the start of the Class Period on NIKE's March 18, 2021 Earnings Call, "[a]t our core, NIKE is a growth company." And at the core of that growth potential, according to Defendants, was the CDA strategy. For example, the July 22, 2020 press release stated that the ***CDA strategy was the Company's "new digitally empowered phase of NIKE's strategy to unlock long-term growth and profitability***," which represents "the next phase of [NIKE's] growth."

713. Defendants also publicly touted specific aspects of the CDA strategy, including its DTC technology and supply chain buildout, as critical to NIKE's business throughout 2021. For example, during the March 18, 2021 Earnings Call, in response to a Credit Suisse analyst's question concerning NIKE's "reinvestment in demand creation," Defendant Friend stated that NIKE "continue[s] investing against the ***things that matter most to our strategy like our tech [and] end-to-end tech transformation***." During the same call, Defendant Donahoe stated: "***our brand*** is powered by our global scale. ***This is [a] particularly critical advantage as we continue to fuel our digital transformation***." During the September 23, 2021 Earnings Call, Defendant Friend stated that "***[a]s we accelerate our consumer-led digital transformation***, we are developing and refining new capabilities that are transforming our operating model, quickly becoming a competitive advantage for NIKE. ***Central to these capabilities is scaling our digital-first supply chain*** to enable NIKE's digital growth while optimizing service, cost, convenience and sustainability."

714. In 2021 and 2022, Defendants also repeatedly and publicly touted the importance of their mono-brand stores to NIKE's business. For example, during the October 6, 2021 Annual

General Meeting, in response to a shareholder question concerning "NIKE's digital ecosystem" and the "role [of] brick-and-mortar stores," Defendant O'Neill stated: "our ***digitally enabled physical stores will continue to play a critical role*** to better serve and create deep relationships with our consumers." And in a May 16, 2022 *Women's Wear Daily* article entitled "Nike Working to Make 2020s the Decade of Women's Sport," the then-VP and General Manager of NIKE Global Women's, Whitney Malkiel, stated: "[w]e have to own our destiny when it comes to the marketplace, that's why ***the push in Nike Direct is important for the business***, and ***that's where our brick-and-mortar and Nike Live stores become important***."

715. NIKE continued to publicly proclaim the critical importance of the CDA strategy throughout 2022. For example, during the June 27, 2022 Earnings Call, Defendant Friend said, in response to a Guggenheim analyst's question about the health of NIKE's business in China: "as we've learned from experience over the years, ***having a healthy pull marketplace in a monobrand marketplace . . . is critical to brand health and long-term growth***." During the September 29, 2022 Earnings Call, Defendant Donahoe, in response to a Credit Suisse analyst's question concerning growth rates and margin opportunities, similarly stated: "***directly connecting with consumers is critical to serve consumers going forward***."

716. Likewise, Defendants repeatedly made similar public statements about the importance of the CDA strategy, including its various key components like DTC technology and product innovation, to NIKE's success throughout 2023. For example, on July 19, 2023, in the "FY22 NIKE, Inc. Impact Report," with an introductory letter signed by Defendant Donahoe, Defendants shared that NIKE's "***technology organization***" encompasses "teams that are ***critical to our overall Consumer Direct Acceleration offense***, including Enterprise Data and Analytics, and Technical Product Management." And during the June 29, 2023 Earnings Call, Defendant

Donahoe stated: "***The key to the whole thing is having the best innovation in the industry***. That's what brings people to our direct channels, that brings people to our digital channels, and the momentum – Heidi [O'Neill] has had her team together off site earlier this week and ***seeing the design, product creation, Men's, Women's Kids', storytelling*** and brand teams really accelerating the pace of innovation***, accelerating our ability to connect with the consumer is ultimately what's going to fuel not only our top line but also our bottom line.***" Similarly, in a November 14, 2023 press release, Defendant O'Neill stated that *"**[i]nnovation,*** design, and storytelling ***have always been the heart and soul of Nike***. These leadership changes enable us to obsess further our unparalleled innovation, product, design, and storytelling to reimagine sport for the next generation of athletes . . . . Together, these leaders will deliver new levels of performance, style and breakthrough storytelling for consumers around the world."

717. Finally, Defendants continued making similar pronouncements in 2023. For instance, during the March 21, 2024 Earnings Call, Defendant Donahoe assured that "***NIKE Direct will continue to play a critical role***"—thus confirming that NIKE's Direct channels (the core of the CDA strategy) had been and would remain critical to NIKE's long-term financial success.

### C. Defendants Closely Monitored the CDA Strategy, Including the Key Metrics Critical to Its Success

718. The Individual Defendants personally oversaw the CDA strategy, including by closely monitoring NIKE's efforts to sustainably build out its DTC channels, such as the DTC technological capabilities and supply chain, brand strength, competitive edge, and innovative product pipeline.

719. Multiple CW accounts confirm that the Individual Defendants closely tracked the progress of the CDA strategy, including efforts to build out the necessary DTC technological capabilities, supply chain, and other key components of this strategy. For example, CW allegations

show that Defendant O'Neill attended audit meetings where problems with NIKE's supply chain were discussed, and that Defendants Donahoe, Friend, O'Neill, and Parker received the audit reports discussed at these meetings. *See supra,* ¶ 154.

720. Defendants also personally tracked the lack of progress NIKE was making in building out its technological capabilities and organization. Multiple CWs' accounts show that Defendants Donahoe, Friend, O'Neill, and Campion attended numerous regular meetings where the failures of the CDA strategy to establish needed technological capabilities and organization, including the problems created by Lavu's "shadow organization," were discussed. These included ***monthly meetings beginning in May or June 2022***. These also included ad-hoc meetings between CW-3 and Defendant Donahoe ***beginning in January or February 2022***. Additionally, Defendant Donahoe signed NIKE's contract with Adobe in 2021 and had "full visibility" into the Adobe partnership's failures. *See, supra,* ¶¶ 190-91 (monthly meetings), 197 (Adobe).

721. Defendants also closely monitored the adverse financial impact of the CDA strategy failures—*i.e.*, its failure to drive the sustainable, long-term growth that Defendants had touted to investors. For example, CW accounts reveal that in summer 2022, Defendants Donahoe and Friend attended a large sales meeting where they gave a presentation detailing that NIKE was not hitting its revenue goals. Additional CW allegations also explained that Defendant O'Neill received quarterly business unit review reports, which detailed how each business unit was performing and provided updates on operations. And CW accounts further confirmed that adverse information contained in Finance team's reports indicating that the CDA strategy was not yielding the projected financial results was escalated to Defendant Donahoe. *See supra*, ¶¶ 385-88.

722. These CW-based allegations are further bolstered by Defendants' own words, which conveyed to investors that the Individual Defendants were directly and personally involved in supervising the CDA strategy, including its key components.

