STOEL RIVES LLP
B. JOHN CASEY, Bar No. 120025
john.casey@stoel.com
ALEX VAN RYSSELBERGHE, Bar No. 174836
alex.vanrysselberghe@stoel.com
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: 503.224.3380
Facsimile: 503.220.2480

GIBSON, DUNN & CRUTCHER LLP
BRIAN M. LUTZ *(Pro Hac Vice)*
blutz@gibsondunn.com
One Embarcadero Center Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8379
Facsimile: 415.374.8474

JESSICA VALENZUELA *(Pro Hac Vice)*
jvalenzuela@gibsondunn.com
JEFF LOMBARD *(Pro Hac Vice)*
JLombard@gibsondunn.com
310 University Avenue
Palo Alto, CA 94301-1744
Telephone: 650.849.5340

*Attorneys for Defendants Nike, Inc., John J. Donahoe II, Matthew Friend, Mark G. Parker, Heidi L. O'Neill, and Andrew Campion*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| IN RE NIKE, INC. SECURITIES LITIGATION | Case No. 3:24-cv-00974-AN |
| | Judge: Hon. Adrienne Nelson |
| | **DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | **ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

**Page**

MOTION...........................................................................................................................1

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS ................................................................................................3

    I.     NIKE Announces Strategy to More Directly Connect with Its Consumers ..........3

    II.    NIKE Discloses Inherent Risks of Its Business and CDA....................................5

    III.   The CDA Strategy Shows Initial Promise .........................................................6

    IV.   NIKE's Sales Begin to Slow and It Returns to Retail Partners ...........................6

    V.    The Lawsuit Is Filed .......................................................................................7

LEGAL STANDARDS .....................................................................................................7

ARGUMENT ...................................................................................................................9

    I.     The Complaint Does Not Identify a Single False or Misleading Statement..........9

          A.    NIKE's CDA Strategy Statements Were True........................................10

          B.    NIKE's Supply Chain Statements Were True. .......................................13

          C.    NIKE's Technology Statements Were True ...........................................16

          D.    NIKE's Product Innovation Statements Were True................................19

          E.    NIKE's Product Category Statements Were True ..................................21

          F.    NIKE's Competition Statements Were True ..........................................22

    II.    Plaintiffs Fail to Plead a Strong Inference of Scienter........................................25

          A.    Plaintiffs Fails to Plead Specific Facts to Show Direct Knowledge of Falsity ..........................................................................................26

          B.    Plaintiffs Fail to Plead Specific Facts to Infer Knowledge of Falsity......30

CONCLUSION.................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010) ................................................................................30

*In re Apple Comput., Inc.*,
127 F. App'x 296 (9th Cir. 2005) .......................................................................................28

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ..............................................................................................32

*In re Biogen Inc. Sec. Litig.*,
193 F. Supp. 3d 5 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017) ...........................20, 23

*Brodsky v. Yahoo! Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009) ..............................................................................10

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ....................................................................................8, 15, 18

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ....................................................................26

*Cheng v. Canada Goose Holdings Inc.*,
2021 WL 3077469 (S.D.N.Y. July 19, 2021) ......................................................................33

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ...........................................................................11, 17, 18, 22

*In re Cloudera, Inc.*,
121 F.4th 1180 (9th Cir. 2024) ............................................................................10, 12, 32

*In re Copper Mountain Sec. Litig.*,
311 F. Supp. 2d 857 (N.D. Cal. 2004) ................................................................................19

*In re Coventry Healthcare, Inc. Sec. Litig.*,
2011 WL 1230998 (D. Md. Mar. 30, 2011)........................................................................27

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) .....................................................................................17, 22

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ...................................................................................1, 10, 22

*In re Ditech Commc'ns. Corp. Sec. Litig.*,
2006 WL 2319784 (N.D. Cal. Aug. 10, 2006) ....................................................................34

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)......................................................................15

Page ii -   DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CONSOLIDATED
CLASS ACTION ALLEGATION COMPLAINT

*In re Eargo, Inc. Sec. Litig.*,
   2023 WL 5663154 (N.D. Cal. Aug. 31, 2023) ...................................................34

*Golubowski v. Robinhood Mkts., Inc.*,
   2023 WL 1927616 (N.D. Cal. Feb. 10, 2023) .............................................14, 20

*Hong v. Extreme Networks, Inc.*,
   2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) .................................................32

*HRSA-ILA Funds v. Adidas AG*,
   745 F. Supp. 3d 1127 (D. Or. 2024) .........................................................21, 25

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
   554 F. Supp. 2d 1083 (C.D. Cal. 2008) .........................................................25

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
   2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) .................................................10

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011) ...............................................................................16

*Joyce v. Amazon.com Inc.*,
   2025 WL 835054 (W.D. Wash. Mar. 17, 2025) .................................................34

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
   19 F.4th 601 (4th Cir. 2021) ......................................................................32

*In re Leapfrog Enter., Inc. Sec. Litig.*,
   200 F. Supp. 3d 987 (N.D. Cal. 2016) ...........................................................19

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ....................................................................21

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024)..................................................................................8

*Malin v. XL Cap. Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007) ............................................................31

*Mallen v. Alphatec Holdings, Inc.*,
   861 F. Supp. 2d 1111 (S.D. Cal. 2012) ..........................................................31

*McGovney v. Aerohive Networks, Inc.*,
   367 F. Supp. 3d 1038 (N.D. Cal. 2019) ..........................................................27

*Nguyen v. Endologix, Inc.*,
   962 F.3d 405 (9th Cir. 2020) ...............................................................1, 8, 26

*In re NVE Corp. Sec. Litig.*,
   551 F. Supp. 2d 871 (D. Minn. 2007), *aff'd*, 527 F.3d 749 (8th Cir. 2008) ...........18

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)..................................................................................11

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) ......................................................8, 13, 14, 20, 25

*Petersen v. Stem, Inc.*,
  2024 WL 4602710 (N.D. Cal. Aug. 30, 2024) ......................................27

*In re Pixar Sec. Litig.*,
  450 F. Supp. 2d 1096 (N.D. Cal. 2006) ............................................34

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ..............................................8, 29, 31, 32

*Prodanova v. H.C. Wainwright & Co., LLC*,
  993 F.3d 1097 (9th Cir. 2021) ........................................................25

*In re Rackable Sys., Inc. Sec. Litig.*,
  2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ....................................28

*Reese v. BP Exploration (Alaska) Inc.*,
  643 F.3d 681 (9th Cir. 2011) ..........................................................16

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard
  Co.*,
  845 F.3d 1268 (9th Cir. 2017) ........................................................23

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ..................................................8, 34, 35

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001), *rev'd on other grounds*, *Glazer Cap. Mgmt.,
  L.P. v. Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023) ................9, 26, 29

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ..........................................................31

*Scheller v. Nutanix, Inc.*,
  450 F. Supp. 3d 1024 (N.D. Cal. 2020) ........................................20, 27

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999), *superseded by statute on other grounds* ................34

*In re Silicon Graphics, Inc. Sec. Litig.*,
  970 F. Supp. 746 (N.D. Cal. 1997) ..................................................29

*In re Stratasys Ltd. S'holder Sec. Litig.*,
  864 F.3d 879 (8th Cir. 2017) ..........................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..............................................................1, 9, 25

*In re Tibco Software, Inc.*,
  2006 WL 1469654 (N.D. Cal. May 25, 2006) ....................................35

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ..............................................................8

*Weston Family P'ship v. Twitter, Inc.*,
    29 F.4th 611 (9th Cir. 2022) ........................................................13, 18

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ............................................................11

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) .............................................13

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..................................24, 25, 26, 30, 33

### Statutes

15 U.S.C. § 78u-4 ...........................................................................1, 8

15 U.S.C. § 78u-5 ..............................................................................19

## LOCAL RULE 7-1(A)(1) CERTIFICATE OF COMPLIANCE

The undersigned certifies that counsel for the parties made a good faith effort through telephone conferences to resolve the dispute but have been unable to do so.

## MOTION

Pursuant to the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4, and Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Nike, Inc. ("NIKE" or the "Company"), John J. Donahoe II, Matthew Friend, Mark G. Parker, Heidi L. O'Neill, and Andrew Campion (collectively, "Defendants") respectfully move the Court to dismiss the Second Amended Consolidated Class Action Allegation Complaint ("Complaint"). This motion is supported by the following Memorandum of Points and Authorities and by the Declaration of Jessica Valenzuela ("Valenzuela Declaration") and exhibits thereto.

## INTRODUCTION

Plaintiffs alleging securities fraud face the most rigorous pleading requirements in American law. To stamp out the "practice of pleading fraud by hindsight," *In re Daou Sys., Inc.*, 411 F.3d 1006, 1021 (9th Cir. 2005), and to curb abusive securities fraud actions targeting deep pocket defendants, *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020), Congress passed the PSLRA, which imposed exacting pleading standards. Plaintiffs must identify "each statement alleged to have been misleading" and specific facts—not generalities or conclusions—explaining "the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u-4(b)(1). And plaintiffs must plead specific facts supporting a *strong* inference—"at least as compelling as any opposing inference"—that *each* defendant made a false or misleading statement with fraudulent intent. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); 15 U.S.C. § 78u-4(b)(2). This case is a textbook example of the very fraud-by-hindsight Congress sought to eliminate.

