IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


IN RE:  NIKE, INC., SECURITIES      )  No. 3:24-cv-00974-AN
LITIGATION                          )
                                    )  February 3, 2026
                                    )
                                    )  Portland, Oregon
                                    )
                                    )
                                    )
                                    )


**TRANSCRIPT OF PROCEEDINGS**

(Oral Argument)


BEFORE THE HONORABLE ADRIENNE NELSON

UNITED STATES DISTRICT COURT JUDGE


**COURT REPORTER:**
Kellie M. Humiston, RMR, CRR
(503) 326-8186
Kellie_Humiston@ord.uscourts.gov

**A P P E A R A N C E S - i**

FOR THE PLAINTIFF CITY PENSION FUND and MOVANTS CAISSE DE DEPOT and DEKA INVESTMENT:

STOLL STOLL BERNE LOKTING & SCHLACHTER
By:  Timothy S. DeJong
209 SW Oak Street
Fifth Floor
Portland, OR 97204

FOR THE MOVANTS CAISSE DE DEPOT and DEKA INVESTMENT:

LABATON KELLER SUCHAROW
By:  Irina Vasilchenko
140 Broadway
34th Floor
New York, NY 10005

FOR THE MOVANTS CAISSE DE DEPOT and DEKA INVESTMENT:

LABATON KELLER SUCHAROW
By:  Matthew J. Grier
140 Broadway
34th Floor
New York, NY 10005

FOR THE MOVANTS CAISSE DE DEPOT and DEKA INVESTMENT:

LABATON KELLER SUCHAROW
By:  Carol C. Villegas
140 Broadway
34th Floor
New York, NY 10005

FOR THE MOVANTS CAISSE DE DEPOT and DEKA INVESTMENT:

LABATON KELLER SUCHAROW
By:  Mark S. Willis
140 Broadway
34th Floor
New York, NY 10005

**A P P E A R A N C E S – ii**

FOR THE DEFENDANT NIKE, INC.:
STOEL RIVES
By:  B. John Casey
760 SW Ninth Avenue
Suite 3000
Portland, OR 97205

FOR THE DEFENDANT NIKE, INC.:
GIBSON, DUNN & CRUTCHER
By:  Jessica Valenzuela
310 University Avenue
Palo Alto, CA 94301

FOR THE DEFENDANT NIKE, INC.:
GIBSON, DUNN & CRUTCHER
By:  Brian M. Lutz
One Embarcadero Center
Suite 2600
San Francisco, CA 94111

FOR THE DEFENDANT NIKE, INC.:
GIBSON, DUNN & CRUTCHER
By:  Jeffrey D. Lombard
310 University Avenue
Palo Alto, CA 94301

(February 3, 2026, 1:03 p.m.)

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  We are here for oral argument in lead case 3:24-cv-00974-AN, In Re:  NIKE, Inc., Securities Litigation.

Counsel, please state your name for the record, beginning with plaintiffs.

MR. DEJONG:  Thank you.  Tim DeJong with Stoll Berne for the plaintiffs.  I'm joined with several of my colleagues from Labaton in New York.

MR. GRIER:  Matthew Grier from Labaton.

MS. VASILCHENKO:  Irina Vasilchenko from Labaton.

MS. VILLEGAS:  Good afternoon, Your Honor.  Carol Villegas from Labaton.

MR. WILLIS:  Mark Willis from Labaton.

THE COURT:  All right.  Good to see you all.

Go ahead.

MR. CASEY:  Good afternoon, Your Honor.  John Casey, Stoel Rives, on behalf of defendants.  I have my colleagues from Gibson, Dunn here with me as well.

THE COURT:  Yes.

MS. VALENZUELA:  Jessica Valenzuela from Gibson, Dunn, Your Honor.

MR. LOMBARD:  Jeff Lombard from Gibson, Dunn.

MR. LUTZ:  Brian Lutz from Gibson, Dunn.

THE COURT:  Nice to see you all.  You can have a seat.

So we have scheduled about an hour.  Of course I'm not going to hold you to right at an hour, because I have some questions dealing with this motion to dismiss.  I did receive the hard copy of the presentation that will be used, but I wanted to let you know that I did read several times your submissions so that I could be up to speed, but I still have some questions.

I want to address the judicial notice portion first and then we'll go to the motion to dismiss, and I'd like for you to utilize your 30 minutes that you have for the motion to dismiss.  Your -- the questions that I'm asking you around judicial notice don't count towards that.  That should have been obvious, but I like to state the obvious.

So it did appear that the defendants did ask the Court to take judicial notice of a number of documents in the exhibits, 23, 24, and 25, and it didn't seem that there was any objection.  Of course, if the Court does take judicial notice of these documents, and they will be incorporated by reference.  I will not take the documents as truth as to the statements.  So I wanted to be clear as to how I would accept it, but plaintiffs, it didn't seem that you had any objections with that understanding.  Is that correct?

MS. VASILCHENKO:  Your Honor, if I may briefly address that.

THE COURT: Absolutely.

MS. VASILCHENKO: Yes. That is generally correct, but we did have one objection that was lodged in our opposition brief, and that's based on the *Khoja* Ninth Circuit case that we cited therein. It's exactly what Your Honor just explained, is that we don't want -- we object to the extent the documents are being used for an improper purpose for truth of the matter asserted to dispute the factual allegations of the complaint including, for example, defendants' reliance on NIKE's revenue numbers and the data, the growth that that represents. They're using that to dispute the allegations by the CWs that the strategy was resulting in under-performance at the time and, therefore, was not working.

And we submitted a notice of supplemental authority about a recent Ninth Circuit decision actually from just last week, the *ON24 Securities* case --

THE COURT: Yes.

MS. VASILCHENKO: -- where the Ninth Circuit --

THE COURT: The case was cited. Yes, I knew it had been cited anyway.

MS. VASILCHENKO: Exactly. And it actually reversed the court with respect to some of the risk warnings statements, but then it also noted in a footnote that the court had improperly incorporated by reference and judicially noticed certain revenue data that defendants had similarly relied on to

contest the complaint allegations of churn and other issues that were at issue there.  So we similarly object, but that's the one main objection.

And there was one logistical thing.  I think one of the exhibits, the article that included the supply chain statement by Defendant Campion, in preparing for oral argument, we noticed that it was missing some text that we had alleged in the complaint, including text that called him NIKE's supply chain guru.  That was missing in the exhibits submitted by defendants.

THE COURT:  You want it for completion?  You want it to be supplemented so that it will be complete?

MS. VASILCHENKO:  Yes.  If Your Honor would allow us, we can submit another version of that article that includes the full text that was missing in defendants' exhibit.  So that -- those were the only objections that we wanted to address.

THE COURT:  Well, as I kind of stated, I would not take those for the truth.  So I am going to take judicial notice of those exhibits.

Can you work together?  I would assume that the article -- that that was just some kind of a human error, because --

MS. VASILCHENKO:  Of course.  We will confer with defense counsel and submit another version that's complete.

THE COURT:  All right.  That's fine.  Can you do it within -- by the end of the week?

MS. VASILCHENKO:  Absolutely.  No problem.

THE COURT:  All right.  Thank you.

MS. VASILCHENKO:  Sure.  And if you don't have any further questions, I will let defense counsel speak.

THE COURT:  Yes.

MS. VALENZUELA:  Your Honor, would you like to proceed with the motion to dismiss now?

THE COURT:  Yes.  I just wanted to make sure that -- I had broken down some questions around marketplace strategy, Adobe partnership, innovation, pipeline strength, the "may" and "could" statements, and the cool metrics.  And you can do your argument and then I may have additional follow-up.  I don't want to interrupt what you're planning to present, but I was specifically focusing on statement numbers 19, 31, 44, 49, 51, 53, 59, 71, 73, 77, and 78.

MS. VALENZUELA:  Okay.  Can you give me a moment to just note those?

THE COURT:  No, no, no.  I can say it again for you if you want me to, because I understand I just kind of rattled off --

MS. VALENZUELA:  I jotted them down.  I just wanted to make my way through the parts to mark those, and it will take me a little bit of time --

THE COURT:  No.  That's okay.

MS. VALENZUELA:  -- because they're lengthy.

MS. VASILCHENKO:  Our apologies for the length, Your Honor.

THE COURT:  No, no.  With this type of litigation, it's going to be long, so no apologies are needed.

(Pause in proceedings)

MS. VALENZUELA:  Okay, Your Honor.  I appreciate the indulgence --

THE COURT:  Yes.

MS. VALENZUELA:  -- as I noted which of the statements you were interested in.

THE COURT:  So in particular regarding that marketplace strategy, I just wanted you to -- because you're getting ready to do your presentation, could you tell me what allegations in that statement Number 71 show that Donahoe had knowledge of that change before the statement was made?  I'm curious to know.

MS. VALENZUELA:  Are you asking what allegations are in the complaint to support Donahoe's knowledge?

THE COURT:  Yes.  Yes, regarding the marketplace strategy.

MS. VALENZUELA:  Well, certainly our CEO --

THE COURT:  But you can incorporate that into your presentation.

MS. VALENZUELA:  Because, of course, there are no allegations in the complaint that establish that any of the defendants acted with knowledge to commit securities fraud, and I

will cover that in my planned remarks, and I think I am planning to cover all of the statements that it appears Your Honor is interested in learning more about, but I do think it's important to step back and look at the big picture here --

THE COURT:  Yes.

MS. VALENZUELA:  -- because essentially we're here today simply because NIKE's stock price dropped.  And that happens with public companies.

Plaintiffs are trying to plead by hindsight that NIKE and its executives committed securities fraud, but I think, as it is clear from the complaint, there aren't any specific facts that support either that any of the nearly 80 statements were false or misleading when they were made, and there certainly aren't any specific facts in the complaint that show an intent by NIKE's top executives to commit fraud.

Plaintiffs' theory is that a group of NIKE executives essentially conspired for a period of nearly four years to mislead investors about its Consumer Direct Acceleration strategy by making statements that the strategy was working, and that is, as plaintiffs must concede, during a period when the CDA strategy was working.  NIKE was delivering historic revenue growth and an increase in digital sales, exactly what the CDA strategy set out to do.

The complaint doesn't plead any specific facts that the executives knew at the time that CDA was not working, because

remember, under the Private Securities Litigation Reform Act, which governs the pleadings standard in this case, plaintiffs must plead with specific and particularized facts that at the date of each of those statements, that the speaker knew that he or she was misleading the market.

On the element of scienter, given that it is inherently comparative, the complaint has to plead that it is more likely that NIKE's executives conspired to commit fraud rather than that NIKE acted in good faith implementing a complex, transformative, multi-billion-dollar strategy that was ambitious and that obviously would have taken some time to redirect the employees within the company.  And for many years the strategy did work until it didn't.

And when the strategy, when it -- when it became apparent to the executives that CDA wouldn't have the long-term growth that they had hoped, they were transparent with the market.  Beginning in December 2023, as plaintiffs concede, and on each of the earnings dates until the end of the class period, NIKE was transparent with investors that its strategy was not turning out as it had planned.  They didn't know it when they set out, and to plead securities fraud, plaintiffs would have to prove that, and to plead that with specific facts that when the CDA strategy began, everybody knew it was doomed to fail.  The complaint does not plead that story.

And plaintiffs' theory also would require the same

executives, who allegedly had been lying for three years, all of a sudden decided to come clean, and that is without any external reason requiring them to and what you would typically see in a securities fraud case, that is, there was no financial restatement. In fact, plaintiffs don't challenge a single one of NIKE's financial metrics during the entire class period. They accurately reported what their performance was. Plaintiffs don't allege otherwise.

There was no whistleblower exposé on social media causing the executives to come clean, there was no government investigation, there was no short seller report, and none of the hallmarks of what you would expect to see if executives were misleading the market.

Instead, what do we have: claims by plaintiff that NIKE, which is perhaps the most recognizable brand in the entire world, was misleading investors by claiming the company was innovative and cool and consumers wanted its product. That, Your Honor, is not a securities fraud claim.

To cobble together their theory of fraud, plaintiffs cherry-picked statements that NIKE made over this 41-month period. They take statements out of context, they mischaracterize what defendants actually said.

And I'm glad Your Honor started with the subject of judicial notice, because I think it is really important in a case like this. The entire reason that the Incorporation by Reference

Doctrine exists is to prevent plaintiffs from doing what they're doing here, and that is plucking out sentence fragments from 100-page disclosures, cobbling together, moving statements around, and trying to portray that NIKE was saying something to the market that it didn't actually say. And I do think it is really important to scrutinize the way plaintiffs characterize statements in the complaint with what was actually said.

And when you look at what NIKE actually said, it is clear that it was providing a very measured and nuanced view to the market of its performance and of its challenges. And contrary to what plaintiffs argue, while CDA was delivering historic revenue, while it was increasing digital sales, it wasn't without challenges, and the disclosures of those challenges are replete through the exhibits that we've submitted.

And while the Court under the Incorporation by Reference Doctrine, the *Khoja* case tells us, can't review those documents to contradict well pled allegations, allegations must be well pled in the first instance, and they aren't here, Your Honor.

Counsel's remark about using those documents to show NIKE's financial metrics, there's no allegations in the complaint by a single confidential witness as to what the, quote unquote, true financial metrics were. So those -- that data is not contradicting anything that's in the complaint. Rather, what those documents reflect is what NIKE actually said.

And I do want to draw your attention, Your Honor, just to the overall picture on the statements that -- that the CDA strategy was working. And first, if you could turn to page 4 of the deck we've provided, I think it's important to look at these statements in the context of the entire timeline, because the complaint does jumble together dates and periods and sort of suggest that if circumstances existed at one period during the class period, they existed throughout. That isn't the case. And under the PSLRA, of course, we have to look at what contemporaneous facts existed at the time of each statement.

If you look at the timeline, statements that the CDA strategy was working go through June 29, 2023. And you raised, Your Honor, statement -- a statement by John Donahoe, Number 71, that the marketplace strategy remains the same. That statement was made in September of 2023. At that point, NIKE is no longer saying to the market the strategy is working. By that point, and the complaint alleges an internal NIKE summit in -- some time in the fall of 2023 where NIKE began to realize that some of the long-term growth might not -- might not materialize, NIKE was telling a very different -- making a very different message to the market after that point. So "CDA strategy is working," those statements are up to June 29, 2023, and then the tone changes.

And if you look it up to June 29, 2023, let's look at the second slide in the deck, and this is a depiction of plaintiffs' own allegations in paragraph 710. And in

paragraph 710, what plaintiffs allege and they concede, that the entire point of the CDA strategy "...was to increase NIKE Direct as a percentage of NIKE's revenue while driving sustainable growth..."  And the line graph you see there, those percentages come right out of paragraph 710.  And what does it show?  That NIKE Direct sales as a percentage of NIKE brand revenue was increasing during the time that NIKE said CDA was working, up to 44 percent in fiscal year 2024.

Plaintiffs' strategy seems to be -- their theory seems to be that, well, how could -- how could NIKE tell the market CDA was working when it had all sorts of internal challenges and struggles that it was -- that it was facing?

And here I want to draw your attention to the supply chain statements.  And if you could turn to page 5, you can see there, Your Honor, the dates on which the challenged statements about supply chain were made, and those were from the beginning of the class period up through April of 2023.  So the entire last year and a half, there aren't any statements challenged about supply chain.

And plaintiffs' theory there is that NIKE is touting that it had already developed a direct-to-consumer supply chain, when in reality, as the complaint alleges, there were all sorts of internal problems.

But here, plaintiffs are trying to rewrite what NIKE actually said.  NIKE never said, "We're done.  We have a perfect

supply chain, and that's going to support our -- our strategy." No. What NIKE actually said is that it was investing in and building a supply chain. NIKE never said it was finished and never said that it encountered no issues.

And the *Tesla* case from the Ninth Circuit tells us that when plaintiffs rewrite what -- what the defendants have said, that can't be the basis for a securities fraud claim.

And when you look at what NIKE actually disclosed -- and here if you go to pages 11 and 12, you'll see -- and, again, this is the importance of the Incorporation by Reference Doctrine, because plaintiffs are saying NIKE never said it had supply chain problems. Here, we have two pages of just examples of some of the disclosures about supply chain issues. Q1 fiscal year '22, near the beginning of the class period, NIKE said it had -- it was lowering -- lowering its guidance because of supply chain impacts. It said that it had lead to short-term inventory shortages, it couldn't get its product to where it needed to be, it had elevated transit times that had an impact on NIKE's business.

If you could go to the next page, 12, NIKE says, "...we are not immune to the global supply chain headwinds that are challenging the manufacture and movement of product around the world."

And I think even more pointedly, Q4 of fiscal year '22, "...consumer demand has significantly exceeded available

inventory supply"; we can't get our product to where our consumers are.

So the picture that plaintiffs are trying to portray that NIKE had supply chain issues, they did, but they were clear with the market about that and they were clear that it was impacting their bottom line.  That's not fraud.  In fact, that is the opposite of what you would see from executives who were trying to commit fraud.

You raised some questions and wanted to discuss some of the statements about the pace of innovation.  Plaintiffs -- and I think you referenced, Your Honor, statements 19 and 59 and 73. The allegation here, plaintiffs' theory, is that NIKE committed fraud by saying its pipeline was strong, innovation is a competitive advantage, and that somehow NIKE intended to mislead investors with these statements.

And first, these are the types of statements that courts routinely hold are not capable of objective verification and therefore can't form the basis of a securities fraud claim, but even if they were, even if we want to say these are not typical corporate optimism, which we would submit they clearly are, because how do you measure innovation and the pace of innovation, if you look at slide 13, Your Honor, there are -- and these are just a handful of examples, quarter after quarter after quarter with NIKE telling the market:  Here are all of the products we're bringing to the market.  We have new sustainable,

environmentally friendly materials, that NIKE built a million-square-foot Serena Williams facility dedicated to design and innovation.

The notion that NIKE was not innovating during this time finds no support in the complaint or in the record. And I would note that the so-called facts that plaintiffs point to to support that there was no innovation is a single confidential witness who said she couldn't find new things she wanted to buy in the NIKE store. That is not the type of specific fact that the -- that can support a securities fraud claim under the PSLRA. We don't even know what -- when she went to the store during the class period.

And I think tied to the concept of innovation is this theory that NIKE flooded the market with classic franchises because it didn't have innovative product. Now, NIKE told investors it was doing this. It was clear. And this, again, ties to the supply chain challenges. NIKE said to the market: Because of these supply chain issues, we are going to lean more heavily on our classic franchises, Air Jordans, Dunks, products that consumers love and they will buy without a discount, and we are going to use this until we can get our supply chain issues in order.

And I would note this is explained in some detail in Exhibit 9. This is the Q1 2022 earnings call from September 2021, pages 8 through 10, and Exhibit 12, which is the

Q4 '22 earnings call.  NIKE was clear with investors what it was doing with its classic franchises.

And I know plaintiffs have pointed to so-called admissions at the end of the class period that the pace of innovation -- that NIKE needed to accelerate the pace of innovation at the end of the class period.  That doesn't mean they weren't innovating during the class period, right?  There was no admission that NIKE knew all along that innovation was essentially non-existent, which is what the complaint would have to plead.

And under the *Hong v. Extreme Networks* case that we've cited in our briefs, for so-called admissions to establish a strong inference of scienter, the admissions have to be along the nature of, "I knew it all along," and you don't find that anywhere in NIKE's statements.  The *Cloudera* case from the Ninth Circuit stands for a similar principle where in that case the alleged admissions were, "We weren't very competitive" and, "We were at a competitive disadvantage."  That is, Your Honor, materially the same as the alleged admissions here that the Ninth Circuit said were not sufficient to plead intent.

I want to touch on -- I think there's two topics I haven't covered yet, that's the Adobe and the technology issues and the cool --

THE COURT:  Yes.

MS. VALENZUELA:  -- the statements about NIKE being

cool.

So let's start with technology. And I think to step back there, it's important to keep in mind what the theory is about technology broadly, and that is, again similar with the supply chain, that NIKE's statements that it was building and innovating and investing in technology somehow communicated to the market that that work was done, they were finished, no more work to do. And, again, this is an example where plaintiffs are trying to rewrite what NIKE actually said, because NIKE never said, "We're done."

And I think -- and I'm going to have to put my glasses on for this, because the font is small, but in -- I think NIKE's risk factors about technology actually prove the point here. And I am referring to Exhibit 8, and this is pages 18 and 19 of 42. And as Your Honor noted, plaintiffs did allege that some of these risk factors are misleading. Not so when you read the entire risk factor in context and don't focus on the cherry-picked language that plaintiffs have in the complaint, because what you'll see here is NIKE tells its investors, "Our NIKE Direct operations, including our retail stores and digital platforms, have required and will continue to require significant investment."

Later in that same paragraph, they say their "...digital offerings will require continued investment in the development and upgrading of our technology platforms."

They say further, off onto the next page, "...as use of our use of digital platforms continues to grow, we will need an increasing amount of technical infrastructure to continue to satisfy our consumers' needs."

What was NIKE telling the market?  "We've spent a lot of money on technology and there is more work to be done.  It's going to be expensive.  We're not done.  We still need to do more."  That, Your Honor, is not fraud.

You flagged one statement about the Adobe platform, statement 31, I believe.

THE COURT:  Yes.

MS. VALENZUELA:  And I believe that was Mr. Friend's statement.  Give me one second to pull it up.

THE COURT:  I'm looking at my notes, and I also had looked at -- I was (pause) --

MS. VALENZUELA:  Donahoe, yeah.

THE COURT:  31 and 66.

MS. VALENZUELA:  Okay.  31 where Donahoe says, "The Adobe platform has played such an important role of delivering a more personalized experience for our consumers", this statement was made in March of 2022.

As you may recall, Your Honor, the Adobe partnership was announced in 2021.  This is a massive technology undertaking.  It takes time to implement and -- and write software and implement a new system into a massive enterprise like NIKE.

What was the other statement, Your Honor?

MR. LUTZ:  66.

MS. VALENZUELA:  Oh, 66.  That was Mr. Friend's statement on June of 2023.  And what does he say there:  "...we have partnered with Adobe..."  That was true.  The complaint concedes that.  "We are only beginning to operationalize these new capabilities and consumer experiences..."  That's entirely consistent with the notion that NIKE was in the process of building out its technology.  It wasn't done:  It never told investors that; indeed, quite the opposite.  And the complaint actually concedes that Adobe was making progress.  So this notion that it was a waste of money and did nothing, the complaint itself refutes that conclusion.

You see in paragraph 211, by 2022, again, and this is the year after the partnership even started, NIKE was already launching pilots of a new CMS system.  In paragraph 226, the Adobe Target product was already being used for A/B testing.  I don't know what that is, Your Honor, but obviously work had to be done to get to that place.  By June of 2022, again, the very next year, NIKE had already rolled out the Adobe Experience platform.

So work was being done, progress was being made.  NIKE didn't mislead anybody about its partnership with Adobe.  And it was clear with investors that its technology, the systems it needed to build and put in place to support its CDA strategy were underway, but there was a lot more work that needed to be done.

The cool brand.  I actually -- I think NIKE's cool.  I think that the challenge here from plaintiffs' -- from plaintiffs' theory, of course, is that they have to plead with specific facts that those statements were false when they were made.  And the statement September 2022 -- plaintiffs have a single confidential witness that they point to that they claim undermines this statement, and that is Confidential Witness 2, who said the cool metric in May 2022 showed NIKE was losing ground to competitors among 18 to 24-year-olds.  May 2022:  they point to that to allege that a statement many, many months later was false.

And we know consumers are fickle and preferences change.  And what my teenage boys thought was cool in May is probably not the same thing they're going to think is cool in September.

So even if you credit Confidential Witness 2's allegations about the cool metric in May 2022, first of all, that says nothing about NIKE's cool rankings in September of 2022.  And the statement itself doesn't even say NIKE isn't number one.  It says it was losing ground to competitors, meaning they were catching up.  And in order to catch up, NIKE had to be on top.  That's all that plaintiffs have to point to and claim that these "cool" statements were wrong.

And the risk factors, while we're here talking about brand and competition, you wanted me to discuss the risk factors

and the May statements.  And I want to look at the language of that risk factor, because I think if you -- if you look at it and read what NIKE actually said, you'll see that this is on four corners with the *Adidas* case out of the Ninth Circuit.

Here what NIKE says, and I'm referring to Exhibit 8 on page 15 of 42 -- and I know that there are multiple risk factors during the class period that plaintiffs challenge, but the language is -- is the same.  NIKE says, "NIKE is a consumer products company and the relative popularity of various sports and fitness activities and changing design trends affect the demand for our products..."

