IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| IN RE NIKE, INC. SECURITIES LITIGATION | Case No.: 3:24-cv-00974-AN |
| | OPINION AND ORDER |

Before the Court are defendants' request for judicial notice and motion to dismiss the second amended complaint. For the reasons described herein, the request for judicial notice is GRANTED and the motion to dismiss is GRANTED in part and DENIED in part.

## LEGAL STANDARDS

**A.     Rule 12(b)(6)**

A complaint may be dismissed for failure to state a claim "'where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory.'" *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). On the other hand, a complaint should not be dismissed when it "contain[s] sufficient factual matter to state a facially plausible claim to relief." *Id.* "A complaint need not state 'detailed factual allegations'" to meet this standard, "but must contain sufficient factual matter to 'state a claim to relief that is plausible on its face.'" *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). A claim is facially plausible when a plaintiff includes sufficient factual matter for the court to reasonably infer the defendant is liable for the alleged claims. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." (quoting *Bell Atl. Corp.*, 550 U.S. at 556)). While a plaintiff need not include "detailed factual allegations," they must provide more than "labels," "conclusions," or "a formulaic recitation of the elements

of a cause of action." *Bell Atl. Corp.*, 550 U.S. at 555.

A plaintiff's factual allegations are entitled to a presumption of truthfulness, and the court must construe these facts "in the light most favorable to the non-moving party." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). However, a court need not presume a plaintiff's allegations are true when they "are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Id.* To be entitled to a court's presumption of truth, a complaint "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

**B.       Rule 9(b) and Private Securities Litigation Reform Act**

"Securities fraud class actions must [also] meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007)). Rule 9(b) requires plaintiffs alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Accordingly, "[t]o satisfy Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (second alteration in original) (citation and quotation marks omitted). The PSLRA additionally mandates "that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (alteration in original) (quoting 15 U.S.C. §§ 78u-4(b)(1)-(2)).

**C.       Judicial Notice and Incorporation by Reference**

A court's review on a motion to dismiss is generally limited to the plaintiff's complaint. Fed. R. Civ. P. 12(b)(6), (d); *Daniels-Hall*, 629 F.3d at 998. However, a court can review materials "attached to

the complaint," "incorporated by reference" into the complaint, or subject to judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). A document may be incorporated by reference if: "(1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). Incorporation by reference may also be appropriate when a "document forms the basis of the plaintiff's claim," even if it is not directly referred to in the complaint. *Ritchie*, 342 F.3d at 908. A court may also take judicial notice of facts "not subject to reasonable dispute" because they are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Additionally, "[a] court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

## BACKGROUND

This is a complicated securities class action. The second amended complaint spans hundreds of pages, includes statements from over a dozen confidential witnesses, and challenges over seventy alleged misstatements. To help parse through this sprawling document, the Court looks first to the basics of this action—the cast of characters and the class period—then to the factual allegations, and then finally to the alleged misstatements.[1]

### A.    Parties, Class Period, and Confidential Witnesses

####      1.      *Parties*

Plaintiffs, led by Caisse de dépôt et placement du Québec ("CDPQ") and Deka Investment GmbH ("DEKA," and collectively with CDPQ, "Lead Plaintiffs"), bring this securities class action on behalf of a class of investors against defendant Nike, Inc. ("NIKE"), the world's largest seller of athletic footwear and apparel; and five individual defendants who served as NIKE executives during the class period. 2d Am.

---

[1] This factual background relies on the second amended complaint as well as the documents incorporated by reference therein. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014).

Compl. ("SAC"), ECF 65, at ¶¶ 45-51.

First, defendant John J. Donahoe II was the President and Chief Executive Officer ("CEO") of NIKE from January 13, 2020 through October 13, 2024. *Id.* ¶ 47. Donahoe also served on the NIKE Board of Directors from 2014 through October 13, 2024. *Id.* Second, defendant Matthew Friend has served as NIKE's Executive Vice President and Chief Financial Officer ("CFO") since April 2020. *Id.* ¶ 48. Third, defendant Mark G. Parker served as NIKE's CEO from 2006 through January 13, 2020, and then as NIKE's Chairman, President, and CEO from 2016 through January 13, 2020. *Id.* ¶ 49. At all relevant times, Parker has also served as the Executive Chairman of the NIKE Board of Directors. *Id.* Fourth, defendant Heidi L. O'Neill has served as the President of Consumer, Product, and Brand at NIKE since May 2023. *Id.* ¶ 50. Prior to that, from April 2020 through May 2023, O'Neill served as President of NIKE Consumer and Marketplace. *Id.* Fifth and finally, defendant Andrew Campion served as NIKE's Managing Director of Strategic Business Ventures from June 2023 until April 5, 2024. *Id.* ¶ 51. Prior to that, Campion served as NIKE's Chief Operating Officer ("COO") from April 2020 until June 2023, as well as several other roles between August 2015 and April 2020. *Id.*

2.      *Class Period*

This action concerns the period of time from March 19, 2021, through October 1, 2024 (the "class period"). *Id.* at 7 (all citations to ECF pagination). NIKE reached a class period high closing price of $177.51 on November 5, 2021. *Id.* ¶ 40. On October 2, 2024, NIKE's stock price fell to a class period low of $83.10. *Id.*

3.      *Confidential Witnesses*

Plaintiffs support their claims with statements from nineteen confidential witnesses ("CWs"). All of the CWs are former NIKE employees, as detailed further below.

CW-1 served as the Vice President of Global Store Development at NIKE from approximately August 2022 through May 2024. *Id.* ¶ 54.

CW-2 held various roles at NIKE from 2002 through the fall of 2022. *Id.* ¶ 55. Most recently, CW-2 was a director within North America Consumer Direct Marketing for NIKE Direct from the fall of

4

2020 through the fall of 2022.  *Id.*

CW-3 served as Vice President of NIKE Digital Product from February 2020 through July 2024. *Id.* ¶ 56.  CW-3 was brought in to help build NIKE's direct-to-consumer capabilities.  *Id.*  To do this, CW-3 worked as an intermediary between the technology and engineering teams and the marketing and strategy teams who dealt with NIKE's digital product development.  *Id.*

CW-4 worked as a Senior Finance Manager of NIKE Direct Strategic Investments from March 2022 through April 2023.  *Id.* ¶ 57.

CW-5 held several roles during her more-than decade at NIKE.  *Id.* ¶ 58.  Most recently, she served as Global Merchandising Director of the D2C Omni Channel until her departure from NIKE in early 2021. *Id.*

CW-6 worked various roles at NIKE from 1998 through June 2024, most recently as a Supply Chain Finance Director for North America NIKE Direct from February 2019 through June 2024.  *Id.* ¶ 59.

CW-7 has held various roles at NIKE.  *Id.* ¶ 60.  Most recently, from 2022 through the summer of 2024, CW-7 worked as a director, overseeing NIKE's relationships with retailers.  *Id.*

CW-8 worked as NIKE's Vice President of Digital Design from October 2020 through December 2021.  *Id.* ¶ 61.

CW-9 worked as a Strategic Account Executive at NIKE from June 2013 through November 2023. *Id.* ¶ 62.

CW-10 worked at NIKE as a Financial Analyst in 2021.  *Id.* ¶ 63.

CW-11 worked at NIKE from September 2014 through April 2023.  *Id.* ¶ 64.  From December 2020 to February 2022, CW-11 worked as Principal Product Director.  *Id.*  From March 2022 to April 2023, CW-11 worked as Director of Product.  *Id.*

CW-12 held various roles at NIKE from 2018 through 2022, most recently as a technology leader working on digital marketing products.  *Id.* ¶ 65.

CW-13 worked in NIKE's global accounting group from the fall of 2018 through the spring of 2023.  *Id.* ¶ 66.

CW-14 worked as a contractor at NIKE until June 2022. *Id.* ¶ 67. From late 2021 to June 2022, CW-14 worked as a Program Manager in NIKE's Global Brand Marketing group, where she helped roll out the Adobe Experience Platform. *Id.*

CW-15 joined NIKE in May 2021 as a technology operations manager, and was promoted to a technology operations director in January 2022, a position she held until May 2024. *Id.* ¶ 68.

CW-16 worked at NIKE's global headquarters from 1998 through April 2024. *Id.* ¶ 69. Most recently, from 2022 through April 2024, CW-16 worked as a Senior Product Manager of the Virtual Material Ecosystem. *Id.*

CW-17 held various roles at NIKE from March 2010 through October 2021. *Id.* ¶ 70. Most recently, CW-17 worked as a Global Director of Program Management from November 2016 through October 2021. *Id.* CW-17 "led program management teams that rolled up to NIKE Direct Digital, which was overseen by Defendant O'Neill." *Id.*

CW-18 worked at NIKE as a General Manager for a sports category within the Men's division in North America from the summer of 2022 through the summer of 2024. *Id.* ¶ 71.

CW-19 worked at NIKE from January 2015 through June 2023, most recently as the Director of Digital Experiments from May 2022 through June 2023. *Id.* ¶ 72.

**B.     Factual Allegations**

Boiled down, plaintiffs allege that defendants oversold the success of a new consumer strategy—called the Consumer Direct Acceleration ("CDA")—that was in fact a failure. It was a failure, plaintiffs allege, because it relied on the success of six components: (1) NIKE's direct-to-consumer ("DTC") supply chain; (2) NIKE's DTC technology; (3) NIKE's product organization; (4) NIKE's innovation pipeline; (5) NIKE's competitive position; and (6) NIKE's channel mix. *Id.* ¶ 105. According to plaintiffs, all these components were fatally deficient. *Id.* ¶ 144.

1.     *NIKE's Consumer Direct Acceleration Strategy*

NIKE sells its products through both wholesale and DTC channels. *Id.* ¶ 2. Historically, most of NIKE's sales have been through the wholesale channel, through multi-brand retailers (e.g., Foot Locker)

6

who stock NIKE products alongside products from other brands. *Id.* ¶¶ 2, 4. Via the DTC channel, NIKE sells its products directly to customers through brick-and-mortar NIKE branded stores ("mono-brand stores") and through digital channels including a website and apps. *Id.* ¶ 77. NIKE primarily reports revenue from its sales through three segments: (1) NIKE Direct, which includes sales from NIKE's DTC channels, including NIKE's physical stores and NIKE Brand Digital; (2) Sales to Wholesale Customers, which includes all sales to NIKE's wholesale partners; and (3) Global Brand Divisions, which includes "NIKE Brand licensing and other miscellaneous revenues that are not part of a geographic operating segment." *Id.* ¶ 79. Nearly all of NIKE Brand revenue is reported under NIKE Direct and Wholesale from 2017 through 2024. *Id.*

In June 2017, NIKE announced a new "Consumer Direct Offense" strategy which sought to increase "direct connections with consumers" through NIKE-owned stores, NIKE's digital channels, and wholesale channels that were designed to "better serve the consumer personally, at scale." Decl. of Jessica Valenzuela Supp. Defs. Mot. to Dismiss ("Valenzuela Decl."), ECF 68, at Ex. 1 at 2-3; *see* SAC ¶ 84. NIKE also announced that it was creating a new NIKE Direct organization, led by O'Neill and NIKE's Chief Digital Officer at the time. SAC ¶ 85. It sought to unite NIKE's digital channels and mono-brand stores to better serve customers, with the goal of increasing DTC sales. *Id.* Revenue from the Consumer Direct Offense strategy was reported under the NIKE Direct segment of NIKE's business. *See id.* ¶ 79.

The CDO initially delivered strong results. In 2019,[2] NIKE's total revenue increased by seven percent from the prior year. Valenzuela Decl. Ex. 3 at 4. However, NIKE's business took a significant hit during the start of COVID, with total revenue decreasing thirty-eight percent in Q4 2020 compared to the prior year's Q4. *Id.* at Ex. 4 at 3. During this time, NIKE closed most of its branded stores in North America, Europe, and Asia. *Id.* at Ex. 4. NIKE's retail partners faced similar closures, leading NIKE's Q4 2020 wholesale channel sales to decline by almost fifty percent compared to the prior year's Q4. NIKE's online sales, however, bloomed—increasing seventy-five percent in Q4 2020 over the same quarter in 2019.

---

[2] All revenue-related dates are described in fiscal years. NIKE's fiscal year runs from June 1 through May 31. SAC ¶ 30 n.3.

*Id.* at Ex. 4 at 4.

In January 2020, Donahoe began to work as NIKE's President and CEO.  SAC ¶ 88.  Donahoe was lauded for his expertise in technology and digital commerce.  *Id.* ¶¶ 90-92.  Six months later, on June 25, 2020, NIKE announced a new phase of its Consumer Direct Offense strategy: "the CDA strategy."  *Id.* ¶ 94.  CDA focused on "three areas of strategic acceleration."  *Id.* ¶ 95.  First, CDA enhanced NIKE's focus on digital channels, including NIKE's digital platforms, NIKE's digitally enabled mono-brand stores, and select multi-brand retail partners.  *Id.* ¶ 96.  Second, CDA shifted NIKE's product organization from sports-based categories, such as running and basketball, to consumer-based categories, such as Men's, Women's, and Kids'.  *Id.* ¶ 97.  NIKE embedded its prior sports-based category structure within these groups—for example, offering a Kid's running category.  Third and finally, CDA sought to expand NIKE's technological capabilities related to DTC.  *Id.* ¶ 98.

While NIKE was confident in CDA, it also warned that there were risks inherent to the new strategy.  For example, in NIKE's Form 10-K filed with the SEC on July 24, 2020, NIKE stated that it "may not be successful in developing platforms that operate effectively with [digital] technologies, systems, networks or standards."  *See* Valenzuela Decl. ¶ 6 & Ex. 6 at 16.  It also provided that its "digital offerings will require continued investment in the development and upgrading of [its] technology platforms" and that "the success of [the] NIKE Direct operations could be adversely impacted" if consumers did not find that the digital platforms met their expectations.  *Id.* at Ex. 6 at 16.  NIKE additionally provided that there were risks arising from the diversion of sales to brick and mortar stores and that the business could face disruptions if the technical infrastructure was insufficient.  *Id.*  NIKE similarly disclosed risks in its Form 10-Ks filed with the SEC on July 21, 2022, *id.* ¶ 14 & Ex. 13; July 20, 2023, *id.* ¶ 18 & Ex. 17; and July 25, 2024, *id.* ¶ 22 & Ex. 21.