723. Defendants claimed they were closely monitoring consumer demand metrics. For instance, on the September 22, 2020 Earnings Call, Defendant Donahoe stated that NIKE's "***engagement and membership metrics*** show incredible momentum," in its Digital business, indicating that Defendants were closely monitoring such consumer engagement and membership metrics related to NIKE's Digital channels (*i.e.*, its website and mobile apps). On NIKE's June 27, 2022 Earnings Call, Defendant Friend stated that Defendants were "***closely monitoring consumer behavior***, ***and . . . consumer demand***." Then, on NIKE's September 9, 2022 Annual Meeting of Shareholders, Defendant Friend stated: "***[W]e'll continue to monitor consumer demand*** for our brands and ensure that we have appropriate levels of supply, taking into consideration changing transit trends." Similarly, on the June 29, 2023 Earnings Call, Defendant Friend stated that NIKE was "***closely monitoring*** . . . ***consumer behavior and retail trends***."

724. Defendants also claimed that NIKE's Board of Directors, which included Defendants Donahoe and Parker, was closely overseeing the CDA strategy. For instance, in a "Message From Our Executive Chairman," included in NIKE's July 21, 2022 Definitive Proxy, Defendant Parker underscored that NIKE's "***Board of Directors oversaw significant transformations in support of the Consumer Direct Acceleration strategy***."

725. Defendant Friend repeatedly emphasized Defendants' monitoring of inventory levels—critical insight when running a DTC operation, including the supply chain. For instance, on NIKE's September 22, 2020 Earnings Call, Defendant Friend stated that NIKE had increased its "***inventory visibility***," indicating that NIKE was closely monitoring the supply and demand of

its products. Similarly, on the December 20, 2021 Earnings Call, Defendant Friend told investors NIKE had "established new fulfillment models with key strategic partners ***to create inventory visibility across the marketplace*** and optimize full-price digital demand."

726. Finally, Defendants repeatedly touted Defendant Donahoe's expertise in digital commerce, which was the main reason that he was hired as CEO, to guide the CDA strategy. For example, in the October 22, 2019 Press Release, Defendant Parker noted Defendant Donahoe's "expertise in digital commerce, technology, global strategy and leadership," and made clear that the goal of NIKE under Donahoe would be to "accelerate our digital transformation and to build on the positive impact of our Consumer Direct Offense." Defendant Donahoe's prior corporate roles evidenced his expertise in digital commerce, and therefore made him the perfect candidate to lead NIKE's "accelerat[ion] of [the Company's] digital transformation." Thus, from the outset of Donahoe's arrival at NIKE, Defendants heralded him as the architect of the CDA strategy, therefore creating the impression with investors that he would personally, closely track its progress and impact on NIKE's business.

727. The October 22, 2019 Press Release also makes it clear Defendant Parker would continue to closely monitor NIKE's DTC transition, as it quotes Defendant Parker stating: "I look forward to continuing to lead the Board as Executive Chairman, as well as partnering closely with John and the management team to help him transition to his new role."

728. Likewise, analysts believed that Defendant Donahoe's prior digital commerce expertise positioned him well to lead NIKE's DTC pivot. For instance, in an October 23, 2019 report assigning NIKE Stock an "Outperform" rating, Oppenheimer wrote that Defendant Donahoe "brings to the CEO role . . . a very impressive backdrop in technology and innovation, including time spent leading eBay and ServiceNow and on the board of PayPal," and that "***as a***

***board member of N[I]KE for the past five years, John Donahoe served as an architect and proponent of the [C]ompany's Consumer Direct Offense operating plan***."

729. Indeed, after NIKE launched the CDA strategy, analysts similarly hailed Defendant Donahoe as the CDA strategy's architect and primary leader, based on his prior digital commerce expertise. For example, in a March 23, 2021 interview with *Retail Dive*, an industry publication, Michael Binetti, managing director at CreditSuisse, praised Donahoe's fit to lead NIKE under the new CDA strategy, stating that "[h]e's the right man for the job . . . . And you see him doing it very, very quickly." Later, in reports on December 15, 2021 (rating NIKE Stock "Buy") and November 16, 2023 (rating NIKE Stock "Hold"), Truist Securities again highlighted Defendant Donahoe's "expertise in digital commerce, technology and global strategy" as instrumental to the CDA strategy.

### D. NIKE Engaged in Large Strategic Shifts That Necessitated Defendants' Knowledge of the CDA Strategy's Failure

730. Throughout the Class Period, NIKE engaged in large-scale strategic shifts that would not have been made without the Individual Defendants' knowledge and approval.

731. **Reversion to Multi-Brand Retailers:** During the Class Period, NIKE reverted to selling a larger amount of its products through wholesale partners as opposed to its own DTC channels. CW allegations support that this began as early as ***fall 2021.*** *See, supra*, Section IV.B.1.f. Since a major pillar of the CDA strategy was a shift ***away*** from wholesale partners, NIKE's decision to pivot back to those partners represented a massive shift in Company strategy—one that would have been known to and approved by NIKE's senior executives, including the Individual Defendants.

732. **Lowered Targets for NIKE's DTC Stores:** During the Class Period, according to CW accounts detailed above, NIKE repeatedly lowered internal targets for the number of its brick-

and-mortar DTC stores NIKE planned to open because of supply chain, innovation, and consumer demand problems. NIKE similarly was forced to rebrand its NIKE Live stores, which were a key element of the CDA strategy, because they were not resonating with consumers. *See, supra*, Section IV.B.1.f. Thus, lowering NIKE's store-opening targets and launching a rebranding initiative represented a major strategic shift for the Company that would have been known to and approved by NIKE's senior executives, including the Individual Defendants.

733. **Reversion to Sport-Based Categories:** During the Class Period, unbeknownst to investors, NIKE reverted to organizing its business around sport-focused consumer categories. Indeed, Defendants admitted explicitly in the disclosures of the truth in 2024 that they had effectuated this return to sport-based categories in June 2023, and CW accounts indicate that this shift actually began a year earlier—***in summer 2022***. *See, supra*, Section IV.B.1.c. As discussed above, this undisclosed reversion back to its sport-based categorization half-way through the Class Period indicates that Defendants knew the CDA was failing. Since a major pillar of the CDA strategy was a shift ***away*** from sport-based categorization, NIKE's decision to pivot back to these categories represented a massive strategic shift by the Company—one that would have been known to and approved by NIKE's senior executives, including the Individual Defendants.

## E. Knowledge of the CDA Strategy's Failures Was Widespread Within NIKE

734. Allegations from numerous former employees of NIKE demonstrate that knowledge of the CDA strategy failures was widespread internally throughout the Class Period, indicating the Individual Defendants knew or recklessly disregarded that their statements regarding the CDA strategy's success were false when made.

735. **DTC Supply Chain:** CW-1 noted that many people internally raised NIKE's DTC-related supply chain problems. CW-1 specifically recalled Mary Beth Laughton, Head of NIKE

Global Direct to Consumer, discussing the problem. According to CW-1, management's response was that it was too expensive to create a separate DTC distribution system, and therefore they did not want to do it. CW-1 described that NIKE refused to invest in addressing the root cause of this issue. CW-1 recalled that CW-1 first learned of the supply chain problems in 2022 from her former supervisor Sumi Ghosh. CW-1 explained that Ghosh had informed the entire leadership team about the problem.