This action follows a series of stock drops after NIKE announced disappointing financial results in consecutive quarters. The Complaint is a sprawling 283 pages and 819 paragraphs, but Plaintiffs' theory of fraud is simple: NIKE and its senior management lied to investors that the Company's business strategy, aimed to grow direct and digital revenues (known as the Consumer Direct Acceleration or "CDA"), "was working" when they supposedly knew it was not. Plaintiffs point to NIKE's later shift in strategy to say Defendants knew all along that CDA was never going to work. But Plaintiffs turn a blind eye to the fact that, ***for years, the strategy did work—driving direct and digital revenues to record highs, consistently beating even NIKE's own aggressive targets***. When consumer shopping patterns changed as the pandemic waned, direct and digital sales plateaued and NIKE's senior management adapted by rebalancing the Company's strategy to focus more on wholesale and retail. Changing a successful strategy when it no longer delivers the value it once did is the *right* thing to do, not evidence of securities fraud.

To manufacture a fraud claim from NIKE's changing strategy, the Complaint challenges every conceivable public statement made about CDA during the Class Period. Missing from the Complaint, however, are the required specific facts demonstrating that any of these statements were false or misleading when made. NIKE never promised, as Plaintiffs imply, flawless execution and zero obstacles to the ambitious CDA strategy. To the contrary, NIKE repeatedly disclosed the risks and uncertainties in the strategy, that CDA was a work in progress, and that NIKE was continuing to invest in supply chain, technology, and innovation as part of the strategy. Plaintiffs, of course, ignore all of this because it undercuts their baseless theory that NIKE and its senior officers hid challenges inherent in the strategy.

Plaintiffs' scienter allegations are even more deficient. They lean on 19 confidential witnesses, most with no direct contact with any Defendant, and offer only vague references to

"problems" and "issues" supposedly discussed in unspecified meetings or documents. These buzzwords fall miles short of the PSLRA's mandate for particularized facts showing that each defendant knew their public statements were false or that they intentionally turned a blind eye to obvious facts showing the strategy was a failure. Plaintiffs' motive theory is equally nonsensical. Plaintiffs assert that certain Individual Defendants had a financial motive to commit securities fraud, as purportedly evidenced by their suspicious stock trades. But NIKE's former CEO actually did *not* sell any stock and stock sales by two other Individual Defendants were routine.

Every major business strategy encounters challenges, and nothing in the federal securities laws requires flawless execution. That NIKE faced execution challenges regarding CDA and did not perfectly predict how consumers would choose to shop coming out of the global pandemic shows that NIKE exists in the real world—not that it committed fraud. Allowing this fraud-by-hindsight case to proceed would be contrary to Congress's enactment of the PSLRA. The Complaint should be dismissed with prejudice.

## STATEMENT OF FACTS

### I. NIKE Announces Strategy to More Directly Connect with Its Consumers

NIKE is the world's largest seller of athletic footwear and apparel. ¶ 74.[1] NIKE earned this position by meeting consumers across its sport experiences and where they shop. ¶¶ 113, 117. Historically, NIKE principally sold its products through retailers like Foot Locker and Dick's, who bought NIKE's products at wholesale prices and sold them alongside competitors' products. ¶ 2.

In 2017, NIKE announced its Consumer Direct Offense ("CDO"). ¶ 84. CDO was a new Company strategy that sought to increase "direct connections with consumers" through both

---

[1] Citations to "¶ __" or "¶¶ __" are to paragraphs in the Complaint. Unless otherwise stated, all emphasis is added, and all internal quotations and citations are omitted.

NIKE-owned stores and NIKE's digital channels, and through partnered wholesale channels "to better serve the consumer personally, at scale." Ex. 1 at 1. This initiative sought to be more connected to NIKE's consumers, to better know and serve them. *Id*. That included, but was not limited to, growing its relatively small direct-to-consumer ("DTC") digital commerce business— that is, making sales through digital channels or leveraging digital services within its NIKE-owned stores. *Id*. at 2. The Company explained that demand through NIKE's digital channels "generates nearly twice the revenue and significantly higher-margin on each transaction" compared to its wholesale channel. Ex. 2 at 7. The Company also implemented organizational changes as part of CDO, including creating teams focused on building DTC capabilities and driving growth. Ex. 1 at 1-2. NIKE reported revenue from its DTC channels under the "NIKE Direct" operating segment. ¶ 79.

CDO delivered strong results from late 2017 through early 2020, primarily driven by new innovative product launches and amplified by increasingly greater direct connections to consumers. For example, NIKE's total revenue for 2019[2] increased 7% from the prior year, "as strategic investments in innovation and digital drove global consumer demand led by NIKE Direct[.]" Ex. 3 at 1. But NIKE's business was significantly impacted by physical store closures in 2020 due to the COVID-19 pandemic. *See* Ex. 4 at 1. In Q4 2020, the first full quarter during the pandemic, NIKE's total revenue decreased 38% compared to the same quarter in 2019, as NIKE closed the majority of its branded stores in North America, Europe and Asia. *Id*. at 2. Its retail partners largely followed the same pattern, and, as a result, NIKE's sales in Q4 2020 through its wholesale channel declined nearly 50% compared to the same quarter in 2019. *Id*. at 1. At the

---

[2] NIKE's fiscal year begins on June 1 and ends on May 31 the following calendar year. All annual references are to NIKE's fiscal year, unless otherwise noted.

same time, NIKE's digital sales in Q4 2020 increased 75% over the same quarter in 2019, as the pandemic drove a broad-based consumer shift to digital commerce. *Id.*

In January 2020, NIKE appointed John Donahoe as its CEO. ¶ 92. Six months later, NIKE announced "a new digitally empowered phase" of CDO: Consumer Direct Acceleration or CDA. Ex. 5 at 3. The Company's goals remained unchanged—but now NIKE increased its focus on digital and announced plans to invest in digital capabilities and build digitally enabled mono-brand stores. *Id.* at 3-4, 6. NIKE also re-aligned its sales organization around three consumer groups—Men's, Women's, and Kid's—with its prior sport category-based structure (like running and basketball) becoming functions embedded within the new consumer groups. *See id.* at 4.

## II. NIKE Discloses Inherent Risks of Its Business and CDA

While NIKE was optimistic about the prospects of CDA, the Company was clear with investors that the strategy's success was far from guaranteed. Throughout the Class Period (March 19, 2021, through October 1, 2024), NIKE warned that CDA might not succeed and that the Company might not be able to build out the necessary technology and infrastructure to support the strategy:

> [W]e have made significant investments in digital technologies and information systems for the digital aspect of our NIKE Direct operations, and our digital offerings will require continued investment in the development and upgrading of our technology platforms . . . We may not be successful in developing platforms that operate effectively with [digital] technologies, systems, networks or standards. A growing portion of consumers access our NIKE Direct digital platforms, but in the event that it is more difficult for consumers to access and use our digital platforms, consumers find that our digital platforms do not effectively meet their needs or expectations or consumers choose not to access or use our digital platforms or use devices that do not offer access to our platforms, the success of our NIKE Direct operations could be adversely impacted.

Ex. 8 at 15-16. NIKE also warned investors that its focus on digital sales could negatively impact the Company's sales from brick-and-mortar stores:

[A]s use of our digital platforms continues to grow, we will need an increasing amount of technical infrastructure to continue to satisfy our consumers' needs. If we fail to continue to effectively scale and adapt our digital platforms to accommodate increased consumer demand, our business may be subject to interruptions, delays or failures and consumer demand for our products and digital experiences could decline.

Risks specific to our digital commerce business also include diversion of sales from our and our retailers' brick and mortar stores, difficulty in recreating the in-store experience through direct channels and liability for online content. Our failure to successfully respond to these risks might adversely affect sales in our digital commerce business, as well as damage our reputation and brands.

*Id*. at 16.  NIKE also disclosed risks posed by intense competition (*id.* at 12), uncertainties related to potential shifts in consumer preferences (*id.* at 14), and the inability to predict the impact of the COVID-19 pandemic (*id.* at 11); *see also generally* Exs. 13, 17, 21.

## III.    The CDA Strategy Shows Initial Promise

CDA showed early success, as both direct and digital sales increased in each of 2021, 2022, and 2023.  ¶¶ 81, 83.  NIKE Direct sales *nearly doubled* between 2020 and the end of 2023, delivering more than $21 billion in revenue by 2023.  *See* Table below.

| Fiscal Year | NIKE Direct Revenue (in billions) | NIKE Direct Revenue % of Y/Y Growth | NIKE Digital Revenue (in billions) | NIKE Digital Revenue % of Y/Y Growth |
|---|---|---|---|---|
| 2020 | $12.382 | -- | $5.50 | -- |
| 2021 | $16.370 | 32% | $9.10 | 64% |
| 2022 | $18.726 | 14% | $10.70 | 18% |
| 2023 | $21.308 | 14% | $12.60 | 18% |

## IV.    NIKE's Sales Begin to Slow and It Returns to Retail Partners

In the second quarter of 2024, NIKE began to see slowing digital growth.  Ex. 18 at 13. NIKE was transparent with investors about this issue, sharing on its Q2 2024 earnings call that "[w]hile NIKE's store traffic continued to grow, [it] saw softness in digital traffic and higher levels of promotional activity across the marketplace," and "increased macro headwinds."  *Id*. at 9.