They're not saying, "it may affect."  They're saying, "it affects.  This is a risk that we are facing today."  As in the *Adidas* case, the risk was taken, it's taken as a given.

NIKE continues to say, "Our NIKE Direct operations, both through our digital commerce operations and retail stores, also compete with multi-brand retailers..."  The risk is present, and NIKE is telling investors that.  This isn't hypothetical.  They're saying it is happening today, it will continue to happen.

NIKE says in the paragraph below that:  Product offerings, technologies, and marketing expenditures... pricing, costs of production, customer service, digital commerce platforms, digital services and experience in social media presence are areas of intense competition.

"Intense competition."  That isn't, "We may face

competition."  It is, "We do, it's intense, and it will continue."

I want to -- I think I've addressed the specific statements that -- that Your Honor flagged.  And when you look at the allegations in the complaint and you look at the documents that are incorporated by reference, there simply aren't specific facts that establish a single one of the statements was false.  They aren't there.

Falsity isn't the only element that plaintiffs need to plead.  They also have to plead an intent to mislead investors.  And they can't point to NIKE as a company, they can't point to an amorphous group of defendants.  They have to plead with respect to each individual defendant that there are specific facts in the complaint that show scienter, and they don't do that.

And the Court, of course, must also look at the allegations holistically.  And as I said at the outset, the theory of fraud here simply doesn't make sense.

And I will draw the Court's attention to slide 3.  And this is an illustration of the guidance, the financial guidance, some of it, that NIKE provided to investors during the class period.  And you would expect for a company that is intentionally committing fraud, that it wouldn't give investors an accurate view of what its future performance will be, but here you see, at least up until the end of the class period, where plaintiffs concede NIKE was honest with investors about its CDA strategy,

NIKE was actually really good at predicting what its future performance would be. In fiscal 2021, it projected revenue guidance of flat to up year over year. It actually knocked that one out of the park. 2022, up mid single digits. Right on the nose, 5 percent. 2023, up low double digits on a currency neutral basis. Again, 10 percent, right on the nose.

A company that is trying to mislead investors does not give them an accurate view of their future financial performance, but NIKE did that.

The other circumstantial evidence, we'll call it, that plaintiffs rely on to attempt to plead intent by the defendants are stock sales. And in the Ninth Circuit, stock sales, motive, financial incentive is never sufficient by itself to plead scienter, but even if you look at the stock sales that have been alleged, they don't -- they don't even contribute to an inference of scienter if we had other allegations, which of course don't exist, because plaintiffs would have to plead that the stock sales were unusual and suspicious and not consistent with prior trading practices, and you don't have that here.

First of all, there are two defendants, O'Neill and Campion, who aren't alleged to have made any stock sales during this period. You've got John Donahoe. The only disposition of stock that he had during the class period was for tax withholdings, so he didn't even personally benefit from that.

So that leaves us with Parker and Friend. Parker sold

more during the control period than he did during the class period.  And Friend's sales were pursuant to a preestablished 10b5-1 trading plan.  They were non-discretionary trades.  He couldn't decide whether to buy or sell.  That was set some time in advance.  Stock sales get plaintiffs nowhere.

And their allegations about the executive compensation plan that tied executive compensation to NIKE's performance, also not at all unusual or suspicious.  In fact, we would want public company executives to share their investors' goals of increasing value.

Plaintiffs also point to the departures of John Donahoe and Andy Campion during the class period.  Nothing nefarious at all about these departures.  John Donahoe was 68 years old, he'd been a public company executive for over 20 years.  I -- he retired, as we see in Exhibit 22, page 2.  Plaintiffs don't offer any facts, specific or otherwise, that John Donahoe left for any other reason than perhaps he was tired.

And Andy Campion left years after this single alleged misstatement he made.  He only made one alleged misstatement, Your Honor, and that was in May of 2022 in a Women's Wear Daily article.  If he was trying to mislead investors, that seems like an awfully odd place to do it, in a women's fashion magazine, but nonetheless, that alleged misstatement in May 2022 about the supply chain, and we covered -- we covered that, but his departure was years after this single alleged misstatement that

he made.  And there's no allegations, as the *Amazon* case requires, no allegations as to what NIKE's typical hiring and firing practices were.  So the executive departures don't get plaintiffs anywhere, either.

So when you step back and look at this, the overall theory doesn't make sense, the specific allegations don't support falsity or scienter.  I mean, sure, there are 19 confidential witnesses that plaintiffs cite, and that may on its face seem like a large number.

The Ninth Circuit in *Zucco* cautions that reliance on confidential witnesses, they are inherently suspicious, of course, shrouded in secrecy, so they can only be reliable if the complaint pleads with specific facts that they are in a position where they would have known this information and that the information itself is reliable, and plaintiffs don't meet either of those.

You know, their confidential witnesses, many of them were not there during the class period or left very soon into it.  Most of them, I think all -- all of them but Confidential Witness 3 didn't have any direct interaction with the executives, setting aside all -- all-hands meetings, you know, company-wide interactions.  Those don't get plaintiffs anywhere, either.

All we can glean from the confidential witnesses is that NIKE's a big company, 80,000 employees, so obviously a lot of former employees, many of whom were terminated or laid off and

have an axe to grind, but the number of confidential witnesses doesn't mean anything other than plaintiffs put a lot of effort into their investigation.

And even if you take what the confidential witnesses say at face value, as we know from the *Tesla* and *Amazon* cases, unless there are allegations in the complaint that the defendants agreed with the confidential witnesses' views of the company, they agreed technology was a disaster, they agreed Adobe was a failure, those allegations are nowhere in the complaint. And unless the complaint pleads that the executives agreed with the confidential witness allegations, they don't get us to pleading falsity or scienter, either.

Thank you, Your Honor.

THE COURT: Thank you.

MS. VASILCHENKO: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MS. VASILCHENKO: NIKE has historically been well known as a company selling sneakers and sports apparel through third-party brick and mortar retail stores that sell many different brands, like Foot Locker, but in this day and age of social media and online shopping, NIKE sold investors on an exciting new transformation of its business. It was going to restructure from a model that relied on selling athletic products associated with specific sports categories, like running sneakers, through third-party retailers to a modern

digital-focused direct-to-consumer, DTC, model that's focused on consumers' buying practices.

This new approach, known as the Consumer Direct Acceleration, or CDA, strategy was pitched as a way to unlock a lucrative new value proposition for investors. Corporate executives are supposed to carefully plan strategies like this, and sometimes strategies fail. The failure is just business. We understand that. But what is not ordinary, what is not just business is -- in fact, what is securities fraud, is lying to investors by claiming a strategy that is failing is in fact working.

Indeed, throughout the class period, NIKE executives touted the overall success of the strategy, claiming it was generating lasting revenue growth. They reinforced this false impression by touting their supposedly successful execution of various key components of the strategy, for example, a shift away from these wholesale retail partners like Foot Locker to sell NIKE's products to its own DTC channels, like NIKE's website, apps, and other such digital platforms, as well as its own fleet of DTC stores that it was building at the time.

Another key component was an enhanced digital capabilities to provide personalized digital marketing to consumers across NIKE's website and apps. A transformed DTC-focused supply chain was another key aspect that defendants repeatedly touted to investors as essential to the CDA's success,

a corporate reorganization from sports-based product categories to gender and age-based categories like other similar companies.

And throughout all this, NIKE claimed that it would preserve NIKE's innovative product pipeline as well as its leading competitive position and brand name, which set it apart from its competitors.

In reality, this core strategy was failing. The execution of each component was plagued with critical problems, not just mere little business challenges, as defense counsel tries to portray it in mischaracterizing what the CWs actually said. This included the build-out of these critical DTC technologies that was essential to provide the marketing to consumers that it needed and supply chain infrastructure to actually deliver the products to NIKE's stores and to consumers directly rather than relying on retail partners as it had in the past.

NIKE began to lose market share to more innovative new competitors like HOKA and On Cloud that I'm sure Your Honor has seen in stores and everywhere. And these new competitors took advantage of the freed up store shelf space in NIKE's former retail partners that NIKE had abandoned as part of the CDA shift.

Recognizing its mistakes, NIKE quietly began to reverse some of these key CDA initiatives in the middle of the class period without telling investors, pivoting back to those same retail wholesale partners they had abandoned, like Foot Locker,

because NIKE had inventory piling up that wasn't selling, because consumers no longer found NIKE's brand to be as cool and exciting as it was. This is according to many CW allegations in the complaint.

Rather than owning up to this reality, NIKE repeatedly denied any such issues with the CDA strategy even when shareholders or analysts directly asked defendants on earnings calls about any such issues. Instead, NIKE relied on unrelated short-term fixes like flooding the market with its classic products, like the Air Jordan sneakers or other ones that you might have seen, rather than innovating new ones to prop up sales and maintain the company's financial results, all the while telling investors that this new strategy was in fact working.

Lead plaintiffs were induced to buying NIKE's stock at prices that were inflated by defendants' lies and omissions. When the truth finally came out publically at the end of the class period, the lead plaintiffs and similarly situated investors suffered substantial losses. This securities class action seeks to recover those losses.

The complaint, which defense counsel repeatedly claims has not alleged any specific facts in her own exaggeration and cherry-picking that ignores the vast bulk of the CW allegations, it pleads it with great particularity, extensive detail. It specifically identifies defendants' misstatements and the true state of affairs within the company during the class period.

Because the case is not in discovery, because under the PSLRA discovery is automatically stayed until we survive a motion to dismiss, the complaint relies on 19 former employees of NIKE to describe the real situation within the company.  It doesn't rely on just these confidential witnesses, as defense counsel claimed.

The accounts are further corroborated by other reliable sources, including many highly reputable articles and investigative journalists, like the Wall Street Journal, that echoed many of the CW allegations, as well as defendants' own later admissions at the end of the class period.  And these later admissions do not just say, "Oh, oops.  We suddenly realize that we're not innovative -- as innovative as we might have liked.  Oh, that competitors are suddenly catching up with us."  No.

If you look at the actual text of the admissions which we cite in the complaint, they admit to knowledge of a gap in NIKE's pipeline of innovative product back in the middle of the class period, in the summer of 2022.  So NIKE itself recognized the problem.  This wasn't just mere disagreement by former employees who were whining and complaining about a strategy that they disagreed with.

And even though we don't have to plead smoking gun-type evidence like direct contact with the individual defendants and the CWs, we actually do have that aplenty in the form of several high level employees who attended meetings with the individual

defendants or observed reports sent such defendants that discuss these very DTC problems at issue.

That CW-3, who you might note defense counsel barely mentioned during her lengthy presentation -- and that's not a surprise, Your Honor, because this was a high level employee, VP, who was personally recruited to NIKE by Defendant O'Neill. This CW counted the CEO, Defendant Donahoe, as his life mentor. And, in fact, CW-3, who was a VP of digital product, had many direct meetings with Donahoe and the other individual defendants throughout the class period about the DTC technology problems at issue. That is pretty close to smoking gun as you can get at the pleading stage before any document discovery or anything else.

So defendants have moved to dismiss on two grounds: they deny making any actionable misstatements or omissions; and number two, they deny having done so with fraudulent intent or recklessness.

Fraudulent intent. So defense counsel repeatedly referred to the scienter standard as intent to mislead, intent to lie. I think, given the accounts that we have here in defendants' own admissions, we plead this kind of intent to lie, but as you can look from the case law that we cited in the Ninth Circuit and elsewhere, it's not just intent to lie. It's deliberate recklessness as to the truth, which includes being -- or having access to adverse contradictory information that tends to suggest that your statements are not accurate. That is

deliberate recklessness, and that has been found to be always sufficient to plead scienter.

So I'm going to walk you through the various categories of misstatements, because, Your Honor, we recognize that there was a lot here. There's seven different categories of misstatements. They all relate to one unified theory of fraud, which centers around this CDA strategy and whether or not it was working, but there were these six different components. And, you know, business strategies by a complex organization like NIKE, obviously it isn't just going to be one issue, right, that is going to derail a complex business strategy like CDA.

So here, the CWs and these other sources that I've talked about allege multiple severe failures across six different components. So it wasn't just one challenge in the supply chain, it wasn't just that their innovation pipeline was stagnating like the CWs described and defendants admitted later on. There were multiple failures, including in key infrastructure necessary for the CDA strategy to work. That includes the DTC tech statements that we talked about.

And so just a little bit of background. Because NIKE had previously relied on its wholesale retail partners to sell its products, it also relied on them to market those products, right? That makes sense, because they didn't have to bother actually getting consumers to think NIKE's cool and interesting and innovative to buy those products, but with the CDA pivot to

DTC operations, it needed to market those products directly to consumers, and to do that, it needed to develop what's called a consumer marketing personalization technology, which sounds kind of fancy, but it's pretty simple, and you probably get this all the time. You get e-mails from various online shopping platforms, the brands that you look up online, and then you get targeted e-mails or text messages or push notifications on your apps that target to you based on your prior search history, based on your preferences. Like, if you looked up NIKE leggings on its website, then you get a couple of e-mails later saying, "Oh, we noticed you were browsing our leggings. Here are some other sports products geared for women," that kind of thing.

And to do that effectively, you need to make sure that your various digital platforms, like your website, your app, and partner apps, like the SNKRS app, all work together so that when you click on that link that you get in your email, it actually takes you to the link for leggings or whatever other products you are interested in and not some other broken link.

And so to develop these capabilities, NIKE partnered up with Adobe, which I know you might associate with something like pdf files, but they do a lot more than that, as I learned during the course of our comprehensive investigation. Adobe also offers digital marketing software, like this Adobe Experience platform that the CWs described, that enables the companies to centralize consumer data and using data science and machine learning to

provide personalized targeting ads to consumers.

So these nine DTC tech misstatements that we allege include multiple statements related to specifically Adobe and these DTC marketing personalization technology.

One of them Your Honor pointed out, and that's exactly the one that I wanted to discuss as well, which is statement 31. That's the March 30th, 2022, statement by CEO Donahoe in the Adobe Facebook post. And he said, "The Adobe platform has played such an important role of delivering a more personalized experience for our consumers."

Look at the verbs that he uses: has "played" such an important role of "delivering" a more personalized experience.

It's a non-forward-looking statement, and defendants have not challenged it as such, that creates the impression that NIKE -- that Adobe has already delivered this experience, that it's already -- that NIKE already has these DTC tech capabilities.

And let's look at the date. This is March of 2022. This is now a year after Adobe has partnered up with NIKE. And according to CW-3, whom I've described as being this very high level employee who was brought in by Defendant O'Neill in early 2020 to build out such DTC digital capabilities, and he -- or she inherited responsibility for implementing the Adobe partnership, so this person definitely is in a position to know what she is talking about, which is the standard that the Ninth Circuit

requires and that I agree with defense counsel there -- anyway, this person, who was essentially in charge of making sure this provided the DTC marketing that NIKE needed, said that NIKE's DTC technology was antiquated and she noted there was little to no progress in this build-out during her tenure, which was from February 2020 through July 2024.

So we have to take the CW allegations as true at this stage. So this directly contradicts what Ms. Valenzuela just said, how NIKE was making progress in -- during the class period in building out this DTC technology. This person said there was not throughout her tenure, which continued until July 2024, which is the end of the class period, or almost near the end. So NIKE did not have this working personalization technology.

And this person gave an example of how you would get an e-mail, you know, marketing you for one specific NIKE product, and when you clicked the link, it would actually take you to something else. And CW-3 described this as significant gaps in these capabilities, that it had a material impact on NIKE's operations, for example, a 38 percent drop year over year in consumer e-mail responses. That is a significant impact and shows that this technology capability was non-existent at the time, it wasn't working.

THE COURT: So I understand that, but how does that show that certain executives had specific knowledge on it?

MS. VASILCHENKO: Well, thank you, Your Honor. So to

that point, so CW-3 talked about this expensive Adobe project partnership, which is a 400 million investment that ultimately did not deliver the promised capability. NIKE was brought in -- NIKE had projected that it would result in 1.5 billion or more in revenue, but according to CW-3, it brought in zero dollars. And this Adobe contract was signed in 2021 and they became -- all these problems were apparent very quickly thereafter, including that Adobe had promised NIKE that the EMEA, the European region, would have personalized messaging by Black Friday -- Thanksgiving, Black Friday or later that year. That did not happen, so they didn't deliver that.

And CW-3 specifically discussed all of these technology problems with Defendant Donahoe, his life mentor. They started having one-on-one ad hoc meetings with Donahoe, including Facetimes or phone calls when Donahoe would call CW-3 up. And CW-3 talked about all of these problems she described to Defendant Donahoe directly. That started in early 2022; January or February is when CW-3 recalled. So that is before Donahoe makes this statement which happens in March 2022.

That also by -- sorry. I skipped over some other facts, but the other scienter fact is that in April 2022, which is shortly after this misstatement, the problems get so bad that CW-3 makes this presentation of a roadmap at an offsite meeting in April of 2022 to senior executives and outlines just how bad, you know, their DTC technology build-out is going.

That causes alarm bells internally and prompts everyone to institute monthly meetings between CW-3 and Defendant Donahoe, Defendant Friend, Defendant O'Neill, and various other key executives. Those key executives include the chief digital officer, who's the head of their technology group, Ratnakar Lavu. That is somebody that, again, defense counsel omitted in her discussion of suspicious departures at the end of the class period.

This guy was fired abruptly in February 2023. And according to multiple CWs and other sources, including a public lawsuit by another former employee filed against NIKE, this guy was creating a lot of problems internally within NIKE's technology group, including creating his own shadow organization that duplicated inefficiently various technology projects. And there was a lot of other misconduct that was apparently being done, corruption, you know, vendor bribes and the like that ultimately resulted in supposedly an SEC investigation. And all of these problems were also directly discussed by CW-3 as well as other multiple CWs. I think there were a total of six other CWs, including many in the technology group, who discuss -- who used the exact term "shadow organization" to talk about these problems with Lavu.

And these problems isn't just some irrelevant speculation or sideshow. This was yet another reason why NIKE's DTC technology build-out was not progressing well during this

time.  They all described how this impeded progress on the projects because people were duplicating efforts, fighting, there was friction.  So this was yet another significant problem that wasn't publically disclosed.

And this isn't just CW-3.  At least five other CWs corroborated such personalization, Adobe, and other DTC tech problems that CW-3 described.

CW-12, who was a technology leader from 2018 to 2022 who worked on a digital marketing project, confirmed that a new content management system from Adobe to provide personalized marketing e-mails was only in a pilot phase when she left in 2022.  Pilot phase means it's still not out there, it's not operational, it's not working.

So that confirms what CW-3 said and directly contradicts Defendant Donahoe's public statement where he creates the false impression that these marketing personalization capabilities already exist and are, you know, resulting in meaningful results.

CW-14, CW-11 also talked about these Adobe Experience platform problems.  CW-14, who was a program manager in NIKE's global brand marketing group, helped roll out this Adobe Experience platform, including a segment called Target.  And according to this CW, it was still a mess, as the platform had issues at various tracking capabilities and was not fully implemented when she left in June of 2022.

CW-11, who was in CW-3's digital product group, corroborate these allegations.  She left in early 2022, so this was right around the time of Donahoe's misstatement.  And she also said that Adobe Target, a program used for A/B testing, a targeted consumer marketing, wasn't capable of doing what NIKE needed to do, describing it as doomed from the start.

And there were multiple other CWs who talked about how there were always issues with the NIKE app, NIKE's website had outage, and all of that hurt NIKE's digital sales.

And then, of course, I talked about the Lavu shadow organization problems that further compounded these issues and prevented them from building out this technology.

So in terms of falsity, we cited the *Robb vs. Fitbit* case, which is an ND Cal decision by Judge Illston that upheld similar statements touting capabilities, including dedicated significant resources to developing such technical capabilities.  These were false and misleading when you omit known material problems with that technology, because that creates a false impression to the market.

This is also material, as defendants themselves admitted by constantly touting this kind of DTC technology to the market, as well as by analyst reports who covered NIKE and talked about how NIKE's using technology to deepen its connection with its consumers.  Personalization technology is key.  And none of these analyst reports that we have seen and cite in the complaint

talked about how NIKE is having problems in this DTC technology build-out.

So if you look at the full context of the misstatements -- and we don't object to your judicial notice of the transcripts and the SEC filings that include all of these misstatements for the proper purpose of seeing what did they really disclose. And if you look at it, you will see that the market was left with an overwhelmingly positive impression that this build-out was going well.

And under the Ninth Circuit decision in *Quality Systems*, even general statements of optimism, when taken in context, may form a basis for securities fraud when they address specific aspects of a company's operation that speaking -- that the speaker knows to be performing poorly. Thus, reassuring investors that everything was going fine with specific areas of NIKE's business, NIKE's development of these DTC tech capabilities, and the supply chain when the company knew otherwise is materially misleading. That is precisely what we allege here.

And in terms of scienter, we talked about how CW-3 directly informed Donahoe in these one-on-one ad hoc meetings by -- started -- that started in January or February of 2022. Paragraph 199, "CW-3 reiterated that Donahoe was kept apprised of the problems with Adobe, as Adobe's implementation and its progress were always featured in her monthly meetings with

Donahoe."

Further, per CW-3, Defendant Donahoe had full visibility into the technology issues with Adobe, which became apparent almost immediately after the Adobe contract was signed in 2021, because Donahoe had a direct hand in signing that agreement.

And it wasn't just CW-3 who had direct contact with defendants, as defense counsel also misleadingly stated.  In December 2021, CW-8, who was another VP, and this one in the digital design group, who was responsible for helping execute the digital DTC strategy, she sent an e-mail directly to Donahoe and Defendant O'Neill as well as some other folks that raised the same concerns about Lavu's shadow organization, including his inability to execute the DTC strategy, in her e-mail.  So this is, again, another smoking gun e-mail that's not required at this stage, but even if it was, we pleaded.  We have it.

Another statement that Your Honor pointed out, that I agree with, was probably one of the strongest technology statements are the statement 66 -- 66, which is the statement by Friend on the June 2023 earnings call.  And I'll read the full text, because defense counsel notably read the first sentence, skipped the actual misstatement that we allege, and then focused on Friend's caveat at the end.  So when you read the full sentence, I think you'll be left with the same over -- overwhelmingly positive misleading impression that investors were

left with.

So what he says actually is, "By better knowing and serving the consumers who love our brands, we are also unlocking strategic and financial benefits for NIKE.  For example, we have partnered with Adobe to enable one-to-one member personalization, driving gains in member retention, click-through rates and conversion, resulting in higher demand per member and returns on digital ad spend.  We are only beginning to operationalize these new capabilities and consumer experiences on our digital platforms, and we see even greater opportunity to come."

So in the present tense of these words that he uses is driving gains in member retention, resulting in higher demand per member and returns of digital spend, again, that conveys that they currently have these DTC tech capabilities, including this personalization technology that he specifically talks about based on the Adobe partnership.

As I just discussed, that was not true during the class period throughout CW-3s tenure, and that was corroborated by the other CWs I mentioned.

So this meeting -- this statement is June of 2023. This is much later in the class period.  CW-3 confirmed that Adobe still hasn't delivered these marketing personalization technology capabilities, it's not working.  This is also a couple months after Lavu was terminated.  That happened in February 2023.  This is June, so this is after defendants, you

know, agreed that -- we can only presume, right, because we don't have an inside into NIKE's operations exactly and we don't know what Friend was thinking, but it certainly looks suspicious that by this point in time, the head of technology has been abruptly terminated and these multiple former employees suggest that it was because of these DTC tech problems, including his shadow organization.

The truth-on-the-market argument, I already touched on how the analyst reports did not cover any so-called problems in this DTC strategy during the class period until the very end. And this is, again, the truth-on-the-market argument, as the Second Circuit *Hain* case that we just submitted as supplemental authority, also recognized. It held that defendant's argument that they had adequately disclosed the relevant issues to investors was a truth-on-the-market defense, which entails a fact-intensive inquiry that should not be resolved at the pleading stage, and defendant's generic disclosures about challenges and the like did not sufficiently counterbalance the sitting impression left by their positive statements. Again, that's exactly the same here.

The tech risk warnings that Your Honor also highlighted, that's statements 10, 44, 70, and 79, this is in the July 10-Ks during the class period. So July 2022 is statement 44. And if you look at the full text, which we urge Your Honor, they basically say that NIKE has made significant investments in

DTC digital technology and that it may not be successful in developing platforms that operate effectively with these technologies.