2.      *The Consumer Direct Acceleration Strategy's Apparent Success*

From 2017 through 2023, NIKE saw increases in the percentage of brand revenue generated by NIKE Direct.  *See id.* ¶ 81.  NIKE Direct made up 28% of NIKE's brand revenue in 2017; 30% in 2018; 32% in 2019; 35% in 2020; 39% in 2021; 42% in 2022; and 44% in 2023 and 2024.  *Id.*  From 2021 through

2023, NIKE increased its NIKE Direct digital revenue by the billions, increasing from $9.1 billion in NIKE Brand digital revenue in 2021 to $12.4 billion in 2023. *Id.* ¶ 83. In 2024, NIKE Brand's digital revenue decreased to $12.1 billion. *Id.* Analysts also reacted positively to the CDA announcement. *See id.* ¶¶ 100, 114, 137, 142. Multiple analysts wrote that the CDA strategy solidified their beliefs in NIKE's long-term revenue and expansion. *Id.* ¶ 100.

While plaintiffs do not deny that NIKE saw initial growth under CDA, plaintiffs allege that this was due to temporary factors such as COVID, NIKE's flooding of the market with legacy franchises, and the sale of products already in development prior to CDA's initiation. *Id.* ¶¶ 361-68. Plaintiffs support all of these allegations with CW statements, as discussed further below.

3.     *The Consumer Direct Acceleration Strategy's Alleged Failures*

While NIKE saw digital revenue gains during CDA's early years, plaintiffs allege that CDA was a disaster behind the scenes. Plaintiffs frame this around their six-component theory, each of which is discussed below:

*NIKE's Supply Chain Issues.* According to plaintiffs' CWs, NIKE's supply chain was plagued with error throughout the entire CDA period. Plaintiffs speak of severe supply chain deficiencies, store mismanagement issues, "hazardous" inventory problems, and sales losses. *Id.* ¶¶ 145-65. Problems were allegedly so severe that NIKE changed its mono-brand strategy and reduced its planned opening of NIKE Live stores from 200 to 100, and then to only seventy-five, within a three-to-five-year window. *Id.* ¶ 160.

*NIKE's Technology Issues.* The CWs also describe technological failures, including stalled development and "antiquated" systems. *Id.* ¶ 178. Marketing technology, for example, failed to develop personalized email blasts as planned, leading to significant declines in consumer email responses and direct engagement marketing. *Id.* ¶¶ 179, 193. NIKE also failed to build a separate DTC distribution system that could keep up with store demands. *Id.* ¶ 148. Plaintiffs ultimately allege that there was no progress on building new DTC technology and that the technology NIKE had built was entirely inadequate to meet CDA's needs. *See id.*

Plaintiffs also allege that NIKE tried to improve its technology by partnering with Adobe—a

partnership that allegedly cost millions. *Id.* ¶ 195. More specifically, CW-3 said NIKE invested over $400 million in the partnership, expecting it to generate $1.5 billion or more in revenue. *Id.* According to CW-3, the partnership with Adobe generated a grand total of zero dollars and failed to ever run properly. *Id.* ¶ 198. By the time CW-14 left NIKE in June 2022, the Adobe platform was "still a work in progress." *Id.* ¶ 236.

*NIKE's Product Organization Issues.* Plaintiffs also allege that NIKE's corporate restructuring from sports-based categories to customer-based categories was a "disaster" that cost NIKE years of experience and expertise. *Id.* ¶¶ 260-63. In the summer of 2022, CW-18 noted that NIKE added general managers for the sports subcategories—renamed to "fields of play"—which she alleges was in response to concerns about the company's performance and was effectively an attempt to recreate NIKE's former organization scheme. *Id.* ¶¶ 264-65. One former-Senior Brand Director at NIKE published an article in 2024 discussing the restructuring and saying that this transition was initially covert and aimed at hiding a "lack of innovation" driven by the failed realignment. *Id.* ¶ 261.

*NIKE's Innovation Pipeline Issues.* Next, plaintiffs critique NIKE's pipeline of innovative products as being "severely deficient" throughout the class period. *Id.* ¶ 280. According to CW-16, products that began in 2020 were still not fully developed by the time of her departure in April 2024. *Id.* ¶ 281. CW-2 added that "NIKE did not bring new and innovative products to the market and instead relied on the same products that previously generated revenue, such as Air Force 1s, Air Jordans, and NIKE Dunks" from at least the fall of 2020 through at least the fall of 2022. *Id.* ¶ 286. NIKE allegedly flooded the market with these classic franchises to hide its innovation deficiencies. *Id.* ¶¶ 280-95.

*NIKE's Competitive Position Issues.* CWs report that NIKE lost competitive standing throughout the class period due to failures in CDA. CW-5 stated that this began before CDA and that, by her departure in early 2021, NIKE had lost market shares to competitors as tracked by third-party metrics. *Id.* ¶ 315. CW-10 added that NIKE lost market shares in the running shoe category by the summer of 2021. *Id.* ¶ 316. CW-7 agreed that NIKE lost many market shares to competitors, and CW-2 recounted that NIKE was losing women's sportswear customers from the fall of 2020 through the fall of 2022. *Id.* ¶¶ 317-18. Specifically,

CW-2 claimed that NIKE was losing market shares to Lululemon Athletica. *Id.* ¶ 318.

At a summit in September or October 2023, NIKE employees allegedly discussed metrics showing "that NIKE was no longer number 1, number 2, or number 3 in running products." *Id.* ¶ 319. CW-2 also mentioned that NIKE lost grounds in its "cool" factor, an important metric measured by outside companies. *Id.* ¶ 321. According to CW-2, by May 2022, NIKE was no longer the number one "cool" brand as compared with companies such as YouTube, TikTok, and Snapchat. *Id.* CW-2 also mentioned that NIKE was losing "cool" grounds amongst its direct competitors—she stated that by May 2022, Adidas and Lululemon had begun "catching up in 'cool' metrics to NIKE." *Id.*

***NIKE's Channel Mix Issues.*** Finally, plaintiffs plead problems with NIKE's planned channel mix between wholesale and mono-brand stores. Although NIKE cut ties with multiple wholesale partners (e.g., Zappos, DSW, Dillard's, Macy's) in 2021, plaintiffs allege that NIKE began covertly turning back to its retail partners to try to resuscitate its failing strategy. *Id.* ¶¶ 139, 332. CWs stated that NIKE began relying on multi-brand retailers by the fall of 2021 to help "rescue the Company from its faltering CDA strategy." *Id.* ¶ 331. CW-10 specifically said that in 2021, NIKE was interested in partnering with Sam's Club and Costco because the DTC strategy was "slowing down" and "not working." *Id.* ¶ 332. CW-7 recalled that a team tried to renew NIKE's relationship with Macy's in early 2023. *Id.* ¶ 334. In 2022, CW-1 alleged that NIKE "strong-armed" Foot Locker into taking excess inventory to inflate NIKE's financials. *Id.* ¶ 336. CW-7 reported that it was known internally that this return was due to DTC's failure. *Id.* ¶ 335.

At the same time, plaintiffs allege that NIKE's mono-brand stores were faltering. *Id.* ¶ 340. CW-2 recalled that the stores were underperforming, not hitting their traffic goals, and not meeting conversion goals. *Id.* ¶ 341. By early 2022, CW-2 said that it was known internally that the "sales-to-returns ratio for some NIKE Live stores were not being met" and, by July 2022, NIKE began lowering its internal targets for store openings. *Id.* ¶¶ 342-43, 348-49.

4.      *The End of the Consumer Direct Acceleration Strategy and Investor Losses*

Plaintiffs allege that CDA's failure was revealed over four disclosures, taking place on December 21, 2023; March 21, 2024; June 27, 2024; and October 1, 2024, each of which caused NIKE's stock to

decline.  *Id.* ¶ 620.

First, on December 21, 2023, NIKE disclosed that its revenue for the second quarter of FY 2024 was $13.39 billion, which was approximately $40 million below analysts' consensus estimate of $13.43 billion, and that the NIKE Direct revenue was $5.7 billion, which was below the consensus estimate of $5.88 billion.  *Id.* ¶ 622.  On an Earnings Call that day, NIKE lowered its financial guidance, stating it expected Q3 to be slightly negative compared to the prior year and Q4 to see low-single digit growth.  *Id.* ¶ 623.  Friend explained this was caused by several factors including adjusted digital growth plans, higher marketplace promotions, and lifecycle management of key franchises.  *Id.*  On this call, Friend also disclosed that NIKE was looking for cost saving measures and that the CDA strategy had added "complexity and inefficiency" to NIKE's operations.  *Id.* ¶ 624.  Defendant Donahoe disclosed on the call that NIKE needed to "be faster, increasing the pace of innovation" and that "this new innovation cycle will take some time to fully ramp up, given [NIKE's] size and scale."  *Id.*  NIKE's stocked declined by $14.49 per share, nearly 12% from its close of $122.53 per share on December 21, 2023, to $108.04 per share on December 22, 2023.  *Id.* ¶ 625.  Analysts decreased their NIKE stock target price accordingly.  *Id.* ¶ 627.

Second, on March 21, 2024, NIKE told investors during an Earnings Call that it expected its full year gross margins to expand only to 120 basis points, down from the 140-to-160 basis points announced in December 2023.  *Id.* ¶ 632.  Defendants "attributed NIKE's disappointing guidance to the CDA strategy's failure," among several other factors.  *Id.*  Donahoe thus said that NIKE would refocus on sports-based categories, increase innovation, strengthen brand marketing, and shift back toward wholesale channels.  *Id.* ¶ 634.  Donahoe also explained that nine months prior, NIKE began making adjustments that included "putting the consumer and sport squarely back into our offense."  *Id.* ¶ 635.  NIKE's stock declined by $6.96 per share, or about 7% from a close of $100.82 per share on March 21, 2024 to a close of $93.86 per share on March 22, 2024. *Id.* ¶ 638.

Third, on June 27, 2024, NIKE announced that its fourth quarter revenue was $12.61 billion, which missed consensus estimates by $250 million.  *Id.* ¶ 643.  Friend explained that this came, in part, from a 10% decline in NIKE Digital sales.  *Id.*  NIKE also reduced its revenue guidance for FY 2025.  *Id.* ¶ 644.

Friend stated that NIKE "had a gap in innovation in [its] pipeline," which began at least "a couple years ago." *Id.* ¶ 645. Donahoe added that over the last ninety days, NIKE "completely aligned across the organization around sport field of play." *Id.* ¶ 649. He also said that NIKE "set out" what it was calling its "'comeback plan' a year ago." *Id.* ¶ 651. NIKE's stock dropped by $18.82 per share, or nearly 20% from a close of $94.19 per share on June 27, 2024, to a close of $75.37 per share on June 28, 2024. *Id.* ¶ 652. This was the largest stock price drop in NIKE's history. *Id.*

Finally, on October 1, 2024, NIKE announced that its first quarter revenue was $11.59 billion, which fell below consensus estimates of $11.64 billion. *Id.* ¶ 658. Friend said that this came from traffic declines across NIKE Direct and "particular softness in traffic on NIKE Digital." *Id.* Friend also said that NIKE was withdrawing its full year guidance and that NIKE was taking "aggressive actions in NIKE Direct, and especially, Digital." *Id.* ¶ 660. Digital, he explained, was down 20% in the quarter, which was largely driven by three classic franchises being down nearly 50% from the previous year. *Id.* Friend "acknowledged some of the missteps related to over-centering on Direct." *Id.* ¶ 663. NIKE's stock declined by $6.03 per share, or approximately 6.8%, from a close of $89.13 per share on October 1, 2024, to a close of $83.10 per share on October 2, 2024. *Id.* ¶ 665.

5.       *Executive Departures and Post-Class Period Allegations*

Plaintiffs allege that three executives, including defendants Campion and Donahoe, left NIKE during the class period. On February 20, 2023, Global Chief Digital Information Officer Ratnakar Lavu resigned. *Id.* ¶ 758. Then, on January 5, 2024, it was announced that Campion would exit NIKE on April 5, 2024. *Id.* ¶ 761. Lastly, on September 19, 2024, NIKE announced that Donahoe was also departing. *Id.* ¶ 762.

On December 19, 2024, NIKE's new CEO, Elliot Hill, stated that NIKE would again "lead with sport." *Id.* ¶ 168. He also said that he aimed to make the supply chain "more efficient" and "accelerate innovation." *Id.* ¶¶ 167-68. Hill acknowledged that NIKE's prioritization of "Digital revenue has impacted the health of [NIKE's] marketplaces." *Id.* ¶ 169.

## C.       Defendants' Alleged Misstatements

At the heart of this action are seventy-nine statements defendants made during the class period that plaintiffs allege are false and misleading. *See* Pl. Not. of Misstatements Chart, ECF 78, at 2; *see also* Pl. Chart, ECF 78-1.[3] Plaintiffs have organized these statements numerically and the Court has since sorted them into seven categories—one category that concerns the CDA strategy overall, and six categories that track plaintiffs' six-component theory. Together, the statements are categorized as involving: (1) NIKE's CDA Strategy, (2) NIKE's Supply Chain, (3) NIKE's Technology, (4) NIKE's Innovation Pipeline, (5) NIKE's Product Organization, (6) NIKE's Competitive Position, and (7) NIKE's Channel Mix.

      1.        *Alleged Misstatements Regarding NIKE's CDA Strategy*

**Statement No. 1.** Donahoe stated on March 18, 2021, that NIKE's "strategy is working, as [it] accelerate[s] innovation." SAC ¶ 439.

**Statement No. 13.** Friend stated on September 23, 2021, that NIKE's "Q1 results illustrate how NIKE's [CDA] Strategy continues to fuel growth and transform [its] long-term financial model." *Id.* ¶ 465.

**Statement No. 15.** Donahoe stated on October 6, 2021, that NIKE was "clearly seeing [its] strategy work." *Id.* ¶ 471.

**Statement No. 16.** Donahoe stated on October 6, 2021, that "NIKE's strategy is working." *Id.* ¶ 473.

**Statement No. 17.** O'Neill stated on October 6, 2021, that "[w]ith the CDA, [NIKE] successfully realigned [its] organization to further invest against [its] highest growth areas." *Id.* ¶ 475.

**Statement No. 20.** O'Neill stated on October 6, 2021, that NIKE's "strategy is definitely working." *Id.* ¶ 480.

**Statement No. 23.** Donahoe stated on November 18, 2021, that "NIKE continues to fuel growth through [its CDA] strategy." *Id.* ¶ 487.

**Statement No. 24.** Donahoe stated on December 20, 2021, that "NIKE's strong results this quarter provide further proof that [its] strategy is working" and that NIKE is "now in a much stronger competitive

---

[3] As discussed later, these filings were made at the Court's request.

position that [it was] 18 months ago." *Id.* ¶ 489.

*Statement No. 25.*   Donahoe stated on December 20, 2021, that "[t]he results [NIKE] delivered offer continued proof that [its] strategy is working." *Id.* ¶ 491.