736. **Innovation/Product Pipeline:** CW-16 recalled that in 2020, it was clear that personnel cuts driven by the CDA would negatively impact NIKE's product pipeline. CW-16 recalled that after the CDA was instituted, NIKE was no longer focused on innovating its products. CW-16, however, also noted that this impact would not necessarily be felt in the marketplace until 2022 because NIKE could lean on products that were already in the pipeline prior to NIKE's pivot to CDA. She added that by mid-2022, NIKE started to see the negative effects on new products in the pipeline. ***CW-16 stated that "there was no way" senior leadership would not have known by mid-2022 that innovation and pipeline were being negatively affected.*** She recalled her managers seemingly "blew off" the concerns she raised because they became focused on positioning themselves for promotions rather than preserving the NIKE team culture after many of the longtime senior leaders had been terminated.

737. NIKE's strategy of unsustainably flooding the market with its classic product franchise like the Air Jordan sneakers was also widely known within NIKE. CW-1 advised that the over-supply of key products was a "dirty secret" at NIKE. CW-1 explained that everyone saw it, but no one discussed it.

738. **Lavu's "Shadow Organization":** Other CWs described widespread internal knowledge about Chief Digital Information Officer Ratnakar Lavu's "shadow organization"

within NIKE. According to CW-11, ***by the end of 2021, it was clear to everyone at the leadership level*** that Lavu's team was not working well or effectively with the other business units, including the Geos (Geography Managers), product management teams, or others. CW-8 recalled that she raised concerns about Lavu's ability to execute the DTC strategy throughout her tenure to NIKE leadership.

739. Likewise, CW-12 stated that complaints about Lavu were coming from all sides.

740. The problems with Lavu's shadow organization were so widely known that NIKE even brought in a third-party consultant to audit Lavu's team. CW-12 recalled that NIKE brought in consultants to solve problems between Lavu and former Vice President, Digital Product CW-3. And CW-3 explained that her concerns about Lavu's shadow organization were discussed during her meetings with Donahoe, and that these discussions led to the hiring of consulting firm Accenture to audit their product teams. According to CW-3, ***the audit results confirmed that Lavu had created a shadow organization***, that they had "100%" more product people than they needed, and that led to laying off about 200 of those employees. CW-3 expressed her frustration that these issues took a lot of her attention away from running the business and focused instead on managing operating levels and organizational charts.

741. **Adobe Partnership:** The failure of NIKE's Adobe partnership to develop the necessary DTC technological capabilities were also widely known within NIKE. CW-3 confirmed that the ***Adobe contract was signed in 2021***, but it ***became apparent almost immediately that there was a gap between what was promised and Adobe's ability to deliver***. CW-3 noted that there were expectations that were not met: Adobe promised that EMEA would have personalized messaging by Black Friday, but that did not happen, and Adobe kept shifting the timeline and focus, such as shifting its focus to North America, because that was an easier geography to address,

but that shift still did not yield results. CW-3 added that the Geo GMs lost faith in the project right away.

742. CW-12 explained that NIKE employees were frustrated when NIKE partnered with Adobe because there were already internal efforts to accomplish the work that Adobe was then hired to do.

743. **Additional Widespread Knowledge of CDA's Failures, Including DTC Technology Problems, by May 2021:** CW-15 recalled hearing from colleagues that NIKE's DTC strategy was failing immediately upon joining NIKE in May 2021. CW-15 recalled that she and her team met regularly with technology leadership during her tenure. CW-15 stated that during these meetings with technology leadership, she and her team raised concerns about unplanned DTC work impeding the technology organization from completing other critical tasks. CW-15 detailed that she and her team specifically explained to technology leadership that NIKE did not take into consideration the technological impacts that the DTC strategy would have on the Company.

744. According to CW-15, concerns about the DTC strategy were repeatedly raised to management. CW-15 elaborated that these concerns about the DTC strategy were repeatedly raised to management throughout her tenure, and that these concerns already existed when she joined NIKE in May 2021, and the negative consequences of the DTC strategy were already apparent at that time.

745. **All-Hands Video Calls Beginning in February 2022**: As detailed *supra,* ¶¶ 378-81, 688-92, beginning no later than February 2022, Defendant Donahoe faced widespread employee pushback regarding the CDA strategy on virtual all-hands calls that he led in employee chats that were monitored by HR. CW-16 recalled that ***in February 2022 she first noticed***

***pushback in the chat function of these video calls***. CW-16 recalled that this led the ***chat function being disabled***, but when it was reactivated, the pushback from NIKE employees increased a lot. She recalled employees, in the chats while Donahoe was speaking, disagreeing with his narrative that in order for DTC sales to pick up that employees needed to be back working at the office instead of remotely, with employees stating that the problem with sales was not working remotely but rather with the transition to fashion and fashion footwear, NIKE not relating to their market any longer, the pivot away from brick-and-mortar sales, and the change in workflow and culture under Donahoe. CW-16 further recalled that the pushback from employees was even stronger on the final all-hands call she attended in 2024, including ***responses that "CDA was ineffective."*** As further detailed above, this CW account was corroborated by reputable media outlets like *The Wall Street Journal's* "The Journal" podcast, which quoted Defendant Donahoe as acknowledging such internal employee pushback on these all-hands chat forums.

746. **September/October 2023 VP Summit**: Another CW's account confirms that Defendants were also directly confronted by similar pushback against the CDA strategy by senior executives, who called out the CDA's failure at internal meetings attended by the Individual Defendants. CW-1 recounted that Craig Williams, President, Geographies & Marketplace, stood up during a VP Summit in around September/October 2023 and said, "***CDA was a failure. We have to acknowledge that.***" CW-1 also said that Williams told her personally during a breakout session during the summit, "let me be crystal clear. ***CDA was a disaster and is not working and we know we have to fix it.*** It's our problem to fix it." CW-1 added that Williams' comments were "refreshing," because everyone at NIKE knew that CDA was "an absolute disaster." In this breakout session, according to CW-1, Williams said that the Company had known for a while that the CDA strategy was not working and that they needed to switch their strategy. CW-1 stated that

Donahoe, Friend, O'Neill, and Williams orchestrated the summit. CW-1 added that Defendants Donahoe, Friend, and O'Neill spoke at the summit.

747. **Additional Allegations of Widespread Knowledge:** Moreover, other CWs similarly confirmed that internally employees widely acknowledged that the CDA strategy was failing throughout the Class Period. For example, CW-17 stated that NIKE's DTC strategy was "the worst thing they ever did" and referred to it as a "disaster." ***CW-17 noted that it was "well known" within NIKE that the DTC strategy was not going well.*** CW-10 stated that one reason why NIKE's DTC strategy failed was because there were "always issues" with the NIKE app, which frustrated consumers. CW-10 recalled that NIKE's executives frequently met to discuss how to fix these problems and improve the app. This account is supported by additional CW allegations—including CW-3's account, detailed above, that described numerous regular meetings with Defendants Donahoe, Friend, and O'Neill, as well as other senior executives like the Technology group head Lavu, wherein they discussed the problems with NIKE's DTC technology and technology organization. CW-12 advised that Donahoe, Lavu, and CW-3 regularly met during her tenure to discuss NIKE's technology, and CW-12 appreciated hearing about this collaboration. CW-12 clarified that Donahoe, Lavu, and CW-3 met to surf Nike.com and the NIKE app and discuss these platforms.