Digital and direct revenue continued to stagnate throughout 2024. In Q3 2024, NIKE reported that direct sales were essentially flat year-over-year and NIKE Digital sales had decreased by 4%. Ex. 19 at 11. In Q4 2024, NIKE disclosed declines across its Men's and Women's business, declines in Nike Digital revenue, shifts in consumer traffic in key markets, and worsening foreign exchange headwinds that were expected to have "a more pronounced impact on Fiscal 25." Ex. 20 at 8. As a result, NIKE lowered its revenue guidance for 2025 and projected Q1 2025 revenues would be down approximately 10% year-over-year. *Id*. at 15.

NIKE's Q1 2025 revenue declined by 10%, with double digit declines for direct and digital sales. Ex. 22 at 7. During the October 1, 2024 earnings call, NIKE disclosed that "[t]raffic declines across NIKE Direct were more significant than [it had] anticipated" with "particular softness in traffic on NIKE Digital as well as [its] partner stores in Greater China." *Id*. at 3.

## V. The Lawsuit Is Filed

NIKE's stock price declined in 2024 and Q1 2025 after the Company's announcement of challenging financial results. Predictably, this stock-drop lawsuit followed. The original complaint in this action was filed in June 2024 against NIKE, Donahoe, and Matthew Friend (NIKE's CFO). ECF No. 1. The court-appointed lead plaintiffs amended the complaint to tack on three additional NIKE executives as defendants (Chairman Mark Parker, President of Consumer, Product & Brand Heidi O'Neill, and former COO Andrew Campion). ECF Nos. 53, 65. The Complaint alleges that nearly every public statement made about the CDA strategy over a nearly three-and-a-half-year period was materially false and misleading.

## LEGAL STANDARDS

Under the PSLRA, Congress imposed a heightened pleading standard for claims brought under Section 10(b) of the Securities Exchange Act of 1934. These requirements have "teeth" and

"present no small hurdle for the securities fraud plaintiff." *Nguyen*, 962 F.3d at 414. To survive a motion to dismiss, a plaintiff must plead as to *each* defendant (1) a material misrepresentation or omission of fact by that defendant, (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) a causal connection between the alleged misrepresentation and the plaintiff's loss. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057 (9th Cir. 2014). Securities fraud claims are subject to both Rule 9(b) and the PSLRA. Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake" by pleading the "who, what, when, where, and how" of the alleged fraud. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). The PSLRA, which has even "more exacting pleading requirements," *Intuitive Surgical*, 759 F.3d at 1057-58, further requires the plaintiff to (i) "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading," and (ii) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for each act or omission. 15 U.S.C. § 78u-4(b)(1)(B), 78u-4(b)(2)(A).

A statement is false or misleading only if it is untrue based "on an objective standard," *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014), or if it omits "material facts necessary to make the 'statements made … not misleading.'" *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 263 (2024). An omission is misleading when it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). "Thus, as long as [any] omissions do not make the actual statements misleading, a company is not required to disclose" other facts "even if investors would consider the omitted information significant." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 880 n.8 (9th Cir. 2012).

To plead scienter, a complaint must plead—again, on a defendant-by-defendant basis—particularized facts giving rise to "a strong inference" that each defendant made a false or misleading statement either intentionally or with deliberate recklessness; that is, with intent to deceive, manipulate, or defraud. *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001), *rev'd on other grounds*, *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747 (9th Cir. 2023). "Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it[.]" *Id*. at 702. An inference of scienter is "strong" if it is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Plaintiffs come nowhere close to meeting these heightened pleading standards as to any Defendant, much less all of them.

## ARGUMENT

## I. The Complaint Does Not Identify a Single False or Misleading Statement

The Complaint, while replete with confidential witness ("CW") critiques of NIKE's business strategy, venting of workplace gripes, and monotonous repetition of suspicions disguised as "facts," fails to plead any particularized facts that show any statement was false or misleading at the time it was made, as required by the PSLRA. The challenged statements generally fall into six categories: (A) NIKE's view that CDA was working; (B) NIKE's investment in creating a digital-first supply chain; (C) NIKE's investment in technology to operate a digital and DTC business; (D) NIKE's product innovation; (E) NIKE's organization of products in Men's,

Women's, and Kid's categories; and (F) NIKE's competitive position.[3]  But the facts alleged, incorporated by reference into the Complaint, and subject to judicial notice, demonstrate that none of these statements were false or misleading when made.  The Complaint simply *assumes* fraud because NIKE's stock price dropped when the CDA strategy lost momentum, without pointing to statements that were false or misleading when made.  This is the exact "fraud by hindsight" theory that Congress "put an end to" when it enacted the PSLRA.  *Daou Sys.*, 411 F.3d at 1021.  That NIKE was transparent with investors when the CDA strategy foundered is evidence of candor, not fraud: "later, sobering revelations do not by themselves make the earlier, cheerier statement a falsehood."  *In re Cloudera, Inc.*, 121 F.4th 1180, 1189 (9th Cir. 2024).

## A.    NIKE's CDA Strategy Statements Were True.

Plaintiffs challenge NIKE's statements between March 2021 and June 2023 that the CDA strategy "is working," ¶¶ 439, 471, 473, 480, 489-93, 499, 501, 508, 512, 516, 520, 522, 533, 540, 566, 571, 573, 575, and "continues to fuel growth," ¶¶ 465, 487; *accord* ¶¶ 494 (CDA "is driving our business forward"), 537 (CDA is "resulting in healthy, profitable growth"), 555 (CDA's "continued success"), 562 ("continued proof of the success of our Consumer Direct Acceleration strategy"), 590 ("Our marketplace strategy remains the same.").  There was no fraud based on

---

[3] Plaintiffs defy the requirement to specify for *each statement* the reason *why* it is misleading, instead cross-referencing multiple paragraphs throughout the Complaint and expecting the Court to decipher why a statement is purportedly false or misleading.  ¶¶ 431-38.  For example, as support for why statements regarding NIKE's efforts to develop a DTC supply chain were supposedly misleading, Plaintiffs refer back to ¶ 431, which in turn references Section IV.A.4.a, comprised of *nine paragraphs*, and Section IV.B.1.A, comprised of *25 paragraphs*.  It is impossible to ascertain from these 34 paragraphs why Plaintiffs allege the statements are misleading.  This pleading maze is "unacceptable" and alone provides grounds to dismiss.  *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, 2018 WL 4181954, at *6, *10 (N.D. Cal. Aug. 31, 2018); *see Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1113, (N.D. Cal. 2009) (dismissing 209-page complaint referencing 17 CWs where plaintiffs' "reasons" supporting falsity all "refer back" to a single paragraph, "which itself merely repeats, refers to and characterizes" other paragraphs).

these statements; they were all *true* when made. Plaintiffs' reading of them as a guarantee that CDA faced no challenges is not grounded in reality.

During this period, between March 2021 and June 2023, NIKE was seeing success with CDA. Both direct and digital revenues had steadily increased, and NIKE was exceeding its targets. ¶¶ 81, 83. For example, on October 6, 2021, when Donahoe stated that "[w]e are clearly seeing our strategy work," NIKE's digital sales were 20% of total revenue—a milestone NIKE reached *three years ahead of plan.* ¶ 471; *see also, e.g.*, ¶¶ 555, 562. In 2021, NIKE's annual digital revenues had increased 64%, and it saw another 18% increase in 2022. Exs. 7, 11. The Complaint does not allege that any of these reported financial metrics were incorrect, and they confirm that the CDA strategy was "working" and "fuel[ing] growth," as NIKE disclosed. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1196 (9th Cir. 2021) (explaining that a "statement that great progress was being made" would "potentially be an actionable false statement" only if the defendant "had been making no progress at all"). Around March 21, 2024, once the CDA strategy began to falter, Donahoe shifted his tone, noting that while "our Consumer Direct Acceleration strategy has driven growth and direct connections with consumers," NIKE needed to make "adjustments." ¶ 602. That is corporate transparency—not deceit.

In addition, any Defendant's *opinion* that the CDA strategy *was* working is not actionable under Section 10(b). "[A] sincere statement of pure opinion is not an untrue statement of material fact, regardless whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). To allege a statement of opinion is false, a plaintiff must allege "(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *City of Dearborn Heights Act 345 Police &*

*Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017). The Complaint does not even attempt to do so, never once alleging that any Defendant did not honestly believe that from March 2021 to June 2023, the CDA strategy was, in fact, working.

The opinion statements also were not misleading by omission. Plaintiffs' theory seems to be that by saying the CDA strategy was "working," NIKE was somehow communicating to investors that NIKE had successfully completed the execution of six so-called "critical components" of the CDA strategy: "(i) developing an effective DTC supply chain; (ii) enhancing NIKE's DTC technological capabilities and establishing an effective technology organization to support those capabilities; (iii) engaging in a corporate reorganization to focus on DTC initiatives, including the creation of new consumer constructs; (iv) maintaining a robust pipeline of innovative products while effectively managing supply of NIKE's key products; (v) maintaining its competitive separation and brand strength; and (vi) effectively adapting to consumer demand patterns regarding shopping at mono-brand and multi-brand retail stores," ¶¶ 437-38, when those representations were untrue. Plaintiffs' theory of misleading omission fails for three reasons.