The Ninth Circuit has repeatedly upheld similar risk warnings as false and misleading, because they warn of only hypothetical future risks, and that's false and misleading to say that a risk may occur in the future when such risks have already begun to occur, as is the case here.  That's the *Alphabet* case, the *Facebook* Ninth Circuit decision.  The *ON24* decision that we just submitted as supplemental authority last week once again recognizes that such hypothetical risk warnings are misleading when -- so, yeah.

The quote is:  Hypothetical risk warnings statements that disclose only that these risks may occur are materially misleading when these risks have already started to come to fruition.

That's exactly the case here, again, because by the time of these 10-Ks, including, for example, this July 2022 one, NIKE was already failing to develop these key DTC technological platforms and provide this critical consumer marketing technology.

The *Adidas* case that defense counsel mentioned, it's -- interesting enough, it actually distinguished the *Facebook* and *Alphabet* cases saying, well, in those cases, the defendants had presented them as purely hypothetical risks, because they didn't

use language like "if" and "could."  And if you look at the language that we highlighted for these risk warnings, NIKE exactly used these "if" and "may" and "could" language, which portrayed these as purely future hypothetical risks rather than ones that had occurred.

Also it was a given in that *Adidas* case, because it revolved around Adidas's failure to disclose that one of its key celebrity business partners, Kanye West, who you might have heard of, was kind of a loose cannon and made some very anti-Semitic and other offensive comments, and therefore the court said that it was not misleading in that context, because everybody knew, given the public notoriety that Kanye West enjoyed, that this was something that has already happened in the past and likely will happen again.

This is very different from what we have here, Your Honor.  We don't have any indication, and defendants haven't cited a single news article or analyst report during the class period showing that the market recognized that the CDA strategy wasn't working well, that there were these critical problems in the technology, the supply chain, or the like.  None of that happened until the end of the class period when defendants finally admitted to these problems, corroborating these CWs.  So that's the tech misstatements.

Supply chain, another category that defense counsel covered.  I want to point you to statement 4, which is the

April 2021 statement by Defendant Friend, the CFO, at the UC Berkeley speech.  In discussing NIKE's DTC strategy, he said, "...we're employing data and analytics capabilities in our supply chain, so we know how to more smartly flow our product, where to put our product, um, the net benefit of that is higher margins because we have less waste, less mark-downs, less inefficiency, and where product sits around the world."  Again, not a forward-looking statement.  It's present and past tense about NIKE's current supply chain DTC capabilities.  It's highly specific.  It claims that they know that they have these data and analytics capabilities in our supply chain to deliver product smartly, flow it around the world.

This is directly contradicted by multiple CWs, including CW-1, who specifically said that NIKE during the class period did not have these planning and forecasting capabilities as to how to effectively distribute products to its DTC stores.

CW-1, who was another high level employee, a VP in global store development responsible for developing and expanding NIKE's DTC -- fleet of DTC stores and attended meetings with defendants, like Defendant O'Neill, said that supply chain management was integral to the CDA strategy, but NIKE did not have sufficient capabilities to manage its supply chain when it pivoted to DTC from its wholesale system, including because it refused to invest in a separate distribution system for its DTC stores; instead, it relied on its wholesale system and never

established planning and allocation teams.

So because of these poor supply chain management systems, NIKE could not figure out how to get the proper amount of product into its DTC stores.  Either there was not enough or there was too much, which caused sales to plummet.  This was discussed in internal quarterly audit reports describing supply chain problems as a huge issue that needs to be fixed.  These reports were sent directly to Defendant Donahoe, Defendant Friend and O'Neill, and the board throughout the class period and into at least 2024.

It's not just CW-1 who describes these supply chain problems.  Other CWs corroborated her.  CW-2, whom defense counsel mentioned as just for the brand misstatements and who was a director of North America consumer marketing, was at NIKE for over 20 years.  So, again, that's somebody who probably knows how NIKE operates its business.  According to her, NIKE Live stores could not allocate and evenly distribute products due to supply chain issues, which adversely affected performance.

CW-2 reviewed daily sales metrics reports for the NIKE Live stores that showed that because of these supply chain problems and innovation pipeline problems, these stores were underperforming.

CW-5, who was a global merchandise director in the DTC omni-channel at NIKE for 11 years, described similar problems, including that NIKE could not develop supply chain capabilities

to plan for DTC demand forecasting how much DTC merchandise would sell before placing orders.

CW-6, a supply chain finance director for North America who worked at NIKE for 26 years, said that the DTC strategy ultimately did not work beginning in 2021 and that NIKE was not even close to hitting digital revenue targets from 2021 through June 2024. This kind of, I think, reinforces that these various problems that we talked about had a material financial impact in a negative way on NIKE's performance.

Scienter. Defendant Friend was the one who made this misstatement. And according to CW-1, Defendant Friend knew about these supply chain problems, because these quarterly audit reports that CW-1 attended meetings from were sent to Defendants Donahoe, Friend, O'Neill, and the board throughout the class period.

Statement 54, which is an October 2022 10-Q that was signed by Defendant Donahoe and Friend, again touted NIKE's investment in "...data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation, which we expect will further accelerate a digital transformation."

So, again, NIKE's positively touting its supply chain capabilities without disclosing these adverse problems that it knows about, which is misleading and reckless to do so under the *Schueneman vs. Arena Pharmaceutical* case that we cited repeatedly

in our briefing.

By the time of this statement in 2022, the supply chain problems had gone so bad that the NIKE Live stores were underperforming so much, that this helped lead NIKE to slash its target for store openings for these DTC stores from 200 to just 100.  And this happened in July 2022, so shortly before this misstatement.

For CW-1, who corroborated these allegations about the slashing of the DTC store opening goals, this led to -- the supply chain problems led to decreased sales of 20 to 30 percent in the DTC stores.  For CW-1, at the end of 2022, NIKE had a lot of excess inventory piled up, and Donahoe and Friend strong-armed Foot Locker, its former retail partner, to take this dead inventory off their hands in order to avoid a hit to its stock price.  That's paragraph 336.

So, again, if you want direct links to the individual defendants for scienter purposes, we have that aplenty.  Donahoe and Friend were personally involved in this effort to strong-arm Foot Locker to take off this unsold inventory off its hands as it's pivoting back to its retail partners, which is yet another reason a lot of these "CDA strategy" statement -- "is working" was false.

As to defendants' statement that they were investing in building a DTC supply chain and technology, that's again one of that literal truth arguments.  And as the Ninth Circuit has

repeatedly recognized, falsity is not measured by literal truth, but by the ability of the material to accurately inform rather than mislead investors.  So these statements were, at the very least, misleading.

And I want to point you to the *In Re:  Splunk, Inc., Securities Litigation* case that we cited from ND Cal by Judge Tigar.  He also upheld similar statements that misled investors into believing incorrectly that defendants' investments were sufficient to build an adequate pipeline to meet its growth and revenue targets, again, based on undisclosed problems in those key areas.

Scienter, I talked about the quarterly audit reports were sent to Defendant Friend, Donahoe, and the board.

I want to skip to the corporate reorganization statements where defendants again touted NIKE's organizational shift away from the sports categories to the consumer construct. So, for example, there were multiple statements about this issue during the class period.  One example is statement 22, which is in October 2021 by Donahoe where he says, "As part of CDA, we successfully realigned our organization and began investing in our highest-growth areas.  Part of that investment is our consumer construct of men's, women's, and kids..."  So this is one such example.

Another one is from later in October 2022, again a similar 10-Q signed by Donahoe and Friend, that's statement

Number 54.  Again, NIKE misleadingly touts that, "We have aligned our product creation and category organizations around a new consumer construct focused on Men's, Women's, Kids'..."  This was false and misleading, because by this time in summer of 2022, NIKE was already beginning to quietly reverse this key CDA initiative, which was a central pillar for the strategy, because it was already going back to this pre-CDA sports category.

This is based on CW-18, who was a general manager, program management, who said that NIKE underwent this internal organizational shift which created general managers for sports categories within the gender constructs in an attempt to recreate the pre-CDA sports categories to address concerns about NIKE's performance given the loss of connection to sports among the company's segments.

So, again, the fact that they are going back on these crucial CDA initiatives suggests this isn't just employees disagreeing with the business strategy.  NIKE itself agreed with them and started reversing these initiatives midway through the class period long before it actually publicly disclosed it to investors.

So this is not just some hindsight pleading.  This is all based on contemporaneous events that CWs described during the class period, which are then supported further by later admissions by the defendants.

And the Ninth Circuit actually has upheld similar

statements based on defendant's later admissions.  So that's the Cutler v. Pickering [sic.] case that we cited in the brief.  I think we talked about it in the context of the Ninth Circuit upholding similar "project is working" statements, but it also relied on admissions in upholding falsity with respect to such statements.

THE COURT:  So, you know, I've given you plenty of time to address not only what you would like to present to the Court, because I can tell that you have lengthy written remarks that you wanted to provide to the Court, but I'd like you to focus on those -- those different statement numbers.

MS. VASILCHENKO:  Innovation?  I was just getting to that, Your Honor.  Thank you.  I appreciate your patience.  I promise I'll wrap this up as quickly as possible.  So --

THE COURT:  You may need to skip some of the things you planned to say.

MS. VASILCHENKO:  Yes, yes.  I'm discovering.

So I'll quickly point out statement 19, which I think you also pointed out, which was a statement by Parker that said, "...the pace of innovation has not slowed down at all", again, a very specific misstatement that claims that it has not slowed down at all, which is directly contradicted by multiple CWs saying that NIKE's innovation pipeline stagnated during the class period.

And we don't allege that NIKE stopped making innovating

products altogether.  Obviously it's a huge company that makes a lot of product, but according to CWs, that innovation significantly slowed down because of various layoffs and other investments that the company made, and this was known already by the time of 2021 and 2022.

The next statement, 53, which I think is another one that you pointed out, which was a September 2022 statement on an earnings call by Defendant Donahoe where in direct response to an analyst's questions regarding inventory and the supply demand for NIKE, Donahoe twice assured that NIKE had a very strong innovation pipeline.  These statements like this "strong pipeline" have been repeatedly upheld by the Ninth Circuit itself, including in the *Quality Systems* case and the *Glazer v. Forescout* case that had a similar strong pipeline -- it was a sales pipeline in that context, but very similar -- because again, as I mentioned, even general statements out of context that might seem like general corporate optimism are actionable when they talk about specific areas of the company that the speaker knows to be performing poorly, which is exactly the case here.

And the statement was false, and knowingly false, by this time in September 2022, because by this time, defendants have admitted to knowing of a gap in innovation in NIKE's pipeline by summer of 2022.  This is paragraph 301 of the complaint.  And it's not just one of those admissions that says,

"Oh, oops. We suddenly realize that we don't have a good innovation pipeline. Mea culpa." He specifically talks about that -- in 2022, he says: A couple of years ago, we realized that the strategy of flooding the market with classic products was contributing to an innovation gap.

So this is looking back and describing what they knew back in 2022. So they knew about a gap in innovation in NIKE's pipeline by the time of this statement in October 2022. That's an admission by defendant. That's as good as it gets.

But this is also corroborated by contemporaneous CW allegations, including CW-16, who talked about how by mid-2022 NIKE saw negative effects on new products in the pipeline, given the loss of institutional NIKE knowledge; CW-2, the marketing director that we talked about who talked about how these product pipeline problems were a major contributor to NIKE's decision to lower its NIKE Live store opening goals in summer of 2022.

So, again, these are not pipeline, very specific, very direct. And defendants knew about it, because they admitted to knowing about it back in 2022.

Statement 59, which is another one that I think Your Honor pointed out, it was in the March 2023 earnings call, and again by Donahoe. Again, in response to an analyst asking questions about market share acceleration opportunities and the forward-looking product pipeline, Donahoe stated, the breadth and depth of the innovation pipeline is really strong.

Again, this is not puffery.  It's actionable, because an analyst is specifically asking him about this.  And the *Forescout* case we -- I cited, it pointed out that statements are even more material when made in this context of an analyst directly asking about it and the defendant then reassuring the investors about it.  So that confirms the materiality of these kinds of statements.

Again, this was even more false and misleading, and knowingly so by this time in 2023, because defendants had admitted to actually starting to rebuild its innovation pipeline by the time -- by this time in early 2023.

And this is paragraph 298, which again I urge you to look at.  Defendant Donahoe specifically said that -- this is in April 2024, one of these corrective disclosures where the truth starts to emerge.  He said that "over the last year" -- meaning from early 2023 through then -- NIKE had already begun rebuilding its disrupted innovation pipeline; therefore, he knew by early 2023 that these remedial efforts were necessary to fix what was broken, which is the innovation pipeline.

And just because NIKE had some innovative products that it released, if you look at the chart in defense counsel's slide, some of those aren't even products.  They're, like, a building dedicated to Serena Williams.  The one is a blog post or something like that.  So I don't know.  I don't think that shows that just because it launched some products, that that means that

their innovation pipeline was strong, especially given their admissions later. Plus the CWs that specifically talked about these problems that were known at the time, and their statements must be taken as true.

The risk warnings statements. Again, Your Honor, I think, pointed out one of these. This was statement 41. Again, this is one of those that's worded in a hypothetical.

THE COURT: I didn't -- I didn't refer to 41.

MS. VASILCHENKO: Oh, I'm sorry.

THE COURT: I referred to 44.

MS. VASILCHENKO: Yeah. 41 is similar. We don't have to talk about it, but if you look at the full text -- I think we didn't include the full text. We just focused on the specific portion. If you look at the full text, which is Exhibit 8 at 14, it includes the "if" language that I pointed out that the Ninth Circuit said is the hallmark of a hypothetical misleading statement: If we fail to anticipate accurately and respond to trends and shifting consumer preferences by adjusting a mix of existing product offerings, developing new products, designs, styles, and categories, influencing sports and fitness preference through extensive marketing, we could experience lower sales, which could have an adverse effect on our results of operations.

Again, that is very much of a hypothetical future potential risk. It doesn't disclose that by this time NIKE is fully aware that they have this innovation gap that they admitted

to by this time in 2022.

Competition of brand statements.  So I don't know if you pointed this out, Your Honor.  I just want to quickly mention it and then I'll turn to the cool brand statements.  Statement --

THE COURT:  I want you to turn to the cool brand statements.

MS. VASILCHENKO:  Okay.  That's statement 49 and statement 51.  Both of these were made in September 2022, one by Donahoe, one by Friend, but it's basically the exact same thing.

Donahoe said, "So, let's start with NIKE's strong brand and our connection to sport which differentiates us all over the globe.  Consumers continue to rate us their number one cool and number one favorite brand as we connect directly and deeply with consumers..."

Friend said basically the same thing.  He added, "NIKE continues to lead as the number one cool and number one favored brand in North America."

And, Your Honor, when I first heard this metric, number one cool brand, you know, I kind of rolled my eyes, like, this sounds pretty puffy.  Seriously, this is a real thing?

And then I Googled it and then we talked to CW-2, who's a marketing director, and she explained that it really is an important real marketing metric that NIKE and other brands closely track, because it measures, it, like, gauges how cool a key demographic --

THE COURT:  I get that's what that is from the definition.

MS. VASILCHENKO:  Yeah.

THE COURT:  I want you to follow --

MS. VASILCHENKO:  So they --

THE COURT:  -- to wrap up.

MS. VASILCHENKO:  -- track this metric based on third-party consumer data, and it was regularly analyzed and discussed that these --

THE COURT:  I want you to wrap up.  I don't want you to just stop and then continue to talk as if I didn't say something to you.

MS. VASILCHENKO:  I'm sorry, Your Honor.

So May 2022, they discuss a decline in this cool brand metric.  And specifically, data showed that NIKE was no longer the number one cool brand among North American consumers age 20 to 24.  This was discussed at a brand meeting that was attended by the chief marketing officer.  This was also memorialized in reports that CW-2 worked on that were ultimately sent up to Defendant O'Neill.  Defendant O'Neill reported directly to Defendant Donahoe.  So we think all of that helps establish scienter.

And just because this allegation was in May 2022, this wasn't many, many months before the September 2022 misstatements, as defense counsel represented.  This was only a couple months

before.  And it's highly unlikely that consumers suddenly liked NIKE again just a few months later, especially given the admissions at the end of the class period which showed that NIKE's competitive position declined significantly during the class period, as they admitted, and they lost significant market share to new competitors HOKA and On in the running product category as well as in women's sportswear to lululemon.  There are multiple CWs who talked about that.  So that, again, confirms the falsity and the scienter of these misstatements.

So Your Honor, I don't -- I think (pause) -- I'm pretty much done.  The channel mix misstatement, I think we talked -- oh, this is the one where you specifically asked whether there was a link to defendant.  So that was statement 71, I believe is the one.  This was the September 2023 statement by Donahoe where, again, he's directly asked by an analyst -- sorry.  It's in response to a shareholder question read by Defendant Parker regarding whether NIKE had changed its strategy, considering recent headlines about re-entering various wholesalers.  Donahoe stated, "Our marketplace strategy remains the same."

So this is when there are market rumors that NIKE is starting to re-enter its wholesalers, and Donahoe specifically denied that's the case, claiming that their marketplace, i.e., wholesale versus DTC strategy, remains the same.  This was false and misleading, because by this time, as Donahoe knew, NIKE had already pivoted back to Foot Locker, started re-engaging with

Macy's.  And NIKE himself -- I mean, Donahoe himself was directly involved in the efforts to strong-arm Foot Locker into taking that inventory at the end of 2022.  So there are these direct links to Donahoe and the other individual defendants.  And this is backed up by multiple CWs.

I will -- I understand, Your Honor, that I am way over my time.  I think we've covered all the key issues, including with respect to the CDA strategy misstatements.  I pointed Your Honor to the *Cutler v. Kirchner* Ninth Circuit case that upheld similar "product is working" statements as actionable based on similar problems.

There's also the *Stitch Fix* case in ND Cal that also upheld similar statements that a product line was working when -- and that defendants materially misrepresented the success of this initiative and its impact on the company's growth, again, based on this failure to disclose problems that the company knows about.

So we -- I think if Your Honor has any questions about the insider sales aspect, my colleague Matt Grier can briefly talk about those if you have any questions.

Otherwise, I just want to wrap up by saying it's not just the CWs, it's not just the admissions.  There's also the holistic analysis that Your Honor must engage in, which includes the suspicious departures, the scienter, the insider sales and compensation structure.  And holistically, that establishes that

defendants made many false, misleading statements to the market with knowledge of adverse contradictory facts, which is enough to plead scienter.

Thank you, Your Honor.

MS. VALENZUELA:  Your Honor, I will be brief.  A securities fraud complaint should present a cogent plausible theory.  It shouldn't take 300 pages and it shouldn't take a 140-page supplemental chart to articulate why statements were false at the time they were made.  Plaintiffs simply can't do that, and I think counsel's argument here today reflects that.

While you heard many broad statements and broad characterizations of various technology problems and supply chain problems and other issues at NIKE at the time, what is lacking are specific facts as to what those problems are that are linked to specific statements that were made at the time those alleged problems occurred, and we simply don't see that.

And any of the so-called issues that plaintiff does allege, as I demonstrated earlier, NIKE was clear with the market as to what those were.

I want to focus just on the issue of Donahoe's knowledge, because counsel did claim that CW-3 and a couple of other CWs demonstrate that Donahoe had knowledge; unclear about what, but knowledge of some sort.  And if you look at CW-3's -- the allegations attributed to her, and really that's the only CW that had direct -- or is alleged to have direct interaction with

Donahoe, and I'll get to the others in a moment, what does the complaint -- not plaintiffs' characterization or argument, but what does the complaint actually plead?

Well, CW-3 says that the executives had CDA strategy meetings.  She admits in paragraph 184 she wasn't there for those meetings, so she doesn't know what was discussed.  She told her own supervisor about, quote unquote, significant technology problems; unclear what, unclear when.  And the complaint surmises, counsel's assumption is that Donahoe likely knew about those, but counsel's assumption about what an executive likely knew doesn't come anywhere close to pleading knowledge with specificity.

And what is it that CW-3 -- what specifics does CW-3 say?  She identifies only two technology issues.  One is problems with e-mail blasts and SMS blasts to consumers, and the other is problems with the compliance -- compliance with the app in China, two very discrete issues, and from those allegations, plaintiffs are concluding that NIKE's technology was doomed.  That isn't enough.

And if you look at the *Tesla* case, Your Honor, the Ninth Circuit basically requires that plaintiffs plead, to state a plausible claim here, that it was impossible that NIKE could have achieved its CDA strategy.  This complaint comes nowhere close.

CW-8 was referenced as allegedly giving Donahoe notice

of, again, some unspecific technology issues. Let's look at what CW-8 actually alleges. This is in paragraph 241, a single e-mail to Donahoe and O'Neill after she left NIKE in December of 2021, very early in the class period. And what does that e-mail say? It expressed concern that Lavu was the wrong person to execute the DTC strategy. Doesn't actually identify any so-called technology problem.

And CW-11? CW-11 was at least four reporting levels away from any defendant. How could she have known anything? The complaint does not allege she communicated a single thing to any defendant.

There just is not specific allegations in the complaint that link knowledge to any defendants that supports an inference, much less a strong, compelling, and cogent inference, that defendants knowingly misled investors or were reckless in misleading investors.

And to plead reckless, the Court must infer -- there must be sufficient allegations to show an extreme departure from the standards of ordinary care. We don't see an extreme departure from anything here.

All we see is NIKE, a massive enterprise, trying to implement a transformative strategy and the inner workings of an organization when it's presented with a challenge. That's all that plaintiffs plead.

Thank you.

THE COURT:  Thank you.

I will take all of this under advertisement, give it the due consideration it should have, and issue an opinion as quickly as I can.  Thank you.

MS. VASILCHENKO:  Thank you, Your Honor.

(Proceedings adjourned at 2:47 p.m.)

## C E R T I F I C A T E

I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-entitled cause.

A transcript without an original signature, conformed signature, or digitally signed signature is not certified.

DATED this 6th day of February 2026.