*Statement No. 26.*   Donahoe stated on December 20, 2021, that NIKE's "results this quarter are evidence that [its] strategy is working." *Id.* ¶ 492.

*Statement No. 27.*   Donahoe stated on December 20, 2021, that "[CDA] is driving [NIKE's] business forward." *Id.* ¶ 494.

*Statement No. 29.*   Friend stated on March 21, 2022, that NIKE's "[CDA] strategy is working." *Id.* ¶ 499.

*Statement No. 30.*   Donahoe and Friend stated on March 21, 2022, that the "[CDA] strategy is working." *Id.* ¶ 501.

*Statement No. 33.*   O'Neill stated on May 16, 2022, that NIKE "can look at [its] results and know [the CDA strategy is] working." *Id.* ¶ 508.

*Statement No. 35.*   Donahoe stated on June 27, 2022, that NIKE's "competitive advantages, including [its] pipeline of innovative product and expanding digital leadership, prove that [its] strategy is working." *Id.* ¶ 512.

*Statement No. 37.*   Friend stated on June 27, 2022, that "[t]oday, NIKE's continued momentum shows that [its] [CDA] strategy is working." *Id.* ¶ 516.

*Statement No. 39.*   Friend stated on June 27, 2022, that NIKE's "[CDA] is working." *Id.* ¶ 520.

*Statement No. 40.*   Friend stated on June 27, 2022, that "NIKE's continued momentum shows that [its] strategy is working." *Id.* ¶ 522.

*Statement No. 45.*   Donahoe stated on September 9, 2022, that "the progress you're seeking on CDA tells us that NIKE's strategy is working.  We continue to see structural tailwinds . . . around . . . a consumer-led shift toward digital . . . our capabilities and efficiencies are allowing us to move at the speed of the consumer and to drive continued competitive separation in the market." *Id.* ¶ 533.

*Statement No. 47.*   Friend stated on September 9, 2022, that "[f]undamentally, the [CDA] strategy

is changing [NIKE's] financial and operating model, resulting in healthy, profitable growth." *Id.* ¶ 537.

**Statement No. 48.**  Donahoe stated on September 29, 2022, that NIKE's "competitive advantages, including the strength of [its] brand, deep consumer connections and pipeline of innovative product and expanding digital leadership, prove that [its] strategy is working." *Id.* ¶ 540.

**Statement No. 55.**  Donahoe stated on December 20, 2022, that NIKE's "Q2 results speak to the continued success of [its] [CDA] strategy." *Id.* ¶ 555.

**Statement No. 56.**  Donahoe stated on December 20, 2022, that NIKE's "results speak to how [it has] leveraged [its] competitive advantages, which include a relentless innovation pipeline, unmatched brands, and deep consumer connections to build relative strength and stay ahead of competition." *Id.* ¶ 557.

**Statement No. 58.**  Donahoe stated on March 21, 2023, that "NIKE's strong results in the third quarter offer continued proof of the success of [its] [CDA] strategy." *Id.* ¶ 562.

**Statement No. 60.**  Donahoe stated on May 24, 2023, that NIKE's "brand momentum is strong, [its] innovation pipeline is unmatched, and [its] strategy is working." *Id.* ¶ 566.

**Statement No. 62.**  Donahoe stated on June 29, 2023, that "NIKE's strong results make clear that [its] strategy is working . . . as [its] unique advantages continue to drive competitive separation.  [NIKE's] investment in innovation and digital leadership are fueling broad-based growth." *Id.* ¶ 571.

**Statement No. 63.**  Donahoe stated on June 29, 2023, that "[i]t's clear that our strategy is working, and that NIKE's unique advantages continue to drive competitive separation." *Id.* ¶ 573.

**Statement No. 64.**  Donahoe stated on June 29, 2023, that "[i]n the end, [NIKE's] CDA strategy is working." *Id.* ¶ 575.

**Statement No. 75.**  Donahoe stated on March 21, 2024, that NIKE's "[CDA] strategy has driven growth and direct connections with consumers." *Id.* ¶ 602.

2.    *Alleged Misstatements Regarding NIKE's Supply Chain*

**Statement No. 2.**  Donahoe stated on March 18, 2021, that NIKE's Celect acquisition allowed NIKE "to fairly impressively pivot to a more direct-to-consumer supply chain." *Id.* ¶ 441.

**Statement No. 12.**  Friend stated on September 23, 2021, that "where [NIKE was] investing was

16

against technology, creating a digital-first supply chain in the marketplace." *Id.* ¶ 463.

**Statement No. 21.** Friend stated on October 6, 2021, that NIKE's "building a digital-first supply chain to meet the strong and growing digital demand that [it sees]." *Id.* ¶ 482.

**Statement No. 34.** Campion stated on May 16, 2022, that NIKE's "got three to four times greater digital commerce distribution capability than [it] had two years ago." *Id.* ¶ 510.

3.      *Alleged Misstatements Regarding NIKE's Technology*

**Statement No. 4.** Friend stated on April 26, 2021, that NIKE was using "[p]ersonalization, leveraging data analytics, [and] machine learning so that [it] can read patterns and consumer behavior," as well as that that NIKE was "employing data and analytics capabilities in [its] supply chain so that [it knows] how to more smartly flow [its] product." *Id.* ¶ 446.

**Statement No. 10.** Donahoe and Friend stated on July 20, 2021, that NIKE "may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards." *Id.* ¶ 459 (emphasis omitted).

**Statement No. 14.** Donahoe and Friend stated on October 5, 2021, that NIKE "continue[s] to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further accelerate [its] digital transformation." *Id.* ¶ 469.

**Statement No. 18.** Friend stated on October 6, 2021, that "[t]he investments [NIKE] made against [its] end-to-end digital transformation are making [NIKE] more agile" and that NIKE was "building the capabilities that are required for NIKE to operate a digitally led omni-channel, direct-t-consumer business at scale." *Id.* ¶ 476.

**Statement No. 28.** Donahoe and Friend stated on January 6, 2022, that NIKE "continue[s] to invest in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further accelerate our digital transformation." *Id.* ¶ 497.

**Statement No. 31.** Donahoe stated on March 30, 2022, that "[t]he Adobe platform has played such an important role of delivering a more personalized experience for [NIKE's] consumers." *Id.* ¶ 504.

**Statement No. 32.** Donahoe and Friend stated on April 5, 2022, that NIKE "continue[s] to invest

17

in data and analytics, demand sensing, insight gathering, inventory management and other areas to create an end-to-end technology foundation which will further accelerate [NIKE's] digital transformation." *Id.* ¶ 506.

***Statement No. 38.*** Friend stated on June 27, 2022, that "[t]hrough new capabilities activated in partnership with Adobe, [NIKE] will unlock additional productivity and demand creation and member retention across our NIKE ecosystem." *Id.* ¶ 518.

***Statement No. 44.*** Donahoe and Friend stated on July 21, 2022, that NIKE "may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards." *Id.* ¶ 531 (emphasis omitted).

***Statement No. 66.*** Friend stated on June 29, 2023, that "[f]or example, [NIKE has] partnered with Adobe to enable one-to-one member personalization, driving gains in member retention, click-through rates and conversion, resulting in higher demand per member and returns on digital ad spend." *Id.* ¶ 579.

***Statement No. 70.*** Donahoe and Friend stated on July 20, 2023, that NIKE "may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards." *Id.* ¶ 588 (emphasis omitted).

***Statement No. 79.*** Donahoe and Friend stated on July 25, 2024, that NIKE "may not be successful in developing platforms that operate effectively with these technologies, systems, networks or standards." *Id.* ¶ 609 (emphasis omitted).

    4.    *Alleged Misstatements Regarding NIKE's Innovation Pipeline*

***Statement No. 3.*** Donahoe stated on March 18, 2021, that NIKE's "unmatched innovation investment and pipeline" propelled the NIKE brand. *Id.* ¶ 443.

***Statement No. 4.*** Friend stated on April 26, 2021, that NIKE was "investing maniacally behind product innovation." *Id.* ¶ 446.

***Statement No. 5.*** Donahoe stated on June 24, 2021, that NIKE "continue[s] to invest in innovation" and its digital leadership." *Id.* ¶ 448.

***Statement No. 6.*** Donahoe stated on June 24, 2021, that NIKE's "relentless pipeline of innovative

product continues to create separation between [NIKE] and [its] competition." *Id.* ¶ 450.

*Statement No. 7.* Donahoe and Friend stated on July 20, 2021, that NIKE's potential inability to adjust the product offerings and develop new products "could have a material adverse effect on [its] sales and profitability." *Id.* ¶ 453 (emphasis omitted).

*Statement No. 19.* Parker stated on October 6, 2021, that "[t]he pace of innovation has not slowed down at all." *Id.* ¶ 478.

*Statement No. 36.* Donahoe stated on June 27, 2022, that NIKE's "relentless pipeline of innovative products, which continues to drive separation between us and our competition." *Id.* ¶ 514.

*Statement No. 41.* Donahoe and Friend stated on July 21, 2022, that certain risks "could have a material adverse effect on our sales and profitability." *Id.* ¶ 525 (emphasis omitted).

*Statement No. 46.* Donahoe stated on September 9, 2022, that "innovation continues to be [NIKE's] greatest competitive advantage." *Id.* ¶ 535.

*Statement No. 50.* Donahoe stated on September 29, 2022, that "NIKE's relentless pipeline of innovative product continues to create separation between [NIKE] and [its] competition." *Id.* ¶ 544.

*Statement No. 53.* Donahoe stated on September 29, 2022, that NIKE's "got a very strong innovation pipeline." *Id.* ¶ 550.

*Statement No. 59.* Donahoe stated on March 21, 2023, that "[t]he breadth and depth of the innovation pipeline is really strong." *Id.* ¶ 564.

*Statement No. 60.* Donahoe stated on May 24, 2023, that NIKE's "brand momentum is strong, [its] innovation pipeline is unmatched, and [its] strategy is working." *Id.* ¶ 566.

*Statement No. 67.* Donahoe and Friend stated on July 20, 2023, that NIKE's potential inability to adjust product offerings and develop new products "could have a material adverse effect on [NIKE's] sales and profitability." *Id.* ¶ 582 (emphasis omitted).

*Statement No. 72.* O'Neill stated on September 12, 2023, that NIKE's "innovation pipeline continue[s] to keep [NIKE] in the lead." *Id.* ¶ 592.

*Statement No. 73.* Donahoe stated on September 29, 2023, that NIKE's "innovation pipeline is

strong." *Id.* ¶ 594.

**Statement No. 76.** Donahoe and Friend stated on July 25, 2024, that NIKE's potential inability to adjust product offerings and develop new products "could have a material adverse effect on [its] sales and profitability." *Id.* ¶ 603 (emphasis omitted).

5.    *Alleged Misstatements Regarding NIKE's Product Organization*

**Statement No. 22.** Donahoe stated on October 6, 2021, that "[a]s part of CDA, [NIKE] successfully realigned [its] organization." *Id.* ¶ 484.

**Statement No. 54.** Donahoe and Friend stated on October 6, 2022, that NIKE has "aligned [its] product creation and category organizations around new consumer construct focused on Men's, Women's and Kids' and continue to invest in data and analytics, demand sensing, insight gathering, inventor management and other areas to create an end-to-end technology foundation, which [NIKE] expect[s] will further accelerate [its] digital transformation." *Id.* ¶ 553.

**Statement No. 57.** Donahoe and Friend stated on January 5, 2023, that NIKE has "aligned [its] product creation and category organizations around new consumer construct focused on Men's, Women's and Kids' and continue[s] to invest in data and analytics, demand sensing, insight gathering, inventor management and other areas to create an end-to-end technology foundation, which [NIKE] expect[s] will further accelerate [its] digital transformation." *Id.* ¶ 560.

**Statement No. 61.** Donahoe and Friend stated on April 6, 2023, that NIKE has "aligned [its] product creation and category organizations around a new consumer construct focused on Men's, Women's and Kids'" and that NIKE "continue[s] to invest in data and analytics, demand sensing, insight gathering, inventor management and other areas to create an end-to-end technology foundation, which [NIKE] expect[s] will further accelerate [its] digital transformation." *Id.* ¶ 569.

**Statement No. 74.** Donahoe stated on December 21, 2023, that "[s]ix months ago, [NIKE] realigned [its] entire organization under Heidi O'Neill and Craig Williams as our Co-Presidents, and it is making a huge difference in our focus and ability to execute." *Id.* ¶ 598.

6.    *Alleged Misstatements Regarding NIKE's Competitive Position*

20

*Statement No. 8.*   Donahoe and Friend stated on July 20, 2021, that "[i]f [NIKE] do[es] not adequately and timely anticipate and respond to [its] competitors, [its] costs may increase, demand for [its] products may decline, possibly significantly, or [it] may need to reduce wholesale or suggested retail prices for [its] products." *Id.* ¶ 455 (emphasis omitted).

*Statement No. 9.*   Donahoe and Friend stated on July 20, 2021, that "[f]ailure to maintain [NIKE's] reputation, brand image, and culture could negatively impact [NIKE's] business." *Id.* ¶ 457 (first alteration in original and emphasis omitted).

*Statement No. 11.*   Donahoe stated on September 23, 2021, that NIKE was "in a stronger position relative to [its] competition than [it was] prior to the pandemic." *Id.* ¶ 461.

*Statement No. 42.*   Donahoe and Friend stated on July 20, 2022, that "[i]f [NIKE] do[es] not adequately and timely anticipate and respond to [its] competitors, [its] costs may increase, demand for [ts] products may decline, possibly significantly, or [it] may need to reduce wholesale or suggested retail prices for [its] products." *Id.* ¶ 527 (emphasis omitted).

*Statement No. 43.*   Donahoe and Friend stated on July 21, 2022, that "[f]ailure to maintain [NIKE's] reputation, brand image, and culture could negatively impact [NIKE's] business." *Id.* ¶ 529 (first alteration in original and emphasis omitted).

*Statement No. 49.*   Donahoe stated on September 29, 2022, that "[c]onsumers continue to rate [NIKE] their number one cool and number one favorite brand as [NIKE] connect[s] directly and deeply with consumers worldwide." *Id.* ¶ 542.

*Statement No. 51.*   Friend stated on September 29, 2022, that "NIKE continues to lead as the number one cool and number one favorite brand in North America." *Id.* ¶ 546.

*Statement No. 52.*   Donahoe stated on September 29, 2022 that NIKE "see[s] strong consumer demand in North America currently.  Right?  There's no signs of any softness." *Id.* ¶ 548.

*Statement No. 65.*   Friend stated on June 29, 2023, that "[t]hroughout the year, [NIKE] drove competitive separation." *Id.* ¶ 577.