### F. Defendants' Own Misstatements Support Scienter

748. Throughout the Class Period, Defendants repeatedly claimed that the CDA strategy was succeeding both overall and in its key components (such as the DTC supply chain and technology buildout). In particular, Defendants repeatedly assured investors throughout the Class Period that that the CDA strategy was working, including in direct response to analysts' or reporters' questions.

749. **<u>CDA's Overall Success</u>:** During the Class Period, Defendants repeatedly falsely attributed NIKE's favorable financial results to the success of the CDA strategy. For example, in the September 23, 2021 Press Release, Defendant Friend stated: "***Our Q1 results illustrate how NIKE's Consumer Direct Acceleration strategy continues to fuel growth and transform our long-term financial model***." Similarly, on the March 21, 2022 Earnings Call in response to a UBS analyst's question concerning the "contours" of Fiscal Year 2023, Defendant Friend falsely reassured investors that the CDA strategy was working: "We're looking at fiscal '23 and believe the foundation is set for another year of strong growth. And that's because ***our Consumer Direct Acceleration strategy is working***." Defendants made numerous similar misstatements touting that the CDA strategy was "working" throughout the Class Period, as discussed above.

750. **<u>DTC Supply Chain:</u>** During the Class Period, Defendants also falsely claimed that NIKE had developed an effective DTC supply chain. For instance, on the March 18, 2021 Earnings Call, Defendant Donahoe falsely asserted, in response to an Evercore ISI Analyst's question about NIKE's CDA strategy, NIKE had "***fairly impressively pivot[ed] to a more direct-to-consumer supply chain.***" And, during the September 23, 2021 Earnings Call, Defendant Friend stated, in response to a Guggenheim analyst's question regarding NIKE's supply chain capabilities "***where we were investing was against technology, creating a digital-first supply chain in the marketplace.***"

751. **<u>Technological Capabilities and Organization</u>:** During the Class Period, Defendants also misled investors about NIKE's progress in developing the DTC technological capabilities and organization needed for the CDA strategy to succeed. For instance, at NIKE's October 6, 2021 Annual General Meeting, Defendant Friend, in response to a shareholder question, misrepresented that "***[t]he investments we've made against our end-to-end digital transformation***

***are making us more agile, and we're building the capabilities that are required for NIKE to operate a digitally led omni-channel, direct-to-consumer business at scale.*** " Further, during the June 29, 2023 Earnings Call, Defendant Friend falsely touted NIKE's partnership with Adobe: ***"[W]e have partnered with Adobe to enable one-to-one member personalization, driving gains in member retention, click-through rates and conversion, resulting in higher demand per member and returns on digital ad spend."***

752. **Streamlined Corporate Reorganization:** During the Class Period, Defendants additionally falsely touted the success of NIKE's corporate reorganization under the CDA strategy. For example, at the October 6, 2021 Annual General Meeting, in response to a shareholder question about the CDA strategy, Defendant O'Neill assured that "***[w]ith the CDA, we successfully realigned our organization to further invest against our highest growth areas.***" In NIKE's Form 10-Q filed on January 5, 2023, Defendants falsely claimed to have successfully "***aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's and Kids'***."

753. **Innovative Product Pipeline:** During the Class Period, Defendants further falsely touted NIKE's purportedly innovative product pipeline. For instance, on the June 24, 2021 Earnings Call, Defendant Donahoe falsely touted NIKE's strong product innovation pipeline, saying "***our relentless pipeline of innovative product continues to create separation between us and our competition***." Likewise, at the October 6, 2021 Annual General Meeting, in response to a shareholder question about NIKE's innovation pipeline, Defendant Parker falsely affirmed: "***The pace of innovation has not slowed down at all.***" And, at the September 9, 2022 Annual General Meeting, in response to a shareholder concerning innovation, Defendant Donahoe misrepresented that "***innovation continues to be our greatest competitive advantage***."

754. **<u>Brand Strength and Competitive Standing</u>:** During the Class Period, Defendants also misrepresented that NIKE had maintained or improved its brand strength and competitive standing. For instance, during the September 23, 2021 Earnings Call, Defendant Donahoe falsely affirmed that "***we're in a stronger position relative to our competition than we were prior to the pandemic***." On the September 29, 2022 Earnings Call, in response to a J.P. Morgan analyst's question regarding demand for NIKE products in North America, Defendant Donahoe assured investors of continued "***strong consumer demand***," specifically denying seeing any "***softness***."

755. **<u>Successful Channel Mix Between Wholesale and DTC</u>:** During the Class Period, Defendants also misrepresented that NIKE had effectively driven business to its DTC channels while meeting consumer demand without depending on its wholesale partners. For instance, at the September 12, 2023 Annual General Meeting, in response to a shareholder question read by Defendant Parker about NIKE's CDA marketplace strategy (*i.e.*, NIKE's mix between wholesale and DTC channels), Defendant Donahoe misleadingly claimed that NIKE had not altered its wholesale and DTC strategies, stating "***[o]ur marketplace strategy remains the same.***"

756. Accordingly, Defendants' ***repeated***, specific assurances to investors–particularly in response to analyst questions, regarding the continued success of the CDA strategy, including its various key components–support scienter.

### G. The Suspicious Departures of Defendants Donahoe and Campion and Global Chief Digital Information Officer Lavu Support Scienter

757. The suspicious departures of Defendants Donahoe and Campion, along with former NIKE Global Chief Digital Information Officer Lavu, senior executives responsible for the CDA strategy or its key components (like the DTC supply chain and technological capabilities), at key points in the Class Period support an inference of scienter.

758. **<u>Global Chief Digital Information Officer Lavu</u>:** On February 20, 2023, *Business Insider* reported that Lavu had "resigned, effective immediately, according to an email sent to [NIKE] employees." *Business Insider* had obtained that internal email, which "did not give a reason for Lavu's departure." Similarly, NIKE gave *Business Insider* a one-sentence statement regarding this departure, stating only that "[w]e confirm that Ratnakar Lavu is no longer at Nike."

759. Lavu was responsible for overseeing the DTC technological capabilities and organization NIKE needed for establish for the CDA strategy to succeed. Indeed, in the June 6, 2019 Press Release announcing Lavu's hiring, NIKE touted that Lavu's "20-year track record in building seamless consumer experiences and leading teams through dynamic, digital transformations will further accelerate our growth." Thus, Lavu, as NIKE's first Global Chief Digital Information Officer was to play a critical role in building out NIKE's DTC technological capabilities and thus ensuring the success of the CDA strategy. Lavu failed spectacularly.

760. As described *supra*, Section IV.B.1.b., under Lavu's watch, NIKE failed to effectively build out its DTC technological capabilities and the technology organization necessary to support those capabilities. Indeed, as described by numerous CWs and in a publicly filed lawsuit, Lavu created a "shadow organization," engaged in corruption and employee retribution, and was purportedly under investigation by the SEC for related misconduct, which all led to his suspicious departure. These problems were well known to the Individual Defendants and other NIKE senior executives: NIKE brought in Accenture to audit Lavu's technology group, which confirmed the CWs' accounts of the many problems in that group; Defendants received an email from one CW in December 2021 detailing such concerns with Lavu; and Defendants had numerous meetings beginning no later than 2022 to discuss the problems with Lavu's group and NIKE's DTC technology failures. Soon afterwards, in early 2023, Lavu suddenly "resigned" from NIKE.