*First*, the Complaint does not allege with particularity how or why the term "working" rendered NIKE's disclosures related to these supposed "critical components" of CDA success false or misleading. Plaintiffs' say-so is not sufficient. *See* ¶¶ 106-42. When "a plaintiff claims that the words used in a statement have some special or nuanced meaning that differs from what the literal words suggest, the plaintiff must plead facts that will support this crucial premise." *Cloudera*, 121 F.4th at 1188. Plaintiffs' theory that "working" is code for having already developed and finalized a made-up list of six "critical components" must be supported by specific facts. It is not. The Complaint does not allege that NIKE defined CDA along those terms or that a reasonable investor would have understood that statements saying the strategy was "working"

were shorthand for specific conclusions about six discrete components of NIKE's business.

*Second*, during the entire period at issue, NIKE provided accurate quarterly updates to investors about the aspects of its business that comprised these six so-called "critical components." When NIKE discussed any of the six items on Plaintiffs' checklist, the Company consistently described its efforts as a work in progress, not a done deal. For example, NIKE disclosed that it was "building" out its supply chain capabilities for direct sales, ¶ 482, "investing" in technology, ¶ 463, and (as late of September 2023) still "powering up our holistic offense across product, storytelling and marketplace," ¶ 592. Put simply, NIKE *never* declared "mission accomplished" on CDA and the "working" and "success" statements do not state or imply that NIKE had accomplished any, much less all, of the six items on Plaintiffs' invented checklist.

*Third*, vague, optimistic statements (*i.e.*, "puffery") are not actionable because they do not induce reliance by reasonable investors. *Apollo Grp.*, 774 F.3d at 606. Because "working" was not "specific or unqualified guidance" about *how* NIKE was implementing the CDA strategy, the challenged statements "are so imprecise and noncommittal that they are incapable of objective verification." *Weston Family P'ship v. Twitter, Inc.*, 29 F.4th 611, 621 (9th Cir. 2022) (holding that company did not have to disclose specific "software bugs" when stating that its overall program was "on track"); *see, e.g.*, *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036-37 (N.D. Cal. 2012) ("we are very pleased with our progress to date" was puffery).

**B.     NIKE's Supply Chain Statements Were True.**

Plaintiffs challenge NIKE's statements that it was "creating" and "building" a "digital-first supply chain," ¶ 441; *see* ¶¶ 463, 482, and "continu[ing] to invest" in tools to improve its supply chain, ¶¶ 469, 497, 506, 553, 560, 569. Plaintiffs contend that the statements were misleading because they "touted NIKE's success in developing an effective DTC supply chain." ¶ 431. But

the Complaint pleads no facts showing that the supply chain statements were not true. Plaintiffs never allege that NIKE was not building or creating a digital-first supply chain. Indeed, Plaintiffs concede that NIKE had a "separate budget" for its supply chain beyond the $2 billion earmarked for technology investments. ¶ 178. As to statements that NIKE "*continue[s] to* invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further accelerate our digital transformation," Plaintiffs never allege that NIKE was not, in fact, making such investments or that it had *stopped* doing so. ¶¶ 469, 497, 506, 553, 560, 569.

To the extent Plaintiffs allege that NIKE misled investors into believing that NIKE had *already finished* creating a digital-first supply chain, that illogical theory directly contradicts NIKE's repeated statements about its need to continue investing in its supply chain. A statement that NIKE was *creating* a supply chain to support CDA on its face says that NIKE had not already finished doing so. Plaintiffs also assert that the supply chain statements are misleading because NIKE allegedly "did not have sufficient capabilities to manage its supply chain" and "did not sufficiently invest in supply chain management," ¶ 431, but they fail to identify any statement NIKE made about the *sufficiency* of its investments in its supply chain or its supply chain capabilities. That Plaintiffs might disagree about the adequacy of NIKE's investment does not constitute fraud. *Golubowski v. Robinhood Mkts., Inc.*, 2023 WL 1927616, at *10 (N.D. Cal. Feb. 10, 2023) (holding that "qualitative goals" are not "specific or concrete enough to constitute a misstatement of fact," even when a complaint alleges "serious operational issues").[4] CW-1's opinion that NIKE should have implemented a separate supply chain system for DTC sales is also

---

[4] Donahoe's statement that NIKE's pivot to a DTC supply chain was "fairly impressive," ¶ 441, is puffery. *See Apollo Grp.*, 774 F.3d at 606.

insufficient to plead fraud.  ¶¶ 148, 151; *see In re Downey Sec. Litig.*, 2009 WL 2767670, at *11 (C.D. Cal. Aug. 21, 2009) ("second-guessing of management decisions by confidential witnesses does not provide a basis for securities fraud").

As to Campion, Plaintiffs refer to and challenge only one public statement during the Class Period.  Plaintiffs do not offer any basis for asserting this statement was false.  In fact, Plaintiffs challenge a single excerpt from a May 2022 *Women's Wear Daily* article about NIKE's 50th Anniversary, in which Campion is quoted as saying that NIKE had "three to four times greater digital commerce distribution capability than we had two years ago."  ¶ 510.  But the Complaint nowhere alleges facts that NIKE *did not* have such capabilities in May 2022 and, thus, fails to plead the statement was false or misleading.  To the contrary, the article itself further describes how NIKE "tripled its digital distribution" at a national distribution center in Memphis and opened "regional centers in the U.S. and Europe" to support DTC sales.  Ex. 10 at 1.  Nor is Campion's statement misleading by omission, as he "neither stated nor implied," *Brody*, 280 F.3d at 1006, that "NIKE had successfully developed an effective DTC supply chain."  ¶ 511.  Indeed, the parts of the article Plaintiffs misleadingly omit show Campion explained that NIKE's efforts to build a digital supply chain were a work-in-progress.  *See, e.g.*, Ex. 10 (quoting Campion as saying: "[the] supply chain had been largely set up to service other retailers" and repeats that "our supply chain to that point was largely set up for wholesale" before stating that "we're going to need to transform"; NIKE "needs platforms that more effectively connect all its parts, whether that's inventory in stores, on apps or purchased through mobile devices"; and NIKE had "to accelerate our technology transformation" because "our technologies are too fragmented.").  Campion also referred to NIKE being in a period of adversity, noting that "[a]t Nike, adversity has always been a catalyst" and that "the challenges and constraints imposed by the pandemic have driven our

teams to transform." *Id.* Because the Complaint does not contain a single fact contradicting the only challenged statement attributed to Campion, the claims against Campion must be dismissed on this ground alone.[5]

### C. NIKE's Technology Statements Were True

Plaintiffs challenge three technology statements: one about general investment in technology to support DTC strategy, ¶ 476; a disclosure in NIKE's Form 10-K about technology-related risks, ¶¶ 459, 531, 588, 609; and statements about NIKE's partnership with Adobe, ¶¶ 504, 518, 579. Plaintiffs allege that these statements "claimed that NIKE had developed the technological capabilities necessary to support NIKE's CDA strategy and/or had a technology organization that would ensure these technological capabilities were successfully developed and deployed" when NIKE had purportedly not done so. ¶ 432. These statements *were true*, and the Complaint does not adequately plead that they were misleading by omission.

Plaintiffs first challenge the following statement by Friend at NIKE's October 2021 Annual General Meeting: "The investments we've made against our end-to-end digital transformation are making us more agile, and we're building the capabilities that are required for NIKE to operate a digitally led omni-channel, direct-to-consumer business at scale." ¶ 476. This statement was true, and Plaintiffs fail to allege that NIKE *was not* investing in technology to support its DTC strategy. Indeed, CW-3 concedes that NIKE "made a significant investment in DTC technology, approximately $2 billion." ¶ 178; *see also* ¶¶ 195, 200. Plaintiffs assert that the statement implied "that NIKE had successfully built out the technological capabilities and organization needed for the CDA strategy to succeed." ¶ 477. But in that statement and throughout the Class Period, NIKE

---

[5]  It is well-settled that Campion cannot be liable under Section 10(b) for any statements made by other Defendants. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011); *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 693 n.8 (9th Cir. 2011).

was transparent that its digital technological capabilities were a work in progress. ¶ 476 ("*we're building* [technological] capabilities"); *see, e.g.*, ¶¶ 446 ("*ultimately* creating these digital" capabilities), 518 ("we *will* unlock"). And Friend's statement that the investments were "making us more agile," ¶ 476, is an inactionable opinion, *Dearborn*, 856 F.3d at 616, and puffery, *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

Plaintiffs cherry-pick one sentence from a paragraph in NIKE's risk factors: "We may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards." ¶¶ 459, 531, 588, 609. Plaintiffs say the word "may" is misleading because NIKE was purportedly already "experiencing severe problems in its efforts to build out and unify its DTC technological capabilities and organization." *E.g.*, ¶ 460. But NIKE never said it had not experienced problems with technology. In the same paragraph containing the challenged statement, NIKE told investors its "digital offerings will require continued investment in the development and upgrading of our technology platforms." *E.g.*, ¶ 459. NIKE also was clear that its "digital platforms must be designed effectively and work well with a range of other technologies." *E.g.*, *id.* That NIKE explicitly told investors such efforts *might not work* directly refutes Plaintiffs' theory that NIKE conveyed that it "had developed the technological capabilities necessary to support NIKE's CDA strategy." ¶ 432.