/s/ Kellie M. Humiston

Kellie M. Humiston, RMR, CRR
Official Court Reporter
Certificates Expire:  9/2027

1

**'**

**'22** [3] - 16:14, 16:24, 19:1

**/**

**/s** [1] - 67:19

**1**

**1.5** [1] - 39:4
**10** [3] - 18:25, 26:6, 46:22
**10-Ks** [2] - 46:23, 47:18
**10-Q** [2] - 51:16, 53:25
**100** [1] - 52:6
**100-page** [1] - 13:3
**10005** [4] - 2:11, 2:15, 2:19, 2:24
**10b5-1** [1] - 27:3
**11** [2] - 16:9, 50:24
**12** [3] - 16:9, 16:20, 18:25
**13** [1] - 17:22
**14** [1] - 59:14
**140** [4] - 2:10, 2:14, 2:18, 2:23
**140-page** [1] - 64:8
**15** [1] - 24:6
**18** [2] - 20:14, 23:9
**184** [1] - 65:5
**19** [6] - 8:14, 17:11, 20:14, 28:7, 33:3, 55:18
**199** [1] - 43:23
**1:03** [1] - 4:1

**2**

**2** [2] - 23:7, 27:15
**2's** [1] - 23:16
**20** [4] - 27:14, 50:15, 52:10, 61:16
**200** [1] - 52:5
**2018** [1] - 41:8
**2020** [2] - 37:22, 38:6
**2021** [12] - 18:25, 21:23, 26:2, 39:6, 44:5, 44:9, 49:1, 51:5, 51:6, 53:19, 56:5, 66:3
**2022** [47] - 18:24, 21:21, 22:14, 22:19, 23:5, 23:8, 23:9, 23:17, 23:18, 26:4, 27:20, 27:23, 33:18, 37:7, 37:18, 39:17, 39:19, 39:21, 39:24,

41:8, 41:12, 41:25, 42:2, 43:22, 46:23, 47:18, 51:16, 52:2, 52:6, 52:11, 53:24, 54:4, 56:5, 56:7, 56:22, 56:24, 57:3, 57:7, 57:8, 57:16, 57:19, 60:1, 60:8, 61:14, 61:23, 61:24, 63:3
**2023** [19] - 11:17, 14:12, 14:15, 14:18, 14:22, 14:23, 15:17, 22:4, 26:5, 40:9, 44:20, 45:20, 45:25, 57:21, 58:9, 58:11, 58:16, 58:18, 62:14
**2024** [6] - 15:8, 38:6, 38:11, 50:10, 51:7, 58:14
**2026** [3] - 1:6, 4:1, 67:16
**209** [1] - 2:6
**211** [1] - 22:14
**22** [2] - 27:15, 53:18
**226** [1] - 22:16
**23** [1] - 5:17
**24** [2] - 5:17, 61:17
**24-year-olds** [1] - 23:9
**241** [1] - 66:2
**25** [1] - 5:17
**26** [1] - 51:4
**2600** [1] - 3:12
**29** [3] - 14:12, 14:22, 14:23
**298** [1] - 58:12
**2:47** [1] - 67:6

**3**

**3** [4] - 1:6, 4:1, 25:18, 28:20
**30** [2] - 5:11, 52:10
**300** [1] - 64:7
**3000** [1] - 3:5
**301** [1] - 56:24
**30th** [1] - 37:7
**31** [5] - 8:14, 21:10, 21:17, 21:18, 37:6
**310** [2] - 3:8, 3:15
**326-8186** [1] - 1:24
**336** [1] - 52:15
**34th** [4] - 2:11, 2:15, 2:19, 2:23
**38** [1] - 38:19
**3:24-cv-00974-AN** [2] - 1:5, 4:5

**4**

**4** [2] - 14:3, 48:25
**400** [1] - 39:2
**41** [3] - 59:6, 59:8, 59:11
**41-month** [1] - 12:20
**42** [2] - 20:14, 24:6
**44** [5] - 8:14, 15:8, 46:22, 46:24, 59:10
**49** [2] - 8:14, 60:7

**5**

**5** [2] - 15:14, 26:5
**503** [1] - 1:24
**51** [2] - 8:14, 60:8
**53** [2] - 8:14, 56:6
**54** [2] - 51:16, 54:1
**59** [3] - 8:14, 17:11, 57:20

**6**

**66** [5] - 21:17, 22:2, 22:3, 44:19
**68** [1] - 27:13
**6th** [1] - 67:16

**7**

**70** [1] - 46:22
**71** [4] - 8:14, 9:14, 14:13, 62:13
**710** [3] - 14:25, 15:1, 15:5
**73** [2] - 8:14, 17:11
**760** [1] - 3:4
**77** [1] - 8:15
**78** [1] - 8:15
**79** [1] - 46:22

**8**

**8** [4] - 18:25, 20:14, 24:5, 59:14
**80** [1] - 10:12
**80,000** [1] - 28:24

**9**

**9** [1] - 18:24
**9/2027** [1] - 67:21
**94111** [1] - 3:12
**94301** [2] - 3:9, 3:16
**97204** [1] - 2:7
**97205** [1] - 3:5

**A**

**A/B** [2] - 22:17, 42:4
**abandoned** [2] - 31:21, 31:25
**ability** [1] - 53:2
**above-entitled** [1] - 67:12
**abruptly** [2] - 40:9, 46:4
**absolutely** [2] - 6:1, 8:1
**accelerate** [2] - 19:5, 51:21
**acceleration** [1] - 57:23
**Acceleration** [2] - 10:18, 30:4
**accept** [1] - 5:21
**access** [1] - 34:24
**according** [8] - 32:3, 37:20, 39:5, 40:10, 41:23, 50:16, 51:11, 56:2
**accounts** [2] - 33:7, 34:19
**accurate** [3] - 25:22, 26:8, 34:25
**accurately** [3] - 12:7, 53:2, 59:17
**achieved** [1] - 65:23
**Act** [1] - 11:1
**acted** [2] - 9:25, 11:9
**action** [1] - 32:19
**actionable** [4] - 34:14, 56:17, 58:1, 63:10
**activities** [1] - 24:10
**actual** [2] - 33:15, 44:22
**ad** [3] - 39:14, 43:21, 45:8
**added** [1] - 60:15
**additional** [1] - 8:12
**address** [6] - 5:9, 5:24, 7:15, 43:12, 54:12, 55:8
**addressed** [1] - 25:3
**adequate** [1] - 53:9
**adequately** [1] - 46:14
**Adidas** [4] - 24:4, 24:14, 47:22, 48:6
**Adidas's** [1] - 48:7
**adjourned** [1] - 67:6
**adjusting** [1] - 59:18
**admission** [2] - 19:8, 57:9
**admissions** [16] - 19:4, 19:12, 19:13, 19:17, 19:19, 33:11, 33:12, 33:15, 34:20,

54:24, 55:1, 55:5, 56:25, 59:2, 62:3, 63:22
**admit** [1] - 33:16
**admits** [1] - 65:5
**admitted** [8] - 35:16, 42:21, 48:22, 56:23, 57:18, 58:10, 59:25, 62:5
**Adobe** [33] - 8:9, 19:22, 21:9, 21:19, 21:22, 22:11, 22:17, 22:20, 22:22, 29:8, 36:20, 36:22, 36:23, 37:3, 37:8, 37:15, 37:19, 37:23, 39:1, 39:6, 39:8, 41:6, 41:10, 41:19, 41:21, 42:4, 43:24, 44:3, 44:4, 45:5, 45:16, 45:22
**Adobe's** [1] - 43:24
**Adobe..** [1] - 22:5
**ADRIENNE** [1] - 1:18
**ads** [1] - 37:1
**advance** [1] - 27:5
**advantage** [2] - 17:14, 31:20
**adverse** [4] - 34:24, 51:23, 59:22, 64:2
**adversely** [1] - 50:18
**advertisement** [1] - 67:2
**affairs** [1] - 32:25
**affect** [2] - 24:10, 24:12
**affected** [1] - 50:18
**affects** [1] - 24:13
**afternoon** [4] - 4:14, 4:19, 29:15, 29:16
**age** [3] - 29:20, 31:2, 61:16
**age-based** [1] - 31:2
**ago** [1] - 57:3
**agree** [2] - 38:1, 44:18
**agreed** [6] - 29:7, 29:8, 29:10, 46:1, 54:17
**agreement** [1] - 44:6
**ahead** [1] - 4:18
**Air** [2] - 18:19, 32:10
**alarm** [1] - 40:1
**aligned** [1] - 54:1
**all-hands** [1] - 28:21
**allegation** [2] - 17:12, 61:23
**allegations** [32] - 6:8, 6:11, 7:1, 9:13, 9:16, 9:24, 13:17, 13:21, 14:25, 23:17, 25:5,

25:16, 26:16, 27:6, 28:1, 28:2, 28:6, 29:6, 29:9, 29:11, 32:3, 32:22, 33:10, 38:7, 42:2, 52:8, 57:11, 64:24, 65:17, 66:12, 66:18

**allege** [11] - 12:8, 15:1, 20:15, 23:10, 35:13, 37:2, 43:19, 44:22, 55:25, 64:18, 66:10

**alleged** [12] - 7:7, 19:17, 19:19, 26:15, 26:21, 27:18, 27:19, 27:23, 27:25, 32:21, 64:15, 64:25

**allegedly** [2] - 12:1, 65:25

**alleges** [3] - 14:17, 15:22, 66:2

**allocate** [1] - 50:17

**allocation** [1] - 50:1

**allow** [1] - 7:12

**almost** [2] - 38:12, 44:4

**Alphabet** [2] - 47:8, 47:24

**Alto** [2] - 3:9, 3:16

**altogether** [1] - 56:1

**Amazon** [2] - 28:1, 29:5

**ambitious** [1] - 11:10

**America** [3] - 50:14, 51:3, 60:17

**American** [1] - 61:16

**amorphous** [1] - 25:12

**amount** [2] - 21:3, 50:3

**analysis** [1] - 63:23

**analyst** [8] - 42:22, 42:25, 46:9, 48:17, 57:22, 58:2, 58:4, 62:15

**analyst's** [1] - 56:9

**analysts** [1] - 32:7

**analytics** [3] - 49:3, 49:11, 51:18

**analyzed** [1] - 61:8

**Andy** [2] - 27:12, 27:18

**announced** [1] - 21:23

**anti** [1] - 48:9

**anti-Semitic** [1] - 48:9

**anticipate** [1] - 59:17

**antiquated** [1] - 38:4

**anyway** [2] - 6:20, 38:1

**apart** [1] - 31:5

**aplenty** [2] - 33:24, 52:17

**apologies** [2] - 9:1, 9:4

**app** [4] - 36:14, 36:15, 42:8, 65:16

**apparel** [1] - 29:18

**apparent** [3] - 11:15, 39:7, 44:4

**appear** [1] - 5:15

**appreciate** [2] - 9:6, 55:13

**apprised** [1] - 43:23

**approach** [1] - 30:3

**apps** [4] - 30:19, 30:23, 36:8, 36:15

**April** [5] - 15:17, 39:21, 39:24, 49:1, 58:14

**areas** [6] - 24:24, 43:15, 51:19, 53:11, 53:21, 56:18

**Arena** [1] - 51:25

**argue** [1] - 13:11

**Argument** [1] - 1:16

**argument** [8] - 4:4, 7:6, 8:11, 46:8, 46:11, 46:13, 64:10, 65:2

**arguments** [1] - 52:25

**arm** [2] - 52:18, 63:2

**armed** [1] - 52:12

**article** [5] - 7:5, 7:13, 7:20, 27:21, 48:17

**articles** [1] - 33:8

**articulate** [1] - 64:8

**aside** [1] - 28:21

**aspect** [2] - 30:24, 63:19

**aspects** [1] - 43:13

**asserted** [1] - 6:8

**associate** [1] - 36:20

**associated** [1] - 29:24

**assume** [1] - 7:19

**assumption** [2] - 65:9, 65:10

**assured** [1] - 56:10

**athletic** [1] - 29:23

**attempt** [2] - 26:11, 54:11

**attended** [4] - 33:25, 49:19, 51:13, 61:17

**attention** [3] - 14:1, 15:13, 25:18

**attributed** [1] - 64:24

**audit** [3] - 50:6, 51:12, 53:12

**authority** [3] - 6:14, 46:13, 47:10

**automatically** [1] -

33:2

**available** [1] - 16:25

**Avenue** [3] - 3:4, 3:8, 3:15

**avoid** [1] - 52:14

**aware** [1] - 59:25

**awfully** [1] - 27:22

**axe** [1] - 29:1

## B

**backed** [1] - 63:5

**background** [1] - 35:20

**bad** [3] - 39:22, 39:24, 52:3

**barely** [1] - 34:3

**based** [13] - 6:4, 31:1, 31:2, 36:8, 45:15, 53:10, 54:8, 54:22, 55:1, 61:7, 63:10, 63:15

**basis** [4] - 16:7, 17:18, 26:6, 43:12

**became** [3] - 11:14, 39:6, 44:3

**BEFORE** [1] - 1:18

**began** [5] - 11:23, 14:18, 31:17, 31:22, 53:20

**beginning** [8] - 4:8, 11:17, 15:16, 16:14, 22:6, 45:8, 51:5, 54:5

**begun** [2] - 47:8, 58:16

**behalf** [1] - 4:20

**bells** [1] - 40:1

**below** [2] - 24:20, 67:10

**benefit** [2] - 26:24, 49:5

**benefits** [1] - 45:4

**Berkeley** [1] - 49:2

**Berne** [1] - 4:9

**BERNE** [1] - 2:4

**better** [1] - 45:2

**between** [1] - 40:2

**big** [2] - 10:4, 28:24

**billion** [2] - 11:10, 39:4

**bit** [2] - 8:23, 35:20

**Black** [2] - 39:9, 39:10

**blasts** [2] - 65:15

**blog** [1] - 58:23

**board** [3] - 50:9, 51:14, 53:13

**bother** [1] - 35:23

**bottom** [1] - 17:6

**boys** [1] - 23:13

**brand** [19] - 12:15, 15:6, 23:1, 23:25, 24:17, 31:5, 32:2, 41:21, 50:13, 60:2, 60:4, 60:5, 60:10, 60:13, 60:17, 60:19, 61:14, 61:16, 61:17

**brands** [4] - 29:20, 36:6, 45:3, 60:23

**breadth** [1] - 57:24

**Brian** [2] - 3:11, 5:1

**bribes** [1] - 40:16

**brick** [1] - 29:19

**brief** [3] - 6:4, 55:2, 64:5

**briefing** [1] - 52:1

**briefly** [2] - 5:24, 63:19

**briefs** [1] - 19:12

**bringing** [1] - 17:25

**broad** [2] - 64:11

**broadly** [1] - 20:4

**Broadway** [4] - 2:10, 2:14, 2:18, 2:23

**broken** [3] - 8:9, 36:18, 58:19

**brought** [3] - 37:21, 39:3, 39:5

**browsing** [1] - 36:11

**build** [9] - 22:24, 31:11, 37:22, 38:5, 39:25, 40:25, 43:2, 43:9, 53:9

**build-out** [6] - 31:11, 38:5, 39:25, 40:25, 43:2, 43:9

**building** [8] - 16:3, 20:5, 22:9, 30:20, 38:10, 42:12, 52:24, 58:22

**built** [1] - 18:1

**bulk** [1] - 32:22

**business** [11] - 16:19, 29:22, 30:7, 30:9, 31:9, 35:9, 35:11, 43:16, 48:8, 50:16, 54:17

**buy** [4] - 18:8, 18:20, 27:4, 35:25

**buying** [2] - 30:2, 32:14

## C

**CA** [3] - 3:9, 3:12, 3:16

**CAISSE** [5] - 2:3, 2:9, 2:13, 2:17, 2:21

**Cal** [3] - 42:14, 53:6, 63:12

**Campion** [4] - 7:6,

26:21, 27:12, 27:18

**cannon** [1] - 48:9

**capabilities** [21] - 22:7, 30:22, 36:19, 37:17, 37:22, 38:18, 41:17, 41:24, 42:15, 42:16, 43:17, 45:9, 45:14, 45:23, 49:3, 49:9, 49:11, 49:15, 49:22, 50:25, 51:23

**capability** [2] - 38:21, 39:3

**capable** [2] - 17:17, 42:5

**care** [1] - 66:19

**carefully** [1] - 30:6

**Carol** [2] - 2:18, 4:14

**case** [36] - 4:5, 6:4, 6:16, 6:19, 11:2, 12:4, 12:24, 13:16, 14:8, 16:5, 19:11, 19:15, 19:16, 24:4, 24:14, 28:1, 33:1, 34:21, 42:14, 46:12, 47:8, 47:17, 47:22, 48:6, 51:25, 53:6, 55:2, 56:13, 56:14, 56:19, 58:3, 62:22, 63:9, 63:12, 65:20

**cases** [3] - 29:5, 47:24

**CASEY** [1] - 4:19

**Casey** [2] - 3:4, 4:19

**catch** [1] - 23:21

**catching** [2] - 23:21, 33:14

**categories** [9] - 29:24, 31:1, 31:2, 35:3, 35:5, 53:16, 54:11, 54:12, 59:20

**category** [4] - 48:24, 54:2, 54:7, 62:7

**caused** [1] - 50:5

**causes** [1] - 40:1

**causing** [1] - 12:10

**cautions** [1] - 28:10

**caveat** [1] - 44:23

**CDA** [33] - 10:20, 10:22, 10:25, 11:15, 11:23, 13:11, 14:2, 14:11, 14:21, 15:2, 15:7, 15:10, 22:24, 25:25, 30:4, 31:21, 31:23, 32:6, 35:7, 35:11, 35:18, 35:25, 48:18, 49:21, 52:21, 53:19, 54:5, 54:7, 54:12, 54:16, 63:8, 65:4, 65:23

**CDA's** [1] - 30:25

**celebrity** [1] - 48:8

**Center** [1] - 3:11
**centers** [1] - 35:7
**central** [1] - 54:6
**centralize** [1] - 36:24
**CEO** [3] - 9:20, 34:7, 37:7
**certain** [2] - 6:25, 38:24
**certainly** [3] - 9:20, 10:13, 46:3
**Certificates** [1] - 67:21
**certified** [1] - 67:14
**certify** [1] - 67:10
**CFO** [1] - 49:1
**chain** [42] - 7:5, 7:8, 15:14, 15:16, 15:19, 15:21, 16:1, 16:3, 16:12, 16:13, 16:16, 16:21, 17:4, 18:17, 18:18, 18:21, 20:5, 27:24, 30:24, 31:13, 35:14, 43:17, 48:20, 48:24, 49:4, 49:9, 49:11, 49:20, 49:22, 50:2, 50:7, 50:11, 50:18, 50:20, 50:25, 51:3, 51:12, 51:22, 52:2, 52:10, 52:24, 64:12
**challenge** [5] - 12:5, 23:2, 24:7, 35:14, 66:23
**challenged** [3] - 15:15, 15:18, 37:14
**challenges** [7] - 13:10, 13:13, 13:14, 15:11, 18:17, 31:9, 46:18
**challenging** [1] - 16:22
**change** [2] - 9:15, 23:13
**changed** [1] - 62:17
**changes** [1] - 14:22
**changing** [1] - 24:10
**channel** [2] - 50:24, 62:11
**channels** [1] - 30:18
**characterization** [1] - 65:2
**characterizations** [1] - 64:12
**characterize** [1] - 13:6
**charge** [1] - 38:2
**chart** [2] - 58:21, 64:8
**cherry** [3] - 12:20, 20:17, 32:22
**cherry-picked** [2] - 12:20, 20:17
**cherry-picking** [1] -

32:22
**chief** [2] - 40:4, 61:18
**China** [1] - 65:16
**churn** [1] - 7:1
**Circuit** [22] - 6:4, 6:15, 6:18, 16:5, 19:16, 19:20, 24:4, 26:12, 28:10, 34:22, 37:25, 43:10, 46:12, 47:4, 47:9, 52:25, 54:25, 55:3, 56:12, 59:16, 63:9, 65:21
**circumstances** [1] - 14:7
**circumstantial** [1] - 26:10
**cite** [3] - 28:8, 33:16, 42:25
**cited** [11] - 6:5, 6:19, 6:20, 19:12, 34:21, 42:13, 48:17, 51:25, 53:6, 55:2, 58:3
**CITY** [1] - 2:3
**claim** [8] - 12:18, 16:7, 17:18, 18:10, 23:6, 23:22, 64:21, 65:22
**claimed** [2] - 31:3, 33:6
**claiming** [4] - 12:16, 30:10, 30:13, 62:22
**claims** [4] - 12:14, 32:20, 49:10, 55:21
**class** [43] - 11:18, 12:6, 14:8, 15:17, 16:14, 18:12, 19:4, 19:6, 19:7, 24:7, 25:20, 25:24, 26:23, 27:1, 27:12, 28:18, 30:12, 31:23, 32:17, 32:18, 32:25, 33:11, 33:18, 34:10, 38:9, 38:12, 40:7, 45:17, 45:21, 46:10, 46:23, 48:17, 48:21, 49:14, 50:9, 51:14, 53:18, 54:19, 54:23, 55:23, 62:3, 62:5, 66:4
**classic** [5] - 18:14, 18:19, 19:2, 32:9, 57:4
**clean** [2] - 12:2, 12:10
**clear** [9] - 5:21, 10:11, 13:9, 17:4, 17:5, 18:16, 19:1, 22:23, 64:18
**clearly** [1] - 17:20
**click** [2] - 36:16, 45:6
**click-through** [1] - 45:6
**clicked** [1] - 38:16

**close** [4] - 34:11, 51:6, 65:11, 65:24
**closely** [1] - 60:24
**Cloud** [1] - 31:18
**Cloudera** [1] - 19:15
**CMS** [1] - 22:16
**cobble** [1] - 12:19
**cobbling** [1] - 13:3
**cogent** [2] - 64:6, 66:14
**colleague** [1] - 63:19
**colleagues** [2] - 4:10, 4:20
**comments** [1] - 48:10
**commerce** [2] - 24:16, 24:22
**commit** [4] - 9:25, 10:15, 11:8, 17:8
**committed** [2] - 10:10, 17:12
**committing** [1] - 25:22
**communicated** [2] - 20:6, 66:10
**companies** [3] - 10:8, 31:2, 36:24
**company** [19] - 11:12, 12:16, 24:9, 25:11, 25:21, 26:7, 27:9, 27:14, 28:21, 28:24, 29:7, 29:18, 32:25, 33:4, 43:17, 56:1, 56:4, 56:18, 63:16
**company's** [4] - 32:12, 43:13, 54:14, 63:15
**company-wide** [1] - 28:21
**comparative** [1] - 11:7
**compelling** [1] - 66:14
**compensation** [3] - 27:6, 27:7, 63:25
**compete** [1] - 24:17
**competition** [5] - 23:25, 24:24, 24:25, 25:1, 60:2
**competitive** [5] - 17:14, 19:17, 19:18, 31:5, 62:4
**competitors** [7] - 23:9, 23:20, 31:6, 31:18, 31:19, 33:14, 62:6
**complaining** [1] - 33:20
**complaint** [41] - 6:8, 7:1, 7:8, 9:17, 9:24, 10:11, 10:14, 10:24, 11:7, 11:24, 13:7, 13:21, 13:24, 14:6, 14:17, 15:22, 18:5,

19:9, 20:18, 22:5, 22:10, 22:12, 25:5, 25:14, 28:13, 29:6, 29:9, 29:10, 32:4, 32:20, 33:3, 33:16, 42:25, 56:25, 64:6, 65:2, 65:3, 65:8, 65:23, 66:10, 66:12
**complete** [2] - 7:11, 7:23
**completion** [1] - 7:10
**complex** [3] - 11:9, 35:9, 35:11
**compliance** [2] - 65:16
**component** [2] - 30:21, 31:8
**components** [3] - 30:16, 35:8, 35:14
**compounded** [1] - 42:11
**comprehensive** [1] - 36:22
**concede** [4] - 10:20, 11:17, 15:1, 25:25
**concedes** [2] - 22:6, 22:11
**concept** [1] - 18:13
**concern** [1] - 66:5
**concerns** [2] - 44:13, 54:12
**concluding** [1] - 65:18
**conclusion** [1] - 22:13
**confer** [1] - 7:22
**Confidential** [3] - 23:7, 23:16, 28:19
**confidential** [12] - 13:22, 18:7, 23:6, 28:7, 28:11, 28:17, 28:23, 29:1, 29:4, 29:7, 29:11, 33:5
**confirmed** [2] - 41:9, 45:21
**confirms** [3] - 41:14, 58:6, 62:8
**conformed** [1] - 67:13
**connect** [1] - 60:13
**connection** [3] - 42:23, 54:13, 60:11
**consideration** [1] - 67:3
**considering** [1] - 62:17
**consistent** [2] - 22:8, 26:18
**conspired** [2] - 10:17, 11:8
**constantly** [1] - 42:21
**construct** [3] - 53:16, 53:22, 54:3

**constructs** [1] - 54:11
**consumer** [17] - 15:21, 16:25, 22:7, 24:8, 30:1, 36:3, 36:25, 38:20, 42:5, 45:9, 47:20, 50:14, 53:16, 53:22, 54:3, 59:18, 61:8
**Consumer** [2] - 10:18, 30:3
**consumers** [19] - 12:17, 17:2, 18:20, 21:20, 23:12, 30:23, 31:13, 31:14, 32:2, 35:24, 36:2, 37:1, 37:10, 42:24, 45:3, 60:12, 61:16, 62:1, 65:15
**consumers'** [2] - 21:4, 30:2
**consumers..** [1] - 60:14
**contact** [2] - 33:23, 44:7
**contemporaneous** [3] - 14:10, 54:22, 57:10
**content** [1] - 41:10
**contest** [1] - 7:1
**context** [10] - 12:21, 14:5, 20:17, 43:3, 43:12, 48:11, 55:3, 56:15, 56:16, 58:4
**continue** [6] - 20:21, 21:3, 24:19, 25:2, 60:12, 61:11
**continued** [2] - 20:24, 38:11
**continues** [3] - 21:2, 24:15, 60:16
**contract** [2] - 39:6, 44:4
**contradict** [1] - 13:17
**contradicted** [2] - 49:13, 55:22
**contradicting** [1] - 13:24
**contradictory** [2] - 34:24, 64:2
**contradicts** [2] - 38:8, 41:15
**contrary** [1] - 13:11
**contribute** [1] - 26:15
**contributing** [1] - 57:5
**contributor** [1] - 57:15
**control** [1] - 27:1
**conversion** [1] - 45:7
**conveys** [1] - 45:13
**cool** [22] - 8:11, 12:17, 19:23, 20:1, 23:1, 23:8, 23:13, 23:14,