*Statement No. 68.*   Donahoe and Friend stated on July 20, 2023, that "[i]f [NIKE] do[es] not

21

adequately and timely anticipate and respond to [its] competitors, [its] costs may increase, demand for [its] products may decline, possibly significantly, or [it] may need to reduce wholesale or suggested retail prices for [its] products." *Id.* ¶ 584 (emphasis omitted).

**Statement No. 69.** Donahoe and Friend stated on July 20, 2023, that "[f]ailure to maintain [NIKE's] reputation, brand image and culture could negatively impact [NIKE's] business." *Id.* ¶ 586 (first alteration in original and emphasis omitted).

**Statement No. 77.** Donahoe and Friend stated on July 25, 2024, that "[i]f [NIKE] do[es] not adequately and timely anticipate and respond to [its] competitors, [its] costs may increase, demand for [its] products may decline, possibly significantly, or [it] may need to reduce wholesale or suggested retail prices for [its] products." *Id.* ¶ 605 (emphasis omitted).

**Statement No. 78.** Donahoe and Friend stated on July 25, 2024, that "[f]ailure to maintain [NIKE's] reputation, brand image and culture could negatively impact [NIKE's] business." *Id.* ¶ 607 (first alteration in original and emphasis omitted).

7.    *Alleged Misstatements Regarding NIKE's Channel Mix*

**Statement No. 71.** Donahoe stated on September 12, 2023, that NIKE's "marketplace strategy remains the same." *Id.* ¶ 590.

**D.    Procedural History**

Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Pembroke Pines initiated this class action lawsuit on June 20, 2024. Compl., ECF 1. Separately, on July 15, 2024, plaintiff Yagnesh Mehta filed a related class action under Case Number 3:24-cv-01150. *See* Order of August 8, 2024, ECF 11. Pursuant to the parties' stipulation, the Court consolidated the two lawsuits on August 8, 2024. *Id.* Over the following month, several parties moved for appointment as lead plaintiff. *See* Op. & Order of October 25, 2024, ECF 42. On October 25, 2024, the Court appointed CDPQ and DEKA as lead plaintiffs, Labaton as lead counsel, and Stoll Berne as liaison counsel. *Id.* Plaintiffs subsequently filed a first amended complaint on February 10, 2025, 1st Am. Compl., ECF 53; and the operative second amended complaint on March 24, 2025, SAC.

On May 12, 2025, defendants moved to dismiss the second amended complaint. Defs. Mot to Dismiss ("Defs. Mot.") ECF 66. Defendants additionally filed a request for judicial notice and incorporation by reference in support of the motion to dismiss, ECF 67, and a supporting declaration from Jessica Valenzuela. On August 11, 2025, plaintiffs filed their opposition to defendants' motion, ECF 69. On September 25, 2025, defendants filed a reply in support of their motion, ECF 70.

On October 27, 2025, plaintiffs filed a notice of supplemental authority, ECF 71, to which defendants responded on October 29, 2025, ECF 72. On January 16, 2026, pursuant to the Court's request, plaintiff filed a chart delineating the statements at issue, ECF 78. On January 28, 2026, defendants filed an additional notice of supplemental authority, ECF 80. On January 30, 2026, plaintiffs filed another notice of supplemental authority, ECF 81.

The Court heard oral argument on defendants' motion on February 6, 2026, Mins. of Proceedings of February 3, 2026, ECF 82; Tr. of Proceedings of February 3, 2026, ECF 83. Later that day, defendants filed a supplemental exhibit correcting an administrative error that was identified during the hearing, ECF 84.

## DISCUSSION

Private parties may sue those who "use or employ . . . any manipulative or deceptive device or contrivance in contravention" of the securities rules "in connection with the purchase or sale of any security registered on a national securities exchange" pursuant to Section 10(b) of the Exchange Act. 15 U.S.C. § 78j(b). Enforcement of Section 10(b) is made actionable through the Securities and Exchange Commission's Rule 10b-5 "which makes it unlawful, among other things, '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1108 (9th Cir. 2010) (alteration in original) (quoting 17 C.F.R. § 240.10b-5(b)). To state a viable claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant," known commonly as falsity and materiality; "(2) scienter; (3) a connection

between the misrepresentation or omission and the purchase or sale of a security (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (citation and quotation marks omitted).

Defendants challenge plaintiffs' allegations as to only two of these elements here: falsity and scienter.[4]   After reviewing the allegations in the second amended complaint, as well as the documents properly subject to judicial notice and incorporation by reference, this Court finds that falsity is only sufficiently alleged as to Statement Nos. 19, 51, 53, 59, 71, 73, and 78.  Of those, scienter is only sufficiently alleged as to Statement No. 73.  Accordingly, as detailed below, defendants' request for judicial notice and incorporation by reference is granted, defendants' motion to dismiss is granted in part and denied in part, and plaintiffs are granted leave to file a third amended complaint.

## A.    Request for Judicial Notice and Incorporation by Reference

Courts addressing a securities class action complaint "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313, 322 (2007) (citation omitted).

Defendants ask the Court to judicially notice or incorporate by reference twenty-two documents. Plaintiffs did not file an objection but instead noted in a footnote to their response to defendants' motion to dismiss that the Court cannot assume the truth of such documents to dispute facts alleged in the complaint. Pl. Resp. 32 n.18 (quoting *Khoja*, 899 F.3d at 1003).  The documents at issue are press releases, transcripts from earnings calls, forms filed with the SEC, and a single published article.  Many of these documents are relied upon heavily in the second amended complaint. *See, e.g.*, SAC ¶ 19.  Only two documents are not expressly cited in the second amended complaint: an earnings call transcript (Ex. 2) and an excerpt of one of NIKE's SEC filings (Ex. 6).  Both are proper subjects of judicial notice. *See In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 930 (N.D. Cal. 2022) (taking judicial notice of earnings call transcripts and SEC

---

[4] Defendants do not challenge the materiality of the allegedly misleading statements.

filings).

Consideration of defendants' proffered documents is appropriate here to understand the scope of information available during the class period. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008). The Court does not, however, take as true each statement made within the documents. *See Khoja*, 899 F.3d at 999. Defendants' request for judicial notice and incorporation by reference is granted accordingly.

**B.      Falsity**

Allegations of falsity must be plead with particularity. *See In re Sorrento Therapeutics, Inc. Sec. Litig.*, 97 F.4th 634, 640 (9th Cir. 2024) ("[F]or falsity, a plaintiff must allege with particularity each statement alleged to be misleading and the reasons why it is misleading."). "[S]tatements and omissions are actionably false or misleading if they directly contradict what the defendant knew at the time or create an impression of a state of affairs that differs in a material way from the one that actually exists." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023) (cleaned up), *cert. dismissed sub nom. Facebook, Inc. v. Amalgamated Bank*, 604 U.S. 4 (2024) (per curiam).

Courts apply a "'reasonable investor' standard to determine whether a statement is misleading." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021) (quoting *In re VeriFone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993)). Only statements that are "capable of objective verification" may be deemed misleading. *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) (citation and quotation marks omitted). To explain why a statement is false or misleading, a complaint "cannot rely on hindsight; rather, it must explain 'why the statements were false or misleading at the time they were made.'" *In re Cloudera, Inc.*, 121 F.4th 1180, 1187 (9th Cir. 2024) (quoting *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012)). Each of the seven categories of alleged misstatements are considered in turn below.

1.      *Alleged Misstatements Regarding NIKE's CDA Strategy*

25

Most of the challenged statements concern the success of NIKE's CDA strategy.[5] *See, e.g.*, SAC ¶ 473 ("NIKE's strategy is working"); *id.* ¶ 487 ("NIKE continues to fuel growth through [its CDA] strategy"); *id.* ¶ 494 ("[CDA] is driving [NIKE's] business forward"); *id.* ¶ 537 ("Fundamentally, the [CDA] strategy is changing [NIKE's] financial and operating model, resulting in healthy, profitable growth for NIKE."). Defendants argue that these statements are not misleading because they are true and because they are inactionable statements of opinion and puffery. Def. Mot. 22-25.

As to truthfulness, plaintiffs raise two arguments in response. The first argument is simple: defendants misled investors into thinking early revenue growth was caused by CDA when in fact it was caused by temporary, unrelated factors. Pls. Resp. 30-31. The second argument is a little more complicated. It begins by premising CDA's success on plaintiffs' six theorized components. *Id.* at 31-32. Plaintiffs' argument follows that these six components were so critical to CDA's success that they were inextricably linked: failure in the components meant failure in CDA. *See id.* And, because the components were in fact failures, CDA was a failure as well. Plaintiffs also challenge defendants' arguments about inactionable opinions and puffery, which are addressed in this section.

    a.    Truthfulness

Beginning with plaintiffs' first argument, it is undisputed that NIKE grew its Direct and Digital revenue after adopting CDA. In 2020, 2021, 2022, and 2023, NIKE saw steady increases in the percent of its revenue generated by NIKE Direct. SAC ¶ 81. Each year from 2021 through 2023, NIKE also increased its Digital revenue by the billions: increasing from $9.1 billion in 2021 to $12.4 billion 2023. *Id.* ¶ 83. Nearly all the challenged statements were made during this timeframe.[6]

---

[5] Using the numbering from plaintiffs' chart of alleged misstatements, this category encompasses Statement Nos. 1, 13, 15-17, 20, 23, 25-27, 29, 30, 33, 35, 37, 39, 40, 45, 47, 48, 55, 56, 58, 60, 62-64, and 75.

[6] Only one statement came after this period: a March 21, 2024 statement that NIKE's "[CDA] strategy has driven growth and direct connections with consumers." SAC ¶ 602. Plaintiffs do not specifically allege that the strategy failed to do either of these things. But, critically, that statement is incomplete. The entire statement made was: "While [NIKE's CDA] strategy has driven growth and direct connections with consumers, it's been clear that [NIKE] need[s] to make some important adjustments." Valenzuela Decl. Ex. 19 at 3. That statement cannot reasonably be deemed false or misleading.

However, plaintiffs also clearly allege that this success was driven by unrelated factors. Specifically, plaintiffs allege that this growth was driven by the COVID pandemic, *id.* ¶¶ 362-65; selling products developed prior to the introduction of the CDA strategy, *id.* ¶¶ 366-67; and, most insidiously, "flooding the market" with legacy brands, *id.* ¶¶ 168, 279, 287, 291-92, 304, 394. The question thus becomes what exactly defendants promised when they spoke of the CDA strategy's success.

Defendants claimed that the CDA strategy was "working," "fuel[ing] growth," and "driving [NIKE's] business forward." *See, e.g.*, *id* ¶¶ 439, 471, 473, 480, 487, 494, 501, 520, 522, 555, 573. Defendants also spoke about NIKE's results as proof that CDA was working. *Id.* ¶ 491 ("The results [NIKE] delivered offer continued proof that [its] strategy is working."); *id.* ¶ 492 ("[NIKE's] results this quarter are evidence that [its] strategy is working"); *id.* ¶ 508 ("[W]e can look at [NIKE's] results and know it's working."). None of these statements claimed that the CDA strategy was the sole driver of NIKE's success. That separates this case from *In re Dentsply Sirona, Inc. Securities Litigation*, which plaintiffs turn to for support. 665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023). Unlike here, the defendant in *In re Dentsply* said that the "[r]evenues ***benefited primarily from strong demand*** for our CAD/CAM Systems and Imaging products." *Id.* at 283 (emphasis added). The plaintiffs alleged that the revenue gains were not driven by the claimed market demand but were in fact driven primarily by minimum purchase requirements. *Id.*

Had defendants claimed that NIKE's growth came entirely, or even primarily, from the CDA strategy, the outcome may be different. But that is not what plaintiffs allege. Plaintiffs allege that defendants claimed the strategy was working and driving growth as reflected in NIKE's revenue gains. NIKE saw significant revenue gains and, while some portion of those gains may not be attributable to CDA, the Court cannot conclude that it was untruthful to say CDA was working when the statements were made.

Plaintiffs' second argument is victim of a fatal mismatch. Plaintiffs effectively argue that defendants promised near-flawless execution of the six alleged components by touting CDA's success. A fair reading of these statements reveals no such promise. No reasonable investor would hear that the CDA strategy was working and understand it to mean the Supply Chain, Technology, Product Organization, Innovation Pipeline, Brand Strength, and Channel Mix were all without fault. While defendants did make

27

specific statements about some of the components, as explored below, defendants' statements about CDA's overall success say nothing of the sort. Errors in the six components do not impact the truthfulness of defendants' statements about CDA's overall success. Plaintiffs do not sufficiently allege that any of these challenged statements were false.

Of course, "literal truth is not the standard for determining whether statements . . . are misleading." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). But plaintiffs also fail to sufficiently allege that the statements were misleading despite their literal truth. "Working" does not mean flawless execution and is not typically measured by plaintiffs' six components. It is insufficient for plaintiffs to assert otherwise—plaintiffs have pleaded no facts showing that "working" was understood to mean plaintiffs' six components or that NIKE had more generally developed plaintiffs' "'distinctive, and false, meaning' attributed to it." *In re Cloudera, Inc.*, 121 F.4th at 1188 (quoting *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021)). "'Where, as here, a plaintiff claims that the words used in a statement have some special or nuanced meaning that differs from what the literal words suggest, the plaintiff must plead facts that will support this crucial premise.'" *In re Cloudera*, 121 F.4th at 1188 (quoting *Wochos*, 985 F.3d at 1193). Plaintiffs offer no such allegations. Defendants' statements regarding the CDA strategy were neither false nor misleading.

b.     Inactionable Statements of Opinion and Puffery

Even if defendants' statements about CDA's success were untrue, they would still be inactionable as statements of opinion and puffery. Puffery, that is, "expressing an opinion rather than a knowingly false statement of fact—is not misleading." *Retail Wholesale*, 845 F.3d at 1275; *see Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098-99 (9th Cir. 2022) ("Corporate 'puffing' involves 'expressing an opinion' that is not 'capable of objective verification.'" (quoting *Retail Wholesale*, 845 F.3d at 1275)). And "a sincere statement of pure opinion is not an untrue statement of material fact, regardless whether an investor can ultimately prove the belief wrong." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) (quotation marks omitted).

Defendants' statements about CDA are classic examples of inactionable corporate optimism. *See*

28

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("Statements of mere corporate puffery, vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers, are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." (citation and quotation marks omitted)).  And, when taken in context, they do not prove misleading.  It is true that the Ninth Circuit has found the term "working" to fall outside the bounds of puffery on at least one occasion.  *See Cutler v. Kirchner*, 696 F. App'x 809, 814 (9th Cir. 2017).  But in that case, the statement that the product was "working" was misleading when it was viewed "in the context of [the company's] other statements, made over a long period of time, describing what [the product] did and what practical aims it was supposed to achieve."  *Id.*  In *Cutler*, the company made various additional statements alongside the "working" claim, providing that the product was "'ready to scale[]' and capable of integrating acquisitions 'quickly'" when, in fact, the product "was causing a decline in cash collections in essentially every new country" it had been expanded to.  *Id.* Altogether, the statements in *Cutler* painted a picture that did not reflect the actual state of affairs.