761. **Defendant Campion**: On January 5, 2024, just ***over two weeks*** after the first disclosure of Defendants' fraud on December 21, 2023, NIKE abruptly announced that Defendant Campion would exit NIKE effective April 5, 2024. From February 2020 until June 2023, Defendant Campion served as the Company's COO. In that role, according to NIKE's February 18, 2020 Press Release announcing his appointment, Campion led NIKE's "***global technology and digital transformation***, sourcing and manufacturing, ***demand and supply management***, distribution and logistics, procurement, sustainability and workplace design and connectivity." Subsequently, Campion served as the Company's Managing Director, Strategic Business Ventures. In that role, according to the Company's May 24, 2023 Press Release announcing his appointment, Campion "[worked] closely with [Defendant] Donahoe to identify and pursue new business opportunities to drive disproportionate growth for the company." Therefore, from the start of the Class Period until his departure, Defendant Campion closely oversaw the major initiatives, including technological, supply chain, and DTC expansion, that were essential components of the CDA strategy.

762. **Defendant Donahoe**: On September 19, 2024, after three consecutive quarters of disappointing financial results and related disclosures about the failures of the CDA strategy, and only ***two weeks*** before the final disclosure of the truth on October 1, 2024, wherein Defendants, *inter alia*, withdrew NIKE's financial guidance for the year, NIKE's Board of Directors announced the abrupt departure of Defendant Donahoe—who was widely regarded as the architect of NIKE's DTC shift as part of the CDA strategy. Specifically, NIKE disclosed that that NIKE veteran Elliott Hill would replace Donahoe as President and CEO of NIKE effective October 13, 2024. In the announcement, Defendant Parker explained: "Given our needs for the future, the past performance of the business, and after conducting a thoughtful succession process, the Board concluded it was

clear Elliott's global expertise, leadership style, and deep understanding of our industry and partners, paired with his passion for sport, our brands, products, consumers, athletes, and employees, make him the right person to lead NIKE's next stage of growth."

763. Indeed, Defendant Donahoe's suspiciously-timed departure and Hill's appointment were tacit admissions of Defendants' knowledge that the CDA strategy had failed, and that Donahoe was to be held accountable, as Hill planned to reverse course on key failings of the CDA strategy. For example, in NIKE's September 19, 2024 Press Release announcing Donahoe's departure, NIKE highlighted Hill's goals included "delivering bold, ***innovative products***" and "***reconnect[ing]" with "trusted partners***"—*i.e.*, the wholesale partners that NIKE had abandoned as part of its DTC shift under the CDA strategy. Similarly, a September 20, 2024 article on *Inc.com* quoted Thomas Hayes, equity manager at Great Hill Capital that: "Hill is going to work on repairing some of Nike's relationships with wholesale customers since Nike has dropped some customers over the years and pulled back some product that has created some ill will (among retailers)."

764. Moreover, as discussed *supra*, extensive news coverage at the end of the Class Period, by respected media outlets like *The Wall Street Journal*, confirms that Defendant Donahoe's departure from NIKE was the direct result of the CDA strategy failures.

**H. End of Class Period/Post-Class Period Admissions Support Scienter**

765. Near the end and after the Class Period, the Individual Defendants made critical admissions that also support an inference of scienter.

766. **Streamlined Organizational Structure:** At the end of the Class Period, Defendants also repeatedly acknowledged the failure of NIKE's prior CDA-based organizational shift to gender and age-based consumer constructs, instead of sport. For example, during NIKE's

March 21, 2024 Earnings Call, Defendant Donahoe admitted NIKE was "making, ***and started nine months ago, important adjustments in our offense. And that started with putting the consumer and sport squarely back into our offense.*** And so that allows a sharpness across men's-women's-kids and Jordan around sport." This admission revealed that NIKE had begun addressing the failure of its reorganization by no later than summer of 2023 (though CW accounts indicate that it was even earlier, in the summer of 2022). On NIKE's December 19, 2024 earnings call, Hill admitted the failure of NIKE's pivot away from a consumer construct based on sports-categories, stating that NIKE was reversing course: "We lost our obsession with sport. ***Moving forward, we will lead with sport***."

767. **<u>Robust Innovation and Product Pipeline</u>:** Defendants also made a series of admissions in late 2023 and throughout 2024 gradually revealing the depth of NIKE's severe innovation problems. For example, on NIKE's December 21, 2023 earnings call, Defendant Donahoe acknowledged that NIKE's pace of innovation had slowed—contrary to prior misstatements specifically denying any such slowdown—admitting that "we know we must be faster, increasing the pace of innovation." On NIKE's March 21, 2024 earnings call, Defendant Donahoe emphasized, while referencing the CDA strategy, that "***it's been clear that we need to make some important adjustments," including that "we must drive a continuous flow of new product innovation***."

768. **<u>Brand Strength and Competitive Separation</u>:** At the end of the Class Period, Defendants also made a series of admissions regarding their knowledge that NIKE's brand equity and competitive separation had declined during the Class Period. For example, on NIKE's March 21, 2024 Earnings Call, Defendant Donahoe acknowledged that, "[w]hile our Consumer Direct Acceleration strategy has driven growth and direct connections with consumers, it's been clear

that ***we need to make some important adjustments***," including that "***our brand marketing must become bolder and more distinctive***." On the October 1, 2024 Earnings Call, according to Defendant Friend, NIKE "***acknowledged that we've lost market share in the running specialty channel. More than four years ago, we pulled back on our engagement with that channel. And as a result of that, we saw market share losses***."

769. **Successful Channel Mix Between Wholesale and DTC:** Toward the end of the Class Period, Defendants further admitted that NIKE did not effectively respond to consumer demand for multi-brand shopping. For example, on the March 21, 2024 Earnings Call, Defendant Friend admitted that Defendants had knowingly disregarded consumer demand for multi-brand shopping so that Defendants could hit performance metrics: "***we've been more focused on trying to achieve mix of marketplace targets than we have serving consumer demand where the consumer is shopping***." On NIKE's June 27, 2024 Earnings Call, Defendant Donahoe stated that the Company had "spent a lot of time leaning in with our wholesale partners." He also stated that NIKE was "embracing a more balanced approach to growing the whole marketplace."

770. **DTC Supply Chain:** The Company's post-Class Period restructuring to improve the efficiency of its supply chain supports that NIKE failed to develop an effective DTC supply chain during the Class Period, as NIKE was then taking measures to remediate these problems. Specifically, on October 30, 2024, NIKE announced that the Company's ***Chief Supply Chain Officer***, Venkatesh Alagirisamy, would now report directly to new CEO Hill (who had taken over as CEO two weeks before) and that Alagirisamy will become a member of NIKE's Senior Leadership Team. On NIKE's December 19, 2024 earnings call, in response to an analyst's question about whether there were plans to make "***the organizational structure around supply chain and distribution . . . more efficient***," Hill discussed this shift in senior leadership.

Specifically, Hill responded that NIKE's Chief Supply Chain Officer "looks [at] everything from factory, transportation all the way through to logistics, to the consumer," and the decision to establish a direct reporting line between himself and the Chief Supply Chain Officer was "one of the first leadership moves I made."