Plaintiffs point to two purported facts that supposedly contradict the risk factor: that NIKE had not developed the ability to "send personalized email blasts to consumers based on those consumers' personalized data," ¶ 179; *see* ¶¶ 193-94, 196, 211, 237, and that NIKE at some point "had to turn off its app in China in order to meet Chinese compliance requirements," ¶ 190. But both allegations are *consistent* with NIKE's statement that it was continuing to invest in and develop technological capabilities. NIKE's risk-factor disclosures "neither stated nor implied"

that NIKE would face *no* obstacles in building out its digital platforms. *Brody*, 280 F.3d at 1006. Nor do securities laws create "an obligation to offer an instantaneous update of every internal development," even when a company experiences setbacks. *Weston*, 29 F.4th at 620.

NIKE also never falsely stated or misleadingly implied the technological gains from its partnership with Adobe. ¶ 432. As the Complaint concedes, NIKE had in fact rolled out parts of the Adobe platform in October 2021. ¶ 235. Plaintiffs challenge Donahoe's statement in March 2022 that the "Adobe platform has played such an important role of delivering a more personalized experience for our consumers." ¶ 504. This statement was Donahoe's *opinion* as to the value of the Adobe partnership, and the Complaint does not allege that Donahoe did not honestly hold this belief. *Dearborn*, 856 F.3d at 616. The statement is also nonactionable puffery, as the term "important" is the sort of vague statement on which investors do not rely. *E.g.*, *In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 895 (D. Minn. 2007), *aff'd*, 527 F.3d 749 (8th Cir. 2008).

Plaintiffs also challenge Friend's statement that Nike "partnered with Adobe to enable one-to-one member personalization, driving gains in member retention, click-through rates and conversion, resulting in higher demand per member and returns on digital ad spend." ¶ 579. But Friend expressly qualified this statement by explaining that NIKE was "*only beginning* to operationalize these new capabilities and consumer experiences." ¶ 579. Plaintiffs' allegation that Friend "conveyed that NIKE ***had successfully built out*** its technological capabilities," ¶ 580, is wrong on its face. The Complaint does not allege how Adobe impacted metrics such as click-through rates or returns on digital spend, much less that these metrics contradicted Friend's statements when they were made. Without "sufficient detail" regarding the timing and extent of Adobe's effect on NIKE's technological capabilities, this statement cannot support a Section 10(b) claim. *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 867-68 (N.D. Cal. 2004).

Friend's statement that, "through new capabilities activated in partnership with Adobe, we *will* unlock additional productivity and demand creation and member retention across our NIKE ecosystem," ¶ 518, is similarly not actionable.  The Complaint does not allege that Adobe did not deliver these results.  But even if it did, the PSLRA creates absolute immunity for forward-looking statements that, like Friend's, state "the plans and objectives of management for future operations." 15 U.S.C. § 78u-5(i)(1)(B); *see In re Leapfrog Enter., Inc. Sec. Litig.*, 200 F. Supp. 3d 987, 1004 (N.D. Cal. 2016) (statements that "expressly refer to what *will* happen in the future" are forward-looking).  As long as a forward-looking statement is accompanied by meaningful cautionary language, there is no liability.  15 U.S.C. § 78u-5(c)(1)(A)(i).  During the call where Friend made his statement, NIKE referred its listeners to the Form 10-K, which included robust warnings that NIKE may not be successful building out its digital platforms.  *See* Ex. 12 at 1.

Finally, Plaintiffs' narrative of a "shadow organization" within NIKE's technology group is a complete sideshow.  ¶¶ 186-92, 207-09, 215-23, 239-43.  None of the challenged statements say anything about the structure of NIKE's technology group, leadership, or personnel.  Plaintiffs' conspiratorial story is irrelevant to any challenged statement.

### D.    NIKE's Product Innovation Statements Were True

Plaintiffs challenge statements about innovation, including that NIKE was investing in product innovation, ¶¶ 443, 446, 448, 571, that the "pace of innovation has not slowed down at all," ¶ 478, and that NIKE had a "pipeline of innovative product," ¶¶ 512, 514, 540, 544, 550, 564, 566, 592, 594.  Plaintiffs allege that these statements are false or misleading because "NIKE failed to maintain its innovative product pipeline and instead relied on unsustainably flooding the market with its classic franchises," *i.e.*, Dunks, Air Force 1's and Air Jordan 1's.  ¶ 434; *see* ¶ 134.

NIKE's statements about innovation were true.  Plaintiffs acknowledge that NIKE was

investing in innovation. ¶ 285. Documents incorporated by reference into the Complaint establish that NIKE launched new products throughout the Class Period. *E.g.*, Ex. 16 at 5 (launch of "new Phantom Luna boot" for women's World Cup); Ex. 18 at 2 (world record set by runner wearing Nike's Alphafly 3); Ex. 9 at 3 ("new Lebron James Innovation Center" that was "five times the size of our previous lab"). Plaintiffs quibble over whether NIKE "fund[ed] innovation to the level the [CDA] strategy needed." ¶ 285. But, again, Plaintiffs' disagreement with NIKE's business decision does not constitute fraud. *Golubowski*, 2023 WL 1927616, at *10.

Plaintiffs challenge just one statement by Parker—that, in October 2021, the "pace of innovation has not slowed down at all." ¶ 478. Simply alleging that NIKE was launching fewer new products *at that time*, ¶ 282 (alleging that, "by *mid-2022*, NIKE started to see the negative effects on new products in the pipeline"), is insufficient to plead falsity. References to the innovation pipeline as "unmatched," ¶¶ 443, 566, "relentless," ¶¶ 450, 514, 544, and "strong," ¶¶ 550, 594, are vague, optimistic statements that are not actionable. *Apollo Grp.*, 774 F.3d at 606; *see In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) ("unmatched"); *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1038 (N.D. Cal. 2020) ("relentless"); *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 42 (D. Mass. 2016), *aff'd*, 857 F.3d 34 (1st Cir. 2017) ("strong").

Plaintiffs also distort NIKE's warnings related to product innovation in its Form 10-Ks. According to the Complaint, NIKE stated that its "*potential* inability to adjust[] the mix of existing product offerings and develop[] new products, styles and categories to meet consumer demand were *hypothetical* risks that could have a material adverse effect on our sales and profitability." ¶¶ 453, 525, 582, 603. Here is what NIKE actually said:

> Because NIKE is a consumer products company, the relative popularity and availability of various sports and fitness activities, as well as changing design trends, affect the demand for our products. We must, therefore, respond to trends and shifts in consumer preferences by adjusting the mix of existing product

offerings, developing new products, styles and categories and influencing sports and fitness preferences through extensive marketing. Failure to respond in a timely and adequate manner could have a material adverse effect on our sales and profitability. *This is a continuing risk.*

*See, e.g.*, Ex. 8 at 2. NIKE did not portray the risk of misjudging the balance of existing and new products as merely hypothetical. *HRSA-ILA Funds v. Adidas AG*, 745 F. Supp. 3d 1127, 1140 (D. Or. 2024) (finding disclosures about the risk that Kanye West's behavior could negatively impact Adidas's reputation not misleading where improper behavior was "a given, not a hypothetical"); *see Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) (rejecting claim about risk disclosure that "in context" similarly did not mislead). Rather, NIKE warned that the risk of overemphasizing "its classic franchises" existed and was continuing. ¶ 434.

### E. NIKE's Product Category Statements Were True

Plaintiffs allege that statements that NIKE had "realigned [its] organization" around Men's, Women's, and Kid's products rather than sports-based categories were misleading because the reorganization was purportedly "a disaster" that was ultimately reversed in June 2023. ¶¶ 435, 475, 484, 553, 560, 569. As an initial matter, Plaintiffs concede that NIKE "pivot[ed] away from sport categorization and toward gender and age constructs" in "June 2020." ¶ 261. CW-3 also asserts that "NIKE got rid of [its] specialized teams and categories [for specific sports] and only maintained general categories, including Men's and Women's products." ¶ 262. And the Complaint makes clear that NIKE kept the Men's/Women's/Kid's categories and reincorporated sports-based **sub**categories within Men's/Women's/Kid's *in summer 2022*. ¶¶ 263-71; *see also* ¶ 264 (CW-18 alleging "sports categories *within* the gender constructs"). Thus, every statement about the reorganization was indisputably true, and Plaintiffs' perception that the reorganization

was a "disaster" simply is not relevant to the existence of a false statement.[6]

O'Neill's and Donahoe's statements in October 2021 that NIKE "*successfully* realigned" its organization, ¶¶ 475, 484, is a nonactionable opinion. The belief was not "objectively untrue" because NIKE did in fact realign across consumer segments, ¶ 469, even if Plaintiffs disagree with the wisdom of that decision. *Dearborn*, 856 F.3d at 616. Even if "successfully realigned" could imply that the realignment would lead to positive business results, the Complaint does not plead with particularity that O'Neill or Donahoe did not "hold the belief [they] professed" about the Men's/Women's/Kids's reorganization *in October 2021. Id.*

Finally, although the Complaint asserts that NIKE "lost substantial expertise and experience in sports categories due to layoffs," ¶ 433, such *post hoc* criticism of the tradeoffs of NIKE's strategy is classic "fraud by hindsight." *Daou Sys.*, 411 F.3d at 1021.