23:17, 23:18, 23:23, 32:2, 35:24, 60:4, 60:5, 60:12, 60:16, 60:19, 60:24, 61:14, 61:16
**copy** [1] - 5:6
**core** [1] - 31:7
**corners** [1] - 24:4
**corporate** [5] - 17:20, 30:5, 31:1, 53:14, 56:17
**correct** [3] - 5:23, 6:2, 67:11
**corrective** [1] - 58:14
**corroborate** [1] - 42:2
**corroborated** [6] - 33:7, 41:6, 45:18, 50:12, 52:8, 57:10
**corroborating** [1] - 48:22
**corruption** [1] - 40:16
**costs** [1] - 24:22
**counsel** [17] - 4:7, 7:23, 8:4, 31:9, 32:20, 33:5, 34:3, 34:17, 38:1, 40:6, 44:8, 44:21, 47:22, 48:24, 50:13, 61:25, 64:21
**counsel's** [5] - 13:20, 58:21, 64:10, 65:9, 65:10
**count** [1] - 5:13
**counted** [1] - 34:7
**counterbalance** [1] - 46:18
**couple** [5] - 36:10, 45:23, 57:3, 61:25, 64:21
**course** [11] - 5:3, 5:18, 7:22, 9:23, 14:9, 23:3, 25:15, 26:16, 28:12, 36:22, 42:10
**COURT** [40] - 1:1, 1:19, 1:23, 4:17, 4:22, 5:2, 6:1, 6:17, 6:19, 7:10, 7:16, 7:24, 8:2, 8:5, 8:8, 8:18, 8:24, 9:3, 9:8, 9:11, 9:18, 9:21, 10:5, 19:24, 21:11, 21:14, 21:17, 29:14, 29:16, 38:23, 55:7, 55:15, 59:8, 59:10, 60:5, 61:1, 61:4, 61:6, 61:10, 67:1
**Court** [8] - 5:15, 5:18, 13:15, 25:15, 55:8, 55:10, 66:17, 67:20
**court** [3] - 6:22, 6:23,

48:10
**Court's** [1] - 25:18
**COURTROOM** [1] - 4:4
**courts** [1] - 17:17
**cover** [3] - 10:1, 10:2, 46:9
**covered** [6] - 19:22, 27:24, 42:22, 48:25, 63:7
**create** [1] - 51:19
**created** [1] - 54:10
**creates** [3] - 37:14, 41:15, 42:18
**creating** [2] - 40:12, 40:13
**creation** [1] - 54:2
**credit** [1] - 23:16
**critical** [4] - 31:8, 31:11, 47:20, 48:19
**CRR** [2] - 1:24, 67:20
**crucial** [1] - 54:16
**CRUTCHER** [3] - 3:7, 3:10, 3:14
**culpa** [1] - 57:2
**curious** [1] - 9:15
**currency** [1] - 26:5
**current** [1] - 49:9
**customer** [1] - 24:22
**Cutler** [2] - 55:2, 63:9
**CW** [8] - 32:3, 32:22, 33:10, 34:7, 38:7, 41:23, 57:10, 64:24
**CW-1** [7] - 49:14, 49:17, 50:11, 51:11, 51:13, 52:8, 52:11
**CW-11** [4] - 41:19, 42:1, 66:8
**CW-12** [1] - 41:8
**CW-14** [2] - 41:19, 41:20
**CW-16** [1] - 57:11
**CW-18** [1] - 54:8
**CW-2** [5] - 50:12, 50:19, 57:13, 60:21, 61:19
**CW-3** [25] - 34:3, 34:8, 37:20, 38:17, 39:1, 39:5, 39:12, 39:15, 39:16, 39:18, 39:23, 40:2, 40:18, 41:5, 41:7, 41:14, 43:20, 43:23, 44:2, 44:7, 45:21, 64:21, 65:4, 65:13
**CW-3's** [2] - 42:1, 64:23
**CW-3s** [1] - 45:18
**CW-5** [1] - 50:23
**CW-6** [1] - 51:3

**CW-8** [3] - 44:9, 65:25, 66:2
**CWs** [23] - 6:11, 31:10, 33:24, 35:12, 35:16, 36:24, 40:10, 40:19, 41:5, 42:7, 45:19, 48:22, 49:13, 50:12, 54:22, 55:22, 56:2, 59:2, 62:8, 63:5, 63:22, 64:22

## D

**Daily** [1] - 27:20
**daily** [1] - 50:19
**data** [10] - 6:10, 6:25, 13:23, 36:25, 49:3, 49:10, 51:18, 61:8, 61:15
**date** [2] - 11:4, 37:18
**DATED** [1] - 67:16
**dates** [3] - 11:18, 14:6, 15:15
**DE** [5] - 2:3, 2:9, 2:13, 2:17, 2:21
**dead** [1] - 52:13
**dealing** [1] - 5:5
**December** [3] - 11:17, 44:9, 66:3
**decide** [1] - 27:4
**decided** [1] - 12:2
**decision** [6] - 6:15, 42:14, 43:10, 47:9, 57:15
**deck** [2] - 14:4, 14:24
**decline** [1] - 61:14
**declined** [1] - 62:4
**decreased** [1] - 52:10
**dedicated** [3] - 18:2, 42:15, 58:23
**deepen** [1] - 42:23
**deeply** [1] - 60:13
**defendant** [9] - 25:13, 51:10, 57:9, 58:5, 58:13, 61:20, 62:13, 66:9, 66:11
**DEFENDANT** [4] - 3:3, 3:7, 3:10, 3:14
**Defendant** [23] - 7:6, 34:6, 34:7, 37:21, 39:13, 39:17, 40:2, 40:3, 41:15, 44:2, 44:12, 49:1, 49:20, 50:8, 51:11, 51:17, 53:13, 56:8, 61:20, 61:21, 62:16
**defendant's** [3] - 46:13, 46:17, 55:1
**defendants** [38] - 4:20, 5:15, 6:25, 7:9,

9:25, 12:22, 16:6, 25:12, 26:11, 26:20, 29:6, 30:24, 32:7, 33:23, 34:1, 34:9, 34:13, 35:16, 37:13, 42:20, 44:8, 45:25, 47:24, 48:16, 48:21, 49:20, 52:17, 53:15, 54:24, 56:22, 57:18, 58:9, 63:4, 63:14, 64:1, 66:13, 66:15
**Defendants** [1] - 51:13
**defendants'** [8] - 6:9, 7:14, 32:15, 32:24, 33:10, 34:20, 52:23, 53:8
**defense** [17] - 7:23, 8:4, 31:9, 32:20, 33:5, 34:3, 34:17, 38:1, 40:6, 44:8, 44:21, 46:15, 47:22, 48:24, 50:12, 58:21, 61:25
**definitely** [1] - 37:24
**definition** [1] - 61:2
**DeJong** [2] - 2:5, 4:9
**DEJONG** [1] - 4:9
**DEKA** [5] - 2:4, 2:9, 2:13, 2:17, 2:21
**deliberate** [2] - 34:23, 35:1
**deliver** [4] - 31:14, 39:3, 39:11, 49:11
**delivered** [2] - 37:15, 45:22
**delivering** [5] - 10:21, 13:11, 21:19, 37:9, 37:12
**demand** [7] - 16:25, 24:11, 45:7, 45:12, 51:1, 51:18, 56:9
**demographic** [1] - 60:25
**demonstrate** [1] - 64:22
**demonstrated** [1] - 64:18
**denied** [2] - 32:6, 62:22
**deny** [2] - 34:14, 34:15
**departure** [3] - 27:25, 66:18, 66:20
**departures** [5] - 27:11, 27:13, 28:3, 40:7, 63:24
**depiction** [1] - 14:24
**DEPOT** [5] - 2:4, 2:9, 2:13, 2:17, 2:21
**depth** [1] - 57:25

**DEPUTY** [1] - 4:4
**derail** [1] - 35:11
**describe** [1] - 33:4
**described** [9] - 35:16, 36:24, 37:20, 38:17, 39:16, 41:1, 41:7, 50:24, 54:22
**describes** [1] - 50:11
**describing** [3] - 42:6, 50:6, 57:6
**design** [3] - 18:2, 24:10, 44:10
**designs** [1] - 59:19
**detail** [2] - 18:23, 32:23
**develop** [4] - 36:2, 36:19, 47:19, 50:25
**developed** [1] - 15:21
**developing** [4] - 42:16, 47:2, 49:18, 59:19
**development** [3] - 20:25, 43:16, 49:18
**different** [8] - 14:20, 29:20, 35:5, 35:8, 35:13, 48:15, 55:11
**differentiates** [1] - 60:11
**digital** [28] - 10:22, 13:12, 20:20, 20:24, 21:2, 24:16, 24:22, 24:23, 30:1, 30:19, 30:21, 30:22, 34:8, 36:14, 36:23, 37:22, 40:4, 41:9, 42:1, 42:9, 44:10, 44:11, 45:8, 45:9, 45:13, 47:1, 51:6, 51:21
**digital-focused** [1] - 30:1
**digitally** [1] - 67:14
**digits** [2] - 26:4, 26:5
**direct** [13] - 15:21, 28:20, 30:1, 33:23, 34:8, 44:5, 44:7, 52:16, 56:8, 57:18, 63:3, 64:25
**Direct** [6] - 10:18, 15:2, 15:6, 20:19, 24:15, 30:3
**direct-to-consumer** [2] - 15:21, 30:1
**directly** [17] - 31:15, 32:7, 36:1, 38:8, 39:17, 40:18, 41:14, 43:21, 44:11, 49:13, 50:8, 55:22, 58:5, 60:13, 61:20, 62:15, 63:1
**director** [5] - 50:14,

50:23, 51:3, 57:14, 60:22
**disadvantage** [1] - 19:18
**disagreed** [1] - 33:21
**disagreeing** [1] - 54:17
**disagreement** [1] - 33:19
**disaster** [1] - 29:8
**disclose** [5] - 43:7, 47:14, 48:7, 59:24, 63:16
**disclosed** [4] - 16:8, 41:4, 46:14, 54:19
**disclosing** [1] - 51:23
**disclosures** [5] - 13:3, 13:13, 16:13, 46:17, 58:14
**discount** [1] - 18:20
**discovering** [1] - 55:17
**discovery** [3] - 33:1, 33:2, 34:12
**discrete** [1] - 65:17
**discretionary** [1] - 27:3
**discuss** [6] - 17:9, 23:25, 34:1, 37:6, 40:20, 61:14
**discussed** [7] - 39:12, 40:18, 45:17, 50:6, 61:9, 61:17, 65:6
**discussing** [1] - 49:2
**discussion** [1] - 40:7
**dismiss** [6] - 5:5, 5:10, 5:11, 8:7, 33:3, 34:13
**disposition** [1] - 26:22
**dispute** [2] - 6:8, 6:11
**disrupted** [1] - 58:17
**distinguished** [1] - 47:23
**distribute** [2] - 49:16, 50:17
**distribution** [1] - 49:24
**DISTRICT** [3] - 1:1, 1:2, 1:19
**DIVISION** [1] - 1:3
**Doctrine** [3] - 13:1, 13:16, 16:11
**document** [1] - 34:12
**documents** [8] - 5:16, 5:19, 5:20, 6:6, 13:17, 13:20, 13:25, 25:5
**dollar** [1] - 11:10
**dollars** [1] - 39:5
**Donahoe** [50] - 9:14,

14:13, 21:16, 21:18, 26:22, 27:11, 27:13, 27:16, 34:7, 34:9, 37:7, 39:13, 39:14, 39:15, 39:17, 39:18, 40:2, 43:21, 43:23, 44:1, 44:2, 44:5, 44:11, 50:8, 51:14, 51:17, 52:12, 52:17, 53:13, 53:19, 53:25, 56:8, 56:10, 57:22, 57:24, 58:13, 60:9, 60:10, 61:21, 62:14, 62:18, 62:21, 62:24, 63:1, 63:4, 64:22, 65:1, 65:9, 65:25, 66:3
**Donahoe's** [4] - 9:17, 41:15, 42:3, 64:20
**done** [12] - 15:25, 20:7, 20:10, 21:6, 21:7, 22:9, 22:19, 22:21, 22:25, 34:15, 40:16, 62:11
**doomed** [3] - 11:23, 42:6, 65:18
**double** [1] - 26:5
**down** [5] - 8:9, 8:21, 55:20, 55:22, 56:3
**downs** [1] - 49:6
**draw** [3] - 14:1, 15:13, 25:18
**driving** [3] - 15:3, 45:6, 45:12
**drop** [1] - 38:19
**dropped** [1] - 10:7
**DTC** [47] - 30:1, 30:18, 30:20, 30:24, 31:11, 34:2, 34:10, 35:18, 36:1, 37:2, 37:4, 37:16, 37:22, 38:3, 38:10, 39:25, 40:25, 41:6, 42:21, 43:1, 43:16, 44:11, 44:14, 45:14, 46:6, 46:10, 47:1, 47:19, 49:2, 49:9, 49:16, 49:19, 49:23, 49:24, 50:4, 50:23, 51:1, 51:4, 52:5, 52:9, 52:11, 52:24, 62:23, 66:6
**DTC-focused** [1] - 30:24
**due** [2] - 50:17, 67:3
**Dunks** [1] - 18:19
**DUNN** [3] - 3:7, 3:10, 3:14
**Dunn** [4] - 4:21, 4:23, 4:25, 5:1
**duplicated** [1] - 40:14

**duplicating** [1] - 41:2
**during** [30] - 10:20, 12:6, 14:7, 15:7, 18:4, 18:11, 19:7, 24:7, 25:20, 26:21, 26:23, 27:1, 27:12, 28:18, 32:25, 34:4, 36:21, 38:5, 38:9, 40:25, 45:17, 46:10, 46:23, 48:17, 49:14, 53:18, 54:22, 55:23, 62:4

## E

**e-mail** [8] - 38:15, 38:20, 44:11, 44:14, 44:15, 65:15, 66:2, 66:4
**e-mails** [4] - 36:5, 36:7, 36:10, 41:11
**early** [7] - 37:21, 39:17, 42:2, 58:11, 58:16, 58:17, 66:4
**earnings** [7] - 11:18, 18:24, 19:1, 32:7, 44:20, 56:8, 57:21
**echoed** [1] - 33:10
**effect** [1] - 59:22
**effectively** [3] - 36:13, 47:2, 49:16
**effects** [1] - 57:12
**effort** [2] - 29:2, 52:18
**efforts** [3] - 41:2, 58:18, 63:2
**either** [6] - 10:12, 28:4, 28:15, 28:22, 29:12, 50:4
**element** [2] - 11:6, 25:9
**elevated** [1] - 16:18
**elsewhere** [1] - 34:22
**email** [1] - 36:16
**Embarcadero** [1] - 3:11
**EMEA** [1] - 39:8
**emerge** [1] - 58:15
**employee** [4] - 34:5, 37:21, 40:11, 49:17
**employees** [8] - 11:11, 28:24, 28:25, 33:3, 33:20, 33:25, 46:5, 54:16
**employing** [1] - 49:3
**enable** [1] - 45:5
**enables** [1] - 36:24
**encountered** [1] - 16:4
**end** [18] - 7:25, 11:18, 19:4, 19:6, 25:24,

32:16, 33:11, 38:12, 40:7, 44:23, 46:10, 48:21, 51:20, 52:11, 62:3, 63:3
**end-to-end** [1] - 51:20
**engage** [1] - 63:23
**engaging** [1] - 62:25
**enhanced** [1] - 30:21
**enjoyed** [1] - 48:12
**entails** [1] - 46:15
**enter** [1] - 62:21
**entering** [1] - 62:18
**enterprise** [2] - 21:25, 66:21
**entire** [7] - 12:6, 12:15, 12:25, 14:5, 15:2, 15:17, 20:16
**entirely** [1] - 22:7
**entitled** [1] - 67:12
**environmentally** [1] - 18:1
**error** [1] - 7:20
**especially** [2] - 59:1, 62:2
**essential** [2] - 30:25, 31:12
**essentially** [4] - 10:6, 10:17, 19:9, 38:2
**establish** [4] - 9:24, 19:12, 25:7, 61:21
**established** [1] - 50:1
**establishes** [1] - 63:25
**European** [1] - 39:8
**evenly** [1] - 50:17
**events** [1] - 54:22
**everywhere** [1] - 31:19
**evidence** [2] - 26:10, 33:23
**exact** [2] - 40:21, 60:9
**exactly** [9] - 6:5, 6:21, 10:22, 37:5, 46:2, 46:20, 47:17, 48:3, 56:19
**exaggeration** [1] - 32:21
**example** [10] - 6:9, 20:8, 30:16, 38:14, 38:19, 45:4, 47:18, 53:17, 53:18, 53:23
**examples** [2] - 16:12, 17:23
**exceeded** [1] - 16:25
**excess** [1] - 52:12
**exciting** [2] - 29:22, 32:2
**execute** [3] - 44:10, 44:14, 66:5
**execution** [2] - 30:15,

31:8
**executive** [5] - 27:6, 27:7, 27:14, 28:3, 65:10
**executives** [20] - 10:10, 10:15, 10:16, 10:25, 11:8, 11:15, 12:1, 12:10, 12:12, 17:7, 27:9, 28:20, 29:10, 30:6, 30:12, 38:24, 39:24, 40:4, 65:4
**exhibit** [1] - 7:14
**Exhibit** [6] - 18:24, 18:25, 20:14, 24:5, 27:15, 59:14
**exhibits** [5] - 5:16, 7:5, 7:9, 7:18, 13:14
**exist** [2] - 26:17, 41:17
**existed** [3] - 14:7, 14:8, 14:10
**existent** [2] - 19:9, 38:21
**existing** [1] - 59:19
**exists** [1] - 13:1
**expanding** [1] - 49:18
**expect** [3] - 12:12, 25:21, 51:20
**expenditures..** [1] - 24:21
**expensive** [2] - 21:7, 39:1
**Experience** [4] - 22:20, 36:23, 41:19, 41:22
**experience** [6] - 21:20, 24:23, 37:10, 37:12, 37:15, 59:21
**experiences** [1] - 45:9
**experiences..** [1] - 22:7
**Expire** [1] - 67:21
**explained** [3] - 6:5, 18:23, 60:22
**exposé** [1] - 12:9
**expressed** [1] - 66:5
**extensive** [2] - 32:23, 59:21
**extent** [1] - 6:6
**external** [1] - 12:2
**extreme** [3] - 19:11, 66:18, 66:19
**eyes** [1] - 60:19

## F

**face** [3] - 24:25, 28:8, 29:5
**Facebook** [3] - 37:8, 47:9, 47:23

**Facetimes** [1] - 39:15
**facility** [1] - 18:2
**facing** [2] - 15:12, 24:13
**fact** [11] - 12:5, 17:6, 18:9, 27:8, 30:9, 30:10, 32:13, 34:8, 39:21, 46:16, 54:15
**fact-intensive** [1] - 46:16
**factor** [2] - 20:17, 24:2
**factors** [5] - 20:13, 20:16, 23:24, 23:25, 24:6
**facts** [16] - 10:11, 10:14, 10:24, 11:3, 11:22, 14:10, 18:6, 23:4, 25:7, 25:13, 27:16, 28:13, 32:21, 39:21, 64:2, 64:14
**factual** [1] - 6:8
**fail** [3] - 11:23, 30:7, 59:17
**failing** [3] - 30:10, 31:7, 47:19
**failure** [4] - 29:9, 30:7, 48:7, 63:16
**failures** [2] - 35:13, 35:17
**faith** [1] - 11:9
**fall** [1] - 14:18
**false** [18] - 10:12, 23:4, 23:11, 25:7, 30:14, 41:16, 42:17, 42:18, 47:5, 47:6, 52:22, 54:4, 56:21, 58:8, 62:23, 64:1, 64:9
**falsity** [7] - 25:9, 28:7, 29:12, 42:13, 53:1, 55:5, 62:9
**fancy** [1] - 36:4
**fashion** [1] - 27:22
**favored** [1] - 60:16
**favorite** [1] - 60:13
**featured** [1] - 43:25
**February** [8] - 1:6, 4:1, 38:6, 39:18, 40:9, 43:22, 45:25, 67:16
**few** [1] - 62:2
**fickle** [1] - 23:12
**Fifth** [1] - 2:6
**fighting** [1] - 41:2
**figure** [1] - 50:3
**filed** [1] - 40:11
**files** [1] - 36:21
**filings** [1] - 43:5
**finally** [2] - 32:16, 48:22
**finance** [1] - 51:3

**financial** [10] - 12:4, 12:6, 13:21, 13:23, 25:19, 26:8, 26:13, 32:12, 45:4, 51:8
**fine** [2] - 7:24, 43:15
**finished** [2] - 16:3, 20:7
**fired** [1] - 40:9
**firing** [1] - 28:3
**first** [8] - 5:9, 13:18, 14:3, 17:16, 23:17, 26:20, 44:21, 60:18
**fiscal** [4] - 15:8, 16:13, 16:24, 26:2
**Fitbit** [1] - 42:13
**fitness** [2] - 24:10, 59:20
**five** [1] - 41:5
**fix** [1] - 58:18
**Fix** [1] - 63:12
**fixed** [1] - 50:7
**fixes** [1] - 32:9
**flagged** [2] - 21:9, 25:4
**flat** [1] - 26:3
**fleet** [2] - 30:19, 49:19
**flooded** [1] - 18:14
**flooding** [2] - 32:9, 57:4
**Floor** [5] - 2:6, 2:11, 2:15, 2:19, 2:23
**flow** [2] - 49:4, 49:12
**focus** [3] - 20:17, 55:10, 64:20
**focused** [6] - 30:1, 30:24, 44:22, 54:3, 59:13
**focusing** [1] - 8:14
**folks** [1] - 44:12
**follow** [2] - 8:12, 61:4
**follow-up** [1] - 8:12
**font** [1] - 20:12
**foot** [1] - 18:2
**Foot** [7] - 29:20, 30:17, 31:25, 52:13, 52:19, 62:25, 63:2
**footnote** [1] - 6:23
**FOR** [10] - 1:2, 2:3, 2:9, 2:13, 2:17, 2:21, 3:3, 3:7, 3:10, 3:14
**forecasting** [2] - 49:15, 51:1
**foregoing** [1] - 67:10
**Forescout** [2] - 56:14, 58:3
**form** [3] - 17:18, 33:24, 43:12
**former** [7] - 28:25, 31:20, 33:3, 33:19, 40:11, 46:5, 52:13

**forward** [3] - 37:13, 49:8, 57:24
**forward-looking** [2] - 49:8, 57:24
**foundation** [1] - 51:20
**four** [3] - 10:17, 24:3, 66:8
**fragments** [1] - 13:2
**franchises** [3] - 18:14, 18:19, 19:2
**Francisco** [1] - 3:12
**fraud** [21] - 9:25, 10:10, 10:15, 11:8, 11:21, 12:4, 12:18, 12:19, 16:7, 17:6, 17:8, 17:13, 17:18, 18:10, 21:8, 25:17, 25:22, 30:9, 35:6, 43:12, 64:6
**fraudulent** [2] - 34:15, 34:17
**freed** [1] - 31:20
**friction** [1] - 41:3
**Friday** [2] - 39:9, 39:10
**Friend** [15] - 26:25, 40:3, 44:20, 46:3, 49:1, 50:8, 51:10, 51:11, 51:14, 51:17, 52:12, 52:18, 53:13, 53:25, 60:9
**friend** [1] - 60:15
**friend's** [2] - 21:12, 22:3
**Friend's** [2] - 27:2, 44:23
**friendly** [1] - 18:1
**fruition** [1] - 47:16
**full** [9] - 7:14, 43:3, 44:2, 44:20, 44:23, 46:24, 59:12, 59:13, 59:14
**fully** [2] - 41:24, 59:25
**FUND** [1] - 2:3
**future** [7] - 25:23, 26:1, 26:8, 47:6, 47:7, 48:4, 59:23

## G

**gains** [2] - 45:6, 45:12
**gap** [5] - 33:16, 56:23, 57:5, 57:7, 59:25
**gaps** [1] - 38:17
**gathering** [1] - 51:19
**gauges** [1] - 60:24
**geared** [1] - 36:12
**gender** [2] - 31:2, 54:11
**general** [5] - 43:11,