Here, NIKE saw revenue increases in key realms during the relevant time period.  While CDA may have caused problems and suffered issues, the allegations do not show that it was misleading for defendants to state that it was "working" at the time.  Because there is no "affirmative duty to disclose any and all material information," disclosure is only required "when necessary 'to make statements made, in light of the circumstances under which they were made, not misleading.'"  *Matrixx Initiatives, Inc.*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b) (ellipsis omitted)).  Under the circumstances here, the statements were not misleading, and no further disclosure was required.

2.      *Alleged Misstatements Regarding NIKE's Supply Chain*

Moving into plaintiffs' six components, the next challenge is to statements made about NIKE's supply chain—for example, that an acquisition had allowed NIKE to "fairly impressively pivot to a more direct-to-consumer supply chain," SAC ¶ 441; that NIKE was "building a digital-first supply chain to meet the strong and growing digital demand that [it sees]," *id.* ¶ 482; and that NIKE was "investing [] against

technology[ and] creating a digital-first supply chain in the marketplace," *id.* ¶ 463.[7]  Plaintiffs also challenge Campion's statement that "[NIKE's] got three to four times greater digital commerce distribution capability than [it] had two years ago."  *Id.* ¶ 510.  According to plaintiffs, these statements misrepresented the state of affairs because NIKE did not build a separate DTC supply chain and because NIKE faced supply chain issues throughout the class period.  Pls. Resp. 16-18.

To be sure, plaintiffs sufficiently allege that NIKE did not create a separate DTC supply chain, and that NIKE faced numerous hurdles in reshaping its supply chain to effectuate the DTC strategy.  *See* SAC ¶¶ 146-50, 160-63, 165.  But they do not allege that NIKE ever promised a separate DTC supply chain or flawless execution of its pivot.  Once again, there is a fatal mismatch between plaintiffs' allegations and the statements at issue.

None of these statements said or even implied that NIKE was building a separate DTC supply chain.  In fact, Donahoe said in one of the challenged statements that an acquisition allowed NIKE to "pivot to a more direct-to-consumer supply chain," thus implying a change to the existing structure.  *Id.* ¶ 441.  The arguments regarding NIKE's failure to build a brand new supply chain are a nonstarter.

As to plaintiffs' remaining arguments, defendants claimed that NIKE was "investing [] against technology" and "creating a digital-first supply chain."  *Id.* ¶¶ 463.  Nothing in the second amended complaint suggests this was untrue.  Only one statement even speaks to the pivot's success—Campion's statement about increasing digital commerce distribution capabilities.  *See id.* ¶ 510.  But again, there are no allegations to the contrary.  Yes, plaintiffs allege that the capabilities were problematic and faced significant troubles, but they say nothing of whether the capabilities increased under the DTC strategy.  Context here further disproves plaintiffs' arguments.  In the same article from which the challenged statement is derived, Campion also said that NIKE "needs platforms that more effectively connect all its parts" and that its "supply chain to that point was largely set up for wholesale."  Valenzuela Decl. Ex. 10.  Those statements suggest that the supply chain transformation was ongoing and had not yet met NIKE's

---

[7] The section on NIKE "Supply Chain" concerns Statement Nos. 2, 12, 21, and 34.

needs.  Defendants' supply chain statements were not false or misleading.

       3.       *Alleged Misstatements Regarding NIKE's Technology*

The next category of challenged statements concerns NIKE's technology.[8]  Plaintiffs challenge statements that NIKE was investing in data analytics and technology, SAC ¶¶ 469, 504, 506; that those investments were making NIKE "more agile," *id.* ¶ 476; that NIKE was "leveraging data analytics" to improve its supply chain, *id.* ¶ 446; and about NIKE's partnership with Adobe, *id.* ¶¶ 504, 518, 579.  The Court considers the general technology statements and the statements about the Adobe partnership in turn.

       a.       General Technology Statements

First, the allegations regarding NIKE's general DTC technology are not false or misleading.  Most of these statements concern NIKE's investments.  *See id.* ¶¶ 469, 497, 506.  Plaintiffs' allegations do not contradict the general fact that NIKE invested in its DTC technology—to the contrary, plaintiffs allege that NIKE invested approximately $2 billion "in DTC technology."  *Id.* ¶¶ 178-195.  Plaintiffs challenge the outcome of those investments plenty, but few of the challenged statements are outcome-oriented.  *Compare id.* ¶¶ 178, 190, 193-94, 211, 237, 675 (alleging in part that NIKE failed to develop technology to send personalized email blasts and that NIKE had to turn its app off in China to meet Chinese compliance standards), *with id.* ¶¶ 446, 497, 506 (discussing NIKE's "employing data and analytics" and investing in data and analytics).  One statement made by Friend on October 6, 2021 did claim that the investments were making NIKE "more agile," which is more outcome-oriented than the others.  *Id.* ¶ 476.  However, plaintiffs plead no allegations showing that NIKE was not improving its agility at the time the statement was made.  *Cf. id.* ¶ 230 (alleging NIKE made progress including replacing application programming interfaces and making updates for the website).  NIKE's technology may not have improved as greatly as NIKE hoped, or as smoothly as plaintiffs wished, but that underperformance does not equate to falsity.

The next group of general technology statements arise from NIKE's annual disclosures, which claimed that NIKE "***may*** not be successful in developing platforms that operate effectively with these

---

[8] This section on NIKE's "Technology" concerns Statement Nos. 4, 10, 14, 18, 28, 31-32, 38, 44, 66, 70, and 79.

technologies, systems, networks or standards." *Id.* ¶¶ 531, 558, 609 (emphasis added).  Plaintiffs argue that these statements were misleading because they claimed in hypothetical language that NIKE "may not be successful" when in fact NIKE was already failing.  Omission of this already-realized failure, plaintiffs allege, was misleading.

"[A]n omission must be misleading" to be actionable under the PSLRA, meaning it "must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  This is because the PSLRA "prohibit[s] *only* misleading and untrue statements, not statements that are incomplete." *Id.* (emphasis in original).  Plaintiffs analogize this case to *In re Facebook, Inc. Securities Litigation*, wherein the Ninth Circuit found it misleading to "speak[] entirely of as-yet-unrealized risks when the risks have already come to fruition."  87 F.4th at 948-50 (citation and quotation marks omitted).  However, *Facebook* concerned quite different facts: *Facebook* concerned a known, concrete risk that had definitively occurred, while the statements at issue here concern a potential failure to reach a not-yet-realized goal.  Looking to the facts in *Facebook* helps make this distinction clear.

The defendants in *Facebook* warned in their disclosures that user data may be improperly accessed or used if the company did not effectively mitigate security breaches.  *Id.* at 948.  These disclosures discussed a concrete risk—a data breach—that *may* occur if the company failed to act.  *Id.*  Months before the statements were made, however, Facebook learned that another company had already improperly accessed and disclosed Facebook's user data.  *See id.* at 943.  The Ninth Circuit found that the statements were therefore misleading because they "'directly contradict[ed] what [Facebook] knew at th[e] time'" they were made.  *Id.* at 948 (quoting *Khoja*, 899 F.3d at 1008).  Put simply, the statements warned that the event may occur when the event had in fact already happened.  That is misleading.

The same is not true here.  The statements about NIKE's potential failure to build appropriate platforms do not speak of a concrete, realized event.  Plaintiffs do not allege that NIKE had completed its attempt to build its DTC technology platforms at the time the statement was made, and there is no other concrete event the statements discuss.  Moreover, NIKE had not already failed to "be successful in

developing platforms" when the statements were made.  SAC ¶¶ 531, 558, 609.  NIKE was certainly facing hurdles in building these systems, but NIKE's statements did not imply perfect development or implementation.  NIKE's systems were a work-in-progress and NIKE appropriately warned that the outcome of that work may be unsuccessful.  While the defendants in *Facebook* could not undo the data misuse, NIKE could still have developed effective systems.  No concrete, spoken-of event had yet come to fruition.  *See HRSA-ILA Funds v. Adidas AG*, 745 F. Supp. 3d 1127, 1143 (D. Or. 2024) ("The threat of future improper behavior—unlike a historical fact such as the fact of a security breach or the existence of a bug—is a problem that can still be remedied by the time a defendant discloses the risk to investors." (cleaned up)), *aff'd sub nom. HRSA-ILA Funds v. adidas AG*, No. 24-6655, 2025 WL 3471703 (9th Cir. Dec. 3, 2025); *see also adidas AG*, 2025 WL 3471703, at \*2 (distinguishing *Facebook* because it dealt with a "historical data breach[] that the compan[y] concealed").  No historical event had occurred here and the alleged omissions about the risks NIKE faced in developing its technology platforms were not misleading.

        b.      Adobe Partnership

As to the Adobe statements, plaintiffs offer hefty allegations about failures in the partnership.  *Id.* ¶¶ 196-98, 211-12, 235-37.  But plaintiffs also allege that NIKE did in fact begin rolling out the Adobe platform in October 2021.  *Id.* ¶ 235.  And despite plaintiffs' arguments, *see id.* ¶ 580, NIKE did not state that it had successfully used Adobe to complete its technology transformation.  At most, Donahoe stated that Adobe "has played such an important role of delivering a more personalized experience for [NIKE's] consumers."  *Id.* ¶ 504.  Like the campaign success statements, this is an inactionable vague opinion— saying that Adobe played an "important role" does not equate to saying that NIKE's use of Adobe achieved its goals or was working without fail.

Plaintiffs also challenge a statement Friend made that NIKE had "partnered with Adobe to enable one-to-one member personalization, driving gains in member retention, click-through rates and conversion, resulting in higher demand per member and returns on digital ad spend."  *Id.* ¶ 579.  None of plaintiffs' allegations show that these statements are untrue.  Plaintiffs allege that the Adobe program itself brought in "zero dollars" in revenue, that its rollout was delayed, that its consumer marketing technology was

33

insufficient, and that there was a drop in consumer email responses year-over-year. *Id.* ¶¶ 179, 193-94, 196-98, 224-27. But the challenged statement makes no mention of consumer email responses, and it does not promise revenue gain from the Adobe partnership. Rather, Friend stated that NIKE had partnered with Adobe to improve its technology—namely, to enable personalization and to drive retention, click-through rates, and conversion—but that Nike was "only beginning to operationalize these new capabilities and consumer experiences." *Id.* ¶ 579.

Finally, plaintiffs challenge Friend's statement made during an Earnings Call that, "[t]hrough new capabilities activated in partnership with Adobe, [NIKE] will unlock additional productivity and demand creation and member retention." *Id.* ¶ 518. This is a forward-looking statement. The PSLRA creates a "safe harbor" for forward-looking statements that are limited by "meaningful cautionary statements." 15 U.S.C. §§ 77z–2(c), 78u–5(c). Friend's statement meets that criteria. Before Friend made this statement, listeners on the Earnings Call were warned that "participants on this call will make forward-looking statements based on current expectations and those statements are subject to certain risks and uncertainties that could cause actual results to differ materially" and then were directed to review NIKE's Form 10-K for more details. Valenzuela Decl. Ex. 12 at 2. And immediately after the statement at issue, Friend clarified that NIKE "ha[d] started testing audience segmentation in North America" and that it had "plans for further expansion in the coming months." *Id.* at Ex. 12 at 14. That cautionary language is sufficient to place Friend's forward-looking statement within PSLRA's safe harbor. Altogether, neither the general technology statements nor the statements about the Adobe partnership were false or misleading.

4.    *Alleged Misstatements Regarding NIKE's Innovation Pipeline*

Unlike the categories of statements discussed thus far, plaintiffs have adequately alleged falsity as to some of the statements about NIKE's innovation pipeline.[9] The Court considers the challenged statements in three groups: (a) statements touting NIKE's innovation as compared to competitors; (b) statements regarding NIKE's investments in innovation; and (c) statements regarding the pace and

---

[9] The section on NIKE's "Innovation Pipeline" concerns Statement Nos. 3-6, 19, 36, 46, 50, 53, 59, 60, 72, and 73.

strength of NIKE's innovation pipeline. Falsity is only adequately alleged as to certain statements made in the third group, about the pace and strength of NIKE's innovation pipeline.

a.    NIKE's Innovation as Compared to Competitors

First, plaintiffs challenge statements comparing NIKE's innovation pipeline to that of its competitors. *See* SAC ¶ 394 (claiming that NIKE's "innovation pipeline is unmatched"); *id.* ¶ 443 (discussing NIKE's "unmatched" investment in innovation); *id.* ¶ 450 (stating that NIKE's "relentless pipeline of innovative product continues to create separation between [NIKE] and [its] competition"); *id.* ¶ 514 (discussing how innovation "drive[s] separation between [NIKE] and [its] competition); *id.* ¶ 535 (stating that "innovation continues to be [NIKE's] greatest competitive advantage"); *id.* ¶ 592 (discussing how NIKE's "innovation pipeline . . . keep[s] [NIKE] in the lead"). The allegations in the second amended complaint do not contradict these statements. Plaintiffs allege that NIKE lost some competitive ground due to innovation failures. *Id.* ¶ 289. But plaintiffs do not allege that NIKE fell below its competitors' innovation levels by any measurable metric. That NIKE lost some market shares does not mean its innovation pipeline did not also separate it from its competition.

b.    NIKE's Investments in Innovation

Second, plaintiffs do not allege with specificity that NIKE failed to invest in innovation. Plaintiffs challenge two statements from 2021: one about NIKE "investing maniacally behind product innovation," *id.* ¶ 446, and another about NIKE's continued investment in innovation, *id.* ¶ 448. Nothing in the second amended complaint contradicts these statements. Plaintiffs allege that NIKE's investments were insufficient, but they do not allege that NIKE stopped, or even significantly reduced, innovation investments. That separates this case from *In re Splunk Inc. Securities Litigation*, which plaintiffs cite. 592 F. Supp. 3d 919 (N.D. Cal. 2022). In *Splunk*, the defendant claimed that "the sales teams are driving along with helping the marketing teams to make sure that we build an adequate pipeline. . . . Our campaign cadence remains high," and that the company "was making investments in marketing and in sales personnel to the extent necessary to build adequate pipeline and meet the company's revenue and growth targets." *Id.* at 932, 938. In actuality, the plaintiffs alleged that the defendant had suspended its "investments in

35

marketing" and had issued a "hiring freeze of sales personnel," both of which the defendant claimed were "material to [the company's] ability to meet its growth and revenue targets." *Id.* at 939-40. That suspension, which cut into the defendants' ability to build an adequate pipeline and maintain its cadence, rendered the statements misleading. *Id.* at 940. Here, plaintiffs do not allege a complete, or even significant, suspension in NIKE's investments.