### I. NIKE's Use of Its Stock Price as a Key Metric in Executive Compensation Supports Defendants' Motive and Thus Contributes to a Strong Inference of Scienter

771. The compensation of the Individual Defendants was closely tied to the performance of the price of NIKE Stock during the Class Period. This was an unusual executive compensation feature that motivated the Individual Defendants to artificially inflate (and/or maintain at artificial levels) NIKE's stock price during the Class Period—including by falsely touting the continued success of the CDA strategy and its various key components, and by concealing adverse information about the numerous, severe problems.[42]

772. Prior to FY 2020, executives at NIKE received awards under NIKE's Long-Term Incentive Plan ("LTIP") based on the Company meeting metrics such as revenue goals, and diluted earnings per share. But in June 2020—the precise month Defendants announced the CDA strategy—NIKE's Board of Directors modified the performance metrics it used to calculate LTIP awards it granted to certain executives, including Defendants Donahoe, Parker, Friend, and

[42] *See, e.g.*, Dan Cable and Freek Vermeulen, *Stop Paying Executives for Performance*, HARV. BUS. REV. (Feb. 23, 2016), https://hbr.org/2016/02/stop-paying-executives-for-performance. ("Contingent pay leads to cooking the books. When a large proportion of a person's pay is based on variable financial incentives, those people are more likely to cheat. In academic terms, we would put it this way: extrinsic motivation causes people to distort the truth regarding goal attainment. When people are largely motivated by the financial rewards for hitting results, it becomes attractive to game the metrics and make it seem as though a payout is due. For example, different studies have shown that paying CEOs based on stock options significantly increases the likelihood of earnings manipulations, shareholder lawsuits, and product safety problems. When people's remuneration depends strongly on a financial measure, they are going to maximize their performance on that measure; no matter how.").

Campion. Specifically, at that time, NIKE adopted a plan modifying the performance metrics for these awards so that they would be earned based on the performance of the Company's stock price ("Absolute TSR") relative to total shareholder return over the same period for the other companies in the S&P 500 index ("Relative TSR"). This relative stock price metric was used to calculate executive compensation over the rolling three-year periods: 2020-2022, 2021-2023, and 2022-2024.

773. Beginning in fiscal year 2022, NIKE replaced cash-based LTIP awards with performance-based restricted stock units ("PSUs"). Like the LTIP awards, executives received greater compensation depending on the performance of NIKE's share price.

774. Thus, beginning in June 2020, Defendants Donahoe, Parker, Friend, and Campion were incentivized to increase or maintain NIKE's stock price to earn more compensation based on NIKE's LTIP and PSU programs. With these unique compensation programs as motivation, these Defendants made numerous false and misleading statements outlined above, thereby artificially inflating or maintaining NIKE's Stock price at artificial levels.

### J. NIKE's Use of Adjusted Digital Revenue as an Executive Compensation Metric Supports Defendants' Motive and Thus Contributes to a Strong Inference of Scienter

775. The compensation of Defendants Donahoe and Friend was, in part, tied to a metric called Adjusted Digital Revenue. This fact bolsters scienter for at least two reasons.

776. ***First***, because Adjusted Digital Revenue was a compensation metric, Defendants Donahoe and Friend were motivated to closely track NIKE's revenue generated through sales on NIKE digital platforms and the operations underlying those sales.

777. ***Second***, Defendants Donahoe and Friend were motivated to increase business in NIKE's DTC channels, even if that growth were unsustainable long-term, because of the

significant compensation that was closely tied to that DTC growth. According to the Company's proxy statements filed with the SEC on July 21, 2022 and July 20, 2023, annual cash incentive awards for executives were tied to the Company hitting target "Adjusted Digital Revenue," meaning Company revenue generated through sales on NIKE digital platforms.

778. In June 2021, the Company began using Adjusted Digital Revenue as a separate metric for the first time in determining executive bonuses for FY 2022. In FY 2022 and FY 2023, the Company set a target for Adjusted Digital Revenue. Executive compensation was based in part on the Company's success relative to that target.

779. Due to the alleged fraud detailed herein, Defendants had intentionally and unsustainably grown NIKE's revenue generated through its digital channels by flooding the market with NIKE's classic franchise products, which NIKE primarily aimed to sell through its Direct channels. As shown in the Company's July 20, 2023 proxy statement, this led to the Company exceeding the Adjusted Digital Revenue goal for FY 2023, leading to an "earnout" of 137% for executives. If Defendants had not unsustainably grown NIKE's Digital revenue, they likely would not have received this earnout.

780. Conveniently for Defendants Donahoe and Friend, according to the NIKE's July 25, 2024 proxy statement, the Company eliminated Adjusted Digital Revenue as a metric used in the annual cash incentive program for its fiscal year beginning in June 2023 (FY 2024). Thus, the Class Period is the only time in which Adjusted Digital Revenue was used to calculate executive bonuses, further supporting its highly unusual nature. Consequently, Defendants Donahoe and Friend were motivated to unsustainably push sales through NIKE's digital channels during the Class Period, they materially benefited by doing so, and when the failures of NIKE's CDA strategy

started hitting NIKE's bottom line towards the end of the Class Period, a new compensation plan was engineered to protect Defendants Donahoe and Friend from any downside.

### K. Defendants Donahoe, Friend, and Parker Enriched Themselves Through Suspicious Insider Sales During the Class Period

781. Knowing all along that the CDA strategy was failing, Defendants Donahoe, Friend, and Parker enriched themselves at the expense of NIKE investors. As explained above, while Defendants repeatedly touted the CDA strategy's success to investors, they concealed adverse information concerning the strategy's failures. Indeed, at the same time as Defendants were publicly touting the CDA strategy's success, Defendants Donahoe, Friend, and Parker engaged in a series of NIKE Stock sales during the Class Period—reaping millions in proceeds.[43] Armed with the knowledge that the CDA strategy was not delivering sustainable growth for NIKE, these three Defendants sold a total of 1,945,223 shares of NIKE Stock, generating proceeds of over ***$245 million***.

782. **Defendant Donahoe's Suspicious Sales:** During the Class Period, Defendant Donahoe sold 105,540 shares of NIKE Stock during for ***$13,493,712***, which contrasts with his Control Period sales of 31,648 shares for $4,526,930. Thus, Defendant Donahoe sold ***more than twice*** as many shares for ***more than three times*** the proceeds than he did in the Control Period.[44] These sales represented a disposition of over 23% of Defendant Donahoe's beneficial ownership of NIKE Stock at the start of the Class Period. As detailed above, throughout the Class Period, Defendant Donahoe knew of multiple key failures in the CDA strategy, including, notably, NIKE's

---

[43] Lead Plaintiffs analyzed the trading by the Individual Defendants during the Class Period and during the equal-length period of September 1, 2017 – March 18, 2021 (the "Control Period").

[44] These transactions were coded with an "F" designation on Defendants' SEC Form 4s. Such "Code F" transactions are defined by the SEC as the "[p]ayment of exercise price or tax liability by delivering or withholding securities incident to the receipt, exercise or vesting of a security issued in accordance with Rule 16b-3."

failure to build out effective DTC technological capabilities, as was reported to him in multiple meetings by no later than early 2022, as described by multiple CWs.