### F.     NIKE's Competition Statements Were True

Finally, Plaintiffs challenge statements about NIKE's competitive advantages, ¶¶ 450, 461, 489, 512, 514, 533, 535, 540, 544, 557, 566, 571, 573, 577; two statements about NIKE's status as the number-one cool brand, ¶¶ 542, 546; disclosures in NIKE's Form 10-K about the risk of competition, ¶¶ 455, 527, 584, 605; and other disclosures about risks to NIKE's brand, ¶¶ 457, 529, 586, 607. Plaintiffs allege that these statements "claimed that NIKE had maintained or enhanced its brand equity and/or competitive standing" even though "NIKE's brand equity and competitive standing declined." ¶ 435.

---

[6] Donahoe's statement in December 2023 that "[s]ix months ago," NIKE had "realigned our entire organization under Heidi O'Neill and Craig Williams as our Co-Presidents" is also true. ¶ 598. The Complaint alleges that O'Neill "has served as President, Consumer, Product & Brand of NIKE since May 2023." ¶ 50; *see* ¶ 54 (describing Williams as "President, Geographies & Marketplace"). And Donahoe's further comment that the reorganization was "making a huge difference in our focus and ability to execute" is corporate puffery. *Cutera*, 610 F.3d at 1111.

The statements about NIKE's "competitive advantage(s)," its "separation" with competition, and its "strong" brand momentum are not "capable of objective verification" and so cannot support a securities fraud claim. *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017). ¶¶ 450, 512, 514, 533, 535, 540, 544, 557, 566, 571, 573, 577. The same applies to Donahoe's statements in late 2021 that NIKE was "in a stronger position relative to our competition than we were prior to the pandemic," ¶ 461, and that NIKE was "in a much stronger competitive position today than we were 18 months ago" (*i.e.*, when the pandemic started), ¶ 489.[7]

Further, the Complaint lacks a single fact that would render NIKE's statements about its competitive advantages untrue at the time of these statements. The Complaint's stray references to "market share" never identify the supposed market, nor plead facts showing any change in metrics measuring market share. *E.g.*, ¶¶ 317 (referring to the loss of "a shit-ton of market share" in unspecified products and in unspecified geographies), 326 (referring to lost market share in "running specialty channel" at the end of Class Period, *after all challenged statements*). Without information about *how* NIKE's competitors performed and *when*, the Complaint does nothing to undermine any of these statements *at the time* they were made.

Plaintiffs also target two statements, from September 2022, that referred to NIKE as the

---

[7] Donahoe's statement in September 2022 that "we see strong consumer demand in North America currently" with "no signs of any softness" (¶ 548) is also not false or misleading. As with other "strong" statements, it is inactionable puffery. *Biogen*, 193 F. Supp. 3d at 42. The Complaint also does not allege that NIKE did not, in fact, see strong consumer demand, nor does it allege any fact contradicting Donahoe's statement that there were "no signs of softness." Indeed, NIKE revenues in North America increased 23% in the first nine months of 2023 compared to the same period in 2022, with a 20% increase in NIKE Direct sales over the same period. Ex. 14 at 32. CW-1's allegation that "management acknowledged that business was softening" in fall 2023 says nothing to contradict Donahoe's statement made a year earlier. ¶ 268.

"number one cool and number one favorite brand." ¶¶ 542, 546. Plaintiffs rely on CW-2's assertion that, "by May 2022, NIKE's 'cool' factor was declining, and that NIKE was no longer the number one 'cool' brand," ¶ 321, which is pure conjecture unsupported by concrete factual allegations. The Complaint "fails to allege with particularity facts supporting its assumptions that the confidential witnesses were in a position to be personally knowledgeable of the information alleged." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009). Because Plaintiffs allege that CW-2's employment ended in "Fall 2022" (which could have been *before* the September 2022 statements), the Complaint does not allege with particularity that CW-2 had access to NIKE's "cool" metrics *when* the statements were made. ¶ 55. Nor do Plaintiffs allege *which* competitor had supposedly surpassed NIKE in "cool" rankings. In fact, CW-2 stated that "'cool' metrics showed that NIKE was losing ground to its competitors, specifically Adidas and Lululemon, both who [*sic*] were gaining points and *catching up* in 'cool' metrics." ¶ 321. Plaintiffs' "catching up" concession confirms that NIKE remained ahead of its competitors.

NIKE's disclosures about competition risk were neither false nor misleading. NIKE warned in each of its Form 10-Ks filed from 2021 to 2024 that "[i]f we do not adequately and timely anticipate and respond to our competitors, our costs may increase, demand for our products may decline, possibly significantly, or we may need to reduce wholesale or suggested retail prices for our products." ¶¶ 455, 527, 584, 605. Plaintiffs allege that this statement is misleading because NIKE had already "lost market share to growing competition." *E.g.*, ¶ 456. But NIKE said right before the challenged sentence (which Plaintiffs conveniently omit) that NIKE faced "intense competition" in "[p]roduct offerings, technologies, marketing expenditures … , pricing, costs of production, customer service, digital commerce platforms, digital services and experiences and social media presence." *See, e.g.*, Ex. 8 at 12. Investors were not misled about competition.

NIKE likewise appropriately informed investors when it warned that the "failure to maintain our reputation, brand image, and culture could negatively impact our business." ¶¶ 457, 529, 586, 607. Plaintiffs allege that this statement was misleading because "NIKE's brand equity and competitive standing had already significantly declined." *E.g.*, ¶ 458. But Plaintiffs do not plead with particularity that NIKE had suffered negative impacts on its business from a supposed drop in reputation, brand image, or culture—much less *at the time of the statements*. *See HRSA-ILA*, 745 F.3d at 1142 (rejecting challenge to similar "could" statement in risk factor).

## II. Plaintiffs Fail to Plead a Strong Inference of Scienter

The Complaint should be dismissed on the separate ground that Plaintiffs fail to meet their "high burden" to plead particularized facts that any Defendant acted with scienter. *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021). Plaintiffs must "allege scienter with respect to *each* of the individual defendants." *Apollo Grp.*, 774 F.3d at 607. A corporate defendant—like NIKE—"is deemed to have the requisite scienter for fraud *only* if the individual corporate officer making the statement has the requisite level of scienter." *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1101 n.12 (C.D. Cal. 2008). And because scienter is necessarily a comparative analysis, *Tellabs*, 551 U.S. at 323-24, the Court must therefore weigh any proposed fraudulent inferences (if supported by particularized facts) against the "opposing innocent inference." *Zucco*, 552 F.3d at 991.

Plaintiffs fail to reach this high bar by claiming that (1) Defendants had *actual* knowledge of the "problems" with CDA, (2) the Court should *infer* Defendants' fraudulent intent, and (3) Defendants had financial *motive* to lie. None of these theories support a strong inference of scienter. Plaintiffs' theory, at bottom, is that Defendants intended to swindle investors when they said CDA strategy "was working" because they purportedly knew that certain challenges would

doom the effort. But "[p]roblems and difficulties are the daily work of business-people"; the fact that the Individual Defendants were aware of them does not make a lie out of Defendants' statements. *Ronconi*, 253 F.3d at 434. Indeed, the far more compelling inference is that NIKE pursued CDA in good faith, made substantial investments to support the strategy, and openly shared its progress and risks with investors. Far from pleading intent to defraud, the most plausible inference is that NIKE's senior officers believed that the Company's ambitious CDA strategy was working—based on three years of strong financial results—and that the Company's investment in technology and infrastructure would support the strategy's long-term success.

### A.    Plaintiffs Fails to Plead Specific Facts to Show Direct Knowledge of Falsity

The Complaint includes no direct facts at all showing that any Defendant had an intent to commit fraud. Instead, Plaintiffs cobble together allegations attributed to 19 CWs who worked at NIKE at various times and ask the Court to *infer* from these CWs that Defendants supposedly knew of business challenges, so they must also have known that CDA was doomed to fail. ¶¶ 668-747. These allegations are plainly insufficient under the PSLRA. CW allegations can support an inference of fraud only in narrow circumstances: (1) the CWs "must be described with sufficient particularity to establish their reliability and personal knowledge" and (2) those statements attributed to CWs "with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco*, 552 F.3d at 995. "[T]he Court may disregard [CW] statements that are speculative, lack specificity, or are not based on personal knowledge." *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *18 (N.D. Cal. Mar. 24, 2014); *Nguyen*, 962 F.3d at 416 (CW allegations "high on alarming adjectives" but "short on the facts" insufficient to plead scienter).

Even a cursory review of the CW allegations makes clear (1) they are unreliable because they either had no direct contact with the Individual Defendants or are not described with sufficient

particularity to explain how the CWs have the information they claim to possess; and (2) the allegations attributable to the CWs do not contradict any of Defendants' challenged statements.