54:8, 54:10, 56:16, 56:17
**generally** [1] - 6:2
**generating** [1] - 30:14
**generic** [1] - 46:17
**Gibson** [4] - 4:21, 4:23, 4:25, 5:1
**GIBSON** [3] - 3:7, 3:10, 3:14
**given** [10] - 11:6, 24:14, 34:19, 48:6, 48:12, 54:13, 55:7, 57:12, 59:1, 62:2
**glad** [1] - 12:23
**glasses** [1] - 20:11
**Glazer** [1] - 56:13
**glean** [1] - 28:23
**global** [4] - 16:21, 41:21, 49:18, 50:23
**globe** [1] - 60:12
**goals** [3] - 27:9, 52:9, 57:16
**Googled** [1] - 60:21
**government** [1] - 12:10
**governs** [1] - 11:2
**graph** [1] - 15:4
**great** [1] - 32:23
**greater** [1] - 45:10
**Grier** [3] - 2:14, 4:12, 63:19
**GRIER** [1] - 4:12
**grind** [1] - 29:1
**ground** [2] - 23:9, 23:20
**grounds** [1] - 34:13
**group** [8] - 10:16, 25:12, 40:5, 40:13, 40:20, 41:21, 42:1, 44:10
**grow** [1] - 21:2
**growth** [8] - 6:10, 10:21, 11:16, 14:19, 30:14, 53:9, 53:21, 63:15
**growth..** [1] - 15:4
**guidance** [4] - 16:15, 25:19, 26:3
**gun** [3] - 33:22, 34:11, 44:15
**gun-type** [1] - 33:22
**guru** [1] - 7:9
**guy** [2] - 40:9, 40:11

## H

**Hain** [1] - 46:12
**half** [1] - 15:18
**hallmark** [1] - 59:16
**hallmarks** [1] - 12:12

**hand** [1] - 44:5
**handful** [1] - 17:23
**hands** [3] - 28:21, 52:14, 52:19
**hard** [1] - 5:6
**head** [2] - 40:5, 46:4
**headlines** [1] - 62:18
**headwinds** [1] - 16:21
**heard** [3] - 48:8, 60:18, 64:11
**heavily** [1] - 18:19
**held** [1] - 46:13
**helped** [2] - 41:21, 52:4
**helping** [1] - 44:10
**helps** [1] - 61:21
**high** [4] - 33:25, 34:5, 37:20, 49:17
**higher** [3] - 45:7, 45:12, 49:5
**highest** [1] - 53:21
**highest-growth** [1] - 53:21
**highlighted** [2] - 46:22, 48:2
**highly** [3] - 33:8, 49:9, 62:1
**himself** [2] - 63:1
**hindsight** [2] - 10:9, 54:21
**hiring** [1] - 28:2
**historic** [2] - 10:21, 13:12
**historically** [1] - 29:17
**history** [1] - 36:8
**hit** [1] - 52:14
**hitting** [1] - 51:6
**hoc** [2] - 39:14, 43:21
**HOKA** [2] - 31:18, 62:6
**hold** [2] - 5:4, 17:17
**holistic** [1] - 63:23
**holistically** [2] - 25:16, 63:25
**honest** [1] - 25:25
**Hong** [1] - 19:11
**Honor** [52] - 4:14, 4:19, 4:24, 5:24, 6:5, 7:12, 8:6, 9:2, 9:6, 10:2, 12:18, 12:23, 13:19, 14:1, 14:13, 15:15, 17:11, 17:22, 19:18, 20:15, 21:8, 21:22, 22:1, 22:18, 25:4, 27:20, 29:13, 29:15, 31:18, 34:5, 35:4, 37:5, 38:25, 44:17, 46:21, 46:24, 48:16, 55:13, 57:21, 59:5, 60:3, 60:18, 61:13, 62:10, 63:6,

63:9, 63:18, 63:23, 64:4, 64:5, 65:20, 67:5
**HONORABLE** [1] - 1:18
**hoped** [1] - 11:16
**hour** [2] - 5:3, 5:4
**huge** [2] - 50:7, 56:1
**human** [1] - 7:20
**Humiston** [3] - 1:24, 67:19, 67:20
**hurt** [1] - 42:9
**hypothetical** [9] - 24:18, 47:6, 47:11, 47:13, 47:25, 48:4, 59:7, 59:16, 59:23

## I

**i.e** [1] - 62:22
**identifies** [2] - 32:24, 65:14
**identify** [1] - 66:6
**ignores** [1] - 32:22
**ii** [1] - 3:1
**Illston** [1] - 42:14
**illustration** [1] - 25:19
**immediately** [1] - 44:4
**immune** [1] - 16:21
**impact** [5] - 16:18, 38:18, 38:20, 51:8, 63:15
**impacting** [1] - 17:6
**impacts** [1] - 16:16
**impeded** [1] - 41:1
**implement** [3] - 21:24, 21:25, 66:22
**implementation** [1] - 43:24
**implemented** [1] - 41:25
**implementing** [2] - 11:9, 37:23
**importance** [1] - 16:10
**important** [9] - 10:3, 12:24, 13:6, 14:4, 20:3, 21:19, 37:9, 37:12, 60:23
**impossible** [1] - 65:22
**impression** [7] - 30:15, 37:14, 41:16, 42:19, 43:8, 44:25, 46:19
**improper** [1] - 6:7
**improperly** [1] - 6:24
**IN** [2] - 1:1, 1:5
**inability** [1] - 44:14
**Inc** [2] - 4:5, 53:5
**INC** [5] - 1:5, 3:3, 3:7, 3:10, 3:14

**incentive** [1] - 26:13
**include** [4] - 37:3, 40:4, 43:5, 59:13
**included** [2] - 7:5, 31:11
**includes** [5] - 7:13, 34:23, 35:18, 59:15, 63:23
**including** [22] - 6:9, 7:8, 20:20, 33:8, 35:17, 39:7, 39:14, 40:10, 40:13, 40:20, 41:22, 42:15, 44:13, 45:14, 46:6, 47:18, 49:14, 49:23, 50:25, 56:13, 57:11, 63:7
**incorporate** [1] - 9:21
**incorporated** [3] - 5:19, 6:24, 25:6
**Incorporation** [3] - 12:25, 13:15, 16:10
**incorrectly** [1] - 53:8
**increase** [2] - 10:22, 15:2
**increasing** [4] - 13:12, 15:7, 21:3, 27:9
**indeed** [2] - 22:10, 30:12
**indication** [1] - 48:16
**individual** [6] - 25:13, 33:23, 33:25, 34:9, 52:16, 63:4
**induced** [1] - 32:14
**indulgence** [1] - 9:7
**inefficiency** [1] - 49:6
**inefficiently** [1] - 40:14
**infer** [1] - 66:17
**inference** [4] - 19:13, 26:15, 66:13, 66:14
**inflated** [1] - 32:15
**influencing** [1] - 59:20
**inform** [1] - 53:2
**information** [3] - 28:14, 28:15, 34:24
**informed** [1] - 43:21
**infrastructure** [3] - 21:3, 31:13, 35:17
**inherently** [2] - 11:6, 28:11
**inherited** [1] - 37:23
**initiative** [2] - 54:6, 63:15
**initiatives** [3] - 31:23, 54:16, 54:18
**inner** [1] - 66:22
**innovating** [5] - 18:4, 19:7, 20:6, 32:11, 55:25
**innovation** [28] - 8:10,

17:10, 17:13, 17:21, 17:22, 18:3, 18:7, 18:13, 19:5, 19:6, 19:8, 35:15, 50:21, 55:12, 55:20, 55:23, 56:2, 56:11, 56:23, 57:2, 57:5, 57:7, 57:25, 58:10, 58:17, 58:19, 59:1, 59:25
**innovative** [9] - 12:17, 18:15, 31:4, 31:17, 33:13, 33:17, 35:25, 58:20
**inquiry** [1] - 46:16
**inside** [1] - 46:2
**insider** [2] - 63:19, 63:24
**insight** [1] - 51:18
**instance** [1] - 13:18
**instead** [3] - 12:14, 32:8, 49:25
**institute** [1] - 40:2
**institutional** [1] - 57:13
**integral** [1] - 49:21
**intended** [1] - 17:14
**intense** [3] - 24:24, 24:25, 25:1
**intensive** [1] - 46:16
**intent** [10] - 10:14, 19:20, 25:10, 26:11, 34:15, 34:17, 34:18, 34:20, 34:22
**intentionally** [1] - 25:21
**interaction** [2] - 28:20, 64:25
**interactions** [1] - 28:22
**interested** [3] - 9:10, 10:3, 36:18
**interesting** [2] - 35:24, 47:23
**internal** [5] - 14:17, 15:11, 15:23, 50:6, 54:9
**internally** [2] - 40:1, 40:12
**interrupt** [1] - 8:13
**inventory** [9] - 16:16, 17:1, 32:1, 51:19, 52:12, 52:14, 52:19, 56:9, 63:3
**invest** [1] - 49:24
**investigation** [4] - 12:11, 29:3, 36:22, 40:17
**investigative** [1] - 33:9
**investing** [4] - 16:2,

20:6, 52:23, 53:20
**investment** [5] - 20:22, 20:24, 39:2, 51:18, 53:21
**INVESTMENT** [5] - 2:4, 2:9, 2:13, 2:17, 2:21
**investments** [3] - 46:25, 53:8, 56:4
**investors** [32] - 10:18, 11:19, 12:16, 17:15, 18:16, 19:1, 20:19, 22:10, 22:23, 24:18, 25:10, 25:20, 25:22, 25:25, 26:7, 27:21, 29:21, 30:5, 30:10, 30:25, 31:24, 32:13, 32:18, 43:15, 44:25, 46:15, 53:3, 53:7, 54:20, 58:6, 66:15, 66:16
**investors'** [1] - 27:9
**involved** [2] - 52:18, 63:2
**Irina** [2] - 2:10, 4:13
**irrelevant** [1] - 40:23
**issue** [8] - 7:2, 34:2, 34:11, 35:10, 50:7, 53:17, 64:20, 67:3
**issues** [21] - 7:1, 16:4, 16:13, 17:4, 18:18, 18:21, 19:22, 32:6, 32:8, 41:24, 42:8, 42:11, 44:3, 46:14, 50:18, 63:7, 64:13, 64:17, 65:14, 65:17, 66:1
**itself** [7] - 22:13, 23:19, 26:13, 28:15, 33:18, 54:17, 56:13

## J

**January** [2] - 39:17, 43:22
**jeff** [1] - 4:25
**Jeffrey** [1] - 3:15
**Jessica** [2] - 3:8, 4:23
**John** [7] - 3:4, 4:19, 14:13, 26:22, 27:11, 27:13, 27:16
**joined** [1] - 4:10
**Jordan** [1] - 32:10
**Jordans** [1] - 18:19
**jotted** [1] - 8:21
**Journal** [1] - 33:9
**journalists** [1] - 33:9
**Judge** [2] - 42:14, 53:6
**JUDGE** [1] - 1:19

**judicial** [7] - 5:9, 5:12, 5:16, 5:18, 7:17, 12:24, 43:4
**judicially** [1] - 6:24
**July** [6] - 38:6, 38:11, 46:23, 47:18, 52:6
**jumble** [1] - 14:6
**June** [10] - 14:12, 14:22, 14:23, 22:4, 22:19, 41:25, 44:20, 45:20, 45:25, 51:7

## K

**Kanye** [2] - 48:8, 48:12
**keep** [1] - 20:3
**KELLER** [4] - 2:9, 2:13, 2:17, 2:22
**Kellie** [3] - 1:24, 67:19, 67:20
**Kellie_Humiston@ord.uscourts.gov** [1] - 1:25
**kept** [1] - 43:23
**key** [14] - 30:16, 30:21, 30:24, 31:23, 35:17, 40:3, 40:4, 42:24, 47:19, 48:7, 53:11, 54:5, 60:25, 63:7
**Khoja** [2] - 6:4, 13:16
**Kids'..** [1] - 54:3
**kids..** [1] - 53:22
**kind** [10] - 7:16, 7:20, 8:19, 34:20, 36:3, 36:12, 42:21, 48:9, 51:7, 60:19
**kinds** [1] - 58:7
**Kirchner** [1] - 63:9
**knocked** [1] - 26:3
**knowing** [3] - 45:2, 56:23, 57:19
**knowingly** [3] - 56:21, 58:9, 66:15
**knowledge** [12] - 9:14, 9:17, 9:25, 33:16, 38:24, 57:13, 64:2, 64:21, 64:22, 64:23, 65:11, 66:13
**known** [7] - 28:14, 29:17, 30:3, 42:17, 56:4, 59:3, 66:9
**knows** [5] - 43:14, 50:15, 51:24, 56:19, 63:16

## L

**LABATON** [4] - 2:9, 2:13, 2:17, 2:22

**Labaton** [5] - 4:11, 4:12, 4:13, 4:15, 4:16
**lacking** [1] - 64:13
**laid** [1] - 28:25
**language** [7] - 20:18, 24:1, 24:8, 48:1, 48:2, 48:3, 59:15
**large** [1] - 28:9
**last** [4] - 6:15, 15:17, 47:10, 58:15
**lasting** [1] - 30:14
**launched** [1] - 58:25
**launching** [1] - 22:16
**Lavu** [5] - 40:5, 40:22, 42:10, 45:24, 66:5
**Lavu's** [1] - 44:13
**law** [1] - 34:21
**lawsuit** [1] - 40:11
**layoffs** [1] - 56:3
**lead** [6] - 4:5, 16:16, 32:14, 32:17, 52:4, 60:16
**leader** [1] - 41:8
**leading** [1] - 31:5
**lean** [1] - 18:18
**learned** [1] - 36:21
**learning** [2] - 10:3, 36:25
**least** [5] - 25:24, 41:5, 50:10, 53:4, 66:8
**leaves** [1] - 26:25
**led** [2] - 52:9, 52:10
**left** [11] - 27:16, 27:18, 28:18, 41:11, 41:25, 42:2, 43:8, 44:24, 45:1, 46:19, 66:3
**leggings** [3] - 36:9, 36:11, 36:17
**length** [1] - 9:1
**lengthy** [3] - 8:25, 34:4, 55:9
**less** [4] - 49:6, 66:14
**level** [4] - 33:25, 34:5, 37:21, 49:17
**levels** [1] - 66:8
**lie** [3] - 34:19, 34:20, 34:22
**lies** [1] - 32:15
**life** [2] - 34:7, 39:13
**likely** [4] - 11:7, 48:13, 65:9, 65:10
**line** [3] - 15:4, 17:6, 63:13
**link** [6] - 36:16, 36:17, 36:18, 38:16, 62:13, 66:13
**linked** [1] - 64:14
**links** [2] - 52:16, 63:4
**literal** [2] - 52:25, 53:1

**Litigation** [3] - 4:6, 11:1, 53:6
**LITIGATION** [1] - 1:6
**litigation** [1] - 9:3
**Live** [4] - 50:16, 50:20, 52:3, 57:16
**Locker** [7] - 29:20, 30:17, 31:25, 52:13, 52:19, 62:25, 63:2
**lodged** [1] - 6:3
**logistical** [1] - 7:4
**LOKTING** [1] - 2:4
**LOMBARD** [1] - 4:25
**Lombard** [2] - 3:15, 4:25
**long-term** [2] - 11:15, 14:19
**look** [32] - 10:4, 13:8, 14:4, 14:9, 14:11, 14:23, 16:8, 17:22, 24:1, 24:2, 25:4, 25:5, 25:15, 26:14, 28:5, 33:15, 34:21, 36:6, 37:11, 37:18, 43:3, 43:7, 46:24, 48:1, 58:13, 58:21, 59:12, 59:14, 64:23, 65:20, 66:1
**looked** [2] - 21:15, 36:9
**looking** [5] - 21:14, 37:13, 49:8, 57:6, 57:24
**looks** [1] - 46:3
**loose** [1] - 48:9
**lose** [1] - 31:17
**losing** [2] - 23:8, 23:20
**loss** [2] - 54:13, 57:13
**losses** [2] - 32:18, 32:19
**lost** [1] - 62:5
**love** [2] - 18:20, 45:3
**low** [1] - 26:5
**lower** [2] - 57:16, 59:21
**lowering** [2] - 16:15
**lucrative** [1] - 30:5
**lululemon** [1] - 62:7
**LUTZ** [2] - 5:1, 22:2
**Lutz** [2] - 3:11, 5:1
**lying** [2] - 12:1, 30:9

## M

**machine** [1] - 36:25
**Macy's** [1] - 63:1
**magazine** [1] - 27:22
**mail** [8] - 38:15, 38:20, 44:11, 44:14, 44:15,

65:15, 66:2, 66:4
**mails** [4] - 36:5, 36:7, 36:10, 41:11
**main** [1] - 7:3
**maintain** [1] - 32:12
**major** [1] - 57:15
**manage** [1] - 49:22
**management** [5] - 41:10, 49:21, 50:2, 51:19, 54:9
**manager** [2] - 41:20, 54:8
**managers** [1] - 54:10
**manufacture** [1] - 16:22
**March** [5] - 21:21, 37:7, 37:18, 39:19, 57:21
**margins** [1] - 49:5
**Mark** [1] - 2:22
**mark** [3] - 4:16, 8:22, 49:6
**mark-downs** [1] - 49:6
**market** [32] - 11:5, 11:17, 12:13, 13:5, 13:10, 14:16, 14:21, 15:10, 17:5, 17:24, 17:25, 18:14, 18:17, 20:7, 21:5, 31:17, 32:9, 35:22, 36:1, 42:19, 42:22, 43:8, 46:8, 46:11, 46:15, 48:18, 57:4, 57:23, 62:5, 62:20, 64:1, 64:18
**marketing** [21] - 24:21, 30:22, 31:12, 36:3, 36:23, 37:4, 38:3, 38:15, 41:9, 41:11, 41:16, 41:21, 42:5, 45:22, 47:20, 50:14, 57:13, 59:21, 60:22, 60:23, 61:18
**marketplace** [6] - 8:9, 9:11, 9:18, 14:14, 62:19, 62:22
**massive** [3] - 21:23, 21:25, 66:21
**material** [6] - 38:18, 42:17, 42:20, 51:8, 53:2, 58:4
**materiality** [1] - 58:6
**materialize** [1] - 14:19
**materially** [4] - 19:19, 43:18, 47:14, 63:14
**materials** [1] - 18:1
**Matt** [1] - 63:19
**matter** [1] - 6:7
**Matthew** [2] - 2:14, 4:12

**mea** [1] - 57:2
**mean** [4] - 19:6, 28:7, 29:2, 63:1
**meaning** [2] - 23:20, 58:15
**meaningful** [1] - 41:18
**means** [3] - 41:12, 58:25, 67:12
**measure** [1] - 17:21
**measured** [2] - 13:9, 53:1
**measures** [1] - 60:24
**media** [3] - 12:9, 24:23, 29:21
**meet** [2] - 28:15, 53:9
**meeting** [3] - 39:23, 45:20, 61:17
**meetings** [11] - 28:21, 33:25, 34:9, 39:14, 40:2, 43:21, 43:25, 49:19, 51:13, 65:5, 65:6
**member** [5] - 45:5, 45:6, 45:7, 45:12, 45:13
**memorialized** [1] - 61:18
**men's** [1] - 53:22
**Men's** [1] - 54:3
**mention** [1] - 60:3
**mentioned** [5] - 34:4, 45:19, 47:22, 50:13, 56:16
**mentor** [2] - 34:7, 39:13
**merchandise** [2] - 50:23, 51:1
**mere** [2] - 31:9, 33:19
**mess** [1] - 41:23
**message** [1] - 14:20
**messages** [1] - 36:7
**messaging** [1] - 39:9
**metric** [6] - 23:8, 23:17, 60:18, 60:23, 61:7, 61:15
**metrics** [5] - 8:11, 12:6, 13:21, 13:23, 50:19
**mid** [1] - 26:4
**mid-2022** [1] - 57:11
**middle** [2] - 31:23, 33:17
**midway** [1] - 54:18
**might** [8] - 14:19, 32:11, 33:13, 34:3, 36:20, 48:8, 56:17
**million** [2] - 18:2, 39:2
**million-square-foot** [1] - 18:2
**mind** [1] - 20:3

**minutes** [1] - 5:11
**mischaracterize** [1] - 12:22
**mischaracterizing** [1] - 31:10
**misconduct** [1] - 40:15
**mislead** [8] - 10:18, 17:14, 22:22, 25:10, 26:7, 27:21, 34:18, 53:3
**misleading** [21] - 10:13, 11:5, 12:13, 12:16, 20:16, 42:17, 43:18, 44:25, 47:5, 47:6, 47:11, 47:15, 48:11, 51:24, 53:4, 54:4, 58:8, 59:16, 62:24, 64:1, 66:16
**misleadingly** [2] - 44:8, 54:1
**misled** [2] - 53:7, 66:15
**misrepresented** [1] - 63:14
**missing** [3] - 7:7, 7:9, 7:14
**misstatement** [11] - 27:19, 27:23, 27:25, 39:22, 42:3, 44:22, 51:11, 52:7, 55:21, 62:11
**misstatements** [12] - 32:24, 34:14, 35:4, 35:6, 37:2, 43:4, 43:6, 48:23, 50:13, 61:24, 62:9, 63:8
**mistakes** [1] - 31:22
**mix** [2] - 59:18, 62:11
**model** [2] - 29:23, 30:1
**modern** [1] - 29:25
**moment** [2] - 8:16, 65:1
**money** [2] - 21:6, 22:12
**monthly** [2] - 40:2, 43:25
**months** [5] - 23:10, 45:24, 61:24, 61:25, 62:2
**mortar** [1] - 29:19
**most** [2] - 12:15, 28:19
**motion** [5] - 5:5, 5:10, 5:11, 8:7, 33:2
**motive** [1] - 26:12
**MOVANTS** [5] - 2:3, 2:9, 2:13, 2:17, 2:21
**moved** [1] - 34:13

**movement** [1] - 16:22
**moving** [1] - 13:3
**MR** [7] - 4:9, 4:12, 4:16, 4:19, 4:25, 5:1, 22:2
**MS** [41] - 4:13, 4:14, 4:23, 5:24, 6:2, 6:18, 6:21, 7:12, 7:22, 8:1, 8:3, 8:6, 8:16, 8:21, 8:25, 9:1, 9:6, 9:9, 9:16, 9:20, 9:23, 10:6, 19:25, 21:12, 21:16, 21:18, 22:3, 29:15, 29:17, 38:25, 55:12, 55:17, 59:9, 59:11, 60:7, 61:3, 61:5, 61:7, 61:13, 64:5, 67:5
**multi** [2] - 11:10, 24:17
**multi-billion-dollar** [1] - 11:10
**multi-brand** [1] - 24:17
**multiple** [13] - 24:6, 35:13, 35:17, 37:3, 40:10, 40:19, 42:7, 46:5, 49:13, 53:17, 55:22, 62:8, 63:5
**must** [8] - 10:20, 11:3, 13:17, 25:15, 59:4, 63:23, 66:17, 66:18

## N

**name** [2] - 4:7, 31:5
**nature** [1] - 19:14
**ND** [3] - 42:14, 53:6, 63:12
**near** [2] - 16:14, 38:12
**nearly** [2] - 10:12, 10:17
**necessary** [2] - 35:17, 58:18
**need** [5] - 21:2, 21:7, 25:9, 36:13, 55:15
**needed** [10] - 9:4, 16:17, 19:5, 22:24, 22:25, 31:13, 36:1, 36:2, 38:3, 42:6
**needs** [2] - 21:4, 50:7
**nefarious** [1] - 27:12
**negative** [2] - 51:9, 57:12
**NELSON** [1] - 1:18
**net** [1] - 49:5
**Networks** [1] - 19:11
**neutral** [1] - 26:6
**never** [8] - 15:25, 16:3, 16:4, 16:11, 20:9,

22:9, 26:13, 49:25
**New** [5] - 2:11, 2:15, 2:19, 2:24, 4:11
**new** [18] - 17:25, 18:8, 21:25, 22:7, 22:16, 29:22, 30:3, 30:5, 31:17, 31:19, 32:11, 32:13, 41:9, 45:9, 54:2, 57:12, 59:19, 62:6
**news** [1] - 48:17
**next** [4] - 16:20, 21:1, 22:19, 56:6
**nice** [1] - 5:2
**NIKE** [150] - 1:5, 3:3, 3:7, 3:10, 3:14, 4:5, 10:9, 10:16, 10:21, 11:9, 11:19, 12:15, 12:20, 13:4, 13:8, 13:25, 14:15, 14:17, 14:18, 14:19, 15:2, 15:6, 15:7, 15:10, 15:20, 15:24, 15:25, 16:2, 16:3, 16:8, 16:11, 16:14, 16:20, 17:4, 17:12, 17:14, 17:24, 18:1, 18:4, 18:9, 18:14, 18:15, 18:17, 19:1, 19:5, 19:8, 19:25, 20:9, 20:19, 21:5, 21:25, 22:8, 22:15, 22:20, 22:21, 23:8, 23:19, 23:21, 24:3, 24:5, 24:8, 24:15, 24:18, 24:20, 25:11, 25:20, 25:25, 26:1, 26:9, 29:17, 29:21, 30:12, 31:3, 31:17, 31:21, 31:22, 32:1, 32:5, 32:8, 33:3, 33:18, 34:6, 35:9, 35:20, 36:9, 36:19, 37:15, 37:16, 37:19, 38:3, 38:9, 38:12, 38:15, 39:3, 39:4, 39:8, 40:11, 42:5, 42:8, 42:22, 43:1, 45:4, 46:25, 47:19, 48:2, 49:14, 49:21, 50:3, 50:14, 50:16, 50:19, 50:24, 50:25, 51:4, 51:5, 52:3, 52:4, 52:11, 54:1, 54:5, 54:9, 54:17, 55:25, 56:10, 57:12, 57:13, 57:16, 58:16, 58:20, 59:24, 60:15, 60:23, 61:15, 62:2, 62:17, 62:20, 62:24, 63:1,