### c.      The Pace and Strength of NIKE's Innovation Pipeline

Lastly, plaintiffs challenge statements regarding the innovation pipeline's pace and strength. *See* SAC ¶ 478 (claiming "[t]he pace of innovation has not slowed down at all"); *id.* ¶ 550 (noting NIKE's "very strong innovation pipeline"); *id.* ¶ 564 (stating that "[t]he breadth and depth of the innovation pipeline is really strong"); *id.* ¶ 594 (touting the innovation pipeline's strength). These statements, which were made between October 2021 and September 2023, are misleading. Unlike the above statements, plaintiffs do offer specific allegations that contradict these claims. For example, plaintiffs allege that NIKE "did not bring new and innovative products to the market and instead relied on the same products that previously generated revenue" from the fall of 2020 through the fall of 2022. *Id.* ¶ 286 (relying on CW-2's statements). Plaintiffs also allege that a former employee noted that NIKE lacked innovation from June 2020 through his 2022 exit. *Id.* ¶ 261. And, significantly, plaintiffs allege that NIKE appointed its first Chief Innovation Officer to "amplify and accelerate NIKE's innovation strategy and distinction" in November 2023, and that Friend claimed in March 2024 that NIKE had "been missing some product newness at scale in [its] portfolio over the last several seasons." *Id.* ¶¶ 296-97. Donahoe followed this in April 2024 by saying NIKE had "been ruthlessly focused on rebuilding [its] disruptive innovation pipeline" over the last year. *Id.* ¶ 298.

Defendants argue that even if these statements are somewhat contradicted, they are not misleading because they are mere puffery. When taken in context, "even general statements of optimism . . . may form a basis for a securities fraud claim when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (citation and quotation marks omitted). The Ninth Circuit addressed a similar situation in *Quality Systems*. There, the defendant touted that its "pipeline is deep" and that it was "strong" in certain

36

categories. *Id.* at 1137-38. But these statements were "inconsistent with real-time financial information" that showed that the market "had become saturated," that business was experiencing a "slowdown," and that the "sales pipeline had been declining," and that "sales executives were falling short," often by as much as 50%. *Id.* at 1144 (quotation marks omitted). While the statements here are not quite as confronting, they are similarly deceptive in context. In both cases, the defendants made optimistic statements about a particular aspect of the business. And in both cases, the pleadings directly contradicted those claims. At this stage of the litigation, plaintiffs' allegations are sufficient to support falsity as to Statement Nos. 19, 53, 59, and 73.

### 5.    *Alleged Misstatements Regarding NIKE's Product Organization*

Plaintiffs have not adequately alleged that NIKE's product organization statements were false or misleading.[10] Plaintiffs do not dispute that NIKE realigned its product organization by changing from sports-based categories to gender- and age-based categories with imbedded sports-based sub groups. *See* SAC ¶¶ 261-71. Plaintiffs allege that this strategy ultimately failed, forcing NIKE to revert back to its previous categories. *Id.* ¶ 433. But none of the challenged statements promised that NIKE would forever convert its categories or that the conversion would bring unbridled gains. Rather, the statements claimed that NIKE aligned its product organization in exactly the way plaintiffs allege. *Id.* ¶¶ 484, 553, 560, 569, 598. At most, NIKE stated that it had "successfully" completed the realignment. *Id.* ¶ 484. But successful completion of a project does not mean the project itself will yield successful results. You can successfully build a house and then decide to move. Whether the house serves you in the future does not change the fact that you succeeded in building it as planned. The fact that NIKE later reverted to its prior categorizations "does not establish that its previous [organization] was weak or inadequate" and certainly does not establish that the transition was unsuccessfully completed. *In re Cloudera, Inc.*, 121 F.4th at 1189.

### 6.    *Alleged Misstatements Regarding NIKE's Competitive Position*

Falsity is sufficiently pleaded as to two of the seventeen challenged statements about competitive

---

[10] The section on NIKE's "Product Organization" concerns Statement Nos. 22, 54, 57, 61, and 74.

standing.[11]  Plaintiffs challenge three buckets of statements regarding NIKE's competitive position: first, statements about NIKE's competitive standing including its ranking as customers' "number one cool and number one favorite brand," SAC ¶¶ 461, 542, 546; second, statements about consumer demand and marketplace strategy, *see e.g.*, *id.* ¶ 548; and finally, statements that allegedly omitted key information, *id.* ¶¶ 457-58.  Two statements are actionably false or misleading: one of the statements about NIKE's "cool" metrics and one alleged omission.

> a.    Customer Rankings

Plaintiffs challenge two statements from September 29, 2022 saying that "[c]onsumers continue to rate [NIKE] their number one cool and number one favorite brand as [NIKE] connect[s] directly and deeply with consumers worldwide," and that "NIKE continues to lead as the number one cool and number one favorite brand in North America."  *Id.* ¶¶ 542, 546.  To be sure, plaintiffs allege that NIKE lost some of its "cool" status.  According to CW-2, NIKE was "no longer the number one 'cool' brand" in North America by May 2022 when compared to general brands including TikTok and YouTube.  *Id.* ¶ 321.  CW-2 also claimed that NIKE was "losing ground to competitors" in its "cool" metrics at that time, specifically Adidas and Lululemon.  *Id.*  Additionally, plaintiffs allege that in "September/October 2023 . . . it was discussed that NIKE was no longer number 1, number 2, or number 3 in running products."  *Id.* ¶ 319.

Taken in context, the first challenged statement concerns NIKE's worldwide "coolness," something that is never mentioned in the second amended complaint.  That mismatch renders the first statement benign under the particularity pleading standards.

Little context is available for the second statement, which plaintiffs only allege Friend made during an Earnings Call.  It is possible that Friend meant NIKE was the number one brand amongst competitors— but it is also possible that Friend meant NIKE was the number one brand overall.  Reading the pleadings in plaintiffs' favor, as the Court must at this stage, it is quite reasonable to assume the latter.  Because that statement was directly contradicted by plaintiffs' allegations at the time it was made, it is actionably false

---

[11] The section on NIKE's "Competitive Standing" concerns Statement Nos. 7-9, 41-43, 49, 51-52, 65, 67-68, 70, 76, and 77-79.

and misleading.

        b.      Consumer Demand and Market Strategy

As to the consumer demand and market strategy statements, plaintiffs do not sufficiently allege falsity. Donahoe stated in September 2022 that there were "no signs of any softness," *id.* ¶ 548, and indeed, at the time, NIKE was seeing increases in its Direct and Digital revenue, *id.* ¶¶ 81, 83, 548. That is not a sign of softness. Additionally, "softness" is not a measurable factor—and certainly is not measured through or contradicted by plaintiffs' six components.

Plaintiffs allege that Donahoe's statement implied "that NIKE had effectively driven business to its DTC channels while meeting customer demand," but that conclusory allegation is unsupported. *Id.* ¶ 549. A fair reading of the statement shows Donahoe is speaking about consumer demand for NIKE products—not NIKE's ability to meet consumer demand, not how NIKE had driven business to DTC channels, and certainly not plaintiffs' six components. Plaintiffs also challenge statements about driving competitive separation, *id.* ¶ 577, and NIKE's position relative to its competitors before and after the COVID pandemic, *id.* ¶ 461, but again, these are not contradicted by plaintiffs' allegations. At most, plaintiffs allege that NIKE lost some unspecified market shares to competition which caused "running customers . . . to buy product from other brands." *Id.* ¶ 315. But there is nothing in the challenged statements suggesting they were restricted to running customers and, regardless, losing some customers does not equate to losing a competitive edge.

Plaintiffs' allegations also do not show that NIKE was in a weaker competitive position in September 2021 than it was prior to COVID. As noted, NIKE saw significant gains during this period. None of these challenged statements are false or misleading.

        c.      Alleged Omissions

Lastly, plaintiffs challenge certain competitive position statements for omitting key information. One is actionably misleading: Donahoe and Friend's July 25, 2024 statement that NIKE's "[f]ailure to maintain [NIKE's] reputation, brand image and culture could negative impact [its] business." *See, e.g.*, *id.* ¶ 607 (first alteration in original and emphasis omitted). This statement misleadingly omits information

about events that had already come to fruition.  Plaintiffs allege that NIKE had already suffered reputation drops by the time this statement was made as measured in the "cool" metric losses.  Additionally, plaintiffs allege that NIKE's business had already been negatively impacted as demonstrated by the December 2023 losses.  *See id.* ¶ 30.  At this stage, that is sufficient to allege falsity.

Plaintiffs actually challenge four instances of this same statement that were made in each of NIKE's Form 10-Ks from 2021 through 2024.  *See, e.g.*, *id.* ¶¶ 457-58.  Only the latest, made in July 2024, is actionable.  The allegations do not show that NIKE saw negative effects on its sales and profitability during the prior three years.  But in December 2023, NIKE disclosed that its revenue fell below analysts' consumer estimates, and NIKE lowered its financial guidance accordingly.  *Id.* ¶¶ 622-23.  By the time of the July 25, 2024 statement, NIKE was experiencing adverse effects on its sales and profitability.  When considered alongside plaintiffs' allegations about NIKE's "cool" metric losses, and drawing all inferences in plaintiffs' favor, a reasonable investor could have been misled by Donahoe and Friend's July 2024 warning that NIKE's failure to maintain its brand image *could* negatively impact business.  Taking plaintiffs' allegations as true, NIKE's failure to maintain its brand image *did* have a materially adverse effect on sales and profitability months before the statement was made.

The next challenged omissions also arise from NIKE's annual Form 10-Ks.  These statements warn, according to the second amended complaint, that NIKE's failure to "adjust the mix of existing product offerings and develop new products, styles, and categories to meet consumer demand were hypothetical risks that *could* have a material adverse effect on [NIKE's] sales and profitability."  *Id.* ¶ 603 (emphasis in original) (cleaned up).  At first glance, it appears these alleged omissions should fare similarly to the brand image omissions.  However, the portion of the statement plaintiffs chose to include is incomplete—and misleadingly so.  The full statement says:

> Because NIKE is a consumer products company, the relative popularity and availability of various sports and fitness activities, as well as changing design trends and consumer preferences, affect the demand for our products.  We must, therefore, respond to trends and shifts in consumer preferences by adjusting the mix of existing product offerings, developing new products, styles and categories and influencing sports and fitness preferences through extensive marketing.  Failure to respond in a timely and adequate manner could have a material adverse effect on our sales and profitability.  *This is a*

*continuing risk.*

Valenzuela Decl. Ex. 21 at 6 (emphasis added).  NIKE clearly disclaimed that this was "a continuing risk."

Something that does not exist cannot continue.  A reasonable investor could only read this statement to

mean NIKE was currently facing these risks and expected them to continue into the future.  That is not the

same as presenting a mere hypothetical.  Taken in context, as the Court must, this statement is not

misleading.  *See Wochos*, 985 F.3d at 1195-96 (finding no falsity where the "challenged statements

contain[ed] no explicit or implicit representation that [the company] had not already experienced such

issues" (emphasis omitted)).

Falsity is insufficiently pleaded as to the remaining alleged omissions, most of which warn that

NIKE's "costs may increase," demand "may decline," or that NIKE "may need to reduce wholesale or

suggested retail prices" if the company fails to adequately anticipate and respond to competitors.  SAC

¶¶ 455, 527, 584, 605.  Plaintiffs do not allege that costs increased, demand declined, or that NIKE reduced

its prices.  None of these statements spoke of events that had already come to fruition.

Additionally, NIKE couched these statements in sufficient warnings.  For example, under the

"Competition" heading on NIKE's Form 10-K, NIKE warned that "[t]he intense competition and rapid

changes in technology and consumer preferences in the markets for athletic and leisure footwear and apparel

and athletic equipment constitute significant risk factors in our operations."  Valenzuela Decl. Ex. 8 at 8.

And immediately preceding the challenged statement, NIKE warned, "the competitive nature of retail,

including shifts in the ways in which consumers shop, and the continued proliferation of digital commerce,

constitutes a risk factor implicating our NIKE Direct and wholesale operations."  *Id.* at Ex. 8 at 15.  NIKE

describes this as a current risk factor implicating its operations, not as a potential hypothetical.  A reasonable

investor would not be misled into thinking NIKE was currently unafflicted by competition.  Ultimately,

plaintiffs adequately allege falsity only as to Statement Nos. 51 and 78.

7.    *Alleged Misstatements Regarding NIKE's Channel Mix*

Lastly, plaintiffs challenge one statement about NIKE's channel mix: Donahoe's September 29,

41

2023 statement that NIKE's "marketplace strategy remains the same."[12]  *Id.* ¶ 590.  Plaintiffs allege that NIKE reduced its internal goals for opening NIKE Live stores in North America by nearly half between the fall of 2020 and July 2022.  *Id.* ¶¶ 160, 347.  And by the fall of 2021, NIKE allegedly began conducting diligence on potential wholesale partners.  *Id.* ¶ 332.  NIKE also allegedly discussed reengaging certain partners in 2023.  *Id.* ¶¶ 334-35.  By the time of Donahoe's statement, the allegations show that NIKE's marketplace strategy had in fact changed.  Accordingly, this statement, Statement No. 71, is actionably false or misleading.

\* \* \*

Altogether, plaintiffs have adequately alleged falsity as to Statement Nos. 19, concerning the pace of innovation; 51, concerning NIKE's brand reputation; 53 and 59, concerning the innovation pipeline; 71, concerning NIKE's marketplace strategy; 73, concerning the innovation pipeline; and 78, concerning NIKE's brand reputation.[13]  The Court next turns to scienter.

## C.     Scienter

Scienter requirements are exacting.  *See Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) ("Falsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is subject to a particularity requirement

---

[12] There is only one statement about NIKE's "Channel Mix," Statement No. 71.