783. **<u>Defendant Friend's Suspicious Sales</u>:** During the Class Period, Defendant Friend sold 105,280 shares of NIKE Stock on the open market for ***$14,378,604*** in proceeds, which contrasts with his open market Control Period sales of 75,700 shares for $9,061,290. Thus, Defendant Friend sold nearly 40% more shares during the Class Period, yielding proceeds that exceed those sales made during the Control Period by nearly 60%. These Class Period open market sales represented a disposition of almost ***56%*** of Defendant Friend's beneficial ownership of NIKE Stock at the start of the Class Period.

784. In additional to these open market sales, Defendant Friend also disposed of 47,392 shares of his NIKE Stock through Code F transactions, worth ***$5,437,895***. These Code F sales represented an ***additional*** disposition of almost 25% of Defendant Friend's beneficial ownership of NIKE Stock at the start of the Class Period. In total, Defendant Friend sold 152,672 shares during the Class Period, reaping ***$19,816,499*** in proceeds, a disposition of approximately ***81%*** of Defendant Friend's beneficial ownership NIKE Stock at the start of the Class Period.

785. Notably, on August 3, 2021, Defendant Friend engaged in an outsized open market sale of 43,000 shares of NIKE Stock, resulting in over $7 million in proceeds. Defendant Friend executed this major sale during the Class Period, after he had made false and misleading statements as part of Defendants' fraud, including in an April 26, 2021 speech where Defendant Friend misleadingly touted NIKE's pipeline of innovative products and DTC technology. Further, as detailed above, by the time of his August 3, 2021 sale, Defendant Friend was already aware of significant problems in the CDA strategy, including, for example that there were severe issues with NIKE's DTC supply chain capabilities. Critically, in making this sale, Defendant Friend

exercised vested options for NIKE Stock that did not expire until July 2025. Therefore, there was no obvious time pressure forcing Defendant Friend to make these sales—except for his own knowledge that the CDA strategy was a ticking timebomb.

786. **Defendant Parker's Suspicious Sales:** During the Class Period, Defendant Parker sold 1,661,428 shares of NIKE Stock on the open market for ***$208,679,987*** in proceeds. These open market sales represented a disposition of almost ***42%*** of Defendant Parker's beneficial ownership of NIKE Stock at the start of the Class Period. In additional to these sales, Defendant Parker also disposed of 25,583 shares of his NIKE Stock through Code F transactions, worth ***$3,893,946***. These Code F sales represented an additional disposition of almost 0.66% of Defendant Parker's beneficial ownership NIKE Stock at the start of the Class Period. In total, during the Class Period, Defendant Parker sold 1,687,011 shares, reaping ***$212,573,933*** in proceeds, a disposition of approximately ***43%*** of Defendant Parker's beneficial ownership NIKE Stock at the start of the Class Period.

787. Notably, Defendant Parker engaged in several especially large and suspiciously timed open market sales during the Class Period. Less than four months into the Class Period, after Defendants made multiple misstatements that artificially inflated or maintained the price of NIKE Stock, Defendant Parker sold 140,000 shares on July 8, 2021, resulting in approximately $22 million in proceeds. ***This sale was not made pursuant to any 10b5-1 trading plan and was Parker's largest one-day sale of NIKE Stock since 2015***.[45] In addition to a large open market sale on July 8, 2021, the very same day Defendant Parker adopted a 10b5-1 trading plan enabling him to sell even more shares within a matter of months. After adopting this plan, Defendant Parker

[45] The Form 144 reporting the sale did not contain the representations required if the sale was pursuant to a 10b5-1 plan.

misleadingly touted NIKE's pipeline of innovative products at NIKE's Annual General Meeting on October 6, 2021. Then, in a matter of weeks, on November 2 and 3, 2021, Defendant Parker made sales pursuant to the 10b5-1 trading plan adopted on July 8, 2021. In these November 2-3, 2021 trades, Defendant Parker sold 160,000 shares for total proceeds of ***$27,034,362***—which constitute ***Defendants Parker's largest two-day sale since 2015***. Further, as detailed above, by the time of his each of these sales in July and November 2021, Defendant Parker was already aware of significant problems in the CDA strategy, including, for example, that there were severe issues with NIKE's DTC supply chain capabilities.

**L. NIKE Possessed Corporate Scienter**

788. NIKE knowingly and/or with deliberate recklessness made, controlled, or had ultimate authority over the materially false and/or misleading statements and omissions alleged herein based on the fact that Individual Defendants knew and/or were deliberately reckless in not knowing or disregarding that the Company's statements set forth in Section V were materially false and/or misleading, and/or omitted material facts at the times that such statements were made. Each of the Individual Defendants was among the most senior employees of the Company throughout the Class Period, was acting within the scope of their authority, and was a member of the Company's senior management. Their scienter may therefore be imputed to the Company. Further, the scienter of other NIKE senior-level executives, including, but not limited to, Ratnakar Lavu (former Global Chief Digital Officer), Craig Williams (President, Geographies & Marketplace), Mary Beth Laughton (former Head of NIKE Global Direct to Consumer), DJ van Hameren (former Chief Marketing Officer), Adam Roth (Vice President, Marketing for North America), and Sumi Ghosh (former Global VP of Stores), who knew or recklessly disregarded various material problems in the CDA strategy as detailed by numerous CWs and other sources,

may be imputed to NIKE under agency principles. Finally, the scienter of any other employees, who ordered or approved the misstatements or their making or issuance, or who furnished information or language for inclusion therein, or the like, may be imputed to the Company.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

789. To the extent that Lead Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the NIKE Stock;

(e) Lead Plaintiffs and other members of the Class purchased NIKE Common Stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f) NIKE Stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g) as a regulated issuer, NIKE filed periodic public reports with the SEC and the NYSE;

(h) NIKE regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national

circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i) NIKE was followed by numerous securities analysts employed by major brokerage firms, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

790. As a result of the foregoing, the market for NIKE Stock promptly digested current information regarding NIKE from publicly available sources and reflected such information in the price of NIKE Stock. Under these circumstances, all persons and entities who or which purchased or otherwise acquired NIKE Stock during the Class Period suffered similar injuries through their purchase of NIKE Stock at artificially inflated prices and thus, the presumption of reliance applies.

791. The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of NIKE Stock.

792. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiffs and other members of the Class purchased shares NIKE Stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were fully disclosed.

793. To the extent that Defendants concealed or improperly failed to disclose material facts with respect to NIKE's business, Lead Plaintiffs are entitled to a presumption of reliance in accordance *with Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## IX. NO SAFE HARBOR

794. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements alleged in this amended

complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

795. In addition, to the extent certain of the statements alleged to be false and misleading may be characterized by Defendants as forward-looking, those statements were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward-looking statements.

796. Further, to the extent certain of the statements alleged to be false and misleading may be characterized by Defendants as forward-looking, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer who knew that the statement was false when made.

## X. CLASS ACTION ALLEGATIONS

797. Lead Plaintiffs bring this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons and entities that purchased or otherwise acquired publicly traded NIKE Class B Common Stock (NYSE: "NKE") ("NIKE Stock") during the period from March 19, 2021 through October 1, 2024, inclusive, the ("Class Period"), and were damaged thereby, except as excluded below (the "Class").