*First*, many of the CWs are not reliable. The Complaint does not describe them with sufficient particularity to establish their reliability and personal knowledge. Plaintiffs essentially concede the lack of particularity for at least seven CWs where Plaintiffs "withheld" necessary details—like period of employment and job title. ¶¶ 55, 58, 60, 65, 66, 68, 71; *see, e.g.*, *Petersen v. Stem, Inc*., 2024 WL 4602710, *5 (N.D. Cal. Aug. 30, 2024) (failure to allege CWs' job titles or responsibilities rendered them unreliable). The Complaint also does not explain how the CWs have the information they claim to possess. For example, Plaintiffs do not explain how CW-2, who was in marketing, would know about supply chain and product-pipeline problems, ¶¶ 55, 288, or how CW-15, who was in the technology group, would know anything about NIKE's competition and product innovation. *See* ¶¶ 245, 289; *see, e.g.*, *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1053-54 (N.D. Cal. 2019) (failure to allege that the CWs were in positions to have the knowledge they profess rendered their allegations unreliable). Regardless, *none* of the CWs are alleged to have reported directly to any of the Individual Defendants during the Class Period; and *only one* of the CWs (CW-3) is alleged to have had any direct interaction with any Individual Defendant.[8]

---

[8] CW-1's allegation that she attended quarterly audit sessions O'Neill *occasionally* attended, ¶ 154, is not enough to establish the reliability of the witness. *See, e.g.*, *In re Coventry Healthcare, Inc. Sec. Litig.*, 2011 WL 1230998, *5 (D. Md. Mar. 30, 2011) (CW's periodic attendance at meetings defendants occasionally attended did not "describe this confidential witness with sufficient particularity to support an inference that this witness could reasonably attribute *scienter* to the [d]efendants") (emphasis in original). The same is true for allegations regarding CW-1's and CW-9's presence at a summit or a sales meeting in which Donahoe, Friend, and/or O'Neill attended. *See, e.g.*, *Scheller*, 450 F. Supp. 3d at 1041-42 ("Merely being present at quarterly 'all-hands' meetings does not demonstrate the requisite personal knowledge to establish scienter").

*Second*, the CW allegations do not help Plaintiffs plead scienter because **none of the CWs identify any specific information conveyed to any Individual Defendant that contradicted any challenged statement.** In other words, no CW "allege[s] contemporaneous facts in sufficient detail and in a manner that would create a strong inference that the alleged adverse facts were known at the time of the challenged statements." *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 3447857, *9 (N.D. Cal. Aug. 27, 2010) (allegations from 22 CWs insufficient where they only raised general knowledge of problems but "[did] not provide the level of particularity from which to infer that Rackable knew that it would miss its gross margin and EPS projections").

For example, Plaintiffs allege, based on CW-1, that Donahoe, Friend, O'Neill, and Parker received quarterly audit reports on unspecified dates over a ten-year period that purportedly included information about unidentified "supply chain *problems*" or "supply chain *issue*." ¶¶155, 369, 671, 719.[9] Yet the Complaint does not allege *what* specific "problems" or "issue" existed, *how* those "problems" or "issues" rendered NIKE's statements false or misleading, *when* these Defendants were made aware, *how* CW-1 knew of the reports' contents, or *how* CW-1 knew these Defendants supposedly received these reports. These general allegations are far too vague to support any inference of scienter. *See In re Apple Comput., Inc.*, 127 F. App'x 296, 303 (9th Cir. 2005) (CW statements alleging defendants' knowledge of "significant [manufacturing] problems" without more specificity were insufficient to plead scienter).

---

[9] Campion, who is alleged to have made a single misstatement about supply chain, is *not* alleged to have received the quarterly audit reports allegedly highlighting "supply chain issues." *See* ¶¶ 113, 391, 510. Instead, he is alleged to have attended monthly technology meetings where problems within the technology group were discussed, ¶ 675, and "all-hands" meetings where he was purportedly made aware of NIKE employees' general unhappiness with the CDA strategy, ¶ 691. These generalized allegations are miles short of the specificity required to support a strong inference that Campion knew that the single challenged statement attributed to him was false or misleading when made, or that he deliberately ignored facts contradicting his statement.

Similarly, CW-2 contends that O'Neill received quarterly business unit reports showing a decline in "cool" metrics (¶ 704), and CW-4 claims that Donahoe received quarterly financial reports (¶¶ 706-07). But, again, the Complaint provides no detail about *what* information these reports showed, *when* they were purportedly received, or *how* they contradicted any challenged statement. *See In re Silicon Graphics, Inc. Sec. Litig.*, 970 F. Supp. 746, 767 (N.D. Cal. 1997) (plaintiffs must plead "titles of the reports, when they were prepared, who prepared them, to whom they were directed, their content, and the sources from which plaintiffs obtained this information").

The allegations attributed to CW-3 also fall short. CW-3 claims she attended monthly technology meetings with Donahoe, Friend, O'Neill, and Campion starting in mid-2022, where CW-3 supposedly shared her concerns about a "compliance maintenance program" impacting NIKE's app in China and the Adobe partnership, which cost over $400 million but which she believed yielded no benefit to NIKE. ¶¶ 188, 190-201. These allegations, at best, show that *some* Individual Defendants knew about *some* challenges in the business. This is insufficient to raise a strong inference that these Defendants (or any other Defendant) made false or misleading statements with fraudulent intent. *Ronconi*, 253 F.3d at 434 ("That [problems and difficulties] exist does not make a lie out of any of the alleged false statements.").

The rest of the CW allegations are unreliable hearsay, conjecture, unsupported opinions, or generalized claims of corporate knowledge that do not support an inference of fraudulent intent. CW-1, for example, alleges that another employee told her during the VP Summit around September/October 2023 that "*the Company had known for a while* that the CDA strategy was not working and that they needed to switch their strategy." ¶ 269. This hearsay statement says nothing about *who* knew *what* and *when*. *See Intuitive Surgical*, 759 F.3d at 1063 (confidential witnesses must provide "first hand knowledge regarding what the individual defendants knew or did not

know" to be indicative of scienter. CW-16's statements that "*there was no way* NIKE's senior leadership did not know how everyone felt regarding the CDA strategy" (¶¶ 372, 686) or how "innovation and pipeline were being negatively affected" (¶¶ 282, 367, 736) is speculation that cannot support an inference of scienter. *See In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 949 (N.D. Cal. 2010) ("[I]t is difficult to surmise how the opinions and observations of the CWs could support a reasonable inference about what the[] Defendants knew or did not know"). The same is true for CW-15's statement that "*it was widely known* within NIKE that the DTC strategy was failing" (¶ 374) and CW-17's allegation that it was "*well known*" within NIKE that "the DTC strategy was not going well" (¶747). These bare "must-have-known" conclusions—untethered to the alleged misstatements—are nothing more than "generalized claims about corporate knowledge" that do not support a strong inference of scienter. *Zucco*, 552 F.3d at 998.

### B. Plaintiffs Fail to Plead Specific Facts to Infer Knowledge of Falsity

Without facts showing that any Individual Defendant knew a challenged statement was false or misleading, Plaintiffs claim that such knowledge should be inferred from (1) supposedly "suspicious" executive departures; (2) the "core operations" theory; and (3) Defendants' purported "admissions." None of these allegations supports an inference of scienter.

***Executive Departures***. Plaintiffs claim that certain executive departures—which were announced and effective at different times over a period of a year—were somehow "suspicious" because they each left NIKE after the announcement of disappointing results. ¶¶ 761-62. But to support an inference of scienter, Plaintiffs "must allege sufficient information to differentiate between a suspicious change in personnel and a benign one." *Zucco*, 552 F.3d at 1002 (resignation of defendant's independent accounting firm a month after the restatement and resignation of other

executives "shortly before" restatement not indicative of scienter).[10]  Plaintiffs plead no such facts

for any Defendant, so their preferred inference "will never be as cogent or as compelling as the

inference" they resigned "for unrelated personal or business reasons."  *Id.*; *Mallen v. Alphatec

Holdings, Inc.*, 861 F. Supp. 2d 1111, 1138 (S.D. Cal. 2012) (CFO's resignation two months after

the alleged "corrective announcement, without any other facts about the resignation, does not

support a strong inference of scienter.").[11]

  ***Core Operations***.  In limited circumstances, a plaintiff may invoke the "core operations"

doctrine to support an inference "that facts critical to a business's core operations or important

transaction are known to a company's key officers."  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776,

782 (9th Cir. 2008).  "Proof under this theory is not easy."  *Intuitive Surgical*, 759 F.3d at 1062.

Only in "rare circumstances" can a plaintiff infer scienter under the core operations doctrine—

where "it would be 'absurd' to suggest that management was without knowledge of the matter."