64:13, 64:18, 65:22, 66:3, 66:21
**NIKE's** [53] - 6:9, 7:8, 10:7, 10:14, 11:8, 12:6, 13:21, 15:3, 16:18, 19:15, 20:5, 20:12, 23:1, 23:18, 27:7, 28:2, 28:24, 30:18, 30:23, 31:4, 31:14, 31:20, 32:2, 32:14, 33:17, 35:24, 38:3, 38:18, 40:12, 40:24, 41:20, 42:8, 42:9, 42:23, 43:16, 46:2, 49:2, 49:9, 49:19, 51:9, 51:17, 51:22, 53:15, 54:12, 55:23, 56:23, 57:7, 57:15, 60:10, 62:4, 65:18
**nine** [1] - 37:2
**Ninth** [22] - 3:4, 6:4, 6:15, 6:18, 16:5, 19:15, 19:19, 24:4, 26:12, 28:10, 34:21, 37:25, 43:10, 47:4, 47:9, 52:25, 54:25, 55:3, 56:12, 59:15, 63:9, 65:21
**non** [4] - 19:9, 27:3, 37:13, 38:21
**non-discretionary** [1] - 27:3
**non-existent** [2] - 19:9, 38:21
**non-forward-looking** [1] - 37:13
**none** [3] - 12:11, 42:24, 48:20
**nonetheless** [1] - 27:23
**North** [4] - 50:14, 51:3, 60:17, 61:16
**nose** [2] - 26:5, 26:6
**notably** [1] - 44:21
**note** [4] - 8:17, 18:6, 18:23, 34:3
**noted** [4] - 6:23, 9:9, 20:15, 38:4
**notes** [1] - 21:14
**nothing** [3] - 22:12, 23:18, 27:12
**notice** [9] - 5:9, 5:12, 5:16, 5:18, 6:14, 7:17, 12:24, 43:4, 65:25
**noticed** [3] - 6:24, 7:6, 36:11
**notifications** [1] - 36:7
**notion** [3] - 18:4, 22:8,

22:11
**notoriety** [1] - 48:12
**nowhere** [3] - 27:5, 29:9, 65:23
**nuanced** [1] - 13:9
**number** [11] - 5:16, 23:19, 28:9, 29:1, 34:15, 60:12, 60:13, 60:16, 60:18, 61:16
**Number** [3] - 9:14, 14:13, 54:1
**numbers** [3] - 6:10, 8:14, 55:11
**NY** [4] - 2:11, 2:15, 2:19, 2:24

## O

**O'Neill** [11] - 26:20, 34:6, 37:21, 40:3, 44:12, 49:20, 50:9, 51:14, 61:20, 66:3
**Oak** [1] - 2:6
**object** [3] - 6:6, 7:2, 43:4
**objection** [3] - 5:17, 6:3, 7:3
**objections** [2] - 5:22, 7:15
**objective** [1] - 17:17
**observed** [1] - 34:1
**obvious** [2] - 5:13, 5:14
**obviously** [5] - 11:11, 22:18, 28:24, 35:10, 56:1
**occur** [3] - 47:7, 47:8, 47:14
**occurred** [2] - 48:5, 64:16
**October** [4] - 51:16, 53:19, 53:24, 57:8
**odd** [1] - 27:22
**OF** [2] - 1:2, 1:15
**offensive** [1] - 48:10
**offer** [1] - 27:15
**offerings** [3] - 20:24, 24:21, 59:19
**offers** [1] - 36:22
**officer** [2] - 40:5, 61:18
**Official** [1] - 67:20
**offsite** [1] - 39:23
**old** [1] - 27:13
**omissions** [2] - 32:15, 34:14
**omit** [1] - 42:17
**omitted** [1] - 40:6
**omni** [1] - 50:24
**omni-channel** [1] -

50:24
**ON24** [2] - 6:16, 47:9
**once** [1] - 47:10
**One** [1] - 3:11
**one** [51] - 6:3, 7:2, 7:4, 12:5, 14:7, 21:9, 21:13, 23:19, 25:7, 26:4, 27:19, 35:6, 35:10, 35:14, 37:5, 37:6, 38:15, 39:14, 43:21, 44:9, 44:18, 45:5, 47:18, 48:7, 51:10, 52:24, 53:18, 53:23, 53:24, 56:6, 56:25, 57:20, 58:14, 58:23, 59:6, 59:7, 60:8, 60:9, 60:12, 60:13, 60:16, 60:19, 61:16, 62:12, 62:14, 65:14
**one-on-one** [2] - 39:14, 43:21
**one-to-one** [1] - 45:5
**ones** [3] - 32:10, 32:11, 48:5
**online** [3] - 29:21, 36:5, 36:6
**oops** [2] - 33:12, 57:1
**opening** [2] - 52:9, 57:16
**openings** [1] - 52:5
**operate** [1] - 47:2
**operates** [1] - 50:16
**operation** [1] - 43:13
**operational** [1] - 41:13
**operationalize** [2] - 22:6, 45:8
**operations** [7] - 20:20, 24:15, 24:16, 36:1, 38:19, 46:2, 59:22
**opinion** [1] - 67:3
**opportunities** [1] - 57:23
**opportunity** [1] - 45:10
**opposite** [2] - 17:7, 22:10
**opposition** [1] - 6:3
**optimism** [3] - 17:20, 43:11, 56:17
**OR** [2] - 2:7, 3:5
**oral** [2] - 4:4, 7:6
**Oral** [1] - 1:16
**order** [3] - 18:22, 23:21, 52:14
**orders** [1] - 51:2
**ordinary** [2] - 30:8, 66:19
**OREGON** [1] - 1:2
**Oregon** [1] - 1:7

**organization** [8] - 35:9, 40:13, 40:21, 42:11, 44:13, 46:7, 53:20, 66:23
**organizational** [2] - 53:15, 54:10
**organizations** [1] - 54:2
**original** [1] - 67:13
**otherwise** [4] - 12:8, 27:16, 43:18, 63:21
**outage** [1] - 42:9
**outlines** [1] - 39:24
**outset** [1] - 25:16
**overall** [3] - 14:2, 28:5, 30:13
**overwhelmingly** [2] - 43:8, 44:25
**own** [8] - 14:25, 30:18, 30:19, 32:21, 33:10, 34:20, 40:13, 65:7
**owning** [1] - 32:5

## P

**p.m** [2] - 4:1, 67:6
**pace** [5] - 17:10, 17:21, 19:4, 19:5, 55:20
**page** [6] - 14:3, 15:14, 16:20, 21:1, 24:6, 27:15
**pages** [5] - 16:9, 16:12, 18:25, 20:14, 64:7
**Palo** [2] - 3:9, 3:16
**paragraph** [13] - 14:25, 15:1, 15:5, 20:23, 22:14, 22:16, 24:20, 43:23, 52:15, 56:24, 58:12, 65:5, 66:2
**park** [1] - 26:4
**Parker** [3] - 26:25, 55:19, 62:16
**parker** [1] - 26:25
**part** [3] - 31:21, 53:19, 53:21
**particular** [1] - 9:11
**particularity** [1] - 32:23
**particularized** [1] - 11:3
**partner** [2] - 36:15, 52:13
**partnered** [4] - 22:5, 36:19, 37:19, 45:5
**partners** [7] - 30:17, 31:15, 31:21, 31:25, 35:21, 48:8, 52:20

**partnership** [7] - 8:10, 21:22, 22:15, 22:22, 37:23, 39:2, 45:16
**parts** [1] - 8:22
**party** [3] - 29:19, 29:25, 61:8
**past** [3] - 31:16, 48:13, 49:8
**patience** [1] - 55:13
**Pause** [1] - 9:5
**pause** [2] - 21:15, 62:10
**pdf** [1] - 36:21
**PENSION** [1] - 2:3
**people** [1] - 41:2
**per** [3] - 44:2, 45:7, 45:12
**percent** [5] - 15:8, 26:5, 26:6, 38:19, 52:10
**percentage** [2] - 15:3, 15:6
**percentages** [1] - 15:4
**perfect** [1] - 15:25
**performance** [10] - 6:12, 12:7, 13:10, 25:23, 26:2, 26:8, 27:7, 50:18, 51:9, 54:13
**performing** [2] - 43:14, 56:19
**perhaps** [2] - 12:15, 27:17
**period** [48] - 10:17, 10:20, 11:18, 12:6, 12:21, 14:7, 14:8, 15:17, 16:14, 18:12, 19:4, 19:6, 19:7, 24:7, 25:21, 25:24, 26:22, 26:23, 27:1, 27:2, 27:12, 28:18, 30:12, 31:24, 32:17, 32:25, 33:11, 33:18, 34:10, 38:9, 38:12, 40:8, 45:18, 45:21, 46:10, 46:23, 48:18, 48:21, 49:15, 50:9, 51:15, 53:18, 54:19, 54:23, 55:24, 62:3, 62:5, 66:4
**periods** [1] - 14:6
**person** [5] - 37:24, 38:2, 38:10, 38:14, 66:5
**personalization** [9] - 36:3, 37:4, 38:13, 41:6, 41:16, 42:24, 45:5, 45:15, 45:22
**personalized** [7] - 21:20, 30:22, 37:1,

37:9, 37:12, 39:9, 41:10
**personally** [3] - 26:24, 34:6, 52:18
**Pharmaceutical** [1] - 51:25
**phase** [2] - 41:11, 41:12
**phone** [1] - 39:15
**picked** [2] - 12:20, 20:17
**Pickering** [1] - 55:2
**picking** [1] - 32:22
**picture** [3] - 10:4, 14:2, 17:3
**piled** [1] - 52:12
**piling** [1] - 32:1
**pillar** [1] - 54:6
**pilot** [2] - 41:11, 41:12
**pilots** [1] - 22:16
**pipeline** [24] - 8:10, 17:13, 31:4, 33:17, 35:15, 50:21, 53:9, 55:23, 56:11, 56:12, 56:14, 56:15, 56:24, 57:2, 57:8, 57:12, 57:15, 57:17, 57:24, 57:25, 58:10, 58:17, 58:19, 59:1
**pitched** [1] - 30:4
**pivot** [1] - 35:25
**pivoted** [2] - 49:23, 62:25
**pivoting** [2] - 31:24, 52:20
**place** [3] - 22:19, 22:24, 27:22
**placing** [1] - 51:2
**plagued** [1] - 31:8
**PLAINTIFF** [1] - 2:3
**plaintiff** [2] - 12:14, 64:17
**plaintiffs** [46] - 4:8, 4:10, 5:21, 10:9, 10:20, 11:2, 11:17, 11:21, 12:5, 12:7, 12:19, 13:1, 13:6, 13:11, 15:1, 15:24, 16:6, 16:11, 17:3, 17:10, 18:6, 19:3, 20:8, 20:15, 20:18, 23:5, 23:22, 24:7, 25:9, 25:24, 26:11, 26:17, 27:5, 27:11, 27:15, 28:4, 28:8, 28:15, 28:22, 29:2, 32:14, 32:17, 64:9, 65:17, 65:21, 66:24
**plaintiffs'** [9] - 10:16, 11:25, 14:25, 15:9,

15:20, 17:12, 23:2, 23:3, 65:2
**plan** [4] - 27:3, 27:7, 30:6, 51:1
**planned** [3] - 10:1, 11:20, 55:16
**planning** [4] - 8:13, 10:1, 49:15, 50:1
**platform** [8] - 21:9, 21:19, 22:20, 36:23, 37:8, 41:20, 41:22, 41:23
**platforms** [10] - 20:20, 20:25, 21:2, 24:23, 30:19, 36:6, 36:14, 45:10, 47:2, 47:20
**plausible** [2] - 64:6, 65:22
**played** [3] - 21:19, 37:8, 37:11
**plead** [24] - 10:9, 10:24, 11:3, 11:7, 11:21, 11:22, 11:24, 19:10, 19:20, 23:3, 25:10, 25:12, 26:11, 26:13, 26:17, 33:22, 34:20, 35:2, 64:3, 65:3, 65:21, 66:17, 66:24
**pleaded** [1] - 44:16
**pleading** [5] - 29:11, 34:12, 46:17, 54:21, 65:11
**pleadings** [1] - 11:2
**pleads** [3] - 28:13, 29:10, 32:23
**pled** [2] - 13:17, 13:18
**plenty** [1] - 55:7
**plucking** [1] - 13:2
**plummet** [1] - 50:5
**plus** [1] - 59:2
**point** [17] - 14:15, 14:16, 14:21, 15:2, 18:6, 20:13, 23:6, 23:10, 23:22, 25:11, 27:11, 39:1, 46:4, 48:25, 53:5, 55:18
**pointed** [11] - 19:3, 37:5, 44:17, 55:19, 56:7, 57:21, 58:3, 59:6, 59:15, 60:3, 63:8
**pointedly** [1] - 16:24
**poor** [1] - 50:2
**poorly** [2] - 43:14, 56:19
**popularity** [1] - 24:9
**portion** [2] - 5:9, 59:14
**PORTLAND** [1] - 1:3
**Portland** [3] - 1:7, 2:7,

3:5
**portray** [3] - 13:4, 17:3, 31:10
**portrayed** [1] - 48:4
**position** [4] - 28:13, 31:5, 37:24, 62:4
**positive** [3] - 43:8, 44:25, 46:19
**positively** [1] - 51:22
**possible** [1] - 55:14
**post** [2] - 37:8, 58:23
**potential** [1] - 59:24
**practices** [3] - 26:19, 28:3, 30:2
**pre** [2] - 54:7, 54:12
**pre-CDA** [2] - 54:7, 54:12
**precisely** [1] - 43:18
**predicting** [1] - 26:1
**preestablished** [1] - 27:2
**preference** [1] - 59:20
**preferences** [3] - 23:12, 36:9, 59:18
**preparing** [1] - 7:6
**presence** [1] - 24:24
**present** [6] - 8:13, 24:17, 45:11, 49:8, 55:8, 64:6
**presentation** [5] - 5:6, 9:13, 9:22, 34:4, 39:23
**presented** [2] - 47:25, 66:23
**preserve** [1] - 31:4
**presume** [1] - 46:1
**pretty** [4] - 34:11, 36:4, 60:20, 62:10
**prevent** [1] - 13:1
**prevented** [1] - 42:12
**previously** [1] - 35:21
**price** [2] - 10:7, 52:15
**prices** [1] - 32:15
**pricing** [1] - 24:21
**principle** [1] - 19:16
**Private** [1] - 11:1
**problem** [4] - 8:1, 33:19, 41:3, 66:7
**problems** [45] - 15:23, 16:12, 31:8, 34:2, 34:10, 39:7, 39:13, 39:16, 39:22, 40:12, 40:18, 40:21, 40:23, 41:7, 41:20, 42:11, 42:18, 43:1, 43:24, 46:6, 46:9, 48:19, 48:22, 50:7, 50:12, 50:21, 50:24, 51:8, 51:12, 51:23, 52:3, 52:10, 53:10, 57:15,

59:3, 63:11, 63:16, 64:12, 64:13, 64:14, 64:16, 65:8, 65:14, 65:16
**proceed** [1] - 8:6
**proceedings** [2] - 9:5, 67:12
**Proceedings** [1] - 67:6
**PROCEEDINGS** [1] - 1:15
**process** [1] - 22:8
**product** [26] - 12:17, 16:17, 16:22, 17:1, 18:15, 22:17, 24:20, 31:1, 31:4, 33:17, 34:8, 38:15, 42:1, 49:4, 49:5, 49:7, 49:11, 50:4, 54:2, 56:2, 57:14, 57:24, 59:19, 62:6, 63:10, 63:13
**production** [1] - 24:22
**products** [22] - 17:25, 18:19, 24:9, 29:23, 30:18, 31:14, 32:10, 35:22, 35:25, 36:1, 36:12, 36:17, 49:16, 50:17, 56:1, 57:4, 57:12, 58:20, 58:22, 58:25, 59:19
**products..** [1] - 24:11
**program** [3] - 41:20, 42:4, 54:9
**progress** [6] - 22:11, 22:21, 38:5, 38:9, 41:1, 43:25
**progressing** [1] - 40:25
**project** [3] - 39:1, 41:9, 55:4
**projected** [2] - 26:2, 39:4
**projects** [2] - 40:14, 41:2
**promise** [1] - 55:14
**promised** [2] - 39:3, 39:8
**prompts** [1] - 40:1
**prop** [1] - 32:11
**proper** [2] - 43:6, 50:3
**proposition** [1] - 30:5
**prove** [2] - 11:22, 20:13
**provide** [6] - 30:22, 31:12, 37:1, 41:10, 47:20, 55:10
**provided** [3] - 14:4, 25:20, 38:3
**providing** [1] - 13:9

**PSLRA** [3] - 14:9, 18:10, 33:2
**public** [6] - 10:8, 27:8, 27:14, 40:10, 41:15, 48:12
**publically** [2] - 32:16, 41:4
**publicly** [1] - 54:19
**puffery** [1] - 58:1
**puffy** [1] - 60:20
**pull** [1] - 21:13
**purely** [2] - 47:25, 48:4
**purpose** [2] - 6:7, 43:6
**purposes** [1] - 52:17
**pursuant** [1] - 27:2
**push** [1] - 36:7
**put** [4] - 20:11, 22:24, 29:2, 49:5

## Q

**Q1** [2] - 16:13, 18:24
**Q4** [2] - 16:24, 19:1
**Quality** [2] - 43:10, 56:13
**quarter** [3] - 17:23, 17:24
**quarterly** [3] - 50:6, 51:12, 53:12
**questions** [10] - 5:5, 5:8, 5:12, 8:4, 8:9, 17:9, 56:9, 57:23, 63:18, 63:20
**quickly** [5] - 39:7, 55:14, 55:18, 60:3, 67:4
**quietly** [2] - 31:22, 54:5
**quite** [1] - 22:10
**quote** [3] - 13:22, 47:13, 65:7

## R

**raised** [3] - 14:12, 17:9, 44:12
**rankings** [1] - 23:18
**rate** [1] - 60:12
**rates** [1] - 45:6
**rather** [7] - 11:8, 13:24, 31:15, 32:5, 32:11, 48:4, 53:2
**Ratnakar** [1] - 40:5
**rattled** [1] - 8:19
**Re** [2] - 4:5, 53:5
**RE** [1] - 1:5
**re** [3] - 62:18, 62:21, 62:25
**re-engaging** [1] -

62:25
**re-enter** [1] - 62:21
**re-entering** [1] - 62:18
**read** [7] - 5:7, 20:16, 24:3, 44:20, 44:21, 44:23, 62:16
**ready** [1] - 9:12
**real** [3] - 33:4, 60:20, 60:23
**realigned** [1] - 53:20
**reality** [3] - 15:22, 31:7, 32:5
**realize** [3] - 14:18, 33:12, 57:1
**realized** [1] - 57:3
**really** [7] - 12:24, 13:6, 26:1, 43:7, 57:25, 60:22, 64:24
**reason** [5] - 12:3, 12:25, 27:17, 40:24, 52:21
**reassuring** [2] - 43:14, 58:5
**rebuild** [1] - 58:10
**rebuilding** [1] - 58:16
**recalled** [1] - 39:18
**receive** [1] - 5:5
**recent** [2] - 6:15, 62:18
**reckless** [3] - 51:24, 66:15, 66:17
**recklessness** [3] - 34:16, 34:23, 35:1
**recognizable** [1] - 12:15
**recognize** [1] - 35:4
**recognized** [4] - 33:18, 46:13, 48:18, 53:1
**recognizes** [1] - 47:11
**recognizing** [1] - 31:22
**record** [3] - 4:7, 18:5, 67:11
**recover** [1] - 32:19
**recreate** [1] - 54:11
**recruited** [1] - 34:6
**redirect** [1] - 11:11
**refer** [1] - 59:8
**Reference** [3] - 12:25, 13:16, 16:10
**reference** [3] - 5:19, 6:24, 25:6
**referenced** [2] - 17:11, 65:25
**referred** [2] - 34:18, 59:10
**referring** [2] - 20:14, 24:5
**reflect** [1] - 13:25

**reflects** [1] - 64:10
**Reform** [1] - 11:1
**refused** [1] - 49:24
**refutes** [1] - 22:13
**regarding** [4] - 9:11, 9:18, 56:9, 62:17
**region** [1] - 39:8
**regularly** [1] - 61:8
**reinforced** [1] - 30:14
**reinforces** [1] - 51:7
**reiterated** [1] - 43:23
**relate** [1] - 35:6
**related** [1] - 37:3
**relative** [1] - 24:9
**released** [1] - 58:21
**relevant** [1] - 46:14
**reliable** [3] - 28:12, 28:15, 33:7
**reliance** [2] - 6:9, 28:10
**relied** [7] - 6:25, 29:23, 32:8, 35:21, 35:22, 49:25, 55:5
**relies** [1] - 33:3
**rely** [2] - 26:11, 33:5
**relying** [1] - 31:15
**remains** [3] - 14:14, 62:19, 62:23
**remark** [1] - 13:20
**remarks** [2] - 10:1, 55:9
**remedial** [1] - 58:18
**remember** [1] - 11:1
**reorganization** [2] - 31:1, 53:14
**repeatedly** [8] - 30:25, 32:5, 32:20, 34:17, 47:4, 51:25, 53:1, 56:12
**replete** [1] - 13:14
**report** [2] - 12:11, 48:17
**reported** [2] - 12:7, 61:20
**Reporter** [1] - 67:20
**REPORTER** [1] - 1:23
**reporting** [1] - 66:8
**reports** [10] - 34:1, 42:22, 42:25, 46:9, 50:6, 50:8, 50:19, 51:13, 53:12, 61:19
**represented** [1] - 61:25
**represents** [1] - 6:10
**reputable** [1] - 33:8
**require** [3] - 11:25, 20:21, 20:24
**required** [2] - 20:21, 44:15

**requires** [3] - 28:2, 38:1, 65:21
**requiring** [1] - 12:3
**resolved** [1] - 46:16
**resources** [1] - 42:16
**respect** [4] - 6:22, 25:12, 55:5, 63:8
**respond** [1] - 59:17
**response** [3] - 56:8, 57:22, 62:16
**responses** [1] - 38:20
**responsibility** [1] - 37:23
**responsible** [2] - 44:10, 49:18
**restatement** [1] - 12:5
**restructure** [1] - 29:23
**result** [1] - 39:4
**resulted** [1] - 40:17
**resulting** [4] - 6:12, 41:17, 45:7, 45:12
**results** [3] - 32:12, 41:18, 59:22
**retail** [10] - 20:20, 24:16, 29:19, 30:17, 31:15, 31:21, 31:25, 35:21, 52:13, 52:20
**retailers** [1] - 29:25
**retailers..** [1] - 24:17
**retention** [2] - 45:6, 45:12
**retired** [1] - 27:15
**returns** [2] - 45:7, 45:13
**revenue** [11] - 6:9, 6:25, 10:21, 13:12, 15:3, 15:6, 26:2, 30:14, 39:5, 51:6, 53:10
**reverse** [2] - 31:22, 54:5
**reversed** [1] - 6:21
**reversing** [1] - 54:18
**review** [1] - 13:16
**reviewed** [1] - 50:19
**revolved** [1] - 48:7
**rewrite** [3] - 15:24, 16:6, 20:9
**risk** [19] - 6:22, 20:13, 20:16, 20:17, 23:24, 23:25, 24:2, 24:6, 24:13, 24:14, 24:17, 46:21, 47:4, 47:7, 47:11, 47:13, 48:2, 59:5, 59:24
**risks** [6] - 47:6, 47:7, 47:14, 47:15, 47:25, 48:4
**RIVES** [1] - 3:3
**Rives** [1] - 4:20