[13] For ease of reference, falsity was adequately alleged as to the following statements:

1.  **Statement No. 19.**  Parker stated on October 6, 2021, that the "pace of innovation has not slowed down at all."  SAC ¶ 478.
2.  **Statement No. 51.**  Friend stated on September 29, 2022, "NIKE continues to lead as the number one cool and number one favorite brand in North America."  *Id.* ¶ 546.
3.  **Statement No. 53.**  Donahoe stated on September 29, 2022, "we got a very strong innovation pipeline."  *Id.* ¶ 550.
4.  **Statement No. 59.**  Donahoe stated on March 21, 2023, "[T]he breadth and depth of the innovation pipeline is really strong."  *Id.* ¶ 564.
5.  **Statement No. 71.**  Donahoe stated on September 12, 2023, "Our marketplace strategy remains the same."  *Id.* ¶ 590.
6.  **Statement No. 73.**  Donahoe stated on September 29, 2023, that "our innovation pipeline is strong."  *Id.* ¶ 594.
7.  **Statement No. 78.**  Donahoe and Friend stated on July 25, 2024, "[F]ailure to maintain our reputation, brand image and culture could negatively impact our business."  *Id.* ¶ 607.

and a *strong inference* standard of plausibility." (emphasis in original)).  To plead scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).  The "required state of mind," *id.*, "covers 'intent to deceive, manipulate, or defraud,' [and] also deliberate recklessness." *Schueneman v. Arena Pharms.*, 840 F.3d 698, 705 (9th Cir. 2016) (citations and quotation marks omitted) (quoting *Matrixx Initiatives*, 563 U.S. at 48). However, "[d]eliberate recklessness is a higher standard than mere recklessness and requires more than a motive to commit fraud." *Glazer Cap. Mgmt.*, 63 F.4th at 765.  Deliberate reckless requires "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (citation and quotation marks omitted). It is insufficient to raise an inference "that a company's executive '*should* have' discovered misconduct." *In re Facebook*, 87 F.4th at 952 (citing *Glazer Cap. Mgmt.*, 549 F.3d at 748-49).

Courts in the Ninth Circuit "conduct[] a dual inquiry" to assess scienter: first, the court must "determine[] whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter," and "second, if no individual allegations are sufficient," the court must "conduct[] a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Glazer Cap. Mgmt.*, 63 F.4th at 766 (quoting *Zucco*, 552 F.3d at 992).  Scienter must be alleged "with respect to each of the individual defendants." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014).  As to the company itself, "an actionably misleading statement must be made by a spokesperson 'who has actual or apparent authority.'" *In re Facebook*, 87 F.4th at 952 (quoting *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015)).

"A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  That inference of scienter must be assessed holistically, considering both the defendants' direct knowledge, based on their access to direct information; as well as the defendants' inferred knowledge, based on the nature of the statements and supporting circumstantial evidence. *See In re Quality Sys., Inc.*

*Sec. Litig.*, 865 F.3d at 1145; *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784-85 (9th Cir. 2008). If an alternative inference is more compelling, then scienter has not been adequately alleged.

Here, plaintiffs argue that the allegations tend to show that defendants had both direct knowledge, based on CW reports, and inferred knowledge, sufficient to support a finding of scienter. The Court finds that scienter is adequately alleged as to one statement: Statement No. 73.

1.　　*Direct Knowledge*

Although the Court must ultimately assess the allegations holistically, it begins this process by first examining defendants' direct knowledge. *See Glazer Cap. Mgmt.*, 63 F.4th at 766 (citation omitted). Because the allegations regarding direct knowledge rely on CW statements, the Court must first assess the reliability of those witnesses and their statements.

a.　　CW Statements

Plaintiffs have sufficiently established the reliability of their CW statements. Where a complaint relies on confidential witness statements, it "must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco Partners*, 552 F.3d at 995. First, the relevant confidential witnesses "must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* Confidential witness statements are insufficient where the witnesses are "not positioned to know the information alleged, [] report only unreliable hearsay, [or] allege conclusory assertions of scienter." *Id.* at 996.

As to the first prong, plaintiffs' allegations are sufficient. Plaintiffs provide detailed allegations about the CWs' job titles and responsibilities and thoroughly explain how each CW gained their relevant knowledge. *See, e.g.*, SAC ¶¶ 53-72. For example, CW-1, who is named as the former Vice President of Global Store Development at NIKE, describes how she attended a VP summit in 2023 alongside numerous defendants. *Id.* ¶¶ 54, 265-71, 319; *see E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 940 (9th Cir. 2023) (finding "confidential witnesses were described with sufficient particularity to establish their reliability" where the complaint described their "job titles and experience" as well as how they "obtained

44

their knowledge"). As another example, CW-3 is described as the former Vice President of NIKE Digital Product and is alleged to have worked as an intermediary between NIKE's technology and marketing teams to develop NIKE's DTC capabilities and digital products. *Id.* ¶ 56. Although not every CW is described with this level of specificity, they are all sufficiently described as to be deemed reliable at this stage.

Having found the CWs to be reliable, the Court turns next to the reliability of each of the statements for which plaintiffs have adequately alleged falsity. Out of an abundance of caution, the Court turns then to the statements for which the Court has not found falsity, and finally, to the alternative competing inferences.

> b.        Direct Knowledge of False and Misleading Statements

The Court now turns to the scienter allegations supporting the seven statements for which plaintiffs sufficiently alleged falsity: Statement Nos. 19, 51, 53, 59, 71, 73, and 78. Each is explored below. Ultimately, direct knowledge is adequately pleaded as to only one of these statements: Statement No. 73.

***Statement No. 19.*** On October 6, 2021, Parker stated that "[t]he pace of innovation has not slowed down at all." SAC ¶ 478. This is the only statement at issue by Parker. However, plaintiffs' allegations regarding Parker's knowledge are threadbare. Plaintiffs allege that Parker received audit reports from meetings that discussed NIKE's supply chain, *id.* ¶ 719, and that the Board of Directors (of which Parker was a member) "closely over[saw] the CDA strategy," *id.* ¶ 724. Those allegations are plainly insufficient to support a strong inference of scienter as they do not state with any particularity how Parker knew that the pace of NIKE's innovation had slowed down before October 6, 2021, the date the statement at issue was made. Direct knowledge does not support a finding of scienter as to Statement No. 19.

***Statement No. 51.*** On September 29, 2022, Friend stated that "NIKE continues to lead as the number one cool and number one favorite brand in North America." *Id.* ¶ 546. Plaintiffs again fail to allege that Friend had any direct knowledge that this statement was untrue when said. The allegations regarding NIKE's drop in "cool" metrics are supported primarily by CW-2, who recalled "cool" metric reports discussed in quarterly meetings. *Id.* ¶ 321. But plaintiffs do not allege that Friend attended these meetings. Plaintiffs allege that "'cool' metrics were included in quarterly business unit review reports" that

were sent to senior directors and vice presidents who then analyzed and edited the reports before they were "ultimately sent to O'Neill to review." *Id.* ¶¶ 702-04. CW-2 further clarified that she "could not guarantee the information she drafted was seen by O'Neill because there were 'a lot of layers'" between them. *Id.* ¶ 704. Even setting aside the sparsity of those allegations, O'Neill did not make the statement at issue. Only Friend made a plausibly misleading statement about NIKE's "cool" metrics. There are no allegations showing that Friend had direct knowledge contradicting Statement No. 51.

*Statement No. 53.* On September 29, 2022, Donahoe stated that NIKE has "a very strong innovation pipeline." *Id.* ¶ 550. Plaintiffs offer three reasons why Donahoe had direct knowledge of this statement's falsity: (1) based on information that arose out of an April 2022 meeting, (2) the lowering of NIKE store targets, and (3) a later admission by Friend. None of these allegations show direct knowledge.

First, plaintiffs allege that Daniel Heaf, the Chief Strategy and Transformation Officer, attended a meeting in April 2022 where technology issues and unexpected costs related to DTC strategy were discussed. *Id.* ¶¶ 182-83. But this allegation is supported by CW-3, who, at that same meeting, "recounted that they felt NIKE had good product selection and depth"—indications against knowledge of a weak innovation pipeline. *Id.* ¶ 183. Even if that meeting did discuss weakness in NIKE's innovation pipeline, the chain of information from that meeting to Donahoe is too attenuated. CW-3 said that she attended this meeting with Heaf, and that Heaf presented to Donahoe at quarterly meetings. *Id.* ¶ 184. CW-3 received text messages from Heaf during the quarterly meetings and debriefed with Heaf afterwards, but she was not herself present for Heaf's meetings with Donahoe and she does not claim to know what exactly was discussed at these meetings. Ultimately, that chain is too weak to support a finding of direct knowledge. CW-3 also said that she spoke with Donahoe in the summer of 2022 "about the technological problems underpinning NIKE's DTC strategy," but, critically, she does not to claim to have discussed weaknesses in NIKE's innovation pipeline. *Id.* ¶ 191. These allegations do not show Donahoe's direct knowledge.

Second, plaintiffs allege that Donahoe knew this statement was false because innovation "pipeline problems . . . were major contributors to NIKE lowering its target for the number of NIKE Live Stores" in and around July 2022. *Id.* ¶ 288. At the same time, plaintiffs allege store opening goals were lowered not

only because of the innovation pipeline failures, but also because stores were "not being sufficiently stocked with the proper products" due to supply chain failures. *Id.* And plaintiffs allege that Friend—not Donahoe—was involved in the decision to cut store opening goals. *Id.* ¶ 349. Even if the decision to cut store openings was driven by innovation pipeline failures, the allegations do not show that Donahoe had direct knowledge of these failures.

Third and finally, plaintiffs allege that Friend knew of the innovation pipeline issues by mid-2022 based on his June 2024 statement that NIKE "started managing [certain] franchises a couple years ago . . . because we had a gap in innovation in our pipeline." *Id.* ¶ 301. But Friend did not make the challenged statement at issue in Statement No. 53, and plaintiffs do not sufficiently allege that Donahoe shared in Friend's knowledge at the time Donahoe spoke of the innovation pipeline. Taken together, these allegations do not show Donahoe had direct knowledge as to the falsity of Statement No. 53.

**Statement No. 59.** On March 21, 2023, Donahoe stated that "[t]he breadth and depth of the innovation pipeline is really strong." *Id.* ¶ 564. This statement fares the same as Statement No. 53. Although plaintiffs do add additional allegations showing Donahoe later developed knowledge, the allegations do not show that he gained that knowledge before March 21, 2023. The allegations are again insufficient to show that Donahoe had direct knowledge as to Statement No. 59.

**Statement No. 71.** On September 12, 2023, Donahoe stated that NIKE's "marketplace strategy remains the same." *Id.* ¶ 590. Plaintiffs allege that Donahoe knew this was false (1) because he flooded the market with legacy brands and arranged a deal with Foot Locker in 2022, and (2) because of other defendants' close engagement with the mono-brand stores. These allegations are again insufficient.

First, plaintiffs allege that Donahoe concocted a "scheme" to flood the market with popular legacy brands by at least 2022 and, when this scheme began to fail, arranged a deal with Foot Locker at the end of 2022 to take excess inventory. *Id.* ¶ 336. According to CW-1, this decision was made because NIKE "knew how much inventory it had 'sitting there.'" *Id.* By the time Donahoe made the challenged statement, he thus knew that NIKE had excess inventory and that NIKE was working with Foot Locker. That knowledge, however, does not mean he knew NIKE's marketplace strategy had changed. It shows his knowledge of

47

inventory issues, but that is a different question.  As to the Foot Locker deal, plaintiffs do not allege that CDA involved a complete discontinuation of NIKE's wholesale and multi-retailer partnerships.  The marketplace strategy that Donahoe described in June 2020 specifically included "a small number of strategic partners who share [NIKE's] vision."  *Id.* ¶ 96 (alteration in original).  Foot Locker may well have been one of these strategic partners—nothing in the second amended complaint suggests otherwise.

Finally, as to the mono-brand stores, plaintiffs allege that O'Neill "led the NIKE Live team," which was his "'project' and 'baby.'"  *Id.* ¶ 339.  Plaintiffs also allege that "Friend was '100%' involved in the decisions to cut the store opening goals."  *Id.* ¶ 349.  Neither of those allegations support *Donahoe*'s direct knowledge as to the change in NIKE's marketplace strategy.  Because the Court must assess each individual defendant's knowledge, plaintiffs' allegations are insufficient to show Donahoe's direct knowledge as to the falsity of Statement No. 71.

*Statement No. 73.*  This is the only statement for which plaintiffs have sufficiently pleaded direct knowledge.  On September 29, 2023, Donahoe stated that NIKE's "innovation pipeline is strong."  *Id.* ¶ 594.  Donahoe's April 12, 2024 admission supports scienter as to this statement.  In April 2024, Donahoe said that NIKE had been "ruthlessly focused on rebuilding [its] disruptive innovation pipeline" "*over the last year*."  *Id.* ¶ 298 (emphasis added).  "[T]he last year" would have begun in April 2023—months before Donahoe made his September 2023 statement about the innovation pipeline's strength.  Additionally, in July 2024, Donahoe also said that NIKE had been "kick-starting a multi-year innovation cycle" "[o]ver this past year," again supporting knowledge as of at least mid-2023.  *Id.* ¶ 302 (alteration in original).  Accordingly, plaintiffs have sufficiently alleged that Donahoe had actual knowledge of falsity when he made Statement No. 73.

*Statement No. 78.*  On July 25, 2024, Donahoe and Friend stated that "[f]ailure to maintain [NIKE's] reputation, brand image and culture could negatively impact [its] business."  *Id.* ¶ 607 (first alteration in original and emphasis omitted).  As described above, this statement was plausibly misleading because of the losses in NIKE's "cool" metrics.  But, as with Statement No. 51, plaintiffs' allegations do not show that Donahoe or Friend had direct knowledge of NIKE's "cool" metrics or, more generally, its

reputation and brand image losses when the statement was made. Accordingly, the allegations about Donahoe and Friend's direct knowledge of Statement No. 78's falsity are insufficient.

c.        Direct Knowledge as to Remaining Statements

Even if the remaining statements were to be considered false or misleading, plaintiffs allegations are insufficient to support a finding of direct knowledge as to their falsity. Many of plaintiffs' allegations are vague and conclusory. For example, plaintiffs allege, based on CW-1, that Donahoe, Friend, O'Neill, and Parker received "audit reports" showing that there were problems with NIKE's "supply chain management" and a "lack of women employed at NIKE's DTC stores." *Id.* ¶¶ 154-55. "[T]he supply chain issue," CW-1 claims, "had been on the list for approximately ten years." *Id.* ¶ 155. Knowledge of a decade-long struggle in supply chain management does not constitute reckless disregard of information sufficient to support scienter.