798. Excluded from the Class are: (a) Defendants; (b) members of the immediate families of any Individual Defendant; (c) the subsidiaries and affiliates of NIKE; (d) any person who was an officer, director or controlling person of NIKE during the Class Period; (e) any entity in which any Defendant has a controlling interest or beneficial interest; and (f) the legal

representatives, heirs, successors or assigns of any such excluded person or entity, in their capacities as such.

799. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the proposed Class. Indeed, as of December 27, 2024, NIKE had 1.18 billion outstanding shares of NIKE Stock.

800. Members of the Class may be identified from records maintained by NIKE or its transfer agent and may be notified of the pendency of this Action by mail, using a form of notice customarily used in securities class actions.

801. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

(a) whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

(b) whether the statements made by Defendants were materially false or misleading, or omitted material facts;

(c) whether Defendants acted knowingly or with deliberate recklessness in making false or misleading statements, omitting material facts, or engaging in deceptive conduct;

(d) whether Defendants engaged in a scheme to defraud investors or otherwise engaged in actionable deceitful conduct;

(e) whether the prices of NIKE Stock during the Class Period were artificially inflated and/or artificially maintained because of Defendants' conduct complained of herein;

(f) whether the Individual Defendants were controlling persons of NIKE; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

802. Lead Plaintiffs' claims are typical of the claims of other members of the Class and sustained damages arising out of Defendants' wrongful conduct in violation of the Exchange Act as alleged in this amended complaint.

803. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

804. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impractical for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

805. Lead Plaintiffs will rely, at least in part, on the presumption of reliance established by the fraud on the market doctrine. All purchasers of NIKE Stock during the Class Period suffered similar injuries, including injury through their purchase of NIKE Stock at artificially inflated prices and/or artificially maintained prices. A presumption of reliance therefore applies.

## COUNT I
## For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) Promulgated Thereunder Against All Defendants

806. Lead Plaintiffs reallege, incorporate, and repeat each allegation above as if fully set forth herein.

807. This Count is brought under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5(b) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5(b), against Defendants NIKE, Donahoe, Friend, O'Neill, Campion, and Parker.

808. Defendants made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading in violation of § 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

809. Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of or attributable to NIKE were materially false and misleading and would be issued or disseminated to the investing public.

810. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for NIKE Stock, Lead Plaintiffs and other members of the Class purchased NIKE Stock at artificially inflated prices during the Class Period. But for Defendants' fraud, Lead Plaintiffs and members of the Class would not have purchased NIKE Stock at such artificially inflated prices.

811. As set forth herein, when adverse, previously undisclosed facts concerning the Defendants were disclosed and/or when previously concealed risks materialized, the price of NIKE Stock declined precipitously, and Lead Plaintiffs and members of the Class were harmed and damaged as a direct and proximate result of their purchase of shares of NIKE Stock at artificially inflated prices and the subsequent decline in the price of NIKE Stock.

812. By virtue of the foregoing, Defendants are liable to Lead Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder.

## COUNT II
## For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants as Control Persons of NIKE

813. Lead Plaintiffs reallege, incorporate, and repeat each allegation above as if fully set forth herein.

814. This Count is brought under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Defendants Donahoe, Friend, Parker, O'Neill, and Campion.

815. Defendants Donahoe, Friend, Parker, O'Neill, and Campion, by reason of their status as senior executive officers and/or directors of NIKE, directly, or indirectly controlled the conduct of NIKE's business and its representations to the public, within the meaning of § 20(a) of the Exchange Act.

816. Defendants Donahoe, Friend, Parker, O'Neill, and Campion knew or recklessly disregarded the fact that NIKE's representations were materially false and misleading and/or omitted material facts when made. In doing so, Defendants Donahoe, Friend, Parker, O'Neill, and Campion did not act in good faith.

817. By virtue of their high-level positions and their participation in and awareness of NIKE's operations and public statements, Defendants Donahoe, Friend, Parker, O'Neill, and Campion were able to and did influence and control NIKE's decision-making, including controlling the content and dissemination of the misrepresentations and other deceptive conduct, that Lead Plaintiffs and the Class contend artificially inflated and/or artificially maintained the price of NIKE Stock.

818. Defendants Donahoe, Friend, Parker, O'Neill, and Campion had the power to control or influence the statements made and conduct engaged in, giving rise to the securities violations alleged herein, as set forth more fully above.

819. By virtue of their positions as controlling persons of NIKE, Defendants Donahoe, Friend, Parker, O'Neill, and Campion are also liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of Defendants Donahoe, Friend, Parker, O'Neill, and Campion's wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchase of NIKE Stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, and on behalf of the other members of the Class, demand judgment against Defendants as follows:

A. Determining the instant Action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiffs as Class Representatives and Labaton Keller Sucharow LLP as Class Counsel;

B. Requiring Defendants to pay damages sustained by Lead Plaintiffs and the Class by reason of the acts alleged herein;

C. Awarding Lead Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, experts' fees, and other costs and disbursements; and

D. Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: March 24, 2025

Respectfully submitted,

*/s/ Irina Vasilchenko*
Irina Vasilchenko

**LABATON KELLER SUCHAROW LLP**

Carol C. Villegas (*pro hac vice*)
cvillegas@labaton.com
Irina Vasilchenko (*pro hac vice*)
ivasilchenko@labaton.com
Matthew J. Grier (*pro hac vice*)
mgrier@labaton.com
Connor C. Boehme (*pro hac vice* forthcoming)
cboehme@labaton.com
Gloria J. Medina (*pro hac vice* forthcoming)
gmedina@labaton.com
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

**LABATON KELLER SUCHAROW LLP**
Mark Willis (*pro hac vice* forthcoming)
mwillis@labaton.com
1050 Connecticut Avenue NW, Suite 500
Washington, D.C. 20036
Telephone: (202) 772-1880
Facsimile: (212) 818-0477

*Counsel for Lead Plaintiffs and Lead Counsel for the Proposed Class*

**DRRT**
Jonathan Cohen (*pro hac vice*)
jcohen@drrt.com
340 West Flagler Street, 2nd Floor
Miami, FL 33130
Telephone: (305) 760-8030
Facsimile: (305) 760-8031

*Additional Counsel for Deka Investment GmbH*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (*pro hac vice*)
stoll@cohenmilstein.com
Molly J. Bowen (*pro hac vice*)
mbowen@cohenmilstein.com
Margaret (Emmy) Wydman (*pro hac vice*)
ewydman@cohenmilstein.com
1100 New York Ave. NW, Suite 800
Washington, DC 20005
Telephone: (202) 408-4600

Facsimile: (202) 408-4699

*Additional Counsel for the Proposed Class*

**STOLL STOLL BERNE LOKTING & SHLACHTER P.C.**
Timothy S. DeJong, OSB No. 940662
tdejong@stollberne.com
Keith A. Ketterling, OSB No. 913368
kketterling@stollberne.com
Cody Berne, OSB No. 142797
cberne@stollberne.com
209 Southwest Oak Street, Suite 500
Portland, OR 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

*Liaison Counsel for Lead Plaintiffs and the Proposed Class*