*Killinger*, 542 F.3d at 786.  Here, the core operations doctrine gets Plaintiffs nowhere.  Simply

because CDA was "important" or "critical," *see, e.g*, ¶¶ 709, 711, does not mean that each of the

Individual Defendants knew all details about what Plaintiffs claim were "critical components" (¶

437) of the CDA strategy or, critically, that such facts would suggest that Defendants' knew their

statements were false or misleading.  *Killinger*, 542 F.3d at 786.  This case is nothing like *Berson*

---

[10] Allegations regarding the departure of Ratnakar Lavu, NIKE's former Global Chief Digital
Information Officer, say nothing about any *Defendant's* intent.  *See Malin v. XL Cap. Ltd.*, 499 F.
Supp. 2d 117, 162 (D. Conn. 2007) ("[I]t is hard to see how the resignation of an executive who
has not been named as a defendant in this action could create an inference of scienter with respect
to the [ ] individuals who have been named.").  ¶¶ 758-59.  Nor does the Complaint allege why
Lavu left, conceding that NIKE's internal email "did not give a reason for [his] departure."  ¶ 758.
[11] Plaintiffs ignore information that was publicly available during that time period which explained
that Campion left NIKE to pursue opportunities as a director of an academic program at UCLA
and CEO of a youth sports business.  There was nothing suspicious about his retirement.

*v. Applied Signal Technology, Inc.*, where it was reasonable to infer that senior officers would have been aware of a stop order on the company's largest contract, which "halted tens of millions of dollars of work it had contracted to do." 527 F.3d 982, 984, 987-88 (9th Cir. 2008).

Rather, Plaintiffs rely solely on vague and unreliable CW allegations that some Individual Defendants attended meetings or received reports concerning the Company's financial results, or generic references to supply chain "problems," "issues," or a "shadow organization" to assess Defendants must have acted with scienter. ¶¶ 719-21. But "[m]issing are allegations linking *specific reports and their contents* to the executives, not to mention the link between the witnesses and the executives." *Intuitive Surgical*, 759 F.3d at 1063. Plaintiffs cannot cure their lack of specific allegations supporting any Individual Defendants' scienter by repackaging these same deficient allegations under the "core operations" umbrella. *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 612 (4th Cir. 2021) ("Plaintiffs are simply asking us to assume scienter because part of [the company's] business plan was not going smoothly. This we cannot do.").

***Defendants' Statements***. Plaintiffs also point to Donahoe's and Friend's end of/post-Class Period statements as supposed "admissions" of their knowledge. ¶¶ 765-70. But "later, sobering revelations" do not by themselves "make the earlier, cheerier statement a falsehood." *Cloudera*, 121 F.4th at 1189. For a "subsequent statement [to be] sufficient to demonstrate [defendant's knowledge of] falsity of a prior statement," the statement must be "along the lines of 'I knew it all along.'" *Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, *21 (N.D. Cal. Apr. 27, 2017).

Here, none of Donahoe's and Friend's later statements amount to an admission that "they knew all along" their prior statements were false. For example, Donahoe stated in March 2024 that NIKE was "making, and started nine months ago, important adjustments in [its] offense" by "putting the consumer and sport squarely back into [its] offense" (¶ 766) and that the Company

had "spent a lot of time leaning in with [its] wholesale partners" (¶ 769). "NIKE must be faster," he said, and must "drive a continuous flow of new product innovation" (¶ 767), and "become bolder and more distinctive" in brand marketing (¶ 768). Friend stated that NIKE has been "more focused on trying to achieve [a] mix of marketplace targets than [it has] serving consumer demand where the consumer is shopping." ¶ 769. Defendants merely shared with investors that NIKE had changed its strategy—something the Company was transparent about all along and "cannot be the basis for finding scienter. Indeed, . . . businesses should be encouraged to innovate and change course when necessary in the face of shifting market conditions." *Cheng v. Canada Goose Holdings Inc*., 2021 WL 3077469, *11 (S.D.N.Y. July 19, 2021).

### C.    Plaintiffs Do Not Allege a Plausible Motive to Commit Fraud

With no facts to support that Individual Defendants lied to investors either knowingly or with deliberate recklessness, Plaintiffs allege that the Individual Defendants had motive to lie— *i.e.*, for their own financial gain. Plaintiffs' feeble attempt to plead motive falls flat and, in any event, motive alone cannot establish a strong inference of scienter. *See Zucco*, 552 F.3d at 997.

***Executive Compensation Plan.*** Plaintiffs contend that because executive compensation was tied to NIKE's stock price and its digital revenues, the Individual Defendants had an illicit motive to (1) keep NIKE's stock price high and (2) focus on growing NIKE's digital sales even if such growth was unsustainable. ¶¶ 771-72, 775-80. These allegations do not support an inference of scienter for two reasons. *First*, "it is hardly unusual for an officer of a publicly traded company to hope to maintain—or increase—the company's stock price." *Joyce v. Amazon.com Inc*., 2025 WL 835054, at *4 (W.D. Wash. Mar. 17, 2025). *Second*, there was nothing nefarious about NIKE's decision to use digital revenues as one criterion for compensation. Indeed, "it is common for executive compensation … to be based partly on the executive's success in achieving key

corporate goals." *Rigel*, 697 F.3d at 884; *see also Joyce*, 2025 WL 835054, at *5.

 ***Stock Sales.***  Stock sales by insiders may only constitute circumstantial evidence of scienter where the sales are "unusual or suspicious." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999), *superseded by statute on other grounds*. Stock sales are suspicious when "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Id.* None of the alleged "sales" by Donahoe, Friend, or Parker, ¶¶ 781-87, were unusual or suspicious, and Campion is not alleged to have made any sales, which defeats any attempt to plead motive as to him. The same is true for O'Neill, who is also not alleged to have made any sales.

 Donahoe ***did not sell any shares during the Class Period.*** *See* Ex. 23. All of his supposed "sales" were transactions where the Company *withheld* shares to satisfy his tax withholding obligations. *Id.*; *see In re Eargo, Inc. Sec. Litig.*, 2023 WL 5663154 (N.D. Cal. Aug. 31, 2023) ("[N]on-discretionary sales generally do not support an inference of scienter."). Friend's and Parker's sales also were not dramatically out of line with their prior trading practices. Friend sold only about 30,000 more shares during the Class Period than the comparative period Plaintiffs selected. ¶ 783; Ex. 24; *see In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096 (N.D. Cal. 2006) (sales by defendant of 50,000 more shares during class period not suspicious). Parker ***sold 41% more shares during an earlier period***. *Compare* ¶ 786, *with* Ex. 25; *see, e.g.*, *In re Ditech Commc'ns. Corp. Sec. Litig.*, 2006 WL 2319784, *8 (N.D. Cal. Aug. 10, 2006) (sales not suspicious when defendant sold more stock preceding the class period).

### D.   The Competing Non-Fraudulent Inference Is Far More Compelling.

 Here, the opposing non-fraudulent inference is far more compelling: NIKE's senior officers believed in and implemented an ambitious, multi-billion-dollar business strategy that

prioritized direct and digital sales. The strategy paid off for many years, delivering outstanding results to NIKE investors and underscoring the belief that the strategy was working and that NIKE's investments in digital technology and infrastructure would yield long-term growth. The strategy began to stall as consumers returned to in-store shopping as the global pandemic waned and NIKE's digital and direct businesses lagged expected growth. But the fact that the CDA strategy did not deliver anticipated long-term results and that NIKE eventually changed course *does not* mean the Individual Defendants knew all along the strategy was doomed to fail or they were lying every time they uttered a word about the CDA strategy. NIKE believed in its strategy, and that it would deliver value to investors. That is evidenced by the fact that NIKE repurchased nearly 150 million shares of the Company's stock during the Class Period. *See* Exs. 8, 13, 17, 21. This $16 billion investment would make no sense if, as Plaintiffs claim, the Individual Defendants knew that the Company's stock price was artificially inflated. *In re Tibco Software, Inc.*, 2006 WL 1469654, at *21 (N.D. Cal. May 25, 2006) ("[S]tock repurchase programs actually negate a finding of scienter."). Here, the non-fraudulent inferences far outweigh Plaintiffs' far-fetched and unsupported theory that everything the Individual Defendants said about the CDA strategy was designed to deceive investors. That is particularly true for Campion, who sold no stock, and whose only challenged statement is proven true by the article from which Plaintiffs cherry-picked the excerpted quote.[12]

**CONCLUSION**

For the above reasons, Defendants' motion to dismiss should be granted with prejudice.

---

[12] Because Plaintiffs fail to plead an underlying violation of Section 10(b), their Section 20(a) claim fails as well. *Rigel*, 697 F.3d at 886.

Page 35 - DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CONSOLIDATED CLASS ACTION ALLEGATION COMPLAINT

DATED:  May 12, 2025

STOEL RIVES LLP


*/s/ John Casey*
B. John Casey, OSB No. 120025
  john.casey@stoel.com
Alex Van Rysselberghe, OSB No. 174836
  alex.vanrysselberghe@stoel.com
Telephone: (503) 224-3380

GIBSON, DUNN & CRUTCHER LLP
Brian M. Lutz *(Pro Hac Vice)*
  blutz@gibsondunn.com
Jessica Valenzuela *(Pro Hac Vice)*
  jvalenzuela@gibsondunn.com
Jeff Lombard *(Pro Hac Vice)*
  JLombard@gibsondunn.com


*Attorneys for Defendants Nike, Inc., John J. Donahoe II, Matthew Friend, Mark G. Parker, Heidi L. O'Neill, and Andrew Campion*