**RMR** [2] - 1:24, 67:20
**roadmap** [1] - 39:23
**Robb** [1] - 42:13
**role** [3] - 21:19, 37:9, 37:12
**roll** [1] - 41:21
**rolled** [2] - 22:20, 60:19
**routinely** [1] - 17:17
**rumors** [1] - 62:20
**running** [2] - 29:24, 62:6

## S

**sales** [19] - 10:22, 13:12, 15:6, 26:12, 26:14, 26:18, 26:21, 27:2, 27:5, 32:11, 42:9, 50:5, 50:19, 52:10, 56:15, 59:21, 63:19, 63:24
**San** [1] - 3:12
**satisfy** [1] - 21:4
**saw** [1] - 57:12
**scheduled** [1] - 5:3
**SCHLACHTER** [1] - 2:5
**Schueneman** [1] - 51:25
**science** [1] - 36:25
**scienter** [18] - 11:6, 19:13, 25:14, 26:14, 26:16, 28:7, 29:12, 34:18, 35:2, 39:21, 43:20, 51:10, 52:17, 53:12, 61:22, 62:9, 63:24, 64:3
**scrutinize** [1] - 13:6
**search** [1] - 36:8
**seat** [1] - 5:2
**SEC** [2] - 40:17, 43:5
**second** [2] - 14:24, 21:13
**Second** [1] - 46:12
**secrecy** [1] - 28:12
**securities** [12] - 9:25, 10:10, 11:21, 12:4, 12:18, 16:7, 17:18, 18:10, 30:9, 32:18, 43:12, 64:6
**Securities** [4] - 4:5, 6:16, 11:1, 53:6
**SECURITIES** [1] - 1:5
**see** [18] - 4:17, 5:2, 12:3, 12:12, 15:4, 15:14, 16:9, 17:7, 20:19, 22:14, 24:3, 25:23, 27:15, 43:7, 45:10, 64:16, 66:19,

66:21
**seeing** [1] - 43:6
**seeks** [1] - 32:19
**seem** [4] - 5:17, 5:22, 28:8, 56:17
**segment** [1] - 41:22
**segments** [1] - 54:14
**sell** [5] - 27:4, 29:19, 30:17, 35:21, 51:2
**seller** [1] - 12:11
**selling** [3] - 29:18, 29:23, 32:1
**Semitic** [1] - 48:9
**senior** [1] - 39:24
**sense** [3] - 25:17, 28:6, 35:23
**sensing** [1] - 51:18
**sent** [6] - 34:1, 44:11, 50:8, 51:13, 53:13, 61:19
**sentence** [3] - 13:2, 44:21, 44:24
**separate** [1] - 49:24
**September** [10] - 14:15, 18:25, 23:5, 23:15, 23:18, 56:7, 56:22, 60:8, 61:24, 62:14
**Serena** [2] - 18:2, 58:23
**seriously** [1] - 60:20
**service** [1] - 24:22
**services** [1] - 24:23
**serving** [1] - 45:3
**set** [4] - 10:22, 11:20, 27:4, 31:5
**setting** [1] - 28:20
**seven** [1] - 35:5
**several** [3] - 4:10, 5:7, 33:24
**severe** [1] - 35:13
**shadow** [5] - 40:13, 40:21, 42:10, 44:13, 46:6
**share** [4] - 27:9, 31:17, 57:23, 62:6
**shareholder** [1] - 62:16
**shareholders** [1] - 32:7
**shelf** [1] - 31:20
**shift** [4] - 30:16, 31:21, 53:16, 54:10
**shifting** [1] - 59:18
**shopping** [2] - 29:21, 36:5
**short** [3] - 12:11, 16:16, 32:9
**short-term** [2] - 16:16, 32:9

**shortages** [1] - 16:17
**shortly** [2] - 39:22, 52:6
**show** [7] - 9:14, 10:14, 13:20, 15:5, 25:14, 38:24, 66:18
**showed** [4] - 23:8, 50:20, 61:15, 62:3
**showing** [1] - 48:18
**shows** [2] - 38:21, 58:24
**shrouded** [1] - 28:12
**sic** [1] - 55:2
**sideshow** [1] - 40:24
**signature** [3] - 67:13, 67:14
**signed** [5] - 39:6, 44:4, 51:17, 53:25, 67:14
**significant** [8] - 20:21, 38:17, 38:20, 41:3, 42:16, 46:25, 62:5, 65:7
**significantly** [3] - 16:25, 56:3, 62:4
**signing** [2] - 44:5, 67:10
**similar** [16] - 19:16, 20:4, 31:2, 42:15, 47:4, 50:24, 53:7, 53:25, 54:25, 55:4, 56:14, 56:15, 59:11, 63:10, 63:11, 63:13
**similarly** [3] - 6:25, 7:2, 32:17
**simple** [1] - 36:4
**simply** [5] - 10:7, 25:6, 25:17, 64:9, 64:16
**single** [11] - 12:5, 13:22, 18:7, 23:6, 25:7, 26:4, 27:18, 27:25, 48:17, 66:2, 66:10
**sits** [1] - 49:7
**sitting** [1] - 46:19
**situated** [1] - 32:17
**situation** [1] - 33:4
**six** [3] - 35:8, 35:13, 40:19
**skip** [2] - 53:14, 55:15
**skipped** [2] - 39:20, 44:22
**slash** [1] - 52:4
**slashing** [1] - 52:9
**slide** [4] - 14:24, 17:22, 25:18, 58:21
**slowed** [3] - 55:20, 55:21, 56:3
**small** [1] - 20:12
**smartly** [2] - 49:4,

49:12
**smoking** [3] - 33:22, 34:11, 44:15
**SMS** [1] - 65:15
**sneakers** [3] - 29:18, 29:25, 32:10
**SNKRS** [1] - 36:15
**so-called** [6] - 18:6, 19:3, 19:12, 46:9, 64:17, 66:6
**social** [3] - 12:9, 24:23, 29:21
**software** [2] - 21:24, 36:23
**sold** [2] - 26:25, 29:21
**sometimes** [1] - 30:7
**soon** [1] - 28:18
**sorry** [4] - 39:20, 59:9, 61:13, 62:15
**sort** [2] - 14:6, 64:23
**sorts** [2] - 15:11, 15:22
**sounds** [2] - 36:3, 60:20
**sources** [3] - 33:8, 35:12, 40:10
**space** [1] - 31:20
**speaker** [3] - 11:4, 43:14, 56:19
**speaking** [1] - 43:13
**specific** [27] - 10:11, 10:14, 10:24, 11:3, 11:22, 18:9, 23:4, 25:3, 25:6, 25:13, 27:16, 28:6, 28:13, 29:24, 32:21, 38:15, 38:24, 43:13, 43:15, 49:10, 55:21, 56:18, 57:17, 59:13, 64:14, 64:15, 66:12
**specifically** [13] - 8:13, 32:24, 37:3, 39:12, 45:15, 49:14, 57:2, 58:2, 58:13, 59:2, 61:15, 62:12, 62:21
**specificity** [1] - 65:12
**specifics** [1] - 65:13
**speculation** [1] - 40:24
**speech** [1] - 49:2
**speed** [1] - 5:8
**spend** [2] - 45:8, 45:13
**spent** [1] - 21:5
**Splunk** [1] - 53:5
**sport** [1] - 60:11
**sports** [11] - 24:9, 29:18, 29:24, 31:1, 36:12, 53:16, 54:7,

54:10, 54:12, 54:13, 59:20
**sports-based** [1] - 31:1
**sportswear** [1] - 62:7
**square** [1] - 18:2
**stage** [4] - 34:12, 38:8, 44:16, 46:17
**stagnated** [1] - 55:23
**stagnating** [1] - 35:15
**standard** [3] - 11:2, 34:18, 37:25
**standards** [1] - 66:19
**stands** [1] - 19:16
**start** [3] - 20:2, 42:6, 60:10
**started** [9] - 12:23, 22:15, 39:13, 39:17, 43:22, 47:15, 54:18, 62:25
**starting** [2] - 58:10, 62:21
**starts** [1] - 58:15
**state** [4] - 4:7, 5:14, 32:25, 65:21
**statement** [52] - 7:5, 8:14, 9:14, 9:15, 14:10, 14:13, 14:14, 21:9, 21:10, 21:13, 21:20, 22:1, 22:4, 23:5, 23:7, 23:10, 23:19, 37:6, 37:7, 37:13, 39:19, 41:15, 44:17, 44:19, 45:20, 46:23, 48:25, 49:1, 49:8, 51:16, 52:2, 52:21, 52:23, 53:18, 53:25, 55:11, 55:18, 55:19, 56:6, 56:7, 56:21, 57:8, 57:20, 59:6, 59:17, 60:4, 60:7, 60:8, 62:13, 62:14
**statements** [62] - 5:20, 6:22, 8:11, 9:9, 10:2, 10:12, 10:19, 11:4, 12:20, 12:21, 13:3, 13:7, 14:2, 14:5, 14:11, 14:22, 15:14, 15:15, 15:18, 17:10, 17:11, 17:15, 17:16, 19:15, 19:25, 20:5, 23:4, 23:23, 24:1, 25:4, 25:7, 34:25, 35:18, 37:3, 42:15, 43:11, 44:19, 46:19, 46:22, 47:13, 53:3, 53:7, 53:15, 53:17, 55:1, 55:4, 55:6, 56:11, 56:16, 58:3,

58:7, 59:3, 59:5, 60:2, 60:4, 60:6, 63:10, 63:13, 64:1, 64:8, 64:11, 64:15

**STATES** [2] - 1:1, 1:19

**stayed** [1] - 33:2

**stenographic** [1] - 67:11

**step** [3] - 10:4, 20:2, 28:5

**still** [5] - 5:8, 21:7, 41:12, 41:23, 45:22

**Stitch** [1] - 63:12

**stock** [10] - 10:7, 26:12, 26:14, 26:17, 26:21, 26:23, 27:5, 32:14, 52:14

**Stoel** [1] - 4:20

**STOEL** [1] - 3:3

**STOLL** [2] - 2:4

**Stoll** [1] - 4:9

**stop** [1] - 61:11

**stopped** [1] - 55:25

**store** [7] - 18:9, 18:11, 31:20, 49:18, 52:5, 52:9, 57:16

**stores** [16] - 20:20, 24:16, 29:19, 30:20, 31:14, 31:19, 49:16, 49:19, 49:25, 50:4, 50:16, 50:20, 50:21, 52:3, 52:5, 52:11

**story** [1] - 11:24

**strategic** [1] - 45:4

**strategies** [3] - 30:6, 30:7, 35:9

**strategy** [53] - 6:12, 8:9, 9:12, 9:19, 10:18, 10:19, 10:20, 10:22, 11:10, 11:12, 11:14, 11:19, 11:23, 14:3, 14:12, 14:14, 14:16, 14:21, 15:2, 15:9, 16:1, 22:24, 25:25, 30:4, 30:10, 30:13, 30:16, 31:7, 32:6, 32:13, 33:20, 35:7, 35:11, 35:18, 44:11, 44:14, 46:10, 48:18, 49:2, 49:21, 51:4, 52:21, 54:6, 54:17, 57:4, 62:17, 62:19, 62:23, 63:8, 65:4, 65:23, 66:6, 66:22

**Street** [2] - 2:6, 33:9

**strength** [1] - 8:10

**strong** [12] - 17:13, 19:13, 52:12, 52:18, 56:10, 56:11, 56:14,

57:25, 59:1, 60:10, 63:2, 66:14

**strong-arm** [2] - 52:18, 63:2

**strong-armed** [1] - 52:12

**strongest** [1] - 44:18

**structure** [1] - 63:25

**struggles** [1] - 15:12

**styles** [1] - 59:20

**subject** [1] - 12:23

**submissions** [1] - 5:7

**submit** [3] - 7:13, 7:23, 17:20

**submitted** [5] - 6:14, 7:9, 13:14, 46:12, 47:10

**substantial** [1] - 32:18

**success** [3] - 30:13, 30:25, 63:14

**successful** [2] - 30:15, 47:1

**successfully** [1] - 53:20

**SUCHAROW** [4] - 2:9, 2:13, 2:17, 2:22

**sudden** [1] - 12:2

**suddenly** [4] - 33:12, 33:14, 57:1, 62:1

**suffered** [1] - 32:18

**sufficient** [6] - 19:20, 26:13, 35:2, 49:22, 53:9, 66:18

**sufficiently** [1] - 46:18

**suggest** [3] - 14:7, 34:25, 46:5

**suggests** [1] - 54:16

**Suite** [2] - 3:5, 3:12

**summer** [4] - 33:18, 54:4, 56:24, 57:16

**summit** [1] - 14:17

**supervisor** [1] - 65:7

**supplemental** [4] - 6:14, 46:12, 47:10, 64:8

**supplemented** [1] - 7:11

**supply** [44] - 7:5, 7:8, 15:13, 15:16, 15:19, 15:21, 16:1, 16:3, 16:12, 16:13, 16:15, 16:21, 17:1, 17:4, 18:17, 18:18, 18:21, 20:5, 27:24, 30:24, 31:13, 35:14, 43:17, 48:20, 48:24, 49:3, 49:9, 49:11, 49:20, 49:22, 50:2, 50:6, 50:11, 50:17, 50:20, 50:25, 51:3, 51:12,

51:22, 52:2, 52:10, 52:24, 56:9, 64:12

**support** [8] - 9:17, 10:12, 16:1, 18:5, 18:7, 18:10, 22:24, 28:6

**supported** [1] - 54:23

**supports** [1] - 66:13

**supposed** [1] - 30:6

**supposedly** [2] - 30:15, 40:17

**surmises** [1] - 65:9

**surprise** [1] - 34:5

**survive** [1] - 33:2

**suspicious** [6] - 26:18, 27:8, 28:11, 40:7, 46:3, 63:24

**sustainable** [2] - 15:3, 17:25

**SW** [2] - 2:6, 3:4

**system** [6] - 21:25, 22:16, 41:10, 49:23, 49:24, 49:25

**Systems** [2] - 43:11, 56:13

**systems** [2] - 22:23, 50:3

# T

**talks** [2] - 45:15, 57:2

**Target** [3] - 22:17, 41:22, 42:4

**target** [2] - 36:8, 52:5

**targeted** [2] - 36:7, 42:5

**targeting** [1] - 37:1

**targets** [2] - 51:6, 53:10

**tax** [1] - 26:23

**teams** [1] - 50:1

**tech** [9] - 35:18, 37:2, 37:16, 41:6, 43:16, 45:14, 46:6, 46:21, 48:23

**technical** [2] - 21:3, 42:16

**technological** [1] - 47:19

**technologies** [3] - 24:21, 31:12, 47:3

**technology** [48] - 19:22, 20:2, 20:4, 20:6, 20:13, 20:25, 21:6, 21:23, 22:9, 22:23, 29:8, 34:10, 36:3, 37:4, 38:4, 38:10, 38:13, 38:21, 39:12, 39:25, 40:5, 40:13, 40:14, 40:20,

40:25, 41:8, 42:12, 42:18, 42:21, 42:23, 42:24, 43:1, 44:3, 44:18, 45:15, 45:23, 46:4, 47:1, 47:21, 48:20, 51:20, 52:24, 64:12, 65:7, 65:14, 65:18, 66:1, 66:7

**teenage** [1] - 23:13

**tends** [1] - 34:24

**tense** [2] - 45:11, 49:8

**tenure** [3] - 38:5, 38:11, 45:18

**term** [5] - 11:15, 14:19, 16:16, 32:9, 40:21

**terminated** [3] - 28:25, 45:24, 46:5

**terms** [2] - 42:13, 43:20

**Tesla** [3] - 16:5, 29:5, 65:20

**testing** [2] - 22:17, 42:4

**text** [10] - 7:7, 7:8, 7:14, 33:15, 36:7, 44:21, 46:24, 59:12, 59:13, 59:14

**Thanksgiving** [1] - 39:10

**THE** [50] - 1:1, 1:2, 1:18, 2:3, 2:9, 2:13, 2:17, 2:21, 3:3, 3:7, 3:10, 3:14, 4:4, 4:17, 4:22, 5:2, 6:1, 6:17, 6:19, 7:10, 7:16, 7:24, 8:2, 8:5, 8:8, 8:18, 8:24, 9:3, 9:8, 9:11, 9:18, 9:21, 10:5, 19:24, 21:11, 21:14, 21:17, 29:14, 29:16, 38:23, 55:7, 55:15, 59:8, 59:10, 60:5, 61:1, 61:4, 61:6, 61:10, 67:1

**themselves** [1] - 42:20

**theory** [13] - 10:16, 11:25, 12:19, 15:9, 15:20, 17:12, 18:14, 20:3, 23:3, 25:17, 28:6, 35:6, 64:7

**thereafter** [1] - 39:7

**therefore** [4] - 6:13, 17:18, 48:10, 58:17

**therein** [1] - 6:5

**thinking** [1] - 46:3

**third** [3] - 29:19, 29:25, 61:8

**third-party** [3] - 29:19, 29:25, 61:8

**three** [1] - 12:1

**throughout** [8] - 14:8, 30:12, 31:3, 34:10, 38:11, 45:18, 50:9, 51:14

**tied** [2] - 18:13, 27:7

**ties** [1] - 18:17

**Tigar** [1] - 53:7

**Tim** [1] - 4:9

**timeline** [2] - 14:5, 14:11

**Timothy** [1] - 2:5

**tired** [1] - 27:17

**today** [4] - 10:7, 24:13, 24:19, 64:10

**together** [5] - 7:19, 12:19, 13:3, 14:6, 36:15

**tone** [1] - 14:22

**took** [1] - 31:19

**top** [2] - 10:14, 23:21

**topics** [1] - 19:21

**total** [1] - 40:19

**touch** [1] - 19:21

**touched** [1] - 46:8

**touted** [4] - 30:13, 30:25, 51:17, 53:15

**touting** [5] - 15:20, 30:15, 42:15, 42:21, 51:22

**touts** [1] - 54:1

**towards** [1] - 5:13

**track** [2] - 60:24, 61:7

**tracking** [1] - 41:24

**trades** [1] - 27:3

**trading** [2] - 26:19, 27:3

**transcript** [2] - 67:11, 67:13

**TRANSCRIPT** [1] - 1:15

**transcripts** [1] - 43:5

**transformation** [2] - 29:22, 51:21

**transformative** [2] - 11:9, 66:22

**transformed** [1] - 30:23

**transit** [1] - 16:18

**transparent** [2] - 11:16, 11:19

**trends** [2] - 24:10, 59:18

**tries** [1] - 31:10

**true** [7] - 13:23, 22:5, 32:24, 38:7, 45:17, 59:4, 67:11

**truth** [11] - 5:20, 6:7, 7:17, 32:16, 34:23, 46:8, 46:11, 46:15,

52:25, 53:1, 58:14
**truth-on-the-market** [3] - 46:8, 46:11, 46:15
**trying** [9] - 10:9, 13:4, 15:24, 17:3, 17:8, 20:9, 26:7, 27:21, 66:21
**turn** [4] - 14:3, 15:14, 60:4, 60:5
**turning** [1] - 11:20
**twice** [1] - 56:10
**two** [7] - 16:12, 19:21, 26:20, 34:13, 34:15, 65:14, 65:17
**type** [3] - 9:3, 18:9, 33:22
**types** [1] - 17:16
**typical** [2] - 17:20, 28:2
**typically** [1] - 12:3

## U

**UC** [1] - 49:2
**ultimately** [4] - 39:2, 40:17, 51:5, 61:19
**unclear** [3] - 64:22, 65:8
**under** [10] - 6:12, 11:1, 13:15, 14:9, 18:10, 19:11, 33:1, 43:10, 51:24, 67:2
**under-performance** [1] - 6:12
**undermines** [1] - 23:7
**underperforming** [2] - 50:22, 52:4
**undertaking** [1] - 21:23
**underway** [1] - 22:25
**underwent** [1] - 54:9
**undisclosed** [1] - 53:10
**unified** [1] - 35:6
**UNITED** [2] - 1:1, 1:19
**University** [2] - 3:8, 3:15
**unless** [2] - 29:6, 29:10
**unlikely** [1] - 62:1
**unlock** [1] - 30:4
**unlocking** [1] - 45:3
**unquote** [2] - 13:22, 65:7
**unrelated** [1] - 32:8
**unsold** [1] - 52:19
**unspecific** [1] - 66:1
**unusual** [2] - 26:18, 27:8

**up** [30] - 5:8, 8:12, 14:22, 14:23, 15:7, 15:17, 21:13, 23:21, 25:24, 26:3, 26:4, 26:5, 31:20, 32:1, 32:5, 32:11, 33:14, 36:6, 36:9, 36:19, 37:19, 39:15, 52:12, 55:14, 61:6, 61:10, 61:19, 63:5, 63:21
**upgrading** [1] - 20:25
**upheld** [7] - 42:14, 47:4, 53:7, 54:25, 56:12, 63:9, 63:13
**upholding** [2] - 55:4, 55:5
**urge** [2] - 46:24, 58:12
**uses** [2] - 37:11, 45:11
**utilize** [1] - 5:11

## V

**Valenzuela** [3] - 3:8, 4:23, 38:8
**VALENZUELA** [17] - 4:23, 8:6, 8:16, 8:21, 8:25, 9:6, 9:9, 9:16, 9:20, 9:23, 10:6, 19:25, 21:12, 21:16, 21:18, 22:3, 64:5
**value** [3] - 27:10, 29:5, 30:5
**various** [12] - 24:9, 30:16, 35:3, 36:5, 36:14, 40:3, 40:14, 41:24, 51:7, 56:3, 62:18, 64:12
**Vasilchenko** [2] - 2:10, 4:13
**VASILCHENKO** [23] - 4:13, 5:24, 6:2, 6:18, 6:21, 7:12, 7:22, 8:1, 8:3, 9:1, 29:15, 29:17, 38:25, 55:12, 55:17, 59:9, 59:11, 60:7, 61:3, 61:5, 61:7, 61:13, 67:5
**vast** [1] - 32:22
**vendor** [1] - 40:16
**verbs** [1] - 37:11
**verification** [1] - 17:17
**version** [2] - 7:13, 7:23
**versus** [1] - 62:23
**view** [3] - 13:9, 25:23, 26:8
**views** [1] - 29:7
**VILLEGAS** [1] - 4:14
**Villegas** [2] - 2:18, 4:15

**visibility** [1] - 44:3
**VP** [4] - 34:5, 34:8, 44:9, 49:17
**vs** [2] - 42:13, 51:25

## W

**walk** [1] - 35:3
**Wall** [1] - 33:9
**warn** [1] - 47:5
**warnings** [7] - 6:22, 46:21, 47:5, 47:11, 47:13, 48:2, 59:5
**waste** [2] - 22:12, 49:6
**Wear** [1] - 27:20
**website** [5] - 30:18, 30:23, 36:10, 36:14, 42:8
**week** [3] - 6:16, 7:25, 47:10
**West** [2] - 48:8, 48:12
**whining** [1] - 33:20
**whistleblower** [1] - 12:9
**wholesale** [6] - 30:17, 31:25, 35:21, 49:23, 49:25, 62:23
**wholesalers** [2] - 62:18, 62:21
**wide** [1] - 28:21
**Williams** [2] - 18:2, 58:23
**Willis** [2] - 2:22, 4:16
**wILLIS** [1] - 4:16
**withholdings** [1] - 26:24
**witness** [4] - 13:22, 18:8, 23:6, 29:11
**Witness** [3] - 23:7, 23:16, 28:19
**witnesses** [7] - 28:8, 28:11, 28:17, 28:23, 29:1, 29:4, 33:5
**witnesses'** [1] - 29:7
**women** [1] - 36:12
**Women's** [2] - 27:20, 54:3
**women's** [3] - 27:22, 53:22, 62:7
**worded** [1] - 59:7
**words** [1] - 45:11
**workings** [1] - 66:22
**world** [4] - 12:16, 16:23, 49:7, 49:12
**wrap** [4] - 55:14, 61:6, 61:10, 63:21
**write** [1] - 21:24
**written** [1] - 55:9

## Y

**year** [13] - 15:8, 15:18, 16:14, 16:24, 22:15, 22:20, 26:3, 37:19, 38:19, 39:10, 58:15
**years** [11] - 10:17, 11:12, 12:1, 27:13, 27:14, 27:18, 27:25, 50:15, 50:24, 51:4, 57:3
**York** [5] - 2:11, 2:15, 2:19, 2:24, 4:11

## Z

**zero** [1] - 39:5
**Zucco** [1] - 28:10