Plaintiffs also rely on meetings CWs had with defendants, but the meetings do not show defendants' actual knowledge. For example, plaintiffs allege that CW-3 had monthly meetings with Donahoe, O'Neill, Friend, and Campion beginning in May 2022, "[t]he purpose of [which] was to force Lavu to be more transparent and cooperative, and to discuss progress regarding technology investments underpinning NIKE's DTC strategy." *Id.* ¶ 675. During these meetings, they discussed a problem with Chinese compliance requirements and Donahoe asked questions about costs and timelines. *Id.* Those discussions do not show direct knowledge of the falsity of defendants' statements. Plaintiffs also argue that CW-3's monthly meetings with Donahoe support Donahoe's scienter as to the Adobe statements. CW-3 stated that "Donahoe was kept apprised of the problem with Adobe, as Adobe's implementation and its progress were always featured in her monthly meetings with Donahoe." *Id.* ¶ 676. But general knowledge about Adobe's "implementation and its progress" does not equate to knowledge that the Adobe partnership was an absolute failure or was not resulting in "higher demand per member and returns on digital ad spend." *Id.* ¶ 579. *Cf. In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d at 1145-46 (finding scienter where "executives themselves told investors they had real-time access to, and knowledge of, sales information" and confidential witness statements established defendants "had access to and used reports documenting in real time the decline in

sales").

Slightly closer are the allegations about the 2023 VP summit. According to CW-1, Donahoe and Friend attended this summit, during which O'Neill presented a remediation plan, as "NIKE was 'no longer number 1, number 2, or number 3 in running products.'" *Id.* ¶¶ 319, 651. CW-11 reported that, at the same meeting, Donahoe allegedly "painted a pretty ugly picture," including "stating that NIKE was no longer a growth company" and that NIKE needed to take certain steps "to be a growth company again." *Id.* ¶ 697. Plaintiffs also allege a non-defendant President of Geographies & Marketplace said at the same summit that "CDA was a failure." *Id.* ¶ 694.

None of the challenged statements claimed that NIKE was number one in running products, so that statement cannot support direct knowledge of any challenged statement's falsity. The same is true for Donahoe's statement about NIKE no longer being a "growth" company—none of the challenged statements speak on this topic. As to CW-1's vague statement that Donahoe "painted a pretty ugly picture," this otherwise unsupported allegation is insufficient to meet the strong inference standard scienter demands. So too is the allegation about the non-defendant's statement that "CDA was a failure." One non-defendant's opinion is not grounds for scienter.

Most of the other allegations are even less specific, showing only that defendants were aware of some issues in the company's day-to-day business. *See, e.g.*, *id.* ¶¶ 369, 372, 374, 391, 510, 619, 671, 686, 747; *see also In re Apple Comput., Inc.*, 127 F. App'x 296, 303 (9th Cir. 2005). Others are too attenuated— for example, CW-4's claims that she attended meetings that included "conversations . . . [that] reflected that NIKE was struggling with executing its DTC strategy and that the DTC strategy was not yielding projected results." *Id.* ¶ 706. CW-4 goes on to state that she prepared financial reports based on these meetings, which were sent to non-defendant Vice Presidents, and that "information from these reports was escalated to Defendant Donahoe." *Id.* ¶ 707. That falls short of the PSLRA's particularity and strong inference requirements.

Plaintiffs' allegations "are high on alarming adjectives . . . [b]ut they are short on the facts . . . that would establish a strong inference that defendants' later statements . . . were intentionally false or made

with deliberate recklessness." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020). "Strong rhetoric is not a substitute for 'particular[ ] facts giving rise to a strong inference' of scienter." *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)(A)). These allegations do not give rise to a strong inference of scienter based on defendants' direct knowledge.

2.    *Inferred Knowledge*

Of course, the Court does not assess scienter in a vacuum. Even where direct knowledge is insufficiently pled, scienter may still be shown based on the defendant's inferred knowledge. Plaintiffs ask the Court to infer scienter here based on (1) the "core operations theory" and defendants' close monitoring of the company, and (2) executive departure and stock sales. Neither theory lends sufficient support to plaintiffs' claims to establish scienter.

a.    Core Operations Theory

First, the core operations theory does not support a strong inference of scienter. Under the core operations theory, courts may "infer 'that facts critical to a business's core operations or an important transaction are known to the company's key officers.'" *Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018) (quoting *S. Ferry LP*, 542 F.3d at 783). Core operations allegations may support a finding of scienter in three circumstances:

> (1) when they, along with other allegations, support a cogent and compelling inference of scienter, (2) when they are themselves particular and suggest that the defendants had actual access to the disputed information, and (3) in the "rare circumstances" when they are not particularized, but "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.

*Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021) (quoting *Police Ret. Sys. of St. Louis*, 759 F.3d at 1063). "Proof under this theory is not easy." *Police Ret. Sys. of St. Louis*, 759 F.3d at 1062. "Under this theory, 'reporting false information will only be indicative of scienter where the falsity is patently obvious.'" *Sneed v. Talphera, Inc.*, 147 F.4th 1123, 1134 (9th Cir. 2025) (quoting *Zucco*, 552 F.3d at 1001). As discussed next, the first prong may be met in this case, but plaintiffs fall short at the second and third steps of the analysis.

Plaintiffs support the theory with allegations showing defendants' detail-oriented management

51

style and exposure to the facts at issue. Specifically, plaintiffs argue that (1) the CDA strategy was a core part of NIKE's business, (2) defendants had actual access to information contradicting their alleged misstatements based on their involved management styles, and (3) it would be absurd to suggest defendants did not know of the alleged problems. Plaintiffs cite primarily to *Retail Wholesale Department Store Union Local 338 Retirement Fund v. Stitch Fix, Inc.* to support their arguments. 790 F. Supp. 3d 763 (N.D. Cal. 2025). In *Stitch Fix*, the company historically operated a mail order clothing subscription where stylists would customize boxes based on the customer's style profile. *Id.* at 770. The plaintiffs' allegations concerned a new product line that was "understood to be 'transformational,' . . . 'a cornerstone of the [c]ompany's growth strategy,' . . . [and] 'a long term driver of top line growth.'" *Id.* at 780. The defendants, the company's founder and CEO and president-turned-CEO, allegedly saw the product line "as central to [their] mission of leading the company's 'second founding.'" *Id.* The plaintiffs challenged promising statements the defendants made about this new line because, the plaintiffs alleged, internal testing showed that the new line was actually "cannibalistic" to the company. *Id.* at 773. The court found the core operations theory applied because the plaintiffs pleaded that the defendants, as the company's founder and CEO and president-turned-CEO, could not plausibly have been unaware of the testing results for this project that was integral to their leadership of the company. *Id.* at 780.

To be sure, there are similarities between this case and *Stitch Fix*. Defendants touted here that NIKE realigned its organization through CDA and that CDA was fundamentally changing NIKE's operating model. SAC ¶¶ 473, 475, 537. That realignment echoes of the central realignment the defendants touted in *Stitch Fix*. And, like the defendants in *Stitch Fix*, Donahoe at least was NIKE's President and CEO. Compared against other cases, CDA was still less integral to NIKE's functioning than is typical of a core operation. *See, e.g.*, *In re PG&E Corp. Sec. Litig.*, 806 F. Supp. 3d 962, 998 (N.D. Cal. 2025) (agreeing with the plaintiffs' allegation that "wildfire safety and compliance are a core operation of PG&E"); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 & n.5 (9th Cir. 2008) (concerning a stop-work order for "the company's largest contract with one of its most important customers"). But construed in plaintiffs' favor, and looking to *Stitch Fix* as persuasive authority, the allegations are sufficient to show that the CDA

52

strategy in general may fairly be seen as a core of NIKE's operations.  The first prong of the core operations theory analysis is met.

This case is dissimilar to *Stitch Fix*, however, on the remaining prongs.  Beginning with the second prong, the heart of the plaintiffs' allegations in *Stitch Fix* concerned internal testing that showed that the new line was cannibalizing profits.  The plaintiffs there alleged that the defendants "had access to data showing that [the new line] was cannibalizing" the company and that both of the defendants "had access to the company's A/B database, which contained detailed information about customer behavior and presented the results of the" relevant testing.  *Stitch Fix*, 790 F. Supp. 3d at 779.  That is a far cry from the allegations here.  Instead of a single major issue based on objective, known testing, plaintiffs here plead a large array of varied troubles across six components.  As described above, plaintiffs do not sufficiently allege that defendants had direct knowledge of the vast majority of these issues.

As to the third prong, it may have been "absurd" for defendants to have no awareness of the CDA strategy in general.  However, that is not what the allegations concern.  Plaintiffs' entire theory of the case revolves around their alleged six CDA components.  While CDA itself may have been core to NIKE's operations, the piecemeal six-part failures plaintiffs allege do not support a similar finding of centrality. The issues in plaintiffs' six alleged components are "not [] fact[s] of such prominence that it would be 'absurd' to suggest that [defendants] did not know about [them]." *Prodanova*, 993 F.3d at 1112; *see In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 889 (N.D. Cal. 2020) ("It does not automatically follow from the 'core' or 'prominent' nature of [the company's] advertising business in general . . . that each particular defendant was immediately aware of the problems affecting [a specific line of] revenue" because that line "constituted only one component of [the company's] suite of advertising products" and the specific change at issue was not alleged to have such a "dramatic" effect on "the company's financials"), *aff'd sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022).  Plaintiffs have therefore failed to show an inference of scienter under the core operations theory.

b.    Executive Departures and Stock Sales

Finally, plaintiffs ask the Court to infer scienter based on executive departures and stock sales.

53

These allegations are also insufficient.

Plaintiffs allege that three executives departed during the relevant time period: Donahoe, Campion, and non-defendant Lavu. Plaintiffs do not cite any cases finding executive departures alone were sufficient to support scienter. Instead, plaintiffs cite only to *Bielousov v. GoPro, Inc.*, in which the court found that the plaintiffs adequately pleaded scienter where the defendants had access to the inventory system at issue, "were motivated to use that system due to prior [] problems," and boasted that they "closely tracked [their] inventory." No. 16-cv-06654-CW, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017). The court found that "[t]hese allegations *are bolstered* by allegations of circumstantial evidence," including "the timing of corrective statements and updates to risk factors as well as the resignation of" the company's president, and "[m]ost notably," that the defendants filed certifications with the SEC that "required them to access sufficient reporting information to certify that the information provided did not omit any material facts to make the report not misleading." *Id.* at *7 (emphasis added). That plethora of circumstantial evidence is not similarly found here. And that case does not show that executive departures, in isolation or in combination with stock sales, are sufficient to support a strong inference of scienter.

An alternative inference is far more reasonable as to the departures of Donahoe, Campion, and Lavu. It is clear that CDA did not ultimately succeed as planned. It is thus entirely unsurprising that executives who worked on the CDA strategy left the company after CDA failed. Additionally, as to Lavu, plaintiffs argue an entirely different reason for his departure—namely that he ran a "shadow organization" and his lies to management. Pls. Resp. 11. Those lies even further undercut plaintiffs' scienter arguments.

The stock sale allegations are equally unavailing. Plaintiffs challenge stock sales by Parker, Friend, and Donahoe. This argument is weakened because two of the five defendants—Campion and O'Neill— did not make any alleged sales. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (providing that one defendant not selling any stocks suggests "that there was no insider information from which to benefit"). Furthermore, none of the sales were particularly suspicious. Public SEC filings show that Friend's and Parker's sales were not particularly out of line with their prior practices. *See* Valenzuela Decl. Exs. 24-25. While Friend did sell a greater percentage of shares during the class

period, Parker sold an equally greater percentage before the class period. *Compare* SAC ¶¶ 783, 786, *with* Valenzuela Decl. Exs. 24-25. Public filings also show that Donahoe did not actually sell shares during the class period, but that the company instead withheld shares to satisfy tax obligations. Valenzuela Decl. Ex. 23. Even if the Court were to disregard these public filings, these allegations would still be insufficient to support a strong inference of scienter when viewed together with the above-described allegations.

Viewed holistically—considering defendants' actual knowledge, the centrality of the alleged failures, executive departures, and stock sales—plaintiffs have only sufficiently alleged scienter as to Statement No. 73.[14]

      3.    *Alternative Inference*

This is a clear case of a more compelling inference. Revenue suggests that CDA worked for a time—key revenue measures increased for several years after the strategy was initiated. And then, like many strategies, its success faltered. When it worked, defendants spoke positively about it. And when it stopped working, defendants told investors and NIKE pivoted strategies. While CDA may not have been an ultimate success, that does not mean the statements defendants made about it were fraudulent. The only exception here is Statement No. 73, concerning the strength of NIKE's innovation pipeline, which was made after Donahoe was alleged to have begun working to address the innovation pipeline's faults. Construing the pleadings in plaintiffs' favor, the alternative inference is not more compelling as to Statement No. 73.

Altogether, plaintiffs have adequately alleged scienter as to Statement No. 73 and have failed to allege scienter as to the remaining challenged statements.

**D.**    **Rule 20(a) Claims**

Plaintiffs' derivative Section 20(a) claims, pleaded as Claim II in the second amended complaint, rise and fall with their Section 10(b) and Rule 10b-5 claims. Having failed to properly allege a violation of Section 10(b) or Rule 10b-5 as to the vast majority of challenged statements, plaintiffs' derivative claims

---

[14] For ease of reference, this is Donahoe's September 28, 2023 statement that NIKE's "innovation pipeline is strong." *Id.* ¶ 594.

under Section 20(a) necessarily fail as to those statements as well. *See Prodanova*, 993 F.3d at 1113. Plaintiffs' Section 20(a) claims may only survive against Donahoe and NIKE as to Statement No. 73.

**E.      Dismissal and Leave to Amend**

Plaintiffs' only surviving claims are those brought against Donahoe and NIKE based on Statement No. 73, which was made on September 28, 2023. Plaintiffs' claims against Friend, O'Neill, Campion, and Parker are dismissed, as are the claims based on any of the other challenged statements. Although this is plaintiffs' second amended complaint, plaintiffs have not yet amended with the benefit of the Court's guidance. Accordingly, dismissal is without prejudice and with leave to amend. If plaintiffs believe they can cure the deficiencies identified in this Opinion and Order, they may file a third amended complaint within thirty (30) days. Failure to do so will result in dismissal with prejudice.

## CONCLUSION

For the reasons stated herein, defendants' request for judicial notice, ECF 67, is GRANTED and defendants' motion to dismiss, ECF 66, is GRANTED in part and DENIED in part.

Defendants' motion to dismiss is granted as to plaintiffs' claims against Friend, O'Neill, Campion, and Parker. Plaintiffs' claims against Friend, O'Neill, Campion, and Parker are DISMISSED accordingly. Defendants' motion to dismiss is denied as to plaintiffs' claims against Donahoe and NIKE that are based on Statement No. 73, which was made on September 28, 2023. Plaintiffs' claims against Donahoe and NIKE based on Statement No. 73 may go forward; plaintiffs' remaining claims against Donahoe and NIKE are DISMISSED.

Dismissal is without prejudice and with leave to amend. If plaintiffs wish to file an amended complaint, they must do so within thirty (30) days.

IT IS SO ORDERED.

DATED this 31st day of March, 2026.

Adrienne Nelson
United States District Judge

56